IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 20 2017

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

| | |
|---|---|
| FREDERICK W. HOPKINS, M.D., M.P.H., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LARRY JEGLEY, Prosecuting Attorney for | ) |
| Pulaski County; STEVEN L. CATHEY, M.D., | ) |
| Chair of the Arkansas State Medical Board; | ) |
| ROBERT BREVING, JR., M.D.; BOB E. | ) |
| COGBURN, M.D.; WILLIAM F. DUDDING, | ) |
| M.D.; OMAR T. ATIQ, M.D.; VERYL D. | ) |
| HODGES, D.O.; MARIE HOLDER; LARRY D. | ) |
| LOVELL; WILLIAM L. RUTLEDGE, M.D.; | ) |
| JOHN H. SCRIBNER, M.D.; SYLVIA D. | ) |
| SIMON, M.D.; DAVID L. STAGGS, M.D.; | ) |
| JOHN B. WEISS, M.D., officers and members of | ) |
| the Arkansas State Medical Board, and their | ) |
| successors in office, in their official capacity, | ) |
| | ) |
| Defendants. | ) |

Case No. 4:17cv404-BRW

This case assigned to District Judge _Wilson_
and to Magistrate Judge _Kay_

**COMPLAINT**

Plaintiff, by and through his undersigned attorneys, brings this Complaint against the
above-named Defendants, their employees, agents and successors in office, and in support
thereof alleges the following:

**INTRODUCTION**

1.      This is a constitutional challenge under 42 U.S.C. § 1983 to four acts of the 91st
Arkansas General Assembly of 2017:

  a.  Act 45, to be codified at Ark. Code §§ 20-16-1801 to 1807 (H.B. 1032 or the "D&E
      Ban");

1

b. Act 733, to be codified at Ark. Code §§ 20-16-1801 to 1810 (H.B. 1434 or the "Medical Records Mandate");[1]

c. Act 1018, to be codified at Ark. Code § 20-16-108(a)(1) (H.B. 2024 or the "Local Disclosure Mandate"); and

d. Act 603, to be codified at Ark. Code §§ 20-17-801 to 802 (H.B. 1566 or the "Tissue Disposal Mandate").

2.     By its terms, H.B. 1434 (the Medical Records Mandate) takes effect January 1, 2018. H.B. 1434, Ark. Code § 12-16-1810.

3.     The other three laws challenged in this suit are set to take effect 90 days after *sine die* adjournment of the General Assembly, which was May 1, 2017. Those three laws are thus scheduled to take effect July 30, 2017.

4.     Under these four laws, Plaintiff, a medical doctor, is subject to severe civil, criminal, and professional penalties for providing safe, legal, pre-viability abortion care.

5.     H.B. 1032, the D&E Ban, bans the safest and most common method of second-trimester abortion, and the only method provided throughout the second trimester in outpatient facilities. A copy of H.B. 1032 is attached hereto as Exhibit A.

6.     H.B. 1434, the Medical Records Mandate, requires that prior to an abortion the physician request and expend undefined time and effort to obtain medical records related to the patient's "entire pregnancy history," including any and all prior pregnancies or any prior medical

---

[1] Both H.B. 1032 (the D&E Ban) and H.B. 1434 (the Medical Records Mandate) amend Arkansas Code Title 20, Chapter 16 to add additional subchapters. Each bill numbers its first additional subchapter as 20-16-1801 and continues numbering subchapters consecutively. Plaintiff assumes this is a drafting error and that subchapters proposed in these bills will be added using consecutive, not concurrent, numbering. For clarity, Plaintiff nonetheless refers to the subchapters as numbered in their respective bills.

treatment for her current pregnancy, resulting in indefinite delay. A copy of H.B. 1434 is attached hereto as Exhibit B.

7.     H.B. 2024, the Local Disclosure Mandate, conditions abortion care for 14- to16-year-olds—even the vast majority of those 14- to 16-year-olds whose sexual activity implicates no child-abuse reporting or criminal conduct—on disclosure of their intensely personal information to local law enforcement and preservation of tissue from the abortion as "evidence." A copy of H.B. 2024 is attached hereto as Exhibit C1.

8.     H.B. 1566, the Tissue Disposal Mandate, requires notice to and consent of third parties prior to every woman's abortion, can be read to bar medication abortion and miscarriage care using medication abortion methods, and enacts unclear and burdensome requirements that will delay or deny women access to care and stop physicians from providing it. A copy of H.B. 1566 is attached hereto as Exhibit D.

9.     These statutes threaten Plaintiff with criminal penalties and deny and burden Plaintiff's patients' constitutionally protected rights to decide to end a pre-viability pregnancy, to make independent decisions related to their pregnancy care, and to protect their private medical information. To protect his patients from these constitutional violations, to enforce his own right to clear legal standards, and to avoid irreparable harm, Plaintiff seeks declaratory and injunctive relief to prevent enforcement of these four laws.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343.

11.     Plaintiff's action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

3

12.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because the majority of Defendants, who are sued in their official capacity, carry out their official duties at offices located in this district.

## PARTIES

13.     Plaintiff Frederick W. Hopkins, M.D., is an experienced, highly credentialed and board-certified obstetrician-gynecologist, and an abortion provider at Little Rock Family Planning Services, the only provider of outpatient, second-trimester abortion care in Arkansas. The abortion services he provides in Little Rock include D&E procedures and medication abortions. He offers abortion and miscarriage care to patients throughout their reproductive years. By the terms of the challenged laws, Dr. Hopkins is therefore subject to the penalties of the D&E Ban in H.B. 1032, and responsible for ensuring compliance with the Medical Records Mandate of H.B. 1434, the Local Disclosure Mandate of H.B. 2024, and the Tissue Disposal Mandate of H.B. 1566. Dr. Hopkins participates in this case in his individual capacity, and not as a representative of the academic and other medical facilities at which he provides care.

14.     Defendant Larry Jegley is the Prosecuting Attorney for Pulaski County, located at 224 South Spring Street, Little Rock, Arkansas. Prosecuting attorneys "shall commence and prosecute all criminal actions in which the state or any county in his district may be concerned." Ark. Code §16-21-103. Defendant Jegley is responsible for criminal enforcement of H.B. 1032, H.B. 1566, and H.B. 1434. He and his agents and successors are sued in their official capacities.

15.     Defendant Steven L. Cathey, M.D., is Chair of the Arkansas State Medical Board. Denfendants Robert Breving, Jr., M.D., Bob E. Cogburn, M.D., William F. Dudding, M.D., Omar T. Atiq, M.D., Veryl D. Hodges, D.O., Marie Holder, Larry D. Lovell, William L. Rutledge, M.D., John H. Scribner, M.D., Sylvia D. Simon, M.D., David L. Staggs, M.D., and

4

John B. Weiss, M.D., are members of the Arkansas State Medical Board. The State Medical Board is responsible for licensing medical professionals under Arkansas law. Ark. Code § 17-95-410. The Board and its members are responsible for imposing licensing penalties under H.B. 1434 and H.B. 2024 and imposing licensing penalties for unprofessional conduct, which includes criminal conviction under statutes such as H.B. 1032, H.B. 1566, and H.B. 1434. Ark. Code §§ 75-95-409(a)(2)(A), (D). Defendants and their successors in office are sued in their official capacity.

## THE CHALLENGED STATUTES

### o H.B. 1032 (the D&E Ban)

16.     H.B. 1032 criminalizes the performance of what the statute calls a "dismemberment abortion." Although this is not a medical term, the definition in the statute clearly prohibits a procedure referred to in the medical profession as dilation and evacuation or "D&E." D&E is the safest and most commonly used method of abortion in the second trimester, and the only method used in outpatient facilities throughout the second trimester.

17.     H.B. 1032 defines "dismemberment abortion" as follows:

(3)(A)(i) "Dismemberment abortion" means an abortion performed with the purpose of causing the death of an unborn child that purposely dismembers the living unborn child and extracts one (1) piece at a time from the uterus through the use of clamps, grasping forceps, tongs, scissors, or similar instruments that, through the convergence of two (2) rigid levers, slice, crush, or grasp a portion of the body of the unborn child to cut or tear off a portion of the body of the unborn child.

(ii) "Dismemberment abortion" includes an abortion in which suction is used to extract the body of the unborn child subsequent to the dismemberment of the unborn child as described under subdivision (3)(A)(i) of this section.

(B) "Dismemberment abortion" does not include an abortion that uses suction to dismember the body parts of the unborn child into the collection container[.]

5

H.B. 1032, § 20-16-1802(3).

18.     The only exception is for instances in which a banned procedure is "necessary to

prevent a serious health risk to the pregnant woman." *Id.* § 20-16-1803(a). The law states:

> (6)(A) "Serious health risk to the pregnant woman" means a condition that, in a
> reasonable medical judgment, complicates the medical condition of a pregnant
> woman to such an extent that the abortion of a pregnancy is necessary to avert
> either the death of the pregnant woman or the serious risk of substantial and
> irreversible physical impairment of a major bodily function of a pregnant woman.
>
> (B) "Serious health risk to the pregnant woman" does not include:
> (i) A psychological or emotional condition; or
> (ii) A medical diagnosis that is based on a claim of the pregnant woman or on a
> presumption that the pregnant woman will engage in conduct that could result in
> her death or that could cause substantial and irreversible physical impairment of a
> major bodily function of the pregnant woman[.]

*Id.* § 20-16-1802(6).

19.     Violation of the ban is a Class D felony, subjecting a physician to punishment of

up to six years' imprisonment, a fine of up to $10,000, or both. *Id.* § 20-16-1805; Ark. Code §§

5-4-201, 5-4-401.

20.     H.B. 1032 creates a cause of action for injunctive relief against a person who

purposely violates the ban. Such a cause of action may be maintained by a patient who obtains

banned medical care; her spouse; her parents or legal guardian, irrespective of the patient's age;

or her current or former licensed health care provider. H.B. 1032, §§ 20-16-1804(a)(1)-(2).

21.     In addition, H.B. 1032 creates a cause of action for damages for psychological

and physical injuries and statutory damages in the amount of three times the cost of the

procedure against a person who violates the ban. *Id.* § 20-16-1804(b)(3). Such a cause of action

can be maintained by the patient, her husband, or her parents if she is a minor or deceased. *Id.* §

20-16-1804(b)(1).

