# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

FREDERICK W. HOPKINS, M.D., M.P.H            PLAINTIFF

v.            Case No. 4:17-cv-00404-KGB

LARRY JEGLEY, Prosecuting Attorney for
Pulaski County, STEVEN L. CATHEY, M.D.,
Chair of the Arkansas State Medical Board;
ROBERT BREVING, JR., M.D.; BOB E.
COGBURN, M.D.; WILLIAM F. DUDDING,
M.D.; OMAR T. ATIQ, M.D.; VERYL D.
HODGES, D.O.; MARIE HOLDER; LARRY D.
LOVELL; WILLIAM L. RUTLEDGE, M.D.;
JOHN H. SCRIBNER, M.D.; SYLVIA D.
SIMON, M.D.; DAVID L. STAGGS, M.D.;
JOHN B. WEISS, M.D., officers and members of
the Arkansas State Medical Board, and their
successors in office, in their official capacity,            DEFENDANTS

## PRELIMINARY INJUNCTION ORDER

Plaintiff, Frederick W. Hopkins, M.D., M.P.H., files this suit pursuant to 42 U.S.C. § 1983 against defendants Larry Jegley, Prosecuting Attorney for Pulaski County; Steven L. Cathey, M.D., Chair of the Arkansas State Medical Board; and Robert Breving, Jr., M.D.; Bob Cogburn, J.D.; William F. Dudding, M.D.; Omar T. Atiq, M.D.; Veryl D. Hodges, D.O.; Marie Holder, Larry D. Lovell; William L. Rutledge, M.D.; John H. Scribner, M.D.; Sylvia D. Simon, M.D.; David L. Staggs, M.D.; and John B. Weiss, M.D., as officers and members of the Arkansas State Medical Board in their official capacities. Dr. Hopkins mounts a constitutional challenge to four acts of the 91st Arkansas General Assembly of 2017, Act 45 (H.B. 1032) ("D&E Mandate"), Act 722 (H.B. 1434) ("Medical Records Mandate"), Act 1018 (H.B. 2024) ("Local Disclosure Mandate"), and Act 603 (H.B. 1566) ("Tissue Disposal Mandate"), to be codified at Arkansas Code Annotated

§§ 20-16-1801 to 1807, 20-16-1801 to 1810, 20-16-108(a)(1), and 20-17-801 to 802, respectively.[1]

By its terms, H.B. 1434 takes effect January 1, 2018. The remaining three laws, H.B. 1032, H.B. 2024, and H.B. 1566, are set to take effect on or about July 30, 2017.

Before the Court is Dr. Hopkins's motion for preliminary injunction or in the alternative temporary restraining order (Dkt. No. 2). Dr. Hopkins seeks preliminary injunctive relief based on the following claims in his complaint: Count 1 based on the D&E Mandate, Counts III and IV based on the Medical Records Mandate, Counts VI and VIII based on the Local Disclosure Mandate, and Counts X and XI based on the Tissue Disposal Mandate. Dr. Hopkins claims that "[t]hese statutes threaten [him] with criminal penalties and deny and burden [his] patients' constitutionally protected rights to decide to end a pre-viability pregnancy, to make independent decisions related to their pregnancy care, and to protect their private medical information." (Dkt. No. 1, at 3, ¶ 9). He seeks declaratory and injunctive relief "[t]o protect his patients from these constitutional violations, to enforce his own right to clear legal standards, and to avoid irreparable harm. . . ." (Dkt. No. 1, at 3, ¶ 9). Defendants responded in opposition to the motion (Dkt. No. 23). Dr. Hopkins filed a reply (Dkt. No. 32). Defendants also submitted two notices of supplemental authority (Dkt. Nos. 31, 34).

The Court conducted a hearing on the motion on July 13, 2017. The parties agreed among themselves not to present additional evidence at the hearing but instead to present only argument,

---

[1] As Dr. Hopkins points out, H.B. 1032 and H.B. 1434 amend Arkansas Code Title 20, Chapter 16 to add additional subchapters. Each bill numbers its first additional subchapter as 20-16-1801 and continues numbering subchapters consecutively. For clarity, Dr. Hopkins refers to the subchapters as numbered in their respective bills, even though it is anticipated that this is a drafting error and that subchapters in the proposed bills will be added using consecutive, not concurrent, numbering.

and the Court agreed to hear only argument. For the following reasons, the Court grants Dr. Hopkins's motion for preliminary injunction.

## I.    Findings of Fact

1.     Dr. Hopkins is a board-certified obstetrician-gynecologist with 25 years of experience in women's health. He is licensed to practice medicine in Arkansas, as well as other states including California and New Mexico. For over five years, Dr. Hopkins has been both Co-Director of the Family Planning Training Program at Santa Clara Valley Medical Center in Santa Clara, California, and Associate Clinical Professor in obstetrics and gynecology at Stanford University School of Medicine in Palo Alto, California (Dkt. No. 5, ¶ 1).

2.     Earlier in 2017, Dr. Hopkins began providing care at Little Rock Family Planning Services in Little Rock, Arkansas (Dkt. No. 5, ¶ 1).

3.     At Little Rock Family Planning Services, Dr. Hopkins provides care that includes medication abortion in the early part of the first trimester and surgical abortion through 21 weeks and six days as measured from the woman's last menstrual period ("LMP"), which is referred to as "21.6 weeks LMP" (Dkt. No. 5, ¶ 2; Dkt. No. 6, ¶ 2).

4.     Dr. Hopkins provides abortion and miscarriage services for patients from young teenagers to women in their later reproductive years (Dkt. No. 5, ¶ 2).

5.     Dr. Hopkins has performed work in Kenya, Tanzania, and Zimbabwe. As a result of that work, he has seen firsthand the results of denying women access to safe abortion care (Dkt. No. 5, ¶ 3).

6.     There are only two entities providing abortion care in Arkansas: Little Rock Family Planning Services, which provides abortions through 21.6 weeks LMP, and Planned Parenthood

Great Plains, which provides only medication abortion through 10 weeks LMP in Little Rock and Fayetteville, Arkansas (Dkt. No. 5, ¶ 6; Dkt. No. 6, ¶ 2).

7. If hospitals in Arkansas are providing any abortion care, it is in only rare circumstances (Dkt. No. 5, ¶ 6).

8. Under current Arkansas law, a woman must first receive state-mandated counseling, in person at the clinic before having an abortion. *See* Ark. Code Ann. § 20-16-1703(b)(1), (2). A woman must then wait 48 hours after that state-mandated counseling before she returns to the clinic for her procedure (Dkt. No. 5, ¶ 7; Dkt. No. 6, ¶ 7).

9. Given the requirements of Arkansas law regarding mandated state counseling, for patients receiving abortion care up to 18.0 weeks LMP, the law requires at least two trips to the clinic (Dkt. No. 6, ¶ 7).

10. According to Dr. Hopkins, the state-mandated counseling and 48-hour waiting period can result in a delay longer than 48 hours for many patients (Dkt. No. 5, ¶ 7).

11. Women must consider whether they have someone to accompany them to the clinic. The support person's availability may impact when a woman is able to return, after the mandatory delay, to receive medical care (Dkt. No. 6, ¶ 7).

12. Little Rock Family Planning Services provides care to women from throughout Arkansas and from other states (Dkt. No. 5, at 37; Dkt. No. 6, ¶ 5).

13. Many patients of Little Rock Family Planning Services are low-income. Approximately 30 to 40% of patients obtain financial assistance to pay for their abortion care (Dkt. No. 6, ¶ 5).

14. Many patients of Little Rock Family Planning Services struggle in their lives and in their efforts to access the medical care they need (Dkt. No. 6, ¶ 5).

15.     The time and effort it takes to make the necessary plans to access medical care cause anxiety and stress and cause financial pressure for women seeking care at Little Rock Family Planning Services. Women must arrange for time off work on multiple days, which can be very difficult given that many are in low-wage jobs and feel that they cannot explain to an employer the reason they need to take time off. For women who already have children, these women must arrange and often pay for childcare. These women also must arrange and pay for transportation. In some cases, these women also have to arrange and pay for a place to stay for multiple nights (Dkt. No. 6, ¶ 8).

16.     Patients of Little Rock Family Planning Services seek abortions for a variety of personal, medical, financial, and family reasons, including that the woman has one child but believes she cannot parent another; that the woman believes she is too young to be ready to carry a pregnancy or to become a parent; that the woman is pursuing educational or work opportunities; that the woman has a health condition that makes carrying a pregnancy dangerous; that the woman has received a diagnosis of fetal abnormality; that the woman is in an abusive relationship; and that the woman is pregnant as a result of rape or sexual assault (Dkt. No. 6, ¶ 6).

17.     Many patients of Little Rock Family Planning Services are desperate not to disclose the reasons for travel and appointments to seek abortion care (Dkt. No. 6, ¶ 8).

18.     Approximately 30% of all women have an abortion at some point in their lives (Dkt. No. 4, ¶ 7).

19.     Abortion in the first and second trimester, utilizing current methods, is safer than carrying a pregnancy to term, as to both morbidity and mortality (Dkt. No. 4, ¶ 8; Dkt. No. 32-1, ¶ 5).

20. The first trimester of pregnancy goes to approximately 14 weeks LMP (Dkt. No. 5, ¶ 8).

21. Nationwide, approximately 90% of abortions occur during the first trimester of pregnancy (Dkt. No. 5, ¶ 8).

22. In Arkansas, approximately 83% of abortions occur during the first trimester of pregnancy (*Id.*).

23. During the first trimester, there are two methods of abortion (Dkt. No. 4, ¶ 11-12; Dkt. No. 5, ¶ 9).

24. As for the first method used during the first trimester, a clinician may use medications to induce an early miscarriage. This method is called early medication abortion. It is generally available only through part of the first trimester of pregnancy, and it is not available in the last weeks of the first trimester of pregnancy. In the most common method of early medication abortion, a woman takes two drugs: first mifepristone and then, the next day, misoprostol. Within 24 to 48 hours of taking the second drug, the woman likely will pass the products of conception, not in a medical facility but in a location that is most comfortable for her, usually her home (Dkt. No. 4, ¶ 11-12; Dkt. No. 5, ¶ 9).

25. Dr. Hopkins does not know the exact timing of the most common method of early medication abortion because he is not with his patient when she passes the products of conception (Dkt. No. 5, ¶ 9).

26. As for the second method used during the second trimester, a clinician may use suction to empty the uterus, which is available through the entire first trimester. This method is called suction or aspiration abortion. The clinician first gently opens the cervix and then inserts a suction cannula into the uterus, and suctions out the embryo (until approximately 10 weeks) or

fetus (thereafter) – as well as the placenta, amniotic fluid, and sac, and the other contents of the uterus (Dkt. No. 4, ¶ 13; Dkt. No. 5, ¶ 10).

27.     In the second trimester of pregnancy, suction alone generally is not sufficient to complete an abortion, nor is it something physicians can rely on to cause fetal demise to avoid liability under the D&E Mandate in the second trimester (Dkt. No. 32-1, ¶ 5).

28.     In the second trimester of pregnancy, beginning at approximately 14.0 weeks LMP, there are two principal methods of abortion (Dkt. No. 4, ¶ 14; Dkt. No. 5, ¶ 11).

29.     As for the first method used beginning at approximately 14.0 weeks LMP, in induction abortion, the clinician uses medications to induce labor.  This procedure can happen only in a hospital or hospital-like facility, not in a second-trimester outpatient clinic.  This procedure can take over 24 hours, and for some patients, this procedure may span multiple days.  This procedure entails labor, which can involve pain requiring significant medication or anesthesia, and which may be psychologically challenging for some women.  This procedure accounts for a tiny fraction of second-trimester abortions in the nation (Dkt. No. 4, ¶ 14; Dkt. No. 5, ¶ 12).

30.     Because induction involves an in-patient stay, requiring up to three days of hospitalization, as opposed to an out-patient procedure, there is an enormous cost difference between induction and the out-patient standard dilation and evacuation ("standard D&E") procedure[2] (Dkt. No. 4, ¶ 14).

---

[2]  The Court uses the term "standard D&E" to distinguish it from "intact D&E," sometimes referred to as "D&X," which involves dilating the cervix enough to remove the whole fetus intact. "Intact D&E" is banned under the Federal Partial-Birth Abortion Ban Act of 2003, unless fetal demise is induced before the procedure.  *See Gonzales v. Carhart*, 550 U.S. 124 (2007) (upholding the federal partial-birth abortion ban).  The Court also uses the term "standard D&E" to refer to the procedure that does not include induced fetal demise.

31.     In some women, an induction abortion fails, and the woman needs intervention in the form of D&E for her safety.  This is infrequent, but this does occur (Dkt. No. 4, ¶ 15; Dkt. No. 5, ¶ 12).

32.     In approximately 5% to 10% of induction abortions, the woman must undergo an additional surgical procedure to remove a retained placenta.  Induction abortion also can cause uterine rupture, which is rare but can be life threatening and can be of particular concern for women who have had multiple previous cesarean deliveries (Dkt. No. 4, ¶ 15; Dkt. No. 25-4, ¶ 8).

33.     Of women who have abortions performed during the second trimester of pregnancy, 95% of those women in this country choose standard D&E (Dkt. No. 4, ¶ 16).

34.     In 2015, the latest year for which statistics are available, there were no induction abortions reported in Arkansas (Dkt. No. 5, ¶ 12).

35.     As for the second method used beginning at approximately 14 weeks LMP, because suction instruments alone are generally no longer sufficient to empty the uterus, doctors can use a method with instrumentation called standard D&E.  This involves two steps:  dilating the cervix, and then evacuating the uterus with instruments such as forceps.  There are several ways to dilate the cervix (Dkt. No. 4, ¶ 17; Dkt. No. 5, ¶ 13).

36.     Typically, during the early weeks of the second trimester of pregnancy, a doctor performing standard D&E uses a combination of medications that open the cervix and manual dilators; then, the same day, the doctor uses forceps to remove the fetus and other contents of the uterus.  Because the fetus is larger than the opening of the cervix, the fetal tissue generally comes apart as the physician removes it through the cervix.  The reason that the cervical opening is smaller than the fetal parts is that, in general, the doctor dilates only enough to allow the safe passage of instruments and fetal tissue through the cervix (Dkt. No. 4, ¶ 17-18; Dkt. No. 5, ¶ 14).

37.     In Arkansas and elsewhere, standard D&E typically is a one-day procedure from 14.0 to 17.6 weeks LMP (Dkt. No. 5, ¶ 15; Dkt. No. 6, ¶ 17).

38.     Of 638 D&Es reported in Arkansas in 2015, 407 or 64% took place during these earliest weeks of the second trimester (Dkt. No. 6, ¶ 17).

39.     Dr. Hopkins is aware of no physicians, other than those with whom he practices at Little Rock Family Planning Services, who provide second trimester abortion care in the state of Arkansas (Dkt. No. 32-2, ¶ 2).

40.     Later in the second trimester, larger instruments require wider cervical dilation. Although some physicians continue to provide standard D&E as a one-day procedure, starting at 18.0 to 20.0 weeks LMP, it is typical for doctors to add overnight osmotic dilation to the standard D&E protocol. Osmotic dilators are thin sticks of material that swell when they absorb moisture; when placed in a woman's cervix, they absorb moisture from the woman's body, expand slowly, and slowly dilate the cervix. Once dilation is sufficient, typically the next day, the doctor proceeds as in earlier standard D&Es, removing the fetus, generally in pieces because it is larger than the cervical opening (Dkt. No. 4, ¶ 17; Dkt. No. 5, ¶ 16).

41.     For patients of Little Rock Family Planning Services who have overnight osmotic dilation with the standard D&E protocol, those patients are required to spend that overnight within 30 minutes of the Clinic so that the doctor is available in the rare instance in which a patient has any problem (Dkt. No. 6, ¶ 18).

42.     Through the second trimester, standard D&E is a safe way to provide abortion in an outpatient setting, such as a family planning clinic (Dkt. No. 5, ¶ 17).

43.     Standard D&E accounts for almost all second-trimester abortions in the United States (Dkt. No. 4, ¶ 16; Dkt. No. 5, ¶ 17).

44.     Standard D&E accounts for 100% of second trimester abortions reported in Arkansas in 2015 (Dkt. No. 5, ¶ 17).

45.     Each year, Little Rock Family Planning Services provides approximately 3,000 abortions, of which approximately 600 or 20% occur during the second trimester (Dkt. No. 6, ¶ 16).

46.     Standard D&E procedure has a long-established safety record in this county, with major complications occurring in less than 1% of standard D&E procedures (Dkt. No. 4, ¶ 19).

47.     Richard A. Wyatt, M.D., an expert for defendants, states that "[b]y the 14th week of pregnancy a living baby has a beating heart and moving limbs, and breathing motions have begun." (Dkt. No. 25-4, ¶ 4).  At this time, and on the record before it, this Court does not equate Dr. Wyatt's use of "living baby" with viability, as the term viability has been used by courts in the abortion context.  *See Edwards v. Beck*, 8 F.Supp.3d 1091 (E.D. Ark. 2014), *aff'd* 786 F.3d 1113 (8th Cir. 2015) (examining the term viability in both medical and legal contexts).

48.     Given the requirements of Arkansas law regarding mandated state counseling, for patients receiving abortion care at 18.0 to 21.6 weeks LMP, the law requires at least three trips to the clinic (Dkt. No. 6, ¶ 7).

49.     Starting at 18.0 to 22.0 weeks, some physicians, including Dr. Hopkins, undertake an additional procedure to try to cause fetal demise before the evacuation phase of a D&E for most patients, meaning those for whom it is not contraindicated (Dkt. No. 5, ¶ 18).

50.     Of the physicians who undertake an additional procedure after 18.0 to 22.0 weeks LMP, the vast majority of physicians inject the drug digoxin into the fetus if possible or, if not, then into the amniotic fluid.  Injecting digoxin into the amniotic fluid is technically easier, but it is less effective (Dkt. No. 4, ¶ 21; Dkt. No. 5, ¶ 18).

51.     The injections may be through the woman's abdomen or vaginal wall.  These injections generally use an 18- to 22-gauge spinal needle, passed under ultrasound guidance, through the patient's abdomen, vaginal wall, or vagina and cervix, and then either into the amniotic fluid or the fetus (Dkt. No. 4, ¶ 21, 25; Dkt. No. 5, ¶ 18).

52.     There are some women for whom an injection of digoxin may be difficult or impossible.  For example, woman may be very obese; may have anatomical variations of the uterine and vaginal anatomy, such as fibroids or a long cervix; and may have fetal positioning that creates issues.  Physicians cited by all parties agree upon this (Dkt. No. 4, ¶ 27; Dkt No. 5, ¶ 25a; Dkt. No. 25-4, ¶ 6; Dkt. No. 32-3, Biggio Cross, at 139; Dkt. No. 25-4, ¶ 6).

53.     These injections also can be dangerous for women with cardiac conditions such as arrhythmias (Dkt. No. 4, ¶ 27).

54.     Even for women who tolerate injections, digoxin will not cause fetal demise in 5% to 10% of all cases in which it is used; physicians cited by all parties agree upon this (Dkt. No. 4, ¶ 28; Dkt. No. 5, ¶ 25b; Dkt. No. 32-3, Biggio Cross, at 142).

55.     Doctors are not able to know in advance for which women digoxin injection will fail (Dkt. No. 5, ¶ 25c).

56.     The failure rate is higher for intramniotic injections of digoxin.  Intramniotic injection would require a skill level similar to that required for amniocentesis.  Intramniotic injections are associated with higher complication rates than intrafetal injection (Dkt. No. 4, ¶ 25; Dkt. No. 32-1, ¶ 7).

57.     Intrafetal injections of digoxin are more difficult to perform and may be impossible to perform due to fetal position, uterine anatomy and other factors, especially the size of the fetus.

The smaller the fetus, the more difficult intrafetal injection will be. Intrafetal digoxin injections require additional skill (Dkt. No. 4, ¶ 28; Dkt. No. 32-1, ¶ 7).

58.     Digoxin works very slowly. Doctors allow 24 hours after the injection for it to work. Even then, it does not always cause fetal demise (Dkt. No. 5, ¶ 18).

59.     The transabdominal injection can be painful and emotionally difficult for the patient. The injection poses risks, including infection, which can threaten the patient's health and future fertility, and accidental absorption of the drug into the patient's circulation, which can result in toxicity and changes to the patient's EKG (Dkt. No. 4, ¶ 25).

60.     Like all medical procedures, the digoxin injection creates risks for the patient. Doctors who use digoxin believe that practical concerns justify using it. The main benefit of using digoxin in procedures after 18.0 to 22.0 weeks LMP is to establish compliance with the federal "partial-birth abortion ban" or similar state laws (Dkt. No. 4, ¶ 23; Dkt. No. 5, ¶ 19).

61.     The federal "partial-birth abortion ban" has an intent requirement (Dkt. No. 4, ¶ 23).

62.     The American Congress of Obstetricians and Gynecologists ("ACOG") concluded: "No evidence currently supports the use of induced fetal demise to increase the safety of second-trimester medical or surgical abortion." This statement is consistent with the medical literature (Dkt. No. 4, ¶ 22; Am. Coll. of Obstetricians & Gynecologists, Practice Bulletin Number 135: Second Trimester Abortion, 121(6) Obstetrics & Gynecology 1394, 1396, 1406 (2013)).

63.     There is no record evidence of any physician attempting digoxin injections earlier than 18 weeks LMP. Physicians relied upon by both sides agree upon this (Dkt. No. 4, ¶ 26; Dkt. No. 32-3, Biggio Cross, at 143).

64.     There are virtually no reported studies, and no studies of record, on using digoxin in the first weeks of the second trimester, when most second trimester abortions are performed. Without studies, doctors do not know the risks, complication rates, or effectiveness of such a procedure. Without this information, doctors cannot counsel patients on the effectiveness or safety of such a procedure (Dkt. No. 4, ¶ 26; Dkt. No. 32-1, ¶ 6, 9-10; Dkt. No. 32-3, Biggio Cross, at 143-44).

65.     There are no reported studies of record on using a second injection of digoxin, or multiple, sequential injections of digoxin, after the first dose fails to bring about fetal demise. Physicians relied upon by both sides agree on this (Dkt. No. 4, ¶ 29; Dkt. No. 23-15, ¶ 6; Dkt. No. 32-3, Biggio Cross, at 142).

66.     Using a second injection of digoxin would, at a minimum, delay the abortion procedure, require the patient to make another trip to the clinic, and increase the risk of uterine infection, extramural delivery, or digoxin toxicity (Dkt. No. 4, ¶ 29).

67.     In Arkansas, the standard D&E protocol changes in two ways starting at 18.0 weeks LMP for almost all patients (Dkt. No. 5, ¶ 20).

68.     First, in Arkansas, a woman at 18.0 weeks LMP receives overnight dilation. This means that the abortion procedure takes two days, rather than one (Dkt. No. 5, ¶ 20).

69.     Second, in Arkansas, at the time a woman at 18.0 weeks LMP has placed in her cervix the osmotic dilators, which is the day before the intended evacuation, the woman also receives an injection of digoxin through the vaginal wall. That injection of digoxin is into the fetus or, if not, into the amniotic fluid. With either method of injection, the digoxin may not work effectively (Dkt. No. 5, ¶ 20).

70. The next day, in women 18.0 weeks or later LMP, if the digoxin has not caused fetal demise, Dr. Hopkins currently will take steps with his forceps, such as compressing fetal parts, to ensure fetal demise and to establish compliance with existing laws. These women would already be dilated and, therefore, at risk without care (Dkt. No. 5, ¶¶ 21, 25b).

71. Another substance, potassium chloride (KCl), will cause fetal demise if injected directly into the fetal heart, which is extremely small (Dkt. No. 4, ¶ 31; Dkt. No. 5, ¶ 22).

72. Injecting potassium chloride has limitations based on gestational age and anatomy (Dkt. No. 25-4, ¶ 6).

73. The procedure of injecting potassium chloride is very rare, as it carries much more severe risks for the woman, including death if the doctor places the solution in the wrong place, and it requires extensive training generally available only to sub-specialists in high-risk obstetrics, known as maternal-fetal medicine (Dkt. No. 4, ¶ 31; Dkt. No. 5, ¶ 22; Dkt. No. 23-15, ¶ 11; Dkt. No. 32-2, ¶ 3; Dkt. No. 32-3).[3]

74. Injecting potassium chloride is usually done in a hospital, not a clinical, setting. The procedure requires an advanced ultrasound machine that is typically available only in a hospital setting and too expensive for most clinics to afford (Dkt. No. 4, ¶ 31; Dkt. No. 32-2, ¶ 3; Dkt. No. 32-3, Biggio Direct, at 111, Biggio Cross, at 140-41).

75. There are some women for whom injecting potassium chloride is not medically appropriate (Dkt. No. 4, ¶ 31).

---

[3] The Court rejects the defendants' expert Richard A. Wyatt, M.D.'s assertion that potassium chloride injections are "no more difficult than amniocentesis." (Dkt. No. 25-4, ¶ 6). Dr. Wyatt professes no expertise in the area of potassium chloride injections (Dkt. No. 25-4, ¶ 1). His assertion directly contradicts the cross examination testimony of Joseph R. Biggio, Jr., M.D., defendants' other expert, who testified at a hearing in a case involving a similar Alabama law and who is trained to perform and trains other physicians to perform such highly specialized procedures (Dkt. No. 32-3, Biggio Cross, at 134, 139-41 ).

76. Neither Dr. Hopkins nor to his knowledge any of the physicians with whom he practices at Little rock Family Planning Services have the specialized training in the sub-specialty of high-risk obstetrics necessary to safely inject potassium chloride (Dkt. No. 5, ¶ 22).

77. Umbilical cord transection involves the physician rupturing the membranes, inserting a suction tube or other instrument such as forceps into the uterus, and grasping the cord, if possible, to divide it with gentle traction, which will cause demise over the course of up to 5 to 10 minutes (Dkt. No. 4, ¶ 32; Dkt. No. 23-15, ¶ 8).

78. The success and ease of this procedure depends on placement of the umbilical cord. If the umbilical cord is blocked by the fetus, it would be very difficult and very risky to attempt to reach it (Dkt. No. 4, ¶ 33).

79. Umbilical cord transection is not widely practiced or researched (Dkt. No. 4, ¶ 32).

80. There has been only one scientific study on the use of cord transection to cause fetal demise; physicians relied upon by both sides agree on this (Dkt. No. 32-1, ¶ 11; Dkt. No. 32-3, Biggio Cross, at 146).

81. The one scientific study on the use of cord transection has limitations and does not support any conclusion about the safety of the procedure (Dkt. No. 32-1, ¶¶ 12-13).

82. Attempting umbilical cord transection before 16.0 weeks LMP is completely unstudied, and like injections, these procedures are more difficult to perform the earlier in pregnancy a woman seeks care. Successfully identifying and transecting the cord at early gestations would take additional time and likely multiple passes with forceps (Dkt. No. 32-1, ¶¶ 14-15).

83.     There are some women for whom umbilical cord transection is not medically appropriate; physicians relied upon by both parties agree on this (Dkt. No. 4, ¶ 32; Dkt. No. 23-15, ¶ 12).

84.     Mark D. Nichols, M.D., an expert upon whom Dr. Hopkins relies, does not perform umbilical cord transection (Dkt. No. 4, ¶¶ 32-35; Dkt. No. 32-1, ¶¶ 11-15).

85.     No physician to which either party cites would require cord transection in their respective practices (Dkt. No. 4, ¶ 34; Dkt. No. 5, ¶ 25d; Dkt. No. 32-3, Biggio Cross, at 144).

86.     Joseph R. Biggio, Jr., M.D., an expert upon whom defendants rely, admits that he would not require umbilical cord transection before every abortion because there is no medical benefit to doing so (Dkt. No. 32-2, at 144).

87.     The longer a D&E takes and the more instrument passes into the woman's uterus occur, the higher the risks of uterine perforation and other complications; physicians relied upon by both sides agree on this (Dkt. No. 4, ¶¶ 32-34; Dkt. No. 5, ¶ 25d; Dkt. No. 32-1, ¶¶ 13, 15; Dkt. No. 23-15, ¶ 8; Dkt. No. 32-3, Biggio Cross, at 144-45; Dkt. No. 25-4, ¶ 6).

88.     Delay can push a woman past the point in pregnancy at which she can receive a medication abortion, requiring a woman who prefers that method to have a procedure with instrumentation that she would otherwise not have.  Delay can push a woman from a first-trimester to a second-trimester procedure, or from a one-day to a two-day procedure in the second trimester. Delay can also push a woman past the point at which she can obtain an abortion at Little Rock Family Planning Services and in Arkansas (Dkt. No. 6, ¶ 13).

89.     The risks associated with legal abortion utilizing current methods increase as pregnancy progresses, particularly if that delay pushes a woman from the first trimester to the second trimester.  Studies demonstrate increased risks of complications, such as bleeding and

uterine perforation, associated with abortions performed later in pregnancy (Dkt. No. 4, ¶ 10; *see also* Dkt. No. 25-4, ¶ 7).

90. Delay also means that a woman may pay more for the abortion procedure itself because the procedure becomes more complex as pregnancy advances (Dkt. No. 6, ¶ 14).

91. Doctors at Little Rock Family Planning Services request medical records for only a "tiny fraction" of patients or approximately 25 patients per year (Dkt. No. 6, ¶ 24).

92. The patients for whom doctors at Little Rock Family Planning Services request medical records include patients who have received a diagnosis of fetal anomaly, decided to end the pregnancy, and received a referral to Little Rock Family Planning Services and patients for whom the doctor believes the records could be useful because of a woman's medical condition (Dkt. No. 6, ¶ 24).

93. For Little Rock Family Planning Services to obtain a patient's medical records, the patient must first sign a form authorizing Little Rock Family Planning Services to obtain the medical records. That authorization is then sent along with a request to the health care provider. Little Rock Family Planning Services staff then follow-up with a phone call to the health care provider, if necessary (Dkt. No. 6, ¶ 25).

94. Because Little Rock Family Planning Services typically requests records related to some aspect of the care the patient will receive, and therefore involve a specific request, not a request for the patient's full medical history, there is no fee charged for the records (Dkt. No. 6, ¶ 25).

95. Even with these specific requests for records, it takes time to obtain a patient's medical records from another health care provider and may take a few hours or up to several weeks (Dkt. No. 6, ¶ 26).

96. When making a request for a patient's complete medical record, a fee usually is charged for obtaining the records (Dkt. No. 6, ¶ 33).

