IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

FREDERICK W. HOPKINS, M.D., M.P.H.,       )
LITTLE ROCK FAMILY PLANNING               )
SERVICES, INC.,                           )
                                          )
Plaintiffs,                               )
                                          )
v.                                        )
                                          )  Case No. 4:17-cv-00404-KGB
LARRY JEGLEY, Prosecuting Attorney for    )
Pulaski County; SYLVIA D. SIMON, M.D.,    )
Chair of the Arkansas State Medical Board;)
ROBERT BREVING, JR., M.D.; ELIZABETH      )
ANDERSON; RHYS L. BRANMAN, M.D.;          )
EDWARD GARDNER, M.D.; VERYL D.            )
HODGES, D.O.; RODNEY GRIFFIN, M.D.;       )
BETTY GUHMAN; WILLIAM L. RUTLEDGE,        )
M.D.; JOHN H. SCRIBNER, M.D.; BRIAN T.    )
HYATT, M.D.; TIMOTHY C. PADEN, M.D.;      )
DON R. PHILLIPS, M.D.; DAVID L. STAGGS,   )
M.D., officers and members of the Arkansas State )
Medical Board; JOSÉ ROMERO, M.D., the     )
Secretary of the Arkansas Department of Health;
PHILLIP GILMORE, PhD.; PERRY AMERINE,
O.D.; MARSHA BOSS, P.D.; LANE CRIDER,
P.E.; BRAD ERNEY, D.M.D.; MELISSA
FAULKENBERRY, D.C.; ANTHONY N. HUI,
M.D.; BALAN NAIR, M.D.; GREG BLEDSOE,
M.D.; STEPHANIE BARNES BEERMAN;
GLEN BRYANT, M.D.; DWAYNE DANIELS,
M.D.; VANESSA FALWELL, A.R.P.N.;
DARREN FLAMIK, M.D., THOMAS JONES,
R.S.; DAVID KIESSLING, D.P.M.; CARL
RIDDELL, M.D.; CLAY WALISKI; TERRY
YAMAUCHI, M.D.; DONALD RAGLAND;
CATHERINE TAPP, M.P.H.; SUSAN
WEINSTEIN, D.V.M.; JAMES ZINI, D.O.,
officers and members of the Arkansas Department
of Health, and their successors in office, in their
official capacity,

Defendants.

1

## FIRST AMENDED COMPLAINT

Plaintiffs, by and through their undersigned attorneys, bring this Complaint against the above-named Defendants, their employees, agents and successors in office, and in support thereof alleges the following:

## INTRODUCTION

1.      This is a constitutional challenge under 42 U.S.C. § 1983 to four acts of the 91st Arkansas General Assembly of 2017:

   a.   Act 45 codified at Ark. Code §§ 20-16-1801 to 1807 (H.B. 1032 or the "D&E Ban");

   b.   Act 733 codified at Ark. Code §§ 20-16-1901 to 1910 (H.B. 1434 or the "Medical Records Mandate");

   c.   Act 1018 codified at Ark. Code § 20-16-108(a)(1) (H.B. 2024 or the "Local Disclosure Mandate"); and

   d.   Act 603 codified at Ark. Code §§ 20-17-801 to 802 (H.B. 1566 or the "Tissue Disposal Mandate").

2.      By its terms, the Medical Records Mandate was set to take effect January 1, 2018. Ark. Code § 12-16-1910.

3.      The other three laws challenged in this suit were set to take effect 90 days after *sine die* adjournment of the General Assembly, which was May 1, 2017.  Those three laws were thus scheduled to take effect July 30, 2017.

4.      Under these four laws, Plaintiffs are subject to severe civil, criminal, and professional penalties for providing safe, legal, pre-viability abortion care.

5.      The D&E Ban, bans the safest and most common method of second-trimester abortion, and the only method provided throughout the second trimester in outpatient facilities.

6.      The Medical Records Mandate, requires that prior to an abortion the physician request and expend undefined time and effort to obtain medical records related to the patient's "entire pregnancy history," including any and all prior pregnancies or any prior medical treatment for her current pregnancy, resulting in indefinite delay..

7.      The Local Disclosure Mandate, conditions abortion care for 14- to16-year-olds— even the vast majority of those 14- to 16-year-olds whose sexual activity implicates no child-abuse reporting or criminal conduct—on disclosure of their intensely personal information to local law enforcement and preservation of tissue from the abortion as "evidence."

8.      The Tissue Disposal Mandate, requires notice to and consent of third parties prior to every woman's abortion, can be read to bar medication abortion and miscarriage care using medication abortion methods, and enacts unclear and burdensome requirements that will delay or deny women access to care and stop physicians from providing it..

9.      These statutes threaten Plaintiffs with criminal penalties and deny and burden Plaintiffs' patients' constitutionally protected rights to decide to end a pre-viability pregnancy, to make independent decisions related to their pregnancy care, and to protect their private medical information.  To protect their patients from these constitutional violations, to enforce their own right to clear legal standards, and to avoid irreparable harm, Plaintiffs seeks declaratory and injunctive relief to prevent enforcement of these four laws.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343.

11.     Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

12.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because the majority of Defendants, who are sued in their official capacity, carry out their official duties at offices located in this district.

## PARTIES

13.     Plaintiff Frederick W. Hopkins, M.D., is an experienced, highly credentialed and board-certified obstetrician-gynecologist, and an abortion provider at Little Rock Family Planning Services, the only provider of outpatient, second-trimester abortion care in Arkansas. The abortion services he provides in Little Rock include D&E procedures and medication abortions.  He offers abortion and miscarriage care to patients throughout their reproductive years.  By the terms of the challenged laws, Dr. Hopkins is therefore subject to the penalties of the D&E Ban, and responsible for ensuring compliance with the Medical Records Mandate, the Local Disclosure Mandate, and the Tissue Disposal Mandate.  Dr. Hopkins participates in this case in his individual capacity, and not as a representative of the academic and other medical facilities at which he provides care.

14.     Plaintiff Little Rock Family Planning Services ("LRFP") is a professional limited liability corporation that is licensed to do business in Arkansas.  It has provided high quality reproductive health care in Arkansas since 1973.  LRFP offers miscarriage care and basic gynecological care, including pap smears, sexually transmitted infection testing, contraceptive counseling and services, and abortion services.  It operates a clinic in Little Rock that provides both medication and surgical abortion care.  Medication abortions are offered up to 10 weeks in pregnancy, as measured by the patient's last menstrual period ("LMP"), and surgical abortions

are offered until twenty-one weeks and six days ("21.6") LMP.  LRFP brings this action on behalf of itself, its patients, its physicians, and staff.