6

22.     Under H.B. 1032, a plaintiff who obtains a favorable judgment in an action for injunctive relief or damages is entitled to an award of attorneys' fees against the defendant. *Id.* § 20-16-1804(c)(1). A physician who successfully defends against a claim may obtain attorneys' fees only if "the court finds that the plaintiff's suit was frivolous and brought in bad faith." *Id.* § 20-16-1804(c)(2).

- ## **H.B. 1434 (the Medical Records Mandate)**

23.     H.B. 1434 mandates that "an abortion shall not be performed until" the physician "[r]equest[s] the medical records of the pregnant woman relating directly to [her] entire pregnancy history," and then spends "reasonable time and effort . . . to obtain" such records. Ark. Code § 20-16-1804(b)(2).

24.     The statute fails to define what constitutes "reasonable time and effort"; fails to define or in any way limit the scope of "medical records relating directly to the entire pregnancy history" of the patient; and fails to specify what actions, if any, the physician is to take upon receiving any records.

25.     H.B. 1434 also lacks any provision allowing the physician to proceed based on health risks to the woman, no matter how serious.

26.     A physician who "knowingly performs or attempts to perform an abortion" prohibited by the Medical Records Mandate is guilty of a Class A misdemeanor, which is punishable by up to one year in jail, a fine, or both. *Id.* §§ 20-16-1805, 5-4-201, 5-4-401.

27.     A physician who performs an abortion prohibited by the Medical Records Mandate "engage[s] in unprofessional conduct for which his or her license to provide healthcare . . . shall be suspended or revoked . . . ." § 20-16-1806(c).

28.     H.B. 1434 also provides for damages, *id.* § 20-16-1806(a)(1), and creates a cause of action for injunctive relief against a physician who knowingly violates the Medical Records Mandate. An injunction action may be brought by the spouse, parent, guardian, or current or former licensed health care provider of the woman who receives or attempts to receive an abortion, or by the Attorney General. *Id.* § 20-16-1806(d).

29.     H.B. 1434 separately provides that a physician "shall not intentionally perform or attempt to perform an abortion with the knowledge that the pregnant woman is seeking the abortion solely on the basis of" sex and requires the physician to ask a pregnant woman if she knows the sex of the embryo or fetus. *Id.* § 20-16-1804(a) & (b)(1). Plaintiff does not challenge those provisions of H.B. 1434.

   o  **H.B. 2024 (the Local Disclosure Mandate)**

30.     Under current Arkansas Code Section 12-18-108, physicians performing abortions for patients ages thirteen or younger must take certain steps to preserve embryonic or fetal tissue from the abortion and to notify local police departments where the minor resides. H.B. 2024 expands these requirements from all abortion patients "less than fourteen (14) years of age" to all abortion patients "less than seventeen (17) years of age." A copy of H.B. 2024 is attached hereto as Exhibit C1.

31.     Specifically, compliance requires (a) informing the young woman's local police department of her abortion and specified identifying information, and (b) preserving tissue from the abortion as "evidence" for transmission to that police department and eventually the State Crime Laboratory. A copy of Section 12-18-108, which H.B. 2024 amends, is attached hereto as Exhibit C2. A copy of the Rules that Section 12-18-108 directs the State Crime Laboratory to adopt are attached hereto as Exhibit C3.

8

32.     Under Section 12-18-108, the physician "shall preserve" the embryonic or "fetal tissue extracted during the abortion in accordance with" the Rules. Those Rules require the physician to preserve and immediately freeze "all products of conception" in a container "labeled with the patient's name and date of birth, date of the collection and the name of the individual collecting the products of conception."

33.     The Rules also require, *inter alia*, that the physician "properly establish and maintain the chain of custody," using a "uniform reporting instrument[.]" Rules 3 & 5. This "Fetal Tissue Submission Form," attached hereto as Exhibit C4, includes the "name and complete address of residence of the parent or legal guardian of the child," Ark. Code § 12-18-108(b)(5), and the name of the "victim" and the "suspect." The Rules establish "proper disposal" of the tissue, "[u]pon completion of DNA analysis" and "receipt of a 'letter of destruction' from the respective investigating agency." Rule 4. The Rules do not specify what is to happen to tissue not subject to DNA analysis or part of any investigation.

34.     Under Section 12-18-108(a)(2), "[b]efore submitting the tissue . . . , the physician shall redact protected health information as required under the [federal] Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191," ("HIPAA") but that reference to redaction does not translate into privacy. Section 12-18-108 and its implementing Rules specifically require that the patient's personal information accompany the "evidence" collected, and HIPAA allows disclosures to law enforcement pursuant to state law.

35.     Section 12-18-108(a)(3) requires that "the physician or the reporting medical facility shall contact the law enforcement agency in the jurisdiction" where the abortion patient resides. Police officers from those agencies are then apparently supposed to take possession of the tissue and eventually convey it to the Arkansas State Crime Laboratory.

9

36.     A physician's failure to comply with Section 12-18-108 or any of the Rules "constitute[s] unprofessional conduct under the Arkansas Medical Practices Act[.]" Ark. Code § 12-18-108(c). Such conduct subjects physicians to discipline by the Arkansas Medical Board, including license revocation and other serious penalties.

37.     H.B. 2024 amends Section 12-18-108, which was itself a 2013 amendment to the Child Maltreatment Act. The Child Maltreatment Act establishes a system for reporting known or suspected abuse to the state, including through a Hotline staffed 24 hours a day by a specialized unit of the state Department of Human Services. *See* Ark. Code § 12-18-103(5).

38.     The Child Maltreatment Act specifies certain groups as "mandated reporters," including physicians and other medical personnel. Mandated reporters must "immediately notify the Child Abuse Hotline" if they have "reasonable cause to suspect that a child has … [b]een subjected to child maltreatment." Ark. Code § 12-18-402.

39.     The Child Maltreatment Act defines "sexual abuse" and "sexual exploitation" as categories of "child maltreatment." Ark. Code § 12-18-103(7). These categories would trigger a report of abuse if a mandated reporter had any "reasonable cause to suspect" that a minor had been the victim of sexual maltreatment or analogous sexual crimes under the Arkansas criminal code. H.B. 2024 requires tissue preservation and disclosure to local law enforcement for all 14- to 16-year-old patients, including the vast majority for whom there is no indication of child maltreatment and no reporting triggered.

o   **H.B. 1566 (the Tissue Disposal Mandate)**

40.     Consistent with current law, embryonic and fetal tissue from abortion and miscarriage care is handled in a number of ways. Tissue from a medication abortion, which is passed at home rather than at a medical facility, can be disposed of without being regulated, and

10

is not included in the Arkansas Code definitions of medical or pathological waste. Human tissue, including fetal tissue, may be disposed of by health care providers in a "respectful and proper manner," including by releasing the tissue to the patient, burial, cremation, or incineration. Ark. Code §§ 20-17-801(a)(1)(A), (b)(2)(C), (b)(2)(D). Tissue from an abortion must be disposed of "in a fashion similar to that in which other tissue is disposed" of. *Id.* § 20-17-802(a); *see also* Ark. Admin. Code 007.05.7 (Table 1) (health care facilities must dispose of "[t]issues, fetuses, organs" by incineration or "[i]nterment in accordance with mortuary regulations and may involve cremation service").

41. Any person violating Ark. Code § 20-17-802 is guilty of a Class A misdemeanor. Under current law, a physician performing an abortion appears to be exempt from compliance with section 802; a facility at which an abortion is performed is not exempt. Ark. Code §§ 20-17-802(e), (f).

42. In addition, under current law, for both abortion and miscarriage, a "dead fetus shall not be disposed of within forty-eight (48) hours of its removal or acquisition unless consent is obtained in writing from the mother of the dead fetus or the mother's spouse." Ark. Code § 20-17-801(a)(1)(B). For purposes of this section, "dead fetus" means "a product of human conception exclusive of its placenta or connective tissue, which has suffered death prior to its complete expulsion or extraction from the mother . . . ." Ark. Code § 20-17-801(b)(2)(A).

43. In sum, under current law, Plaintiff may dispose of embryonic or fetal tissue following a surgical abortion or miscarriage completion through incineration, in addition to other means, and women opting for medication abortion or who complete a miscarriage through medication may dispose of the tissue at home.

11

44.     H.B. 1566 changes current law to require that all embryonic or fetal tissue—whether from an abortion or miscarriage—be disposed of in accordance with the Arkansas Final Disposition Rights Act of 2009 ("FDRA"), Ark. Code § 20-17-102. H.B. 1566 § 2 (removing "fetal tissue" from the definition of "human tissue"), § 1 (requiring that a "dead fetus" be disposed of in accordance with the FDRA), and § 3 (requiring that a "physician or facility that performs an abortion shall ensure that fetal remains and all parts are disposed" of in accordance with the FDRA and Ark. Code § 20-17-801, which itself refers back to the FDRA).

45.     Under H.B. 1566, physicians who perform abortions face criminal penalties for failure to ensure that tissue is disposed of in accordance with the FDRA.

46.     The FDRA primarily governs which family members have "[t]he right to control the disposition of the remains of a deceased person, the location, manner, and conditions of disposition." Ark. Code § 20-17-102(d)(1).

47.     Under the FDRA, if a decedent has not appointed anyone to control the final disposition of his or her remains, that right vests in individuals in the order prescribed by the statute: the decedent's surviving spouse; surviving child or children; parent or parents; and so on, including other family members, or, ultimately, a state government actor who has the statutory obligation to provide for the disposition of a decedent's remains. *See id.* §§ 20-17-102(d)(1)(A)-(L).

48.     A person with disposition rights may "dispose of human remains in any manner that is consistent with existing laws, rules, and practices for disposing of human remains," including cremation. Ark. Code § 20-17-102(i).

12

49.     "The right to control the disposition of the remains of a deceased person, the location, manner, and conditions of disposition," vests only to persons who are 18 years old or older. *Id.* § 20-102(d)(1).

50.     When the disposition right vests in the decedent's parents and one of the parents is "absent," the right vests in the remaining parent only after "reasonable efforts have been unsuccessful in locating the absent surviving parent." *Id.* § 20-102(d)(1)(E)(ii). The FDRA defines neither "absent" nor "reasonable efforts."