97. Little Rock Family Planning Services is a well-known abortion provider. Any request for medical records made by Little Rock Family Planning Services, in and of itself, discloses that the patient likely is seeking an abortion. As a result, Little Rock Family Planning Services does not request records without a woman's prior written consent, and some women specifically request that Little Rock Family Planning Services not seek records from another health care provider because the women do not want that provider to know of the pregnancy and abortion decision (Dkt. No. 6, ¶ 27).

98. Some women have informed Little Rock Family Planning Services that the women fear hostility or harassment from the other health care providers for deciding to seek an abortion (Dkt. No. 6, ¶ 28).

99. A few years ago, Little Rock Family Planning Services requested a woman's medical records from another health care provider and that provider's wife then reached out to the woman in an effort to dissuade her from having an abortion (Dkt. No. 6, ¶ 28).

100. Little Rock Family Planning Services provides medical care to approximately 3,000 women each year, the majority of whom have had one or more prior pregnancies, during which the women received medical care from one or more providers or received care for a current pregnancy (Dkt. No. 6, ¶ 32).

101. Under Arkansas law, a woman under the age of 18 must obtain the consent of one parent prior to obtaining an abortion or, alternatively, can seek a judicial bypass (Dkt. No. 6, ¶ 36). *See* Ark. Code Ann. § 20-16-804.

102.     In 2016, Little Rock Family Planning Services provided abortions to five minors under the age of 14, all five of whom had parental consent, and 69 minors under the age of 17, all of whom except one had parental consent with the one exception having received a judicial bypass (Dkt. No. 6, ¶ 36).

103.     The numbers from 2016 are typical for Little Rock Family Planning Services in that the majority of women under the age of 17 have obtained a parent's consent to seek medical care at Little Rock Family Planning Services (Dkt. No. 6, ¶ 36).

104.     A few minor patients of Little Rock Family Planning Services are married, and those patients' husbands may or may not be involved in the patients' decisions to have an abortion (Dkt. No. 6, ¶ 37).

105.     Under the Child Maltreatment Act, Little Rock Family Planning Services reports suspected abuse to the Arkansas State Police's Child Abuse Hotline (Dkt. No. 6, ¶ 38).   *See* Ark. Code Ann. § 12-18-402 (providing that mandated reporters "shall immediately notify the Child Abuse Hotline" if they have reasonable cause to suspect child abuse, and listing reproductive healthcare facility employees and volunteers as mandatory reporters).

106.     Under Arkansas law, for women who are 13 years old or younger, Little Rock Family Planning Services must preserve tissue and have local law enforcement in the jurisdiction in which the minor resides pick it up.   Ark. Code Ann. § 12-18-108(a).   Little Rock Family Planning Services sends a form to local law enforcement with information identifying the patient to alert local law enforcement to come pick up the tissue (Dkt. No. 6, ¶ 40); Ark. Code Ann. § 12-18-108(b)(5).

107.    Compliance with this law requires, on occasion, Little Rock Family Planning Services to speak by telephone with local law enforcement and local law enforcement's obligation to comply with the law (Dkt. No. 6, ¶ 41).

108.    Local law enforcement do not reliably comply with existing law by picking up the preserved tissue for patients who are 13 or younger ((Dkt. No. 6, ¶ 41).

109.    Local law enforcement can be very small, with as few as two officers, and operate in small communities (Dkt. No. 6, ¶ 45).

110.    On occasion, when a Little Rock Family Planning Services representative has spoken to local law enforcement about the existing law, personnel lecture the Little Rock Family Planning Services and "preach[] anti-abortion rhetoric, including telling [the representative] that the Clinic is taking a life." (Dkt. No. 6, ¶ 43).

111.    Little Rock Family Planning Services, as a part of its routine counseling, discusses with the woman the age of her sexual partner (Dkt. No. 6, ¶ 38).

112.    In general, when a crime has already been reported, law enforcement are involved before the minor visits Little Rock Family Planning Services, and law enforcement call Little Rock Family Planning Services before the minor patient arrives.  When an investigation is involved, Little Rock Family Planning Services preserves tissue for law enforcement (Dkt. No. 6, ¶ 39).

113.    For patients who are 13 or younger and reside out of state, Little Rock Family Planning Services makes the same efforts to contact the local police department where the minor resides (Dkt. No. 6, ¶ 42).

114.    Unlike the State Child Abuse Hotline, which is associated with a unit whose staff have specialized training in child maltreatment and handling these complicated issues, local law enforcement does not have the same kind of specialized unit or training (Dkt. No. 6, ¶ 43).

115.    Under an Arkansas law enacted in 2015, Little Rock Family Planning Services obtains each patient's consent in writing to having the embryonic or fetal tissue from her abortion disposed of within 48 hours (Dkt. No. 6, ¶ 50); *See* Ark. Code Ann. § 20-17-801(b).

116.    Currently, Little Rock Family Planning Services contracts with a vendor that transports tissue generated at the Clinic out of Arkansas to be disposed of by incineration (Dkt. No. 6, ¶ 49).

117.    Currently, a few patients of Little Rock Family Planning Services each year wish to have their tissue cremated and make those arrangements themselves (Dkt. No. 6, ¶ 49).

118.    Currently, Little Rock Family Planning Services sends the pregnancy tissue of a few patients to pathology.  This may be done when a physician suspects a molar pregnancy or an abnormal growth of fetal tissue that can become a tumor or when the patient received a diagnosed fetal anomaly (Dkt. No. 6, ¶ 53).

119.    In a medication abortion, the patient passes the pregnancy tissue at home over a period of hours or days, but she collects and disposes of it as she would during menstruation (Dkt. No. 6, ¶ 52).

120.    The record includes affidavits from individual women who describe mental distress resulting from their individual choices to have abortions and an affidavit from one abortion counselor who claims to have witnessed these reactions in other women with whom she has interacted in a post-abortion support group setting (Dkt. No. 25-12; Dkt. No. 25-14; Dkt. No. 25-15; Dkt. No. 25-16).

121.    The American Psychiatric Association rejected the notion that abortion causes mental distress (Dkt. No. 32-1, ¶ 16).

122.     Individual patients may experience a full range of emotional and psychological responses to having an abortion, but well-designed and rigorous research concludes that there is no evidence that abortion causes mental health problems (Dkt. No. 32-1, ¶¶ 16-18).

123.     In Arkansas, 3,771 abortions were performed in 2015 (Dkt. No. 5, Ex. B). Of those, 581 were medication abortion and 3,190 were not. Of the 3,771 total abortions in 2015 in Arkansas, 528 were obtained by married women, and 3,234 were obtained by not married women (*Id.*). Nine individuals reported "unknown" when asked marital status (*Id.*). Of the 3,771 total abortions in 2015 in Arkansas, 141 were obtained by individuals below the age of 18 (*Id.*).

## II.     Threshold Matters

Defendants filed a motion to dismiss, which first became ripe on July 25, 2017 (Dkt. Nos. 21, 33). In that motion, defendants raise several threshold matters upon which this Court must rule before turning to the merits of this case. The Court must satisfy itself that the parties and these disputes are properly before the Court.

### A.     Article III Standing

Defendants first contend that Dr. Hopkins purportedly lacks standing to assert challenges to these Acts and that, therefore, the Court should dismiss this action. "Article III, § 2, of the Constitution restricts the federal 'judicial [p]ower' to the resolution of 'Cases' and 'Controversies.'" *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). Dr. Hopkins has the burden of establishing that he has standing. *Id.* To demonstrate "Article III" standing, a plaintiff must demonstrate:

> (1) [A]n injury in fact (*i.e.,* a "concrete and particularized" invasion of a "legally protected interest"); (2) causation (*i.e.,* a "'fairly . . . trace[able]'" connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.,* it is "'likely'" and not "merely 'speculative'" that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

*Id.* at 273-74 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)).

In addition to the three "irreducible constitutional minimum" requirements of Article III standing, *Lujan,* 504 U.S. at 560, courts weigh other "prudential" considerations in determining whether plaintiffs have standing. *United States v. Windsor*, 133 S. Ct. 2675, 2685 (2013) (explaining the distinction between "the jurisdictional requirements of Article III and the prudential limits on its exercise").

Dr. Hopkins is identified in the complaint as "an experienced, highly credentialed and board-certified obstetrician-gynecologist, and an abortion provider at Little Rock Family Planning Services, the only provider of outpatient, second-trimester abortion care in Arkansas." (Dkt. No. 1, at 4, ¶ 13). Dr. Hopkins claims that the statutes he challenges "threaten [him] with criminal penalties and deny and burden [his] patients' constitutionally protected rights to decide to end a pre-viability pregnancy, to make independent decisions related to their pregnancy care, and to protect their private medical information." (Dkt. No. 1, at 3, ¶ 9). He seeks declaratory and injunctive relief "[t]o protect his patients from these constitutional violations, to enforce his own right to clear legal standards, and to avoid irreparable harm. . . ." (Dkt. No. 1, at 3, ¶ 9).

In their filings, defendants make several arguments challenging standing in this case. As an initial matter, the United States Supreme Court held in *Doe v. Bolton*, 410 U.S. 179, 188 (1973), that abortion doctors have first-party standing to challenge laws limiting abortion when, as in *Doe* and the current case, the doctors are subject to penalties for violation of the laws. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 903-04, 909 (1992) (plurality opinion); *Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 911 (7th Cir. 2015); *Planned Parenthood of Greater Tex. Surg. Health Serv. v. Abbott II*, 748 F.3d 583, 598 (5th Cir. 2014) ("*Abbott II*"); *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 794 (7th Cir. 2013);

*Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 62 (1976). Here, Dr. Hopkins faces criminal penalties under the D&E Mandate, the Medical Records Mandate, and the Tissue Disposal Mandate. Further, he faces licensing penalties under the Medical Records Mandate and the Local Disclosure Mandate, along with licensing penalties for alleged unprofessional conduct that includes criminal conviction under statutes such as the D&E Mandate, the Medical Records Mandate, and the Tissue Disposal Mandate. Defendants assert that Dr. Hopkins alleges that the Mandates violate his personal due process rights. Defendants maintain that Dr. Hopkins lacks standing to assert these claims because Dr. Hopkins cannot establish an "injury in fact," meaning "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Defendants concede that courts have held, in some circumstances, that a party need not expose himself to arrest or prosecution in order to challenge a criminal statute but that, even there, there must be "a credible threat of prosecution" before a plaintiff has standing to challenge the provision. *Babbitt*, 442 U.S. at 298.

This Court has rejected nearly identical arguments that the injury was "speculative and conjectural" because the challenged abortion law had not yet been enforced against the plaintiff physician, including by licensure action. *See Edwards v. Beck*, 8 F.Supp.3d 1091 (8th Cir. 2014), *aff'd* 786 F.3d 1113 (8th Cir. 2015). The law is well-settled that a plaintiff need not "first expose himself to actual. . . prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Courts have concurred even in the abortion context. *See, e.g., Danforth*, 428 U.S. at 62; *Doe v. Bolton*, 410 U.S. at 188. Here, Dr. Hopkins's declaration demonstrates the impact and threat of these Mandates (Dkt. No. 5, ¶¶ 23-62).

The Court disagrees with defendants' argument that *Clapper v. Amnesty International*, 133 S. Ct. 1138 (2013), overruled this precedent. In *Clapper*, the Court determined plaintiffs, who were not directly targeted by the challenged law, relied upon a "highly attenuated chain of possibilities" and harm too speculative to satisfy the Article III injury requirement. *Id.* at 1144-48. The facts presented here are distinguishable, and *Clapper* does not control. The Court concludes that, based on controlling precedent and the claims alleged, Dr. Hopkins faces concrete, imminent injuries from enforcement of the challenged Mandates.

Defendants also contend that Dr. Hopkins cannot assert the third-party rights of his hypothetical future patients. They maintain that Dr. Hopkins cannot demonstrate a "close relation" with abortion patients because he is challenging laws that were enacted to protect the health and safety of those patients. Defendants claim that this presents a conflict of interest between providers and patients, and third-party standing is forbidden if the interests of the litigant and the third-party rights-holder are even "potentially in conflict." *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 15 (2004); *see also Kowalski v. Tesmer*, 543 U.S. 125, 135 (2004) (Thomas, J., concurring) (noting that third-party standing is disallowed when the litigants "may have very different interests from the individuals whose rights they are raising"); *Canfield Aviation, Inc. v. Nat'l Transp. Safety Bd.,* 854 F.2d 745, 748 (5th Cir. 1988) ("[C]ourts must be sure. . . that the litigant and the person whose rights he asserts have interests which are aligned.").

The United States Supreme Court in a plurality opinion in *Singleton v. Wulff*, 428 U.S. 106 (1976), concluded that "it generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision." *Id.* at 118. Other courts also have rejected this argument. *See Abbott II,* 748 F.3d at 589 n.9. *See also Whole*

*Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) (adjudicating physicians' and clinics' 42 U.S.C. § 1983 action against abortion restrictions on behalf of themselves and their patients).

Defendants' claim regarding a purported conflict of interest could be made with respect to any abortion regulation that purports to advance a valid state interest, but courts have repeatedly allowed abortion providers to challenge such laws, determining that the providers' and women's interests are aligned and not adverse. *See, e.g., Bellotti v. Baird,* 443 U.S. 622, 627 n.5 (1979) (holding that a physician plaintiff had standing to raise his minor patients' claims to determine whether a parental consent law should be upheld to protect the alleged vulnerability of minors); *Charles v. Carey*, 627 F.2d 772, 779 n.10 (7th Cir. 1980) (rejecting the state's claim of conflict of interest in a challenge to a counseling law designed to "protect women from abusive medical practices"). This has not defeated a providers' standing to challenge contraception restrictions. *See Carey v. Population Servs. Int'l,* 431 U.S. 678, 683-84, 690 (1977) (granting third-party standing where the government defended a contraception restriction based on its interest in protecting health); *Eisenstadt v. Baird,* 405 U.S. 438, 445-46, 450 (1972) (allowing a plaintiff to raise the rights of others seeking contraception where the government defended a restriction as "regulating the distribution of potentially harmful articles").

### B.      Considerations Under 42 U.S.C. § 1983

Defendants also contend that, even if Dr. Hopkins could avoid these alleged limits on third-party litigation, he still cannot assert third-party rights under 42 U.S.C. § 1983 because, defendants claim, § 1983 extends only to litigants who assert their *own* rights. Based on this, defendants contend the third-party claims may proceed only under the implied right of action established by the Supremacy Clause, and the claims cannot serve as a basis for attorneys' fees. *See Planned*

*Parenthood of Houston & Se. Tex. v. Sanchez,* 480 F.3d 734, 739-40 (5th Cir. 2007); *Planned Parenthood of Houston & Se. Tex. v. Sanchez,* 403 F.3d 324, 333 (5th Cir. 2005).

There is no language in the statute that supports this argument. *See* 42 U.S.C. § 1983 (providing in pertinent part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."). This Court agrees with the reasoning of the Seventh Circuit Court of Appeals on this point and rejects defendants' argument regarding standing under § 1983. *See Van Hollen*, 738 F.3d at 794−95. The Supreme Court has repeatedly allowed abortion providers to raise the rights of their patients in cases brought under § 1983, and this Court will do the same. *See e.g.*, *Whole Woman's Health*, 136 S. Ct. 2292; *Gonzales*, 550 U.S. 124; *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 324-25 (2006) (noting that plaintiffs raised patients' claims in suit under 42 U.S.C. § 1983); *Bellotti,* 428 U.S. at 136 (same).

### C.  The Mandates' Private Rights of Action

Defendants also contend that Dr. Hopkins lacks standing to challenge the Mandates' private rights of action "because any injury to [Dr.] Hopkins is not 'fairly traceable' to the defendants." (Dkt. No. 22, at 13). Defendants maintain that they possess no authority to enforce the complained-of provisions and, therefore, cannot be sued by Dr. Hopkins in a pre-enforcement challenge to the constitutionality of the particular statutory provisions, citing among other cases *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957-58 (8th Cir. 2015) (Dkt. No. 22, at 13). Defendants further argue that "none of the Acts empower any of the defendants to bring

a private right of action for damages against an abortion provider, nor do the defendants have authority to otherwise enforce those provisions. Instead, just like the act at issue in *Hutchinson*, the challenged provisions of the Acts here provide for enforcement through private actions for damages. Defendants are therefore not the proper parties to sue when claiming that such provisions are unconstitutional." (Dkt. No. 23, at 22-23).

Dr. Hopkins asserts that, "while it is true that two of the challenged laws—H.B. 1032's D&E Ban and H.B. 1434's Medical Records Mandate—create such private rights of action, each of the four laws provides for criminal prosecution and/or civil licensing enforcement by defendants . . . . There is thus no relevance to defendants' claim that they are 'immune from suit challenging the constitutionality of an act when it provided for enforcement *only* th[r]ough private actions for damages,' and that in such a suit, 'a federal court lacks jurisdiction to declare it unconstitutional or to provide any other relief.'" (Dkt. No. 32, at 12). *See, e.g., Casey*, 505 U.S. at 887-88 (noting, as to spousal notification law the Court struck down, that "[a] physician who performs an abortion" for a married woman without spousal notice "will have his or her license revoked, and is liable to the husband for damages"). The private rights of action present in the D&E Mandate and the Local Disclosure Mandate do not deprive this Court of jurisdiction to address the constitutionality of the laws.

### D.     Sovereign Immunity Under The Eleventh Amendment

Dr. Hopkins seeks declaratory and injunctive relief. Defendants move to dismiss all of his claims under the Eleventh Amendment (Dkt. No. 22, at 18). "The Eleventh Amendment confirms the sovereign status of the States by shielding them from suits by individuals absent their consent." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996)). However, "[t]o ensure the enforcement of federal law . . . the Eleventh

Amendment permits suits for *prospective* injunctive relief against state officials acting in violation of federal law." *Id.* (emphasis added) (citing *Ex parte Young*, 209 U.S. 123 (1908)). "A state official is amenable to suit to enjoin the enforcement of an unconstitutional state statute only if the officer has 'some connection with the enforcement of the act.'" *Digital Recognition Network*, 803 F.3d at 960 (citing *Ex Parte Young,* 209 U.S. at 157).

To determine whether an action against state officials in their official capacities avoids an Eleventh Amendment bar to suit, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 296 (1997) (O'Connor, J., concurring). In this case, Dr. Hopkins seek declaratory relief declaring the Mandates as unconstitutional "[t]o protect his patients from these constitutional violations, to enforce his own right to clear legal standards, and to avoid irreparable harm. . . ." (Dkt. No. 1, at 3, ¶ 9). In his complaint, Dr. Hopkins also seeks preliminary and permanent injunctive relief that would enjoin the enforcement of these Mandates. Dr. Hopkins's prayer for relief "clearly satisfies [the Court's] 'straightforward inquiry.'" *Verizon Maryland, Inc.*, 535 U.S. at 645.

Furthermore, defendants, who are sued in their official capacities, are amenable to suit in this action. Dr. Hopkins alleges, and defendants do not dispute, that:

> 14.     Defendant Larry Jegley is the Prosecuting Attorney for Pulaski County, located at 224 South Spring Street, Little Rock, Arkansas. Prosecuting attorneys "shall commence and prosecute all criminal actions in which the state or any county in his district may be concerned." Ark. Code Ann. § 16-21-103. Defendant Jegley is responsible for criminal enforcement of H.B. 1032, H.B. 1566, and H.B. 1343. He and his agents and successors are sued in their official capacities.

> 15.     Defendant Steven L. Cathey, M.D., is the Chair of the Arkansas State Medical Board. Defendants Robert Breving, Jr., M.D.; Bob Cogburn, J.D.; William F. Dudding, M.D.; Omar T. Atiq, M.D.; Veryl D. Hodges, D.O.; Marie Holder,

Larry D. Lovell; William L. Rutledge, M.D.; John H. Scribner, M.D.; Sylvia D. Simon, M.D.; David L. Staggs, M.D.; and John B. Weiss, M.D., are members of the Arkansas State Medical Board. The State Medical Board is responsible for licensing medical professionals under Arkansas law. Ark. Code Ann. § 17-95-410. The Board and its members are responsible for imposing licensing penalties under H.B. 1434 and H.B. 2024 and imposing licensing penalties for unprofessional conduct, which includes criminal conviction under statutes such as H.B. 1032, H.B. 1566, and H.B. 1434. Ark. Code Ann. §§ 75-95-409(a)(2)(A), (D). Defendants and their successors in office are sued in their official capacity.

(Dkt. No. 1, at 4-5, ¶¶ 14, 15). Therefore, defendants can be sued for prospective injunctive and declaratory relief in this action, as they have "'some connection with the enforcement of the act.'" *Digital Recognition Network, Inc.*, 803 F.3d at 960 (citing *Ex Parte Young,* 209 U.S. at 157).

### III.    Facial Versus As-Applied Challenges

Dr. Hopkins brings both facial and as-applied challenges to certain of these Mandates. In regard to facial challenges in general, the majority of courts have adopted a definition of facial challenges as those seeking to have a statute declared unconstitutional in all possible applications. *See, e.g., Sabri v. United States*, 541 U.S. 600, 609 (2004); *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Steffel*, 415 U.S. at 474. As-applied challenges are construed as an argument that the statute is unconstitutional as applied to precise plaintiffs. "Each holding carries an important difference in terms of outcome: If a statute is unconstitutional as applied, the State may continue to enforce the statute in different circumstances where it is not unconstitutional, but if a statute is unconstitutional on its face, the State may not enforce the statute under any circumstances." *See Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187, 193-94 (6th Cir. 1997), *cert. denied*, 523 U.S. 1036 (1998).

The Supreme Court has made clear that as-applied challenges are preferred. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 448-451 (2008) (discussing the preference for as-applied challenges as opposed to facial challenges). In *Salerno*, the Supreme

Court stated that a "facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully" and will only succeed if a litigant can "establish that no set of circumstances exists under which the Act would be valid." 481 U.S. at 745.

The standard that controls a facial challenge to an abortion statute is somewhat different than that applicable to facial challenges in general. The Eighth Circuit Court of Appeals has recognized that facial challenges to abortion statutes can succeed only if a plaintiff can show that "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey,* 505 U.S. at 895. *See also Planned Parenthood Minn., N.D., S.D. v. Rounds*, 653 F.3d 662, 667-68 (8th Cir. 2011), *vacated in part on reh'g en banc sub nom. Planned Parenthood Minn., N.D., S.D. v. Rounds*, 662 F.3d 1072 (8th Cir. 2011) and *in part on reh'g en banc sub nom. Planned Parenthood Minn., N.D., S.D. v. Rounds*, 686 F.3d 889 (8th Cir. 2012); *see also Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 725, 733 n.8 (8th Cir. 2008) ("*Rounds* cases"). In *Whole Woman's Health*, the Supreme Court clarified that "cases in which the provision at issue is relevant" is a narrower category than "all women," "pregnant women," or even "*women seeking abortions* identified by the State." 136 S. Ct. at 2320 (quoting *Casey*, 505 U.S. at 895-95). To sustain a facial challenge and grant a preliminary injunction, this Court must find that the challenged Mandate is an undue burden for a large fraction of women "for whom the provision is an actual rather than an irrelevant restriction." *See id.* (discussing this as the "relevant denominator").

The Eighth Circuit Court of Appeals recognizes that "the 'large fraction' standard is in some ways 'more conceptual than mathematical,'" but this Court is required by controlling precedent to conduct this fact finding "to determine whether that number constitutes a 'large fraction.'" *Planned Parenthood of Arkansas & Eastern Oklahoma v. Jegley*, No. 16-2234, *11

(8th Cir. July 28, 2017) (citing *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 374 (6th Cir. 2006)).

To the extent defendants argue that a different legal standard should apply to facial challenges to abortion statutes, the Court rejects the argument. The Eighth Circuit's decisions control this Court's decisions, and the Eighth Circuit has applied this same standard to a facial challenge to an abortion statute since the decision in *Gonzales,* 550 U.S. at 168. *See Planned Parenthood of Arkansas & Eastern Oklahoma v. Jegley*, No. 16-2234, *11 (8th Cir. July 28, 2017).

"Traditionally, a plaintiff's burden in an as-applied challenge is different from that in a facial challenge. In an as-applied challenge, 'the plaintiff contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional.'" *Voinovich*, 130 F.3d at 193-94 (quoting *Ada v. Guam Soc'y of Obstetricians and Gynecologists*, 506 U.S. 1011, 1012 (1992) (Scalia, J., dissenting), *denying cert. to* 962 F.2d 1366 (9th Cir. 1992)). "Therefore, the constitutional inquiry in an as-applied challenge is limited to the plaintiff's particular situation." *Voinovich*, 130 F.3d at 193-94.

## IV.    Requests For Preliminary Injunctions

The Court turns to examine the factors set forth in *Dataphase Systems, Inc. v. C L Systems, Inc.*, as applied to Dr. Hopkins's requests for preliminary injunctive relief. 640 F.2d 109 (8th Cir. 1981). In deciding a preliminary injunction motion, the Court considers four factors:  (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the balance of the equities; and (4) the public interest. *Grasso Enterprises, LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1035 n.2 (8th Cir. 2016) (citing *Dataphase*, 640 F.2d at 114). Under *Dataphase*, no one factor is determinative. *Id.* at 113.

The Eighth Circuit modifies the *Dataphase* test when applied to challenges to laws passed through the democratic process. Those laws are entitled to a "higher degree of deference." *Rounds*, 530 F.3d at 732. In such cases, it is never sufficient for the moving party to establish that there is a "fair chance" of success. Instead, the appropriate standard, and threshold showing that must be made by the movant, is "likely to prevail on the merits." *Id.* Only if the movant has demonstrated that it is likely to prevail on the merits should the Court consider the remaining factors. *Id.* The Court will examine Dr. Hopkins's argument with respect to each of the four challenged laws.

### A. The D&E Mandate (Count 1 Based On H.B. 1032, Act 45)

The Court examines whether it should preliminarily enjoin enforcement of the D&E Mandate, which imposes civil liability and a criminal penalty on physicians who "purposely perform or attempt to perform a dismemberment abortion and thereby kill an unborn child unless it is necessary to prevent a serious health risk to the pregnant woman." Ark. Code Ann. § 20-16-1803(a). Dr. Hopkins seeks a preliminary injunction based on count one of his complaint, which alleges that the D&E Mandate violates the Due Process Clause of the United States Constitution by placing an undue burden on Dr. Hopkins's patients' rights to liberty and privacy. This is a facial challenge.

Under the D&E Mandate, "purposely" is defined as acting "with purpose with respect to a material element of an offense" when, "[i]f the element involves the nature of the conduct of the actor or a result of the conduct of the actor, it is the conscious object of the actor to engage in conduct of that nature or cause such a result," and "[i]f the element involves the attendant circumstances, the actor is aware of the existence of such circumstances." Ark. Code Ann. § 20-16-1802(5).

"Attempt to perform or induce an abortion" is defined as "an act or omission of a statutorily required act, that under the circumstances as the actor believes them to be, constitutes a substantial step in a course of conduct planned to culminate in the performance or induction of an abortion in this state in violation of this subchapter. . . ." Ark. Code Ann. § 20-16-1802(2).

"Dismemberment abortion" is defined as "an abortion performed with the purpose of causing the death of an unborn child that purposely dismembers the living unborn child and extracts one (1) piece at a time from the uterus through the use of clamps, grasping forceps, tongs, scissors, or similar instruments that, through the convergence of two (2) rigid levers, slice, crush, or grasp a portion of the body of the unborn child to cut or tear off a portion of the body of the unborn child." Ark. Code Ann. § 20-16-1802(3)(A)(i). It includes "an abortion in which suction is used to extract the body of the unborn child subsequent to the dismemberment of the unborn child. . . ." Ark. Code Ann. § 20-16-1802(3)(A)(ii). It does not include "an abortion that uses suction to dismember the body parts of the unborn child into a collection container." Ark. Code Ann. § 20-16-1802(3)(B).

"Unborn child" is defined by the Arkansas legislature as "an individual organism of the species Homo sapiens from fertilization until live birth. . . ." Ark. Code Ann. § 20-16-1802(7).

"Woman" is defined as "a female human being whether or not she has reached the age of majority." Ark. Code Ann. § 20-16-1802(8). "Serious health risk to the pregnant woman" is defined as "a condition that, in a reasonable medical judgment, complicates the medical condition of a pregnant woman to such an extent that the abortion of a pregnancy is necessary to avert, either the death of the pregnant woman or the serious risk of substantial and irreversible impairment of a major bodily function of the pregnant woman." Ark. Code Ann. § 20-16-1802(6)(A). It does not include a psychological or emotional condition or "a medical diagnosis that is based on a claim

of the pregnant woman or on a presumption that the pregnant woman will engage in conduct that could result in her death or that could cause substantial and irreversible physical impairment of a major bodily function of the pregnant woman." Ark. Code Ann. § 20-16-1802(7)(B)(i)-(ii).

If a physician violates the D&E Mandate, the law imposes civil liability, Ark. Code Ann. § 20-16-1804, as well as the criminal penalties of a Class D felony under Arkansas law, Ark. Code Ann. § 20-16-1805.

Dr. Hopkins asserts that, if the D&E Mandate goes into effect, he will stop performing standard D&E abortions altogether due to ethical and legal concerns regarding compliance with the law, thereby rendering abortions essentially unavailable in the State of Arkansas starting at 14.0 weeks LMP. The most common method of second trimester abortion is a method with instrumentation called standard D&E. This involves two steps: dilating the cervix, and then evacuating the uterus with instruments such as forceps. There are several ways to dilate the cervix (Dkt. No. 4, ¶ 17; Dkt. No. 5, ¶ 13).

Typically, during the early weeks of the second trimester of pregnancy, a doctor performing standard D&E uses a combination of medications that open the cervix and manual dilators; then, the same day, the doctor uses forceps to remove the fetus and other contents of the uterus. Because the fetus is larger than the opening of the cervix, the fetal tissue generally comes apart as the physician removes it through the cervix. The reason that the cervical opening is smaller than the fetal parts is that, in general, the doctor dilates only enough to allow the safe passage of instruments and fetal tissue through the cervix (Dkt. No. 4, ¶ 17-18; Dkt. No. 5, ¶ 14). In Arkansas and elsewhere, standard D&E typically is a one-day procedure from 14.0 to 17.6 weeks LMP (Dkt. No. 5, ¶ 15; Dkt. No. 6, ¶ 17). Due to Arkansas's state mandated counseling laws, this means that

generally a woman would be required to make two trips to the clinic for abortion care from 14.0 to 17.6 weeks LMP.