15.     Defendant Larry Jegley is the Prosecuting Attorney for Pulaski County, located at 224 South Spring Street, Little Rock, Arkansas.  Prosecuting attorneys "shall commence and prosecute all criminal actions in which the state or any county in his district may be concerned." Ark. Code §16-21-103.  Defendant Jegley is responsible for criminal enforcement of the D&E Ban, the Medical Records Mandate, and the Tissue Disposal Mandate.  He and his agents and successors are sued in their official capacities.

16.     Defendant Sylvia D. Simon, M.D., is Chair of the Arkansas State Medical Board. Defendants Robert Breving, Jr., M.D., Veryl D. Hodges, D.O., Elizabeth Anderson, Rhys L. Branman, M.D., Edward Gardner, M.D., Rodney Griffin, M.D., Betty Guhman, Bryan T. Hyatt, M.D., Timothy C. Paden, M.D., Don R. Phillips, M.D., William L. Rutledge, M.D., John H. Scribner, M.D., and David L. Staggs, M.D., are members of the Arkansas State Medical Board. The State Medical Board is responsible for licensing medical professionals under Arkansas law. Ark. Code § 17-95-410.  The Board and its members are responsible for imposing licensing penalties under the Medical Records Mandate and the Local Disclosure Mandate and imposing licensing penalties for unprofessional conduct, which includes criminal conviction under statutes such as the D&E Ban, the Tissue Disposal Mandate, and the Local Disclosure Mandate.  Ark. Code §§ 75-95-409(a)(2)(A), (D).  Defendants and their successors in office are sued in their official capacity.

17.     Defendant José Romero, M.D. is the Secretary of the Arkansas Department of Health.  Defendants Phillip Gilmore, PhD, Perry Amerine, O.D., Marsha Boss, P.D., Lane Crider, P.E., Brad Erney, D.M.D., Melissa Faulkenberry, D.C., Anthony N. Hui, M.D., Balan

Nair, M.D., Greg Bledsoe, M.D., Stephanie Barnes Beerman, Glen Bryant, M.D., Dwayne

Daniels, M.D., Vanessa Falwell, A.R.P.N., Darren Flamik, M.D., Thomas Jones, R.S., David

Kiessling, D.P.M., Carl Riddell, M.D., Clay Waliski, Terry Yamauchi, M.D., Donald Ragland,

Catherine Tapp, M.P.H., Susan Weinsten, D.V.M., and James Zini, D.O are members of the

Arkansas Board of Health.  The Department of Health's members are charged with enforcing

licensing penalties against LRFP for violations of any law or rule.  Ark. Code Ann. § 20-9-302.

Defendants and their successors in office are sued in their official capacity.

## THE CHALLENGED STATUTES

- ○ **The D&E Ban**

18.     The D&E Ban criminalizes the performance of what the statute calls a

"dismemberment abortion."  Although this is not a medical term, the definition in the statute

clearly prohibits a procedure referred to in the medical profession as dilation and evacuation or

"D&E."  D&E is the safest and most commonly used method of abortion in the second trimester,

and the only method used in outpatient facilities throughout the second trimester.

19.     H.B. 1032 defines "dismemberment abortion" as follows:

(3)(A)(i) "Dismemberment abortion" means an abortion performed with the
purpose of causing the death of an unborn child that purposely dismembers the
living unborn child and extracts one (1) piece at a time from the uterus through
the use of clamps, grasping forceps, tongs, scissors, or similar instruments that,
through the convergence of two (2) rigid levers, slice, crush, or grasp a portion of
the body of the unborn child to cut or tear off a portion of the body of the unborn
child.

(ii) "Dismemberment abortion" includes an abortion in which suction is used to
extract the body of the unborn child subsequent to the dismemberment of the
unborn child as described under subdivision (3)(A)(i) of this section.

(B) "Dismemberment abortion" does not include an abortion that uses suction to
dismember the body parts of the unborn child into the collection container[.]

H.B. 1032, § 20-16-1802(3).

20.     The only exception is for instances in which a banned procedure is "necessary to prevent a serious health risk to the pregnant woman." *Id.* § 20-16-1803(a).  The law states:

>       (6)(A)  "Serious health risk to the pregnant woman" means a condition that, in a reasonable medical judgment, complicates the medical condition of a pregnant woman to such an extent that the abortion of a pregnancy is necessary to avert either the death of the pregnant woman or the serious risk of substantial and irreversible physical impairment of a major bodily function of a pregnant woman.
>
>       (B) "Serious health risk to the pregnant woman" does not include:
>       (i) A psychological or emotional condition; or
>       (ii) A medical diagnosis that is based on a claim of the pregnant woman or on a presumption that the pregnant woman will engage in conduct that could result in her death or that could cause substantial and irreversible physical impairment of a major bodily function of the pregnant woman[.]

*Id.* § 20-16-1802(6).

21.     Violation of the ban is a Class D felony, subjecting a physician to punishment of up to six years' imprisonment, a fine of up to $10,000, or both.  *Id.* § 20-16-1805; Ark. Code §§ 5-4-201, 5-4-401.

22.     H.B. 1032 creates a cause of action for injunctive relief against a person who purposely violates the ban.  Such a cause of action may be maintained by a patient who obtains banned medical care; her spouse; her parents or legal guardian, irrespective of the patient's age; or her current or former licensed health care provider.  H.B. 1032, §§ 20-16-1804(a)(1)-(2).

23.     In addition, H.B. 1032 creates a cause of action for damages for psychological and physical injuries and statutory damages in the amount of three times the cost of the procedure against a person who violates the ban.  *Id.* § 20-16-1804(b)(3).  Such a cause of action can be maintained by the patient, her husband, or her parents if she is a minor or deceased.  *Id.* § 20-16-1804(b)(1).

24.     Under H.B. 1032, a plaintiff who obtains a favorable judgment in an action for injunctive relief or damages is entitled to an award of attorneys' fees against the defendant. *Id.* § 20-16-1804(c)(1).  A physician who successfully defends against a claim may obtain attorneys' fees only if "the court finds that the plaintiff's suit was frivolous and brought in bad faith." *Id.* § 20-16-1804(c)(2).

- **The Medical Records Mandate**

25.     H.B. 1434 mandates that "an abortion shall not be performed until" the physician "[r]equest[s] the medical records of the pregnant woman relating directly to [her] entire pregnancy history," and then spends "reasonable time and effort . . . to obtain" such records. Ark. Code § 20-16-1904(b)(2).