51.     When there is more than one person within the class entitled to the disposition right, members of that class must use "reasonable efforts" to notify the others prior to disposition. *See id.* § 20-17-102(d)(3)(A).

52.     If there is a dispute among people who share equal disposition rights, the circuit court decides to whom to award the disposition right. *See id.* § 20-17-102(e)(2). In addition, a person may exercise disposition rights only if he or she is willing to assume liability for the costs associated with disposal. *See id.* § 20-17-102(e)(1)(C).

53.     The FDRA defines "final disposition" as "the burial, interment, cremation, removal from Arkansas, or other authorized disposition of a dead body or fetus." Ark. Code Ann. § 20-17-102(a)(2)(C).

54.     It is not clear what "other authorized disposition" includes.


## **FACTUAL ALLEGATIONS**

### **Background**

55.     Legal abortion is extremely safe, and safer for a woman than carrying to term and giving birth.

13

56.     Nonetheless, the earlier in pregnancy a woman is able to access abortion care, the safer it is for her: first, remaining pregnant itself entails risks; second, the risks associated with abortion increase as pregnancy advances.

57.     In Arkansas, as in the nation as a whole, the vast majority of women who seek abortion care do so in the first trimester of pregnancy. Likewise, the great majority of second-trimester abortions occur in the early weeks of the second trimester.

58.     For young women under age 18, Arkansas requires the consent of one parent before she obtains an abortion. Alternatively, a minor may seek judicial authorization for an abortion. In Arkansas, almost all abortion patients under 18 years old obtain a parent's consent for their abortion; a small fraction obtain a judicial bypass allowing them to end their pregnancies without parental consent.

59.     Women face many obstacles in accessing abortion care in Arkansas. There are only two outpatient providers: one that provides only medication abortion in part of the first trimester in Little Rock and Fayetteville, and another, Little Rock Family Planning Services, that provides early medication abortion as well as surgical abortions through 21 weeks and 6 days as measured from the first day of the woman's last menstrual period ("21.6 weeks LMP").

60.     Many abortion patients are very low income and struggle to make arrangements for, and absorb the cost of, missed work; childcare if they have children, which most do; transportation to and from the clinic; and any needed hotel rooms. These burdens are increased by Arkansas's mandate that a woman make an additional trip to a physician—to receive state-mandated counseling in person—and then delay at least 48 hours before making another trip to obtain her abortion. These burdens can create delay.

61.     Confidentiality is a primary concern for women seeking abortion care.

## A. **The Impact of H.B. 1032 (the D&E Ban)**

62.  H.B. 1032 bans dilation and evacuation abortion, or D&E, the safest and most common abortion method used during the second trimester.

63.  D&Es account for more than 95% of all second-trimester abortions nationally and 100% of second-trimester abortions reported in Arkansas in 2015.

64.  Virtually all abortions performed in Arkansas at or after approximately ten weeks after the patient's last menstrual period (10 weeks LMP) are performed at Little Rock Family Planning Services, where Plaintiff provides care.

65.  In the first trimester of pregnancy, abortions are performed using medical or instrumental means. Medication abortions, which are available up to 10.0 weeks LMP, involve the ingestion of two medications to induce an early miscarriage. Instrumental abortions in the first trimester are performed using a suction device to aspirate (or empty) the uterus. During the period in which both methods are available, a woman may have many, varied reasons for preferring one method or the other; for some women, one method or the other may be medically indicated.

66.  Starting at approximately 14.0 weeks LMP, Plaintiff uses a combination of suction and forceps or other instruments to remove the fetus and other products of conception from the uterus, followed by additional suction to ensure the uterus is completely empty. Because the cervical opening is smaller than the fetus, separation or disarticulation of fetal tissue usually occurs as the physician brings the tissue through the cervix. The use of instruments, alone or in conjunction with suction, to empty the uterus in this manner is known as D&E.

67.  D&E is safely performed as an outpatient procedure throughout the second trimester of pregnancy. The evacuation phase takes approximately ten minutes.

15

68.     Other than D&E, the only other medically-proven abortion method available during the second trimester is induction abortion, where a physician uses medication to induce labor and delivery of a non-viable fetus. Induction of labor accounts for only about 5% of second-trimester procedures nationally. Induction abortions must be performed in a hospital or similar facility that has the capacity to monitor a patient overnight. Induction abortions can last anywhere from five hours to three days; are extremely expensive; entail more pain, discomfort, and recovery time for the patient—similar to that of a woman giving birth—than D&E; and are medically contraindicated for some patients.

69.     Arkansas hospitals perform abortions only in extremely rare circumstances, and such services are not available to most women. According to Arkansas Department of Health statistics, no induction abortions were performed in the state in 2015.

70.     H.B. 1032 does not ban D&Es in which the physician—through a separate procedure—attempts to cause and succeeds in causing fetal demise prior to starting the evacuation phase of the D&E. But that does not narrow the ban's scope. Because a physician cannot know if an additional fetal demise procedure will be successful, H.B. 1032 bars a physician from starting any D&E.

71.     Before 18 weeks LMP, there is no safe, studied procedure for Plaintiff even to attempt to cause fetal demise in a D&E abortion. Any attempt to do so would impose risks with no medical benefit to the patient. Such attempts are virtually untested; have unknown risks and uncertain efficacy; and would be outside the standard of care.

72.     Starting at 18 to 22 weeks LMP, some physicians use transabdominal or transvaginal injections of a drug called digoxin to attempt to cause fetal demise.

16

73.     Because digoxin takes at least 24 hours to work, even if such injections were feasible and acceptable medical practice prior to 18 weeks LMP—which they are not—its use in the early second trimester would turn one-day procedures into two-day procedures, which would be a tremendous burden on patients. Because of Arkansas's mandated extra visit, women whose abortions are two-day procedures must make 3 trips to the clinic. Prolonging the procedure would compound the burdens patients already face and introduce unnecessary risk.

74.     The minority of clinicians who use digoxin to attempt to induce fetal demise generally do so in order to comply with federal and state "partial-birth abortion" bans. That includes Plaintiff in his role at Little Rock Family Planning Services.

75.     Published data show that use of digoxin provides no clear medical benefit to the patient. According to the American Congress of Obstetricians and Gynecologists: "No evidence currently supports the use of induced fetal demise to increase the safety of second-trimester medical or surgical abortion." Am. Coll. Obstetricians and Gynecologists, Second Trimester Practice Bulletin (No. 135, June 2013).

76.     Digoxin injections are not possible for every patient who seeks care after 18 weeks LMP. Anatomical characteristics, such as fibroids or an elongated cervix, may contraindicate such injections. Other patients have medical contraindications to digoxin, such as heart arrhythmia.

77.     Digoxin sometimes fails to cause fetal demise. Using a second injection of digoxin in those cases is completely unstudied.

78.     There are no other reliable, safe, and available methods of attempting to cause fetal demise in the outpatient setting. An injection of KCl (potassium chloride) directly into the fetal heart does effectively cause demise, but requires years of specialized training and hospital-

17

grade equipment. This level of training and equipment are necessary because inadvertent injection of KCl into a patient's blood stream can put her into cardiac arrest. Umbilical cord transection, where a clinician attempts to grasp and divide the umbilical cord to cause demise, exposes the patient to increased risk of uterine perforation, cervical injury, and bleeding, and would prolong a D&E, also increasing risk. Additionally, because in many cases it is difficult, if not impossible, to grasp the cord without also grasping fetal tissue, attempts at cord transection would violate, rather than circumvent, the D&E Ban.

79.     Before starting a D&E, even at and after 18 weeks LMP, it is impossible to know whether an attempt to cause fetal demise will be possible or successful. Thus, Plaintiff cannot start any D&E, even at and after 18 weeks, because he knows he may not be able to complete the procedure without violating the ban.

80.     Therefore, H.B. 1032 imposes a criminal ban, and significant penalties, on second-trimester abortion practice.

## B. The Impact of H.B. 1434 (the Medical Records Mandate)

81.     Under H.B. 1434, a physician cannot perform an abortion unless and until "reasonable time and effort is spent" pursuing requests for all the "medical records of the pregnant woman relating directly to [her] entire pregnancy history." The law does not specify any actions the physician must undertake if and when the records arrive.

82.     There is no medical reason to obtain these records prior to providing an abortion. Obtaining prior medical records is medically indicated for only a tiny fraction of abortion patients. Even in those cases, only a specific sub-set of records is relevant, and even then, unless the records are transmitted very quickly, any medical benefit of waiting for the records is

18

outweighed by the fact that delaying abortion care increases the risks associated with the procedure for the patient.

83. Obtaining medical records is a detailed, time-intensive process, particularly for a woman's "entire" pregnancy-related history, and thus a "reasonable time and effort" to do so may be quite substantial. H.B. 1434 does not clarify its standard or limit its scope in any way.

84. Federal law, for example, allows health care providers in the U.S. 30 days for their initial response to records requests, and the actual medical records may follow later. If the provider who receives the request does not comply within that timeline, an appeals process involves further review by government officials and/or litigation.

85. Some patients in Arkansas also have received pregnancy-related care outside Arkansas or abroad, and obtaining foreign medical records can take even longer and require translation.

86. In addition to its costs in time, the Medical Records Mandate imposes staff, copying, and other processing costs on the physician and/or patient. To release records, for example, Arkansas medical providers can charge per-page copying fees and separate fees for retrieval of records from storage. The patient seeking an abortion must herself gather information, such as the dates of prior providers' services, and often complete several different signed requests; each medical provider can require its own specialized form for records release.

87. The Medical Records Mandate significantly delays or outright bars abortion care for all patients who have had a prior pregnancy or have received medical care from another provider related to their current pregnancy. That is the great majority of patients in Arkansas.

88. The Medical Records Mandate bars or significantly delays care because its unclear and onerous requirements do not tell a physician when he or she can proceed, and

19

violations carry serious criminal, civil, and professional penalties. Thus, the physician is forced either to wait to obtain all the records, or not to provide an abortion. The only abortions that H.B. 1434 would not bar or significantly delay are those for a patient without any prior pregnancy or pregnancy-related care, or who received past care solely from the physician or clinic from whom she seeks abortion care.

89.     Moreover, when an abortion clinic or physician requests medical records, the process discloses the fact of the patient's pregnancy and abortion decision to her other health care providers. Thus, H.B. 1434 mandates the involuntary disclosure of the patient's pregnancy and abortion decision to all others from whom she has ever received any pregnancy-related care.