Later in the second trimester, larger instruments require wider cervical dilation. Although some physicians continue to provide standard D&E as a one-day procedure, starting at 18.0 to 20.0 weeks LMP, it is typical for doctors to add overnight osmotic dilation to the standard D&E protocol. In Arkansas, the standard D&E protocol changes in two ways starting at 18.0 weeks LMP for almost all patients (Dkt. No. 5, ¶ 20). First, in Arkansas, a woman at 18.0 weeks LMP receives overnight dilation. This means that the abortion procedure takes two days, rather than one (Dkt. No. 5, ¶ 20). Second, in Arkansas, at the time a woman at 18.0 weeks LMP has placed in her cervix the osmotic dilators, which is the day before the intended evacuation, the woman also receives an injection of digoxin through the vaginal wall. That injection of digoxin is into the fetus or, if not, into the amniotic fluid. With either method of injection, the digoxin may not work effectively (Dkt. No. 5, ¶ 20). The next day, in women 18.0 weeks or later LMP, if the digoxin has not caused fetal demise, Dr. Hopkins currently will take steps with his forceps, such as compressing fetal parts, to ensure fetal demise and to establish compliance with existing laws (Dkt. No. 5, ¶ 21).

Osmotic dilators are thin sticks of material that swell when they absorb moisture; when placed in a woman's cervix, they absorb moisture from the woman's body, expand slowly, and slowly dilate the cervix. Once dilation is sufficient, typically the next day, the doctor proceeds as in earlier standard D&Es, removing the fetus, generally in pieces because it is larger than the cervical opening (Dkt. No. 4, ¶ 17; Dkt. No. 5, ¶ 16). For patients of Little Rock Family Planning Services, they are required to spend that overnight within 30 minutes of the clinic so that the doctor is available in the rare instance in which a patient has any problem (Dkt. No. 6, ¶ 18).

Given the requirements of Arkansas law regarding mandated state counseling, for patients receiving abortion care at 18.0 to 21.6 weeks LMP, the law requires at least three trips to the clinic (Dkt. No. 6, ¶ 7). Starting at 18.0 to 22.0 weeks LMP, some physicians, including Dr. Hopkins, undertake an additional procedure to try to cause fetal demise before the evacuation phase of a D&E for most patients, meaning those for whom it is not contraindicated (Dkt. No. 5, ¶ 18).

Through the second trimester, standard D&E is a safe way to provide abortion in an outpatient setting, such as a family planning clinic (Dkt. No. 5, ¶ 17). The standard D&E procedure has a long-established safety record in this county, with major complications occurring in less than 1% of standard D&E procedures (Dkt. No. 4, ¶ 19).

### 1.      Likelihood Of Success On The Merits

To determine whether Dr. Hopkins is likely to succeed on his challenge to the D&E Mandate, this Court applies the undue burden standard. "A statute, which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Whole Woman's Health*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S. at 877 (plurality opinion)). Abortion regulations that "have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." *Id.* (quoting *Casey*, 505 U.S. at 878 (plurality opinion)).

### a.      Applicable Law

Federal constitutional protection of reproductive rights is based on the liberty interest derived from the due process clause of the Fourteenth Amendment. *Casey*, 505 U.S. at 846 (majority opinion). Dr. Hopkins challenges the D&E Mandate on this basis. The United States Supreme Court, when recognizing this right, stated:

> We forthwith acknowledge our awareness of the sensitive and emotional nature of the abortion controversy, of the vigorous opposing views, even among physicians,

and of the deep and seemingly absolute convictions that the subject inspires. One's philosophy, one's experiences, one's exposure to the raw edges of human existence, one's religious training, one's attitudes toward life and family and their values, and the moral standards one establishes and seeks to observe, are all likely to influence and to color one's thinking and conclusions about abortion.

In addition, population growth, pollution, poverty, and racial overtones tend to complicate and not to simplify the problem.

*Roe v. Wade*, 410 U.S. 113, 116 (1973).

Dr. Hopkins argues that, as a matter of Supreme Court precedent, defendants "cannot criminalize the performance of the most common method of abortion (and indeed the only method in Arkansas) in the second-trimester, pre-viability stage of pregnancy. *See Stenberg v. Carhart*, 530 U.S. 914, 945-46 (2000); *accord Gonzales*, 550 U.S. at 150; *Danforth*, 428 U.S. at 77-79." (Dkt. No. 32, at 28). Dr. Hopkins further asserts that, "[t]his is exactly what the D&E Ban does, and it is unconstitutional. . . Decades of settled law holds that it is *per se* unconstitutional for the State to criminalize 'the . . . dominant second-trimester abortion method.' *Gonzales*, 550 U.S. at 165; *see also id.* at 150-54; *Danforth*, 428 U.S. at 77-79." (Dkt. No. 32, at 28). Defendants do not respond to this argument. The Court acknowledges this argument but concludes that, given the circumstances before it in this matter, an undue burden analysis of the D&E Mandate is warranted.

Unless and until *Roe* is overruled by the United States Supreme Court, to determine whether a state statute is unconstitutional and violates substantive due process rights in this context, the Court applies the "undue burden" standard developed in *Casey*, 505 U.S. at 876-79 (plurality opinion), and *Whole Women's Health,* 136 S. Ct. at 2309-11.

In *Casey*, a plurality of the Supreme Court determined that, if a government regulation has "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus," the regulation is an undue burden on a woman's right to have an abortion and is unconstitutional. 505 U.S. at 877. The Supreme Court recently reiterated the undue burden

standard that "a statute which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Whole Woman's Health*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S. at 877 (plurality opinion)).

The Supreme Court in *Casey* recognized that a woman's right of privacy extends to the freedom "from unwarranted governmental intrusion so fundamentally affecting a person as the decision whether to bear or beget a child." 505 U.S. at 896 (majority opinion) (quoting *Eisenstadt*, 405 U.S. at 453). "Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause." 505 U.S. at 874 (citations omitted). *See also Stenberg*, 530 U.S. at 930; *Mazurek v. Armstrong*, 520 U.S. 968, 872−73 (1997) (per curiam).

The undue burden analysis requires this Court to "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health*, 136 S.Ct. at 2309. "An undue burden is an unconstitutional burden." *Casey*, 505 U.S. at 877. In *Casey*, the Supreme Court described the "undue burden" test as follows: "[a] finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id*. The *Gonzalez* Court then simplified *Casey*'s description, settling on the effects test. 550 U.S. at 158. To show an undue burden, Dr. Hopkins must show that "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895. A court limits its inquiry to "the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* at 894.

Defendants argue that the Supreme Court has created two distinct undue burden tests, depending on what interests the state seeks to regulate. Defendants contend that the balancing test of *Whole Woman's Health* applies only when "the state's interest is in. . . a patient's health or safety" and that the lesser standard of rational basis review applies "when a state regulates to promote respect for unborn life." (Dkt. No. 23, at 37). The Court rejects defendants' argument.

At this stage, despite defendants' arguments to the contrary (Dkt. No. 23, at 38), the Court rejects rational basis review because this standard is inconsistent with controlling precedents that inform the nature of a woman's right to decide whether to continue a pregnancy or to abort a nonviable fetus. *See Whole Women's Health*, 136 S. Ct. at 2309-11; *Casey*, 505 U.S. at 834, 851; *Lawrence v. Texas*, 539 U.S. 558, 565 (2003) (determining that the right to abortion has "real and substantial protection as an exercise of [a woman's] liberty under the Due Process Clause"). In *Casey*, the Supreme Court examined state statutes purported to advance the state's interest in fetal life and applied the balancing test later cited in *Whole Woman's Health*. Even in *Gonzalez*, which defendants contend supports the use of rational basis review, the Supreme Court did not apply rational basis review to the challenged regulation. *See Gonzalez*, 550 U.S. at 158, 160-161.

When applying the undue burden test, this Court must "weigh[ ] the asserted benefits against the burdens." *Whole Women's Health*, 136 S. Ct. at 2310. There must be "a constitutionally acceptable" reason for regulating abortion, and the abortion regulation must also actually advance that goal in a permissible way. *Id.* at 2309-10. The regulation will not be upheld unless the benefits it advances outweigh the burdens it imposes. *Id.* at 2310. "[T]he means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it." *Casey,* 505 U.S. at 877.

Defendants also argue that the Court should not engage in a balancing test when conducting the undue burden analysis (Dkt. No. 23, at 38-39). Defendants contend that, if the challenged provision survives the minimal rational basis scrutiny defendants advocate, the provision may be struck only based on the effects and that, in evaluating these effects, the Court may not evaluate the strength of the asserted state interests against these effects. The Court rejects this argument. Other courts that have considered challenges to abortion restrictions based on the state's asserted interest in potential life since the Supreme Court issued its decision in *Whole Woman's Health* have applied the undue burden test, weighing the extent of the burden against the strength of the state's justification. *See Planned Parenthood of Ind. & Ky., Inc. v. Comm'r*, No. 1:16-cv-01807-TWP-DML, 2017 WL 1197308 (S.D. Ind. March 31, 2017) (applying undue burden balancing test to requirement that women delay abortion by 18 hours after obtaining an ultrasound premised in part on state's interest in promoting potential life), *appeal docketed*, No. 17-1883 (7th Cir. Apr. 27, 2017); *Whole Women's Health*, No. A-16-CA-1300-SS, 2017 WL 462400, at *7-8 (applying undue burden test to tissue disposal regulations justified in part on state's interest in expressing respect for potential life), *appeal docketed*, No. 17-50154 (5th Cir. Mar. 1, 2017); *W. Ala. Women's Ctr. v. Miller*, 217 F.Supp.3d 1313, 1346-47 (M.D. Ala. 2016) (balancing benefits and burdens in assessing D&E ban justified as advancing the state's interest in respect for life), *appeal docketed*, No. 16-17296 (11th Cir. Nov. 26, 2016).

Further, under the applicable undue burden standard, although the Court must "review 'legislative fact finding under a deferential standard,'" *Whole Woman's Health*, 136 S. Ct. at 2310, the court "retains an independent constitutional duty to review [a legislature's] factual findings where constitutional rights are at stake. . . . Uncritical deference to [the legislature's] factual

findings in these cases is inappropriate." *Gonzalez*, 550 U.S. at 165, 167. See also *Whole Woman's Health*, 136 S. Ct. at 2310.

Generally, the state has the burden of demonstrating a link between the legislation it enacts and what it contends are the state's interests. *See Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 430 (1983), *overruled on other grounds by Casey*, 505 U.S. 833 (describing the burden as that of the state). As a part of the Court's inquiry, the Court may take into account the degree to which the restriction is over-inclusive or under-inclusive, *see, e.g., Whole Woman's Health*, 136 S. Ct. at 2315 (discussing over- and under-inclusive scope of the provision), and the existence of alternative, less burdensome means to achieve the state's goal, including whether the law more effectively advances the state's interest compared to prior law, *see, e.g., Whole Woman's Health*, 136 S. Ct. at 2311 (noting that prior state law was sufficient to serve asserted interest); *Id.* at 2314 ("The record contains nothing to suggest that [the challenged provisions] would be more effective than pre-existing [state] law at deterring wrongdoers. . . from criminal behavior.").

Dr. Hopkins, who challenges the laws, retains the ultimate burden of proving their unconstitutionality. *Mazurek*, 520 U.S. at 972 (reversing appellate court for enjoining abortion restriction where plaintiffs had not proven that the requirement imposed an undue burden); *Casey*, 505 U.S. at 884 (affirming provision where "there is no evidence on this record" that the restriction would amount to an undue burden).

For Dr. Hopkins's challenges based on alleged violations of the Due Process Clause, the Court will begin its analysis of the merits by examining each provision and the asserted state justification for each provision. The Court will then examine the alleged undue burden of the provision, and the Court will make findings of fact regarding the fraction of women, if any, for whom the D&E Mandate imposes an undue burden.

### b. Analysis Of The D&E Mandate

### 1. State's Interests

No legislative findings accompany the D&E Mandate. The Court does not have an explanation from the legislature of the purpose of the law. Defendants argue that the law advances the interests of regulating medical ethics and promoting respect for the life of an unborn child (Dkt. No. 22, at 20).[4] The Court assumes the legitimacy of these interests. *Whole Woman's Health*, 136 S. Ct. at 2310 (assuming that the State had legitimate state interests where the statute did not contain any legislative findings).

### 2. Burdens Imposed On Women

Dr. Hopkins argues that, although the D&E Mandate does not use recognized medical terminology, it bans standard D&E because it criminalizes the use of surgical instruments to cause disarticulation or, in the D&E Mandate's terms, "dismemberment" of a "living" fetus. Ark. Code Ann. § 20-16-1802(3) (2017). He asserts that the law would force Arkansas women seeking pre-viability abortions to undergo medically unnecessary procedures and subject women to increased health risks. Dr. Hopkins also asserts that, if the D&E Mandate goes into effect, standard D&E abortions essentially will become unavailable in the State of Arkansas starting at 14.0 weeks LMP due to ethical and legal concerns regarding compliance with the law.

He maintains that the D&E Mandate "would constitute a significant step backward. . . ." (Dkt. No. 3, at 6). Standard D&E was a significant advance over earlier methods of second trimester abortion (Dkt. No. 4, ¶ 19). *See also City of Akron*, 462 U.S. at 435-36, *overruled in part*

---

[4] Defendants do not argue that the D&E Mandate is designed to avoid fetal pain. Based on record evidence submitted by defendants, according to at least one study defendants submitted, fetal pain is not a biological possibility until 29 weeks, well beyond the range of standard D&E procedures (Dkt. No. 23-6, at 3).

*on other grounds by Casey*, 505 U.S. 833 ("Since [*Roe v. Wade* was decided], the safety of second trimester abortions has increased dramatically. The principal reason is that the D&E procedure is now widely and successfully used. . . .") (footnotes omitted).

Starting in the early second trimester, standard D&E is the only procedure that can be performed on an outpatient, ambulatory basis (Dkt. No. 4 ¶ 14; Hopkins 17). *See also City of Akron*, 462 U.S. at 436. This significantly reduces the expense of a second trimester abortion (Dkt. No. 4, ¶ 14).

The alternative to standard D&E is an induction procedure, in which physicians use medication to induce labor and delivery of a non-viable fetus (Dkt. No. 4, ¶ 14). Induction must be performed at a facility such as a hospital, not in an outpatient setting, and the patient may be kept for an extended stay because an induction may take 5 hours to 3 days to complete, not the 10 to 15 minutes it takes to complete a standard D&E (Dkt. No. 4, ¶ 14; Dkt. No. 5, ¶ 12). Induction requires a woman to go through labor, which is painful, psychologically challenging for some women, and medically contraindicated for some women (Dkt. No. 4, ¶ 14, Dkt. No. 5, ¶1 2).

If the D&E Mandate were to take effect, Dr. Hopkins asserts that he would stop performing abortions at approximately 14.0 weeks LMP because, after that point, he would not know whether he would be able to ensure fetal demise before taking actions banned under the D&E Mandate (Dkt. No. 3, at 7; Dkt. No. 5, ¶¶ 23, 26). Under the D&E Mandate, the only D&E that would be legal is one in which a physician successfully induces fetal demise through an additional procedure prior to starting the evacuation phase of D&E (Dkt. No. 3, at 7). Dr. Hopkins claims that, because it is not feasible or safe for him to induce fetal demise through an additional procedure in every patient prior to starting the evacuation phase of D&E, he would not start any D&E because he may not be able to complete the procedure without violating the D&E Mandate (Dkt. No. 3, at 7).

Defendants respond that fetal demise can be achieved before standard D&E with one of three procedures: digoxin injections, potassium chloride injections, and umbilical cord transection.[5] The Court's determination whether the D&E Mandate imposes substantial obstacles to abortion access depends on the feasibility of defendants' proposed fetal demise methods. For the following reasons, the Court rejects each of defendants' proposed fetal demise methods.

To the extent defendants contend that this Court is barred from evaluating the medical evidence concerning both the feasibility and safety of defendants' proposed fetal demise methods, the Court rejects this argument (Dkt. No. 23, at 45-46). Defendants contend that medical disagreement or uncertainty over the impact of the D&E Mandate is for resolution by the legislature alone (*Id.*). The Court disagrees. As an initial matter, the Court is unconvinced at this stage, based on the record evidence now before it, that defendants' evidence creates a medical disagreement or uncertainty. Even if it does, as the Supreme Court acknowledged in *Casey*, "[i]t is conventional constitutional doctrine that where reasonable people disagree the government can adopt one position or the other. . . . That theorem, however, assumes a state of affairs in which the choice does not intrude upon a protected liberty." 505 U.S. at 851. There is a protected liberty interest at stake here. In *Whole Woman's Health*, the Supreme Court rejected a similar argument, holding that the "statement that legislatures, and not courts, must resolve questions of medical uncertainty is. . . inconsistent with this Court's case law." 136 S. Ct. at 2310. For these reasons, this Court does not accept at this stage defendants' argument regarding medical disagreement.

---

[5] Defendants suggest, without evidentiary support in the record, that physicians may rely on suction to cause fetal demise so as to avoid liability in the second trimester (Dkt. No. 23, at 31). The Court rejects that assertion based on record evidence (Dkt. No. 32-1, ¶ 5).

### a.      Digoxin Injection

When examining digoxin injections, it is important to distinguish between injections before 18.0 weeks LMP and those after 18.0 weeks LMP, based on the record before the Court.  Dr. Hopkins asserts that there is no reasonable or accepted procedure available for a physician providing standard D&E even to attempt fetal demise in a way that might avoid the ban before 18.0 weeks LMP (Dkt. No. 4, ¶ 36; Dkt. No. 5, ¶ 24).  He maintains that all methods proposed by defendants for inducing fetal demise before standard D&E, including digoxin injection before 18.0 weeks LMP, are virtually untested, have unknown risks and uncertain efficacy, and would be outside the standard of care (Dkt. No. 4, ¶ 26; Dkt. No. 5, ¶¶ 25-26).  Any attempts to cause fetal demise prior to 18.0 weeks LMP would mean experimentation and imposing risks with no medical benefit, according to Dr. Hopkins (Dkt. No. 3, at 8).

Starting at 18.0 weeks LMP, during the latter part of the second trimester, a majority of physicians who attempt to induce fetal demise, including Dr. Hopkins and other physicians at Little Rock Family Planning Services, do so by injecting digoxin either transabdominally or transvaginally (Dkt. No. 4, ¶ 21; Dkt. No. 5, ¶ 25).  Usually, physicians using these injections, including Dr. Hopkins, do so to comply with the federal "partial birth abortion ban" and similar state laws (Dkt. No. 4, ¶ 23; Dkt. No. 5, ¶ 19).  *See* 18 U.S.C. 1531; Ark. Code Ann. 20-16-1203 (2009).  Doing so confers no medical benefit for the woman, as the American College of Obstetricians and Gynecologists ("ACOG") has stated:  "'No evidence currently supports the use of induced fetal demise to increase the safety of second trimester medical or surgical abortion.'" (Dkt. No. 4, ¶ 22)(quoting Am. Coll. of Obstetricians & Gynecologists, Practice Bulletin Number 135:  Second Trimester Abortion, 121(6) Obstetrics & Gynecology 1394, 1396, 1406 (2013)).

Dr. Hopkins maintains that this practice does not save the D&E Mandate even for those patients post-18.0 weeks LMP. First, he maintains digoxin injections are not possible for every patient due to anatomical characteristics which may contraindicate these injections (Dkt. No. 3, at 9). Second, in some cases, digoxin fails to cause fetal demise, and Dr. Hopkins or any other physician cannot know before starting a procedure the patients in whom it will fail (Dkt. No. 4, ¶ 28; Dkt. No. 5, ¶ 25c). Dr. Hopkins maintains the proper course when digoxin fails is to complete the abortion without additional delay (Dkt. No. 4, ¶ 29; Dkt. No. 5, ¶ 25d).

If digoxin does not result in fetal demise after 24 hours, the D&E Mandate could be read to compel a physician to attempt a second injection of digoxin, which is untested and contrary to the standard of care (Dkt. No. 4, ¶ 29; Dkt. No. 5, ¶ 25b). According to Dr. Hopkins, administering a second dose of digoxin and waiting an undetermined amount of time for fetal demise, rather than completing the abortion, would put a patient who is already dilated and whose uterus may have already started to contract at risk of infection or delivery outside the clinic (Dkt. No. 4, ¶ 29; Dkt. No. 5, ¶ 25b).

Dr. Hopkins would not feel comfortable asserting that those risks, while real and unacceptable, rise to the very high level of the D&E Mandate's narrow exception, limited to circumstances "necessary to avert either. . . death. . . or the serious risk of substantial and irreversible physical impairment of a majority of bodily function." 20-16-1802(6)(A) - 1803(a). He forms this opinion based on his experience (Dkt. No. 5, ¶ 25f).

In sum, Dr. Hopkins maintains that he would end standard D&E practice if the D&E Mandate takes effect because, although he is a highly trained and experienced obstetrician-gynecologist, and can attempt digoxin injections to try to cause fetal demise in most patients beginning at 18.0 weeks LMP, he will not experiment on patients by attempting injections earlier

than 18.0 weeks LMP, will not do injections when medically contraindicated, will not do a second injection if the first one fails, and will not start a procedure when he does not know whether he will be able to finish it without violating the ban (Dkt. No. 5, ¶ 24). This would end standard D&E practice starting at 14.0 weeks LMP, which represents 100% of abortion care during that period reported in Arkansas in 2015 (Dkt. No. 4, ¶ 38; Dkt. No. 5, ¶ 23).

The Court concludes that digoxin injections are not a feasible method of causing fetal demise before a standard D&E. Digoxin injections are experimental for women before 18.0 weeks LMP, and most second trimester abortions in Arkansas are performed before 18.0 weeks LMP. There is no record evidence of any physician attempting digoxin injections earlier than 18.0 weeks LMP (Dkt. No. 4, ¶ 25). There are virtually no reported studies, and no studies of record, on using digoxin in the first weeks of the second trimester, when most second trimester abortions are performed (Dkt. No. 4, ¶ 26; Dkt. No. 32-3, Biggio Cross, at 143-44). Requiring digoxin injections for every patient starting at 14.0 weeks LMP would be requiring a physician to experiment on his patient, without any way to know or counsel her on the effectiveness or safety of the experiment (Dkt. No. 32-1, ¶ 9; Dkt. No. 5, ¶ 24).

Of the physicians who undertake an additional procedure after 18.0 to 22.0 weeks LMP, the vast majority of physicians inject the drug digoxin into the fetus if possible or, if not, then into the amniotic fluid. Injecting digoxin into the amniotic fluid is technically easier, but it is less effective (Dkt. No. 4, ¶ 21; Dkt. No. 5, ¶ 18). The injections may be through the woman's abdomen or vaginal wall. These injections generally use an 18- to 22-gauge spinal needle, passed under ultrasound guidance, through the patient's abdomen, vaginal wall, or vagina and cervix, and then either into the amniotic fluid or the fetus (Dkt. No. 4, ¶ 21, 25; Dkt. No. 5, ¶ 18).

There are some women for whom an injection of digoxin may be difficult or impossible. For example, woman may be very obese; may have anatomical variations of the uterine and vaginal anatomy, such as fibroids or a long cervix; and may have fetal positioning that creates issues. These injections also can be dangerous for women with cardiac conditions such as arrhythmias (Dkt. No. 4, ¶ 27). Even for women who tolerate injections, digoxin will not cause fetal demise in 5% to 10% of all cases in which it is used (Dkt. No. 4, ¶ 28).

The failure rate is higher for intramniotic injections. Intramniotic injections are associated with higher complication rates than intrafetal injection (Dkt. No. 4, ¶ 25). Intrafetal injections are more difficult to perform and may be impossible to perform due to fetal position, uterine anatomy and other factors, especially the size of the fetus. The smaller the fetus, the more difficult intrafetal injection will be (Dkt. No. 4, ¶ 28).

Digoxin works very slowly. Doctors allow 24 hours after the injection for it to work. Even then, it does not always cause fetal demise (Dkt. No. 5, ¶ 18). There is record evidence that the transabdominal injection can be painful and emotionally difficult for the patient. The injection poses risks, including infection, which can threaten the patient's health and future fertility, and accidental absorption of the drug into the patient's circulation, which can result in toxicity and changes to the patient's EKG (Dkt. No. 4, ¶ 25).

Like all medical procedures, the digoxin injection creates risks for the patient. Doctors who use digoxin believe that practical concerns justify using it. The record evidence is that the main benefit of using digoxin is to establish compliance with the federal "partial-birth abortion ban" or similar state laws (Dkt. No. 4, ¶ 23; Dkt. No. 5, ¶ 19). The federal "partial-birth abortion ban" has an intent requirement (Dkt. No. 4, ¶ 23).

Based on the record before the Court there are no reported studies of record on using a second injection of digoxin, or multiple, sequential injections of digoxin, after the first dose fails to bring about fetal demise (Dkt. No. 4, ¶ 29). Using a second injection of digoxin would, at a minimum, delay the abortion procedure, require the patient to make another trip to the clinic, and increase the risk of uterine infection, extramural delivery, or digoxin toxicity (Dkt. No. 4, ¶ 29).

Utilizing a digoxin injection to induce fetal-demise would impose additional logistical obstacles to abortion access. Women undergoing digoxin injections would be required to make an additional trip to the clinic 24 hours prior to their D&E procedure appointment. *See Whole Woman's Health*, 126 S. Ct. at 1213 (external factors that affect women's ability to access abortion care – such as increased driving distance—should be considered as an additional burden when conducting the undue burden analysis). If digoxin injections were used to induce fetal demise, a woman seeking an abortion would have to meet with a physician at least three times over a minimum of four days for a 10 to 15 minute procedure. First, she would have to receive the counseling mandated by Arkansas law. Second, she would have to return for the digoxin injection. Third, she would have to return after 24 hours for the physician to determine whether fetal demise was achieved. If fetal demise was achieved, the D&E could proceed. However, in 5% to 10% of cases, the first digoxin injection will fail. As a result, additional visits could be required.

The burden of having to make multiple trips for the procedure is especially pronounced for low-income women. The procedure would become time and cost-prohibitive for some women. Faced with this financial and logistical burden, some low income women may delay obtaining an abortion or not have an abortion at all. Many patients of Little Rock Family Planning Services are low-income. Approximately 30 to 40% of patients obtain financial assistance to pay for their abortion care (Dkt. No. 6, ¶ 5). Many patients of Little Rock Family Planning Services struggle

in their lives and in their efforts to access the medical care they need (Dkt. No. 6, ¶ 5). The time and effort it takes to make the necessary plans to access medical care cause anxiety and stress and cause financial pressure for women seeking care at Little Rock Family Planning Services. Women must arrange for time off work on multiple days, which can be very difficult given that many are in low-wage jobs and feel that they cannot explain to an employer the reason they need to take time off. For women who already have children, these women must arrange and often pay for childcare. These women also must arrange and pay for transportation. In some cases, these women also have to arrange and pay for a place to stay for multiple nights (Dkt. No. 6, ¶ 8).

Due to the unreliability of the procedure, unknown risks for women before 18.0 weeks LMP, unknown risks associated with injection of a second dose of digoxin if the first fails, increased risks of complications, increased travel burden, and pain and invasiveness of the procedure, the Court concludes that a digoxin injection is not a feasible method of inducing fetal demise before standard D&E in Arkansas.

### b. Potassium Chloride Injection

Another substance, potassium chloride (KCl), will cause fetal demise if injected directly into the fetal heart, which is extremely small (Dkt. No. 4, ¶ 31; Dkt. No. 5, ¶ 22). The record evidence is, and there is no credible dispute, that the procedure of injecting potassium chloride is very rare, as it carries much more severe risks for the woman, including death if the doctor places the solution in the wrong place (Dkt. No. 4, ¶ 31; Dkt. No. 5, ¶ 22; Dkt. No. 32-2, ¶ 3; Dkt. No. 32-3, Biggio Direct, at 111, Biggio Cross, at 140-41).

The procedure requires extensive training generally available only to sub-specialists in high-risk obstetrics, known as maternal-fetal medicine (Dkt. No. 4, ¶ 31; Dkt. No. 5, ¶ 22; Dkt. No. 32-2, ¶ 3; Dkt. No. 32-3, Biggio Direct, at 111, Biggio Cross, at 140-41). Dr. Hopkins and

the other doctors with whom he practices at Little Rock Family Planning Services, like the vast majority of obstetrician-gynecologists, do not have this specialized training (Dkt. No. 4, ¶ 31; Dkt. No. 5, ¶ 22). Contrary to defendants' suggestion, the Court is unaware of any authority, including in *Gonzales*, that requires Dr. Hopkins to undertake years of training in the subspecialty of maternal fetal medicine to perform abortions (Dkt. No. 23, at 43 (citing *Gonzales*, 550 U.S. at 163)).

Further, injecting potassium chloride is usually done in a hospital, not a clinical, setting. The procedure requires an advanced ultrasound machine that is typically available only in a hospital setting and too expensive for most clinics to afford (Dkt. No. 4, ¶ 31; Dkt. No. 32-2, ¶ 3; Dkt. No. 32-3, Biggio Direct, at 111, Biggio Cross, at 140-41). Defendants cite no legal or record support for their argument that Dr. Hopkins or Little Rock Family Planning Services can be required to obtain, or could obtain, such equipment without unduly burdening women who seek abortion (Dkt. No. 23, at 43). *See Whole Woman's Health*, 136 S. Ct. at 2318 (examining, in the undue burden context, the costs a current abortion facility would have to incur to meet the regulation's requirements). The cost also would be prohibitive for women who seek abortion. *See Causeway Med. Suite v. Foster,* 43 F.Supp.2d 604, 612-13 (E.D. La. 1999) (a ban on "surgical abortion" unless "fetal demise is first induced" imposes an undue burden because it "may force women seeking abortions to accept riskier or costlier abortion procedures."). Further, defendants cite no legal or record support for their suggestion that over 600 patients seeking a standard D&E each year in Arkansas could go to an Arkansas hospital for a potassium chloride injection to terminate their second-trimester pregnancies, equating roughly to 12 patients per week (Dkt. No. 23, at 43).

There also are some women for whom injecting potassium chloride is not medically appropriate (Dkt. No. 4, ¶ 31). Obesity, fetal and uterine positioning, and presence of uterine fibroids may complicate or prevent the administration of these injections.