26.     The statute fails to define what constitutes "reasonable time and effort"; fails to define or in any way limit the scope of "medical records relating directly to the entire pregnancy history" of the patient; and fails to specify what actions, if any, the physician is to take upon receiving any records.

27.     H.B. 1434 also lacks any provision allowing the physician to proceed based on health risks to the woman, no matter how serious.

28.     A physician who "knowingly performs or attempts to perform an abortion" prohibited by the Medical Records Mandate is guilty of a Class A misdemeanor, which is punishable by up to one year in jail, a fine, or both. *Id.* §§ 20-16-1905, 5-4-201, 5-4-401.

29.     A physician who performs an abortion prohibited by the Medical Records Mandate "engage[s] in unprofessional conduct for which his or her license to provide healthcare . . . shall be suspended or revoked . . . ." § 20-16-1906(c).

30.    H.B. 1434 also provides for damages, *id.* § 20-16-1906(a)(1), and creates a cause of action for injunctive relief against a physician who knowingly violates the Medical Records Mandate.  An injunction action may be brought by the spouse, parent, guardian, or current or former licensed health care provider of the woman who receives or attempts to receive an abortion, or by the Attorney General.  *Id.* § 20-16-1906(d).

31.    H.B. 1434 separately provides that a physician "shall not intentionally perform or attempt to perform an abortion with the knowledge that the pregnant woman is seeking the abortion solely on the basis of" sex and requires the physician to ask a pregnant woman if she knows the sex of the embryo or fetus.  *Id.* § 20-16-1904(a) & (b)(1).  Plaintiffs do not challenge those provisions of H.B. 1434.

o   **The Local Disclosure Mandate**

32.    Under current Arkansas Code Section 12-18-108, physicians performing abortions for patients ages thirteen or younger must take certain steps to preserve embryonic or fetal tissue from the abortion and to notify local police departments where the minor resides. H.B. 2024 expands these requirements from all abortion patients "less than fourteen (14) years of age" to all abortion patients "less than seventeen (17) years of age."

33.    Specifically, compliance requires (a) informing the young woman's local police department of her abortion and specified identifying information, and (b) preserving tissue from the abortion as "evidence" for transmission to that police department and eventually the State Crime Laboratory.  A copy of the Rules that Section 12-18-108 directs the State Crime Laboratory to adopt are attached hereto as Exhibit A.

34.    Under Section 12-18-108, the physician "shall preserve" the embryonic or "fetal tissue extracted during the abortion in accordance with" the Rules.  Those Rules require the

physician to preserve and immediately freeze "all products of conception" in a container "labeled with the patient's name and date of birth, date of the collection and the name of the individual collecting the products of conception."

35.     The Rules also require, *inter alia*, that the physician "properly establish and maintain the chain of custody," using a "uniform reporting instrument[.]" Rules 3 & 5.  This "Fetal Tissue Submission Form," attached hereto as Exhibit B, includes the "name and complete address of residence of the parent or legal guardian of the child," Ark. Code § 12-18-108(b)(5), and the name of the "victim" and the "suspect."  The Rules state that "proper disposal" of the tissue takes place only "[u]pon completion of DNA analysis" and "receipt of a 'letter of destruction' from the respective investigating agency."  Rule 4.  The Rules do not specify what is to happen to tissue not subject to "completion of DNA analysis" nor part of any investigation.

36.     Under Section 12-18-108(a)(2), "[b]efore submitting the tissue . . . , the physician shall redact protected health information as required under the [federal] Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191," ("HIPAA") but that reference to redaction does not translate into privacy.  Section 12-18-108 and its implementing Rules specifically require that the patient's personal information accompany the "evidence" collected, and HIPAA allows disclosures to law enforcement pursuant to state law.

37.     Section 12-18-108(a)(3) requires that "the physician or the reporting medical facility shall contact the law enforcement agency in the jurisdiction" where the abortion patient resides.  Under that section and the Rules, the local police agency in the patient's community is to take possession of the tissue and eventually convey it to the Arkansas State Crime Laboratory.

38.     A physician's failure to comply with Section 12-18-108 or any of the Rules "constitute[s] unprofessional conduct under the Arkansas Medical Practices Act[.]" Ark. Code §

12-18-108(c).  Such conduct subjects physicians to discipline by the Arkansas Medical Board, including license revocation and other serious penalties.

39.     H.B. 2024 amends Section 12-18-108, which was itself a 2013 amendment to the Child Maltreatment Act.  The Child Maltreatment Act establishes a system for reporting known or suspected abuse to the state, including through a Hotline staffed 24 hours a day by a specialized unit of the state Department of Human Services.  *See* Ark. Code § 12-18-103(5).

40.     The Child Maltreatment Act specifies certain groups as "mandated reporters," including physicians and other medical personnel.  Mandated reporters must "immediately notify the Child Abuse Hotline" if they have "reasonable cause to suspect that a child has … [b]een subjected to child maltreatment."  Ark. Code § 12-18-402.

41.     The Child Maltreatment Act defines "sexual abuse" and "sexual exploitation" as categories of "child maltreatment."  Ark. Code § 12-18-103(7).  These categories would trigger a report of abuse if a mandated reporter had any "reasonable cause to suspect" that a minor had been the victim of sexual maltreatment or analogous sexual crimes under the Arkansas criminal code.  H.B. 2024 requires tissue preservation and disclosure to local law enforcement for all 14- to 16-year-old patients, including the vast majority for whom there is no indication of child maltreatment and no reporting triggered.

  o   **The Tissue Disposal Mandate**

42.     Consistent with current law, embryonic and fetal tissue from abortion and miscarriage care is handled in a number of ways.  Tissue from a medication abortion, which is passed at home rather than at a medical facility, can be disposed of without being regulated, and is not included in the Arkansas Code definitions of medical or pathological waste.  Human tissue, including fetal tissue, may be disposed of by health care providers in a "respectful and

11

proper manner," including by releasing the tissue to the patient, burial, cremation, or incineration. Ark. Code §§ 20-17-801(a)(1)(A), (b)(2)(C), (b)(2)(D). Tissue from an abortion must be disposed of "in a fashion similar to that in which other tissue is disposed" of. *Id.* § 20-17-802(a); *see also* Ark. Admin. Code 007.05.7 (Table 1) (health care facilities must dispose of "[t]issues, fetuses, organs" by incineration or "[i]nterment in accordance with mortuary regulations and may involve cremation service").

43.     Any person violating Ark. Code § 20-17-802 is guilty of a Class A misdemeanor. Under current law, a physician performing an abortion appears to be exempt from compliance with section 802; a facility at which an abortion is performed is not exempt. Ark. Code §§ 20-17-802(e), (f).