90.     The Medical Records Mandate by its plain terms applies to all abortions. However, even were it read to apply only to patients who know the sex of the embryo or fetus, it would have the same constitutional infirmities and require the same remedies Plaintiff seeks here.

### C. **The Impact of H.B. 2024 (the Local Disclosure Mandate)**

91.     Plaintiff and his colleagues at Little Rock Family Planning Services take extremely seriously their obligation to report known or suspected abuse to the state Child Abuse Hotline. This suit does not challenge that obligation and does not challenge H.B. 2024 as applied to patients for whom such reporting to the state Hotline is required.

92.     This suit challenges H.B. 2024, and the requirements of Section 12-10-108 that it imposes, only as applied to those patients whom Plaintiff and his clinic do not report to the state Hotline under the Child Maltreatment Act because there is no indication that they are the victims of any illegal sexual activity or abuse.

93.     A 14-, 15- or 16-year-old patient's prior sexual intercourse does not indicate that

she is a victim of Child Maltreatment, for example, if it occurred with her husband (16-year-olds

may marry with parental consent) or with a similar age partner and not a caretaker, absent any

indication of "forcible compulsion" or prostitution.

94.     The vast majority of 14- to 16-year-old patients at Little Rock Family Planning

Services fall into that category of no required reporting: They are typically young women who

have engaged in consensual intercourse with a boyfriend who is close in age; Arkansas

criminalizes neither the young woman's conduct nor her partner's. The products of conception

removed in these patients' abortion procedures have no purpose as "evidence" of abuse or

criminality. Thus, H.B. 2024 mandates disclosure of a patient's private information and imposes

tissue preservation requirements on physicians without justification.

95.     In addition, H.B. 2024 can be read to bar the use of medication abortion for these

patients. That is because in medication abortion, the patient passes the products of conception

outside the medical facility, across a multi-day period, making it impossible for the physician to

collect and preserve those products, as Section 12-18-108 and its implementing Rules appear to

require.

96.     Although Section 12-18-108's single reference to "fetal tissue extracted" seems to

exclude medication abortion, the definition of abortion in both the Child Maltreatment Act and

the Rules implementing 12-18-108 explicitly includes abortions accomplished with a "medicine,

drug, or any other substance," and under the Rules, simply "[a]ll products of conception should

be preserved." As this language appears to encompass all methods, in order to protect himself

from a finding of "unprofessional conduct," Plaintiff will be forced to stop performing

medication abortions for the group of patients it covers if the statute takes effect.

21

97.     Losing access to medication abortion would deprive certain patients of the best abortion method for them, and would require women to have a clinical procedure when they otherwise could have ended their pregnancy by taking medication.

## D. The Impact of H.B. 1566 (the Tissue Disposal Mandate)

98.     H.B. 1566 imposes unclear and burdensome requirements that threaten Plaintiff's ability to continue providing abortion and miscarriage care.

99.     Plaintiff's patients who have medication abortions or complete miscarriage through medication dispose of tissue outside the medical facility, usually at home. For almost all surgical abortions, a contractor collects medical waste and embryonic or fetal tissue generated at the clinic and disposes of it out of state through incineration. A few patients each year choose to have the tissue cremated, and those patients make arrangements with the cremation facility. Also, for a few patients each year, tissue is sent to pathology labs to test for specific medical conditions or to determine the cause of anomalies and the likelihood of recurrence in future pregnancies. In addition, following some abortions, tissue is preserved and made available to law enforcement.

100.    To comply with the provision in current law prohibiting disposal of a dead fetus within 48 hours without permission from the "mother of the dead fetus," each of Plaintiff's patients who receives a suction or D&E abortion consents in writing to disposal within 48 hours.

101.    As a practical matter, Plaintiff cannot provide care without knowing that tissue can be disposed of lawfully. Accordingly, Plaintiff must ensure he can meet the requirements of H.B. 1566—and thus the requirements of the FDRA—before beginning abortion or miscarriage care.

22

102.     Under the FDRA, Plaintiff must notify and seek the consent of at least one third party prior to every patient's abortion and miscarriage care.

103.     The FDRA gives both parents of a decedent equal rights in determining the disposition of remains. Importing this requirement to the context of abortion or miscarriage means the woman and her sexual partner, the "father," have an equal disposition right as the "parents" of the tissue. Accordingly, H.B. 1566 requires Plaintiff to notify the patient's sexual partner, and seek his consent to disposition and thus, to the abortion itself, prior to providing care.

104.     Further, only after unspecified "reasonable efforts" have been made to locate an "absent" parent may the disposition right vest solely in the woman as the "remaining parent" of the tissue. Plaintiff's attempts to make "reasonable efforts" will delay many women's access to abortion.

105.     Under the FDRA, a person has the right to dispose of a decedent's remains only if he or she is at least 18 years old. Ark. Code § 20-17-102(d)(1). Accordingly, a patient under 18 years seeking abortion or miscarriage care has no rights under the FDRA.

106.     For example, where a patient is 17 and her partner is 18, under the FDRA, he would have the disposition right and she would not.

107.     Where both a patient and her sexual partner are under 18, the disposition right passes to their parent or parents as the "grandparents" of the embryonic or fetal tissue. *See id.* § 20-17-102(d)(1)(G). H.B. 1566 thus mandates the involvement of a minor's parent(s) in her abortion, regardless of whether she has obtained a judicial bypass allowing her to proceed without a parent's consent. In doing so, H.B. 1566 circumvents Arkansas's parental involvement law, which requires a parent's consent to a minor's abortion unless she obtains a judicial bypass.

108.    Further, her parent(s) *and* his parent(s) as the "grandparents" of the tissue would have the disposition right. To comply with the FDRA, Plaintiff would have to notify all "grandparents" of their disposition right, and thus of the minor's abortion or miscarriage.

109.    By requiring notice and consent of third parties, H.B. 1566 interferes with a woman's access to abortion and her ability to make independent decisions about medical care, including pregnancy care.

110.    Notification of a woman's partner, parent(s), and/or the parents of a minor's sexual partner also threatens the well-being and safety of women who need to keep the fact of their abortion confidential from others, including an abusive partner, spouse, or parent.

111.    Indeed, the prospect of notification will dissuade some women from obtaining abortions. Attempting to obtain the required notice and consents would also delay or ultimately deny some women access to abortion.

112.    In addition, women and their families hold a diversity of views about pregnancy and the embryo or fetus. H.B. 1566, however, enshrines into law a narrow set of beliefs regarding embryonic and fetal tissue, including that a woman is the "parent" of such tissue, regardless of whether she holds that view.

113.    Further, attempting to comply with all the FDRA's requirements will block access to abortion. For example, ascertaining and documenting the fact that a person is entitled to the disposition right under the FDRA, but forfeits that right because he or she is unwilling to assume financial responsibility for the disposition, may be difficult or impossible for Plaintiff. Likewise, those with disposition rights can request disposition "in any manner that is consistent with existing laws, rules, and practices of disposing human remains," leaving Plaintiff uncertain as to

what methods of disposition might be selected and whether those means are acceptable. *Id.* § 20-17-102(i).

114.    Plaintiff and his clinic cannot establish systems that ensure all of the requirements of the FDRA could be met before providing care. Because H.B. 1566 creates the risk of criminal penalties, Plaintiff would be forced to stop providing abortion and miscarriage care.

115.    In addition, H.B. 1566 effectively bars medication abortion and miscarriage completed with medication because Plaintiff cannot "ensure" the products of conception passed outside the medical facility are disposed of in accordance with the FDRA.

116.    H.B. 1566's mandate that physicians and clinics "ensure" that embryonic and fetal tissue is disposed of in accordance with the FDRA applies even if tissue is sent to a pathology lab. H.B. 1566 thus threatens Plaintiff with criminal liability based on the actions of third parties who receive tissue for reasons other than disposition, because he cannot control how pathology labs dispose of tissue after testing. Sending tissue to pathology is critical for certain women's health.

117.    H.B. 1566 requires that tissue from an abortion or miscarriage be disposed of in accordance with the FDRA, but does not require the same of any other human tissue. Tissue from other medical procedures is still defined as "human tissue" under Arkansas Code Section 20-17-801; accordingly, a physician has the discretion to dispose of this tissue in a "respectful and proper manner," including by releasing the tissue to the patient, incineration, burial, or cremation.

118.    H.B. 1566 thus treats tissue from an abortion or miscarriage differently from other types of tissue, mandating that it be disposed of as if it were a deceased family member.

25

119. H.B. 1566 also imposes criminal penalties only on the failure to dispose of embryonic and fetal tissue from an abortion in accordance with the FDRA.

## IRREPARABLE HARM

120. Enforcement of each of the four challenged laws threatens to block altogether a woman's constitutionally protected right to access abortion care. Each would impose delay, which endangers a woman's health and can itself make abortion care impossible for her to obtain. Each except the D&E Ban threatens to disclose her private circumstances and medical decisions to others, which can endanger a woman, delay her, and even prevent her from accessing care at all.

121. Enforcement of H.B. 1032's D&E Ban would effectively ban abortions in Arkansas beginning at 14 weeks LMP for women, including Plaintiff's patients.

122. Enforcement of H.B. 1434's Medical Records Mandate would subject Plaintiff to a criminal law so vague that he has no notice of how to comply. Women, including Plaintiff's patients, would be indefinitely delayed and/or outright blocked in obtaining abortion care, and/or would have their private medical decisions disclosed to other health care providers against their will.

123. Enforcement of H.B. 2024's Local Disclosure Mandate as applied to 14- to 16-year-olds for whom no reporting is appropriate under the Child Maltreatment Act would disclose the private medical decisions of those young women, including Plaintiff's patients, to local law enforcement where they reside. This law also seems to preclude medication abortion, which would force some patients to undergo surgical abortions they would otherwise not undergo.

124. Enforcement of H.B. 1566's Tissue Disposal Mandate would force women, including Plaintiff's patients, to have their abortion or miscarriage disclosed to third parties or

26

forgo such care and/or be delayed or blocked in obtaining care. This law also could be read to preclude medication abortion, which would force certain patients to undergo clinical procedures they would prefer to avoid. Further, under threat of criminal penalties for non-compliance with H.B. 1566's vague mandates, Plaintiff would be forced to stop providing care.