The Court concludes that potassium chloride injections are not a feasible method of inducing fetal demise before standard D&E procedures. Injecting potassium chloride takes specialized training, and Dr. Hopkins lacks that specialized training. The only subspecialists who are trained to perform the injections are maternal-fetal medicine fellows who go through highly supervised training to specialize in high-risk pregnancies. Further, Dr. Hopkins lacks the costly equipment necessary to perform the procedure on an outpatient basis.

Potassium chloride injections are an unnecessary and potentially harmful medical procedure with no counterbalancing medical benefit for the patient. It is a technically challenging procedure that carries serious health risks. For all of these reasons, the Court determines potassium chloride injections are an unavailable method for fetal demise for women seeking a standard D&E abortion in the state of Arkansas.

### c. Umbilical Cord Transection[6]

Umbilical cord transection involves the physician rupturing the membranes, inserting a suction tube or other instrument such as forceps into the uterus, and grasping the cord, if possible, to divide it with gentle traction, which will cause demise over the course of up to 10 minutes (Dkt. No. 4, ¶ 32). The success and ease of this procedure depends on placement of the umbilical cord.

---

[6] Defendants' expert, Dr. Biggio, has less practical experience and significantly less expertise than Dr. Hopkins's experts. Specifically, Dr. Biggio's testimony on cord transection "was largely theoretical and not based on experience." *W. Ala. Women's Ctr.*, 217 F.Supp.3d at 1339 n.24.

If the umbilical cord is blocked by the fetus, it would be very difficult and very risky to attempt to reach it (Dkt. No. 4, ¶ 33).

The record evidence is that umbilical cord transection is not widely practiced or researched (Dkt. No. 4, ¶ 32). There has been only one scientific study on the use of cord transection to cause fetal demise; the physicians relied upon by the parties agree on this (Dkt. No. 32-1, ¶ 11; Dkt. No. 32-3, Biggio Cross, at 146). The one scientific study on the use of cord transection has limitations and does not support any conclusion about the safety of the procedure (Dkt. No. 32-1, ¶¶ 12-13).

Attempting umbilical cord transection before 16.0 weeks LMP is completely unstudied, and like injections, these procedures are more difficult to perform the earlier in pregnancy a woman seeks care. Successfully identifying and transecting the cord at early gestations would take additional time and likely multiple passes with forceps (Dkt. No. 32-1, ¶¶ 14-15).

Further, this procedure exposes the woman to an increased risk of uterine perforation, cervical injury, and bleeding, while it unnecessarily prolongs the D&E procedure (Dkt. No. 4, ¶¶ 32-34). The record evidence is that the longer a D&E takes and the more instruments passes into the woman's uterus occur, the higher the risks of uterine perforation and other complications; physicians relied upon by both sides agree on this (Dkt. No. 4, ¶¶ 32-34; Dkt. No. 5, ¶ 25d; Dkt. No. 32-1, ¶¶ 13, 15; Dkt. No. 23-15, ¶ 8; Dkt. No. 32-3, Biggio Cross, at 144-45; Dkt. No. 25-4, ¶ 6).

There are some women for whom umbilical cord transection is not medically appropriate; physicians relied upon by both sides agree on this (Dkt. No. 4, ¶ 32; Dkt. No. 23-15, ¶ 12).

In seeking to grasp the umbilical cord, physicians will often have no way to avoid grasping fetal tissue instead of, or in addition to, the cord. Doing so would violate the D&E Mandate,

according to Dr. Hopkins, and umbilical cord transection provides no way to circumvent the D&E Mandate (Dkt. No. 4, ¶ 35; Dkt. No. 5, ¶¶ 25d-25e).

Dr. Nichols, an expert upon whom Dr. Hopkins relies, does not perform umbilical cord transection (Dkt. No. 4, ¶¶ 32-35; Dkt. No. 32-1, ¶¶ 11-15). No physician to which either party cites would require cord transection in their respective practices (Dkt. No. 4, ¶ 34; Dkt. No. 5, ¶ 25d; Dkt. No. 32-3, Biggio Cross, at 144).

This essentially is an experimental procedure that provides no medical benefits to the woman. The Court concludes that because this procedure is difficult, because this procedure has the potential for serious harm, and due to the lack of sufficient research on the procedure, umbilical cord transection is an unavailable method for fetal demise for women seeking a standard D&E abortion in the state of Arkansas.

For all three of these methods – digoxin, potassium chloride injections, and umbilical cord transection – no evidence currently supports the use of induced fetal demise to increase the safety of second-trimester medical or surgical abortion. This is consistent with the medical literature (Dkt. No. 4, ¶ 22; Am. Coll. of Obstetricians & Gynecologists, Practice Bulletin Number 135: Second Trimester Abortion, 121(6) Obstetrics & Gynecology 1394, 1396, 1406 (2013)).

### 3. Balancing

In *Whole Woman's Health*, the Supreme Court clarified that the undue burden analysis "requires that courts considers the burdens a law imposes on abortion access together with the benefits those laws confer." 136 S. Ct. at 2309. The Supreme Court has determined that, to prevail, a plaintiff bringing a facial challenge must demonstrate that "in a large fraction of cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895. The Court assumes the State of Arkansas's interests are

legitimate. The State of Arkansas maintains that its interests are sufficiently strong to justify the burdens the D&E Mandate would impose because, even with the Mandate, women would retain the ability to terminate pregnancy at or after 14.0 weeks LMP.

Defendants' argument is premised on it being feasible for Dr. Hopkins to utilize one of the three fetal-demise methods examined above: digoxin injection, potassium chloride injection, or umbilical cord transection. For the reasons discussed above, the Court concludes that on the current record these proposed methods are not feasible for inducing fetal demise before the standard D&E procedure Dr. Hopkins and other Arkansas abortion providers perform. *Danforth*, 428 U.S. at 79 (striking down an abortion method ban where the alternatives proposed by the state were largely experimental and unavailable to women in the state). Therefore, the Court concludes that the D&E Mandate does not "confer[ ] benefits sufficient to justify the burdens upon access that [it] imposes." *Whole Woman's Health*, 136 S. Ct. at 2299.

This Court concludes that, whether this Court weighs the asserted state interests against the effects of the provisions or examines only the effects of the provisions, Dr. Hopkins has carried his burden of demonstrating at this stage of the litigation that he is likely to prevail on the merits and to establish that the challenged D&E Mandate creates an undue burden for a large fraction of women for whom the D&E Mandate is an actual rather than an irrelevant restriction. The record includes sufficient evidence from which Dr. Hopkins satisfies his burden to present evidence of causation that the Mandate's requirements will lead to this effect. *See Whole Woman's Health*, 136 S. Ct. at 2313.

Further, the Court rejects defendants' other attempts to salvage the constitutionality of the D&E Mandate. Specifically, for the following reasons, the Court rejects defendants' arguments

premised on a scienter requirement in the D&E Mandate and the health exception in the D&E Mandate.

### a.    Scienter Requirement

Defendants maintain that there is a scienter requirement in the D&E Mandate, relying on language that prohibits a person from "purposely performing" a dismemberment abortion, meaning that it is one's "conscious object. . . to engage in conduct of that nature." (Dkt. No. 23, at 9 n.4).  Defendants essentially contend that this scienter requirement preserves access to D&E, thereby rendering the D&E Mandate constitutional.  The Court rejects this argument.

There is record evidence that physicians use digoxin to demonstrate a lack of *mens rea* and thereby avoid liability under the federal and similar state partial-birth abortion bans.  *See* 18 U.S.C. § 1531(b)(1)(A) (prohibiting a person's acting "deliberately and intentionally. . . for the purpose of performing an overt act that the person knows will kill the. . . fetus."); Ark. Code Ann. §20-16-1202 (prohibiting a person's acting "purposely. . . for the purpose of performing an overt act that the person knows will kill the. . . fetus.").  From this, defendants maintain that Dr. Hopkins could comply with the D&E Mandate by injecting women with digoxin before 18.0 weeks LMP, regardless of the effectiveness of those injections because the injection alone would be enough to negate the scienter requirement of the D&E Mandate.

The Court makes no determination on whether the D&E Mandate includes the type of scienter requirement defendants claim.[7]  The Court also makes no determination regarding the

---

[7]    The Court observes and agrees with Dr. Hopkins that, at a minimum, defendants' arguments on this point are inconsistent.  Although defendants contend the injection of digoxin would satisfy the scienter requirement even if ineffective, defendants also argue that before proceeding with D&E the physician would have to "employ other methods for ensuring the fetal demise including cutting the umbilical cord."  (Dkt. No. 23, at 42; Dkt. No. 32, at 38-39).

scope or contours of such a requirement.[8]  Even if the D&E Mandate does include the scienter requirement defendants advocate there is no record evidence that demonstrates the safety or reliability of injecting women with digoxin earlier than 18.0 weeks LMP.  In other words, concluding that the D&E Mandate has a scienter requirement would not resolve this dispute regarding the safety and reliability of using digoxin in D&E procedures before 18.0 weeks LMP.  It also would not resolve the safety and feasibility issues associated with potassium chloride injections.  Those disputes remain and render digoxin injections before 18.0 weeks LMP and potassium chloride injections not feasible alternatives, even with a scienter requirement.

Moreover, such a scienter requirement also would not save the method of umbilical cord transection for different reasons.  Defendants maintain that the scienter requirement allows for separation of fetal tissue if the physician is using forceps to try to grasp and transect the cord (Dkt. No. 23, at 44-45).  Dr. Hopkins convincingly argues that this ignores the fact that the experts relied upon by both sides agree that a physician knows that in attempting to reach for the cord, he is likely to grasp fetal tissue instead of or in addition to the cord (Dkt. No. 4, ¶ 35; Dkt. No. 5, ¶ 25e; Dkt. No. 32-3, Biggio Direct, at 125).  There is some evidence that the earlier in pregnancy a woman seeks care, the more likely this is to happen (Dkt. No. 32-1, ¶ 15).  Having this knowledge, Dr. Hopkins maintains a physician cannot proceed to perform a D&E by umbilical transection and credibly maintain that he did not purposely violate the D&E Mandate, given the law's defined terms and the inability to avoid prosecution through willful blindness.  This Court, at this stage of the proceedings, finds Dr. Hopkins arguments on this point persuasive (Dkt. No. 32, at 42-43).

---

[8]  The Court observes and agrees with Dr. Hopkins that defendants later argue that the scienter requirement protects only a physician who proceeds with D&E not realizing that an attempted demise has failed and not detecting a continuing heartbeat (Dkt. No. 23, at 42; Dkt. No. 32, at 40-41).

### b.      Health Exception

The Court rejects defendants' argument that "women who need [a D&E] for medical reasons" would still be able to obtain one (Dkt. No. 23, at 45).  There is no record evidence to support this assertion.  Instead, the record evidence supports Dr. Hopkins's argument that the health exception is narrow and does not justify defendants' assertion.  Dr. Hopkins maintains that a woman who is already dilated and for whom digoxin has failed needs an abortion "for medical reasons" but that care is not yet "necessary to avert" her "death" or "serious risk of substantial and irreversible" physical harm (Dkt. No. 4, ¶ 25f).  The D&E Mandate, even with its health exception, would require that a woman be denied a D&E abortion until her health condition substantially and inevitably deteriorated (Dkt. No. 4, ¶ 25f).  Further, as Dr. Hopkins argues, the health exception also does not provide an exception for any woman for whom the other fetal demise methods offered by defendants are difficult or impossible because of anatomy or medical contraindication (Dkt. No. 32, at 42).  Nothing in the record contradicts Dr. Hopkins on these points.  For these reasons, the health exception does not save the D&E Mandate at this stage of the proceeding.

### 4.      Women Effected

To sustain a facial challenge and grant a preliminary injunction, this Court must find that the challenged D&E Mandate is an undue burden for a large fraction of women for whom the provision is an actual, rather than an irrelevant, restriction.  The Court makes that finding here and rejects defendants' argument that the D&E Mandate is not unconstitutional because it "affects only a small fraction of abortions" (Dkt. No. 23, at 29).  Dr. Hopkins maintains that the D&E Mandate impacts all D&Es in Arkansas (Dkt. No. 4, ¶¶ 14, 16).  Under the D&E Mandate, the only D&E that would be legal is one in which a physician successfully induces fetal demise through an additional procedure prior to starting the evacuation phase of D&E (Dkt. No. 3, at 7).  Dr. Hopkins

claims that, because it is not feasible or safe to induce fetal demise through an additional procedure in every patient prior to starting the evacuation phase of D&E, providers would not start any D&E because they may not be able to complete the procedure without violating the D&E Mandate (Dkt. No. 3, at 7).

Little Rock Family Planning Services, along with Dr. Hopkins, provides care to women from throughout Arkansas and from other states (Dkt. No. 6, ¶ 5). Dr. Hopkins is aware of no physicians, other than those with whom he practices at Little Rock Family Planning Services, who provide second trimester abortion care (Dkt. No. 32-2, ¶ 2). In other words, there are no other providers in Arkansas that could fill this gap in care.

The Court makes the following findings of fact with respect to the fraction of women effected by the D&E Mandate. Little Rock Family Planning Services is the only abortion care provider for women seeking abortion after 10.0 weeks LMP in Arkansas (Dkt. No. 5, ¶ 6; Dkt. No. 6, ¶ 2). Each year, Little Rock Family Planning provides approximately 3,000 abortions, of which approximately 20% occur during the second trimester (Dkt. No. 6, ¶ 16). Standard D&E accounts for 100% of second trimester abortions reported in Arkansas in 2015 (Dkt. No. 5, ¶ 17). Standard D&E accounts for 95% of all second trimester abortions nationally (Dkt. No. 4, ¶¶ 14-16; Dkt. No. 5, ¶ 17). The vast majority of standard D&Es currently occur from 14.0 to 18.0 weeks LMP (Dkt. No. 5, ¶¶ 25-26). Of the 638 D&Es reported in Arkansas in 2015, 407 or 64% took place during these earliest weeks of the second trimester (Dkt. No. 6, ¶ 17).

This Court determines that, if the Court considers the D&E Mandate relevant for Arkansas women who select standard D&E during the early weeks of the second trimester, it creates an undue burden for a large fraction of these women. In Arkansas in 2015, 407 women had a standard D&E from 14.0 to 18.0 weeks LMP. The D&E Mandate would unduly burden 100% of these

women because, if the D&E Mandate goes into effect, standard D&E abortions will no longer be performed in Arkansas due to ethical and legal concerns regarding compliance with the law, thereby rendering abortions essentially unavailable in the State of Arkansas starting at 14.0 weeks LMP.

This Court determines that, even if the Court considers the D&E Mandate relevant for Arkansas women who select standard D&E throughout the second trimester, it creates an undue burden for a large fraction of these women. In Arkansas in 2015, 638 women selected standard D&E. If the D&E Mandate goes into effect, standard D&E abortions will no longer be performed in Arkansas due to ethical and legal concerns regarding compliance with the law, thereby rendering abortions essentially unavailable in the State of Arkansas starting at 14.0 weeks LMP. In that case, 100% or all 638 of these women will experience a substantial obstacle to abortion.[9]

The Court determines that it is not appropriate to use as the denominator all Arkansas women who obtained second trimester abortion; the D&E Mandate is only relevant for Arkansas women who elected to have the standard D&E. Regardless, even if the Court considers the D&E Mandate relevant for Arkansas women who select abortion throughout the second trimester, these numbers do not change. In 2015, no Arkansas woman elected to have an induction abortion; all Arkansas women elected to have a standard D&E. 638 women selected standard D&E. If the D&E Mandate goes into effect, standard D&E abortions will no longer be performed in Arkansas due to ethical and legal concerns regarding compliance with the law, thereby rendering abortions

---

[9] Even if this Court were to take the position that the D&E Mandate would impact only standard D&Es performed from 14.0 to 18.0 weeks LMP, 407 of the 638 women still would be impacted. 64% of these 638 women would experience a substantial obstacle to abortion. The Court notes that these figures would apply if there is a scienter requirement in the D&E Mandate; defendants maintain that, after 18.0 weeks LMP in Arkansas, the digoxin that is administered would be sufficient to comply with a scienter requirement in the D&E Mandate.

essentially unavailable in the State of Arkansas starting at 14.0 weeks LMP. In that case, 100% or all 638 of these women will experience a substantial obstacle to abortion.

Many patients of Little Rock Family Planning Services are low-income. Approximately 30 to 40% of patients obtain financial assistance to pay for their abortion care (Dkt. No. 6, ¶ 5). Many patients of Little Rock Family Planning Services struggle in their lives and in their efforts to access the medical care they need (Dkt. No. 6, ¶ 5). The time and effort it takes to make the necessary plans to access medical care cause anxiety and stress and cause financial pressure for women seeking care at Little Rock Family Planning Services (Dkt. No. 6, ¶ 8). If Little Rock Family Planning Services no longer performed abortions in Arkansas after 14.0 weeks LMP, financial and logistical issues would burden 30 to 40 % of these women, or 191 to 255, in finding any alternate care out of state. These findings, coupled with the finding that abortions would essentially be unavailable in the State of Arkansas starting at 14.0 weeks LMP if the D&E Mandate takes effect, bolster this Court's conclusion that if the D&E Mandate takes effect a large fraction of Arkansas women who select abortion throughout the second trimester would experience a substantial obstacle to abortion.

To the extent defendants maintain induction abortion would be an available abortion option in Arkansas if the D&E Mandate were to take effect, the only record evidence before the Court is that there were no induction abortions reported in Arkansas in 2015 (Dkt. No. 5, ¶ 12). Further, an induction abortion requires a hospital or hospital-like facility; it is not performed in a second-trimester outpatient clinic. If hospitals in Arkansas are providing any abortion care, it is in only rare circumstances (Dkt. No. 5, ¶ 6). Induction abortion can take over 24 hours, and for some patients, this procedure may span multiple days. This procedure entails labor, which can involve pain requiring significant medication or anesthesia, and which may be psychologically challenging

for some women (Dkt. No. 4, ¶ 14; Dkt. No. 5, ¶ 12). Because induction involves an in-patient stay, requiring up to three days of hospitalization, as opposed to an out-patient procedure, there is an enormous cost difference between induction and the out-patient standard D&E procedure (Dkt. No. 4, ¶ 14). In some women, an induction abortion fails, and the woman needs intervention in the form of D&E for her safety. This is infrequent, but this does occur (Dkt. No. 4, ¶ 15; Dkt. No. 5, ¶ 12). In approximately 5% to 10% of induction abortions, the woman must undergo an additional surgical procedure to remove a retained placenta. Induction abortion also can cause uterine rupture, which is rare but can be life threatening and can be of particular concern for women who have had multiple previous cesarean deliveries (Dkt. No. 4, ¶ 15; Dkt. No. 25-4, ¶ 8). Controlling precedent does not require the Court to consider this method, but even if it did, for these reasons, the Court rejects induction abortion as a viable alternative second trimester option in Arkansas.

### 2.     Irreparable Harm

Enforcement of the D&E Mandate will inflict irreparable harm on Dr. Hopkins and the fraction of women for whom the Mandate is relevant as there is no adequate remedy at law. It is well-settled that the inability to exercise a constitutional right constitutes irreparable harm. *See Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977) ("Planned Parenthood's showing that the ordinance interfered with the exercise of its constitutional rights and the rights of its patients supports a finding of irreparable injury.") (citations omitted); *accord Kirkeby v. Furness*, 52 F.3d 772, 775 (8th Cir. 1995) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

In the absence of an injunction, the fraction of women for whom the Mandate is relevant would immediately lose the right to obtain a pre-viability abortion anywhere in the State of

Arkansas after 14.0 weeks LMP. Therefore, the second requirement for an order preliminarily enjoining enforcement of the D&E Mandate is satisfied.

### 3. Balancing Of Harms

In the absence of an injunction, the fraction of women for whom the Mandate is relevant would immediately lose the right to obtain a pre-viability abortion anywhere in the State of Arkansas after 14.0 weeks LMP if the D&E Mandate were allowed to take effect. Whereas, if an injunction issues, a likely unconstitutional law passed by Arkansas legislators will not go into effect. The threatened harm to Dr. Hopkins and the fraction of women for whom the Mandate is relevant clearly outweighs whatever damage or harm a proposed injunction may cause the State of Arkansas.

### 4. Public Interest

It is in the public interest to preserve the *status quo* and to give the Court an opportunity to evaluate fully the lawfulness of the D&E Mandate without subjecting Dr. Hopkins, or his patients, or the public to any of the law's potential harms.

The Court notes that the Eleventh Amendment bars relief against an allegedly unconstitutional provision if the named state officials do not have the authority to enforce it. U.S. Const. amend XI; *see also Hutchinson*, 803 F.3d at 957-58. Therefore, the preliminary injunction does not extend to the private civil-enforcement provisions under the D&E Mandate.

It is therefore ordered that Dr. Hopkins's motion for preliminary injunction is granted to the extent that defendants are preliminarily enjoined from enforcing the provisions of Ark. Code Ann. § 20-16-1803 and Ark. Code Ann. § 20-16-1805 which imposes criminal penalties on a person who violates Ark. Code Ann. § 20-16-1803(a).

## B. Medical Records Mandate (Counts III and IV based H.B. 1434)

Dr. Hopkins seeks a preliminary injunction based on count three, which alleges that the Medical Records Mandate violates the Due Process Clause of the United States Constitution by placing an undue burden on Dr. Hopkins's patients' right to liberty and privacy, and count four, which alleges that the Medical Records Mandate violates the Due Process Clause due to its vagueness.

The Medical Records Mandate subjects physicians to civil liability and criminal penalties for violating the law. It requires:

(b) Before performing an abortion, the physician or other person who is performing the abortion shall:

    (1)    (A) Ask the pregnant woman if she knows the sex of the unborn child.

              (B) If the pregnant woman knows the sex of the unborn child, the physician or other person who is performing the abortion shall inform the pregnant woman of the prohibition of abortion as a method of sex selection for children; and

    (2)    (A) Request the medical records of the pregnant woman relating directly to the entire pregnancy history of the woman.

              (B) An abortion shall not be performed until reasonable time and effort is spent to obtain the medical records of the pregnant woman as described in subdivision (b)(2)(A) of this section.

(c) If this section is held invalid as applied to the period of pregnancy prior to viability, then the section shall remain applicable to the period of pregnancy subsequent to viability.

Ark. Code Ann. § 20-16-1804.

A physician who "knowingly performs or attempts to perform an abortion" prohibited by this law "is guilty of a Class A misdemeanor" under Arkansas law. Ark. Code Ann. § 20-16-1805. This includes punishment of up to one year in jail, a fine, or both. Ark. Code Ann. §§ 5-4-201, 5-

4-401.  A physician who violates the law also is subject to civil penalties and professional sanctions, including but not limited to suspension or revocation of his or her medical license for "unprofessional conduct" by the Arkansas State Medical Board.  Ark. Code Ann. § 20-16-1806.

Dr. Hopkins does not challenge the requirement that a physician not perform an abortion knowing that the woman is seeking the abortion solely on the basis of the sex of the embryo or fetus.  Ark. Code Ann. § 201-6-1804(a), (b)(1).  Dr. Hopkins is unaware of such a case in Arkansas (Dkt. No. 5, ¶ 30; Dkt. No. 6, ¶ 22).  Defendants do not dispute that this type of challenge solely to the Medical Records Mandate is permissible.[10]

### 1.    Likelihood Of Success On The Merits:  Due Process Clause

### a.    Applicable Law

To determine whether Dr. Hopkins is likely to succeed on his challenge to the Medical Records Mandate under the Due Process Clause, this Court applies the undue burden standard.  In *Whole Woman's Health*, the Supreme Court clarified that this undue burden analysis "requires that courts considers the burdens a law imposes on abortion access together with the benefits those laws confer."  136 S. Ct. at 2309.  The Supreme Court has determined that, to prevail, a plaintiff bringing a facial challenge must demonstrate that "in a large fraction of cases in which [the law]

---

[10]    When confronting a constitutional flaw in a statute, a federal court must "try not to nullify more of a legislature's work than is necessary."  *Ayotte,* 546 U.S. at 329.  It is preferable "to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact."  546 U.S. at 329 (citations omitted).  Severability is a matter of state law.  *See Russell v. Burris,* 146 F.3d 563, 573 (8th Cir. 1998).  Under Arkansas law, "an act may be unconstitutional in part and yet be valid as to the remainder."  *Ex Parte Levy,* 163 S.W.2d 529 (1942).  In determining whether a constitutionally invalid portion of a legislative enactment is fatal to the entire legislation, the Supreme Court of Arkansas looks to "(1) whether a single purpose is meant to be accomplished by the act; and (2) whether the sections of the act are interrelated and dependent upon each other."  *U.S. Term Limits, Inc. v. Hill,* 872 S.W.2d 349, 357 (1994).  Applying this standard, the Court satisfies itself that this type of challenge solely to the Medical Records Mandate of the statute is acceptable.

is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895. To sustain a facial challenge and grant a preliminary injunction, this Court must make a finding that the Medical Records Mandate is an undue burden for a large fraction of women for whom the law is relevant.

The law that controls the Court's evaluation of Dr. Hopkins's challenge to the Medical Records Mandate under the Due Process Clause is set forth in more detail at Section IV.A.1.a. of this Order.

### b. Analysis Of The Medical Records Mandate

#### 1. State's Interest

The Arkansas legislature included "legislative findings and purpose" when enacting this law. Ark. Code Ann. § 20-16-1802. The purpose of the law is to "[b]an abortions performed solely for reasons of sex-selection" and to "[p]rotect women from the risks inherent in late-term abortions." Ark. Code Ann. § 20-16-1802(b). Dr. Hopkins does not seek a preliminary injunction on or challenge enforcement of the law with respect to the ban on abortions performed solely for reasons of sex-selection. Dr. Hopkins does seek a preliminary injunction challenging enforcement of the Medical Records Mandate.

With respect to maternal health, the Arkansas legislature made the following findings:

(A) It is undisputed that abortion risks to maternal health increase as gestation increases.

(B) The risk of death for pregnant women at eight (8) weeks' gestation is one (1) death per one million (1,000,000) and rises to:

    (i) One (1) death per twenty-nine thousand (29,000) abortions between sixteen (16) and twenty (20) weeks' gestation, and

    (ii) One (1) death per eleven thousand (11,000) abortions at twenty-one (21) weeks' gestation or later;

(C) A woman is thirty-five (35) times more likely to die from an abortion performed at twenty (20) weeks' gestation than she would have been had the abortions been performed in the first trimester;

(D) A woman is ninety-one (91) times more likely to die from an abortion performed at twenty-one (21) weeks' gestation or later than she would have been had the abortion been performed in the first trimester; and

(E) Because abortions performed solely based on the sex of a child are generally performed later in pregnancy, women undergoing these abortions are unnecessarily exposed to increased health risks, including an exponentially higher risk of death.

Ark. Code Ann. § 20-16-1802(a)(2).

## 2.    Burdens Imposed On Women

Defendants maintain that the Medical Records Mandate applies only in "situations where the woman knows the sex" of the embryo or fetus (Dkt. No. 23, at 48-49). When examining the meaning of a criminal statute, the Supreme Court of Arkansas applies these principles:

> We construe criminal statutes strictly, resolving any doubts in favor of the defendant. *Hagar v. State,* 341 Ark. 633 19 S.W.3d 16 (2000). We also adhere to the basic rule of statutory construction, which is to give effect to the intent of the legislature. *Id.* We construe the statute just as it reads, giving the words their ordinary and usually accepted meaning in common language, and if the language of the statute is plain and unambiguous, and conveys a clear and definite meaning, there is no occasion to resort to rules of statutory interpretation. *Id.* Additionally, in construing any statute, we place it beside other statutes relevant to the subject matter in question and ascribe meaning and effect to be derived from the whole. *Id.*

*Short v. State*, 79 S.W.3d 313, 495 (Ark. 2002).

The Supreme Court of Arkansas also explained:

> It is a well-settled principle of statutory construction that statutes (will) receive a common-sense construction, and, where one word has been erroneously used for another, or a work omitted, and the context affords the means of correct, the proper word will be deemed substituted or supplied. This is but making the strict letter of the statute yield to the obvious intent of the Legislature.

*Henderson v. Russell*, 589 S.W.2d 565, 568 (Ark. 1979) (citations omitted).

The Supreme Court of Arkansas stated:

Statutes will not be defeated on account of mistakes, errors or omissions, provided the intent of the General Assembly can be collected from the whole statute. *Hazelrigg v. Board of Penitentiary Commissioners*, 184 Ark. 154, 40 S.W.2d 998 (1931). We have often held that the title of an act is not controlling in its construction even though it is a matter to be considered in determining the meaning of a statute which is otherwise ambiguous. *Matthews v. Byrd*, 187 Ark. 458, 60 S.W.2d 909 (1933). Likewise, the language used in the title of an act is not controlling but may play a part in explaining ambiguities in the body of the statute. *City of Conway v. Summers*, 176 Ark. 796, 4 S.W.2d 19 (1928). We examine the title of an act only for the purpose of shedding light on the intent of the General Assembly. *Lyerley v. Manila School District No. 15*, 214 Ark. 245, 215 S.W.2d 733 (1948).

*Henderson*, 589 S.W.2d at 568.

In *Henderson*, acknowledging that controlling law, the Supreme Court of Arkansas reviewed language to determine if an emergency had been defined by the Arkansas legislature such that the emergency clause was effective, accelerating the effective date of the law. The court examined the following:

Where County Officers must have Deputies and employees necessary to carry out the essential activities of County Government, it is hereby found that it is in the best interest of County Government that no person be employed as a Deputy or County Employee who is related by affinity or consanguinity within the third degree to any elected official. Therefore, an emergency is hereby declared to exist and this Ordinance being necessary for the immediate preservation of public peace, health and safety shall be in full force and effect from and after its passage and approval.

*Henderson*, 589 S.W. 2d at 569. The Supreme Court of Arkansas reasoned "[t]here [wa]s simply nothing in the emergency clause to indicate a real emergency existed" and declared "that the emergency clause had failed and the ordinance [would] take effect as it would have had there been no emergency clause." *Id*.