44.     In addition, under current law, for both abortion and miscarriage, a "dead fetus shall not be disposed of within forty-eight (48) hours of its removal or acquisition unless consent is obtained in writing from the mother of the dead fetus or the mother's spouse." Ark. Code § 20-17-801(a)(1)(B). For purposes of this section, "dead fetus" means "a product of human conception exclusive of its placenta or connective tissue, which has suffered death prior to its complete expulsion or extraction from the mother . . . ." Ark. Code § 20-17-801(b)(2)(A).

45.     In sum, under current law, Plaintiffs may dispose of embryonic or fetal tissue following a surgical abortion or miscarriage completion through incineration, in addition to other means, and women opting for medication abortion or who complete a miscarriage through medication may dispose of the tissue at home.

46.     H.B. 1566 changes current law to require that all embryonic or fetal tissue—whether from an abortion or miscarriage—be disposed of in accordance with the Arkansas Final Disposition Rights Act of 2009 ("FDRA"), Ark. Code § 20-17-102. H.B. 1566 § 2 (removing

"fetal tissue" from the definition of "human tissue"), § 1 (requiring that a "dead fetus" be disposed of in accordance with the FDRA), and § 3 (requiring that a "physician or facility that performs an abortion shall ensure that fetal remains and all parts are disposed" of in accordance with the FDRA and Ark. Code § 20-17-801, which itself refers back to the FDRA).

47.    Under H.B. 1566, physicians who perform abortions face criminal penalties for failure to ensure that tissue is disposed of in accordance with the FDRA.

48.    The FDRA primarily governs which family members have "[t]he right to control the disposition of the remains of a deceased person, the location, manner, and conditions of disposition." Ark. Code § 20-17-102(d)(1).

49.    Under the FDRA, if a decedent has not appointed anyone to control the final disposition of his or her remains, that right vests in individuals in the order prescribed by the statute: the decedent's surviving spouse; surviving child or children; parent or parents; and so on, including other family members, or, ultimately, a state government actor who has the statutory obligation to provide for the disposition of a decedent's remains. *See id*. §§ 20-17-102(d)(1)(A)-(L).

50.    A person with disposition rights may "dispose of human remains in any manner that is consistent with existing laws, rules, and practices for disposing of human remains," including cremation. Ark. Code § 20-17-102(i).

51.    "The right to control the disposition of the remains of a deceased person, the location, manner, and conditions of disposition," vests only to persons who are 18 years old or older. *Id.* § 20-102(d)(1).

52.    When the disposition right vests in the decedent's parents and one of the parents is "absent," the right vests in the remaining parent only after "reasonable efforts have been

13

unsuccessful in locating the absent surviving parent." *Id.* § 20-102(d)(1)(E)(ii). The FDRA

defines neither "absent" nor "reasonable efforts."

53.     When there is more than one person within the class entitled to the disposition

right, members of that class must use "reasonable efforts" to notify the others prior to

disposition. *See id.* § 20-17-102(d)(3)(A).

54.     If there is a dispute among people who share equal disposition rights, the circuit

court decides to whom to award the disposition right. *See id.* § 20-17-102(e)(2). In addition, a

person may exercise disposition rights only if he or she is willing to assume liability for the costs

associated with disposal. *See id.* § 20-17-102(e)(1)(C).

55.     The FDRA defines "final disposition" as "the burial, interment, cremation,

removal from Arkansas, or other authorized disposition of a dead body or fetus." Ark. Code Ann.

§ 20-17-102(a)(2)(C).

56.     It is not clear what "other authorized disposition" includes.

## FACTUAL ALLEGATIONS

### Background

57.      Legal abortion is extremely safe, and safer for a woman than carrying to term and

giving birth.

58.     Nonetheless, the earlier in pregnancy a woman is able to access abortion care, the

safer it is for her: first, remaining pregnant itself entails risks; second, the risks associated with

abortion increase as pregnancy advances.

59.     In Arkansas, as in the nation as a whole, the vast majority of women who seek

abortion care do so in the first trimester of pregnancy. Likewise, the great majority of second-

trimester abortions occur in the early weeks of the second trimester.

60.     For young women under age 18, Arkansas requires the consent of one parent before she obtains an abortion.  Alternatively, a minor may seek judicial authorization for an abortion.  In Arkansas, almost all abortion patients under 18 years old obtain a parent's consent for their abortion; a small fraction obtain a judicial bypass allowing them to end their pregnancies without parental consent.

61.     Women face many obstacles in accessing abortion care in Arkansas.  There are only two outpatient providers: one that provides only medication abortion in part of the first trimester in Little Rock and Fayetteville (although there are no abortions currently being provided at this location), and another, LRFP, that provides early medication abortion as well as surgical abortions through 21 weeks and 6 days as measured from the first day of the woman's last menstrual period ("21.6 weeks LMP").

62.     Many abortion patients are very low income and struggle to make arrangements for, and absorb the cost of, missed work; childcare if they have children, which most do; transportation to and from the clinic; and any needed hotel rooms.  These burdens are increased by Arkansas's mandate that a woman make an additional trip to a physician—to receive state-mandated counseling in person—and then delay at least 72 hours before making another trip to obtain her abortion.  These burdens can create delay.

63.     Confidentiality is a primary concern for women seeking abortion care.

A.  **The Impact of H.B. 1032 (the D&E Ban)**

64.     H.B. 1032 bans dilation and evacuation abortion, or D&E, the safest and most common abortion method used during the second trimester.

65.     D&Es account for more than 95% of all second-trimester abortions nationally and 100% of second-trimester abortions reported in Arkansas in 2019.

66.     Virtually all abortions performed in Arkansas at or after approximately ten weeks after the patient's last menstrual period (10 weeks LMP) are performed at LRFP.

67.     In the first trimester of pregnancy, abortions are performed using medical or instrumental means.  Medication abortions, which are available up to 10.0 weeks LMP, involve the ingestion of two medications to induce an early miscarriage.  Instrumental abortions in the first trimester are performed using a suction device to aspirate (or empty) the uterus.  During the period in which both methods are available, a woman may have many, varied reasons for preferring one method or the other; for some women, one method or the other may be medically indicated.

68.     Starting at approximately 14.0 weeks LMP, Plaintiffs use a combination of suction and forceps or other instruments to remove the fetus and other products of conception from the uterus, followed by additional suction to ensure the uterus is completely empty.  Because the cervical opening is smaller than the fetus, separation or disarticulation of fetal tissue usually occurs as the physician brings the tissue through the cervix.  The use of instruments, alone or in conjunction with suction, to empty the uterus in this manner is known as D&E.