125. Enforcement of each of these laws would subject Plaintiff and his patients to irreparable harm, including deprivation of Plaintiff's patients' constitutional rights and the imposition of medical harm on Plaintiff's patients.

126. Plaintiff and his patients have no adequate remedy at law.

## CLAIMS FOR RELIEF

### COUNT I

### (D&E Ban – Due Process – Undue Burden on Plaintiff's Patients' Right to Liberty and Privacy)

127. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 126.

128. By banning the safest and most common method of second-trimester abortion— and thereby banning second-trimester outpatient abortion in Arkansas—the D&E Ban violates Plaintiff's patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

### COUNT II

### (D&E Ban – Due Process – Plaintiff's Patients' Right to Bodily Integrity)

129. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 126.

130.    By forcing women to undergo additional or different procedures, or to continue a pregnancy involuntarily, the D&E Ban violates Plaintiff's patients' right to bodily integrity guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT III

### (Medical Records – Due Process – Undue Burden on Plaintiff's Patients' Right to Liberty and Privacy)

131.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 126.

132.    By indefinitely delaying abortion care, requiring involuntary disclosure of a woman's abortion decision to other health care providers, and imposing insurmountable administrative obstacles for abortion providers, the Medical Records Mandate violates Plaintiff's patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT IV

### (Medical Records – Due Process –Vagueness)

133.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 126.

134.    By failing to give notice of how to comply with its terms, and imposing criminal and serious civil penalties, the Medical Records Mandate violates Plaintiff's right to due process as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT V

### (Medical Records – Due Process – Plaintiff's Patients' Right to Informational Privacy)

135. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 126.

136. By requiring involuntary disclosure of Plaintiff's patients' private medical decisions to other health care providers, H.B. 1434's Medical Records Mandate violates Plaintiff's patients' right to privacy and liberty as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT VI

### (Local Disclosure Mandate – Due Process – Undue Burden on Plaintiff's Patients' Right to Liberty and Privacy)

137. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 126.

138. By requiring a physician to collect and transmit to local law enforcement all products of conception, along with identifying information, and by thereby apparently removing medication abortion as a treatment option, for 14- to 16-year-old patients for whom no child maltreatment reporting is appropriate, H.B. 2024 and its Rules impose an undue burden on those patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT VII

### (Local Disclosure Mandate – Due Process – Plaintiff's Patients' Right to Bodily Integrity)

139. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 126.

140. By requiring a physician to collect and transmit to local law enforcement all products of conception, and thereby apparently removing medication abortion as a treatment

29

option, for 14- to 16-year-old patients for whom no sexual abuse reporting is appropriate, forcing those young women to undergo clinical procedures or continue a pregnancy involuntarily, H.B. 2024 and its Rules violate those patients' right to bodily integrity guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT VIII

### (Local Disclosure Mandate – Due Process – Plaintiff's Patients' Right to Informational Privacy)

141.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 126.

142.    By mandating disclosure of private information to local police departments and preservation of tissue labeled with identifying information that is not evidence of any crime or child maltreatment, H.B. 2024 and its Rules, as applied to 14- to 16-year-old patients for whom no child maltreatment reporting is appropriate, violate those patients' rights to privacy and liberty as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT IX

### (Local Disclosure Mandate – Due Process – Vagueness)

143.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 126.

144.    By failing to give Plaintiff fair notice of when tissue preservation and local disclosure are required under the statute, and in particular whether the statute applies to medication abortions, H.B. 2024 and its Rules violate Plaintiff's right to due process as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT X

**(Tissue Disposal Mandate – Due Process – Undue Burden on Plaintiff's Patients' Right to Liberty and Privacy)**

145.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 126.

146.     By mandating notice and consent of third parties to every woman's abortion, delaying and blocking access to abortion, and apparently banning medication abortion, H.B. 1566 violates Plaintiff's patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT XI

### (Tissue Disposal Mandate – Due Process – Vagueness)

147.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 126.

148.     By failing to give Plaintiff fair notice of how to comply with the mandates of the FDRA in the context of abortion and miscarriage care, and failing to give fair notice of whether medication abortion comes within H.B. 1566's requirements and therefore is banned, H.B. 1566 violates Plaintiff's right to due process as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT XII

### (Tissue Disposal Mandate – Due Process – Plaintiff's Patients' Right to Bodily Integrity)

149.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 126.

150.     By apparently banning medication abortion, and thus forcing women to undergo a clinical procedure or continue a pregnancy, H.B. 1566 violates Plaintiff's patients' right to bodily

integrity as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## INJUNCTIVE RELIEF

151. H.B. 1032, H.B. 1434, H.B. 1566 and H.B. 2024 would subject Plaintiff and his patients to irreparable harm for which there exists no adequate remedy at law.

152. Enforcement of these laws would cause irreparable harm by threatening Plaintiff with substantial penalties for providing constitutionally protected abortion care.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff asks this Court:

A. To issue a preliminary injunction and permanent injunction restraining Defendants and their successors in office from enforcing H.B. 1032, H.B. 1434, H.B. 1566 and H.B. 2024.

B. To enter a judgment declaring that H.B. 1032, H.B. 1434, H.B. 1566, and H.B. 2024 violate the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

C. To award Plaintiff his attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

D. To grant such other and further relief as the Court deems just and proper.

Respectfully Submitted,

Dated: June 20, 2017

Bettina Brownstein (85019)
Bettina E. Brownstein Law Firm

32

904 West 2nd Street, Ste. 2
Little Rock, AR 72201
Cooperating Attorney, ACLU of Arkansas
Phone: (501) 920-1764
Email:   bettinabrownstein@gmail.com

Susan Talcott Camp*
Ruth Harlow*
Elizabeth Watson*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004-2400
Phone: (212) 549-2633
Email:   tcamp@aclu.org
              rharlow@aclu.org
              ewatson@aclu.org

Hillary Schneller*
Center for Reproductive Rights
199 Water Street, 22nd Floor
New York, NY 10038
Phone: (917) 637-3777
Email:   hschneller@reprorights.org

*ATTORNEYS FOR PLAINTIFF*

*Application for *pro hac vice* pending

# EXHIBIT A

| 1 | State of Arkansas | *As Engrossed:* | *H1/17/17 H1/18/17* |
|---|---|---|---|

1 State of Arkansas          *As Engrossed:   H1/17/17 H1/18/17*
2 91st General Assembly                   A Bill
3 Regular Session, 2017                                      HOUSE BILL 1032
4
5 By: Representatives A. Mayberry, Ballinger, Baltz, Barker, Bentley, Capp, Cavenaugh, Coleman, Davis,
6 Della Rosa, Eubanks, C. Fite, L. Fite, Fortner, Gazaway, Holcomb, Lowery, Lundstrum, Lynch, Maddox,
7 D. Meeks, Payton, Pilkington, Richmond, Rushing, Rye, Speaks, Sullivan, Vaught, Warren, Watson, J.
8 Williams, Wing, Womack, *Dotson*
9 By: Senators D. Sanders, Bledsoe
10
11                         **For An Act To Be Entitled**
12             AN ACT TO CREATE THE ARKANSAS UNBORN CHILD PROTECTION
13             FROM DISMEMBERMENT ABORTION ACT; AND FOR OTHER
14             PURPOSES.
15
16
17                              **Subtitle**
18             THE ARKANSAS UNBORN CHILD PROTECTION FROM
19             DISMEMBERMENT ABORTION ACT.
20
21
22 BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF ARKANSAS:
23
24       SECTION 1.  Arkansas Code Title 20, Chapter 16, is amended to add an
25 additional subchapter to read as follows:
26       Subchapter 18 — Arkansas Unborn Child Protection from Dismemberment Abortion
27                              Act
28
29       20-16-1801.  Title.
30       This subchapter shall be known and may be cited as the "Arkansas Unborn
31 Child Protection from Dismemberment Abortion Act".
32
33       20-16-1802.  Definitions.
34       As used in this subchapter:
35       (1)  "Abortion" means the use or prescription of any instrument,
36 medicine, drug, or any other substance or device:



(A) To terminate the pregnancy of a woman known to be
pregnant with an intention other than to:
                    (i) Increase the probability of a live birth;
                    (ii) Preserve the life or health of the child after
live birth; or
                    (iii) Remove a dead unborn child who died in utero
as the result of natural causes, accidental trauma, or a criminal assault on
the pregnant woman or her unborn child; and
          (B) Which causes the premature termination of the
pregnancy;
          (2) "Attempt to perform or induce an abortion" means an act or
an omission of a statutorily required act, that under the circumstances as
the actor believes them to be, constitutes a substantial step in a course of
conduct planned to culminate in the performance or induction of an abortion
in this state in violation of this subchapter;
          (3)(A)(i) "Dismemberment abortion" means an abortion performed
with the purpose of causing the death of an unborn child that purposely
dismembers the living unborn child and extracts one (1) piece at a time from
the uterus through the use of clamps, grasping forceps, tongs, scissors, or
similar instruments that, through the convergence of two (2) rigid levers,
slice, crush, or grasp a portion of the body of the unborn child to cut or
tear off a portion of the body of the unborn child.
                    (ii) "Dismemberment abortion" includes an abortion
in which suction is used to extract the body of the unborn child subsequent
to the dismemberment of the unborn child as described under subdivision
(3)(A)(i) of this section.
          (B) "Dismemberment abortion" does not include an abortion
that uses suction to dismember the body parts of the unborn child into a
collection container;
          (4) "Physician" means any person licensed to practice medicine
in this state, including a medical doctor or a doctor of osteopathy;
          (5) "Purposely" means to act with purpose with respect to a
material element of an offense when:
                    (A) If the element involves the nature of the conduct of
the actor or a result of the conduct of the actor, it is the conscious object
of the actor to engage in conduct of that nature or cause such a result; and

1              (B) If the element involves the attendant circumstances,
2    the actor is aware of the existence of such circumstances or the actor
3    believes or hopes that such circumstances exist;
4              (6)(A) "Serious health risk to the pregnant woman" means a
5    condition that, in a reasonable medical judgment, complicates the medical
6    condition of a pregnant woman to such an extent that the abortion of a
7    pregnancy is necessary to avert either the death of the pregnant woman or the
8    serious risk of substantial and irreversible physical impairment of a major
9    bodily function of the pregnant woman.
10             (B) "Serious health risk to the pregnant woman" does not
11   include:
12                  (i) A psychological or emotional condition; or
13                  (ii) A medical diagnosis that is based on a claim of
14   the pregnant woman or on a presumption that the pregnant woman will engage in
15   conduct that could result in her death or that could cause substantial and
16   irreversible physical impairment of a major bodily function of the pregnant
17   woman;
18             (7) "Unborn child" means an individual organism of the species
19   Homo sapiens from fertilization until live birth; and
20             (8) "Woman" means a female human being whether or not she has
21   reached the age of majority.
22
23        20-16-1803. Ban on dismemberment abortion.
24        (a) A person shall not purposely perform or attempt to perform a
25   dismemberment abortion and thereby kill an unborn child unless it is
26   necessary to prevent a serious health risk to the pregnant woman.
27        (b)(1) A person who is accused of violating subsection (a) of this
28   section may seek a hearing before the Arkansas State Medical Board regarding
29   whether the dismemberment abortion was necessary to prevent a serious health
30   risk to the pregnant woman.
31        (2) The findings of the board are admissible in any court
32   proceedings under this subchapter.
33        (3) Upon a motion by the person who is accused of violating
34   subsection (a) of this section, a court shall delay the beginning of a trial
35   for no more than thirty (30) days to permit a hearing under subdivision
36   (b)(1) of this section.