Applying those principles here, the Court concludes that Ark. Code Ann. § 20-16-804(b) should be read as enacted; there is no ambiguity in the language. The portion which is the Medical Records Mandate in subsection (2) is a second, independent requirement from the requirement in

subsection (1) of asking the pregnant woman if she knows the "sex of the unborn child." In other words, as written, the statute requires that "[b]efore performing an abortion, the physician or other person who is performing the abortion shall" comply with both subsection (1) *and* (2) of § 804(b). In fact, "and" appears at the end of subsection (1)(b) preceding subsection (2). There is no language in the statute as written that limits subsection (2) to instances in which the pregnant woman knows the "sex of the unborn child" or makes subsection (2) dependent upon the woman's answer to subsection (1) of § 804(b).

Defendants do not argue a mistake, error, or omission in § 804(b). Instead, defendants argue that the Medical Records Mandate says something that it plainly does not (Dkt. No. 23, at 48). If the Court is permitted under Arkansas law and these circumstances to look to the title and legislative findings, the Court finds more persuasive defendants' argument that the legislature intended something other than what the statute plainly says (Dkt. No. 23, at 49). However, the Court is not convinced that it may look to the title and legislative findings here.

Regardless, at this stage of the proceeding, the Court will consider both interpretations of the Medical Records Mandate. The Court finds as a matter of law that the Medical Records Mandate impermissibly delays or bars most abortions for which the law is relevant, contains no health exception, and imposes prohibitive requirements on providers.

Based on the record evidence before the Court, obtaining medical records is medically indicated for only a fraction of abortion patients (Dkt. No. 4, ¶ 9; Dkt. No. 5, ¶¶ 33-34; Dkt. No. 6, ¶ 24). The doctors at Little Rock Family Planning Services request medical records for approximately 25 patients per year out of the approximately 3,000 women patients each year (Dkt. No. 6, ¶¶ 24, 32). The patients for whom doctors at Little Rock Family Planning Services request medical records include patients who have received a diagnosis of fetal anomaly, decided to end

the pregnancy, and received a referral to Little Rock Family Planning Services and patients for whom the doctor believes the records could be useful because of a woman's medical condition (Dkt. No. 6, ¶ 24).

Even then, a request for only certain records related to a specific medical issue is appropriate (Dkt. No. 4, ¶ 9; Dkt. No. 5, ¶¶ 33-34; Dkt. No. 6, ¶ 24). For Little Rock Family Planning Services to obtain a patient's medical records, the patient must first sign a form authorizing Little Rock Family Planning Services to obtain the medical records. That authorization is then sent along with a request to the health care provider. Little Rock Family Planning Services staff then follow-up with a phone call to the health care provider, if necessary (Dkt. No. 6, ¶ 25).

Because Little Rock Family Planning Services typically requests records related to some aspect of the care the patient will receive, and therefore involve a specific request, not a request for the patient's full medical history, there is no fee charged for the records (Dkt. No. 6, ¶ 25). Even with these specific requests, it takes time to obtain a patient's medical records from another health care provider and may take a few hours or up to several weeks (Dkt. No. 6, ¶ 26).

When certain records related to a specific medical issue are requested, unless the records are transmitted and received very quickly, any medical benefit of waiting for the records is outweighed by the fact that delaying abortion care increases the risks associated with the procedure for the patient (Dkt. No. 4, ¶ 9; Dkt. No. 5, ¶ 39).

Attempting to comply with the Medical Records Mandate would mean waiting until Dr. Hopkins had spent an undefined amount of time trying to obtain records. Even for very targeted requests, it may take anywhere from a few hours to several weeks to receive records (Dkt. No. 6, ¶ 26). The types of requests required by the Medical Records Mandate likely will mean delays in

receiving records would be even greater (*Id.*). Federal law allows United States providers 30 days for the initial response to records requests; the actual medical records may follow later; and the patients' recourse for non-production of records involves review by government officials and/or litigation. 45 C.F.R. § 164.524. Delay would be compounded for patients receiving pregnancy related care outside of Arkansas or outside of the United States, and for patients whose records are in another language and must be translated into English (Dkt. No. 5, ¶ 14; Dkt. No. 6, ¶ 30).

The delay caused by the Medical Records Mandate is not quantified by the law, as explained in this Court's discussion regarding the vagueness of this provision. Due to this delay, enforcement of the Medical Records Mandate could cause a woman's time to obtain abortion care in Arkansas to expire. Currently, Arkansas bans abortions after 21.6 weeks LMP. Ark. Code Ann. § 20-16-1405 (2013) (banning abortion after 20.0 weeks post-fertilization, which is 22.0 weeks LMP). This seems especially likely given defendants' contention that the Medical Records Mandate "applies only to potential sex-selection abortions – which by definition are later-term abortions where the mother knows the sex of the child she is carrying." (Dkt. No. 23, at 49). If what defendants contend is true, for those women, time is of the essence in accessing abortion care in Arkansas. Even defendants concede that delay increases the risk to the woman, given the findings of fact of the legislature that "sex-selection abortions are generally performed later in pregnancy and that the risks from abortion to maternal health increase as gestation increases" (Dkt. No. 23, at 49). *See* Ark. Code Ann. § 20-16-1802(a)(2) (legislative findings).

The record evidence is that delay can push a woman past the point in pregnancy at which she can receive a medication abortion, requiring a woman who prefers that method to have a procedure with instrumentation that she would otherwise not have. Delay can push a woman from a first-trimester to a second-trimester procedure, or from a one-day to a two-day procedure in the

second trimester. Delay can also push a woman past the point at which she can obtain an abortion at Little Rock Family Planning Services and in Arkansas (Dkt. No. 6, ¶ 13).

The record evidence is that the risks associated with legal abortion utilizing current methods increase as pregnancy progresses, particularly if that delay pushes a woman from the first trimester to the second trimester. Studies demonstrate increased risks of complications, such as bleeding and uterine perforation, associated with abortions performed later in pregnancy (Dkt. No. 4, ¶ 10). The record evidence is that delay also means that a woman may pay more for the abortion procedure itself because the procedure becomes more complex as pregnancy advances (Dkt. No. 6, ¶ 14).

This type of delay, and the impact of this delay, erects a substantial obstacle to abortion access. *See Schimel*, 806 F.3d at 920 (explaining that delay causes women to "forgo first-trimester abortions and instead get second-trimester ones, which are more expensive and present greater health risks. Other women would be unable to obtain any abortion, because the delay would push them past" the point in pregnancy at which abortion care is available), *cert. denied*, 136 S. Ct. 2545 (2016). When examining the judicial bypass procedures, which allow minors to obtain abortion care without otherwise mandated parental involvement, the Supreme Court made clear such procedures are unconstitutional unless they assure an expeditious time frame for completion of the process. *See, e.g., Bellotti*, 443 U.S. at 644 (holding that judicial bypass process for minors "must assure that a resolution of the issue, and any appeals that may follow, will be completed with anonymity and sufficient expedition to provide an effective opportunity for an abortion to be obtained"); *Causeway*, 109 F.3d at 1110 (striking down judicial bypass statute that lacked time limits and noting that "[s]uch open-ended bypass procedure has never been approved"), *overruled on other grounds by Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001).

The Medical Records Mandate's requirements apply even where abortion is necessary to prevent a serious health risk to the woman; the Medical Records Mandate has no exception to allow physicians to act without the required medical records search in cases where a serious health risk to the woman is present. Although the plain text of the Medical Records Mandate does not permit a physician to proceed based on health risks to the woman, the State of Arkansas argues such an exception is implicit in the law. The State of Arkansas points to language in the law that prohibits an abortion "solely on the basis of the sex of the unborn child" and argues that, if an abortion is needed for health reasons, the abortion is not a sex-selection abortion prohibited by the law (Dkt. No. 22, at 35). The Court rejects this argument. As an initial matter, defendants point to section (a) for this language, not section (b) that includes the Medical Records Mandate. *See* Ark. Code Ann. § 20-16-1804. There is no language in section (b) from which the Court could infer this exception. Instead, the language of section (b) requires medical records requests for women's "entire pregnancy history" and the delay of "reasonable time and effort to obtain the medical records" before any abortion can be performed. Ark. Code Ann. § 20-16-1804(b). Further, other Arkansas statutes regarding abortion, including some challenged here, specifically include specific health exception language. That language is absent in this statute. This Court has no legal basis from which to read that language, or such an exception, into the Medical Records Mandate.

In addition, there is record evidence that compliance with the Medical Records Mandate would drain providers' resources: the staff, copying, and processing costs of requesting records and attempting to compile all the records for the great majority of patients would be overwhelming (Dkt. No. 6, ¶¶ 24, 32). Little Rock Family Planning Services provides medical care to approximately 3,000 women each year, the majority of whom have had one or more prior

pregnancies, during which the women received medical care from one or more providers or received care for a current pregnancy (Dkt. No. 6, ¶ 32). Each woman would have to gather past information, including identifying her past providers and the dates she received service, to complete a signed request for each former provider (Dkt. No. 6, ¶ 33). Little Rock Family Planning Services, which provides approximately 3,000 abortions of the 3,800 abortions reported in Arkansas each year cannot process that volume of requests (Dkt. No. 6, ¶¶ 24, 31). As a result, implementation of the Medical Records Mandate will simply shut down care for those patients (Dkt. No. 3, at 34).

The Arkansas Medical Board advises that Arkansas medical providers can charge per-page copying fees and separate fees for retrieval of records from storage. See Ark. Code Ann. 16-46-106 (2008). The record evidence is that, when making a request for a patient's complete medical record, a fee usually is charged for obtaining the records (Dkt. No. 6, ¶ 33).

At this stage of the proceeding, the Court acknowledges the evidence in the record that compliance would violate the women's confidentiality: requesting medical records would disclose the fact of the woman's pregnancy and her abortion decision to all her previous and current pregnancy related health care providers (Dkt. No. 5, ¶ 38; Dkt. No. 6, ¶ 28).[11] Little Rock Family Planning Services is a well-known abortion provider. Any request for medical records made by Little Rock Family Planning Services, in and of itself, discloses that the patient likely is seeking

_____

[11] The Court notes that defendants seem to have misconstrued Dr. Hopkins's bases for a preliminary injunction as to the Medical Records Mandate. While Dr. Hopkins does state in his complaint that the Medical Records Mandate's medical records requirement violates a patient's right to privacy under the Fourteenth Amendment (Dkt. No. 1, ¶ 136), Dr. Hopkins does not move for a preliminary injunction on those grounds (Dkt. No. 2, at 31). Thus, the Court will take defendants' arguments pertaining to informational privacy with respect to the Medical Records Mandate and apply them to the law on which Dr. Hopkins moves for a preliminary injunction on those grounds—the Local Disclosure Mandate.

an abortion. As a result, Little Rock Family Planning Services does not request records with a woman's prior written consent, and some women specifically request that Little Rock Family Planning Services not seek records from another health care provider because the woman does not want that provider to know of the pregnancy and abortion decision (Dkt. No. 6, ¶ 27). The record evidence is that some women have informed Little Rock Family Planning Services that the women fear hostility or harassment from their other health care providers for deciding to seek an abortion (Dkt. No. 6, ¶ 28).

Many women do not want that to occur (Dkt. No. 5, ¶ 38; Dkt. No. 6, ¶ 28). As a result, this Court concludes that there is record evidence that this violation of confidentiality would further interfere with a woman's right to decide to end a pregnancy. *Bellotti*, 443, U.S. at 655. It will cause women to forgo abortion in Arkansas rather than risk disclosure to medical providers who they know oppose abortion or who are family friends or neighbors (Dkt. No. 6, ¶ 28).

### 3.    Balancing

The burdens imposed by the Medical Records Mandate appear to serve no proper state purpose. *See Whole Woman's Health*, 136 S. Ct. at 2318 (an abortion regulation is unconstitutional where it provides "few, if any" medical benefits); *Schimel*, 806 F.3d at 920 (emphasizing that the "feebler the medical grounds (in this case nonexistent), the likelier" it is that any burden on abortion is disproportionate and therefore undue). The ban on abortions sought based solely on sex, with its enforcement through Ark. Code Ann. 20-16-1804(a), stands on its own. Dr. Hopkins does not challenge this ban.[12] Any aid the Medical Records Mandate might provide for this ban has not been established by record evidence nor has it been shown by record evidence to outweigh

---

[12] As an aside, there is no record evidence that abortions in Arkansas have been sought based solely on sex (Dkt. No. 5, ¶ 30; Dkt. No. 6, ¶ 22). The Court has not relied on this observation in reaching its determination regarding the burden the Medical Records Mandate imposes.

the substantial burdens that the Medical Records Mandate imposes on abortion access for the women for whom the Mandate is relevant. "This necessarily means that the burden to be considered undue is greatly reduced as a requirement as the benefit from the regulation becomes minuscule, if any." *W. Ala. Women's Ctr.*, 2016 WL 6395904 at *4.

Here, the Medical Records Mandate requires blanket requests for entire medical histories related to pregnancy care. There is record evidence that such blanket requests will increase the delay in receiving records and the cost of obtaining records (Dkt. No. 6, ¶¶ 24, 32, 33). These delays may put abortion care out of reach for many of the women for whom this law is relevant, especially given defendants' contention that the Medical Records Mandate "applies only to potential sex-selection abortions – which by definition are later-term abortions where the mother knows the sex of the child she is carrying." (Dkt. No. 23, at 49; *see also* Dkt. No. 6, ¶ 13). Time is of the essence in accessing abortion care in Arkansas, given the limits under Arkansas law on when abortions may be performed. All parties conceded that any delay in receiving abortion care increases the risk to the woman. *See* Ark. Code Ann. § 20-16-1802(a)(2) (legislative findings).

Although defendants state "a patient is always more likely to receive better care when her physician has greater knowledge of her health history," there is no evidentiary support for this statement in the record before the Court. It is an unsupported statement by defense counsel. In fact, the record evidence before this Court is that the current standard abortion care does not require a physician to obtain medical records for entire medical histories related to pregnancy care for women before providing abortion care (Dkt. No. 5, ¶¶ 31-42; Dkt. No. 6, ¶¶ 24-34). *See Whole Woman's Health*, 136 S. Ct. at 2315 (determining, when conducting the undue burden analysis, that "[t]here [was] considerable evidence in the record supporting the District Court's findings

indicating that the statutory provision requiring all abortion facilities to meet all surgical-center standards does not benefit patients and is not necessary").

From the record evidence before the Court, obtaining medical records is medically indicated for only a fraction of abortion patients (Dkt. No. 4, ¶ 9; Dkt. No. 5, ¶¶ 33-34; Dkt. No. 6, ¶ 24). Even then, a request for only certain records related to a specific medical issue is appropriate (Dkt. No. 4, ¶ 9; Dkt. No. 5, ¶¶ 33-34; Dkt. No. 6, ¶ 24). When certain records related to a specific medical issue are requested, unless the records are transmitted and received very quickly, any medical benefit of waiting for the records is outweighed by the fact that delaying abortion care increases the risks associated with the procedure for the patient (Dkt. No. 4, ¶ 9; Dkt. No. 5, ¶ 39).

Nothing in the Medical Records Mandate explains what a doctor is to do with these records. Defendants in their filings assert that "[m]edical records pertaining to a woman's past pregnancy history is likely to shed light on whether a woman is seeking a sex-selection abortion. For example, medical records documenting that a woman who had previously been pregnant with two girls and two boys who had abortions of the two girls would be highly probative of whether or not a woman who was currently pregnant with a girl was seeking a sex-selection abortion." (Dkt. No. 22, at 34-35). This factual assertion that medical records "likely" will provide this information is not supported by any record evidence. Moreover, the Medical Records Mandate does not address this; nothing in the Mandate directs a doctor to use these records to aid in making a determination whether a woman seeks an abortion based solely on gender. That link is not established by the language of the Medical Records Mandate, nor is it established by any evidence in the record.

Defendants further state "[t]he discovery that a woman was seeking a sex-selection abortion may indicate that the woman has a need for counseling or is herself the victim of a

coercive domestic partner who demands that she abort any child of a particular sex." (Dkt. No. 23, at 50). Again, there is no support for this in the record. It is another unsupported statement by defense counsel.

There also is no evidence in the record from defendants to inform this Court on the ease with which a provider like Dr. Hopkins could comply with the Medical Records Mandate, as defendants suggest is possible. Instead, the only evidence in the record is that provided by Dr. Hopkins, which is based on experience and personal knowledge, and that evidence establishes the substantial burdens of compliance. *See Whole Woman's Health*, 136 S. Ct. at 2318 (examining, when conducting the undue burden analysis, "the costs that a currently licensed abortion facility would have to incur to meet" the challenged regulation). The Court accepts Dr. Hopkins's evidence on this point at this stage of the proceeding.

There also is no evidence in the record to counter the Court's conclusion that compliance would implicate the women's confidentiality.

These harms are not dependent on unusual, as-applied circumstances, despite defendants' contention to the contrary (Dkt. No. 23, at 51). There is no record evidence to support that assertion. That assertion is directly contradicted by the record.

For all of these reasons, this Court concludes at this stage of the proceedings that Dr. Hopkins is likely to succeed in showing that the Medical Records Mandate imposes an undue burden on a large fraction of women for whom the law is relevant. The record includes sufficient evidence from which Dr. Hopkins satisfies his burden to present evidence of causation that the Mandate's requirements will lead to this effect. *See Whole Woman's Health*, 136 S. Ct. at 2313. Therefore, at this stage of the proceeding, the Court determines the Medical Records Mandate is likely unconstitutional.

### 4.      Women Effected

To sustain a facial challenge and grant a preliminary injunction, this Court must find that the challenged Mandate is an undue burden for a large fraction of women for whom the provision is an actual rather than an irrelevant restriction.  Regardless of how the Medical Records Mandate is construed – whether it effects all 3,000 women in Arkansas seeking an abortion, as Dr. Hopkins contends, or only those women who know gender when seeking an abortion, as defendants contend, it creates an undue burden for a large fraction of them.  The Medical Records Mandate does very little to advance defendants' interest, for the reasons explained.  Compliance with the Medical Records Mandate for these women presents substantial obstacles to abortion care by increasing delays, very possibly putting abortion care out of reach for women late in pregnancy, increasing health risks to women as gestational age advances, increasing costs associated with compliance, and implicating privacy concerns.  The vagueness of this Mandate, especially in relation to whom it applies and how long the provider is expected to wait for records, prohibits the Court from deducing fractions of women burdened by the Mandate with any specificity.

If the Medical Records Mandate is intended to apply to all women seeking an abortion in Arkansas, based on record evidence from 2015 which is the last year for which the Arkansas Department of Health published statistics, it will apply to 3,771 women – all of the women who sought an abortion in Arkansas during that year (Dkt. No. 3, at 3 n.1).  If the Medical Records Mandate requires providers to seek records for all women before providing abortion, the Mandate will substantially burden all women's access.  If the Medical Records Mandate requires providers to seek records only for women who have had prior pregnancies, approximately two-thirds of the women who obtained abortions in 2015 had had one or more previous live births; this equates to approximately 2,514 women (Dkt. No. 5, ¶ 32).  There is record evidence that, of the remaining

third, "many" will have had care earlier in their current pregnancy, a previous stillbirth, miscarriage, or abortion, or a previous ectopic or molar pregnancy (Dkt. No. 5, ¶ 32). The remaining third represents 1,256 women; the Court construes "many" as "a large number of" which is how the term is commonly defined. *Many,* The Oxford Dictionary (10th ed. 2014). All of these figures represent large fractions of the women effected.

If the Medical Records Mandate is intended to apply only to women who know the sex of the unborn child, those are the women for whom the law is relevant, and the undue burdens created by the Medical Records Mandate will apply to all of those women. The burdens of the Mandate will substantially outweigh its benefits, based on the record before this Court for the reasons explained. The Court takes judicial notice that one typical method to determine the sex of an unborn child is through ultrasound and that other, essentially commercial, services are offered to aid women in determining the sex of an unborn child. *See* F.R.E. 201(b)(2); *see also* Pam Belluck, *Test Can Tell Fetal Sex at 7 Weeks, Study Says*, N.Y.TIMES, Aug. 11, 2011, at 1, *available at* http://www.nytimes.com/2011/08/10/health/10birth.html (citing Stephanie A. Devaney, Glenn E. Palomaki, Joan A. Scott, and Diana W. Bianchi, Noninvasive Fetal Sex Determination Using Cell-Free Fetal DNA: A Systematic Review and Meta Analysis, 306(6) JAMA 627-636 (2011)).

Arkansas law expressly requires "[a] person authorized to perform abortions under Arkansas law" to perform an abdominal ultrasound for the stated purpose of testing for a heartbeat, and, if a fetal heartbeat is detected during the abdominal ultrasound examination, the physician must inform the pregnant woman in writing that the fetus possesses a heartbeat and the statistical probability of bringing the unborn child to term based on gestational age. Ark. Code Ann. § 20-16-1303(a), (b), (c), (d)(1), (d)(2), (e); *see Edwards*, 8 F.Supp.3d 1091 (examining Ark. Code Ann. §§ 20-16-1301 through 1307, declaring portions of the heartbeat testing and portions of the

disclosure requirements constitutional and declaring the ban on abortions when fetal heartbeat is detected and the fetus has reached twelve weeks' gestation unconstitutional). These informational disclosures are required regardless of whether the fetus has attained twelve weeks' gestation. *Edwards*, 8 F.Supp.3d 1091. Although a physician would by necessity determine the gestational age of the fetus as part of determining the statistical probability of bringing the fetus to term, the Act does not mandate a particular method for determining gestational age. *Id.* There was evidence of record in *Edwards*, upon which the court relied, that "[e]arly in pregnancy, abdominal ultrasound does not produce images that are sufficiently clear to permit accurate gestational dating. As a result, some other method of gestational dating, such as vaginal ultrasound, must be used." *Edwards*, 8 F.Supp.3d at 1096 (citing the sworn declaration of Janet Cathey, M.D., board-certified in the speciality of obstetrics and gynecology).[13] These requirements make it much more likely that a woman in Arkansas will know the sex of the unborn child before her abortion.

## 2.     Likelihood Of Success On The Merits:  Vagueness

Dr. Hopkins contends that the Medical Records Mandate is void for vagueness. Under the Due Process Clause, "an enactment is void for vagueness if its prohibitions are not clearly defined." *D.C. v. City of St. Louis,* 795 F.2d 652, 653 (8th Cir. 1986) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)). Due process requires that laws provide fair notice by giving a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so

---

[13]  The Court notes that under the informed consent provision of the Arkansas Woman's Right to Know Act, codified at Ark.Code Ann. §§ 20-16-901 through 908, before the day of an abortion, a physician must tell the woman seeking an abortion the "probable gestational age of the fetus." *See* Ark.Code Ann. § 20-16-901. The Woman's Right to Know Act further provides that "'[p]robable gestational age of the fetus' means what in the judgment of the physician will with reasonable probability be the gestational age of the fetus at the time the abortion is planned to be performed." Ark.Code Ann. § 20-16-902(9).

he may act accordingly." *Id.* Due process also demands explicit standards to prevent arbitrary or discriminatory actions by those charged with enforcement. *Id.*

"As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Gonzales*, 500 U.S. at 167 (quoting *Kolender v. Lawson,* 461 U.S. 352, 357 (1983); *Posters 'N' Things, Ltd. v. United States,* 511 U.S. 513, 525 (1994)). "The degree of vagueness that the Constitution tolerates. . . depends in part on the nature of the enactment," with greater tolerance for statutes imposing civil penalties and those tempered by scienter requirements. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99 (1982). The Court notes that it must abide by "the elementary rule that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Gonzales*, 550 U.S. at 153. In construing the law narrowly to avoid constitutional doubts, the Court "must also avoid a construction that would seriously impair the effectiveness of [the law] in coping with the problem it was designed to alleviate." *See United States v. Harriss*, 347 U.S. 612, 623 (1954).

Dr. Hopkins contends that, if a law "threatens to inhibit the exercise of constitutionally protected rights," the Constitution requires an especially high level of clarity. *Village of Hoffman Estates,* 455 U.S. at 499. He further argues that when violation of a law carries criminal penalties, "a strict test of specificity" applies. *D.C.,* 795 F.2d at 654. Even if a law "nominally imposes only civil penalties," if those are "prohibitory and stigmatizing," courts still undertake a close review for vagueness. *Village of Hoffman Estates,* 455 U.S. at 499. Dr. Hopkins argues that the challenged provisions "triggers the strictest vagueness review, because it both inhibits the exercise of constitutionally protected rights to liberty and privacy. . .and imposes criminal and other

stigmatizing penalties, such as the finding of 'unprofessional conduct' and revocation of a physician's license to practice. H.B. 1434 § 1." (Dkt. No. 3, at 32).

In regard to the Medical Records Mandate, Dr. Hopkins maintains that the statute "fails to define what constitutes 'reasonable time and effort'; fails to define or in any way limit the scope of 'medical records relating directly to the entire pregnancy history' of the patient; and fails to specify what actions, if any, the physician is to take upon receiving any records." (Dkt. 3, at 12). Further, Dr. Hopkins asserts that the statute does not include a provision allowing the physician to proceed based on medical risks to the woman, regardless of how serious.

Dr. Hopkins asserts that the Medical Records Mandate is unconstitutionally vague in at least three respects. Dr. Hopkins states that, first, it gives no guidance as to what constitutes "reasonable time and effort," leaving the word "reasonable" with no content and no context (*Id.*). Dr. Hopkins poses potential questions to illustrate the alleged vagueness of the provision: "How much effort is needed to be 'reasonable'? How long is it 'reasonable' to wait for records?" (*Id.*). The Court recognizes the possibility that a medical records requests may take days, weeks, or even months to fulfill, if the request is responded to at all.

Dr. Hopkins notes that the Medical Records Mandate also does not explain whether any facts—beyond the effort expended to request records and the number of days or weeks of delay spent awaiting their arrival—are relevant in assessing what is "reasonable." Dr. Hopkins posits more questions to illustrate this alleged ambiguity: "Is the amount of money the physician or patient must pay for searching, copying, and, where necessary, securing translation of records into English relevant to what is 'reasonable'?" (Dkt. No. 3, at 32). In response, at the hearing on the instant motion, defendants argued that, "Indeed, common sense tells us that physicians and their staffs are perfectly capable of determining, based on their years of experience, whether they have

84

made reasonable efforts." Defendants further assert that "But [Dr. Hopkins's] claim that the reasonableness standard is vague is insufficient as a matter of law to plead a vagueness claim. Numerous criminal and civil statutes use an objective 'reasonableness' standard to evaluate conduct. To hold that Act 733's medical-records provision is void for vagueness due to its incorporation of an objective reasonableness standard would entail finding that *all* such prohibitions violate the Constitution." (Dkt. No. 23, at 52-53).

Defendants cite a number of cases that they claim support their argument that " Courts have rejected allegations of vagueness where abortion laws use an objective reasonableness standard. *See Ohio v. Akron Ctr. For Reprod. Health*, 497 U.S. 502, 519 (1990) (rejecting a facial challenge to a statute that requires physicians to give notice by telephone or in person if this can be done through 'reasonable efforts'); *Twin-Lick Oil Co. v. Marbury*, 91 U.S. 587 (1875) (what counts as 'reasonable time' must be arrived at by a consideration of all elements which affect the question at hand); *United States v. Bewig*, 354 F.3d 731, 738 (8th Cir. 2003) (rejecting the argument that a statute that criminally prohibited activity that included 'having reasonable cause to believe' a matter was unconstitutionally vague); *Karlin v. Foust*, 188 F.3d 446, 497 (7th Cir. 1999) (rejecting the arguments that a statute incorporating an objective reasonableness standard is unconstitutionally vague and imposes an undue burden on a woman's right to choose an abortion)." (Dkt. No. 23, at 53). The Court has reviewed the cases and finds them unpersuasive, as they involve facts distinctly different from the facts in this matter. Most of the cases cited involve similar words in different types of laws and do not involve vagueness claims at all. *See Johnson*, 135 S. Ct. 2551 (striking down as unconstitutionally vague a provision about "serious potential risk of physical injury to another"); *Twin-Lick Oil Co*, 91 U.S. 587 (rejecting effort to rescind a contract).

The Court has reviewed many cases in which language like this has resulted in a determination of unconstitutional vagueness. *See, e.g., Johnson v. United States*, 135 S. Ct. 2551 (2015) (determining that the Armed Career Criminal Act violates due process); *Kolender,* 461 U.S. 352 (enjoining as vague a statute that required providing "credible and reliable" identification when requested by police officer); *Smith v. Goguen*, 415 U.S. 566 (1974) (enjoining as vague a statute that failed to define "contemptuous treatment" of the flag, whether intentional or inadvertent); *Reproductive Health Services of Planned Parenthood of the St. Louis Region, Inc. v. Nixon,* 428 F.3d 1139 (8th Cir. 2005) (enjoining the enforcement of the state's informed-consent statute that required physicians to advise of "risk factors" of abortion and imposed punishments for "knowing" violations); *Planned Parenthood of Greater Iowa, Inc. v. Miller*, 195 F.3d 836 (8th Cir. 1999) (striking as unconstitutionally vague the state's "partial birth abortion" ban which included definitions of the prohibited acts).

Dr. Hopkins also notes that there is no exception in the provision allowing a physician to provide care absent "reasonable time and effort" where necessary to protect a patient from increased risk, yet increased risk will, according to Dr. Hopkins, necessarily result from the indefinite delay inherent in the Mandate. Dr. Hopkins poses another set of questions illustrating potential ambiguities: "Is it 'reasonable' to proceed without receiving records in order to avoid the increased risk of a one-month delay? A one-week delay? To avoid pushing a woman's care into the second trimester, past 14.0 weeks LMP, when she would need a D&E, which entails higher risks than a suction abortion? If so, does that mean it is 'reasonable' to delay for a number of weeks-and make follow up contacts to numerous providers seeking records-for a patient who initially seeks care at 10 weeks, but not for a patient who initially seeks care at 13 weeks and some number of days? For that patient, how many days is it 'reasonable' to delay? Is just making the

initial records request alone ever 'reasonable'?  Is it 'reasonable' to force a woman to delay three

weeks if she has the financial resources and flexibility to return in 3 weeks, but not reasonable in

the case of a woman struggling financially, who absolutely cannot return-and pay for a later, more

expensive procedure-in three weeks?" (Dkt. No. 3, at 33).

The Court shares Dr. Hopkins's concerns regarding these inquiries and concludes that the

phrase "reasonable time and effort" is subjective in nature and has no specified boundaries.  Thus,

the Court finds that the Medical Records Mandate fails to provide fair notice and could potentially

result in arbitrary enforcement.  *See, e.g.*, *Grayned,* 408 U.S. at 113 (highlighting the due process

problems with a "completely subjective standard").