69.     D&E is safely performed as an outpatient procedure throughout the second trimester of pregnancy.  The evacuation phase takes approximately ten minutes.

70.     Other than D&E, the only other medically-proven abortion method available during the second trimester is induction abortion, where a physician uses medication to induce labor and delivery of a non-viable fetus.  Induction of labor accounts for only about 5% of second-trimester procedures nationally.  Induction abortions must be performed in a hospital or similar facility that has the capacity to monitor a patient overnight.  Induction abortions can last anywhere from five hours to three days; are extremely expensive; entail more pain, discomfort,

and recovery time for the patient—similar to that of a woman giving birth—than D&E; and are medically contraindicated for some patients.

71.    Arkansas hospitals perform abortions only in extremely rare circumstances, and such services are not available to most women. According to Arkansas Department of Health statistics, no induction abortions were performed in the state in 2019.

72.    H.B. 1032 does not ban D&Es in which the physician—through a separate procedure—attempts to cause and succeeds in causing fetal demise prior to starting the evacuation phase of the D&E. But that does not narrow the ban's scope. Because a physician cannot know if an additional fetal demise procedure will be successful, H.B. 1032 bars a physician from starting any D&E.

73.    Before 18 weeks LMP, there is no safe, studied procedure for Plaintiffs even to attempt to cause fetal demise in a D&E abortion. Any attempt to do so would impose risks with no medical benefit to the patient. Such attempts are virtually untested; have unknown risks and uncertain efficacy; and would be outside the standard of care.

74.    Starting at 18 to 22 weeks LMP, some physicians use transabdominal or transvaginal injections of a drug called digoxin to attempt to cause fetal demise.

75.    Because digoxin takes at least 24 hours to work, even if such injections were feasible and acceptable medical practice prior to 18 weeks LMP—which they are not—its use in the early second trimester would turn one-day procedures into two-day procedures, which would be a tremendous burden on patients. Because of Arkansas's mandated extra visit, women whose abortions are two-day procedures must make 3 trips to the clinic. Prolonging the procedure would compound the burdens patients already face and introduce unnecessary risk.

76.     The minority of clinicians who use digoxin to attempt to induce fetal demise generally do so in order to comply with federal and state "partial-birth abortion" bans.  That includes Plaintiff Hopkins and the other physicians at LRFP.

77.     Published data show that use of digoxin provides no clear medical benefit to the patient.  According to the American Congress of Obstetricians and Gynecologists: "No evidence currently supports the use of induced fetal demise to increase the safety of second-trimester medical or surgical abortion."  Am. Coll. Obstetricians and Gynecologists, Second Trimester Practice Bulletin (No. 135, June 2013).

78.     Digoxin injections are not possible for every patient.  Anatomical characteristics, such as fibroids or an elongated cervix, may contraindicate such injections.  Other patients have medical contraindications to digoxin, such as heart arrhythmia.

79.     Digoxin sometimes fails to cause fetal demise.  Using a second injection of digoxin in those cases is completely unstudied.

80.     There are no other reliable, safe, and available methods of attempting to cause fetal demise in the outpatient setting.  An injection of KCl (potassium chloride) directly into the fetal heart does effectively cause demise, but requires years of specialized training and hospital-grade equipment.  This level of training and equipment are necessary because inadvertent injection of KCl into a patient's blood stream can put her into cardiac arrest.  Umbilical cord transection, where a clinician attempts to grasp and divide the umbilical cord to cause demise, exposes the patient to increased risk of uterine perforation, cervical injury, and bleeding, and would prolong a D&E, also increasing risk.  Additionally, because in many cases it is difficult, if not impossible, to grasp the cord without also grasping fetal tissue, attempts at cord transection would violate, rather than circumvent, the D&E Ban.

81.     Before starting a D&E, even at and after 18 weeks LMP, it is impossible to know whether an attempt to cause fetal demise will be possible or successful.  Thus, Plaintiffs cannot start any D&E, even at and after 18 weeks, without exposing themselves to criminal liability and exposing their patients to increased risks.

82.     Therefore, H.B. 1032 imposes a criminal ban, and significant penalties, on second-trimester abortion practice.

**B.   The Impact of H.B. 1434 (the Medical Records Mandate)**

83.     Under H.B. 1434, a physician cannot perform an abortion unless and until "reasonable time and effort is spent" pursuing requests for all the "medical records of the pregnant woman relating directly to [her] entire pregnancy history."  The law does not specify any actions the physician must undertake if and when the records arrive.

84.     There is no medical reason to obtain these records prior to providing an abortion. Obtaining prior medical records is medically indicated for only a tiny fraction of abortion patients.  Even in those cases, only a specific sub-set of records is relevant, and even then, unless the records are transmitted very quickly, any medical benefit of waiting for the records is outweighed by the fact that delaying abortion care increases the risks associated with the procedure for the patient.

85.     Obtaining medical records is a detailed, time-intensive process, particularly for a woman's "entire" pregnancy-related history, and thus a "reasonable time and effort" to do so may be quite substantial.  H.B. 1434 does not clarify its standard or limit its scope in any way.

86.     Federal law, for example, allows health care providers in the U.S. 30 days for their initial response to records requests, and the actual medical records may follow later.  If the

provider who receives the request does not comply within that timeline, an appeals process involves further review by government officials and/or litigation.

87. Some patients in Arkansas also have received pregnancy-related care outside Arkansas or abroad, and obtaining foreign medical records can take even longer and require translation.

88. In addition to its costs in time, the Medical Records Mandate imposes staff, copying, and other processing costs on the physician and/or patient. To release records, for example, Arkansas medical providers can charge per-page copying fees and separate fees for retrieval of records from storage. The patient seeking an abortion must herself gather information, such as the dates of prior providers' services, and often complete several different signed requests; each medical provider can require its own specialized form for records release. LRFP must attempt to manage all of this paperwork for thousands of patients annually, with no medical purpose and no direction as to these records' role, adding to the costs of abortion and taking resources away from patient health care.

89. The Medical Records Mandate significantly delays or outright bars abortion care for all patients who have had a prior pregnancy or have received medical care from another provider related to their current pregnancy. That is the great majority of patients in Arkansas.

90. The Medical Records Mandate bars or significantly delays care because its unclear and onerous requirements do not tell a physician when he or she can proceed, and violations carry serious criminal, civil, and professional penalties. Thus, the physician is forced either to wait to obtain all the records, or not to provide an abortion. The only abortions that H.B. 1434 would not bar or significantly delay are those for a patient without any prior

pregnancy or pregnancy-related care, or who received past care solely from the physician or clinic from whom she seeks abortion care.