1     (c)  The following individuals are excluded from liability under this
2 subchapter:
3     (1)  A woman who receives or attempts to receive a dismemberment
4 abortion;
5     (2)  A nurse, technician, secretary, receptionist, or other
6 employee or agent who is not a physician but acts at the direction of a
7 physician; and
8     (3)  A pharmacist or other individual who is not a physician but
9 who fills a prescription or provides instruments or materials used in a
10 dismemberment abortion to the physician or at the direction of the physician.
11     (d)  This subchapter does not prohibit an abortion by any other method
12 for any reason, including rape or incest.
13
14     *20-16-1804.  Civil remedies — Attorney's fees.*
15     (a)(1)  A cause of action for injunctive relief against a person who
16 has purposely violated this subchapter may be maintained by:
17     (A)  The woman who receives or attempted to receive a
18 dismemberment abortion in violation of this subchapter;
19     (B)  A person who is the spouse, parent, or legal guardian
20 of the woman who receives or attempted to receive a dismemberment abortion in
21 *violation of this subchapter; or*
22     (C)  A current or former licensed healthcare provider of
23 the woman who receives or attempted to receive a dismemberment abortion in
24 *violation of this subchapter.*
25     (2)  The injunction shall prevent the abortion provider from
26 performing or attempting to perform further dismemberment abortions in
27 violation of this subchapter.
28     (b)(1)  A cause of action for civil damages against a person who has
29 purposely violated this subchapter may be maintained by:
30     (A)  The woman who receives a dismemberment abortion in
31 violation of this subchapter;
32     (B)  The father of the unborn child, if the father is
33 married to the woman at the time the dismemberment abortion was performed in
34 violation of this subchapter; or
35     (C)  If the woman who received a dismemberment abortion in
36 violation of this subchapter is a minor or has died as a result of the

1    dismemberment abortion, the parents or legal guardians of the woman who
2    received a dismemberment abortion in violation of this subchapter.
3              (2)  Civil damages shall not be awarded to a plaintiff if the
4    pregnancy resulted from the criminal conduct of the plaintiff.
5              (3)  Civil damages shall include:
6                   (A)  Monetary damages for psychological injuries and
7    physical injuries associated with the dismemberment abortion; and
8                   (B)  Statutory damages equal to three (3) times the cost of
9    the dismemberment abortion.
10        (c)(1)  If judgment is rendered in favor of the plaintiff, the court
11    shall also render judgment for a reasonable attorney's fee in favor of the
12    plaintiff against the defendant.
13             (2)  If judgment is rendered in favor of the defendant and the
14    court finds that the plaintiff's suit was frivolous and brought in bad faith,
15    the court shall also render judgment for a reasonable attorney's fee in favor
16    of the defendant against the plaintiff.
17             (3)  A reasonable attorney's fee shall not be assessed against
18    the woman who received a dismemberment abortion.
19
20        20-16-1805.  Criminal penalty.
21        A person who violates § 20-16-1803(a) commits a Class D felony.
22
23        20-16-1806.  Protection of privacy in court proceedings.
24        (a)  In a civil proceeding or action brought under this subchapter, the
25    court shall determine whether the anonymity of a woman who received or
26    attempted to receive a dismemberment abortion shall be preserved from public
27    disclosure without her written consent.
28        (b)(1)  Upon determining that the anonymity of a woman who received or
29    attempted to receive a dismemberment abortion shall be preserved, the court
30    shall issue an order to the parties, witnesses, and counsel and shall direct
31    the sealing of the record and exclusion of individuals from courtrooms or
32    hearing rooms to the extent necessary to safeguard from public disclosure the
33    identity of the woman who received or attempted to receive a dismemberment
34    abortion.
35             (2)  An order under subdivision (b)(1) of this section shall be
36    accompanied by specific written findings explaining:

1              (A)  Why the anonymity of the woman who received or
2  attempted to receive a dismemberment abortion should be preserved from public
3  disclosure;
4              (B)  Why the order is essential to that end;
5              (C)  How the order is narrowly tailored to serve that end;
6  and
7              (D)  Why no reasonable, less restrictive alternative
8  exists.
9          (3)  In the absence of written consent of the woman who received
10 or attempted to receive a dismemberment abortion, anyone other than a public
11 official who brings an action under § 20-16-1804 shall bring the action under
12 a pseudonym.
13         (4)  This subsection does not conceal from the defendant the
14 identity of the plaintiff or of a witness.
15
16     *20-16-1807.  Construction.*
17     This subchapter does not:
18         (1)  Create or recognize a right to abortion;
19         (2)  Create or recognize a right to a particular method of
20 abortion; or
21         (3)  Make lawful an abortion that is currently unlawful under any
22 law of this state.
23
24                        */s/A. Mayberry*
25
26
27                  *APPROVED: 01/26/2017*
28
29
30
31
32
33
34
35
36

# EXHIBIT B

| | |
|---|---|
| 1 | State of Arkansas *As Engrossed: S3/16/17* |
| 2 | 91st General Assembly **A Bill** |
| 3 | Regular Session, 2017 HOUSE BILL 1434 |
| 4 | |
| 5 | By: Representatives Collins, Bentley, C. Fite, Petty |
| 6 | By: Senators Irvin, Rapert |
| 7 | |
| 8 | **For An Act To Be Entitled** |
| 9 | AN ACT TO CREATE THE SEX DISCRIMINATION BY ABORTION |
| 10 | PROHIBITION ACT; AND FOR OTHER PURPOSES. |
| 11 | |
| 12 | |
| 13 | **Subtitle** |
| 14 | TO CREATE THE SEX DISCRIMINATION BY |
| 15 | ABORTION PROHIBITION ACT. |
| 16 | |
| 17 | |
| 18 | BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF ARKANSAS: |
| 19 | |
| 20 | SECTION 1. Arkansas Code Title 20, Chapter 16, is amended to add an |
| 21 | additional subchapter to read as follows: |
| 22 | Subchapter 18 — Sex Discrimination by Abortion Prohibition Act |
| 23 | |
| 24 | 20-16-1801. Title |
| 25 | This subchapter shall be known and may be cited as the "Sex |
| 26 | Discrimination by Abortion Prohibition Act". |
| 27 | |
| 28 | 20-16-1802. Legislative findings and purpose. |
| 29 | (a) The General Assembly finds that: |
| 30 | (1) With regard to sex-selection abortion: |
| 31 | (A) The victims of sex-selection abortion are |
| 32 | overwhelmingly female; |
| 33 | (B) A sex-selection abortion is used to prevent the birth |
| 34 | of a child of an undesired sex; |
| 35 | (C) The United States, along with other countries, has |
| 36 | petitioned the United Nations General Assembly to declare sex-selection |



abortion a crime against women;

(D) Countries such as India, Great Britain, and China have taken steps to end sex-selection abortions;

(E) Women are a vital part of our society and culture and possess the same fundamental human rights as men;

(F) The United States prohibits discrimination on the basis of sex in various areas including employment, education, athletics, and health insurance;

(G) It is undesirable to have a distortion in the sex ratio within a society, particularly when there is a shortage of women; and

(H) Countries with high rates of male preference have experienced ill effects as a result of having a increasing population of young, unmarried men; and

(2) With regard to maternal health:

(A) It is undisputed that abortion risks to maternal health increase as gestation increases;

(B) The risk of death for pregnant women at eight (8) weeks' gestation is one (1) death per one million (1,000,000) and rises to:

(i) One (1) death per twenty-nine thousand (29,000) abortions between sixteen (16) and twenty (20) weeks' gestation; and

(ii) One (1) death per eleven thousand (11,000) abortions at twenty-one (21) weeks' gestation or later;

(C) A woman is thirty-five (35) times more likely to die from an abortion performed at twenty (20) weeks' gestation than she would have been had the abortion been performed in the first trimester;

(D) A woman is ninety-one (91) times more likely to die from an abortion performed at twenty-one (21) weeks' gestation or later than she would have been had the abortion been performed in the first trimester; and

(E) Because abortions performed solely based on the sex of a child are generally performed later in pregnancy, women undergoing these abortions are unnecessarily exposed to increased health risks, including an exponentially higher risk of death.