Dr. Hopkins next argues that the Medical Records Mandate fails to define or in any way

limit the scope of "medical records relating directly to the [patient's] entire pregnancy history."  In

response, defendants argue that, "[i]t is difficult to imagine what could be unclear about this

requirement.  The Act requires that a physician request (1) any medical records that (2) directly

relate to (3) the woman's (4) past pregnancies, with a view toward determining whether a woman

is seeking a sex-selection abortion." (Dkt. No. 23, at 54).  Defendants cite *Gonzales* for the

proposition that "[t[he Act provides doctors of ordinary intelligence a reasonable opportunity to

know what is [required]." *Gonzales*, 550 U.S. at 149 (citation omitted) (internal quotation marks

omitted).

As written, the term "reasonable" search seems to apply to a potential myriad of past and

present physicians who treated the woman, and both current and any prior pregnancies or medical

visits related to a current or prior pregnancy.  (Dkt. No. 5, ¶ 23).  The term "direct" in the provision

is also unclear.  To illustrate, Dr. Hopkins poses inquiries:  "Does a 'direct' relation to a patient's

entire pregnancy history include care by her general practitioner for pregnancy-related symptoms? Must [Dr. Hopkins] request records from a laboratory or ultrasound center?" (Dkt. No. 3, 33-34).

Lastly, as related to the Medical Records Mandate, Dr. Hopkins argues that the mandate "gives no direction whatsoever on what actions, if any, the physician is to take upon receiving any records." (Dkt. No. 3, at 34). Dr. Hopkins questions whether "with a mandatory search for the patient's 'entire pregnancy history,' must the physician review every record, and, if so, for what purpose?" (*Id.*). Dr. Hopkins asserts that "[c]ontrary to the Due Process Clause, the Medical Records Mandate fails to provide clear standards for physicians, inviting arbitrary enforcement by prosecutors, the Arkansas Medical Board, and others. Dr. Hopkins is therefore likely to prevail in this challenge to the Mandate." (*Id.*). In response, defendants contend that "[b]ut the Act clearly specifies what actions a physician must *not* take—namely, the doctor must not intentionally perform an abortion with knowledge that the woman is seeking it on the basis of the child's sex. Again, the medical records are likely to shed light on this matter. In the context of this Act, it is clear what the doctor is supposed to look for in the records—indications that the woman is seeking a sex-selection abortion." (Dkt. No. 23, at 49). However, the assertion that the provision specifies what actions a doctor must not take is inapposite in relation to the contention that the terms indicating what actions a doctor must take are vague.

Dr. Hopkins contends that "defendants' own arguments highlight the Medical Records Mandate's vagueness." (Dkt. No. 32, at 49). Dr. Hopkins notes that defendants appear to understand the reference in § 20-16-1804(b)(2)(A) to a woman's "entire pregnancy history" to apply only to "past pregnancies," yet no language in the statute specifies that limitation. Instead, the language is "entire pregnancy history," and that language as used in (b)(2)(A) could be read to include only the current "pregnancy history" or, to give more meaning to "entire," to encompass

both past pregnancies *and* the women's current "pregnancy history." Dr. Hopkins argues that "defendants arbitrarily assume that the reference only applies to past pregnancies, however, and pick one of three possible readings of this unclear statutory language." (Dkt. No. 53, at 75-76).

Dr. Hopkins asserts that defendants provide no clarity as to the universe of medical records that might "directly relate to" a woman's "entire pregnancy history," and instead leave "unclear and undefined the universe of prior health care providers from whom records *must* be requested to remove § 20-16-1804(b)(2)(A)'s prohibition on proceeding with an abortion." (Dkt. No. 32, at 53).

Dr. Hopkins notes that as to § 20-16-1804(b)(2)(B)'s requirement of "reasonable time and effort" to obtain the medical records after (2)(A)'s requests, defendants try to import a notion of "objective reasonableness" that is nowhere referenced in the law and offer no concrete description of what "reasonable time and effort" in this context might be. Instead, defendants refer to cases concerning different standards in other contexts or to professionals' medical judgments. *Id.* Their arguments wholly fail to clarify what Arkansas means by "reasonable time and effort" in the context of § 20-16-1804(b)(2)'s non-medically indicated, blanket searches for entire medical histories, or what physicians are to do with records if and when they arrive.

Defendants rely heavily on *Gonzales* to argue that the Medical Records Mandate is not unconstitutionally vague. Defendants state that "[i]n *Gonzales*, the Court upheld the partial-birth abortion ban in the face of a facial vagueness challenge similar to that which Hopkins makes here." (Dkt. No. 23, at 51-52). The Court, however, is not persuaded by this comparison, as it finds *Gonzales* factually distinct from the instant case. In *Gonzales*, the Court stated that "[i]ndeed, [the statute at issue in that case] sets forth 'relatively clear guidelines as to prohibited conduct' and provides 'objective criteria' to evaluate whether a doctor has performed a prohibited procedure. *Posters 'N' Things, supra,* at 525–526." *See* Gonzales, 550 U.S. at 149. The Court finds that the

Mandates challenged on vagueness grounds in this case contain no objective criteria or clear guidelines.

Defendants argue that "the statute clearly states precisely what conduct is criminally prohibited: knowingly performing or attempting to perform an abortion with the intent to terminate a pregnancy before spending reasonable time and effort to obtain medical records directly relating to the previous pregnancies of a woman who knows the sex of the child she is carrying." (Dkt. No. 23, at 52). Defendants miss the mark with this contention. The vagueness of the Medical Records Mandate lies not in its description of what conduct is prohibited; it lies in its terminology used to outline compliance with the mandate. For all of these reasons, based on the record before the Court at this stage of the proceeding, Dr. Hopkins is likely to succeed on his claim that the Medical Records Mandate is unconstitutionally vague.

### 3. Irreparable Harm

Enforcement of the Medical Records Mandate will inflict irreparable harm on Dr. Hopkins and the fraction of women for whom the Mandate is relevant as there is no adequate remedy at law. It is well-settled that the inability to exercise a constitutional right constitutes irreparable harm. *See Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977) ("Planned Parenthood's showing that the ordinance interfered with the exercise of its constitutional rights and the rights of its patients supports a finding of irreparable injury.") (citations omitted); *accord Kirkeby v. Furness*, 52 F.3d 772, 775 (8th Cir. 1995) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

In the absence of an injunction, a large fraction of women in Arkansas for whom the Medical Records Mandate is relevant– whether that is all 3,000 women in Arkansas seeking an abortion if the Medical Records Mandate is construed as Dr. Hopkins contends, or those women

who know gender when seeking an abortion, if the Medical Records Mandate is construed as defendants contend—face an undue burden resulting from the Mandate's obstacles to abortion access.  Dr. Hopkins faces the violation of his due process rights due to the enforcement of a vague statute.  Therefore, the second requirement for an order preliminarily enjoining enforcement of the Medical Records Mandate is satisfied.

### 4.      Balancing Of Harms

In the absence of an injunction, a large fraction of women in Arkansas for whom the Medical Records Mandate is relevant– whether that is all 3,000 women in Arkansas seeking an abortion if the Medical Records Mandate is construed as Dr. Hopkins contends, or those women who know gender when seeking an abortion, if the Medical Records Mandate is construed as defendants contend—face an undue burden resulting from the Mandate's obstacles to abortion access.  Dr. Hopkins faces violation of his due process rights due to the enforcement of a vague statue.  Whereas, if an injunction issues, a likely unconstitutional law passed by Arkansas legislators will not go into effect.  The threatened harm to Dr. Hopkins and the fraction of women for whom the Mandate is relevant clearly outweighs whatever damage or harm a proposed injunction may cause the defendants.

### 5.      Public Interest

It is in the public interest to preserve the *status quo* and to give the Court an opportunity to evaluate fully the lawfulness of the Medical Records Mandate without subjecting Dr. Hopkins, or his patients, or the public to any of the law's potential harms.

The Court notes that the Eleventh Amendment bars relief against an allegedly unconstitutional provision if the named state officials do not have the authority to enforce it.  U.S. Const. amend XI; *see also Hutchinson*, 803 F.3d at 957-58.  Therefore, the preliminary injunction

does not extend to the private civil-enforcement provisions under the Medical Records Mandate. *See* Ark. Code Ann. § 20-16-1806.

It is therefore ordered that Dr. Hopkins's motion for preliminary injunction is granted to the extent that defendants are preliminarily enjoined from enforcing the provisions of Ark. Code Ann. §§ 20-16-1804(b)(2)(A) and (b)(2)(B); § 20-16-1805 which imposes criminal penalties on a physician or other person who violates §§ 20-16-1804(b)(2)(A) and (b)(2)(B); and § 20-16-1806 to the extent it permits a physician to have his or her medical license suspended or revoked for violating §§ 20-16-1804(b)(2)(A) and (b)(2)(B).

### C.     Local Disclosure Mandate (Counts VI and VIII based on H.B. 2024)

Dr. Hopkins seeks a preliminary injunction based on his as-applied challenge to the Local Disclosure Mandate in count six, which alleges that the local disclosure mandate violates the Due Process Clause of the United States Constitution by placing an undue burden on Dr. Hopkins's patients' right to liberty and privacy, and count eight, which alleges that the local disclosure mandate violates the Due Process Clause by violating Dr. Hopkins's patients' right to informational privacy.

The Arkansas legislature amended an existing law that required a physician who performed an abortion on a child less than fourteen (14) years of age at the time of the abortion to preserve fetal tissue extracted during the abortion in accordance with rules adopted by the office of the Arkansas State Crime Laboratory.  Ark. Code Ann. § 12-18-108(a)(1).  The amendment raised the age from fourteen (14) to seventeen (17), requiring physicians who perform abortions on women less than seventeen (17) years of age at the time of the abortion to preserve fetal tissue extracted during the abortion in accordance with rules adopted by the office of the Arkansas State Crime Laboratory.  Ark. Code Ann. § 12-18-108(a)(1).  A physician's failure to comply with the law

"shall constitute unprofessional conduct under the Arkansas Medical Practices Act," Ark. Code Ann. § 12-18-103(c), and subject the physician to license suspension or revocation and other disciplinary penalties, Ark. Code Ann. § 17-95-409 (2009).

The Arkansas State Crime Laboratory has prescribed rules to implement the law, including a requirement that "[a]ll products of conception should be preserved" and immediately frozen, in an air-tight container, with a label that includes "the patient's name and date of birth." Ark. Admin. Code §§ 171.00.2(1)-(2) (2013). The "physician must properly establish and maintain the chain of custody for this evidence," by completing a "Fetal Tissue Submission Form," and contacting the local law enforcement where the child resides. The form includes the name and "address of the victim, [and her] parent and/or legal guardian," her date of birth, and the name and date of birth of the "suspect." Ark. Admin. Code § 171.00.2(3).

The rule for "proper disposal of fetal tissue preserved" under this law requires that "[u]pon completion of DNA analysis, any remaining samples will be disposed of by the Arkansas State Crime Laboratory after receipt of a 'letter of destruction' from the respective investigating agency." Ark. Admin. Code § 171.00.2(4). The law does not apply to treatment for spontaneous miscarriage or removal of an ectopic pregnancy—only abortion. Ark. Code Ann. § 12-18-103(2)(B).

Dr. Hopkins brings an as-applied challenge. He does not seek a preliminary injunction regarding enforcement of the preexisting law, which already required him to transmit to local law enforcement identifying information of children less than 14 years old, along with the fetal tissue extracted during the abortion (Dkt. No. 1, ¶¶ 91-92). Instead, he maintains the as-applied challenge on behalf of patients under the age of seventeen (17) at the time of the abortion for whom there is no basis to report to the state Hotline under the Child Maltreatment Act (Dkt. No. 1, ¶ 92).

### 1. Likelihood Of Success On The Merits: Due Process

#### a. Applicable Law

To determine whether Dr. Hopkins is likely to succeed on his challenge to the Local Disclosure Mandate under the Due Process Clause, this Court applies the undue burden standard. "A statute, which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Whole Woman's Health*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S. at 877 (plurality opinion)). Abortion regulations that "have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." *Id.* (quoting *Casey*, 505 U.S. at 878 (plurality opinion)). Because this is an as-applied challenge, the Court confines its examination of the application of the Local Disclosure Mandate to that particular context. *Voinovich*, 130 F.3d at 193-94.

#### b. Analysis Of The Local Disclosure Mandate

##### 1. State's Interest

No legislative findings accompany the Local Disclosure Mandate. The Court does not have an explanation from the legislature of the purpose of the law. The State of Arkansas argues that the law advances the interests of protecting children from sexual abuse and in prosecuting those who sexually exploit them (Dkt. No. 23, at 49). The Court assumes the legitimacy of these interests. *Whole Woman's Health*, 136 S. Ct. at 2310 (assuming that the State had legitimate state interests where the statute did not contain any legislative findings).

## 2. Burdens Imposed On Women

As originally enacted, the law applied only to women who are 13 years of age or younger at the time of the abortion.[14] The amended law regarding maintaining forensic samples now requires that, for every woman who is less than 17 years of age at the time of the abortion, her physician must (1) disclose the fact of her abortion to her local police department and (2) preserve all embryonic or fetal tissue from her abortion as "evidence." Ark. Code Ann. 12-18-108(a)(1). Dr. Hopkins challenges the new requirements only as applied to those women ages 14, 15, and 16 whose sexual activity indicates no potential sexual abuse and, therefore, is not covered by the reporting requirements under the Arkansas Child Maltreatment Act (the "Non-CMA Teenage Patients"). *See generally* Ark. Code Ann. §§ 12-18-401 *et seq*.

In Arkansas, almost all patients in this affected 14 to 16 year old age group are receiving abortion care with a parent involved. Some may have husbands involved, as well. According to Dr. Hopkins, the sexual activity of 14 to 16 year old women does not constitute reportable "sexual abuse" under Arkansas law when it takes place with a similar-age partner or that teenager's spouse, and not with a caretaker or involving forcible compulsion. *See, e.g.,* Ark. Code Ann. §§ 12-18-103(20)(B) -103(20)(C). Such similar-age consensual sexual activity does not constitute criminal activity. Ark. Code Ann. §§ 5-14-101(2009), 103 (2013), 110 (2016), 124 (2013), 125 (2013), 126 (2009) 127 (2009). For 16-year-old women, because Arkansas does not regulate the age of their consensual sexual partners, abuse reporting or criminality arises when the person involved

---

[14] Arkansas law makes a distinction if the victim is above or below the age of 14. Under Arkansas law, if the victim is below the age of 14, in a prosecution for statutory rape, the statute does not create a presumption of intent depending on the victim's age. Proof of intent regarding the victim's age is not required because statutory rape is a strict liability crime, although there are certain affirmative defenses available depending on the age of the accused. Ark. Code Ann. §§ 5-14-102(b), 103(a)(4); *see also Gaines v. State*, 118 S.W.3d 102 (Ark. 2003).

uses force or is a caretaker or other person in a similar relationship of power.  Ark. Code Ann. §§ 5-14-101(2009), 103 (2013), 110 (2016), 124 (2013), 125 (2013), 126 (2009), 127 (2009).

The sexual partner of the Non-CMA Teenage Patients would be a consensual partner, typically of the same age or similar age, and based on common sense and these cited provisions of Arkansas law would not be a criminal or abuse suspect, just as the patient would not be a victim.

The Local Disclosure Mandate requires the physician to disclose the Non-CMA Teenage Patient's abortion to her local law enforcement and mandates retention of tissue from her abortion indefinitely in a crime laboratory, even when facts indicate no potential abuse or criminality. Regarding the proper disposal of the fetal tissue, the Local Disclosure Mandate assumes that the context is always criminal or an abuse investigation.  That is not the case for all Non-CMA Teenage Patients.  There is nothing in the law to address disposal of tissue when there is no need for any investigation.

Dr. Hopkins argues that the law can be read to bar medication abortion for patients under 17 years of age through its mandate that "[a]ll products of conception" be preserved (Dkt. No. 3, at 18).  With medication abortion, a physician cannot collect and preserve "[a]ll products of conception" and thus would risk violating this law and its implementing Rules if performing a medication abortion.  *See* Ark. Admin. Code § 171.00.2(1) (2014).  Consistent with applicable standards of care and when appropriate, Dr. Hopkins offers 14 to 16 year old women medication abortion (Dkt. No. 5, ¶ 52).  After counseling, and in nearly all cases with the assistance of an involved parent or guardian, many women decide that medication abortion is a better choice for them (Dkt. No. 5, ¶ 52; Dkt. No. 6, ¶ 36).  In certain instances, these women prefer or will better tolerate medication abortion, for example if the woman has never had a pelvic exam, or when uterine anomalies or high body mass index are present (Dkt. No. 5, ¶ 52).

For all Non-CMA Teenage Patients, physicians would have to disclose and explain during their pre-abortion counseling the Local Disclosure Mandate's requirement of local law enforcement reporting and tissue transmittal (Dkt. No. 5, ¶ 50; Dkt. No. 6, ¶ 46). These Non-CMA Teenage Patients' sexual activity does not implicate child abuse concerns or criminal law. This discussion of law enforcement contact and "evidence" collection would be punitive, confusing, and likely humiliating for these women and their families. To prevent notice to local law enforcement, some Non-CMA Teenage Patients may forgo abortion care or at least significantly delay their care by seeking a procedure out of state (Dkt. No. 5, ¶ 50; Dkt. No. 6, ¶ 46).

The required notice of abortion and transmittal of "crime lab" evidence will stigmatize these women and potentially subject them to a range of negative reactions that can occur in response to the revealed decision to end a pregnancy. There is record evidence of the stigmatizing treatment these women may receive (Dkt. No. 6, ¶¶ 27-28). Absent any indication of child maltreatment, providing information to local law enforcement is itself a harm (Dkt. No. 3, at 20). S*ee generally Lambert v. Wicklund*, 520 U.S. 292, 295 (1997) (if an abortion statute requires parental consent, a judicial bypass that "ensure[s] the minor's anonymity" is required to satisfy constitutional requirements); *Casey*, 505 U.S. at 894 (recognizing an undue burden of spousal notification requirement on married women who seek an abortion without such disclosure; a "significant number of women. . . are likely to be deterred from procuring an abortion as surely as if the Commonwealth had outlawed abortion"); *Thornburgh v. Am. Coll. of Ob. & Gyn.*, 476 U.S. 747, 766-67 (1986) (emphasizing that a "woman and her physician will necessarily be more reluctant to choose an abortion if there exists a possibility that her decision and her identity will become known" to third parties), *overruled in part on other grounds, Casey*, 505 U.S. at 881. While officers will presumably treat such information as confidential, once the information is

known by local community members and written on required documents, there are risks to these young women's privacy, which can engender fear on the part of these young women (Dkt. No. 5, ¶ 47; Dkt. No. 6, ¶ 45).

The required disclosure to local law enforcement of this information creates heightened concerns for those few teenagers who rely on the judicial bypass so that they need not involve a parent in their abortion decision; the young women who, along with one parent or guardian, decide not to inform another parent or household member because of concerns; and other young women living under circumstances that might expose them to physical or other serious harm should the fact of their abortion or sexual activity become known in their home or local community (Dkt. No. 3, at 20).

### 3. Balancing

The State of Arkansas maintains that the Local Disclosure Mandate applies only to surgical abortions where a physician extracts fetal tissue, not to medication abortion (Dkt. No. 22, at 49). Defendants maintain that a woman will not be obstructed from obtaining an abortion by these regulations. Defendants contend that the Local Disclosure Mandate "rationally promotes the health and safety of young women who have had an abortion and does not require disclosures that are either broad or public" and therefore "does not create an undue burden on the decision of whether or not to have an abortion." (Dkt. No. 23, at 67). The Court disagrees.

This Court concludes that, as a matter of law, the Local Disclosure Mandate serves no valid state purpose as applied to Non-CMA Teenage Patients, those 14 to 16 year old women who become pregnant through consensual sexual intercourse with, for example, a teenager of the same age. The Non-CMA Teenage Patients' health care is purely a private matter. There is no mandatory reporting required, and there is no role for local law enforcement or the Arkansas State

Crime Laboratory under those circumstances. The State of Arkansas argues that the law advances the interests of protecting children from sexual abuse and in prosecuting those who sexually exploit them (Dkt. No. 23, at 49). There exists no state interest in addressing child abuse and criminal conduct in these situations. Under *Casey* and *Whole Woman's Health*, there is no "constitutionally acceptable" interest to balance against the substantial obstacles erected by the Local Disclosure Mandate for Non-CMA Teenage Patients. Therefore, the Local Disclosure Mandate imposes an undue burden on Non-CMA Teenage Patients' right to access abortion. *Whole Woman's Health*, 136 S. Ct. at 2309-10.

The Court finds this regardless of whether the Local Disclosure Mandate prohibits medication abortion for all 14, 15, and 16 year old patients, as Dr. Hopkins contends, or not. Dr. Hopkins maintains that, by requiring the abortion provider to preserve all embryonic or fetal tissue from her abortion as "evidence," the Local Disclosure Mandate eliminates the possibility of medication abortion because collection of embryonic or fetal tissue by the abortion provider is not feasible with medication abortion. *See* Ark. Code Ann. 12-18-108(a)(1). If this is the case, it is a factor in the Court's analysis of the burden imposed by the Local Disclosure Mandate for this as-applied challenge. There are other factors the Court considers, as well. In Arkansas, approximately 83% of all abortions occur during the first trimester of pregnancy (*Id.*). Of those abortions occurring in the first trimester of pregnancy, 581 or approximately 20% were medication abortions, and 2,552 were suction abortions in 2015 (Dkt. No. 5, at 36).

When the General Assembly first enacted Ark. Code Ann. § 12-18-108, it applied exclusively to abortions involving girls age 13 and under and targeted "sexual crimes on child victims" and "sexually predatory adults." H.B. 1447 1(a), (b) (Findings and Purposes), 89th Gen. Assemb., Reg. Sess. (Ark. 2013). It was directed at "reporting medical facilit[ies]" and explicitly

contemplated that its application was co-extensive with mandatory reporting. *Id.*, (1)(b)(3), (5). That focus on girls 13 and under also tracked the criminal threshold for statutory rape. Ark. Code Ann. § 5-14-103(a)(3)(A) (2013).

The Local Disclosure Mandate greatly expands the reach of this section, without justification, to non-criminal, non-reportable activity that is affirmatively constitutionally protected: abortions sought by Non-CMA Teenage Patients after sexual activity under circumstances indicating no form of sexual abuse.

Defendants maintain that "there is no basis outside of [Dr.] Hopkins's subjective judgment for defining a 'discrete and well-defined' class of children to whom [this portion of the law] may be unconstitutionally applied." (Dkt. No. 23, at 65). When arguing this, defendants assert that "an abortion provider is not in the best position to identify many victims of sexual abuse. Local law enforcement are in a much better position to make a judgment concerning whether children are victims of sexual abuse." (*Id.*). There is no evidentiary support in the record for these assertions. These assertions are contradicted by Dr. Hopkins's role, and all doctors' roles, as mandatory reporters under existing Arkansas law.

The Arkansas Child Maltreatment Act includes detailed definitions of sexual abuse and sexual exploitation. This Act already enlists mandatory reporters such as Dr. Hopkins and the staff of Little Rock Family Planning Services to report to the specialized state Child Abuse Hotline whenever there is an indication that a child may be the victim of maltreatment. The class of children to whom the Local Disclosure Mandate may be unconstitutionally applied is defined by the Child Maltreatment Act itself, under current Arkansas law, not Dr. Hopkins's "subjective judgment," as defendants contend.

Defendants point out that "law enforcement officers operate under codes of confidentiality that prevent improper public disclosures of sensitive information." (Dkt. No. 23, at 66-67). In pertinent part, defendants assert that the Law Enforcement Code of Ethics requires, "Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty." (Dkt. No. 23, at 67). Defendants also assert that records kept by the Arkansas State Crime Laboratory are privileged and confidential under Ark. Code Ann. § 12-12-312 and that such records can "be released only under the direction of a court of competent jurisdiction, the prosecuting attorney having criminal jurisdiction over the case, or the public defender appointed or assigned to the case." Ark. Code Ann. 12-12-312(a)(1)(A)(ii).

However, Arkansas state law already determined the central repository for any suspicions of child maltreatment – the state Child Abuse Hotline, which is run by a specially trained unit of the State Police, along with the Department of Human Services. In fact, local law enforcement are themselves mandatory reporters to the state Child Abuse Hotline. If local law enforcement have information sufficient to raise suspicions of illegal sexual activity, then local law enforcement officers must raise their suspicions with the state Child Abuse Hotline, which then coordinates any investigation and response. Ark. Code Ann. 12-18-402(a)(1)(A), (b)(13). There is record evidence that supports this system of reporting to the Child Abuse Hotline is a better method, given how it is staffed and that those staffers are better trained than local law enforcement to address abuse allegations (Dkt. No. 6, ¶¶ 41, 43, 45). *See also Whole Woman's Health*, 136 S. Ct. at 2311 (examining the undue burden of the challenged regulation and determining that "nothing in Texas' record evidence" showed that "compared to prior law (which required a 'working arrangement'

with a doctor with admitting privileges), the new law advanced Texas' legitimate interest in protecting women's health."). There is no record evidence to the contrary.

Dr. Hopkins maintains that the Local Disclosure Mandate is irrelevant to ensuring that law enforcement in Arkansas will continue to have the full cooperation of Dr. Hopkins and his colleagues at the clinic in collecting tissue evidence in situations like these, where there are facts indicating rape, of a patient of any age, or other sexual abuse (Dkt. No. 5, ¶ 43; Dkt. No. 6, ¶¶ 35, 39).

For Non-CMA Teenage Patients, there are no facts indicating abuse. There is no required reporting under Arkansas's Child Abuse Hotline, and thus, for Non-CMA Teenage Patients, the Local Disclosure Mandate "separately intervenes to require disclosure to local police in the teenager's hometown, of those purely private facts of an abortion and earlier sexual activity." (Dkt. No. 32, at 55).

Defendants point out that the statute requires that, "[b]efore submitting the tissue under subdivision (a)(1) of this section, the physician shall redact protected health information as required under the [federal] Health Insurance Portablity and Accountability Act of 1996," but that reference to redaction may be misleading (Dkt. No. 23, at 66). Ark. Code Ann. § 12-18-108(a)(2). The Local Disclosure Mandate, and its implementing Rules, specifically require that personal information accompany the "evidence" collected, and HIPPA allows such disclosures made to law enforcement pursuant to state law. Here, the Local Disclosure Mandate and its implementing Rules require disclosure of the woman's abortion to local law enforcement in her home jurisdiction, infinite storage of tissue labeled with her name on it, and use of a Fetal Tissue Transmission Form, which includes not only her name, but her parent's name, her home address,

and the name of the "suspect," her sexual partner. HIPAA does not appear to permit redaction here.

"[R]ecordkeeping and reporting provisions that are reasonably directed to the preservation of maternal health and that properly respect a patient's confidentiality and privacy are permissible." *Casey*, 505 U.S. at 900. The local disclosure of a teenager's identity, her address, her parents, her sexual partner, and the tissue from her abortion as contemplated by the Local Disclosure Mandate does not equate to, and is much more invasive than, the anonymous reporting and record-keeping about abortion upheld in *Casey*, 505 U.S. at 900, and in various states to serve public health purposes, including Arkansas.

As defendants note, the Local Disclosure Mandate applies to minors who receive an abortion who already have either parental consent or a judicial bypass. Ark. Code Ann. §§ 20-16-804 and 20-16-809. Defendants claim that "[i]t is unlikely that a child who – having obtained parental consent or judicial bypass – will be deterred from obtaining an abortion merely because the law requires her name to be transmitted to local law enforcement and the fetal remains preserved after the fact." (Dkt. No. 23, at 66). There is no factual support in the record for this assertion.

Instead, there is factual support in the record that "many" patients of Little Rock Family Planning Services "are desperate not to disclose the reasons for travel and appointments to seek abortion care." (Dkt. No. 6, ¶ 8). Further, there is record evidence that some women specifically request that Little Rock Family Planning Services not seek medical records from another healthcare provider because the women do not want that provider to know of the pregnancy and abortion decision (Dkt. No. 6, ¶ 27). Some women fear hostility or harassment from the other healthcare providers for deciding to seek an abortion (Dkt. No. 6, ¶ 28). There is evidence that,

even documents meant to be confidential, such as medical record requests, can be disclosed and result in efforts to dissuade women from obtaining abortions (Dkt. No. 6, ¶ 28).

The substantial obstacles erected are access to abortion if the mandate prohibits medication abortion and preventing or delaying abortion care for these Non-CMA Teenage Patients by confusing them with discussions of evidence, suspects, and investigations as those terms are used in the Local Disclosure Mandate when those terms do not apply to them; humiliating them by disclosing very private facts about their sexual activity and reproductive choices in writing to local community members; and making them fearful of the reaction by local law enforcement in their home jurisdiction if they proceed with the care they seek and their abortion is therefore disclosed. These burdens apply to all Non-CMA Teenage Patients.

Even if these obstacles were not substantial, the Local Disclosure Mandate would still fail constitutional review in this as-applied challenge because it lacks any justifying state purpose as applied to Non-CMA Teenage Patients. *Whole Woman's Health*, 136 S. Ct. at 2309-10; *Van Hollen*, 738 F.3d at 788 (stressing that the weaker the state's grounds for its regulations, "the likelier the burden, even if slight, to be 'undue' in the sense of disproportionate or gratuitous"). That tips the balance when compared to the burdens, and the Court is required to balance. When examining the burden imposed by the abortion regulation challenged in *Whole Woman's Health*, the Court observed that it is true that increased driving distance to access an abortion does not "always" constitute an "undue burden," as noted in *Casey*, but the *Whole Woman's Health* Court said the "the virtual absence of any health benefit" from the challenged hospital affiliation requirement was a factor to be weighed in making an undue burden ruling. 136 S. Ct. at 2313. Balancing is therefore required. *Id.*, at 2309. *See also Comprehensive Health of Planned Parenthood Great Plains v. Williams*, No. 2:16-cv-04313, 2017 WL 1407656, *3 (W.D. Mo. April

19, 2017) (the necessary balancing "means the burden to be considered undue is greatly reduced. . . . as the benefit from the regulation becomes miniscule, if any").