91.     Moreover, when an abortion clinic or physician requests medical records, the process discloses the fact of the patient's pregnancy and abortion decision to her other health care providers.  Thus, H.B. 1434 mandates the involuntary disclosure of the patient's pregnancy and abortion decision to all others from whom she has ever received any pregnancy-related care.

92.     The Medical Records Mandate by its plain terms applies to all abortions. However, even were it read to apply only to patients who know the sex of the embryo or fetus, it would have the same constitutional infirmities and require the same remedies Plaintiffs seek here.

C.  **The Impact of H.B. 2024 (the Local Disclosure Mandate)**

93.     All of Plaintiff LRFP's clinicians and staff take extremely seriously their obligation to report known or suspected abuse to the state Child Abuse Hotline.  This suit does not challenge that obligation and does not challenge H.B. 2024 as applied to patients for whom such reporting to the state Hotline is required.

94.     This suit challenges H.B. 2024, and the requirements of Section 12-10-108 that it imposes, only as applied to those patients whom Plaintiffs do not report to the state Hotline under the Child Maltreatment Act because there is no indication that they are the victims of any illegal sexual activity or abuse (the "Non-CMA Teenage Patients").

95.     A 14-, 15- or 16-year-old patient's prior sexual intercourse does not indicate that she is a victim of Child Maltreatment, for example, if it occurred with her husband (16-year-olds may marry with parental consent) or with a similar age partner and not a caretaker, absent any indication of "forcible compulsion" or prostitution.

96.    The vast majority of 14- to 16-year-old patients at LRFP fall into that category of no required reporting:  They are typically young women who have engaged in consensual intercourse with a boyfriend who is close in age; Arkansas criminalizes neither the young woman's conduct nor her partner's.  The products of conception removed in these patients' abortion procedures have no purpose as "evidence" of abuse or criminality.  H.B. 2024 nonetheless mandates disclosure of the patient's private information, imposes tissue preservation requirements on physicians without justification, and provides that the local police must take custody of the tissue from the patient's procedure to be held in the State Crime Laboratory.

97.    Clinician-patient confidentiality is a bedrock principle of medical care, including in reproductive care for minors.  The Non-CMA Teenage Patients expect their medical care at LRFP to be confidential.  Their sexual activity, abortion, and tissue from that care are intimate matters that they would not voluntarily share with the local police or the crime laboratory.

98.    The Local Disclosure Mandate and its Rules interfere with the Non-CMA Teenage Patients' access to abortion by invading their privacy and breaching their confidentiality.  The Local Disclosure Mandate will delay some patients' abortion care and dissuade other patients from obtaining the abortions they seek.

99.    In addition, H.B. 2024 can be read to bar the use of medication abortion for these patients.  That is because in medication abortion, the patient passes the products of conception outside the medical facility, across a multi-day period, making it impossible for the physician to collect and preserve those products, as Section 12-18-108 and its implementing Rules appear to require.

100.   Although Section 12-18-108's single reference to "fetal tissue extracted" seems to exclude medication abortion, the definition of abortion in both the Child Maltreatment Act and

the Rules implementing 12-18-108 explicitly includes abortions accomplished with a "medicine, drug, or any other substance," and under the Rules, simply "[a]ll products of conception should be preserved." As this language appears to encompass all methods, in order to protect themselves from a finding of "unprofessional conduct," and licensing penalties, Plaintiffs will be forced to stop performing medication abortions for the group of patients it covers if the statute takes effect and there is no limiting of its scope from the courts.

101.    Losing access to medication abortion would deprive certain patients of the best abortion method for them, and would require women to have a clinical procedure when they otherwise could have ended their pregnancy by taking medication.

**D.  The Impact of H.B. 1566 (the Tissue Disposal Mandate)**

102.    H.B. 1566 imposes unclear and burdensome requirements that threaten Plaintiffs' ability to continue providing abortion and miscarriage care.

103.    Plaintiffs' patients who have medication abortions or complete miscarriage through medication dispose of tissue outside the medical facility, usually at home. For almost all surgical abortions, a contractor collects medical waste and embryonic or fetal tissue generated at the clinic and disposes of it out of state through incineration, with each patient's permission, as discussed below. A few patients each year choose to have the tissue cremated, and those patients make arrangements with the cremation facility. Also, for a few patients each year, tissue is sent to pathology labs at patients' request to test for specific medical conditions or to determine the cause of anomalies and the likelihood of recurrence in future pregnancies. In addition, following some abortions after a crime has been reported, tissue is preserved at the patient's request and/or pursuant to legal process and turned over to law enforcement.

104.     To comply with the provision in current law prohibiting disposal of a dead fetus within 48 hours without permission from the "mother of the dead fetus," each of Plaintiffs' patients who receives a suction or D&E abortion consents in writing to disposal within 48 hours unless they fall into one of the few exceptions just described.

105.     As a practical matter, Plaintiffs cannot provide care without knowing that tissue can be disposed of lawfully. Accordingly, Plaintiffs must ensure they can meet the requirements of H.B. 1566—and thus the requirements of the FDRA—before beginning abortion or miscarriage care.

106.     Under the FDRA, Plaintiffs must notify and seek the consent of at least one third party prior to every patient's abortion and miscarriage care.

107.     The FDRA gives both parents of a decedent equal rights in determining the disposition of remains. Importing this requirement to the context of abortion or miscarriage means the woman and her sexual partner, the "father," have an equal disposition right as the "parents" of the tissue. Accordingly, H.B. 1566 requires Plaintiffs to notify the patient's sexual partner, and seek his consent to disposition and thus, to the abortion itself, prior to providing care.

108.     Further, only after unspecified "reasonable efforts" have been made to locate an "absent" parent may the disposition right vest solely in the woman as the "remaining parent" of the tissue. Plaintiffs' attempts to make "reasonable efforts" will delay many women's access to abortion.

109.     Under the FDRA, a person has the right to dispose of a decedent's remains only if he or she is at least 18 years old. Ark. Code § 20-17-102(d)(1). Accordingly, a patient under 18 years seeking abortion or miscarriage care has no rights under the FDRA.

110. For example, where a patient is 17 and her partner is 18, under the FDRA, he would have the disposition right and she would not.