(b) Based on the findings in this section, the purpose of this act is to:

(1) Ban abortions performed solely for reasons of sex-selection;

1   and
2        (2)  Protect women from the risks inherent in late-term
3   abortions.
4
5        20-16-1803.  Definitions.
6        As used in this subchapter:
7        (1)(A)  "Abortion" means the act of using or prescribing any
8   instrument, medicine, drug, or any other substance, device, or means with the
9   intent to terminate the clinically diagnosable pregnancy of a woman, with
10  knowledge that the termination by any of those means will with reasonable
11  likelihood cause the death of the unborn child.
12            (B)  An act under subdivision (1)(A) of this section is not
13  an abortion if the act is performed with the intent to:
14                (i)  Save the life or preserve the health of the
15  unborn child;
16                (ii)  Remove a dead unborn child caused by
17  spontaneous abortion; or
18                (iii)  Remove an ectopic pregnancy;
19        (2)  "Incompetent" means an individual who has been adjudicated
20  as an individual with a disability and has had a guardian appointed for her;
21        (3)  "Minor" means an individual under eighteen (18) years of
22  age;
23        (4)  "Physician" means a person licensed to practice medicine in
24  this state, including a medical doctor and a doctor of osteopathy;
25        (5)  "Sex-selection abortion" means an abortion performed solely
26  on the basis of the sex of the unborn child;
27        (6)  "Unborn child" means the offspring of human beings from
28  conception until birth; and
29        (7)  "Viability" means the state of fetal development when, in
30  the judgment of the physician based on the particular facts of the case
31  before him or her and in light of the most advanced medical technology and
32  information available to him or her, there is a reasonable likelihood of
33  sustained survival of the unborn child outside the body of the mother, with
34  or without artificial life support.
35
36        20-16-1804.  Prohibition — Sex-selection abortion.

1        (a)  A physician or other person shall not intentionally perform or
2   attempt to perform an abortion with the knowledge that the pregnant woman is
3   seeking the abortion solely on the basis of the sex of the unborn child.
4        (b)  Before performing an abortion, the physician or other person who
5   is performing the abortion shall:
6             (1)(A)  Ask the pregnant woman if she knows the sex of the unborn
7   child.
8                  (B)  If the pregnant woman knows the sex of the unborn
9   child, the physician or other person who is performing the abortion shall
10  inform the pregnant woman of the prohibition of abortion as a method of sex
11  selection for children; and
12            (2)(A)  Request the medical records of the pregnant woman
13  relating directly to the entire pregnancy history of the woman.
14                 (B)  An abortion shall not be performed until reasonable
15  time and effort is spent to obtain the medical records of the pregnant woman
16  as described in subdivision (b)(2)(A) of this section.
17       (c)  If this section is held invalid as applied to the period of
18  pregnancy prior to viability, then the section shall remain applicable to the
19  period of pregnancy subsequent to viability.
20
21       20-16-1805.  Criminal penalties.
22       A physician or other person who knowingly performs or attempts to
23  perform an abortion prohibited by this subchapter is guilty of a Class A
24  misdemeanor.
25
26       20-16-1806.  Civil penalties and professional sanctions.
27       (a)(1)  A physician or other person who knowingly violates this
28  subchapter is liable for damages and shall have his or her medical license
29  suspended or revoked as applicable.
30            (2)  The physician or other person may also be enjoined from
31  future acts prohibited by this subchapter.
32       (b)(1)  A woman who receives an abortion in violation of this
33  subchapter without being informed of the prohibition of abortion as a method
34  of sex selection for children, the parent or legal guardian of the woman if
35  the woman is a minor who is not emancipated, or the legal guardian of the
36  woman if the woman has been adjudicated incompetent may commence a civil

action for any reckless violation of this subchapter and may seek both actual
and punitive damages.
            (2)  Damages may include without limitation:
                  (A)  Money damages for all psychological and physical
injuries occasioned by the violation of this subchapter; and
                  (B)  Statutory damages equal to ten (10) times the cost of
the abortion performed in violation of this subchapter.
      (c)  A physician or other person who performs an abortion in violation
of this subchapter shall be considered to have engaged in unprofessional
conduct for which his or her license to provide healthcare services in this
state shall be suspended or revoked by the Arkansas State Medical Board.
      (d)(1)  A cause of action for injunctive relief against any physician
or other person who has knowingly violated this subchapter may be maintained
by:
                  (A)  A person who is the spouse, parent, guardian, or
current or former licensed healthcare provider of the woman who receives or
*attempts to receive an abortion in violation of this subchapter; or*
                  *(B)  The Attorney General.*
            (2)  The injunction shall prevent the physician or other person
from performing further abortions in violation of this subchapter.

      20-16-1807.  Exclusion of liability for a woman who undergoes
prohibited abortion.
      (a)  A woman who receives or attempts to receive an abortion in
violation of this subchapter shall not be prosecuted under this subchapter
for conspiracy to violate this subchapter or otherwise be held criminally or
civilly liable for any violation.
      (b)  In a criminal proceeding or action brought under this subchapter,
a woman who receives or attempts to receive an abortion in violation of this
subchapter is entitled to all rights, protections, and notifications afforded
to crime victims.
      (c)(1)  In a civil proceeding or action brought under this subchapter,
the anonymity of the woman who receives or attempts to receive the abortion
in violation of this subchapter shall be preserved from public disclosure
unless she gives her consent to disclosure.
            (2)  A court of competent jurisdiction, upon motion or sua

1  sponte, shall issue orders to the parties, witnesses, and counsel and direct
2  the sealing of the record and exclusion of the individuals from the courtroom
3  or hearing room to the extent necessary to safeguard the identity of the
4  woman from public disclosure.
5            (3)  In the absence of written consent of the woman who receives
6  or attempts to receive an abortion in violation of this subchapter, a person
7  who initiates a proceeding or action under § 20-16-1806(b) or § 20-16-1806(d)
8  of this subchapter shall do so under a pseudonym.
9
10     20-16-1808.  Construction.
11     (a)  This act shall not be construed as creating or recognizing a right
12  to abortion.
13     (b)  It is not the intention of this act to make lawful an abortion
14  that is currently unlawful.
15
16     20-16-1809.  Right of intervention.
17     The General Assembly by joint resolution may appoint one (1) or more of
18  its members who sponsored or cosponsored this subchapter in his or her
19  official capacity to intervene as a matter of right in any case in which the
20  constitutionality of this law is challenged.
21
22     20-16-1810.  Effective date.
23     This subchapter takes effect on January 1, 2018.
24
25     SECTION 2.  DO NOT CODIFY.  SEVERABILITY CLAUSE.  If any provision of
26  this act or the application of this act to any person or circumstance is held
27  invalid, the invalidity shall not affect other provisions or applications of
28  this act which can be given effect without the invalid provision or
29  application, and to this end, the provisions of this act are declared
30  severable.
31
32                           /s/Collins
33
34
35                        APPROVED: 03/28/2017
36

# EXHIBIT C1

| 1 | State of Arkansas | *As Engrossed: H3/14/17 H3/15/17 H3/22/17* |
|---|---|---|

2  91st General Assembly      # A Bill

3  Regular Session, 2017      HOUSE BILL 2024

4

5  By: Representative Barker

6

## 7 For An Act To Be Entitled

8      *CONCERNING ABORTION; AND TO AMEND LAW REGARDING*

9      *MAINTENANCE OF FORENSIC SAMPLES FROM ABORTIONS*

10      *PERFORMED ON A CHILD; AND FOR OTHER PURPOSES.*

11

12

## 13 Subtitle

14      *TO AMEND PROVISIONS OF THE ARKANSAS CODE*

15      *CONCERNING ABORTION; AND TO AMEND LAW*

16      *REGARDING MAINTENANCE OF FORENSIC SAMPLES*

17      *FROM ABORTIONS PERFORMED ON A CHILD.*

18

19

20  BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF ARKANSAS:

21

22      SECTION 1.  Arkansas Code § 12-18-108(a)(1), concerning the maintenance

23  of forensic samples from abortions performed on a child, is amended to read

24  as follows:

25      (a)(1)  A physician who performs an abortion on a child who is less

26  than ~~fourteen (14)~~ seventeen (17) years of age at the time of the abortion

27  shall preserve under this subchapter fetal tissue extracted during the

28  abortion in accordance with rules adopted by the office of the State Crime

29  Laboratory.

30

31

32

33

34

35      */s/Barker*

36      ***APPROVED: 04/06/2017***



# EXHIBIT C2

West's Arkansas Code Annotated
  Title 12. Law Enforcement, Emergency Management, and Military Affairs
    Subtitle 2. Law Enforcement Agencies and Programs (Chapters 6 to 24)
      Chapter 18. Child Maltreatment Act (Refs & Annos)
        Subchapter 1. General Provisions

A.C.A. § 12-18-108

§ 12-18-108. Maintenance of forensic samples from abortions performed on a child

Effective: August 16, 2013
Currentness

(a)(1) A physician who performs an abortion on a child who is less than fourteen (14) years of age at the time of the abortion shall preserve under this subchapter fetal tissue extracted during the abortion in accordance with rules adopted by the office of the State Crime Laboratory.

(2) Before submitting the tissue under subdivision (a)(1) of this section, the physician shall redact protected health information as required under the Health Insurance Portability and Accountability Act of 1996, [1] Pub. L. No. 104-191.

(3) The physician or the reporting medical facility shall contact the law enforcement agency in the jurisdiction where the child resides.

(b) The State Crime Laboratory shall adopt rules prescribing:

(1) The amount and type of fetal tissue to be preserved under this section;

(2) Procedures for the proper preservation of the tissue for the purpose of DNA testing and examination;

(3) Procedures for documenting the chain of custody of the tissue for use as evidence;

(4) Procedures for proper disposal of fetal tissue preserved under this section;

(5) A uniform reporting instrument mandated to be utilized by physicians when submitting fetal tissue under this section which shall include the name and address of the physician submitting the fetal tissue and the name and complete address of residence of the parent or legal guardian of the child upon whom the abortion was performed; and

(6) Procedures for communication with law enforcement agencies regarding evidence and information obtained under this section.

(c) Failure of a physician to comply with this section or any rule adopted under this section shall constitute unprofessional conduct under the Arkansas Medical Practices Act, § 17-95-201 et seq., § 17-95-301 et seq., and § 17-95-401 et seq.

**Credits**

Acts of 2013, Act 725, § 5, eff. Aug. 16, 2013.

Footnotes

1        42 U.S.C.A. § 300gg et seq.

A.C.A. § 12-18-108, AR ST § 12-18-108

The constitution and statutes are current through Acts effective through April 7, 2017, from the 2017 Regular Session of the 91st Arkansas General Assembly, and Acts effective through May 4, 2017, from the 2017 First Extraordinary Session of the 91st Arkansas General Assembly, and include changes made by the Arkansas Code Revision Commission received through May 8, 2017.