Further, Dr. Hopkins maintains that, in terms of noticing possible abuse and revealing sexual activity, there is no difference between teenagers seeking abortion care and those seeking care for miscarriage, sexually transmitted infections, contraception or prenatal care, but only abortion patients are targeted by the Local Disclosure Mandate, including Non-CMA Teenage Patients for whom there is no indication at all of actual abuse. *See Whole Woman's Health*, 136 S. Ct. at 2315 (discussing under-inclusive scope of the provision).

Because this is an as-applied challenge, the Court confines its examination of the application of the Local Disclosure Mandate to Non-CMA Teenage Patients and determines that, in that particular context, the Local Disclosure Mandate imposes an undue burden on abortion access. *Voinovich*, 130 F.3d at 193-94. The record includes sufficient evidence from which Dr. Hopkins satisfies his burden to present evidence of causation that the Mandate's requirements will lead to this effect. *See Whole Woman's Health*, 136 S. Ct. at 2313.

## 2. Likelihood Of Success On The Merits: Informational Privacy

Dr. Hopkins also contends that the Local Disclosure Mandate violates both decisional and informational privacy (Dkt. No. 3, at 38). Dr. Hopkins further states that "H.B. 2024 serves no valid state purpose as applied to fourteen to sixteen year-olds, who have become pregnant through consensual sexual intercourse with a partner of the same age" (Dkt. No. 3, at 40). Dr. Hopkins states that, in situations of that nature, a teenager's health care is a purely private matter with no mandatory reporting and no need to involve the local law enforcement or the Arkansas State Crime Laboratory.

Dr. Hopkins further argues that his patients have a strong, constitutionally-protected interest in avoiding disclosure of their sexual activity and their abortion to local law enforcement (Dkt. No. 3, at 43). He points to the constitutional safeguards provided to individuals from unwarranted governmental intrusions into their personal lives. *See Eagle v. Morgan,* 88 F.3d 620, 625 (8th Cir. 1996) (citing *Whalen v. Roe,* 429 U.S. 589, 598 n.23 (1977)). This right protects against undue burdens on private decisions, but also shields the confidentiality of "highly personal matters" in "the most intimate aspects of human affairs." *Id.* (quoting *Wade v. Goodwin,* 843 F.2d 1150, 1153 (8th Cir. 1988)). The Eighth Circuit has described this constitutional right as applying to information where disclosure would be "a shocking degradation or an egregious humiliation," or "a flagrant bre[a]ch of a pledge of confidentiality which was instrumental in obtaining the personal information." *Id.* (quoting *Alexander v. Peffer,* 993 F.2d 1348, 1350 (8th Cir. 1993)). Dr. Hopkins contends that "[w]hen the information is inherently private, it is entitled to protection." *Id.* (quoting *Fraternal Order of Police, Lodge 5 v. City of Philadelphia,* 812 F.2d 105, 116 (3d Cir. 1987)).

Dr. Hopkins states that medical information is "considered extremely personal and entitled to protection under the fourteenth amendment." *Shuda v. Williams,* No. 4:08-cv-3168, 2008 WL 4661455, at *3 (D. Neb. Oct. 20, 2008) (finding that plaintiff stated a constitutional claim for disclosure of treating physicians and diagnoses). Dr. Hopkins also points to a Western District of Arkansas decision, *Bolt v. Doe,* in which the court stated "the right to informational privacy under the Fourteenth Amendment 'extends to medical test results, medical records, and medical communications. *See Ferguson v. City of Charleston,* 532 U.S. 67, 78 (2001) (individuals have a reasonable expectation of privacy in medical test results and that those results will not be shared

with nonmedical personnel without the patient's consent).'" Case No. 5:14-cv-5223, 2014 WL 5797706, at *5 (W.D. Ark. Nov. 7, 2014).

A district court in Kansas assessed a reporting statute that required reporting of all consensual underage sexual activity as sexual abuse. *See Aid For Women v. Foulston*, 427 F.Supp. 2d 1093 (D. Kan. 2006), *overruled on other grounds by* Nos. 06–3187, 06–3188, 06–3202, 2007 WL 6787808 (10th Cir. 2007). The issue before that court was whether minor patients had a right to informational privacy concerning consensual sexual activity with an age-mate where there was no evidence of force, coercion, or power differential. That court reasoned that, "[an individual's right to informational privacy may be implicated when the government compels disclosure of that individual's personal sexual or health-related information to the government and/or to other third parties." *Id.*, at 1104.

Dr. Hopkins asserts that "[t]hese required disclosures under H.B. 2024 cause significant harm by exposing inherently private information, in breach of the confidential physician-patient relationship, to local police officers and others without any countervailing state interest" (Dkt. No. 3, 48). In response, defendants argue that Dr. Hopkins's claim that the Local Disclosure Mandate violates the right to informational privacy conflicts with the fact the neither the Eighth Circuit nor the Supreme Court has ever recognized this right (Dkt. No. 23, at 55). Defendants cite a number of cases in which the Eighth Circuit addresses a constitutional right to informational privacy but declines to find a violation of such a right. *See Alexander v. Peffer*, 993 F.2d 1348 (8th Cir. 1993); *Eagle*, 88 F.3d at 627; *Riley v. St. Louis Cty. of Mo.*, 153 F.3d 627, 631 (8th Cir. 1998); *Cooksey v. Boyer*, 289 F.3d 513, 516 (8th Cir. 2002). Defendants argue that "because the Eighth Circuit has never decided a case upholding a right to informational privacy, its discussions of various scenarios that fail to implicate that 'right' similarly do not establish the existence of such a right.

*Cf. Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1368 (2013) ("[W]e are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated.") (citation omitted) (inner quotation marks omitted)" (Dkt. No. 23, 56-57).

Defendants argue that "in the absence of a clear indication by the Supreme Court that there is a right to informational privacy of constitutional dimensions, there are compelling reasons to forbear from finding that such a right exists" (Dkt. No. 23, 57). In the past, the Supreme Court has assumed that a constitutional right to informational privacy exists without actually making a finding as to its existence. *See NASA v. Nelson*, 562 U.S. 134 (2011); *Whalen v. Roe*, 429 U.S. 589 (1977); *Nixon v. Adm'r of General Servs.*, 433 U.S. 425 (1977). In *Whalen*, the Supreme Court identified at least two kinds of constitutional privacy interests protected by the Fourteenth Amendment: avoiding disclosure of personal matters and independence in making certain kinds of important decisions. 429 U.S. 589, 599-600 (1977). Both the Supreme Court and district courts frequently cite *Whalen* for the prospect that the United States Constitution protects against the disclosure of personal matters. *See Belotti*, 443 U.S. at 655 (Rehnquist, J., concurring)*; United States DOJ v. Reporters Comm. for Freedom of Press,* 489 U.S. 749, 762 (1989)*; Eagle,* 88 F.3d 620; *Alexander v. Peffer,* 993 F.2d 1348, (8th Cir. 1993); *Haid v. Cradduck*, No. 5:14-cv-5119, 2016 U.S. Dist. LEXIS 82528, at * 15 (W.D. Ark. June 24, 2016).

Numerous courts have recognized that confidential medical information is entitled to constitutional privacy protection in order to prevent the disclosure of such personal medical records. *See Cooksey*, 289 F.3d at 516; *A.L.A. v. West Valley City*, 26 F.3d 989, 990 (10th Cir. 1994); *U.S. v. Westinghouse Elec. Corp.,* 638 F.2d 570, 577 (3d Cir. 1980); *Haid v. Cradduck*, No. 5:14-cv-51192016 U.S. Dist. LEXIS 82528, at * 15 (W.D. Ark. June 24, 2016); *Bolt v. Doe*, No. 5:14-cv-5223, 2014 U.S. Dist. LEXIS 158304, at *11 (W.D. Ark. Nov. 7, 2014); *Shuda v.*

*Williams,* No. 4:08CV3168, 2008 WL 4661455, at *3 (D. Neb. Oct. 20, 2008); *cf. Leher v. Bailey*, 2006 WL 1307658 (E.D. Ark. May 10, 2006).

Defendants point the Court to a number of Eighth Circuit decisions that find no violation of the right to informational privacy in support of defendants' argument that this protection does not exist (Dkt. No. 23, at 56-57). The Court will analyze those cases in turn. In *Alexander v. Peffer*, the Eighth Circuit held that to elevate remarks made about a woman's unsuccessful application to be a police officer to constitutional dimensions would trivialize the Fourteenth Amendment. 993 F.2d 1348, 1351 (8th Cir. 1993). In *Eagle v. Morgan*, the Eighth Circuit found that the improper acquisition and unwarranted public disclosure of a man's expunged criminal record did not violate a constitutional right to privacy. 88 F.3d at 627. In *Riley*, the Eighth Circuit stated that because plaintiff allowed her son's remains to be viewed at the visitation, she had no legitimate expectation that information about her son's death or her son's remains would be kept confidential. 153 F.3d at 631. Finally, in *Cooksey*, the Eighth Circuit held that the disclosure of plaintiff's psychological treatment for stress did not reach the level of a constitutional violation. 289 F.3d 513. The Eighth Circuit recognized that all mental health information is not created equal and should not be treated categorically under a privacy rights analysis. *Id.*, at 517. The court went on to say that its holding was limited to the facts of the case and not intended to imply that unauthorized publication of any and all information relating to an individual's mental health is constitutionally permitted. *Id.*

The cases cited by defendants are distinguishable from the matter currently before this Court. Defendants are correct in their assertion that not every disclosure of personal information implicates the right against public disclosure of private information. The Eighth Circuit addressed this, stating "this protection against public dissemination of information is limited and extends to

highly personal matters representing 'the most intimate aspects of human affairs.'" *Eagle*, 88 F.3d at 625. The Court acknowledges the high burden that applies to informational privacy claims. However, this case involves some of the most intimate and personal aspects of a woman's life. [15]

Based on the law, the Court finds unpersuasive defendants' contention that the Constitution of the United States does not provide protection against disclosure of personal information, especially when such information rises to the level of an individual's most private and intimate affairs in the context of abortion regulation. At this stage of the case, the Court determines that Dr. Hopkins is likely to succeed on the merits of his informational privacy claim as it relates to the Local Disclosure Mandate and Non-CMA Teenage Patients.

### 3. Irreparable Harm

In the absence of an injunction, Dr. Hopkins and the fraction of women for whom the Local Disclosure Mandate is relevant—Non-CMA Teenage Patients'—would be unduly burdened by the substantial obstacles created by the Local Disclosure Mandate, which lacks any justifying state purpose as applied to Non-CMA Teenage Patients. *Whole Woman's Health*, 136 S. Ct. at 2309-10.

Enforcement of the Local Disclosure Mandate will inflict irreparable harm on Dr. Hopkins and his Non-CMA Teenage Patients as there is no adequate remedy at law. It is well-settled that the inability to exercise a constitutional right constitutes irreparable harm. *See Planned*

---

[15] Several Courts have held that a woman's private sexual matters warrant a constitutional protection against public dissemination. *See Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998) (holding that a rape victim has a fundamental right to privacy in preventing government officials from gratuitously and unnecessarily releasing the intimate details of the rape where no penalogical purpose is being served); *Eastwood v. Dep't of Corrections*, 846 F.2d 627 (10th Cir. 1988)(stating that the right to privacy is implicated when an individual is forced to disclose information regarding personal sexual matters); *Thorne v. City of El Segundo*, 762 F.2d 459 (9th Cir. 1983)(stating the interest [the plaintiff] raises in the privacy of her sexual activities are within the zone protected by the Constitution).

*Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977) ("Planned Parenthood's showing that the ordinance interfered with the exercise of its constitutional rights and the rights of its patients supports a finding of irreparable injury.") (citations omitted); *accord Kirkeby v. Furness*, 52 F.3d 772, 775 (8th Cir. 1995) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

In the absence of an injunction, Non-CMA Teenage Patients' ability to access abortion would be unduly burden by the substantial obstacles created by the Local Disclosure Mandate that lacks any justifying state purpose as applied to Non-CMA Teenage Patients. *Whole Woman's Health*, 136 S. Ct. at 2309-10. Further, the Non-CMA Teenage Patients' right to informational privacy in the abortion context likely will be violated.

Therefore, the second requirement for an order preliminarily enjoining enforcement of the Local Disclosure Mandate is satisfied.

### 4.        Balancing Of Harms

In the absence of an injunction, Dr. Hopkins and the fraction of women for whom the Local Disclosure Mandate is relevant would be unduly burdened by the substantial obstacles created by the Local Disclosure Mandate, which lacks any justifying state purpose as applied to Non-CMA Teenage Patients. *Whole Woman's Health*, 136 S. Ct. at 2309-10. Further, the Non-CMA Teenage Patients' right to informational privacy in the abortion context likely will be violated. Whereas, if an injunction issues, a likely unconstitutional law as applied to Non-CMA Teenage Patients passed by Arkansas legislators will not go into effect. The threatened harm to Dr. Hopkins and the Non-CMA Teenage Patients clearly outweighs whatever damage or harm a proposed injunction may cause the defendants.

### 5.    Public Interest

It is in the public interest to preserve the *status quo* and to give the Court an opportunity to evaluate fully the lawfulness of the Local Disclosure Mandate without subjecting Dr. Hopkins, or his Non-CMA Teenage Patients, or the public to any of the law's potential harms.

It is therefore ordered that Dr. Hopkins's motion for preliminary injunction is granted to the extent that defendants are preliminarily enjoined from enforcing the provisions of Ark. Code Ann. § 12-18-108(a)(1); the Arkansas State Crime Laboratory Rules prescribed to implement the amended law, Ark. Admin. Code §§ 171.00.2 (2013); and Ark. Code Ann. § 12-18-103(c) which subjects a physician who violates Ark. Code Ann. § 12-18-108(a)(1) to license suspension or revocation and other disciplinary penalties, Ark. Code Ann. § 17-95-409 (2009).

### D.    Tissue Disposal Mandate (Counts X and XI based on H.B. 1566)

Dr. Hopkins seeks a preliminary injunction based on the Tissue Disposal Mandate in count ten, which alleges that the tissue disposal mandate violates the Due Process Clause by placing an undue burden on Dr. Hopkins's patients' right to liberty and privacy, and count eleven, which alleges that the tissue disposal mandate violates the Due Process Clause due to its vagueness.

Currently, embryonic and fetal tissue generated from abortion and miscarriage is handled in a number of ways. Women who have medication abortions or complete miscarriage through medication dispose of the tissue at home. This is consistent with current Arkansas law that permits tissue passed at home, rather than at a medical facility, to be disposed of without being regulated. *See generally* Ark. Code Ann. § 20-32-101(1993) (governing disposal of commercial medicate waste); Ark. Code Ann. § 20-31-101(5) (defining "medical waste," in relevant part, as limited to "waste from healthcare-related facilities"); Ark. Code Ann. § 20-32-101(5)(A) (defining

"pathological waste"); Ark. Code Ann. § 20-17-802(2015) (requiring disposal of tissue from abortion "in a fashion similar to that in which other tissue is disposed").

For surgical abortions, a contractor collects medical waste and embryonic or fetal tissue generated at the clinic and disposes of it out of state through incineration (Dkt. No. 6, ¶ 49). A few patients each year choose to have the tissue cremated, and those patients make arrangements with the cremation facility (*Id.*). Also, for a few patients each year, the tissue is sent to pathology labs to test for specific medical conditions or to determine the cause of the anomalies and the likelihood of recurrence in future pregnancies. In addition, following some abortions, tissue is preserved and made available to local law enforcement (Dkt. No. 6, ¶ 39). Before the Tissue Disposal Mandate was enacted, "fetal tissue" from abortion was defined as "human tissue" – which may be disposed of without regard to the Final Disposition Rights Act. Ark. Code Ann. §§ 20-17-801(a)(1)(A), 20-17-801(b)(2)(C).

The Tissue Disposal Mandate requires that a "physician or facility that performs an abortion shall ensure that the fetal remains and all parts are disposed of in accordance with § 20-17-801 and the Arkansas Final Disposition Rights Act of 2009, § 20-17-102." Ark. Code Ann. § 20-17-802(a). This law applies whether the embryonic or fetal tissue comes from abortion or miscarriage. The law subjects physicians violating it to criminal penalties, specifically those associated with Class A misdemeanors under Arkansas law. Ark. Code Ann. § 20-17-802(f).

The Arkansas Final Disposition Rights Act of 2009 ("FDRA") governs which family members have "[t]he right to control the disposition of the remains of a deceased person, the location, manner, and conditions of disposition." Ark. Code Ann. § 20-17-102(d)(1). Under the FDRA, if a decedent has not appointed anyone to control the final disposition of his or her remains, that right vests in individuals in the order the FDRA sets forth, including the decedent's spouse;

child or children; parent or parents; and including other family members or, ultimately, a state government actor with the statutory obligation to arrange for the disposition of a decedent's remains. Ark. Code Ann. § 20-17-102(d)(1)(A) – (L). When the disposition right vests in a parent, and the other parent is "absent," that right vests solely in the remaining parent only after "reasonable efforts have been unsuccessful in locating the absent surviving parent." Ark. Code Ann. § 20-17-102(d)(1)(E)(ii). The FDRA defines neither "absent" nor "reasonable efforts." Ark. Code Ann. § 20-17-102.

The right to control the disposition of remains of a deceased person under the FDRA vests only in individuals who are 18 years old or older. Ark. Code Ann. § 20-17-102(d)(1). The right to control the disposition of remains of a deceased person under the FDRA also depends on the individual's willingness to assume liability for the costs associated with disposal and only if the individual "exercise[s] his or her right of disposition within two (2) days of notification of death of the decedent." Ark. Code Ann. § 20-17-102(e)(1)(B), (C). If there is a dispute among individuals who share equal disposition rights under the FDRA, the circuit court for the county decides to whom to award the disposition right. Ark. Code Ann. § 20-17-102(e)(2).

The FDRA defines "final disposition" as "the burial, interment, cremation, removal from Arkansas, or other authorized disposition of a dead body or fetus." Ark. Code Ann. § 20-17-102(2)(C). The FDRA does not define "other authorized disposition." A response with disposition rights also may "dispose of the remains in any manner that is consistent with existing laws, rules, and practices for disposing of human remains, including. . . cremat[ion]." Ark. Code Ann. § 20-17-102(i).

### 1. Likelihood Of Success On The Merits: Due Process Challenge

#### a. Applicable Law

To determine whether Dr. Hopkins is likely to succeed on his challenge to the Tissue Disposal Mandate under the Due Process Clause, this Court applies the undue burden standard. In *Whole Woman's Health*, the Supreme Court clarified that this undue burden analysis "requires that courts considers the burdens a law imposes on abortion access together with the benefits those laws confer." 136 S. Ct. at 2309. The Supreme Court has determined that, to prevail, a plaintiff bringing a facial challenge must demonstrate that "in a large fraction of cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895. To sustain a facial challenge and grant a preliminary injunction, this Court must make a finding that the Tissue Disposal Mandate is an undue burden for a large fraction of women for whom the law is relevant.

The law that controls the Court's evaluation of Dr. Hopkins's challenge to the Tissue Disposal Mandate under the Due Process Clause is set forth in more detail at Section IV.A.1.a. of this Order.

#### b. Analysis Of The Tissue Disposal Mandate

##### 1. State's Interest

No legislative findings accompany the tissue disposal mandate. The Court does not have an explanation from the legislature of the purpose of the law. Defendants maintain that the tissue disposal mandate promotes the legitimate interests in "medical ethics" and "regulating the medical profession by ensuring that abortion clinics follow the same standards as other health care facilities that must dispose of fetal remains" and "demonstrating respect for the life of the unborn by requiring abortion providers to follow the same standards as other health care facilities that must

dispose of fetal remains" (Dkt. No. 23, at 71). The Court assumes the legitimacy of these interests. *Whole Woman's Health*, 136 S. Ct. at 2310 (assuming that the State had legitimate state interests where the statute did not contain any legislative findings).

## 2. Burdens Imposed On Women

Defendants cite to *Planned Parenthood of Minnesota v. State of Minnesota* and assert that a woman's right to abortion is not implicated by the Tissue Disposal Mandate. 910 F.2d 479 (8th Cir. 1990). The Minnesota statute examined in that case did not require notice and consent; it lacked any provision comparable to the FDRA. Further, the case was decided before *Casey* and before *Whole Woman's Health*. The Court determines it is not controlling with regard to the facts presented here.

Defendants also argue that the Tissue Disposal Mandate requires abortion providers to make "the same arrangements that all other healthcare providers are required to make for human remains." (Dkt. No. 23, at 72). Defendants cite no authority for this, and there is no evidentiary support in the record for this contention. The FDRA itself imposes no obligations on healthcare providers; the Tissue Disposal Mandate is the first time the FDRA has been applied to a healthcare provider and then only to a "physician or facility that performs an abortion" in the context of abortion and miscarriage. Ark. Code Ann. § 20-17-802(a). Prior to the Tissue Disposal Mandate, the FDRA applied to the disposition of human remains for individuals and their family members and established protections for funeral homes and crematoria when those entities relied on information regarding disposition provided by family members. Ark. Code Ann. §§ 20-17-102(d)(1), (f)(2).

Here, the Tissue Disposal Mandate requires notice and consent to the disposition of embryonic and fetal tissue – and of every woman's abortion – from a woman's sexual partner or,

if the woman and her sexual partner are minors, the parent or parents of both, in direct conflict with Supreme Court precedent. *See Casey*, 505 U.S. at 893-94 (examining spousal notification); *Hodgson v. Minnesota*, 497 U.S. 417 (1990) (examining parental consent and required judicial bypass); *Bellotti*, 443 U.S. at 622 (same).

That fact that both "parents" have disposition rights under the FDRA creates a requirement of notice and consent of the woman's sexual partner and requires that, when the other "parent" is "absent," then "reasonable efforts" need to be made to locate him prior to disposition. Ark. Code Ann. 20-17-102(d)(1)(E). The FDRA does not define "reasonable efforts."

This notice and consent requirement of a woman's sexual partner directly violates binding Supreme Court precedent. *See Danforth*, 428 U.S. at 69 ("[T]he State may not constitutionally require consent of the spouse. . . as a condition for abortion. . . ."); *Casey*, 505 U.S. at 898 (invaliding a provision requiring spousal notification prior to abortion); *see also id.* ("A husband has no enforceable right to require a wife to advise him before she exercises her personal choices," including about pregnancy.).

That the woman's sexual partner could be difficult to locate, could withhold consent, could seek a different means of disposition, or could otherwise delay the abortion gives him "an effective veto" over her decision. *Casey*, 505 U.S. at 897. Notice of abortion could subject some women to physical and psychological abuse. *Casey*, 505 U.S. at 893. (Dkt. No. 5, ¶¶ 56-57; Dkt. No. 6, ¶ 60). Therefore, the Tissue Disposal Mandate burdens all women seeking abortions by virtue of this notice requirement and is "likely to prevent a significant number of women from obtaining an abortion." *Casey*, 505 U.S. at 893.

Defendants asserts that "the right to decide how to dispose of the [embryonic and fetal tissue] vests in the parents of the deceased child." (Dkt. No. 22, at 58). The law provides "that if

the father is absent, the mother is vested with the rights of disposition after reasonable efforts are unsuccessful in locating the father." (Dkt. No. 22, at 58). However, defendants maintain that "this section plainly does not require that any efforts be made to notify the father or to obtain his consent." (Dkt. No. 22, at 58). Instead, defendants propose that, if no action is taken for five days, "'if any person' – including the father of the deceased child – does not exercise his disposition right within five days of the death, he forfeits that right." (Dkt. No. 22, at 58). And then "the right of disposition vests solely in the mother, and her wishes for the disposition of the fetal remains control." (Dkt. No. 22, at 58).

The woman alone is vested with the right to disposition only after reasonable efforts have been unsuccessful in locating the "father." Ark. Code Ann. 20-17-102(d)(1)(E)(ii). Defendants appear to suggest that efforts could be undertaken to locate the other "parent," but that nothing more is necessary under the statute and that, if found, the other "parent" need not be notified of his disposition right. As Dr. Hopkins observes, this reading of the Tissue Disposal Mandate would require "a physician or his patient" to "engage in a search of an undefined time, but for no ultimate purpose." (Dkt. No. 32, at 62). The Court rejects this reading of the Tissue Disposal Mandate. In construing the law narrowly to avoid constitutional doubts, the Court "must also avoid a construction that would seriously impair the effectiveness of [the law] in coping with the problem it was designed to alleviate." *See Harriss*, 347 U.S. at 623.

Defendants also contend that other provisions of the law cause the right "to vest solely in the mother even sooner." (Dkt. No. 22, at 58). Defendants point to the provision that states, if the "father" is "unwilling to assume the liability for the costs" of disposition, then the right vests solely and immediately in the mother. Ark. Code Ann. 20-17-102(e)(1)(C). As Dr. Hopkins points out, "to convey an unwillingness to assume the cost of disposition, one would have to be notified of

his right in the first place" which implicates the notice requirements he challenges as unconstitutional (Dkt. No. 32, at 66).

Defendants maintain that, if the father is "'estranged' – meaning a 'physical and emotional separation from the decedent at the time of death which has existed for a period of time that clearly demonstrates an absence of due affection, trust, and regard for the decedent' – then the disposition right vests solely in the mother immediately." (Dkt. No. 22, at 58) (citing Ark. Code Ann. 20-17-102(e)(1)(D)(ii)). The Court agrees with Dr. Hopkins that there is no explanation for how a physician would know whether a woman's sexual partner was "estranged" from the "decedent," which are defined terms under the Tissue Disposal Mandate (Dkt. No. 32, at 66). There is no safe harbor for a physician to rely on a woman's representation that the other parent is "estranged" from the "decedent" or unwilling to assume the costs of disposition and avoid the Mandate's penalties. To read such a provision into the FDRA would be difficult because the FDRA specifically includes a safe harbor provision stating that a "funeral establishment, cemetery, or crematory shall have the right to rely on" a signed funeral service contract or authorization, and "shall have the authority to carry out the instructions of the person or persons whom the funeral home, cemetery, or crematory reasonably believes holds the right of disposition." Ark. Code Ann. § 20-17-102(f)(2). There is no comparable provision for Dr. Hopkins or other abortion providers. The Court finds the statutory canon of *expressio unius est exclusio alterius*—the expression of one is the exclusion of others— applicable on these facts. This canon, like all rules of construction, is applicable under certain conditions to determine the intention of the lawmaker when it is not otherwise manifest. Here, the state explicitly provided a safe harbor provision in the FDRA for funeral establishments, cemeteries, and crematoriums, but declined to provide a safe harbor provision pertaining to abortion providers in the Tissue Disposal Mandate.

In the case of a minor woman, if her sexual partner was at least 18, then he would control disposition under the FDRA. Ark. Code Ann. §§ 20-17-102(d)(1), (d)(1)(E). This implicates the same constitutional concerns cited in regard to notification of sexual partners. If a minor woman's sexual partner was also a minor, then the woman's parents and her partner's parents would control disposition under the FDRA. Ark. Code Ann. §§ 20-17-102(d)(1), (d)(1)(G). This would necessitate notice to the woman's parents and her partner's parents of the woman's intent to have an abortion.

This requirement effectively circumvents Arkansas's constitutionally mandated judicial bypass process. Current law requires that a physician obtain the written consent of one parent before providing abortion care to a minor patient. Ark. Code Ann. § 20-16-804. The law also provides that a court may authorize the minor to consent to the abortion without the consent of her parent. Ark. Code Ann. §§ 20-16-808, 20-16-809. The availability of the judicial bypass process reflects long-standing constitutional requirements. *Bellotti*, 443 U.S. at 643 ("[I]f the State decides to require a pregnant minor to obtain one or both parents' consent to an abortion, it also must provide an alternative procedure whereby authorization for the abortion can be obtained."); *Id.*, at 639-40 ("[A] State [can] not lawfully authorize an absolute parent veto over the decision of a minor to terminate her pregnancy.")(citing *Danforth*, 428 U.S. at 74)).

Defendants claim that this law does not require a minor's parents be involved, regardless of whether she has obtained a judicial bypass. Defendants rely on language that states, in the "absence" of any person qualified under the statute to exercise the disposition right, "any other person" who is willing to act may exercise the right, Ark. Code Ann. § 20-17-102(d)(2), to argue that a minor who has obtained a judicial bypass may act without involving parents. (Dkt. No. 22, at 58). Under the FDRA no one under the age of 18 has the right to control disposition, so

defendants are incorrect on this point. Ark. Code Ann. § 20-17-102(d)(1). Further, the provision upon which defendants rely applies only after no one else is willing to exercise a disposition right. This provision of the FDRA requires that a person exercising a right under § 20-17-102(d)(2), which is the provision upon which defendants rely to make this argument invoking judicial bypass, "attest[ ] in writing that a good faith effort has been made to no avail to contact the individuals under this subsection." Ark. Code Ann. § 20-17-102(d)(2). These requirements thwart defendants' claim regarding judicial bypass.

Dr. Hopkins contends that he cannot provide care without first knowing that the tissue can be disposed of lawfully (Dkt. No. 3, at 23). Therefore, the law requires that he notify at least one, and perhaps more than one, third party before every woman's abortion. The law mandates disclosure to a woman's partner or spouse, even if that person is no longer in her life or is a perpetrator of sexual assault. For minor women, it bypasses the State's constitutionally mandated judicial bypass process, through which a minor can choose not to involve her parent in her abortion decision and instead obtain judicial authorization. The FDRA potentially expands disclosure to all four parents – those of the woman and those of her sexual partner. Dr. Hopkins argues that these forced disclosures alone are enough to interfere severely with abortion care (Dkt. No. 3, at 23). *See, e.g., Casey*, 505 U.S. at 894 ("[A] significant number of women. . . are likely to be deterred [by a spousal notification requirement] from procuring an abortion as surely as if the [State] had outlawed abortion in all cases.") (Dkt. No. 5, ¶¶ 56-57; Dkt. No. 6, ¶ 61). There is no evidence in the record before the Court to contradict Dr. Hopkins's assertions regarding compliance with the Tissue Disposal Mandate.

What defendants may not do directly they also may not do indirectly. The Tissue Disposal Mandate gives a parent or others "an absolute, and possible arbitrary, veto" over a minor's decision

to have an abortion. *Danforth*, 428 U.S. at 74; s*ee also Bellotti*, 443 U.S. at 639-40, 644. The Tissue Disposal Mandate requires a minor to disclose her decision to both parents, in some instances risking her health and safety by doing so. *See Hodgson*, 497 U.S. at 450-451. The Tissue Disposal Mandate goes even further by requiring, under certain circumstances, the involvement of the woman's sexual partner's parents, and others even further removed from the woman, under certain circumstances. These requirements cannot be reconciled with binding Supreme Court precedent.