111. Where both a patient and her sexual partner are under 18, the disposition right passes to their parent or parents as the "grandparents" of the embryonic or fetal tissue. *See id.* § 20-17-102(d)(1)(G). H.B. 1566 thus mandates the involvement of a minor's parent(s) in her abortion, regardless of whether she has obtained a judicial bypass allowing her to proceed without a parent's consent. In doing so, H.B. 1566 circumvents Arkansas's parental involvement law, which requires a parent's consent to a minor's abortion unless she obtains a judicial bypass.

112. Further, her parent(s) *and* his parent(s) as the "grandparents" of the tissue would have the disposition right. To comply with the FDRA, Plaintiffs would have to notify all "grandparents" of their disposition right, and thus of the minor's abortion or miscarriage.

113. By requiring notice and consent of third parties, H.B. 1566 interferes with a woman's access to abortion and her ability to make independent decisions about medical care, including pregnancy care.

114. Notification of a woman's partner, parent(s), and/or the parents of a minor's sexual partner also threatens the well-being and safety of women who need to keep the fact of their abortion confidential from others, including an abusive partner, spouse, or parent.

115. Indeed, the prospect of notification will dissuade some women from obtaining abortions. Attempting to obtain the required notice and consents would also delay or ultimately deny some women access to abortion.

116. In addition, women and their families hold a diversity of views about pregnancy and the embryo or fetus. H.B. 1566, however, enshrines into law a narrow set of beliefs

regarding embryonic and fetal tissue, including that a woman is the "parent" of such tissue, regardless of whether she holds that view.

117.    Further, attempting to comply with all the FDRA's requirements will block access to abortion.  For example, ascertaining and documenting the fact that a person is entitled to the disposition right under the FDRA, but forfeits that right because he or she is unwilling to assume financial responsibility for the disposition, may be difficult or impossible for Plaintiffs. Likewise, those with disposition rights can request disposition "in any manner that is consistent with existing laws, rules, and practices of disposing human remains," leaving Plaintiffs uncertain as to what methods of disposition might be selected and whether those means are acceptable. *Id.* § 20-17-102(i).

118.    Plaintiffs cannot establish systems that ensure all of the requirements of the FDRA could be met before providing care.  Because H.B. 1566 creates the risk of criminal penalties, Plaintiffs would be forced to stop providing abortion and miscarriage care.

119.    When H.B. 1566 passed, its application to medication abortion was unclear. H.B. 1566 could be read to effectively ban medication abortion, because it is impossible for Plaintiffs to "ensure" that products of conception passed outside the medical facility are disposed of in accordance with the FDRA.

120.    On July 20, 2017, the Department of Health issued an emergency rule acknowledging that, under H.B. 1566, it "is unclear if abortion facilities would be responsible for the disposition of dead fetuses and fetal tissue when the evacuation occurs outside the presence of the inducing physician or away from the facility in which the physician administered the inducing medications." Defs.' Not. of Suppl. Auth. Ex. A, 35, July 20, 2017, ECF No. 31-1. The rule instructs providers that the FDRA "shall not apply to abortions induced by the

administration of medications," provided the evacuation of tissue occurs outside the facility. Code Ark. R. 007.05.2-6(O).

121.     The basis on which the Department determined that H.B. 1566 does not apply to tissue from a medication abortion is unclear. It is also not clear how distinguishing between tissue from a medication abortion and from an abortion procedure serves the state's interests.

122.     H.B. 1566's mandate that physicians and clinics "ensure" that embryonic and fetal tissue is disposed of in accordance with the FDRA applies even if tissue is sent to a pathology lab.   H.B. 1566 thus threatens Plaintiffs with criminal liability based on the actions of third parties who receive tissue for reasons other than disposition, because they cannot control how pathology labs dispose of tissue after testing.  Sending tissue to pathology is critical for certain women's health.

123.     H.B. 1566 requires that tissue from an abortion or miscarriage be disposed of in accordance with the FDRA, but does not require the same of any other human tissue.  Tissue from other medical procedures is still defined as "human tissue" under Arkansas Code Section 20-17-801; accordingly, a physician has the discretion to dispose of this tissue in a "respectful and proper manner," including by releasing the tissue to the patient, incineration, burial, or cremation.

124.     H.B. 1566 thus treats embryonic or fetal tissue from an abortion or miscarriage differently from other types of tissue, mandating that it be disposed of as if it were a deceased family member.

125.     H.B. 1566 also imposes criminal penalties only on the failure to dispose of embryonic and fetal tissue from an abortion in accordance with the FDRA.

**IRREPARABLE HARM**

126.    Enforcement of each of the four challenged laws threatens to block altogether a woman's constitutionally protected right to access abortion care.  Each would impose delay, which endangers a woman's health and can itself make abortion care impossible for her to obtain.  Each except the D&E Ban requires disclosure of her private circumstances and medical decisions to others, which can endanger a woman, delay her, and even prevent her from accessing care at all.

127.    Enforcement of H.B. 1032's D&E Ban would effectively ban abortions in Arkansas beginning at 14 weeks LMP for women, including Plaintiffs' patients.

128.    Enforcement of H.B. 1434's Medical Records Mandate would subject Plaintiffs to a criminal law so vague that they have no notice of how to comply.  Women, including Plaintiffs' patients, would be indefinitely delayed and/or outright blocked in obtaining abortion care, and/or would have their private medical decisions disclosed to other health care providers against their will.

129.    Enforcement of H.B. 2024's Local Disclosure Mandate as applied to 14- to 16-year-olds for whom no reporting is appropriate under the Child Maltreatment Act would disclose the private medical decisions of those young women, including Plaintiffs' patients, to local law enforcement where they reside. This law also seems to preclude medication abortion, which would force some patients to undergo surgical abortions they would otherwise not undergo.

130.    Enforcement of H.B. 1566's Tissue Disposal Mandate would force women, including Plaintiffs' patients, to have their abortion or miscarriage disclosed to third parties or forgo such care and/or be delayed or blocked in obtaining care.  This law also could be read to preclude medication abortion, which would force certain patients to undergo clinical procedures

they would prefer to avoid.  Further, under threat of criminal penalties for non-compliance with H.B. 1566's vague mandates, Plaintiffs would be forced to stop providing care.

131.    Enforcement of each of these laws would subject Plaintiffs and their patients to irreparable harm, including deprivation of Plaintiffs' patients' constitutional rights and the imposition of medical harm on Plaintiffs' patients.

132.    Plaintiffs and their patients have no adequate remedy at law.

## CLAIMS FOR RELIEF

### COUNT I

### (D&E Ban – Due Process – Undue Burden on Plaintiffs' Patients' Right to Liberty and Privacy)

133.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 132.