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C3

# ARKANSAS STATE CRIME LABORATORY

RULES AND PROCEDURES

FOR THE

COLLECTION, MAINTENANCE, AND PRESERVATION

OF FETAL TISSUE

AS REQUIRED BY ACT 725 OF 2013

## AUTHORITY

As required by the Administrative Procedures Act, Arkansas Code 25-15-204, the Arkansas State Crime Laboratory duly adopts and promulgates the following rules and regulations for the procedures to implement the requirements of Act 725 of 2013 (Child Maltreatment Act).

## TITLE

The title of these rules and regulations will be known as "The Child Maltreatment Act": Regulations to provide for the collection of a forensic sample of fetal tissue following an abortion performed on a child who is less than fourteen (14) years of age at the time of the abortion and to establish procedures for the collection, maintenance, and dissemination of the forensic samples.

# DEFINITIONS

- "Abortion" means the act of using or prescribing any instrument, medicine, drug, or any other substance, device, or means with the intent to terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will with reasonable likelihood cause the death of the unborn child.

- "Abortion" does not mean the act of using or prescribing any instrument, medicine, drug, or any other substance, device, or means with the intent to terminate the clinically diagnosable pregnancy if done with the intent to:
  - Save the life or preserve the health of the unborn child;
  - Remove a dead unborn child caused by spontaneous abortion;
  - Remove an ectopic pregnancy.

- "Reproductive healthcare facility" means any office, clinic, or any other physical location that provides abortions, abortion counseling, abortion referrals, contraceptives, contraceptive counseling, sex education, or gynecological care and services;

- Chain of custody is a legal process referring to the paper trail that assures the integrity and security of the evidence. Chain of custody forms and labels document possession of the evidence from the moment of collection until the moment it is introduced in court, where the chain of custody will be closely scrutinized. If the chain of custody is broken, the evidence can be challenged in court and subject to allegations of mishandling or evidence tampering.

- Products of conception are the medical term used for the tissue derived from the union of egg and a sperm. It is the fragments of fetal, or membrane tissue remaining in utero following delivery abortion.

# STATE CRIME LABORATORY SHALL ADOPT RULES PRESCRIBING

1. The amount and type of fetal tissue to be preserved;
2. Procedures for the proper preservation of the tissue for the purpose of DNA testing and examination;
3. Procedures for documenting the chain of custody of the tissue for use as evidence;
4. Procedures for proper disposal of fetal tissue;
5. A uniform reporting instrument mandated to be utilized by physicians when submitting fetal tissue under this section shall include the name and address of the physician submitting the fetal tissue and the name and complete address of residence of the parent or legal guardian of the child upon whom the abortion was performed; and
6. Procedures for communication with law enforcement agencies regarding evidence and information obtained.

# RULES

1. The amount and type of fetal tissue to be preserved;

   o All products of conception should be preserved and submitted to the Arkansas State Crime Laboratory.

2. Procedures for the proper preservation of the tissue for the purpose of DNA testing and examination:

   o Fetal tissue should be collected with no preservatives and packaged in an air-tight, sealed and labeled container and immediately frozen at -20°C.

- o Never use formalin or formaldehyde to preserve any biological evidence because these chemicals degrade DNA.
- o Container shall be labeled with the patient's name and date of birth, date of the collection and the name of the individual collecting the products of conception.

3. Procedures for documenting the chain of custody of the tissue for use as evidence:

   - o The chain of custody begins as soon as the physician locates or obtains physical evidence. The physician must properly establish and maintain the chain of custody for this evidence. To properly initiate the chain of custody, labels are placed on each item of sealed evidence indicating the patient's name and date of birth, the date of the collection and the name of the individual collecting the products of conception, the name of the person who sealed the evidence, the date and time it was sealed, the names of those who release and receive the evidence, and the time it is transferred. The final transfer of evidence to law enforcement is then documented on the Arkansas State Crime Laboratory Submission Sheet.

4. Procedures for proper disposal of fetal tissue:

   - o Upon completion of DNA analysis, any remaining samples will be disposed of by the Arkansas State Crime Laboratory after receipt of a "letter of destruction" from the respective investigating agency.

5. A uniform reporting instrument mandated to be utilized by physicians when submitting fetal tissue under this which shall include the name and address of the physician submitting the fetal tissue and the name and complete address of residence of the parent or legal guardian of the child upon whom the abortion was performed;

   - o Physician collecting the sample must utilize the Arkansas State Crime Laboratory Evidence Submission Sheet which will document the name and address of the physician submitting the fetal tissue and the name and complete address of residence of the parent or legal guardian of the child upon whom the abortion was performed. This submission sheet will be available on the Arkansas State Crime Laboratory website: http://www.crimelab.arkansas.gov/

6. Procedures for communication with law enforcement agencies regarding evidence and information obtained.

o  In accordance with requirements enumerated in the Act, the physician or the reporting medical facility shall contact the law enforcement agency in the jurisdiction where the child resides. The address of the victim, parent and/or legal guardian must be placed on the Arkansas State Crime Laboratory Submission Sheet (see attached).

# EXHIBIT C4



# ARKANSAS STATE CRIME LABORATORY
## FETAL TISSUE SUBMISSION FORM

www.arkansas.gov/crimelab

P.O. Box 8500
3 Natural Resources Drive
Little Rock AR 72215
Phone: (501) 227-5747
Fax: (501) 227-0713

P.O. Box 868
Hope AR 71802

Phone: (870) 722-8530
Fax: (870) 722-8534

| Has any evidence been previously submitted on this case by any agency? ☐ Yes ☐ No | Agency Case # | ASCL Case # |
|---|---|---|
| If known, please list ASCL Case # | | |

| Investigating Agency | Investigating Officer (Prefix, First, Last) | |
|---|---|---|
| If applicable, please list additional agencies involved | Phone | |
| | Mobile (optional) | |
| | E-Mail Address | |

## Collection Facility Information

| Clinic/Medical Facility | Address |
|---|---|
| Physician | |

## Victim/Suspect Information

| Victim | DOB | Address |
|---|---|---|
| Parent/Legal Guardian | | Address |
| Suspect | DOB | |

## Evidence

| Evidence # | Evidence Description |
|---|---|
| | |

| Samples Collected By | Date & Time Collected |
|---|---|
| | |

## Chain of Possession

| Received From | Date | Time |
|---|---|---|
| Received By | Date | Time |

| Submitting Officer (Print) |
|---|
| Signature                                          Date |

# EXHIBIT D

| | | |
|---|---|---|
| 1 | State of Arkansas | |
| 2 | 91st General Assembly | **A Bill** |
| 3 | Regular Session, 2017 | HOUSE BILL 1566 |
| 4 | | |

5   By: Representatives Hammer, Cozart, C. Fite, D. Meeks, Payton, Penzo, Sullivan

6

7                          **For An Act To Be Entitled**

8            AN ACT TO AMEND THE PROVISIONS OF LAW CONCERNING THE

9            DISPOSITION OF FETAL REMAINS; AND FOR OTHER PURPOSES.

10

11

12                               **Subtitle**

13            TO AMEND THE PROVISIONS OF LAW CONCERNING

14            THE DISPOSITION OF FETAL REMAINS.

15

16

17   BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF ARKANSAS:

18

19            SECTION 1.  Arkansas Code § 20-17-801(b)(1)(B), concerning the

20   disposition of a dead fetus, is amended to read as follows:

21                    (B)  A dead fetus shall ~~not be disposed of within forty-~~

22   ~~eight (48) hours of its removal or acquisition unless consent is obtained in~~

23   ~~writing from the mother of the dead fetus or the mother's spouse~~ be disposed

24   of in accordance with the Arkansas Final Disposition Rights Act of 2009, §

25   20-17-102.

26

27            SECTION 2.  Arkansas Code § 20-17-801(b)(2)(C), concerning the

28   definition of "human tissue" within the law regarding the disposition of

29   human and fetal tissue, is amended to read as follows:

30                    (C)  "Human tissue" means any tissue of the human body,

31   including without limitation an external member of the human body, ~~fetal~~

32   ~~tissue,~~ placenta, or fetal connective tissue; and

33

34            SECTION 3.  Arkansas Code § 20-17-802 is amended to read as follows:

35   20-17-802. Fetal remains resulting from abortion.

36            (a)  A physician or facility that performs an abortion shall ensure



02-14-2017 14:16:54 JMB284

1 that the fetal remains and all parts are disposed of ~~in a fashion similar to~~
2 ~~that in which other tissue is disposed~~ in accordance with § 20-17-801 and the
3 Arkansas Final Disposition Rights Act of 2009, § 20-17-102.

4 　　　　(b)　A person shall not perform any biomedical or behavioral research
5 on:

6 　　　　　　　　(1)　A fetus born alive as the result of a legal abortion unless
7 the research is for the exclusive benefit of the fetus so born; or

8 　　　　　　　　(2)　A fetus born dead as the result of a legal abortion or on
9 any fetal tissue produced by the abortion ~~without permission of the mother~~.

10 　　　　(c)　A person shall not buy, sell, give, exchange, or barter or offer
11 to buy, sell, give, exchange, or barter any fetus born dead as a result of a
12 legal abortion or any organ, member, or tissue of fetal material resulting
13 from a legal abortion.

14 　　　　(d)　A person shall not possess either a fetus born dead as a result of
15 a legal abortion or any organ, member, or tissue of fetal material resulting
16 from a legal abortion.

17 　　　　(e)　~~This section~~ Subsection (d) of this section does not apply to:

18 　　　　　　　　(1)　A physician performing a legal abortion or a pathologist
19 performing a pathological examination as the result of a legal abortion;

20 　　　　　　　　(2)　An employee, agent, or servant of a physician performing a
21 legal abortion or pathologist performing a pathological examination as the
22 result of a legal abortion;

23 　　　　　　　　(3)　The staff, faculty, students, or governing body of any
24 institution of higher learning or institution of secondary education to the
25 extent of courses of instruction taught and research conducted at the
26 institutions;

27 　　　　　　　　(4)　Licensed physicians or their employees, agents, and servants
28 while in the conduct of medical research; ~~or~~

29 　　　　　　　　(5)　Any licensed physician when performing a standard autopsy
30 examination; or

31 　　　　　　　　(6)　Any person acting in accordance with § 20-17-801 or the
32 Arkansas Final Disposition Rights Act of 2009, § 20-17-102.

33 　　　　(f)　A person violating this section is guilty of a Class A
34 misdemeanor.

35 　　　　　　　　　　　　　　**APPROVED: 03/23/2017**

36