The Tissue Disposal Act imports the FDRA's disclosure and decision-making requirements – originally enacted to provide a framework for disposition of human remains by family members – to the disposition of embryonic and fetal tissue. The Tissue Disposal Mandate will dissuade and delay women who seek abortions and also, as a practical matter based on the record evidence before this Court, make it impossible for Dr. Hopkins to continue providing abortions because he cannot ensure that tissue disposition will ultimately take place in compliance with the FDRA, subjecting him to criminal sanctions. To avoid criminal penalties, Dr. Hopkins takes the position that he will have no choice but to cease providing abortions if the Tissue Disposal Mandate takes effect (Dkt. No. 5, ¶ 61). *See Whole Woman's Health*, 136 S. Ct. at 2313 (examining the undue burden resulting from closure of abortion facilities).

Compliance with the law requires that within each class of decision-makers, present class members "used reasonable efforts to notify" others and that any dispute is resolved by a vote of the class members or a proceeding before the circuit court. Ark. Code Ann. §§ 20-17-102(d)(1)(E), (d)(1)(G), (e)(2). The notice and search requirements for interested parties under the Tissue Disposal Mandate will cause significant delay that would result in harm to women seeking abortion care (Dkt. No. 5, ¶¶ 58, 61). Delay increases the risks associated with pregnancy-related care, can

deny a woman her choice of abortion procedure, and if she is pushed past the clinic's gestational limit, can make it impossible for her to obtain an abortion in Arkansas. *See, e.g., Schimel*, 806 F.3d at 920; *Jegley*, 2016 WL 6211310, at *29.

Further, because the phrase "in any manner that is consistent with existing laws, rules, and practices for disposing of human remains" is undefined, it is not clear as to what acceptable methods of disposition might be selected. Ark. Code Ann. §§ 20-17-102(d)(2), (e)(2). The FDRA also requires that only those willing to pay the cost of disposition have a say in the plan. Ark. Code Ann. § 20-17-102(e)(1)(C). Dr. Hopkins argues that ascertaining and documenting the fact that a person with a disposition right forfeits input due to a lack of willingness or resources to assume financial responsibility may be difficult or impossible for Dr. Hopkins (Dkt. No. 3, at 24). The notice, search, and documentation requirements for interested parties under the Tissue Disposal Mandate will cause significant delay and will harm women seeking abortion care (Dkt. No. 5, ¶¶ 58, 61).

It would be a burden on Dr. Hopkins and his clinic to set up systems sufficient and timely enough to ensure that all requirements of the FDRA are met before Dr. Hopkins provides abortion care (Dkt. No. 5, ¶ 58; Dkt. No. 6, ¶¶ 50-51, 55-56, 59, 62). *See Whole Woman's Health*, 136 S. Ct. at 2318 (examining, in the context of the undue burden analysis, the cost of complying with the new regulation). Proceeding with abortion care without knowing that the requirements of the FDRA have been met subjects Dr. Hopkins to criminal penalties.

It also is unclear whether at-home disposal of tissue following medication abortion or treatment of miscarriage is permitted under the FDRA (Dkt. No. 3, at 24). Defendants claim that this law does not ban medication abortions used during the first trimester, arguing the law "expressly applies only to a 'physician or facility that performs an abortion.'" (Dkt. No. 60).

Defendants argue this phrase does not apply "to a woman taking a pill in the comfort of her home pursuant to a medication-abortion procedure." (Dkt. No. 22, at 60). Under Arkansas law, medication abortion must be performed by a physician. Ark. Code Ann. § 5-61-101 (crime for anyone other than licensed physician to perform abortion); Ark. Code Ann. § 20-16-603(b)(1) (physician-only law for medication abortion).

Dr. Hopkins faces criminal penalties if he fails to dispose properly of tissue following a medication abortion or treatment of miscarriage. Absent certainty on these points, Dr. Hopkins maintains that he will have to stop providing medication abortion (Dkt. No. 5, ¶ 55; Dkt. No. 6, ¶ 52). Regardless if the Tissue Disposal Mandate applies to medication abortion or not, that fact does not change the Court's ultimate conclusion regarding the constitutionality of the Mandate.

On July 20, 2017, defendants submitted supplemental authority in support of their opposition to Dr. Hopkins's motion for preliminary injunction (Dkt. No. 31). Defendants state that, on July 20, 2017, "the Arkansas Legislative Council approved an amended rule concerning the disposition of fetal remains. The amended rule, which is attached to this notice as Exhibit A, defines 'dead fetus or fetal remains' and provides that each facility shall ensure that each dead fetus or fetal remains are disposed of in accordance with Ark. Code. Ann. § 20-17-102." (Dkt. No. 31, at 1). Defendants contend that "[t]he amendments to Agency Rule #007.05 expressly provide that the requirements for the disposition of fetal remains under Ark. Code Ann. § 20-17-102 do not apply to medication abortions: 'The requirements of this subsection shall not apply to abortions induced by the administration of medications when the evacuation of any human remains occurs at a later time and not in the presence of the inducing physician nor at the facility in which the physician administered the inducing medications.' Exh. A at 6-3 ¶ 6.O.1." (*Id.*).

The Court is unclear on the authority possessed by the Legislative Council and, therefore, unclear on the binding nature of this amendment to the Tissue Disposal Mandate. The Court also questions whether this amendment has to go through an approval process before being formally adopted. The Court has reviewed the website of the Arkansas State Legislature for further guidance; that provides no clarity. *See* http://www.arkleg.state.ar.us/assembly/2011/2012F/pages/CommitteeDetail; s*ee* also Andy Davis, *Board Approves Rule to Clarify Arkansas Abortion Law*, Arkansas Democrat Gazette, Jul. 20, 2017, at 1, *available at* http://www.arkansasonline.com/news/2017/jul/20/board-approves-rule-to-clarify-abortion/.

The Court has reviewed thoroughly the amendment attached as Exhibit A to the supplemental authority. The Court concludes that, even if it had proof that this amended rule was the final, approved-of, form, the change does not make the Tissue Disposal Mandate constitutional. As a result, the Court will take note of the amendment, but the Court concludes as a matter of law that it does not alter the analysis as to the constitutionality of the Mandate.

Further, under the law, Dr. Hopkins maintains that he must ensure disposition under the FDRA's requirements even if such tissue is sent to a pathology lab. Dr. Hopkins cannot control how a pathology lab disposes of tissue after testing, but this law purports to subject Dr. Hopkins to criminal liability based on the actions of third parties who receive the tissue for reasons other than disposition (Dkt. No. 5, ¶ 60; Dkt. No. 6, ¶ 53). The Tissue Disposal Mandate puts Dr. Hopkins in a position of not sending tissue when it is important for women's health or risking criminal liability under the Tissue Disposal Mandate.

Defendants claim that "a fetal tissue sample sent to a pathology lab would fall under the definition of 'human tissue' in Ark. Code Ann. § 20-17-801(b)(2)(C), and can be disposed of 'in

a respectful and proper manner' under the statute." (Dkt. No. 22, at 60). Therefore, defendants argue that Dr. Hopkins would not face criminal liability for sending fetal tissue for pathological testing, even if he could not assure that the pathology lab would dispose of fetal tissue as required by the Tissue Disposal Mandate (Dkt. No. 22, at 60). The Tissue Disposal Mandate amended Ark. Code Ann. § 20-17-801(b)(2)(C) to remove "fetal tissue" from the definition of "human tissue," making that means of disposal impermissible for fetal tissue.

Dr. Hopkins also cannot control how law enforcement disposes of tissue. However, Dr. Hopkins maintains that he arranges the transport of tissue to law enforcement "consistent with existing laws," Ark. Code Ann. § 20-17-102(i), and accordingly understands the disposition to be consistent with the FDRA (Dkt. No. 3, at 25 n.11).

The Court determines these burdens support facial invalidity of the Tissue Disposal Mandate. The Court will premise its analysis on defendants' contention that the Mandate applies to all non-medication abortions. The notice provision impermissibly burdens women over the age of majority or under the age of majority with a partner over the age of majority who seek a non-medication abortion by requiring notice to the other "parent," meaning the woman's spouse or partner. The notice provision impermissibly burdens women who are minors with minor partners who seek non-medication abortions by requiring notice to the parent or parents, including notice to the partner's parents.

The Court cannot apply the defendants' suggested workarounds to the notice provisions in an effort to construe the Tissue Disposal Mandate as constitutional for the reasons stated. The workarounds are not supported by the text of the Tissue Disposal Mandate.

### 3. Balancing

Dr. Hopkins asserts that, while the burdens of the Tissue Disposal Mandate are many and substantial, it advances no valid interest in a permissible way. He contends that any interest the State of Arkansas has in disposition of embryonic and fetal tissue in a medically appropriate way is sufficiently advanced by current law. *See Whole Woman's Health*, 136 S. Ct. at 2311, 2314 (finding no significant problem that the new restriction "helped to cure," nor was it "more effective than pre-existing [state] law" in advancing state's asserted interest). The Tissue Disposal Mandate does not specify any new method of disposal. Instead, it only imposes the FDRA's complex requirements for authorization of disposal that are separate and apart from the method, and it applies those only to a "physician or facility that performs an abortion" in the context of abortion and miscarriage. Ark. Code Ann. § 20-17-802(a). Dr. Hopkins is likely to succeed on this argument.

For these reasons, the Court is not convinced that importing the FDRA's complex requirements for authorization advances a public health goal. These requirements also do not advance interests in women's health because delay and other negative effects instead threaten women's health and wellbeing. Neither can any interest the State has in potential life support the Tissue Disposal Mandate because it applies to tissue disposal after an abortion or miscarriage, when there is no "potential life." *See Whole Woman's Health*, 136 S. Ct. at 2314 ("Unlike legitimate state interests recognized by the Supreme Court, [Texas's] professed interest regulates a time when there is no potential life."); *Planned Parenthood of Ind. & Ky., Inc.*, 194 F.Supp.3d at 833 ("interest in potential life has not been extended. . . to imposing procedures taken after the pregnancy has been terminated like the fetal tissue disposition provisions do" (internal quotation marks and citations omitted)).

Weighing the burdens against the Tissue Disposal Mandate's state interests, if any, and the marginal way the Tissue Disposal Mandate advances those state interests, if at all, the Court concludes that Dr. Hopkins is likely to prevail on his claim that in a large fraction of cases in which the Tissue Disposal Mandate is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion. The record includes sufficient evidence from which Dr. Hopkins satisfies his burden to present evidence of causation that the Mandate's requirements will lead to this effect. *See Whole Woman's Health*, 136 S. Ct. at 2313.

### 4.      Women Effected

To sustain a facial challenge and grant a preliminary injunction, this Court must make a finding that the Tissue Disposal Mandate is an undue burden for a large fraction of women the Mandate impacts. If the Mandate is construed as defendants assert, meaning that the Mandate does not apply to medication abortion, the numbers the Court will discuss may change slightly. The end result will not.

In Arkansas, 3,771 abortions were performed in 2015 (Dkt. No. 5, Ex. B, at 36). Of those, 581 were medication abortion and 3,190 were not. Of the 3,771 total abortions in 2015 in Arkansas, 528 were obtained by married women, and 3,234 were obtained by not married women (*Id.*). Nine individuals reported "unknown" when asked marital status (*Id.*). Of the 3,771 total abortions in 2015 in Arkansas, 141 were obtained by individuals below the age of 18 (*Id.*).

As explained, the Tissue Disposal Mandate requires notice and consent to the disposition of embryonic and fetal tissue – and of every woman's abortion – from a woman's sexual partner or, if the woman and her sexual partner are minors, the parent or parents of both. There is no judicial bypass procedure for a minor, as this Court is unable to adopt defendants' argument advancing one. The denominator for this Court's analysis of women impacted by the Mandate is

either 3,771 total abortions or 3,190 total non-medication abortions. Regardless, the numerator equals the denominator in this fraction. To comply with the Tissue Disposal Mandate, all women seeking abortions must notify their sexual partner or, if both the woman and her sexual partner are minors, the women must notify the parent or parents of both.

Lower court judges are bound by Supreme Court precedent, even if they seriously question what the Court has done. *MKB Management Corp. v. Stenehjem*, 795 F.3d 768 (8th Cir. 2015). The lower federal courts cannot second-guess the Supreme Court regarding "underlying facts." *Id.*, at 772. On the record before this Court, there is no basis upon which to revisit the holdings in *Casey*, *Hodgson*, and *Bellotti*, along with other consistent precedent, regarding the undue burden imposed by the types of notification requirements in the Tissue Disposal Mandate. This is especially true here where the interests the State advances in support of the Mandate are not as compelling as those interests advanced in *Casey*, *Hodgson*, *Bellotti*, and other consistent precedent. It is also true where, as here, there is no factual basis in the record upon which this Court could question or revisit the underlying factual determinations made by the Supreme Court in those cases.

In *Casey*, this spousal notification law at issue provided that, "except in cases of medical emergency, that no physician shall perform an abortion on a married woman without receiving a signed statement from the woman that she has notified her spouse that she is about to undergo an abortion. The woman has the option of providing an alternative signed statement certifying that her husband is not the man who impregnated her; that he husband could not be located; that the pregnancy is the result of spousal sexual assault which she has reported; or that the woman believes that notifying her husband will cause him or someone else to inflict bodily injury upon her. A physician who performs an abortion on a married woman without receiving the appropriate signed

statement will have his or her license revoked, and is liable to the husband for damages." *Casey*, 505 U.S. at 887-88. The Court laid out the factual findings "supported by studies of domestic violence." *Id.*, at 891.

The Court then concluded that "[t]he spousal notification requirement is thus likely to prevent a significant number of women from obtaining an abortion. It does not merely make abortions a little more difficult or expensive to obtain; for many women, it will impose a substantial obstacle. We must not blind ourselves to the fact that the significant number of women who fear for their safety and the safety of their children are likely to be deterred from procuring an abortion as surely as if the Commonwealth had outlawed abortion in all cases." *Id.* at 893-94.

Defendants in *Casey* attempted to avoid that conclusion by arguing the spousal notification law imposed almost no burden at all for the vast majority of women seeking abortions. "They begin by noting that only about 20 percent of the women who obtain abortions are married. They then note that of these women about 95 percent notify their husbands of their own volition. Thus, respondents argue, that the effects of [the spousal notification law] are felt by only one percent of the women who will be able to notify their husbands without adverse consequences or will qualify for one of the exceptions, the statute affects fewer than one percent of women seeking abortions." *Id.* at 894. Defendants relied upon this argument to claim the statute could not be "invalid on its face." *Id.*

The Court rejected this argument, stating "[t]he analysis does not end with the one percent of women upon whom the statute operates; it begins there. . . . The proper focus of the constitutional inquiry in the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* The Court determined that "[t]he unfortunate yet persisting conditions that we document above will mean that in a large fraction of the cases in which [the spousal notification

law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion. It is an undue burden, and therefore invalid." *Id.*, at 895.

In a five to four plurality decision in *Hodgson*, the Supreme Court concluded that, standing by itself, a provision of a Minnesota statute requiring that no abortion be performed on a woman under 18 years of age until at least 48 hours after both of her parents had been notified, except where an immediate abortion was necessary to prevent the woman's death or where the woman declared that she was a victim of parental abuse or neglect, and except where notification of only one parent is necessary because the second parent is dead or cannot be located through reasonably diligent effort, was unconstitutional as violating Fourteenth Amendment due process guaranties, since insofar as the statute required both parents to be notified, it did not reasonably further any legitimate state interest. *Id.*, at 452-454. In assessing the alleged state interest, the Court noted that a two–parent notification requirement would be harmful to some minors and their families, thereby doing a disservice to the state's interest in protecting and assisting minors. *Id.*, at 451.

The Court reasoned that the state had no legitimate interest in conforming family life to a state–designed ideal by requiring family members to talk together, nor could the state's interest in protecting a parent's interest in shaping a child's values and lifestyle overcome the liberty interests of a minor acting with the consent of a single parent, or a court. *Id.*

However, a majority of the justices were of the opinion that the challenged Minnesota statute avoided constitutional infirmity because it contained an adequate judicial procedure for bypassing the parental notification requirement—that is, a provision that a court of competent jurisdiction could, in a confidential proceeding, authorize an abortion without parental notification upon determining that the minor is mature and capable of giving informed consent, or that an abortion without notice to both parents would be in the minor's best interest, and the Court

accordingly affirmed a judgment holding the statute, with the judicial bypass procedure, constitutional. *See also Bellotti*, 443 U.S. at 622 (standing for the proposition that a parental consent law is constitutional if it provides for a sufficient judicial bypass alternative).

If the Mandate is construed as Dr. Hopkins contends, then the Tissue Disposal Mandate applies to all abortions in Arkansas. Accepting defendants' argument regarding scope, the Mandate would not bar medication abortion in Arkansas, but it would still impose the impermissible notification requirements. The Court finds as a matter of law that Dr. Hopkins is likely to succeed on his claim that the Tissue Disposal Mandate is an undue burden for a large fraction of the women impacted by the Mandate, regardless of how the Court construes the Mandate.

Even if the notification requirements are not alone sufficient to constitute an undue burden, and this Court determines it is bound to apply controlling precedent to conclude that they are, there are other undue burdens imposed by the Tissue Disposal Mandate that lead the Court to conclude Dr. Hopkins is likely to succeed on the merits. Dr. Hopkins takes the position that, to avoid criminal penalties, he will have no choice but to cease providing abortions if the Tissue Disposal Mandate takes effect (Dkt. No. 5, ¶ 61). *See Whole Woman's Health*, 136 S. Ct. at 2313 (examining the undue burden resulting from closure of abortion facilities). Little Rock Family Planning Services, along with Dr. Hopkins, provides care to women from throughout Arkansas and from other states (Dkt. No. 6, ¶ 5). Dr. Hopkins is aware of no physicians, other than those with whom he practices at Little Rock Family Planning Services, who provide second trimester or surgical abortion care (Dkt. No. 32-2, ¶ 2). The only other provider in Arkansas provides medication abortion through 10 weeks LMP in Little Rock and Fayetteville (Dkt. No. 5, ¶ 6). In other words, there are no other providers in Arkansas that could fill this gap in care.

Many patients of Little Rock Family Planning Services are low-income. Approximately 30 to 40% of patients obtain financial assistance to pay for their abortion care (Dkt. No. 6, ¶ 5). Many patients of Little Rock Family Planning Services struggle in their lives and in their efforts to access the medical care they need (Dkt. No. 6, ¶ 5). The time and effort it takes to make the necessary plans to access medical care cause anxiety and stress and cause financial pressure for women seeking care at Little Rock Family Planning Services (Dkt. No. 6, ¶ 8). These findings, coupled with the finding that abortions other than medication abortions would essentially be unavailable in the State of Arkansas if the Tissue Disposal Mandate takes effect, bolster this Court's conclusion that if the Tissue Disposal Mandate takes effect a large fraction of Arkansas women who select non-medication abortion throughout the first and second trimesters would experience a substantial obstacle to abortion.

Attempting to comply with the notice and search requirements for interested parties under the Tissue Disposal Mandate will cause significant delay that will result in harm to women seeking abortion care (Dkt. No. 5, ¶¶ 58, 61). Delay increases the risks associated with pregnancy-related care, can deny a woman her choice of abortion procedure, and if she is pushed past the clinic's gestational limit, can make it impossible for her to obtain an abortion in Arkansas. *See, e.g., Schimel*, 806 F.3d at 920; *Jegley*, 2016 WL 6211310, at *29.

There likely would be additional costs associated with abortion care if the Tissue Disposal Mandate were to take effect and if there were a non-medication abortion provider in Arkansas, due to the increased burden of administrative costs to be incurred by the provider in setting up systems to attempt to comply with the notice provisions, document compliance, and document the fact that a person with a disposition right forfeits input due to a lack of willingness or resources to assume financial responsibility (Dkt. No. 5, ¶ 58; Dkt. No. 6, ¶¶ 50-51, 55-56, 59, 62). *See Whole Woman's*

*Health*, 136 S. Ct. at 2318 (examining, in the context of the undue burden analysis, the cost of complying with the new regulation).  All of these burdens inform this Court's finding that the Tissue Disposal Mandate imposes an undue burden on the fraction of women for whom the statute is relevant.

### 2.    Likelihood Of Success On The Merits:  Vagueness

The Tissue Disposal Mandate requires physicians to ensure that embryonic and fetal tissue is disposed of in accordance with the FDRA and that physicians must ensure that outcome, but, Dr. Hopkins contends that the requirements of the FDRA as applied to abortion and miscarriage management leave many critical questions unanswered.  He challenges the Tissue Disposal Mandate as void for vagueness.  Specifically, Dr. Hopkins contends that H.B. 1566, "including its incorporation of the FDRA, is impermissibly vague in at least two respects:  first, whether tissue resulting from a medication abortion or following miscarriage care may be disposed of by the patient at home, and, second, what, if any, obligations are imposed on women seeking abortion and miscarriage care and/or Plaintiff regarding 'reasonable efforts' to locate an 'absent' 'parent' or 'other members of the class' of 'grandparents.'   Ark. Code. Ann.§§ 20-17-102(d)(l)(E), (d)(3)(B)." (Dkt. No. 3, at 53).

Dr. Hopkins further argues that "while the FDRA appears to concern the "[f]inal disposition' of 'a dead body or fetus,' *id. §* 20-17-102(a)(2)(C), its various references to 'human remains,' *id.* §§ 20-17-102(b )(1 )(A), ( c ), (h), (i), (j), are unclear, because H.B. 1566 now uses 'fetal remains' to refer to tissue disposition after abortion, *see* H.B. 1566 § 3.  Given the potential liability for violating H.B. 1566, plaintiff cannot make good faith efforts to comply and hope for the best. Rather, Dr. Hopkins is faced with uncertainty that will require him to curtail services." (Dkt. No. 3, at 58).

The FDRA addresses methods of disposition in three provisions. As noted, the statute defines "final disposition" to include "burial, interment, cremation, removal from Arkansas, or other authorized disposition of a dead body or fetus," Ark. Code Ann. § 20-17-102(a)(2)(C), gives a person with disposition rights the authority to control "the disposition of the remains of a deceased person, the location, manner, and conditions of disposition," *id.*, § 20-17-102(d)(l); and also authorizes a person with disposition rights, in the absence of a declaration of final disposition by the decedent, to "dispose of the remains in any manner that is consistent with existing laws, rules, and practices for disposing of human remains, including ... cremat[ion]," *id.* § 20-17-102(i). Dr. Hopkins contends that these civil provisions are not drafted with the precision necessary to provide him or enforcement authorities with "fair notice of conduct that is forbidden or required." *Fed. Commc'ns Comm'n v. Fox Television Station, Inc.,* 567 U.S. 239, 253 (2012).

Dr. Hopkins also notes that "[t]he lack of clarity as to a physician's obligations under the FDRA [is] compounded by the fact that § 20-17-802 of the Arkansas Code, which imposes criminal penalties, contains no scienter requirement and appears to be a strict liability offense." *See Stivers v. State,* 118 S.W.3d 588 (Ark. 2003) (offense outside the criminal code, which contained no *mens rea* requirement, in the absence of legislative intent to include one, was a strict liability offense). *See also Stahl v. City of St. Louis, Missouri,* 687 F.3d 1038, 1041 (8th Cir. 2012) (lack of *mens rea* requirement 'further demonstrate[s]' vagueness)." (Dkt. No. 3, at 55, n. 16).

Dr. Hopkins states that "this vagueness gives [him] no option but to stop providing care, and will impermissibly deprive his patients of access to abortion and miscarriage care, including the safe and accepted method of medication abortion and disposition of the tissue at home." *See Planned Parenthood. Sioux Falls Clinic v. Miller,* 63 F.3d at 1465, 1467. Defendants argue that, "the requirements for the disposition of 'human tissue' are clearly set forth in a portion of the

statute that he does not challenge, Ark. Code Ann. § 20-17-801.  For its part, the Final Disposition Rights Act is also clear, providing detailed instructions for determining who has the right to dispose of a dead child's body.  Ark. Code Ann. § 20-17-102.  For these reasons, Hopkins cannot show that he is likely to prevail on a vagueness challenge to Act 603." (Dkt. No. 23, at 75-76.).  The Court notes that the discussion of the potential Legislative Council amendment to the Tissue Disposal Mandate could remedy the vagueness in this section of the Tissue Disposal Mandate. However, as stated, the Court has no information in the record to determine the authority if that decision-making body or to determine whether the amendment is final.  Even if the amendment remedies the vagueness as to the types of tissue that must be disposed, the Court finds that the other sections of the Mandate are still unconstitutionally vague.  Dr. Hopkins has no way of knowing from the Mandate the definitions of "reasonable efforts" to locate an "absent" parent or "grandparent," as required by the Mandate.

The Court concludes that Dr. Hopkins is likely to succeed on his claim that the Tissue Disposal Mandate is vague such that it unconstitutionally deprives Dr. Hopkins of his due process rights.  Based on the record before it at this stage of the proceeding, the Court is unclear as to the scope of the obligations imposed upon women seeking abortion and miscarriage care and/or Dr. Hopkins regarding "reasonable efforts" to locate an "absent" "parent" or "other members of the class" of "grandparents."   The Tissue Disposal Mandate fails to provide Dr. Hopkins or enforcement authorities with "fair notice of conduct that is forbidden or required." *Fed. Commc'ns Comm'n,* 567 U.S. at 253.

### 3.      Irreparable Harm

Enforcement of the Tissue Disposal Mandate will inflict irreparable harm on Dr. Hopkins and the fraction of women unduly burdened by the Mandate for whom there is no adequate remedy

at law. It is well-settled that the inability to exercise a constitutional right constitutes irreparable harm. *See Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977) ("Planned Parenthood's showing that the ordinance interfered with the exercise of its constitutional rights and the rights of its patients supports a finding of irreparable injury.") (citations omitted); *accord Kirkeby v. Furness*, 52 F.3d 772, 775 (8th Cir. 1995) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

In the absence of an injunction, the fraction of women impacted by the Mandate would be unduly burdened in their right to abortion by the substantial obstacles created by the Tissue Disposal Mandate, and Dr. Hopkins likely would be denied due process as a result of the statute's vagueness. *Whole Woman's Health*, 136 S. Ct. at 2309-10.

Therefore, the second requirement for an order preliminarily enjoining enforcement of the Tissue Disposal Mandate is satisfied.

### 4. Balancing Of Harms

In the absence of an injunction, the fraction of the women impacted by the Mandate would be unduly burdened in their right to abortion by the substantial obstacles created by the Tissue Disposal Mandate, and Dr. Hopkins likely would be denied due process as a result of the statute's vagueness. *Whole Woman's Health*, 136 S. Ct. at 2309-10. Whereas, if an injunction issues, a likely unconstitutional law passed by Arkansas legislators will not go into effect. The threatened harm to Dr. Hopkins and the women unduly burdened by the Mandate clearly outweighs whatever damage or harm a proposed injunction may cause the defendants.

### 5.      Public Interest

It is in the public interest to preserve the *status quo* and to give the Court an opportunity to evaluate fully the lawfulness of the Tissue Disposal Mandate without subjecting Dr. Hopkins, or the fraction of women impacted by the Mandate, or the public to any of the law's potential harms.

It is therefore ordered that Dr. Hopkins's motion for preliminary injunction is granted to the extent that defendants are preliminarily enjoined from enforcing the provisions of Ark. Code Ann. § 20-17-801(b)(1)(B); Ark. Code Ann. § 20-17-801(b)(2)(C); Ark. Code Ann. § 20-17-802; and including but not limited to Ark. Code Ann. § 20-17-802(f) which subjects a physician who violates the law to criminal penalties.

## V.      Security

Under Federal Rule of Civil Procedure 65(c), a district court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  In these proceedings, defendants have neither requested security in the event this Court grants a preliminary injunction nor presented any evidence that they will be financially harmed if they were wrongfully enjoined.

The Court waives the bond requirement under Federal Rule of Civil Procedure 65(c).  Dr. Hopkins is serving a public interest in acting to protect constitutional rights related to abortion. Defendants will not be harmed by the order to preserve the *status quo*.  Therefore, the Court will not require the posting of a bond.  *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016).  For these reasons, the Court declines to require security from Dr. Hopkins.

## IV. Conclusion

For the foregoing reasons, the Court determines that Dr. Hopkins has met his burden for the issuance of preliminary injunctions for the challenged Mandates. Therefore, the Court grants Dr. Hopkins's motion for preliminary injunction. The Court hereby orders that defendants, and all those acting in concert with them, are preliminarily enjoined from enforcing the requirements of:

(1) the D&E Mandate, more specifically Ark. Code Ann. § 20-16-1803 and Ark. Code Ann. § 20-16-1805 which imposes criminal penalties on a person who violates Ark. Code Ann. § 20-16-1803(a);

(2) the Medical Records Mandate, more specifically Ark. Code Ann. §§ 20-16-1804(b)(2)(A) and (b)(2)(B); § 20-16-1805 which imposes criminal penalties on a physician or other person who violates §§ 20-16-1804(b)(2)(A) and (b)(2)(B); and § 20-16-1806 to the extent it permits a physician to have his or her medical license suspended or revoked for violating §§ 20-16-1804(b)(2)(A) and (b)(2)(B);

(3) the Local Disclosure Mandate, more specifically as to Non-CMA Teenage Patients the requirements of Ark. Code Ann. § 12-18-108(a)(1); the Arkansas State Crime Laboratory Rules prescribed to implement the amended law, Ark. Admin. Code §§ 171.00.2 (2013); and Ark. Code Ann. § 12-18-103(c) which subjects a physician who violates Ark. Code Ann. § 12-18-108(a)(1) to license suspension or revocation and other disciplinary penalties, Ark. Code Ann. § 17-95-409 (2009); and

(4) the Tissue Disposal Mandate, more specifically Ark. Code Ann. § 20-17-801(b)(1)(B); Ark. Code Ann. § 20-17-801(b)(2)(C); Ark. Code Ann. § 20-17-802; and including but not limited to Ark. Code Ann. § 20-17-802(f) which subjects a physician who violates the law to criminal penalties.

Further, defendants are enjoined from failing to notify immediately all state officials responsible for enforcing these requirements, about the existence and requirements of this preliminary injunction. This preliminary injunction remains in effect until further order from this Court.

So ordered this 28th day of July, 2017 at 11:20 p.m.

_____
Kristine G. Baker
United States District Judge