134.    By banning the safest and most common method of second-trimester abortion— and thereby banning second-trimester outpatient abortion in Arkansas—the D&E Ban violates Plaintiffs' patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

### COUNT II

### (D&E Ban – Due Process – Plaintiffs' Patients Right to Bodily Integrity)

135.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 134.

136.    By forcing women to undergo additional or different procedures, or to continue a pregnancy involuntarily, the D&E Ban violates Plaintiffs' patients' right to bodily integrity guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT III

**(Medical Records – Due Process – Undue Burden on Plaintiffs' Patients' Right to Liberty and Privacy)**

137.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 136.

138.     By indefinitely delaying abortion care, requiring involuntary disclosure of a woman's abortion decision to other health care providers, and imposing insurmountable administrative obstacles for abortion providers, the Medical Records Mandate violates Plaintiffs' patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT IV

**(Medical Records – Due Process –Vagueness)**

139.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 138.

140.     By failing to give notice of how to comply with its terms, and imposing criminal and serious civil penalties, the Medical Records Mandate violates Plaintiffs' right to due process as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT V

**(Medical Records – Due Process – Plaintiffs' Patients' Right to Informational Privacy)**

141.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 140.

142.     By requiring involuntary disclosure of Plaintiffs' patients' private medical decisions to other health care providers, H.B. 1434's Medical Records Mandate violates

Plaintiffs' patients' right to privacy and liberty as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT VI

### (Local Disclosure Mandate – Due Process – Undue Burden on Plaintiffs' Patients' Right to Liberty and Privacy)

143. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 142.

144. By requiring a physician to collect and transmit to local law enforcement all products of conception, along with identifying information, and by thereby apparently removing medication abortion as a treatment option, for 14- to 16-year-old patients for whom no child maltreatment reporting is appropriate, H.B. 2024 and its Rules impose an undue burden on those patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT VII

### (Local Disclosure Mandate – Due Process – Plaintiffs' Patients' Right to Bodily Integrity)

145. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 144.

146. By requiring a physician to collect and transmit to local law enforcement all products of conception, and thereby apparently removing medication abortion as a treatment option, for 14- to 16-year-old patients for whom no sexual abuse reporting is appropriate, forcing those young women to undergo clinical procedures or continue a pregnancy involuntarily, H.B. 2024 and its Rules violate those patients' right to bodily integrity guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT VIII

### (Local Disclosure Mandate – Due Process – Plaintiffs' Patients' Right to Informational Privacy)

147.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 146.

148.     By mandating disclosure of private information to local police departments and preservation of tissue labeled with identifying information that is not evidence of any crime or child maltreatment, H.B. 2024 and its Rules, as applied to 14- to 16-year-old patients for whom no child maltreatment reporting is appropriate, violate those patients' rights to privacy and liberty as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT IX

### (Local Disclosure Mandate – Due Process – Vagueness)

149.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 148.

150.     By failing to give Plaintiffs fair notice of when tissue preservation and local disclosure are required under the statute, and in particular whether the statute applies to medication abortions, H.B. 2024 and its Rules violate Plaintiffs' right to due process as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT X

### (Tissue Disposal Mandate – Due Process – Undue Burden on Plaintiffs' Patients' Right to Liberty and Privacy)

151.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 150.

152. By mandating notice and consent of third parties to Plaintiffs' patients' abortion care, and delaying or threatening to block access to abortion, H.B. 1566 violates Plaintiffs' patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT XI

### (Tissue Disposal Mandate – Due Process – Vagueness)

153. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 152.

154. By failing to give Plaintiffs' fair notice of how to comply with the mandates of the FDRA in the context of abortion and miscarriage care, and failing to give fair notice of whether medication abortion comes within H.B. 1566's requirements and therefore is banned, H.B. 1566 violates Plaintiffs' right to due process as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT XII

### (Tissue Disposal Mandate – Due Process – Plaintiffs' Patients' Right to Bodily Integrity)

155. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 154.

156. To the extent that H.B. 1566 bans medication abortion, and thus forces women to undergo a clinical procedure or continue a pregnancy, H.B. 1566 violates Plaintiffs' patients' right to bodily integrity as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## INJUNCTIVE RELIEF

157.     The D&E Ban, the Medical Records Mandate, the Local Disclosure Mandate, and the Tissue Disposal Mandate would subject Plaintiffs and their patients to irreparable harm for which there exists no adequate remedy at law.

158.     Enforcement of these laws would cause irreparable harm by threatening Plaintiffs with substantial penalties for providing constitutionally protected abortion care.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs ask this Court:

A.  To issue a preliminary injunction and permanent injunction restraining Defendants and their successors in office from enforcing H.B. 1032, H.B. 1434, H.B. 1566 and H.B. 2024 (as applied to the Non-CMA Teenage Patients).

B.  To enter a judgment declaring that H.B. 1032, H.B. 1434, H.B. 1566, and H.B. 2024 (as applied to the Non-CMA Teenage Patients) violate the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

C.  To award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

D.  To grant such other and further relief as the Court deems just and proper.


Dated:  December 22, 2020                    Respectfully submitted,

Ruth Harlow*
Elizabeth Watson*
Brigitte Amiri*
Alexa Kolbi-Molinas*
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004-2400
Phone: (212) 549-2633
rharlow@aclu.org
ewatson@aclu.org
bamiri@aclu.org
akolbimolians@aclu.org

Jenny Ma*
Arielle Humphries*
Center for Reproductive Rights
199 Water Street, 22nd Fl.
New York, NY 10038
Phone: (917) 637-3705
jma@reprorights.org
ahumphries@reprorights.org

Bettina Brownstein (AR Bar No. 85019)
Bettina E. Brownstein Law Firm
904 West 2nd Street, Ste. 2
Little Rock, AR 72201
Cooperating Attorney, ACLU of Arkansas
Phone: (501) 920-1764
bettinabrownstein@gmail.com

Brooke-Augusta Ware (AR Bar No. 2004091)
Mann & Kemp, PLLC
221 West Second Street, Suite 408
Little Rock, Arkansas 72201
Phone: (501) 222-7330
brooke@mannkemp.com

Leah Godesky*
Christopher P. Burke*
David Cohen*
Sara N. Pahlavan*
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, New York 10036
Phone: (212) 326-2254
lgodesky@omm.com
cburke@omm.com
dcohen@omm.com
spahlavan@omm.com

Kendall Turner*
O'Melveny & Myers LLP
1625 Eye St. NW
Washington, DC 20006
Phone: (202) 383-5300
kendallturner@omm.com

*Attorneys for Proposed Plaintiffs*

*\* Motion for admission pro hac vice granted*