# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**FREDERICK W. HOPKINS, M.D., M.P.H.,**
**and LITTLE ROCK FAMILY PLANNING SERVICES, INC.**          **PLAINTIFFS**

**v.**                    **Case No. 4:17-cv-00404-KGB**

**LARRY JEGLEY, Prosecuting Attorney for**
**Pulaski County, SYLVIA D. SIMON, M.D.,**
**Chair of the Arkansas State Medical Board;**
**ROBERT BREVING, JR., M.D.; ELIZABETH ANDERSON;**
**RHYS L. BRANMAN, M.D.; EDWARD GARDNER, M.D.;**
**VERYL D. HODGES, D.O.; RODNEY GRIFFIN, M.D.;**
**BETTY GUHMAN; WILLIAM L. RUTLEDGE, M.D.;**
**JOHN H. SCRIBNER, M.D.; BRIAN T. HYATT, M.D.;**
**TIMOTHY C. PADEN, M.D.; DON R. PHILLIPS; M.D.;**
**DAVID STAGGS, M.D., officers and members of**
**the Arkansas State Medical Board; JOSE ROMERO, M.D.,**
**the Secretary of the Arkansas Department of Health;**
**PHILLIP GILMORE, Ph.D.; PERRY AMERINE, O.D.;**
**MARSHA BOSS, P.D.; LANE CRIDER, P.E.;**
**BRAD ERNEY, D.M.D.; MELISSA FAULKENBERRY, D.C.;**
**ANTOHNY N. HUI, M.D.; BALAN NAIR, M.D.;**
**GREG BLEDSOE, M.D.; STEPHANIE BARNES BEERMAN;**
**GLEN BRYANT, M.D.; DWAYNE DANIELS, M.D.;**
**VANESSA FALWELL, A.R.P.N.; DARREN FLAMIK, M.D.;**
**THOMAS JONES, R.S.; DAVID KIESSLING, D.P.M.;**
**CARL RIDDELL, M.D.; CLAY WALISKI; TERRY YAMAUCHI, M.D.;**
**DONALD RAGLAND; CATHERINE TAPP, M.P.H.;**
**SUSAN WEINSTEIN, D.V.M; JAMES ZINI, D.O.,**
**officers and members of the Arkansas Department of Health,**
**and their successors in office, in their official capacity**          **DEFENDANTS**

## PRELIMINARY INJUNCTION ORDER AFTER REMAND

Before the Court is plaintiffs Frederick W. Hopkins, M.D., M.P.H., and Little Rock Family

Planning Services, Inc.'s ("LRFP") motion for a second preliminary injunction and/or a temporary

restraining order (Dkt. No. 73). Defendants responded in opposition to the motion for a second

preliminary injunction (Dkt. No. 92). Plaintiffs replied (Dkt. No. 93). Also before the Court is

defendants' motion to strike plaintiffs' motion for a second preliminary injunction and request for

expedited consideration (Dkt. No. 75). Plaintiffs responded in opposition to the motion to strike (Dkt. No. 89). The Court conducted a hearing on the pending motions on January 4, 2021, at which counsel presented argument only to the Court (Dkt. No. 94).

## I. Procedural Background

Initially, Dr. Hopkins filed this suit on June 20, 2017, pursuant to 42 U.S.C. § 1983. On December 22, 2020, Dr. Hopkins amended his complaint and Little Rock Family Planning Services, Inc. ("LRFP"), joined Dr. Hopkins as a plaintiff in filing suit against defendants Larry Jegley, Prosecuting Attorney for Pulaski County; Sylvia D. Simon, M.D., Chair of the Arkansas State Medical Board; Robert Breving, Jr., M.D.; Elizabeth Anderson; Rhys L. Branman, M.D.; Edward Gardner, M.D.; Veryl D. Hodges, D.O.; Rodney Griffin, M.D.; Betty Guhman; William L. Rutledge, M.D.; John H. Scribner, M.D.; Brian T. Hyatt, M.D.; Timothy C. Paden, M.D.; Don R. Phillips, M.D.; David L. Staggs, M.D., as officers and members of the Arkansas State Medical Board; Jose Romero, M.D., the Secretary of the Arkansas Department of Health; Phillip Gilmore, Ph.D.; Perry Amerine, O.D.; Marsha Boss, P.D.; Lane Crider, P.E.; Brad Erney, D.M.D.; Melissa Faulkenberry, D.C.; Anthony N. Hui, M.D.; Balan Nair, M.D.; Greg Bledsoe, M.D.; Stephanie Barnes Beerman; Glen Bryant, M.D.; Dwayne Daniels, M.D.; Vanessa Falwell, A.R.P.N.; Darren Flamik, M.D.; Thomas Jones, R.S.; David Kiessling, D.P.M.; Carl Riddell, M.D.; Clay Waliski; Terry Yamauchi, M.D.; Donald Ragland; Catherine Tapp, M.P.H.;. Susan Weinstein, D.V.M; James Zini, D.O., officers and members of the Arkansas Department of Health, and their successors in office, in their official capacities (Dkt. No. 82).

In this suit, Dr. Hopkins and LRFP mount a constitutional challenge to four acts of the 91st Arkansas General Assembly of 2017, Act 45 (H.B. 1032), codified at Ark. Code Ann. §§ 20-16-1801 to 1807 ("D&E Mandate"); Act 733 (H.B. 1434), codified at Ark. Code Ann. §§ 20-16-1901

to 1910 ("Medical Records Mandate"); Act 1018 (H.B. 2024), codified at Ark. Code Ann. § 20-16-108(a)(1) ("Local Disclosure Mandate"); and Act 603 (H.B. 1566), codified at Ark. Code Ann. §§ 20-17-801 to 802 ("Tissue Disposal Mandate"). By its terms, H.B. 1434 was to take effect January 1, 2018. The remaining three laws, H.B. 1032, H.B. 2024, and H.B. 1566, were to take effect on or about July 30, 2017.

The Court previously enjoined enforcement of these statutes in a preliminary injunction entered on July 28, 2017 (Dkt. Nos. 35, 36). On August 25, 2017, a notice of appeal of this Court's preliminary injunction was filed (Dkt. No. 38). Neither party asked this Court or the United States Court of Appeals for the Eighth Circuit for a stay while the appeal was pending (Dkt. No. 91). After three years, and based on intervening decisions issued by the United States Supreme Court, the Eighth Circuit vacated this Court's preliminary injunction order and remanded "for reconsideration in light of Chief Justice Roberts's separate opinion in *June Medical*, which is controlling, as well as the Supreme Court's decision in *Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780 (2019) (per curiam)." (Dkt. No. 49, at 7).[1]

In his initial motion (Dkt. No. 2), Dr. Hopkins sought preliminary injunctive relief based on the following claims in his complaint: Count I based on the D&E Mandate, Counts III and IV based on the Medical Records Mandate, Counts VI and VIII based on the Local Disclosure Mandate, and Counts X and XI based on the Tissue Disposal Mandate. Dr. Hopkins claims that "[t]hese statutes threaten [him] with criminal penalties and deny and burden [his] patients' constitutionally protected rights to decide to end a pre-viability pregnancy, to make independent decisions related to their pregnancy care, and to protect their private medical information." (Dkt.

---

[1] *June Medical*" in the Eighth Circuit opinion is referring to *June Medical Services. v. Russo*, 140 S. Ct. 2013, 2020 WL 3492640 (2020)(plurality opinion).

No. 1, at 3, ¶ 9). He sought declaratory and injunctive relief "[t]o protect his patients from these constitutional violations, to enforce his own right to clear legal standards, and to avoid irreparable harm. . . ." (Dkt. No. 1, at 3, ¶ 9). Defendants responded in opposition to the motion (Dkt. No. 23). Dr. Hopkins filed a reply (Dkt. No. 32). Defendants also submitted two notices of supplemental authority (Dkt. Nos. 31, 34). The Court conducted a hearing on the motion for preliminary injunction on July 13, 2017. The parties agreed among themselves not to present additional evidence at the hearing but instead to present only argument, and the Court agreed to hear only argument. In an Order dated July 28, 2017, the Court granted Dr. Hopkins's motion for a preliminary injunction (Dkt. Nos. 35, 36)

Prior to the Eighth Circuit's mandate issuing, Dr. Hopkins and LRFP moved for a temporary restraining order based on the same findings and this Court's legal conclusions granting the 2017 preliminary injunction (Dkt. No. 69, at 3). Defendants responded in opposition (Dkt. No. 78). The Court conducted a hearing (Dkt. No. 91). The Court granted Dr. Hopkins and LRFP's motion for temporary restraining order and temporarily enjoined the enforcement of these four laws to preserve the *status quo* until the merits of Dr. Hopkins and LRFP's pending motions, and defendants' pending motion to strike, could be determined (Dkt. No. 83).

On December 18, 2020, Dr. Hopkins and LRFP filed a motion to amend complaint (Dkt. No. 65), which this Court granted (Dkt. No. 81). Dr. Hopkins and LRFP assert in their amended complaint legal challenges to the D&E Mandate, the Medical Records Mandate, the Local Disclosure Mandate, and the Tissue Disposal Mandate that are substantially similar to the challenges made by Dr. Hopkins in 2017. For the following reasons, after remand, the Court denies defendants' motion to strike and grants plaintiffs' motion for a second preliminary injunction order.

## II.     Mandate Rule

Defendants request that this Court strike plaintiffs' "proffered declarations and the entirety of the motion [for a second preliminary injunction] that relies on it" arguing they are "an improper attempt to circumvent the Eighth Circuit's limited remand by revamping the factual record." (Dkt. No. 75, at 1). Defendants cite the mandate rule in support of this argument. Plaintiffs oppose the motion to strike, asserting that the Eighth Circuit in ruling on an interlocutory appeal of a preliminary injunction altered the governing undue burden standard based on an intervening Supreme Court decision issued during the pendency of the interlocutory appeal but did not limit the scope of further proceedings in this Court (Dkt. No. 89, at 1). Plaintiffs point out that the Eighth Circuit's judgment is that "the cause is remanded to the district court for proceedings consistent with the opinion of this court." (*Id.*, at 2). Plaintiffs also argue that, "in light of the Eighth Circuit's changes to a central legal standard in this case, other intervening legal decisions, and the still-preliminary stage of the case, it would be fundamentally unfair and improper to limit Plaintiffs to the evidentiary submissions they made at the very start of the case in 2017." (*Id.*, at 1).

The mandate rule generally requires a district court to comply strictly with the mandate rendered by the reviewing court. *See In re Tri-State Financial, LLC*, 885 F.3d 528, 533 (8th Cir. 2018); *Grass v. Reitz,* 749 F.3d 738, 741-42 (8th Cir. 2014); *United States v. Bartsh,* 69 F.3d 864, 866 (8th Cir. 1995). Similarly, under the "mandate rule," while a district court is "bound to follow the mandate, and the mandate 'controls all matters within its scope, . . . a district court on remand is free to pass upon any issue which was not expressly or impliedly disposed of on appeal.'" *Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.*, 299 F. Supp. 2d 903, 914 (N.D. Iowa 2004) (citations omitted). The mandate rule provides that a district court is bound by any decree issued

by the appellate court and "is without power to do anything which is contrary to either the letter or spirit of the mandate construed in light of the opinion." *Pearson v. Norris*, 94 F.3d 406, 409 (8th Cir. 1996) (quoting *Thornton v. Carter*, 109 F.2d 316, 320 (8th Cir. 1940)).

Even when the mandate rule applies to an issue, courts have recognized exceptions that allow a matter to be revisited. Those exceptions are "(1) the availability of new evidence, (2) an intervening change of controlling law, or (3) the need to correct a clear error or prevent manifest injustice." *Federated Rural Elec. Ins. Corp. v. Arkansas Elec. Cooperatives, Inc.*, 896 F. Supp. 912, 914 (E.D. Ark. 1995) (citing *Bethea v. Levi Strauss,* 916 F.2d 453, 457 (8th Cir.1990); *In re Progressive Farmers Ass'n,* 829 F.2d 651, 655 (8th Cir. 1987) (on remand lower court required to follow appellate court decision unless new evidence introduced or decision is clearly erroneous and works manifest injustice)).

None of the cases cited by defendants in support of their argument involve remand after the interlocutory appeal of a preliminary injunction; most involve remand and application of the mandate rule after final judgments previously entered by the trial court. *See Briggs v. Pa. R. Co.*, 334 U.S. 304 (1948) (mandate after appeal of judgment after trial); *Children's Broadcasting Corp. v. Walt Disney Co.*, 357 F.3d 860, 870 (8th Cir. 2004) (mandate after appeal of judgment after trial); *In re Mid Am. Energy Co.*, 286 F.3d 483 (8th Cir. 2002) (mandate after appeal of summary judgment order); *Duncan Energy Co. v. U.S. Forest Serv.*, 109 F.3d 497 (8th Cir. 1997) (mandate after appeal of summary judgment order); *United States v. Bartsh*, 69 F.3d 864 (8th Cir. 1995) (mandate after appeal of judgment and commitment from guilty plea and sentencing); *United States v. Cornelius*, 968 F.2d 703 (8th Cir. 1992) (mandate after appeal of judgment and commitment from conviction at trial and sentencing); *Bethea v. Levi Strauss & Co.*, 916 F.2d 453 (8th Cir. 1990) (mandate after appeal of judgment after trial).

In regard to the imposition of an injunction that is in the first instance subject to the mandate rule, courts have determined that, under certain circumstances, the mandate rule does not bar courts from consideration of the status of the injunction, given the unique nature of injunctive relief and the equitable considerations that inform it. *See Americans United For Separation of Church & State v. Prison Fellowship Ministries*, 555 F. Supp. 2d 988, 991 (S.D. Iowa 2008) (examining whether the mandate rule barred the lower court from dissolving an injunction, the grant of which had been ordered or approved of by the appeal); *see also Barrett v. Claycomb*, 936 F. Supp. 2d 1099, 1101-02 (W.D. Mo. 2013) (after interlocutory appeal vacating preliminary injunction entered on facial challenge, district court considered motion for preliminary injunction based on as-applied challenge and offered parties opportunity to present additional evidence). "There is a fundamental difference. . . between the granting of retrospective relief and the granting of prospective relief." *Americans United For Separation of Church & State*, 555 F. Supp. at 991 (quoting *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1360 (Fed. Cir. 2008)). "Due to the equitable nature of injunctive relief, district courts have wide discretion to determine under what circumstances the grant of injunctive relief is appropriate, and under what circumstances the modification or dissolution of that injunction is warranted." *Id.* (internal citations omitted).

The last time this Court examined the facts of this dispute was over three years ago, in July 2017 (Dkt. Nos. 35; 36). Evaluating the propriety of any injunctive relief, but especially this type of injunctive relief, depends on the facts and circumstances that exist at the time the relief is requested. Arkansas requires the collection of data regarding abortions performed in the state. Several more years of data are now available for this Court's review in resolving this dispute. The Court is reluctant to foreclose consideration of that data and other facts that have developed and changed during the three years since this Court last undertook its review.

The Supreme Court has issued decisions the Eighth Circuit instructs bear directly on these disputes; those were not controlling law at the time the parties filed this dispute, the parties briefed this dispute, or the Court ruled on this dispute at the preliminary injunction stage in July 2017. In addition, many more district courts have examined these issues and permitted parties to develop factual and legal arguments related to similar disputes in other states since this Court last examined the merits. Given the language of the Eighth Circuit's mandate and the preliminary stage of this litigation, both sides of this dispute should be permitted to present, not foreclosed from presenting, similar factual and legal arguments to this Court, if they are inclined to do so. For all of these reasons, the Court will consider the pending motion for a second preliminary injunction and will consider the new factual materials presented for consideration by plaintiffs and defendants, along with the changed law. The Court grants defendants' request for expedited consideration of the motion; the Court denies defendants' motion to strike (Dkt. No. 75).[2]

## III. Findings of Fact

The Court adopts by reference its findings of fact in its prior Order granting Dr. Hopkins's request for a preliminary injunction and Order granting temporary restraining order after remand (Dkt. Nos. 35, 36, 83). *See* Fed. R. Civ. P. 10(c). The Court also makes the following findings of fact. To the extent the findings of fact in this Order contradict the findings of fact in the Court's prior Orders, the findings of fact in this Order control. Further, the Court will address these and additional factual matters in the context of its discussion of the legal issues; the Court makes the findings of fact addressed in that context as well. In 2017, plaintiffs objected to the Court's

---

[2] Even if the Court were confined to the factual record presented by the parties in 2017 with respect to reconsideration in the light of *June Medical* and *Box*, the Court would reach the same result and grant preliminary injunctive relief enjoining the enforcement of the four challenged Mandates. The Court essentially did so in the temporary restraining order entered after remand in this matter (Dkt. No. 83).

consideration of several of defendants' exhibits submitted in 2017 (Dkt. No. 32, at 19-23). In 2020, plaintiffs reassert those objections and raise objections to many of the articles and other documents defendants attach to their 2020 opposition brief (Dkt. No. 93, at 12-15). The Court takes plaintiffs' objection under advisement at this preliminary stage of the litigation. The Court has considered and weighed all of the evidence presented in the record at this stage; the Court has resolved any disputes consistent with the statements in this Order.

1.      Dr. Hopkins is a board-certified obstetrician-gynecologist with 25 years of experience in women's health. He is licensed to practice medicine in Arkansas, as well as other states including California and New Mexico. For over five years, Dr. Hopkins has been both Co-Director of the Family Planning Training Program at Santa Clara Valley Medical Center in Santa Clara, California, and Associate Clinical Professor in obstetrics and gynecology at Stanford University School of Medicine in Palo Alto, California (Dkt. No. 5, ¶ 1).

2.      Early in 2017, Dr. Hopkins began providing care at LRFP in Little Rock, Arkansas (Dkt. No. 5, ¶ 1).

3.      At LRFP, Dr. Hopkins provides care that includes medication abortion in the early part of the first trimester and surgical abortion through 21 weeks and six days as measured from the woman's last menstrual period ("LMP"), which is referred to as "21.6 weeks LMP" (Dkt. No. 5, ¶ 2; Dkt. No. 6, ¶ 2).

4.      Dr. Hopkins provides abortion and miscarriage services for patients from young teenagers to women in their later reproductive years (Dkt. No. 5, ¶ 2).

5.      Dr. Hopkins has performed work in Kenya, Tanzania, and Zimbabwe. As a result of that work, he has seen firsthand the results of denying women access to safe abortion care (Dkt. No. 5, ¶ 3).

6.     Willie J. Parker, M.D., M.P.H., M.Sc., is a board-certified obstetrician-gynecologist with subspecialty training in family planning, contraception, and abortion (Dkt. No. 73-2, ¶ 1).  He has 30 years of experience in obstetrics and gynecology, including as the Director of the Division of Family Planning and Preventive Services at the Washington Hospital Center in Washington, D.C.; as the Medical Director of Planned Parenthood of Metropolitan Washington, overseeing clinical and laboratory services at five health care centers in Maryland, Virginia, and the District of Columbia; and as an independent abortion provider at outpatient abortion clinics in Alabama, Arkansas, Georgia, Illinois, Mississippi, Nevada, and Washington (*Id.*).  Dr. Parker provides a declaration based on his personal knowledge and offers expert opinions as an obstetrician-gynecologist and abortion provider, based on his education, training, professional experience, and review of relevant medical literature (Dkt. No. 73-2, ¶ 7).

7.     Dr. Parker serves as the interim medical director at LRFP (Dkt. No. 73-2, ¶ 2).  He became licensed to practice in Arkansas in March 2020, began providing abortion services at LRFP in April 2020, and became interim medical director on August 14, 2020 (*Id.*).  In that role, Dr. Parker oversees clinical practice, ensures the medical services provided at LRFP comply with the standard of care, and supervises others in providing a range of reproductive health care services, including abortion.  He is currently the primary provider of abortion at LRFP.  He provides medication abortion up to 10.0 weeks LMP and procedural abortion, also referred to as "surgical abortion," up to 21.6 weeks LMP (*Id.*).[3]

---

[3]  The terms "surgical abortion," "procedural abortion," and "abortion procedure" are used interchangeably in modern medicine.  Although many in the medical field still use the term "surgical abortion" to refer to all abortions that use instruments rather than medications, aspiration and D&E abortions are more accurately referred to as "procedural abortions" or "abortion procedures," because neither entail what is commonly considered to be a "surgery," *i.e.*, an incision into bodily membranes.  *See* Am. Coll. Of Obstetrics & Gynecology ("ACOG"), *Definition of "Procedures" Related to Obstetrics and Gynecology*, ACOG (Jan. 2018),

8.     Dr. Parker agrees with Dr. Hopkins' descriptions of abortion care, the restrictions the challenged Mandates place on abortion practice, and the impact the restrictions would have on one's ability to provide safe and confidential abortion care in Arkansas (Dkt. No. 73-2, ¶ 6).

9.     There are only two outpatient providers of abortion care in Arkansas:  (1) Planned Parenthood Great Plains provides only medication abortion in part of the first trimester through 10.0 weeks LMP in Little Rock and Fayetteville, although there are no abortions currently being provided at the Fayetteville location, and (2) LRFP provides early medication abortion through 10.0 weeks LMP as well as procedural abortions through 21.6 weeks LMP (Dkt. Nos. 82, ¶ 61; 73-2, ¶ 9; Dkt. No. 73-2, ¶¶ 10-12).

10.     According to Lori Williams, M.S.N., A.P.R.N., who has worked at LRFP since 2004 and has been the Clinical Director at LRFP since 2007, LRFP has operated an abortion clinic in Little Rock since 1973 and has been licensed by the State of Arkansas as an abortion provider since licensing began in the mid-1980s (Dkt. No. 73-3, ¶¶ 4, 8).  LRFP also offers health care services that are similar to abortion care for patients whose pregnancies end in miscarriage as well as basic gynecological care, including pap smears, STD testing, and contraceptive counseling and services (Dkt. No. 73-3, ¶ 8).

11.     As Clinical Director of LRFP, Ms. Williams is responsible for all aspects of day-to-day operations, including overseeing patient care in coordination with the physicians and other care professionals, supervising the staff, maintaining policies and procedures, interacting with the Arkansas Department of Health ("ADH") licensing personnel when they visit, inspect, or request

---

https://www.acog.org/clinical-information/policy-and-position-statements/position-statements/2018/definition-of-procedures-related-to-obstetrics-and-gynecology. (Dkt. No. 73-2, at 2 n.1).   The Court will refer to aspiration and D&E abortions collectively as "procedural abortions" or "abortion procedures" in this Order, unless specifically quoting source material.

information, and ensuring that LRFP complies with all laws and regulations. She also interacts with patients on a daily basis, including by participating in patient counseling (Dkt. No. 73-3, ¶ 6).

12.    LRFP is the only entity providing abortions after 10.0 weeks LMP and the only entity providing procedural abortion in the entire state (Dkt. No. 73-2, ¶ 9; 73-3, ¶ 13).

13.    D&E procedural abortions are the only outpatient abortion procedure available throughout the second trimester in Arkansas (Dkt. No. 73-2, ¶ 4a).

14.    If hospitals in Arkansas are providing any abortion care, it is in only rare circumstances (Dkt. No. 5, ¶ 6).

15.    Dr. Hopkins is aware of no physicians, other than those with whom he practices at LRFP, who provide second trimester abortion care in the state of Arkansas (Dkt. No. 32-2, ¶ 2).

16.    Under current Arkansas law, a woman must first receive state-mandated counseling, in person at the clinic, before having an abortion. *See* Ark. Code Ann. § 20-16-1703(b)(1), (2). A woman must then wait at least 72 hours after that state-mandated counseling before she returns to the clinic for her procedure (Dkt. No. 82, ¶ 62; Dkt. No. 73-2, ¶ 11; Dkt. No. 73-3, ¶ 15). In the last few years, the mandatory delay between state-mandated counseling and care has steadily increased from 24 hours, to 48 hours in 2015, to 72 hours within the last year (Dkt. No. 73-3, ¶ 15).

17.    Given the requirements of Arkansas law regarding mandated state counseling, for patients receiving abortion care up to 18.0 weeks LMP, the law requires at least two trips to the clinic (Dkt. No. 6, ¶ 7).

18.    According to Dr. Hopkins, the state-mandated counseling and waiting period can result in a delay longer than the state-mandated waiting period for many patients (Dkt. No. 5, ¶ 7).

19.     Women must consider whether they have someone to accompany them to the clinic. The support person's availability may impact when a woman is able to return, after the mandatory delay, to receive medical care (Dkt. No. 6, ¶ 7; Dkt. No. 73-3, ¶ 15).  If a patient receives medication for sedation during the procedure, the patient must consider whether she has someone to accompany her to the clinic, and sedation is required for almost every patient obtaining an abortion at LRFP after 13 weeks (Dkt. No. 73-3, ¶ 15).

20.     LRFP provides care to women from throughout Arkansas and from other states (Dkt. No. 5, at 37; Dkt. No. 6, ¶ 5; Dkt. No. 73-3, ¶ 18).

21.     Many patients of LRFP are low-income (Dkt. No. 73-2, ¶ 19; Dkt. No. 73-3, ¶ 18).

22.     As of 2017, approximately 30 to 40% of patients obtained financial assistance to pay for their abortion care (Dkt. No. 6, ¶ 5).

23.     According to Ms. Williams, the number of patients needing financial assistance to cover abortion care or associated costs has increased over time – and increased dramatically over the last several months – due to the additional financial strain COVID-19 has put on LRFP patients (Dkt. No. 73-3, ¶ 18).

24.     As of late 2020, approximately 60% of LRFP patients met the criteria of being at or below 110% of the federal poverty guidelines so as to qualify for some funding from the National Abortion Federation ("NAF") to cover part of the costs of abortion care (Dkt. No. 73-3, ¶ 18).  The current Arkansas federal poverty level for a three-person household is an annual income of $21,720 (*Id.*).

25.     Many patients of LRFP struggle in their lives and in their efforts to access the medical care they need (Dkt. No. 6, ¶ 5; Dkt. No. 73-3, ¶ 21).

26. The time and effort it takes to make the necessary plans to access medical care cause anxiety and stress and cause financial pressure for women seeking care at LRFP. Women must arrange for time off work on multiple days, which can be very difficult given that many are in low-wage jobs and feel that they cannot explain to an employer the reason they need to take time off; women routinely report that they cannot risk their employment and confidentiality by taking time off. For women who already have children, these women must arrange and often pay for childcare. These women also must arrange and pay for transportation. In some cases, these women also have to arrange and pay for a place to stay for multiple nights. The stress involved is compounded by the fact that making these arrangements often involves family members or other individuals, which means the patient risks having to disclose the reasons for her travel and appointments – a disclosure record evidence indicates many patients are desperate not to make (Dkt. No. 6, ¶ 8; Dkt. No. 73-2, ¶¶ 19-20; Dkt. No. 73-3, ¶ 19-20).

27. Patients of LRFP seek abortions for a variety of personal, medical, financial, and family reasons, including that the woman has one child but believes she cannot parent another; that the woman believes she is too young to be ready to carry a pregnancy or to become a parent; that the woman is pursuing educational or work opportunities; that the woman has a health condition that makes carrying a pregnancy dangerous; that the woman has received a diagnosis of fetal abnormality; that the woman is in an abusive relationship; and that the woman is pregnant as a result of rape or sexual assault (Dkt. No. 6, ¶ 6; Dkt. No. 73-2, ¶ 28; Dkt. No. 73-3, ¶ 9).

28. Many patients of LRFP are desperate not to disclose the reasons for travel and appointments to seek abortion care (Dkt. No. 6, ¶ 8; Dkt. No. 73-3, ¶¶ 19-20).

29. Making the necessary arrangements and raising funds for travel and other costs associated with seeking care at LRFP can also delay patients' access to care (Dkt. No. 73-3, ¶ 21).

Ms. Williams regularly has conversations with LRFP patients as they schedule and reschedule their appointments, as patients try to get time off of work, arrange for childcare, and obtain funds to cover the costs of abortion care. Many of LRFP patients face logistical delays in obtaining abortions, including raising the money necessary to pay for a procedure, travel, issues with unsupportive or abusive partners, and a lack of access to medical care to confirm the pregnancy (Dkt. No. 73-3, ¶ 21).

30.     Arkansas is a relatively large state geographically where transportation can present a challenge for LRFP patients (Dkt. No. 73-3, ¶ 21). Fayetteville, where many LRFP patients live, is approximately 400 miles roundtrip from Little Rock (*Id.*). Arkansas also has rural parts of the state where there are few public-transportation options and rural residents often live far away from health care providers (*Id.*).

31.     The 72-hour delay and extra-trip requirement required by current Arkansas law increases the financial, emotional, and logistical burdens LRFP patients face (Dkt. No. 73-3, ¶ 22). Compliance with the requirement, according to Ms. Williams, means that LRFP patients may have to spend more money to stay overnight, travel multiple times back and forth to the clinic, miss more days of work or school, and/or pay for more childcare (*Id.*). It also delays patients' procedures because LRFP and patients must find time for the procedure when schedules match and when patients can make all the necessary arrangements (*Id.*).

32.     Delaying care results in physical and emotional consequences for patients who have decided to end a pregnancy, especially for those patients who are sick or experiencing pregnancy complications (Dkt. No. 73-3, ¶ 23).

33.     Delaying care can push a patient past the point in pregnancy at which she can receive a medication abortion, requiring a patient who prefers that method to have a procedure

(Dkt. No. 6, ¶ 13; Dkt. No. 73-2, ¶¶ 30-31; Dkt. No. 73-3, ¶ 23). Delay can push a patient from a first-trimester to a second-trimester procedure or from a one-day procedure in the second trimester to a two-day procedure. Delay can also push a patient beyond the point at which she can obtain an abortion at LRFP and, therefore, in Arkansas, which means she may well not be able to access abortion at all. Because abortion care becomes more complex as pregnancy advances, it also becomes more expensive. Thus, delay also means that patients pay more for the procedure itself (*Id.*).

34. Providers of abortion care, particularly in the second trimester, are scarce, especially in the American South, and the cost of care, which is already very difficult for current LRFP patients to meet, rises as pregnancy advances (Dkt. No. 73-2, ¶ 29).

35. For patients unable to access abortion care at LRFP, there are few options, all of which require substantial travel. While medication abortion is available at another clinic in the state, without LRFP, a patient seeking abortion care after 10.0 weeks LMP would be forced to travel out of state. To Ms. Williams' knowledge, the nearest clinics providing abortion care up to 21.6 weeks LMP is in Granite City, Illinois, and Dallas, Texas, both of which are approximately 600 to 700 miles round trip from Little Rock, Arkansas. To Ms. Williams' knowledge, the next nearest clinic currently providing abortion procedures is in Memphis, Tennessee, where abortion care is available up to 19.6 weeks LMP. Memphis is approximately 300 miles roundtrip from Little Rock, and 600 miles round trip from Fayetteville, where many current patients of LRFP live. Some women will be unable to make these substantial trips for an abortion procedure and will be forced to carry a pregnancy to term against their will (Dkt. No. 73-3, ¶ 25).

36. Delay-related concerns identified by the 2018 National Academies consensus-study exist in Arkansas, even setting aside the potential for enforcement of the Mandates challenged in

this lawsuit, because of existing Arkansas laws that require women seeking abortion care to wait 72 hours after receiving state-mandated counseling in-person before returning to the clinic for the procedure and given that LRFP is the only clinic in Arkansas that provides abortion procedures, as opposed to medication abortion (Dkt. No. 73-1, ¶ 11).

37.    Approximately 30% of all women have an abortion at some point in their lives (Dkt. No. 4,[4] ¶ 7).

38.    Abortion in the first and second trimester, utilizing current methods, is safer than carrying a pregnancy to term, as to both morbidity and mortality (Dkt. No. 4, ¶ 8; Dkt. No. 32-1, ¶ 5; Dkt. No. 73-1, ¶ 9).

39.    A 2018 consensus-study report by the National Academies of Sciences, Engineering, and Medicine concluded that the clinical evidence makes clear that legal abortions in the United States – whether by medication, aspiration, D&E, or induction – are safe and effective.  Serious complications are rare, occurring in fewer than one percent of abortions in the vast majority of studies (Dkt. No. 73-1, ¶¶ 8-9 (citing National Academy of Sciences, Engineering, and Medicine, 2018.  *The safety and quality of abortion care in the United States*.  Washington, D.C.  The National Academies Press (hereinafter "2018 National Academies consensus-study report"))).[5]

_____

[4]  The declaration of Mark D. Nichols, M.D., in support of Dr. Hopkins first motion for preliminary injunction or in the alternative a temporary restraining order, is reaffirmed in a declaration attached as Exhibit 3 to Dr. Hopkins and LRFP's motion for an *ex parte* temporary restraining order (Dkt. No. 69-3).  Further, Dr. Nichols reaffirms his June 8, 2017, declaration (Dkt. No. 4) and July 19, 2017, rebuttal declaration (Dkt. No. 32-1) in his December 10, 2020, declaration (Dkt. No. 73-1, ¶ 6).

[5]  According to record evidence, "[t]he three academies work together to 'provide independent, objective analysis and advice to the nation. . . to solve complex problems and inform public policy decisions," and consensus-study reports like this one "document the evidence-based consensus on the study's statement of task by an authoring committee of experts."  (Dkt. No. 73-

40.     Further, according to the record evidence and 2018 National Academies consensus-study report, "[d]eaths associated with a legal abortion in the United States is an exceedingly rare event." (*Id.*).   The abortion-related mortality rate (0.7 per 100,000 procedures) is significantly lower than that of childbirth (8.8), adult tonsillectomies (2.9 – 6.3), colonoscopies (2.9), plastic surgery (0.8-1.7), and dental procedures (0-1.7) (Dkt. No. 73-1, ¶ 9).

41.     According to the record evidence and 2018 National Academies consensus-study report, the risk of a serious complication due to abortion increases with weeks' gestation and, therefore, "delaying the abortion increases the risk of harm to the woman." (Dkt. No. 73-1, ¶ 10; *see also* 73-2, ¶ 20).

42.     Based upon record evidence, the 2018 National Academies consensus-study report explained that "[s]tate regulations that require women to make multiple in-person visits and wait multiple days delay the abortion," and "[i]f the waiting period is required after an in-person counseling appointment, the delay is exacerbated." (Dkt. No. 73-1, ¶ 10; *see also* Dkt. No. 73-2, ¶ 20).   The 2018 National Academies consensus-study report also explained that "[r]estrictions on the types of providers. . . also delay care by reducing the availability of care." (*Id.*).

43.     The first trimester of pregnancy goes to approximately 14 weeks LMP (Dkt. No. 5, ¶ 8; 73-2, ¶ 10).

44.     Nationwide, as of the time this lawsuit was filed in 2017, approximately 90% of abortions occurred during the first trimester of pregnancy (Dkt. No. 5, ¶ 8).   As of late 2020, nationwide approximately 91% of abortions occurred during the first trimester (Dkt. No. 73-2, ¶ 10).

---

1, ¶ 8).  The record indicates the 2018 consensus-study was authored by "a group of neutral and well-respected scientists." (*Id.*).

45.     In Arkansas, as of the time this lawsuit was filed in 2017, approximately 83% of abortions occurred during the first trimester of pregnancy (Dkt. No. 5, ¶ 8).  As of late 2020, in Arkansas approximately 88% of abortions occurred during the first trimester (Dkt. No. 73-2, ¶ 10).

46.     During the first trimester, there are two principal methods of abortion (Dkt. No. 4, ¶ 11-12; Dkt. No. 5, ¶ 9; Dkt. No. 73-2, ¶ 12).

47.     As for the first method used during the first trimester, a clinician may use medications to induce a process similar to miscarriage.  This method is called early medication abortion.  It is generally available only through part of the first trimester of pregnancy, and it is not available in the last weeks of the first trimester of pregnancy.  In the most common method of early medication abortion, a woman takes two drugs:  first mifepristone is taken on the first day and then, misoprostol is taken within approximately 24 to 48 hours later in a location of the patient's choosing.  After taking the second drug, the woman likely will pass the products of conception, not in a medical facility but in a location that is most comfortable for her, usually her home (Dkt. No. 4, ¶ 11-12; Dkt. No. 5, ¶ 9; Dkt. No. 73-2, ¶ 12).

48.     In Arkansas, medication abortion is available up to 10.0 weeks LMP (Dkt. No. 73-2, ¶ 12; Dkt. No. 73-3, ¶ 11).

49.     Dr. Hopkins does not know the exact timing of the most common method of early medication abortion because he is not with his patient when she passes the products of conception (Dkt. No. 5, ¶ 9).

50.     As for the second method, a clinician may use suction to empty the uterus, which is available through the entire first trimester.  This method is called suction or aspiration abortion. The clinician first gently opens the cervix, then inserts a suction cannula into the uterus, and then

uses suction to evaluate the contents of the uterus (Dkt. No. 4, ¶ 13; Dkt. No. 5, ¶ 10; Dkt. No. 73-2, ¶ 12).

51.     In Arkansas, aspiration abortion is available throughout the first trimester (Dkt. No. 73-2, ¶ 12).

52.     LRFP is the only provider of aspiration abortion in Arkansas (Dkt. No. 73-2, ¶ 12).

53.     In the second trimester of pregnancy, based on record evidence currently before the Court, suction alone generally is not sufficient to complete an abortion, nor is it something physicians can rely on to cause fetal demise to avoid liability under the D&E Mandate in the second trimester (Dkt. No. 32-1, ¶ 5; Dkt. No. 73-2, ¶ 26; Dkt. No. 93-1, ¶¶ 3-4, 7).

54.     Because suction alone may be insufficient to evacuate the uterus, a physician may need to use instruments to evacuate the uterus as quickly and safely as possible. As the pregnancy advances, so does the likelihood that suction will be insufficient to complete the procedure (Dkt. No. 73-2, ¶ 26; Dkt. No. 93-1, ¶¶ 3-4). As a result, even providers who start second-trimester procedures with suction are aware that instruments may be necessary to complete any given procedure, and this likelihood increases later in the second trimester when instruments certainly will be necessary to complete a procedure, based on record evidence currently before the Court (Dkt. No. 73-2, ¶ 26; Dkt. No. 93-1, ¶ 4).

55.     In the second trimester of pregnancy, beginning at approximately 14.0 weeks LMP, there are two principal methods of abortion (Dkt. No. 4, ¶ 14; Dkt. No. 5, ¶ 11).

56.     As for the first method used beginning at approximately 14.0 weeks LMP, in induction abortion, the clinician uses medications to induce labor. This procedure can happen only in a hospital or hospital-like facility, not in a second-trimester outpatient clinic. This procedure can take over 24 hours, and for some patients, this procedure may span multiple days. This

procedure entails labor, which can involve pain requiring significant medication or anesthesia and which may be psychologically challenging for some women. This procedure accounts for a tiny fraction of second-trimester abortions in the nation (Dkt. No. 4, ¶ 14; Dkt. No. 5, ¶ 12; Dkt. No. 73-2, ¶ 14).

57.     Because induction involves an in-patient stay, requiring up to three days of hospitalization, as opposed to an out-patient procedure, there is an enormous cost difference between induction and the out-patient D&E procedure (Dkt. No. 4, ¶ 14; Dkt. No. 73-2, ¶ 14).

58.     In some women, an induction abortion fails, and the woman needs intervention in the form of D&E for her safety. This is infrequent, but this does occur (Dkt. No. 4, ¶ 15; Dkt. No. 5, ¶ 12).

59.     In approximately 5% to 10% of induction abortions, the woman must undergo an additional surgical procedure to remove a retained placenta. Induction abortion also can cause uterine rupture, which is rare but can be life threatening and can be of particular concern for women who have had multiple previous cesarean deliveries (Dkt. No. 4, ¶ 15; Dkt. No. 25-4, ¶ 8).

60.     At the time this lawsuit was filed in 2017, of women who have abortions performed during the second trimester of pregnancy, 95% of those women in this country choose D&E (Dkt. No. 4, ¶ 16). As of late 2020, nationally, data suggest D&E accounts for almost all second-trimester abortion procedures in the United States (Dkt. No. 73-2, ¶ 14).

61.     In 2015, the latest year for which statistics were available at the time this lawsuit was filed in 2017, there were no induction abortions reported in Arkansas (Dkt. No. 5, ¶ 12).

62.     As for the second method used beginning at approximately 14 weeks LMP, because suction instruments alone are generally no longer sufficient to empty the uterus, doctors can use a

method with instrumentation called D&E.[6]  This involves two steps:  dilating the cervix, and then evacuating the uterus with a combination of suction and instruments.  There are several ways to dilate the cervix (Dkt. No. 4, ¶ 17; Dkt. No. 5, ¶ 13; Dkt. No. 73-2, ¶ 13).

63.     Typically, during the early weeks of the second trimester of pregnancy, a doctor performing D&E uses a combination of medications that open the cervix and manual dilators; then, the same day, the doctor uses forceps to remove the fetus and other contents of the uterus.  Because the fetus is larger than the opening of the cervix, the fetal tissue generally comes apart as the physician removes it through the cervix.  The reason that the cervical opening is smaller than the fetal parts is that, in general, the doctor dilates only enough to allow the safe passage of instruments and fetal tissue through the cervix (Dkt. No. 4, ¶ 17-18; Dkt. No. 5, ¶ 14; Dkt. No. 73-2, ¶ 13).

64.     In Arkansas, D&E procedures take place over one to two days, depending on the medical needs of the patient (Dkt. No. 73-2, ¶ 15; Dkt. No. 73-3, ¶ 29).

65.     In Arkansas and elsewhere, D&E typically is a one-day procedure from 14.0 to 17.6 weeks LMP (Dkt. No. 5, ¶ 15; Dkt. No. 6, ¶ 17; Dkt. No. 73-3, ¶ 29).

66.     Of 638 D&Es reported in Arkansas in 2015, 407 or 64% took place during these earliest weeks of the second trimester (Dkt. No. 6, ¶ 17).

67.     According to Dr. Parker, as of late 2020, for a large majority of LRFP's second-trimester abortion patients, a physician will be able to achieve safely sufficient dilation in one day

_____

[6] Defendants include as record evidence in support of their opposition to plaintiffs' motion only a portion of the transcript from a hearing conducted at the district court level in *Carhart v. Stenberg* in 1997.  The transcript appears to describe the D&E procedure used by one doctor in 1997.  There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

using manual dilators and medication and will evaluate the uterus on the same day (Dkt. No. 73-2, ¶ 15).

68.     The procedure typically takes under ten minutes (Dkt. No. 73-2, ¶ 13).

69.     According to Dr. Parker, as of late 2020, a small number of LRFP's second-trimester abortion patients undergo overnight dilation where physicians place osmotic dilators that will expand slowly to achieve gently greater dilation over the course of several hours (Dkt. No. 73-2, ¶ 15).

70.     According to Dr. Parker and Ms. Williams, physicians evaluate patient history and circumstances and use their clinical judgment to determine the best dilation protocol for each individual patient (Dkt. No. 73-2, ¶ 15; Dkt. No. 73-3, ¶ 30).

71.     Ms. Williams confirms that currently for the majority of LRFP's second-trimester patients, physicians provide a D&E procedure in one day, meaning the dilation and evacuation occur on the same day.  This is true for essentially all LRFP patients who – when they return to the clinic after the 72-hour mandatory delay period, are between 14.0 and 17.6 weeks LMP, and about half of LRFP patients who are 18.0 to 20.0 weeks LMP.  A small number of LRFP's second-trimester patients undergo overnight dilation, meaning the dilation process takes place over two days.  About half of LRFP's patients between 19.0 and 20.0 weeks LMP, and almost all patients between 20.0 and 21.5 weeks LMP, undergo overnight dilation (Dkt. No. 73-3, ¶ 29).

72.     Later in the second trimester, larger instruments require wider cervical dilation.  Although some physicians continue to provide D&E as a one-day procedure depending on the patients' needs, doctors may add overnight osmotic dilation to the D&E protocol.  Osmotic dilators are thin sticks of material that swell when they absorb moisture; when placed in a woman's cervix, they absorb moisture from the woman's body, expand slowly, and slowly dilate the cervix.  Once

dilation is sufficient, typically the next day, the doctor proceeds as in earlier D&Es, removing the fetus, generally in pieces because it is larger than the cervical opening (Dkt. No. 4, ¶ 17; Dkt. No. 5, ¶ 16; Dkt. No. 73-2, ¶ 15; Dkt. No. 73-3, ¶ 31).

73.     For patients of LRFP who have overnight osmotic dilation with the D&E protocol, those patients are required to spend that overnight within 30 minutes of LRFP so that the doctor is available in the rare instance in which a patient has any problem (Dkt. No. 6, ¶ 18; Dkt. No. 73-3, ¶ 31).

74.     In Arkansas, from the time this lawsuit was filed in 2017 to late 2020, the D&E protocol changed (Dkt. No. 5, ¶ 20; Dkt. No. 73-3, ¶ 32).  In 2017, in Arkansas, a woman at 18.0 weeks LMP received overnight dilation, which meant that the procedure took two days, rather than one (Dkt. No. 5, ¶ 20).  In 2017, in Arkansas, at the time a woman at 18.0 weeks LMP had placed in her cervix the osmotic dilators, which was the day before the intended evacuation, the woman also received an injection of digoxin through the vaginal wall.  That injection of digoxin was into the fetus or, if not, into the amniotic fluid.  With either method of injection, the digoxin may not work effectively (Dkt. No. 5, ¶ 20).

75.     According to Ms. Williams, since 2017 LRFP updated its protocols to reduce the number of patients who undergo overnight dilation, meaning more D&E patients have their procedures in one day, avoiding the need for those patients to make an extra trip to the clinic and to avoid an extra digoxin injection (Dkt. No. 73-3, ¶ 32).

76.     As of late 2020, for some D&E patients, one-day dilation is safe and effective, and providers are increasingly relying on one-day dilation (Dkt. No. 73-1, ¶ 16).

77. In cases where the provider does not begin cervical preparation the day before the procedure, administering a digoxin injection would unnecessarily require the patient to make an additional trip to the facility (Dkt. No. 73-1, ¶ 16).

78. According to record evidence submitted to the Court in 2017, in women 18.0 weeks or later LMP, if the digoxin had not caused fetal demise the next day after being administered, Dr. Hopkins would take steps with his forceps, such as compressing fetal parts, to ensure fetal demise and to establish compliance with existing laws. These women would already be dilated and, therefore, at risk without care (Dkt. No. 5, ¶¶ 21, 25b).

79. Based on record evidence submitted in 2020, Dr. Nichols reports on a recent study that confirms 74% of providers who reported performing D&Es at 18 weeks LMP or greater do not routinely induce preoperative fetal demise and that, among the minority who do use demise procedures, 70% do so only for procedures at 20 weeks LMP or greater (Dkt. No. 73-1, ¶ 14).

80. Based on record evidence, physicians who attempt fetal demise before providing a D&E generally do so to demonstrate compliance with the statue commonly referred to as the "Partial Birth Abortion Ban," which prohibits a rarely used abortion method performed later in pregnancy, "intact D&E," sometimes referred to as "D&X," which involves dilating the cervix enough to remove the whole fetus intact (generally only after 20 to 22 weeks LMP)[7] (Dkt. No. 73-1, ¶ 14). Further, providers who attempt fetal demise before a D&E do so with the knowledge that

---

[7] Throughout this Order, when the Court uses the term "D&E" the Court refers to a standard D&E as distinguished from an "intact D&E," sometimes referred to as "D&X," which involves dilating the cervix enough to remove the whole fetus intact. "Intact D&E" is banned under the Federal Partial-Birth Abortion Ban Act of 2003, unless fetal demise is induced before the procedure. *See Gonzales v. Carhart*, 550 U.S. 124 (2007) (upholding the federal partial-birth abortion ban).

they are still able to proceed with the D&E if the demise method fails or if a demise procedure is contraindicated for a particular patient (Dkt. No. 73-1, ¶ 15).

81.     D&E procedures cannot safely begin unless the physicians know that they will be able to complete timely the procedure because delaying the procedure after a first digoxin injection and after the uterus has been dilated would increase the risk of uterine infection, extramural delivery, or digoxin toxicity (Dkt. No. 73-1, ¶ 15).

82.     Through the second trimester, D&E is a safe way to provide abortion in an outpatient setting, such as a family planning clinic (Dkt. No. 5, ¶ 17).

83.     D&E accounted for almost all second-trimester abortions in the United States at the time this lawsuit was filed in 2017 (Dkt. No. 4, ¶ 16; Dkt. No. 5, ¶ 17).

84.     D&E is the only outpatient abortion method available throughout the second trimester in Arkansas (Dkt. No. 73-2, ¶ 13).

85.     D&E accounts for 100% of second trimester abortions reported in Arkansas in 2015 (Dkt. No. 5, ¶ 17).

86.     D&E abortions accounted for 100% of second-trimester abortions reported in Arkansas in 2019 (Dkt. No. 73-2, ¶ 14).

87.     At the time this lawsuit was filed in 2017, each year, LRFP provided approximately 3,000 abortions, of which approximately 600 or 20% occurred during the second trimester (Dkt. No. 6, ¶ 16; Dkt. No. 73-3, ¶ 28).  In 2019, LRFP provided 1,950 abortions, 15% of which occurred in the second trimester (Dkt. No. 73-3, ¶ 28).

88.     D&E procedure has a long-established safety record in this county, with major complications occurring in less than 1% of D&E procedures (Dkt. No. 4, ¶ 19; Dkt. No. 73-4, ¶ 9).

89.     According to Dr. Parker, during the D&E procedure, fetal tissue separation occurs as tissue is removed from the uterus with forceps (Dkt. No. 73-2, ¶ 21).

90.     According to Dr. Parker, there is no safe and reliable way to guarantee fetal demise prior to the evacuation of the uterus with instruments (Dkt. No. 73-2, ¶ 22).

91.     Richard A. Wyatt, M.D., an expert for defendants, states that "[b]y the 14th week of pregnancy a living baby has a beating heart and moving limbs, and breathing motions have begun." (Dkt. No. 25-4, ¶ 4).  At this time, and on the record before it, this Court does not equate Dr. Wyatt's use of "living baby" with viability, as the term viability has been used by courts in the abortion context.  *See Edwards v. Beck*, 8 F.Supp.3d 1091 (E.D. Ark. 2014), *aff'd* 786 F.3d 1113 (8th Cir. 2015) (examining the term viability in both medical and legal contexts).

92.     Given the requirements of Arkansas law regarding mandated state counseling, even setting aside the potential for enforcement of the D&E Mandate challenged in this lawsuit, for patients receiving abortion care at 18.0 to 21.6 weeks LMP, the law requires at least three trips to the clinic (Dkt. No. 6, ¶ 7).

93.     Starting at 18.0 to 22.0 weeks, some physicians, including Dr. Hopkins as of 2017, undertake an additional procedure to try to cause fetal demise before the evacuation phase of a D&E for most patients, meaning those for whom it is not contraindicated (Dkt. No. 5, ¶ 18; Dkt. No. 73-2, ¶ 16).

94.     Of the physicians who undertake an additional procedure, the vast majority of physicians inject the drug digoxin into the fetus if possible or, if not, then into the amniotic fluid. Injecting digoxin into the amniotic fluid is technically easier, but it is less effective (Dkt. No. 4, ¶ 21; Dkt. No. 5, ¶ 18; Dkt. No. 73-2, ¶ 16).

95.     The injections may be through the woman's abdomen or vaginal wall.  These injections generally use an 18- to 22-gauge spinal needle, passed under ultrasound guidance, through the patient's abdomen, vaginal wall, or vagina and cervix, and then either into the amniotic fluid or the fetus (Dkt. No. 4, ¶ 21, 25; Dkt. No. 5, ¶ 18).

96.     There are some women for whom an injection of digoxin may be difficult or impossible.  For example, women may be very obese; may have anatomical variations of the uterine and vaginal anatomy, such as fibroids or a long cervix; and may have fetal positioning that creates issues.  Physicians cited by all parties agree upon this (Dkt. No. 4, ¶ 27; Dkt No. 5, ¶ 25a; Dkt. No. 25-4, ¶ 6; Dkt. No. 32-3, at 35; Dkt. No. 25-4, ¶ 6; Dkt. No. 73-2, ¶ 23c).

97.     For some women, other factors such as quickly advancing dilation may make delaying evacuation by a day too risky for the patient meaning, even after 18 weeks LMP, digoxin cannot always be safely injected (Dkt. No. 73-2, ¶ 23c).

98.     These injections also can be dangerous for women with cardiac conditions such as arrhythmias (Dkt. No. 4, ¶ 27).

99.     Even for women who tolerate injections, digoxin will not cause fetal demise in 5% to 10% of all cases in which it is used; physicians cited by all parties agree upon this (Dkt. No. 4, ¶ 28; Dkt. No. 5, ¶ 25b; Dkt. No. 32-3, at 38).

100.    Doctors are not able to know in advance for which women digoxin injection will fail (Dkt. No. 5, ¶ 25c; Dkt. No. 73-2, 23d).

101.    The failure rate is higher for intramniotic injections of digoxin.  Intramniotic injection would require a skill level similar to that required for amniocentesis.  Intramniotic injections are associated with higher complication rates than intrafetal injection (Dkt. No. 4, ¶ 25; Dkt. No. 32-1, ¶ 7; Dkt. No. 73-1, ¶ 17).

102.     Intrafetal injections of digoxin are more difficult to perform and may be impossible to perform due to fetal position, uterine anatomy and other factors, especially the size of the fetus. The smaller the fetus, the more difficult intrafetal injection will be.  Intrafetal digoxin injections require additional skill (Dkt. No. 4, ¶ 28; Dkt. No. 32-1, ¶ 7; Dkt. No. 73-1, ¶ 17).

103.     Digoxin works very slowly.  Doctors allow 24 hours after the injection for it to work.  Even then, it does not always cause fetal demise (Dkt. No. 5, ¶ 18; Dkt. No. 73-2, ¶ 16).

104.     According to Dr. Parker, because a physician would not extend the procedure by an entire day solely to inject digoxin and give it time to cause demise, this additional step is only taken with the small number of patients for whom overnight dilation is medically appropriate (Dkt. No. 73-2, ¶ 17).

105.     The transabdominal injection required for digoxin can be painful and emotionally difficult for the patient.  The injection poses risks, including infection, which can threaten the patient's health and future fertility, and accidental absorption of the drug into the patient's circulation, which can result in toxicity and changes to the patient's EKG (Dkt. No. 4, ¶ 25).

106.     Like all medical procedures, the digoxin injection creates risks for the patient. Doctors who use digoxin believe that practical concerns justify using it.  The main benefit of using digoxin in procedures after 18.0 to 22.0 weeks LMP is to establish compliance with the federal "partial-birth abortion ban" or similar state laws (Dkt. No. 4, ¶ 23; Dkt. No. 5, ¶ 19; Dkt. No. 73-2, ¶ 16).

107.     According to Dr. Parker, if a patient requiring overnight dilation returns the next day and the digoxin injection has not caused fetal demise, the physician will still evacuate the patient's uterus on that same day.  At that point, according to Dr. Parker, physicians will take steps

with their forceps – such as compressing fetal parts – in order to cause demise and otherwise demonstrate compliance with existing "partial-birth abortion" laws (Dkt. No. 73-2, ¶ 18).

108.    The federal "partial-birth abortion ban" has an intent requirement (Dkt. No. 4, ¶ 23).

109.    At the time this lawsuit was filed in 2017, the American Congress of Obstetricians and Gynecologists ("ACOG") concluded: "No evidence currently supports the use of induced fetal demise to increase the safety of second-trimester medical or surgical abortion." This statement is consistent with the medical literature (Dkt. No. 4, ¶ 22; Am. Coll. of Obstetricians & Gynecologists, Practice Bulletin Number 135: Second Trimester Abortion, 121(6) Obstetrics & Gynecology 1394, 1396, 1406 (2013)).

110.    Dr. Nichols addresses a recent clinical trial that compared routes of digoxin administration before abortion in a randomized controlled trial (Dkt. No. 73-1, ¶ 19a). Based on the study, according to Dr. Nichols, even when a physician attempts an intrafetal digoxin injection, which is more effective in causing fetal demise than intraamniotic injections, it is not uncommon for the physician to be unable to inject digoxin into the fetus and to resort to a less effective, intraamniotic injection. Further, the results of the study suggest that in earlier gestational ages, when intrafetal injection is even more technically difficult due to the size of the fetus, less effective intraamniotic injections would be used even more frequently, according to Dr. Nichols (Dkt. No. 73-1, ¶ 19a). Dr. Nichols explains that the study reported significant failure rates in that, among patients who received intraamniotic digoxin, the injection failed to cause fetal demise 20% of the time and that, although those who actually received an intrafetal injection had a failure rate of less than 2%, the failure rate for the group randomized to receive intrafetal injection was 5% because

some patients actually received an intraamniotic injection due to the technical administration difficulties described in the study (Dkt. No. 73-1, ¶ 19b).

111.    There are virtually no reported studies on using digoxin in the first weeks of the second trimester before 18 weeks LMP, when most second trimester abortions are performed. Physicians relied upon by both sides agree upon this (Dkt. No. 4, ¶ 26; Dkt. No. 32-3, at 39-40). Without studies, doctors do not know the risks, complication rates, or effectiveness of such a procedure.  Without this information, doctors cannot counsel patients on the effectiveness or safety of such a procedure (Dkt. No. 4, ¶ 26; Dkt. No. 32-1, ¶ 6, 9-10; Dkt. No. 32-3, at 39-40; Dkt. No. 73-2, ¶ 23a).

112.    Even if physicians were willing to inject digoxin experimentally early in the second trimester, doing so would extend the D&E procedure by a day for D&E patients who currently undergo a one-day procedure (Dkt. No. 73-2, ¶ 23b).  Because digoxin takes up to 24 hours to cause demise, patients would have to make an additional trip to the clinic solely for the purpose of receiving an experimental digoxin injection and giving it time to work (Dkt. No. 73-2, ¶ 23b).

113.    There are virtually no reported studies on using a second injection of digoxin, or multiple, sequential injections of digoxin, after the first dose fails to bring about fetal demise. Physicians relied upon by both sides agree on this (Dkt. No. 4, ¶ 29; Dkt. No. 23-15, ¶ 6; Dkt. No. 32-3, at 38; Dkt. No. 73-1, ¶ 17; Dkt. No. 73-2, ¶ 23d).

114.    Attempting a second injection of digoxin, or multiple, sequential injections of digoxin, after the first dose fails to bring about fetal demise likely would delay the procedure for yet another 24 hours, given the reported time it takes for digoxin to be effective (Dkt. No. 73-2, ¶ 23d).

115.    According to Dr. Nichols, a study documented that, while digoxin toxicity is rare, it is an extremely serious risk associated with the injection of digoxin at certain levels, resulting in the study patient being paralyzed and intubated due to respiratory failure after a digoxin injection (Dkt. No. 73-1, ¶ 19c.).

116.    Using a second injection of digoxin would, at a minimum, delay the abortion procedure, require the patient to make another trip to the clinic, and increase the risk of uterine infection, extramural delivery, or digoxin toxicity (Dkt. No. 4, ¶ 29; Dkt. No. 73-1, ¶¶ 15, 17).

117.    According to Dr. Nichols, it is not currently acceptable medical practice to perform multiple injections of digoxin and wait even longer for demise (Dkt. No. 73-1, ¶ 17).

118.    Another substance, potassium chloride (KCl), will cause fetal demise if injected directly into the fetal heart, which is extremely small (Dkt. No. 4, ¶ 31; Dkt. No. 5, ¶ 22).

119.    Injecting potassium chloride has limitations based on gestational age and anatomy (Dkt. No. 25-4, ¶ 6).

120.    The procedure of injecting potassium chloride is very rare, as it carries much more severe risks for the woman, including death if the doctor places the solution in the wrong place, and it requires extensive training generally available only to sub-specialists in high-risk obstetrics, known as maternal-fetal medicine (Dkt. No. 4, ¶ 31; Dkt. No. 5, ¶ 22; Dkt. No. 23-15, ¶ 11; Dkt. No. 32-2, ¶ 3; Dkt. No. 32-3; Dkt. No. 73-2, ¶ 24).[8]

---

[8]    The Court rejects the defendants' expert Richard A. Wyatt, M.D.'s assertion that potassium chloride injections are "no more difficult than amniocentesis." (Dkt. No. 25-4, ¶ 6). Dr. Wyatt professes no expertise in the area of potassium chloride injections (Dkt. No. 25-4, ¶ 1). His assertion directly contradicts the cross examination testimony of Joseph R. Biggio, Jr., M.D., defendants' other expert, who testified at a hearing in a case involving a similar Alabama law and who is trained to perform and trains other physicians to perform such highly specialized procedures (Dkt. No. 32-3, at 30, 35-37).

121.     Injecting potassium chloride is usually done in a hospital, not a clinical, setting. The procedure requires an advanced ultrasound machine that is typically available only in a hospital setting and too expensive for most clinics to afford (Dkt. No. 4, ¶ 31; Dkt. No. 32-2, ¶ 3; Dkt. No. 32-3, at 7, at 36-37).

122.     There are some women for whom injecting potassium chloride is not medically appropriate (Dkt. No. 4, ¶ 31).

123.     Neither Dr. Hopkins, Dr. Parker, nor any of the physicians practicing at LRFP have the specialized training in the sub-specialty of high-risk obstetrics necessary to inject safely potassium chloride (Dkt. No. 5, ¶ 22; Dkt. No. 73-2, ¶ 24).

124.     The specialized training needed to perform this procedure is not a standard part of training for clinicians who provide abortion care.  Rather, certain specialists learn to perform the procedure through a three-year subspecialist program in high risk obstetrics after completing an obstetrics-gynecology residency (Dkt. No. 73-2, ¶ 24).

125.     According to Dr. Parker, even if he were willing to obtain training to perform injections of potassium chloride, returning to any fellowship, let along one as highly competitive as the one required to obtain this training, to learn a single rarely used procedure that is unnecessary for him to continue his current practice is not feasible or reasonable in his view (Dkt. No. 73-2, ¶ 24).

126.     Plaintiffs offer the affidavit of Katharine D. Wenstrom, M.D., who is a physician licensed to practice medicine, Board Certified by the American Board of Obstetrics and Gynecology in Obstetrics and Gynecology since 1992 and in Maternal-Fetal Medicine since 1994, and by the American Board of Medical Genetics since 1990 (Dkt. No. 73-9, ¶¶ 1-3).  Dr. Wenstrom details her experience, her service with the Society for Maternal-Fetal Medicine and the American

College of Obstetricians and Gynecologists, and her peer-reviewed publications, along with her other qualifications (*Id.*).

127.     Dr. Wenstrom opines, having reviewed the D&E Mandate challenged by plaintiffs, that based on her training and experience the D&E Mandate as written bans D&E abortion procedures (Dkt. No. 73-9, ¶ 5).

128.     Based on her training and experience, Dr. Wenstrom "adamantly disagrees" with defendants' contention that "injection of KCl is a safe and effective means for physicians who provide abortion care in Arkansas to ensure fetal demise before performing a D&E and thereby circumvent" the D&E Mandate[9] (Dkt. No. 73-9, ¶ 6).

129.     Dr. Wenstrom has performed approximately 200 intracardiac potassium chloride injections, including approximately 50 for patients who were in the second trimester of their pregnancy at the time of the procedure (Dkt. No. 73-9, ¶ 10).

130.     According to Dr. Wenstrom:  "some physicians with advanced training are capable of inducing fetal demise using intracardiac (fetal) administration of KCl *via* a transabdominal injection performed with ultrasound guidance.  To cause demise, KCl is rapidly injected in the fetal heart using a 7-to-9-inch needle that must be guided extremely carefully through the patient's abdominal and uterine walls, into the uterus and amniotic fluid, and then into the fetal chest and directly into the fetal heart.  Ultrasound is thereafter used to confirm asystole (no cardiac activity).  If there are no complications, the entire procedure, start to finish, typically takes approximately 60 minutes.  Due to dilution, KCl will not cause fetal demise when injected into amniotic fluid;

---

[9]     The Court uses the abbreviation "KCl" and the phrase "potassium chloride" interchangeably in this Order.

injection into the fetal heart is required to safety and effectively perform the procedure." (Dkt. No. 73-9, ¶ 7).

131. According to Dr. Wenstrom, "[t]he fetal heart is approximately the size of a pea at 14 weeks into a pregnancy [LMP], and roughly the size of an olive at 20 weeks LMP." (Dkt. No. 73-9, ¶ 8).

132. Dr. Wenstrom explains that these types of injections "are typically used in the context of selective termination in a multi-fetal pregnancy, *i.e.*, when a person is pregnant with more than one fetus and wishes to reduce the risk of preterm birth, or when one fetus has an anomaly. Multifetal pregnancy reduction generally confers medical benefits by reducing the risks associated with multifetal gestation." (Dkt. No. 73-9, ¶ 9).

133. Dr. Wenstrom further explains that this "procedure requires a high level of skill, and is thus almost exclusively performed by OBGYNs who are specialists in maternal-fetal medicine ("MFM")." (Dkt. No. 73-9, ¶ 11).

134. According to Dr. Wenstrom, "MFM is an OBGYN sub-specialty involving an additional three-year training program after residency with extensive, advanced training at a major medical center and a focus on high-risk pregnancies. Training to perform KCl injections is not included in OBGYN residency training, and KCl-injection training is included in only a few MFM programs." (Dkt. No. 73-9, ¶ 11). Admission to those fellowship programs is "extremely competitive" and, if admitted, a "full-time obligation." (Dkt. No. 73-9, ¶ 12). Even then, according to Dr. Wenstrom, a physician is not guaranteed to receive KCl-injection training (*Id.*). Instead, the physician "must seek out specific MFM programs with tertiary Fetal Therapy Centers (e.g., in New York, Philadelphia, or Texas) if they are interested in obtaining the training necessary to performed intracardiac KCl injections." (*Id.*).

135.     Dr. Wenstrom also clarifies that "training in and competence to perform KCl injections has become increasingly rare and difficult to obtain in recent years, because the high-order multifetal pregnancies that were common from the 1980s to the early 2000s have become less common in view of (among other things) advances in in-vitro fertilization laboratory techniques." (Dkt. No. 73-9, ¶ 13).

136.     According to Dr. Wenstrom, "[b]efore a physician can be trained to competently perform KCl injections, the clinician must obtain advanced ultrasound training, which is not generally available in Family Practice or OBGYN residencies. . . .  KCl injections, however, require a physician to use a two-dimensional ultrasound image to visualize and guide a needle through three-dimensional maternal and fetal structures, while the fetus is moving." (Dkt. No. 73-9, ¶ 14).  Dr. Wenstrom received during her MFM fellowship hundreds of hours of highly specialized ultrasound training that served as a necessary foundation for KCl-injection training (*Id.*).

137.     Dr. Wenstrom also describes the training she received to do two advanced ultrasound guided needle procedures that were essential to acquiring the skills required for more technically difficult KCl injections; those procedures are genetic amniocentesis, of which Dr. Wenstrom performed approximately 40 to 50 training procedures, and cordocentesis after achieving mastery of genetic amniocentesis, of which Dr. Wenstrom performed approximately 20 to 30 cordocentesis procedures (Dkt. No. 73-9, ¶ 15).  Then, during Dr. Wenstrom's medical genetic fellowship she assisted a mentor in performing intracardiac KCl injections before performing the procedure herself, under her mentor's supervision (*Id.*).

138.     According to Dr. Wenstrom, "[a] physician who does not have experience performing many dozens of ultrasound-guided needle procedures (such as the genetic

amniocentesis and cordocentesis procedures described above) would first need to become expert in performing prenatal ultrasound exams, and then need to perform at least 30 to 40 KCl injections under the direct supervision of a trained expert before he or she could be trained to competency and perform the procedure with confidence that it would not cause additional stress or risk to the patient or fetus." (Dkt. No. 73-9, ¶ 16).

139.    Dr. Wenstrom offers that, "[i]n view of the relatively low volume of available KCl-injection procedures, [she has] been able over the course of the last 20 years to train only two MFM fellows in administering KCl injections, one of whom was not able to participate in enough procedures to be trained to competency." (Dkt. No. 73-9, ¶ 17).

140.    According to Dr. Wenstrom, she was the only physician trained in the procedure when she was on faculty from 2009 to 2018 at Women and Infant's Hospital, which she describes as a tertiary women's hospital in Providence, Rhode Island, that does 8,700 deliveries a year; is not currently aware of any other physicians in Rhode Island who are trained in the procedure; and is aware of at most only two other physicians in the greater Boston area who are trained in the procedure (Dkt. No. 73-9, ¶ 17).

141.    Dr. Wenstrom identifies additional obstacles to obtaining the necessary training to perform KCl injections, such as the physician's need to take significant time off from current practice; the likely need to move to another part of the country to obtain the training; find a qualified MFM or medical-genetics OBGYN physician willing to provide the training and who has a high enough case volume that he or she could train the physician to competency within a reasonable period of time; and likely need to complete the entire three-year MFM fellowship program, with no ability to learn solely KCl injections (Dkt. No. 73-9, ¶ 18).

142.    Even with all of that, Dr. Wenstrom opines that, "[n]o matter their level of training, in [her] experience, certain physicians simply do not have the requisite hand-eye coordination and skill in ultrasonography necessary for KCl injections." (Dkt. No. 73-9, ¶ 19).

143.    In addition to a trained physician, KCl injections also require the assistance of a trained and sophisticated ultrasound technician or another physician who can accurately guide the ultrasound transducer so that the physician performing the injection has – at certain times – both hands available for the procedure, according to Dr. Wenstrom (Dkt. No. 73-9, ¶ 20). Dr. Wenstrom explains the reasons for this requirement in relation to the KCl injection procedure and its requirements (Dkt. No. 73-9, ¶ 21).

144.    There are a number of maternal health risks with KCl injections, according to Dr. Wenstrom (Dkt. No. 73-9, ¶ 22). She provides as examples risks of maternal tissue damage and severe pain if the KCl is inadvertently injected into the uterine muscle, and maternal cardiac arrest if the KCl is inadvertently injected into a material blood vessel (Dkt. No. 73-9, ¶ 22a), risks of infection or chorioamnionitis, a serious condition in which the membranes surrounding the fetus are infected by bacteria, resulting from transfer of bacteria from the maternal skin surface to the uterus (Dkt. No. 73-9, ¶ 22b), and although unlikely if performed by a trained physician, an unsuccessful procedure can result in sepsis or the need for a hysterectomy (Dkt. No. 73-9, ¶ 22c).

145.    Dr. Wenstrom explains that KCl injections can be very complicated or even impossible to perform in women with common conditions such as obesity or uterine fibroids (Dkt. No. 73-9, ¶ 23). Dr. Wenstrom explains the reasons why these common conditions impact KCl injections (*Id*.).

146.    According to Dr. Wenstrom, the procedure itself can be an upsetting and uncomfortable experience for the patient, especially in view of the size of the needle (Dkt. No. 73-

9, ¶ 24).  The patient is awake throughout the procedure and will feel pain as the needle penetrates the skin and the uterus.  Although there are methods to reduce pain at the skin, uterine pain cannot be prevented, according to Dr. Wenstrom (*Id.*).  Patients' pain tolerance and anxiety level can complicate the procedure making it even more difficult, as Dr. Wenstrom explains (*Id.*).

147.    Dr. Wenstrom also avers that "[i]n the event that the initial procedure is unsuccessful, a second procedure must be performed.  Undergoing the procedure twice is extremely physically and emotionally stressful for the patient, and subjects her to risks all over again.  Continuing a pregnancy after an incomplete KCl injection could be dangerous and thus medically inappropriate, given the risks to maternal health and likely harm that would result to the fetus." (Dkt. No. 73-9, ¶ 25).

148.    Umbilical cord transection involves the physician rupturing the membranes, inserting a suction tube or other instrument such as forceps into the uterus, and grasping the cord, if possible, to divide it with gentle traction, which will cause demise over the course of up to 5 to 10 minutes (Dkt. No. 4, ¶ 32; Dkt. No. 23-15, ¶ 8).

149.    The success and ease of this procedure depends on placement of the umbilical cord. If the umbilical cord is blocked by the fetus, it would be very difficult and very risky to attempt to reach it (Dkt. No. 4, ¶ 33; Dkt. No. 73-2, ¶ 25).

150.    The serious risks to which a patient may be exposed during this procedure include uterine perforation (Dkt. No. 73-2, ¶ 25).

151.    Umbilical cord transection is not widely practiced or researched (Dkt. No. 4, ¶ 32).

152.    There has been only one scientific study on the use of cord transection to cause fetal demise; physicians relied upon by both sides agree on this (Dkt. No. 32-1, ¶ 11; Dkt. No. 32-3, at 42; Dkt. No. 73-1, ¶ 20).

153. The one scientific study on the use of cord transection has limitations and does not support any conclusion about the safety of the procedure (Dkt. No. 32-1, ¶¶ 12-13). That study reports on the use of transection for demise in a single setting (Dkt. No. 73-1, ¶ 22).

154. Attempting umbilical cord transection before 16.0 weeks LMP is completely unstudied, and like injections, these procedures are more difficult to perform the earlier in pregnancy a woman seeks care. Successfully identifying and transecting the cord at early gestations would take additional time and likely multiple passes with forceps (Dkt. No. 32-1, ¶¶ 14-15).

155. There are some women for whom umbilical cord transection is not medically appropriate; physicians relied upon by both parties agree on this (Dkt. No. 4, ¶ 32; Dkt. No. 23-15, ¶ 12).

156. In some cases, the fetus blocks access to the cord, rendering it difficult, if not impossible, to grasp the cord before using forceps to remove fetal tissue; even if the physician is ultimately successful, the mechanics of the procedure will increase its duration and risk, such as by prolonging the patient's bleeding and increasing the risk of uterine perforation and cervical injury (Dkt. No. 4, ¶¶ 32-34).

157. Moreover, physicians may grasp and separate fetal tissue instead of or in addition to transecting the cord, meaning the provider would know that they may be unable to avoid transecting fetal tissue even if he or she does not intend to do so (Dkt. No. 4, ¶ 35; Dkt. No. 73-2, ¶ 25).

158. Mark D. Nichols, M.D., an expert upon whom Dr. Hopkins relies, does not perform umbilical cord transection (Dkt. No. 4, ¶¶ 32-35; Dkt. No. 32-1, ¶¶ 11-15).

159.     No physician to whom either party cites would require cord transection in their respective practices (Dkt. No. 4, ¶ 34; Dkt. No. 5, ¶ 25d; Dkt. No. 32-3, at 40).

160.     Joseph R. Biggio, Jr., M.D., an expert upon whom defendants rely, admits that he would not require umbilical cord transection before every abortion because there is no medical benefit to doing so (Dkt. No. 32-3, at 40).  He also offered testimony about risks from the procedure under specific circumstances and limited literature he reviewed regarding the procedure (Dkt. No. 32-3, at 40-43).

161.     Physicians cannot safely guarantee fetal demise in every case before commencing a D&E, even under the workarounds suggested by defendants (Dkt. No. 73-1, ¶ 13).[10]

162.     The longer a D&E takes and the more instrument passes into the woman's uterus occur, the higher the risks of uterine perforation and other complications; physicians relied upon by both sides agree on this (Dkt. No. 4, ¶¶ 32-34; Dkt. No. 5, ¶ 25d; Dkt. No. 32-1, ¶¶ 13, 15; Dkt. No. 23-15, ¶ 8; Dkt. No. 32-3, at 40-41; Dkt. No. 25-4, ¶ 6).

163.     According to Dr. Parker, "[b]ecause there is no way to guarantee fetal demise with every patient," the D&E Mandate "prohibits abortion beginning as early as 14 weeks LMP." (Dkt. No. 73-2, ¶ 27).

164.     According to Dr. Parker, if physicians were required under the D&E Mandate to attempt a digoxin injection for every patient before 18.0 to 20.0 weeks LMP and half of LRFP's patients between 18.0 and 20.0 weeks -- who make up the vast majority of second trimester patients

---

[10]  The Court also rejects Dr. Wyatt's assertion that "there are several ways to cause a baby's demise prior to a D&E including injection of medications, injection of potassium chloride, and severing of the baby's umbilical cord (umbilical transection)." (Dkt. No. 25-4, ¶ 5).  Dr. Wyatt professes no expertise in the area of abortion care having professed to not performing an elective abortion since his residency from 1981 to 1985 (Dkt. No. 25-4, ¶ 1).  Dr. Wyatt does not base his assertion on any reported study or medical literature and his opinion is directly contradicted by the affidavits of plaintiffs' more qualified experts (Dkt. Nos. 73-1, ¶¶ 13-22; 73-2, ¶¶ 23-26; 73-9).

at LRFP -- these patients would have to make an additional trip to LRFP because their one day procedures would become two day procedures. These patients who currently make two trips to the clinic would have to make three – and spend extra time, overnight, near the clinic (Dkt. No. 73-3, ¶ 34).

165.    Requiring the vast majority of LRFP patients to make a further additional trip to the clinic would impose additional logistical and financial burdens on these patients, who are the greatest majority of second-trimester patients at LRFP (Dkt. No. 73-3, ¶ 35). Requiring patients to undergo an additional demise procedure, in addition to the D&E procedure, could also increase the cost of the procedure, imposing another financial burden on LRFP patients (Dkt. No. 73-3, ¶ 35).

166.    Because the D&E Mandate has no exception for failed demise attempts, patients may be forced to undergo multiple demise procedures, which could entail repeat trips to the clinic or may be denied care altogether (Dkt. No. 73-3, ¶ 34).

167.    The risks associated with legal abortion utilizing current methods increase as pregnancy progresses, particularly if that delay pushes a woman from the first trimester to the second trimester. Studies demonstrate increased risks of complications, such as bleeding and uterine perforation, associated with abortions performed later in pregnancy (Dkt. No. 4, ¶ 10; *see also* Dkt. No. 25-4, ¶ 7; Dkt. No. 73-2, ¶¶ 30-31).

168.    Delay also means that a woman may pay more for the abortion procedure itself because the procedure becomes more complex as pregnancy advances (Dkt. No. 6, ¶ 14; Dkt. No. 73-2, ¶¶ 30-31).

169.    Dr. Nichols cites foundational tenets of medical ethics as: that providers respect patients' autonomy, including an obligation to act only with patients' informed consent; that

providers act in patients' best interests; that providers avoid unnecessary harm to patients; and that providers acts in a manner to promote justice for patients and society more generally (Dkt. No. 73-1, ¶ 23). Dr. Nichols offers the opinion that the D&E Mandate would force Arkansas physicians who perform D&E procedures to practice medicine in ways that are not compatible with foundational tenets of medical ethics because forcing physicians to subject every patient to an additional procedure in an attempt to cause fetal demise – regardless of the fact that in certain cases, the additional procedure may be contraindicated, experimental, expose the patient to increased risk, and/or require the patient to make an otherwise unnecessary and burdensome additional trip to the clinic – or force the patient to seek out-of-state care would violate the foundational tenets of medical ethics he identifies (Dkt. No. 73-1, ¶¶ 23-24).

170.    In support of their response to plaintiffs' request for preliminary injunctive relief, defendants include a declaration of Joseph R. Biggio Jr., M.D., prepared in August 2016 and submitted with specific regard to a proposed Alabama law directed to the performance of D&E in Alabama in the case of *West Alabama Women's Center v. Strange*, No. 2:15-cv-497-MHT (Dkt. No. 23-15). The Court observes the following.

(1)    Plaintiffs include in the record transcripts of testimony given by Dr. Biggio in the Alabama case (Dkt. No. 32-3); defendants do not. Dr. Biggio has not submitted a declaration specific to the Arkansas D&E Mandate challenged in this litigation nor has he appeared to offer testimony at any of the hearings conducted by the Court to date in this matter. In the Alabama litigation in which Dr. Biggio participated directly, the district court entered a preliminary and permanent injunction barring enforcement of the Alabama law directed to the performance of D&E in Alabama, and the Eleventh Circuit Court of Appeals affirmed the district court's decision. In

the both the district court's opinion granting a preliminary injunction and a permanent injunction, the district court discounted Dr. Biggio's opinion. *See W. Alabama Women's Ctr. v. Miller*, 217 F. Supp. 3d 1313, 1339 n.24 (M.D. Ala. 2016); *W. Alabama Women's Ctr. v. Miller*, 299 F. Supp. 3d 1244, 1279-80 (M.D. Ala. 2017), aff'd *sub nom. W. Alabama Women's Ctr. v. Williamson*, 900 F.3d 1310 (11th Cir. 2018). The district court found that Dr. Biggio "has expertise in the provision of potassium-chloride injections in an academic medical center, but that he has significantly less expertise than the plaintiffs' experts on abortion in general, because he does not in any sense specialize in abortion and has performed far fewer such procedures. In particular, he did not evince significant knowledge of the provision of abortion in outpatient-clinic settings or the conditions that exist in those clinics, and his testimony as to digoxin injection and umbilical-cord transection was largely theoretical and not based on experience. Accordingly, the court gave his testimony less weight based on those concerns." *W. Alabama Women's Ctr. v. Miller*, 299 F. Supp. 3d 1244, 1279 (M.D. Ala. 2017), *aff'd sub nom. W. Alabama Women's Ctr. v. Williamson*, 900 F.3d 1310 (11th Cir. 2018). With respect to his opinion that umbilical-cord transection would be feasible, the district court concluded that Dr. Biggio "did not recognize the differences between the type of specialized hospital where he practices and the clinics." *Id*.

(2) In other words, Dr. Biggio's declaration, testimony, and other evidence did not carry the day for the State of Alabama in that case at the trial court level or on appeal; the challenged Alabama law was enjoined permanently as unconstitutional. *See West Alabama Women's Center*, 209 F.Supp.3d 1244. In the Eleventh Circuit

opinion, the court observed: "The State's expert, Dr. Joseph Biggio, testified that digoxin injections would subject women to 'an approximately 5–10% risk of spontaneous onset of labor, rupture of the membranes or development of intrauterine infection,' and 'small risks of bleeding, infection, and inadvertent penetration of the bowel or bladder with the needle.' He also testified that potassium chloride subjects women to bleeding, sepsis, bowel or bladder injury, and cardiac arrest." *W. Alabama Women's Ctr. v. Williamson*, 900 F.3d 1310, 1325 n.12 (11th Cir. 2018).

(3) Dr. Biggio avers, with respect to digoxin injection: "whether injected into the amniotic cavity or directly into the fetus, has been reported to take up to 24 hours to cause demise when effective. Rates of producing demise following a single injection of digoxin are approximately 95% in the literature. There are not good data on the effectiveness or timeframe for the effect of a second injection should the first not result in demise." (Dkt. No. 23-15, ¶ 6).

(4) With respect to the injection-based procedures suggested as work arounds to the Alabama law, Dr. Biggio avers that, "it is [his] expert medical opinion that without additional training in the performance of these injections-based procedures that [the board certified OBGYN physicians who regularly perform abortions] would feel inadequately trained in these techniques, especially intracardiac injection of potassium chloride." (Dkt. No. 23-15, ¶ 15). Dr. Biggio also avers that, "[g]iven the similarity of these procedures to the performance of an amniocentesis, a procedure which obstetrics and gynecology residents are trained to perform, a board-certified obstetrician-gynecologist should be able to acquire the requisite

skills with appropriate training." (Dkt. No. 23-15, ¶ 11).  Dr. Biggio does not offer

information in his declaration regarding what that training would entail

(5)     Dr. Biggio provided testimony involving a proposed Alabama law with respect to

the current frequency of the procedure, the training available, and the training

necessary to perform these highly specialized procedures (Dkt. No. 32-3, at 30, 35-

37).  In granting a permanent injunction, the district court in the Alabama case

rejected Dr. Biggio's testimony relating to the plaintiffs' ability to administer

potassium chloride injections.  *W. Alabama Women's Ctr.*, 299 F. Supp. 3d at 1280.

The district court found that Dr. Biggio's estimate that it would take only "10-20

procedures for the plaintiffs to learn to inject potassium chloride for purposes of

performing abortions in the outpatient clinics" was "unreasonably low given the

technical difficulty of the procedure, the severity of the potential health risk to the

woman, and the difference in technological and emergency resources between the

academic hospital where the State's expert works and the plaintiffs' outpatient

clinics."  *Id*.

(6)     On cross examination at the preliminary injunction hearing in the Alabama case,

Dr. Biggio admitted that he had no idea of the prevalence of any of the specific

methods offered by the State of Alabama to induce fetal demise (Dkt. No. 32-3, at

32); he had no idea of the percentage of physicians performing abortions used any

of the methods the State of Alabama proposed for fetal demise (*Id.*).

171.   Defendants submit an article titled, "*What about us?  Staff reactions to D&E*," that

states on the first page it was "[p]resented at the 1978 meeting of the Associated of Planned

Parenthood Physicians, San Diego, California, October 26" (Dkt. No. 23-2).   There is no

sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

172.    Defendants submit an article titled, "Perspective on Human Life:  Why I No Longer Do Abortions:  Tearing a second-trimester fetus apart simply at a mother's request is depravity that should not be permitted," that is dated September 12, 1991 (Dkt. No. 23-3).    There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

173.    Defendants submit an article titled, "Recent advances in second-trimester abortion: an evidence-based review," that is dated April 2009 (Dkt. No. 23-4).   There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

174.    Defendants submit an article titled, "A randomized pilot study on the effectiveness and side-effect profiles of two doses of digoxin as fetocide when administered intraamniotically or intrafetally prior to second-trimester surgical abortion," dated 2010 (Dkt. No. 23-5).   Based upon the abstract, the study design was:  "Fifty-two women presenting for elective termination of pregnancy between 18 and 24 weeks gestation were randomized to one of four digoxin treatment groups:  1.0 mg intraamniotic (1.0 IA), 1.0 mg intrafetal (1.0 IF), 1.5 mg intraamniotic (1.5 IA) or 1.5 mg intrafetal (1.5 IF)." (Dkt. No. 23-5, at 1).   Again, based upon the abstract, the results were: "Digoxin effectively induced fetal death in 87% of women.  The failure rate did not vary by route of administration (IA or IF) and was not lowered by increasing the dose from 1.0 to 1.5 mg.  IF injections induced fetal death more rapidly than IA injections.  Digoxin administration did not result in increased pain or nausea." (Dkt. No. 23-5, at 1).   There is no sponsoring witness for this

document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

175.    Defendants submit an article titled, "Induction of fetal demise before abortion," dated January 2010 (Dkt. No. 23-6).  The abstract makes clear the limited study of the methods of fetal demise prior to D&E and states, in pertinent part:  "Additional randomized trials might provide clearer evidence upon which to make further recommendations about any role of inducing demise before surgical abortion.  At the current time, the Society of Family Planning recommends that pharmacokinetic studies followed by randomized controlled trials be conducted to assess the safety and efficacy of feticidal agents to improve abortion safety."  (Dkt. No. 23-6, at 1).  There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

176.    Defendants submit an article titled, "Potassium Chloride-Induced Fetal Demise:  A Retrospective Cohort Study of Efficacy and Safety," which is dated 2014 (Dkt. No. 23-7).  "The study was a retrospective cohort analysis of all patients presenting for induction of fetal demise before termination of pregnancy at Yale New Haven Hospital's Department of Obstetrics, Gynecology, and Reproduction Sciences between October 2002 and October 2011. . . .   All procedures were performed by maternal-fetal medicine attending physicians or by fellows directly supervised by an attending physician. . . .  Of the 197 procedures planned from October 2002 to October 2011, 192 were completed (97.5%).  Five procedures were stopped before injections of KCl.  Three of these procedures were stopped before KCl injection because of maternal discomfort. A fourth procedure was stopped before KCl injection because of a change in the fetal position. The fifth procedure was stopped because of the onset of a maternal seizure, with placement of the needle again before injection of the feticidal agent. . . .   There was 1 procedure that was considered

a failed procedure because asystole was not confirmed after injection of KCl. . . . Thus, of the 192 completed procedures of intracardiac KCl-induced fetal demise, 191 were successful (99.5%)." (Dkt. No. 23-7, at 2-3). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

177. Defendants submit an article titled, "Surgical Abortion in the Second Trimester," dated 2008 (Dkt. No. 23-8). This article reviewed, as of 2008, the then-current "surgical methods used in second trimester abortion, as well as their safety, advantages and disadvantages, acceptability and associated complications." (Dkt. No. 23-8, at 1). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

178. Defendants submit an article titled "Intracardiac injection of potassium chloride as method for feticide: experience from a single UK tertiary centre," dated November 27, 2007 (Dkt. No. 23-9). Based upon terms used in the article, the study period was January 2000 to December 2005, examined "239 late terminations of pregnancy performed at a median gestational age of $22^{+6}$ weeks (range $20^{+6}$ to $36^{+3}$ weeks)." (Dkt. No. 23-9, at 1). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

179. Defendants submit an article titled "Effectiveness and safety of digoxin to induce fetal demise prior to second-trimester abortion," dated 2008 (Dkt. No. 23-10). Based upon the abstract, the study design was: "A retrospective cohort analysis of 1795 pregnant women between 17 and 24 weeks' gestation who received varying doses of digoxin by transabdominal intrafetal or intra-amniotic injection at the time of laminaria placement was conducted. . . . Digoxin dosages

started at 1.0 mg for intrafetal and 0.5 mg for intra-amniotic injections and were progressively decreased based on best clinical judgment." (Dkt. No. 23-10, at 1). Based on the abstract, the results were: "The overall rate of failure to achieve fetal demise was 6.6% (95% Cl, 5.507.9). Failure rates varied according to route of administration and dosage. There were no failures using a 1.0-mg intrafetal dose, but failures occurred with lower doses. Failure rate were higher with 0.5 mg for intra-amniotic (8.3%) than intrafetal administration. There were no adverse material events at any of the doses in this study." (Dkt. No. 23-10, at 1). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

180.    Defendants submit an article titled, "Relationship of intraamniotic digoxin to fetal demise," dated 2010 (Dkt. No. 23-11). According to the article, the study involved 22 women with a mean gestational age of 19.0 weeks (range 18 to 22.5 weeks) (Dkt. No. 23-11, at 2). The study was designed to assess "ultrasonic fetal cardiac assessments 1, 2, 4 and 20 to 24 h after intraamniotic injection of 1.5 mg of digoxin." (Dkt. No. 23-11, at 1). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

181.    Defendants submit an article titled, "Laminaria, induced fetal demise and misoprostol in late abortion," dated April 13, 2001 (Dkt. No. 23-12). This study, based on its abstract, examined during a nine year period, 1,677 abortions performed on patients whose pregnancies ranged "from 18 to 34 menstrual weeks in an outpatient facility." (Dkt. No. 23-12, at 1). The conclusion reached: "Outpatient abortion may be performed safely from 18 through 34 menstrual weeks using combined surgical and medical procedures. Use of intrauterine post-amniotomy misoprostol was associated with reduced amniotomy-to-procedure time and reduced

variability in the amniotomy-to-procedure time." (Dkt. No. 23-12, at 1). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

182. Defendants submit an article titled, "Umbilical cord transection to induce fetal demise prior to second-trimester D&E abortion," 2013 (Dkt. No. 23-13). Based on the abstract, the study design was: "This descriptive report from a single center involves a large case series of D&Es ranging from 16 to 23 weeks of gestation. Umbilical cord transection (UCT) was attempted immediately prior to D&E in 407 cases, which were reviewed to determine success, time to fetal asystole and complications." (Dkt. No. 23-13, at 1). The center was "a free-standing women's surgical center that provides abortion to 22 weeks of gestational age" (Dkt. No. 23-13, at 2). Based on the abstract, the results were: "Both UCT and asystole were achieved in 100% of cases. . . . Few patients had minor (4.6%) or major (0.3%) complications; time to asystole was not associated with complications." (Dkt. No. 23-13, at 1). Based on language in the article: "During the study period, 468 patients presented at 16-22 weeks as determined by preoperative ultrasound. Fifteen cases were excluded from the cohort for clinical reasons (e.g., IUFD, precipitous delivery). An additional 46 patients were excluded due to incomplete medical records. Thus, 407 cases were eligible for analysis." (Dkt. No. 23-13, at 2). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

183. Defendants submit an article titled, "Safety of digoxin for fetal demise before second-trimester abortion by dilation and evacuation," dated 2012 (Dkt. No. 23-14). Based on the abstract, the study design was: "a retrospective cohort study with historical controls at a large family planning center. We reviewed the records of patients at 18 to 24 weeks' gestation who

received digoxin before D&E from May 15, 2007 (date the center initiated digoxin use), through March 31, 2008. We also reviewed the records of patients who presented for D&E without digoxin from February 22, 2006, through May 12, 2007. We compared the rates of immediate complications." (Dkt. No. 23-14, at 1). Based on the abstract, the results were: "We included 566 digoxin patients and 513 controls. Eleven spontaneous abortions occurred in the digoxin cohort; none occurred among controls (p<.001). We found 19 cases of infection in the digoxin and three among controls (odds ratio 5.91; 95% confidence interval 1.74-20.07). Eleven digoxin patients were admitted to a hospital after the preoperative visit; no controls were admitted (p<.001)." (Dkt. No. 23-14, at 1). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

184.    Defendants submit the prescribing information for digoxin, dated 2011 (Dkt. No. 25-1). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

185.    Defendants submit a document titled, "Specifications S-21: The Law Enforcement Code of Ethics," with no date (Dtk. No. 25-2). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

186.    Defendants submit an article titled, "Short and long term mortality rates associated with first pregnancy outcome: Population register based study for Denmark 1980 – 2004," dated 2012 (Dkt. No. 25-5). There is no sponsoring witness for this document to explain, among other

things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

187. Defendants submit an abstract from an article titled, "The comparative safety of legal induced abortion and childbirth in the United States," dated 2012 (Dkt. No. 25-6). According to the abstract, the results were: "The pregnancy-associated mortality rate among women who delivered live neonates was 8.8 deaths per 100,000 live births. The mortality rate related to inducted abortion was 0.6 deaths per 100,000 abortions. In the one recent comparative study of pregnancy morbidity in the United States, pregnancy-related complications were more common with childbirth than with abortion." (Dkt. No. 23-6, at 1). The exhibit appears focused on a comment with respect to the abstract or study. There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

188. Defendants submit an article titled, "Detective obtain fetal tissue as part of rape investigation," that is dated September 23, 2011, and appears to be from *The Spokesman-Review* (Dkt. No. 25-7). It reports on a case from Spokane, Washington (*Id.*). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

189. Defendants submit an article titled, "Tissue From Aborted Fetus Is Tested In Rape Case," dated November 1, 1990, that appears to be from *The New York Times* (Dkt. No. 25-8). It reports on a case from Texas (*Id.*). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

190.    Defendants submit an article titled, "DNA From Pre-Teen's Late Term Abortion Matches Milwaukee Suspect," updated February 9, 2017, that appears to have been printed from the internet (Dkt. No. 25-9). It reports on a case from Milwaukee, Wisconsin (*Id.*). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

191.    Defendants submit an article titled, "Fetal DNA filed in '02 leads to guilty plea in rape of St. Paul girl," dated March 29, 2012, that appears to be from the *Star Tribune* (Dkt. No. 25-10). It reports on a case from St. Paul, Minnesota (*Id.*). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

192.    Defendants submit a document titled, "Arkansas DHS Statistical Report The Division of Children and Family Services SFY 2015," with information from 2015 (Dkt. No. 25-11). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

193.    Defendants submit a document titled, "Induced Abortion Report 2019," from the Center of Health Statistics, Arkansas Department of Health dated June 1, 2020, with information from 2019 (Dkt. No. 92-16). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

194.    Defendants submit an article titled, "Feasibility, effectiveness and safety of transvaginal digoxin administration prior to dilation and evacuation," dated 2013 (Dkt. No. 25-13). Based on the abstract, the study design was: a "descriptive report from a single center

involves a large case series of dilations and evacuations (D&Es) ranging from 18 to 22 weeks of gestation. Transvaginal feticidal injection with digoxin was attempted in 1640 cases; intrafetal, intraamniotic and combined (intrafetal and intraamniotic) injections were administered. Digoxin dosage ranged from 0.5 to 3.0 mg, with the majority receiving 1.0 mg. Cases were reviewed to determine feasibility, efficacy and adverse events." (Dkt. No. 25-13, at 1). According to the abstract, the results were: "Successful completion of transvaginal injection occurred in 98.5% (1637/1662) of eligible cases, and 1596 cases were evaluable for fetal demise. Demise occurred by the time of D&E in 99.4% of all cases; 99.7% of intrafetal injections resulted in fetal demise. Doses ≥1 mg were equally effective (98.1%-99.6%) regardless of injection site (intraamniotic, combined intrafetal/intraamniotic or intrafetal). Doses <1.0 mg were less successful at inducing demise if not administered intrafetally (p<.001). Rates of ruptured membranes (4.1%), chorioamnionitis (0.49%) and extramural deliveries (0.12%) were low. Patients who experienced complications were more likely to be of greater gestational age and have had a previous cesarean section." (Dkt. No. 25-13, at 1). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

195. Defendants submit an article published May, 1978, titled, "A Randomized Study of 12-mm and 15.9-mm Cannulas in Midtrimester Abortion by Laminaria and Vacuum Curettage" by Phillip G. Stubblefield, M.D. *et al.* (Dkt. No. 92-17). The article summarizes findings of a study that evaluated the use of a 16 mm vacuum cannula and compared it to a 12-mm vacuum system to "empty the uterus." (Dkt. No. 92-17, at 1). The article states the study concluded that the "large-cannula system was able to empty the uterus through 16 weeks, but at 17 and 18 weeks it offered no advantage over the smaller system and forceps were always needed." (*Id.*). The

article "caution[s] against forcible cervical dilation to 16 mm and urge[s] the use of laminaria instead" and stated the "findings together with published reports of the safety of late dilations and evacuation, would appear to justify wider clinical trials by experienced investigators." (*Id*.). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

196.    Dr. Nichols states in his rebuttal declaration attached to plaintiffs' reply that authors of the Stubblefield study's "sample size for 15 to 16 weeks LMP is very small, including only 11 patients.  Suction was adequate on its own to complete an abortion in only 6 of those 11 cases (about 50% of the patients).  In the remaining 5 cases, fetal tissue lodged at the tip of [the] cannula and had to be manually removed." (Dkt. No. 93-1, ¶ 6a).  In Dr. Nichols's opinion, "[b]ecause the fetus would not be intact in those circumstances, a clinician in similar circumstances would be at risk of violating a law like the D&E Ban." (*Id*.)  Dr. Nichols also states that "the study noted that forceps were required in every instance at 17 weeks LMP." (*Id*.).

197.    Defendants submit Chapter 11 "Dilation and Evacuation" from *Management of Unintended and Abnormal Pregnancy:  Comprehensive Abortion Care*, published in 2009 (Dkt. No. 92-12).  Related to "Standard D&E" the authors state that, "[e]arly in the second trimester, suction may suffice to remove the fetus and placenta without the use of forceps." (Dkt. No. 92-12, at 21).  The authors further observe that even at 16 weeks "forceps may be needed to extract some fetal parts such as the calvarium or spine" and that "[a]fter about 16 weeks' gestation, the 16-mm suction cannula alone is not sufficient, and forceps extraction is necessary." (*Id*.).  Defendants offer no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

198.     Dr. Nichols states in his rebuttal declaration attached to plaintiffs' reply that authors of the "Dilation and Evacuation" chapter do not rely on any independent analysis or study, but "relies exclusively" on a "study involving 11 patients for this proposition." (Dkt. No. 93-1, ¶ 6b).

199.     Defendants submit an article titled, "Methods for Induced Abortion" by Phillip G. Stubblefield, M.D. *et al*. published July, 2004 (Dkt. No. 92-14).  The article states that the "16-mm cannula system (MedGyn, Lomard, IL) allows evacuation with the vacuum curette alone through 16 weeks, but at 17 weeks and beyond, even this large-diameter aspiration system is not adequate by itself.  Forceps evacuation becomes the primary method and vacuum the secondary." (Dkt. No. 92-14, at 6).  There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

200.     Dr. Nichols states in his rebuttal declaration attached to plaintiffs' reply that, "[t]his study again relies solely on the *Subblefield, Albrecht, et al.* [study] for the proposition that a '16-mm cannula system [] allows evacuation with the vacuum curette alone through 16 weeks.'" (Dkt. No. 93-1, ¶ 6c).  Dr. Nichols states that the study acknowledges that beyond 17 weeks "[f]orceps evacuation becomes the primary method and vacuum, the secondary." (*Id*.).

201.     Defendants submit an article entitled, "Manual vacuum aspiration for second-trimester pregnancy termination" by C.S. Todd, *et al*. dated May 28, 2003 (Dkt. No. 92-13).  According to the abstract, the objective was to "compare manual and electric vacuum aspiration for surgical abortions between 14 and 18 weeks of pregnancy."  The results indicated that, "[t]here was no significant difference in procedure time between the two groups." (*Id*.).  There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

202.    Dr. Nichols states in his rebuttal declaration attached to plaintiffs' reply that the Todd article compares the use of two types of vacuum aspiration to "initiate the D&E procedure— in other words, prior to using forceps to remove fetal tissue." (Dkt. No. 93-1, ¶ 6d).  According to Dr. Nichols, the study did not "examine, let alone offer any conclusions, about whether and when suction is sufficient to cause demise prior to the use of forceps." (*Id.*).  Dr. Nichols states that, "the study itself acknowledges that the size of the cannula depended on, among other things, 'the preference of the surgeon, and the pliability of the cervix.'" (*Id.*).  In Dr. Nichols's opinion, "Defendants' reliance on this study for the conclusion that abortions can be accomplished by suction 'up to 18 weeks' (Defs.' Br. at 52) is therefore completely unsupported." (*Id.*).

203.    At the time this lawsuit was filed in 2017, doctors at LRFP requested medical records for only a "tiny fraction" of patients or approximately 25 patients per year (Dkt. No. 6, ¶ 24).  In 2020, Ms. Williams avers the same, explaining that a "tiny fraction" of patients is on average about 20 to 25 patients per year for whom doctors at LRFP request medical records (Dkt. No. 73-3, ¶ 39).

204.    According to Dr. Parker, a patient's medical records from another health care provider are almost never relevant to or required for abortion care, and it is exceedingly rare for him to seek medical records from another clinician prior to providing an abortion (Dkt. No. 73-2, ¶ 34).  He does not recall any instance of broadly requesting medical records about a patient's full reproductive history, even from a single other health care provider, before performing an abortion (Dkt. No. 73-2, ¶ 37).  In almost all situations, according to Dr. Parker, medical records play no role in and would not affect abortion health care (Dkt. No. 73-2, ¶¶ 34, 37).

205.    Dr. Parker explains that, when he does request medical records for patients, the records typically relate to a patient's comorbidities, rather than to pregnancy itself (Dkt. No. 73-2,

¶ 35).  He has on occasion requested records from patients' other treating physicians, with the patients' consent, when patients have bleeding disorders or seizure disorders to determine whether providing abortion care in an ambulatory setting is appropriate (Dkt. No. 73-2, ¶ 35).

206.    Dr. Parker also has had patients come to him with some discrete records or have such discrete records conveyed along with a referral, if a fetal anomaly has been diagnosed in the patients' current pregnancy and if the patient seeks further post-abortion tissue testing related to that diagnosis (Dkt. No. 73-2, ¶ 36).  Consistent with this, the patients for whom doctors at LRFP request medical records include patients who have received a diagnosis of fetal anomaly, decided to end the pregnancy, and received a referral to LRFP and patients for whom the doctor believes the records could be useful because of a woman's medical condition (Dkt. No. 6, ¶ 24; Dkt. No. 73-3, ¶ 39).

207.    For LRFP to obtain a patient's medical records, the patient must first sign a form authorizing LRFP to obtain the medical records.  That authorization is then sent along with a request to the health care provider.  LRFP staff then follow-up with a phone call to the health care provider, if necessary (Dkt. No. 6, ¶ 25; Dkt. No. 73-3, ¶ 40).

208.    Because LRFP typically requests records related to some aspect of the care the patient will receive, and therefore involve a specific request, not a request for the patient's full medical history, there is no fee charged for the records (Dkt. No. 6, ¶ 25; Dkt. No. 73-3, ¶ 40).

209.    Even with these specific requests for records, it takes time to obtain a patient's medical records from another health care provider and may take a few hours or up to several weeks (Dkt. No. 6, ¶ 26; Dkt. No. 73-3, ¶ 41).

210.    Ms. Williams avers that, for the few patients for whom LRFP requests medical records, LRFP is generally able to obtain more limited records without delaying abortion care; if

there is a risk that waiting for a patient's records could unduly delay her care, it is within the physician's judgment whether to continue to wait for the records or proceed with her care (Dkt. No. 73-3, ¶ 41).

211.    In Dr. Parker's experience, in those rare instances when he has requested an abortion patient's records from another clinician or facility, securing the records has not been easy (Dkt. No. 73-2, ¶ 38).

212.    Many of Dr. Parker's patients typically have no health care "home" that coordinates care, rely on episodic visits to different providers and facilities as needed, and sporadically receive other health care, if any, in indigent-care settings largely funded by the government, including free clinics, walk-in clinics, urgent care, and emergency rooms (Dkt. No. 73-2, ¶ 38).

213.    When making a request for a patient's complete medical record, a fee usually is charged for obtaining the records (Dkt. No. 6, ¶ 33).  Ms. Williams is aware that some providers charge a fee for records (Dkt. No. 73-3, ¶¶ 40, 49).

214.    In Dr. Parker's experience, securing even discrete portions of patient records from physicians who provided care has often required multiple inquiries by his staff such as by phone, fax, and email to identify where the records may be held, to send the patient's signed records release, and then to make several more contacts to obtain the records (Dkt. No. 73-2, ¶ 39; Dkt. No. 73-3, ¶ 49).

215.    Despite pressing for the records urgently given the time-sensitive nature of abortion care, Dr. Parker's experience has been that it may take many days to fulfill the request (Dkt. No. 73-2, ¶ 40).  If the Medical Records Mandate requires securing records for a patient's entire pregnancy history, Dr. Parker anticipates such an effort would easily stretch over days, weeks, or months and would depend on factors outside of his control (Dkt. No. 73-2, ¶ 42).

216.    The Medical Records Mandate, in Dr. Parker's opinion, will delay abortion care (Dkt. No. 73-2, ¶ 62).  It provides no exceptions and requires a records search for patients (*Id.*).

217.    The language used in the Medical Records Mandate, in Dr. Parker's opinion, is unclear with respect to scope of the record search required (Dkt. No. 73-2, ¶ 33).  Records that might "directly relate" to that "entire pregnancy history" would seem, at a minimum, to encompass labor and delivery records from hospitals; records regarding any prenatal care from obstetricians or other physicians; miscarriage records from physicians or emergency rooms; and any records related to a prior abortion; the language also might include but not be limited to testing and monitoring records created at laboratories, clinics, or ultrasound facilities; and the language could include records of care or monitoring necessary for the patient's own medical conditions exacerbated during the patient's current or past pregnancy, according to Dr. Parker (Dkt. No. 73-2, ¶ 33).  Ms. Williams shares these concerns (Dkt. No. 73-3, ¶ 47).

218.    The language used in the Medical Records Mandate, in Dr. Parker's opinion, is unclear with respect to what constitutes "reasonable time and effort" to obtain the records (Dkt. No. 73-2, ¶ 41).  Ms. Williams shares these concerns (Dkt. No. 73-3, ¶ 46).  This lack of clarity impacts how facilities and physicians can plan abortion care and how patients can schedule their care (Dkt. No. 73-2, ¶ 41; Dkt. No. 73-3, ¶ 46).

219.    At the time this lawsuit was filed in 2017, LRFP provided medical care to approximately 3,000 women each year, the majority of whom had one or more prior pregnancies, during which the women received medical care from one or more providers or received care for a current pregnancy (Dkt. No. 6, ¶ 32).  Ms. Williams confirms that, as of 2020, LRFP sees approximately 2,000 to 3,000 patients each year, the majority of whom have had one or more prior

pregnancies, during which they received medical care from one or more providers and/or received care for their current pregnancy (Dkt. No. 73-3, ¶ 48).

220. While LRFP currently seeks records for approximately 20 to 25 patients per year and seeks only discrete records in most cases, seeking records for more patients if required to do so under the Medical Records Mandate will create additional administrative and procedural obstacles to care (Dkt. No. 73-3, ¶ 48-50). Patients likely would be required to sign a separate form allowing physicians to obtain medical records from each health care provider from whom the patient received past care; seeking complete pregnancy-related medical records likely would result in a fee being charged due to the broad-nature of the request, which fee would have to be paid by the patient or LRFP; and pursuing this type of request from each prior provider likely will require multiple back-and-forth communications with each to have any chance of receiving records, meaning additional LRFP staff and resources devoted to this work (*Id.*). LRFP will then have to coordinate patient care based on the timing of these tasks (*Id.*).

221. The language used in the Medical Records Mandate does not tell abortion providers what, if anything, they are to do with the records obtained (Dkt. No. 73-2, ¶ 44; Dkt. No. 73-3, ¶ 54).

222. To the extent that the Medical Records Mandate is intended to be of service in preventing "Sex Discrimination by Abortion," according to Dr. Parker, it does not serve that aim (Dkt. No. 73-2, ¶ 47). The sex of the embryo or fetus cannot be determined during the earliest stages of pregnancy (*Id.*). Though testing can determine sex as pregnancy progresses, it is not common for patients at LRFP to have undergone any testing that would reveal the sex of the embryo or fetus prior to seeking abortion (*Id.*).

223. Although an ultrasound examination is performed as part of routine prenatal care, it cannot determine the sex of the fetus before the fourteenth week of pregnancy because male and female fetuses develop physically in the same way up to that point (Dkt. No. 73-2, ¶ 48). Further, although prenatal ultrasound is used to date the gestational age of pregnancy at LRFP for abortion patients, that type relies on less powerful ultrasound technology than is used later in pregnancy for prenatal care and does not include informing the patient of the sex of the embryo or fetus, even if it might be determinable (*Id.*; *see also* Dkt. No. 73-3, ¶ 53).

224. There is also a blood test that can disclose information about the sex of the embryo or fetus earlier, but that test typically occurs only for the purpose of assessing the risk of chromosomal abnormalities in wanted pregnancies, is generally available only to those with private health insurance coverage, and is inaccessible to the vast majority of abortion patients at LRFP (Dkt. No. 73-2, ¶ 49).

225. Only a small minority of abortion patients come to LRFP knowing the sex of the fetus, and those patients are almost always seeking abortion only after learning of a fetal diagnosis (Dkt. No. 73-2, ¶ 50; Dkt. No. 73-3, ¶ 52). Their care decision has nothing to do with sex-selection, according to Dr. Parker (Dkt. No. 73-2, ¶ 50).

226. The small minority of abortion patients who come to LRFP knowing the sex of the fetus and seeking abortion care only after learning of a fetal diagnosis necessarily have seen at least one prior pregnancy related medical provider (Dkt. No. 73-3, ¶ 52). Ms. Williams avers that compliance with the Medical Records Mandate even for these patients would delay these patients care at a time when medical risks, costs, and logistical challenges are significantly increasing and would delay these patients timely access to care (*Id.*).

227. Plaintiffs do not challenge the statute's requirements that abortion providers ask each patient if she knows the sex of the embryo or fetus and then inform any LRFP patient that knows the sex "of the prohibition of abortion as a method of sex selection for children." (Dkt. No. 73-2, ¶ 45).

228. There is no record evidence of any abortions occurring in Arkansas "solely on the basis of the sex of the unborn child." (*See* Dkt. No. 73-2, ¶ 46; Dkt. No. 73-3, ¶ 37).

229. Medical records related to a patient's pregnancy history, especially if any past pregnancy resulted in a miscarriage, an ectopic pregnancy, or an abortion, and not a live birth, would be extremely unlikely to contain any record of the sex of the developing embryo or fetus (Dkt. No. 73-2, ¶ 51). Sex-identification is not a standard part of the medical record and in many instances may not even be known at the time of care (*Id.*). Although possible that historical records regarding a wanted pregnancy terminated only after a fetal diagnosis might reflect the sex of the fetus, that notation under such circumstances would not indicate sex selection (*Id.*). Medical records are not necessary to determine the sex of past pregnancies carried to term; the abortion patient can inform the physician of the sex of any children (Dkt. No. 73-2, ¶ 52).

230. Given this, medical records from an abortion patient's past pregnancy history would not provide to a physician any information about whether the patient was currently seeking an abortion "solely on the basis of sex," according to Dr. Parker (Dkt. No. 73-2, ¶ 53).

231. If the Medical Records Mandate's requirement applies only to abortion patients who have demonstrated knowledge of the sex in the current pregnancy, according to Dr. Parker, there is no need for any medical record search to attempt to determine the same, and physicians will have made explicit to the patient, as required by the unchallenged provision of the law, that abortions solely for sex-selection are not permitted (Dkt. No. 73-2, ¶ 56).

232.     LRFP and Dr. Parker are well-known abortion providers. Any request for medical records made by LRFP or Dr. Parker, in and of itself, discloses that the patient likely is seeking an abortion (Dkt. No. 73-2, ¶ 58). As a result, LRFP does not request records without a woman's prior written consent, and some women specifically request that LRFP not seek records from another health care provider because the women do not want that provider to know of the pregnancy and abortion decision (Dkt. No. 6, ¶ 27; Dkt. No. 73-3, ¶ 43).

233.     Some women have informed LRFP that the women fear hostility or harassment from the other health care providers for deciding to seek an abortion; Ms. Williams averts that patients "routinely" tell her they fear this hostility and that "every week" patients ask to ensure their current health care provider will not know that they sought abortion care (Dkt. No. 6, ¶ 28; Dkt. No. 73-3, ¶ 44; see also Dkt. No. 73-2, ¶ 61).

234.     A few years prior to this lawsuit being filed, LRFP requested a woman's medical records from another health care provider and that provider's wife then reached out to the woman in an effort to dissuade her from having an abortion (Dkt. No. 6, ¶ 28; Dkt. No. 73-3, ¶ 44).

235.     Dr. Parker also avers that virtually all patients are desperate to keep the fact of their abortion private (Dkt. No. 73-2, ¶ 59). Many patients are tearful in requesting reassurance from Dr. Parker and his staff that their abortion care will be disclosed to no one, including their other doctors, and seek reassurance that their other health are providers will not be able to tell that they have had an abortion from routine gynecological exams or other check-ups in the future (*Id.*).

236.     Confidentiality is a bedrock principle of medical practice because it is foundational to the physician-patient relationship; patients must be able to share relevant information with the physician, so that the physician can provide the best care, and trust that the physician will keep that information confidential (Dkt. No. 73-2, ¶ 60 (citing *AMA Code of Medical Ethics Opinion*

*3.2.1: Confidentiality*, Am. Med. Ass'n, https://www.ama-assn.org/delivering-care/ethics/confidentiality (last visited Nov. 12, 2020)). These foundational protections extend not only to adults but also to minors accessing reproductive health care (*Id.*). Dr. Parker recognizes that there are limited circumstances not applicable to the Medical Records Mandate that serve as exceptions to this principle (*Id.*).

237.    Dr. Parker and the staff at LRFP take seriously their obligation as mandatory reporters of any suspicion of child abuse, whether sexual or otherwise, and recognize that clinicians' mandatory reporting of suspicions of child abuse is one of the limited, but important, exceptions to confidential health care of any kind (Dkt. No. 73-2, ¶ 68).

238.    Dr. Parker avers that he and the staff at LRFP strictly adhere to the Arkansas Child Maltreatment Act ("CMA") and all the state's specialized child abuse hotline in any case in which the CMA's comprehensive definitions of abuse warrant reporting (Dkt. No. 73-2, ¶ 68-69).

239.    Dr. Parker also avers that he and the staff at LRFP have experience cooperating with law enforcement during active criminal investigations and are well-versed in assisting victims when criminal allegations have been made (Dkt. No. 73-2, ¶ 70).

240.    Under Arkansas law, a woman under the age of 18 must obtain the consent of one parent prior to obtaining an abortion or, alternatively, can seek a judicial bypass (Dkt. No. 6, ¶ 36; Dkt. No. 73-3, ¶ 57). *See* Ark. Code Ann. § 20-16-804.

241.    In 2016, LRFP provided abortions to five minors under the age of 14, all five of whom had parental consent, and 69 minors under the age of 17, all of whom except one had parental consent with the one exception having received a judicial bypass (Dkt. No. 6, ¶ 36).

242. In 2019, LRFP provided abortions to five minors under the age of 14, all of five of whom had parental consent, and 53 minors under the age of 17, all of whom except two had parental consent with the two exceptions having received a judicial bypass (Dkt. No. 73-3, ¶ 57).

243. The numbers from 2016 and 2019 are typical for LRFP in that the majority of women under the age of 17 have obtained a parent's consent to seek medical care at LRFP (Dkt. No. 6, ¶ 36; Dkt. No. 73-3, ¶ 57).

244. A few minor patients of LRFP are married, and those patients' husbands may or may not be involved in the patients' decisions to have an abortion (Dkt. No. 6, ¶ 37; Dkt. No. 73-3, ¶ 58).

245. Under the Child Maltreatment Act, LRFP reports suspected abuse to the Arkansas State Police's Child Abuse Hotline (Dkt. No. 6, ¶ 38; Dkt. No. 73-3, ¶ 59). *See* Ark. Code Ann. § 12-18-402 (providing that mandated reporters "shall immediately notify the Child Abuse Hotline" if they have reasonable cause to suspect child abuse and listing reproductive healthcare facility employees and volunteers as mandatory reporters).

246. Under Arkansas law, for women who are 13 years old or younger, LRFP must freeze and preserve the tissue and have local law enforcement in the jurisdiction in which the minor resides pick it up. Ark. Code Ann. § 12-18-108(a). LRFP sends a form to local law enforcement with information identifying the patient to alert local law enforcement to come pick up the tissue to take the tissue to the Arkansas State Crime Laboratory, where it remains (Dkt. No. 6, ¶ 40; Dkt. No. 73-3, ¶¶ 59, 61); Ark. Code Ann. § 12-18-108(b)(5).

247. Compliance with this law requires, on occasion, LRFP to speak by telephone with local law enforcement and local law enforcement's obligation to comply with the law (Dkt. No. 6, ¶ 41; Dkt. No. 73-3, ¶ 62).

248. In Ms. Williams' experience, with respect to the requirements for patients who are 13 years old or younger, local law enforcement are rarely familiar with the requirements of the applicable law and do not reliably comply with existing law by picking up the preserved tissue for patients who are 13 or younger (Dkt. No. 6, ¶ 41; Dkt. No. 73-3, ¶ 62).

249. Although for most Arkansas patients 13 or younger, local law enforcement eventually arrive to collect the tissue, in one example from the past year, such tissue has not been picked up by the Arkansas local law enforcement, despite numerous contact attempts with law enforcement to explain the requirements (Dkt. No. 73-3, ¶ 64).

250. For patients who are 13 or younger and reside out of state, LRFP makes the same efforts to contact the local police department where the minor resides (Dkt. No. 6, ¶ 42; Dkt. No. 73-3, ¶ 65). Ms. Williams recalls at least two occasions when local out-of-state law enforcement never came to pick up the tissue (*Id.*). According to Ms. Williams, "[c]ommunicating with and involving out-of-state local law enforcement in these situations continues to be a problem. Out-of-state local law enforcement (like most of the local Arkansas police departments) do not understand why [Ms. Williams is] calling, or why they should comply with this Arkansas law. . . ." (*Id.*).

251. Ms. Williams avers that, since the law that applies to patients who are 13 or younger has been in effect in Arkansas, LRFP has never been contacted about the use in any active crime investigation of fetal tissue obtained under the law and stored at the Arkansas State Crime Laboratory (Dkt. No. 73-3, ¶ 69).

252. Local law enforcement can be very small, with as few as two officers, and operate in small communities (Dkt. No. 6, ¶ 45; Dkt. No. 73-3, ¶ 68).

253.     Ms. Williams avers that complying with current Arkansas law for patients who are 13 or younger makes her "uncomfortable" because she is "disclosing to people in the patient's community – people who may know her and her family – that she has had an abortion." (Dkt. No. 73-3, ¶ 68).  Ms. Williams describes a past incident when a patient's relative worked for the local police department to whom Ms. Williams had to make that disclosure (*Id.*).

254.     On occasion, when a LRFP representative has spoken to local law enforcement about the existing law, personnel lecture the LRFP and "preach[] anti-abortion rhetoric, including telling [the representative] that the Clinic is taking a life." (Dkt. No. 6, ¶ 43; Dkt. No. 73-3, ¶ 66).

255.     LRFP, as a part of its routine counseling, discusses with the woman the age of her sexual partner (Dkt. No. 6, ¶ 38; Dkt. No. 73-3, ¶ 59).

256.     In general, when a crime has already been reported, law enforcement are involved before the minor or adult victim visits LRFP, and law enforcement call LRFP before the minor or adult patient arrives.   When an investigation is involved, LRFP preserves tissue for law enforcement (Dkt. No. 6, ¶ 39; Dkt. No. 73-3, ¶ 60).   Under these circumstances, LRFP are not initiating the process or making phone calls to local law enforcement who are not already involved; when there is an active investigation, according to Ms. Williams law enforcement is responsive (Dkt. No. 73-3, ¶ 60).

257.     Unlike the State Child Abuse Hotline, which is associated with a unit whose staff have specialized training in child maltreatment and handling these complicated issues, local law enforcement does not have the same kind of specialized unit or training (Dkt. No. 6, ¶ 43; Dkt. No. 73-3, ¶ 67).

258.     As a matter of course, physicians do not disclose the fact that a patent has sought confidential abortion care to any member of the patient's local community (Dkt. No. 73-2, ¶ 63).

259.     The Local Disclosure Mandate provides parents, who almost always accompany 14 to 16 year old patients, that they have no choice with respect to the Local Disclosure Mandate and that their name and address will also be disclosed to local police in connection with the abortion and kept on file at the Arkansas State Crime Laboratory (Dkt. No. 73-2, ¶ 64).

260.     The Local Disclosure Mandate has no exception for those few 14 to 16 year old patients who use judicial bypass to access abortion and do not disclose their abortion to a parent (Dkt. No. 73-2, ¶ 65; Dkt. No. 73-3, ¶ 70).

261.     According to Dr. Parker, based on his many years of experience in providing abortion care to patients of all ages, including hundreds of 14 to 16 year old patients, he cannot imagine any 14 to 16 year old who would not be very distressed by the Local Disclosure Mandate (Dkt. No. 73-2, ¶ 67).  Ms. Williams shares this concern (Dkt. No. 73-3, ¶ 70).

262.     When initially meeting with patients seeking abortion care, including 14 to 16 year old patients, Dr. Parker and LRFP describe each step of care that will be provided and answer any questions the patient may have (Dkt. No. 73-2, ¶ 72; Dkt. No. 73-3, ¶ 70).  If the Local Disclosure Mandate takes effect, Dr. Parker and LRFP will have to describe at that time the required notification to local police departments, the preservation of tissue as evidence, the information about their private lives that will go alone with that tissue, and the eventual storage of that tissue and possible DNA testing at the Arkansas State Crime Laboratory (*Id.*).

263.     In Dr. Parker's opinion, setting forth the Local Disclosure Mandate's requirements for 14 to 16 year old patients will be confusing and troubling to the patients on whose behalf plaintiffs challenge the Local Disclosure Mandate (Dkt. No. 73-2, ¶ 73).  According to Dr. Parker, "[t]hese required consequences shroud their abortion, and the sexual intercourse that resulted in their pregnancy, in criminality and condemnation, even though there is no indication of any crime

and they are in the clinic to obtain constitutionally protected medical care. This law is very likely to shame and humiliate them." (*Id.*).

264. In Dr. Parker's opinion, the Local Disclosure Mandate's requirements will also create ongoing fear in his patients, given that the law "does not merely preserve 'evidence,' but labels that evidence with the patient's name and requires explicit notice to a local police officer in communities that may be very small." (Dkt. No. 73-2, ¶ 74). According to Dr. Parker, this breaches privacy and "instills fear from the fact that their neighbors in law enforcement will now know of their abortion, their home address, and perhaps their sexual partner's name, as requested on the State's fetal tissue transmission form." (*Id.*). This "forces them to live in fear of further breaches in perpetuity" because they have chosen abortion and because the Local Disclosure Mandate turns over their medical care details and the tissue from the procedure to remain in law enforcement custody indefinitely (Dkt. No. 73-2, ¶ 76). Ms. Williams shares these concerns (Dkt. No. 73-3, ¶ 70).

265. In Dr. Parker's opinion, he anticipates the Local Disclosure Mandate's requirements may "be so troubling to some of these young patients that they will delay their care or be deterred from obtaining an abortion in this state, even though they are clear in their desire for an abortion." (Dkt. No. 73-2, ¶ 75). According to Dr. Parker, they "may attempt to abort their pregnancy on their own, possibly using unsafe methods, or attempt to travel to another state to receive care without these draconian conditions," and if they "do eventually come back to LRFP and proceed with their abortion despite this law's consequences, the dilemma it creates for them will have delayed their care as they searched for and did not succeed in finding other options." (*Id.*).

266.     According to Dr. Parker, many 14 to 16 year old patients will have had limited experience with the health care system prior to their abortion, and he expresses concern that the Local Disclosure Mandate's requirements may have a lasting negative impact on the patients' willingness to seek out health are in the future (Dkt. No. 73-2, ¶ 77).

267.     The Local Disclosure Mandate does not specify what happens to the tissue collected at the Arkansas State Crime Lab or any restrictions on its use (Dkt. No. 73-3, ¶ 71).

268.     The Local Disclosure Mandate applies only to patients seeking abortion care; it does not impose the same requirements on miscarriage or ectopic pregnancy care for young people, or for obstetrics care, even though the patients are of the same age and their reproductive health care likewise reveals prior sexual activity (Dkt. No. 73-2, ¶ 78).

269.     The Local Disclosure Mandate nowhere specifies that medication abortion is excluded and can proceed, despite physicians and LRFP's inability to preserve tissue and given that the rules implementing the Local Disclosure Mandate refer to abortion by medication (Dkt. No. 73-2, ¶ 79; Dkt. No. 73-3, ¶ 72).

270.     If, as the State of Arkansas argues, the Local Disclosure Mandate does not apply to medication abortion but instead only to procedural abortion, according to Dr. Parker it "condemns only those patient's choosing procedural abortion, or who are later in their pregnancy and cannot access medication abortion, to the invasion of privacy and humiliation. . . mak[ing] one particular medical method trigger significant consequences for the patient when another method accomplishing the same result does not." (Dkt. No. 73-2, ¶ 80).

271.     Defendants submit an article published online on May 13, 2013, titled, "Violence, Crime, and Abuse Exposure in a National Sample of Children and Youth An Update" (Dkt. No. 92-1). According to the summary, the results were: "Two-fifths (41.2%) of children and youth

experienced a physical assault in the lat year, and 1 in 10 ( 10.1%) experienced an assault-related injury.  Two percent experienced sexual assault of sexual abuse in the last year, but the rate was 10.7% for girls aged 14 to 17 years. More than 1 in 10 (13.7%) experienced maltreatment by a caregiver, including 3.7% who experienced physical abuse.  Few significant changes could be detected in rates since an equivalent survey in 2008, but declines were documented in peer flashing, school bomb threats, juvenile sibling assault, and robbery and total property victimization." (Dkt. No. 23-6, at 1).  There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

272.    Defendants submit an article dated August, 2012, titled, "Victimizations Not Reported to the Police, 2006-2010" (Dkt. No. 92-2).  According to the article, "[d]uring the period from 2006 to 2010, 52% of all violent victimizations, or an annual average of 3,382,200 violent victimizations, were not reported to police;" "2 in 3 (65%) rape or sexual assault victimizations were not reported to police from 2016 to 2010;" and "[f]rom 2006 to 2010, victimizations against youth ages 12 to 17 were more likely to go unreported than victimizations against persons in other age categories" (Dkt. No. 92-2, at 1, 4).  There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

273.    Defendants submit a report dated March, 2001, titled, "Sex Trafficking of Women in the United States:  International and Domestic Trends" (Dkt. No. 92-3).  The report discusses a study of the sex industry in the United States in the Northeast, Metro New York, Northern Midwest – Minnesota, Southeast – Atlanta, Georgia, Florida, and Military Bases in North Carolina, and Metro San Francisco (Dkt. No. 92-3, 32-39).  There is no sponsoring witness for this document to

explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

274.    Defendants submit an article published online on August 28, 2020, from a Little Rock, Arkansas, television station titled, "Human trafficking cases increase in Arkansas, but not convictions" (Dkt. No. 92-4). According to the article, a "Human Trafficking Institute report showed just two federal convictions in 2019 and one federal conviction in 2018. On a state level, just one human trafficking case conviction was recorded in the past two years, according to the Administrative Office of the Courts." (Dkt. No. 92-4, at 1-2). The article also states that according to the report, Arkansas ranked "32nd for the number of active criminal human trafficking cases making their way through federal courts in 2019" which, according to the article, was a slight decrease from previous years (Dkt. No. 92-4, at 2). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

275.    Defendants submit an Arkansas state summary of the "2019 Federal Human Trafficking Report" which states that "Federal prosecutors in Arkansas charged 2 new criminal human trafficking cases in 2019, ranking it 22nd in the nation for number of new cases;" "Federal courts in Arkansas handled 5 active criminal human trafficking cases in 2019, ranking it 32nd in the nation for number of active cases;" and "Federal courts in Arkansas convicted 2 defendants in human trafficking cases in 2019, ranking it 35th in the nation for number of defendants convicted." (Dkt. No. 92-5, at 1). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

276.    Defendants submit a 2014 article published in the *Annals of Health Law* titled, "The Health Consequences of Sex Trafficking and Their Implications for Identifying Victims in Healthcare Facilities" (Dkt. No. 92-6).  According to the article, "the most frequently reported treatment site [reported by survivors of sex trafficking] was a hospital/emergency room," with 63.3% being treated at such a facility.  Survivors also had significant contact with clinical treatment facilities, most commonly Planned Parenthood clinics, which more than a quarter of survivors (29.6%) visited." (Dkt. No. 92-6, at 17).  The article states that, "pregnancy, miscarriage, and abortion were all experienced by half or more of the survivors who answered questions about them;" and "[c]linics that perform abortion must be especially vigilant in efforts to recognize possible trafficking victims." (Dkt. No. 92-6, at 19).  There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

277.    Defendants submit a May 2018 document from group known as "Live Action" titled, "Aiding Abusers." (Dkt. No. 92-7).  The document purports to "compile[] several court cases, state health department reports, and testimonials from former Planned Parenthood managers and employees that document Planned Parenthood's history and corporate culture of failing to report incidents to authorities, even though many pregnant teens who come to the chain for abortions are under the age of legal sexual consent." (Dkt. No. 97-6, at 4).  The document asserts that "Planned Parenthood is the nation's largest recipient of federal Title X family planning funds." (Dkt. No. 97-6, at 6).  There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

278.     Defendants submit an article from the website "thefederalist.com" dated June 13, 2019, titled, "When I Was A Pregnant Teen Sleeping With Older Men, Planned Parenthood Failed Me." (Dkt. No. 92-8).  The article appears to be the personal account of a woman who chose not to have an abortion and claims that "Planned Parenthood covers up statutory rape, lies to women, leaves vulnerable women in abusive situations, and tells women that their lives are better without their babies and children." (Dkt. No. 92-8, at 1).  There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

279.     Defendants submit the August, 2014, Report of The Arkansas Task Force For the Prevention of Human Trafficking (Dkt. No. 92-9).  The report makes recommendations to lawmakers in Arkansas for addressing all aspects of human trafficking including both sext trafficking and labor trafficking (Dkt. No. 92-9, at 5-9).  There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

280.     Defendants submit a June 27, 2019, opinion published in *The New York Times* titled, "When An Abortion Doctor Becomes a Mother" (Dkt. No. 92-10).  There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

281.     Defendants submit several documents about sex selection (Dkt. Nos. 92-11, 92-22, 92-23, 92-24, 92-25).  Plaintiffs do not challenge in this lawsuit the prohibition on abortion based on the sex of the embryo or fetus that was enacted as part of Act 722, H.B. 1434 and is codified at Arkansas Code Annotated § 20-16-1904(a), (b)(1) (Dkt. No. 74 at 31).  Additionally, there is no

sponsoring witness for these documents to explain, among other things, their relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

282.    Under an Arkansas law enacted in 2015, LRFP obtains each patient's consent in writing to having the embryonic or fetal tissue from her abortion disposed of within 48 hours (Dkt. No. 6, ¶ 50); *See* Ark. Code Ann. § 20-17-801(b).

283.    At the time this lawsuit was filed in 2017 and as of late 2020, LRFP contracted with a vendor that transported tissue generated at the Clinic out of Arkansas to be disposed of by incineration (Dkt. No. 6, ¶ 49; Dkt. No. 73-3, ¶ 74).

284.    At the time this lawsuit was filed in 2017 and as of late 2020, a few patients of LRFP each year wished to have their tissue cremated and made those arrangements themselves (Dkt. No. 6, ¶ 49; Dkt. No. 73-3, ¶ 74).

285.    According to Ms. Williams, to comply with a 2015 Arkansas law, each patient of LRFP consents in writing to having the embryonic or fetal tissue from her abortion disposed of (Dkt. No. 73-3, ¶ 75).

286.    At the time this lawsuit was filed in 2017, LRFP sent the pregnancy tissue of a few patients to pathology.  This may be done when a physician suspects a molar pregnancy or an abnormal growth of fetal tissue that can become a tumor or when the patient received a diagnosed fetal anomaly (Dkt. No. 6, ¶ 53; Dkt. No. 73-3, ¶ 77).

287.    In a medication abortion, the patient passes the pregnancy tissue at home over a period of hours or days, but she collects and disposes of it as she would during menstruation (Dkt. No. 6, ¶ 52; Dkt. No. 73-2, ¶ 86).

288.    According to Dr. Parker and Ms. Williams, as a practical matter, physicians and clinics need to know that each step of the medical care they provide can be accomplished, both

practically and legally, before undertaking it (Dkt. No. 73-2, ¶ 85; Dkt. No. 73-3, ¶ 79). Otherwise, providing care jeopardizes the physicians and clinics' licenses and may expose them to other penalties, including civil liability or criminal prosecutions (*Id.*).

289.     According to Dr. Parker, compliance with the Tissue Disposal Mandate if it were to take effect would require him to make reasonable efforts to notify others about his patients' abortion care, would require him to violate his professional ethical obligations including to breach confidentiality that is essential to the physician-patient relationship, and would require him to put his patients in potential danger, which he would not do (Dkt. No. 73-2, ¶ 88). Dr. Parker also maintains that, because the law is unclear in numerous ways, he would not be able to comply even if willing to violate his ethical obligations to keep his patients' care confidential (Dkt. No. 73-2, ¶ 88).

290.     Requiring the breach of confidentiality about an abortion patients' abortion decision conditions a patient's ability to obtain an abortion on forfeiting the confidentiality of their abortion decision, according to Dr. Parker (Dkt. No. 73-2, ¶ 89).

291.     Requiring the breach of confidentiality about an abortion patients' abortion decision can also increase the risk to the patients' personal safety or risk that patients experience retribution for their decisions, according to Dr. Parker (Dkt. No. 73-2, ¶ 89).

292.     According to Dr. Parker, patients may have a variety of reasons for wanting to keep their abortion private, including from the person by whom they became pregnant (Dkt. No. 73-2, ¶ 91). Some patients go to great lengths to keep their abortions private (*Id.*). Some want and need to keep their abortion private from partners who are unsupportive or abusive, for personal safety reasons (*Id.*). Patients may fear other forms of retribution stemming from the stigma associated with abortion, or concern that their partner will disagree with their decisions, try to interfere with

it, or punish them for considering or accessing abortion care (*Id.*). Patients experiencing intimate partner violence may also fear for the safety of their existing children, including fear that a partner could retaliate against her for her abortion decision by harming her children (*Id.*). Or patients may simply want to keep their abortion confidential because it is their private medical decision involving intimate personal matters (*Id.*). Ms. Williams shares similar concerns (Dkt. No. 73-3, ¶¶ 80-81, 84).

293. Ms. Williams anticipates, based on her experience in counseling patients of LRFP, that patients would forgo obtaining an abortion in the state rather than disclosing their abortion decision in the manner required by the Tissue Disposal Mandate, if it were to take effect (Dkt. No. 73-3, ¶ 85).

294. Further, as Ms. Williams explains, the Tissue Disposal Mandate seems to provide no right to a patient who is 17 years old who has a boyfriend who is 18 years old; instead, the Tissue Disposal Mandate seems to give only the 18 year old boyfriend the right to make a decision about disposition (Dkt. No. 73-3, ¶ 81).

295. According to Dr. Parker, minors have many of the same fears and reasons for keeping their abortions private (Dkt. No. 73-2, ¶ 92). Although most minor abortion patients involve one parent, both the parent and the minor patient are often emphatic about maintaining their privacy from the other parent according to Dr. Parker (*Id.*).

296. The Local Disclosure Mandate has no judicial bypass process and appears to require efforts to notify a minor's parents, and the minor's sexual partner's parents, even if the minor has obtained a judicial bypass (Dkt. No. 73-2, ¶ 92). Ms. Williams shares these concerns (Dkt. No. 73-3, ¶ 80).

297.     According to Dr. Parker, it is counter-intuitive and likely harmful for him to inform the minor's parents about the minor's abortion, if the minor has already obtained a judicial bypass (Dkt. No. 73-2, ¶ 92).

298.     Dr. Parker also has concerns that the Tissue Disposal Mandate would require him "to pressure patients to provide [him] with the names of the individual(s)" to be notified under the Tissue Disposal Mandate, which patients may be reluctant to do, and "appears designed to send the message to patients that tissue from an abortion should be treated like a decease person, a family member – regardless of whether the patient views the tissue that way" and "replaces the diversity of views patients have about their pregnancy with the State's" view (Dkt. No. 73-2, ¶¶ 93-94).  Based on her experience with patients, Ms. Williams shares similar concerns (Dkt. No. 73-3, ¶ 87).

299.     To the extent the Tissue Disposal Mandate applies to medication abortion, according to Dr. Parker it appears to eliminate medication abortion as an option for patients because tissue from a medication abortion is disposed of outside the abortion facility and there is no way for a provider to "ensure" that tissue from a medication abortion is disposed of in compliance with the Tissue Disposal Mandate (Dkt. No. 73-2, ¶ 95; Dkt. No. 73-3, ¶ 76).

300.     If, as the State of Arkansas argues, the Tissue Disposal Mandate does not apply to medication abortion but instead only to procedural abortion, Dr. Parker does not "understand why tissue from a medication abortion, and the state-mandated decision-making about its disposal, would be treated differently than tissue from an abortion procedure" (Dkt. No. 73-2, ¶ 95).  Ms. Williams shares these concerns (Dkt. No. 73-3, ¶ 76).

301.     Ms. Williams explains that, because the Tissue Disposal Mandate has no exception for tissue that is sent to a pathology laboratory or to local law enforcement, LRFP cannot "ensure"

tissue is disposed of in accordance with the Tissue Disposal Mandate when others are responsible for ultimately disposing of it (Dkt. No. 73-3, ¶ 77). Each year LRFP sends the pregnancy tissue for a few patients to pathology if, for example, the physician suspects a molar pregnancy, which is an abnormal growth of fetal tissue that can become a tumor, or if the patient received a fetal diagnosis and requests further testing (*Id.*). Likewise, Arkansas law currently requires that LRFP provide tissue for certain patients to local law enforcement (Dkt. No. 73-3, ¶60).

302. The language used in the Tissue Disposal Mandate, in Dr. Parker and Ms. Williams' opinions, is unclear with respect to scope "reasonable efforts" required to notify a patient's sexual partner (Dkt. No. 73-2, ¶ 96; Dkt. No. 73-3, ¶¶ 82-83). According to Dr. Parker, the Tissue Disposal Mandate also is unclear about what it means for a patient's sexual partner to be "absent" (*Id.*). He avers that other aspects of the Tissue Disposal Mandate also are unclear, including the requirement that disposition rights are contingent on assuming "liability for the costs of such arrangements." (Dkt. No. 73-2, ¶ 98).

303. Because the Tissue Disposal Mandate "emphasizes the importance of making 'reasonable efforts' to notify those individuals with disposition rights," Dr. Parker is skeptical of the State of Arkansas's position that compliance could be achieved by preserving tissue for five days before disposing of it (Dkt. No. 73-2, ¶ 99).

304. Dr. Parker avers that, if the Tissue Disposal Mandate takes effect, he "would be unable to continue providing abortion care under the vague, unethical, and burdensome mandates it creates for [his] patients and [him]. Even if the Mandate did not apply to medication abortion and that option continued to be available, the Mandate would have devastating consequences for [Dr. Parker's] patients and [Dr. Parker]," according to Dr. Parker (Dkt. No. 73-2, ¶ 100).

305. The effect of the Tissue Disposal Mandate could delay a patient's abortion or miscarriage care while the physician and LRFP try to comply with the requirements (Dkt. No. 73-3, ¶ 85).

306. According to Ms. Williams, even if LRFP were to attempt to delay notifying the various third parties until after a patient's abortion, "which would leave both the clinic and patients in limbo," Ms. Williams has the same concerns about patient safety and confidentiality and believes based on her experience that would cause some patients to try to seek care out of state or potentially discourage them altogether (Dkt. No. 73-3, ¶ 86).

307. Ms. Williams also has concerns about LRFP's ability to store properly tissue for days, weeks, or more as notifications under the Tissue Disposal Mandate play out and to navigate LRFP's role when various third parties could claim the tissue, forcing LRFP into the middle of these potentially protracted disputes (Dkt. No. 73-3, ¶ 86).

308. Defendants submit the "Final Report" of the Select Investigative Panel of the Energy and Commerce Committee of the United States House of Representatives dated December 30, 2016 (Dkt. No. 92-15). The report addresses, "laws protecting late-term and born-alive infants" and "laws pertaining to public funding for fetal tissue research and abortion providers." (*Id*. at 22). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

309. The record includes affidavits from individual women who describe mental distress resulting from their individual choices to have abortions and an affidavit from one abortion counselor who claims to have witnessed these reactions in other women with whom she has

interacted in a post-abortion support group setting (Dkt. No. 25-12; Dkt. No. 25-14; Dkt. No. 25-15; Dkt. No. 25-16).

310.    The American Psychiatric Association rejected the notion that abortion causes mental distress (Dkt. No. 32-1, ¶ 16).

311.    Individual patients may experience a full range of emotional and psychological responses to having an abortion, but well-designed and rigorous research concludes that there is no evidence that abortion causes mental health problems (Dkt. No. 32-1, ¶¶ 16-18).

312.    Plaintiffs offer an affidavit from Sheila M. Katz, Ph.D., who is offered as an expert in the field of sociology specifically focused on poverty, women's economic status, and social policies at the state and federal level in the United States; who has conducted research into and is familiar with the difficulties of poor and low-income women; whose sociological research has included qualitative methods and data analysis regarding women's experiences of poverty; whose expertise includes the consequences and social policy determinants of women's poverty nationwide; who has published on these topics in peer-reviewed sociology and poverty journals and in a book; and who has presented her research at numerous professional conferences and provided expert testimony on these issues to the United States Congress in 2005, 2006, and 2011, among other qualifications and experiences (Dkt. No. 73-4, ¶¶ 9-13).

313.    Dr. Katz describes the methodology she employed to research the effect of enforcement of the Mandates challenged by plaintiffs in this case (Dkt. No. 73-4, ¶¶ 10, 14-16).

314.    Dr. Katz offers the overall opinion that enforcement of the Mandates challenged by plaintiffs in this case would impose logistical and financial obstacles that harm poor and low-income women in the following ways:  preventing some from being able to obtain and abortion; delaying other women's access to that care; jeopardizing women's confidentiality and/or

employment; increasing the risk that victims of domestic violence will experience physical violence or other abuse; and putting women and their families at risk of deepening poverty, hunger, or eviction (Dkt. No. 73-4, ¶ 10). She supports her opinion in a detailed, 75-paragraph affidavit (Dkt. No. 73-4).

315. Dr. Katz opines, in part, that "[b]y forcing women to travel hundreds of miles to obtain an abortion, or make multiple trips to the clinic, the 2017 abortion restrictions will greatly exacerbate the financial struggles a poor or low-income woman will face to access care. And because a large proportion of abortion patients are poor or low income, these laws will result in a significant number of Arkansas women facing the challenges" Dr. Katz identifies (Dkt. No. 73-4, ¶ 71).

316. Dr. Katz opines, in part, that "[i]ncreasing the costs and the logistical burdens of accessing abortion care may also make it impossible for a woman seeking an abortion to keep her decision confidential from her employer, or an abusive intimate partner who may not want her to terminate her pregnancy. A woman's fears of the consequences of this loss of confidentiality, of course, are in addition to the logistical and psychological hurdles" that Dr. Katz identifies (Dkt. No. 73-4, ¶ 73).

317. Dr. Katz offers the opinion that, "the increased costs, additional time, logistical challenges, and social-psychological hurdles imposed by the [Mandates plaintiffs challenge] are precisely the kind of challenges that delay women from accessing needed services, or prevent them from accessing such services altogether. Even the poor and low-income women who are able to raise funds to pay for an unexpected medical expense like abortion have to make difficult choices about where to get that additional money and what they are willing to sacrifice in order to raise the necessary funds. These choices put poor and low-income women at greater risk in terms of their

safety, physical and emotional well-being, and the confidentiality of their decisions." (Dkt. No. 73-4, ¶ 75).

318.    Plaintiffs submit an affidavit from Lauren J. Ralph, Ph.D., M.P.H., who is offered as an expert and who currently conducts "research that examines the context in which women, and in particular adolescents, experience and make decisions around pregnancy and childbirth, and the consequences of early and unintended childbearing on women's health and well-being" (Dkt. No. 73-5, ¶ 4).  Dr. Ralph describes her education, experience, research, peer-reviewed publications, and other qualifications and experience (Dkt. No. 73-5, ¶¶ 1-10).

319.    Dr. Ralph offers the opinion that the Local Disclosure Mandate "will significantly add to the obstacles that the Non-CMA Teenage Patients face in accessing abortion care.  It will delay care, add medical risks, impose new stigma and fears, and for some, prevent them from accessing the abortion that they want." (Dkt. No. 73-5, ¶ 11).  Dr. Ralph opines that the "Local Disclosure Mandate breaches patient confidentiality and injects policing into health care in ways that will harm patients in both the near and long term." (*Id.*).

320.    According to Dr. Ralph, abortion statistics among adolescents in Arkansas track those in the United States (Dkt. No. 73-5, ¶ 17).  In Arkansas in 2019, adolescents aged 19 and younger accounted for 10% of the 2,963 abortions in the state (*Id.*).  Those aged 18 to 19 accounted for nearly 7% of all abortions, while those aged 15 to 17 accounted for 3% (*Id.*).  Adolescents younger than 15 years old accounted for 0.3% of all abortions (*Id.*).  In 2019, 65 out of 2,963 abortions or 2.2% were provided to patients 16 and under (*Id.*).  Dr. Ralph explains that Arkansas's reporting, like most national and state-level presentations of abortion statistics, groups all patients under 15 together, so the state's reporting does not allow one to break out the precise number of patients who were 14 to 16 years old at the time of their abortions (*Id.*).

321.     Dr. Ralph explains that adolescent abortion patients in Arkansas, like adult patients in the state and nationally, are disproportionately people of color; for example, according to Dr. Ralph 50% of Arkansas abortion patients aged 16 years and under were African American in 2019 (Dkt. No. 73-5, ¶ 18).  She explains that "[t]his reflects the effects of many layers of inequality in American health care and society.  People of color, for example, experience higher rates of unintended pregnancies, in part because they face more barriers to accessing highly effective contraceptive methods, including barriers rooted in discrimination." (*Id.*).

322.     Dr. Ralph also explains that, like adult abortion patients, adolescent patients disproportionately come from poor and low-income households based on national research (Dkt. No. 73-5, ¶ 19).

323.     Further, based on national research, adolescents who seek abortion care live in a variety of familiar and other settings (Dkt. No. 73-5, ¶ 20).  According to Dr. Ralph, that research demonstrates that 51.8% of 15 to 16 year old patients live with both biological or adoptive parents, 10.9% live with a biological mother and step or adoptive parent, 31.6% live with a single parent (biological, adoptive, or stepparent), and 5.6% live in other situations (*Id.*).

324.     In Arkansas today, adolescents already tend to have abortions later in pregnancy, based on Dr. Ralph's assessment (Dkt. No. 73-5, ¶ 21).  In 2019, 20.7% of patients 19 and under had their abortion at 13 weeks LMP and later, compared to 14.8% of patients aged 20 to 24 (*Id.*).  Over 10% of patients aged 19 and under in 2019 had their abortions at 16 weeks LMP or later, again a higher percentage than in other age groups (*Id.*).

325.     According to Dr. Ralph, these figures are consistent with prior research on the national level, which pointed to a combination of factors pushing adolescent abortions later in pregnancy (Dkt. No. 73-5, ¶ 22).

326.     Based on research, it takes adolescents an average of one week longer than older women to suspect and confirm they are pregnant (Dkt. No. 73-5, ¶ 23).

327.     The need to involve at least one parent and obtain that parent's consent or obtain a judicial bypass also like contributes to delay, according to Dr. Ralph (Dkt. No. 73-5, ¶ 24).  Based on a multi-year study over time, approximately 10% of minor patients in Arkansas obtain judicial bypass (Dkt. No. 73-5, ¶ 25).

328.     Dr. Ralph recognizes that delays in abortion care for adolescents will add medical risk, high costs for more complex procedures, and other accompanying challenges, including additional clinic visits and possible travel for greater distances from home or for lengthier periods to obtain that care (Dkt. No. 73-5, ¶ 26).

329.     According to Dr. Ralph, adolescents value confidentiality in reproductive health care, seeking to maintain personal autonomy over whether and to whom they disclose their decision to seek an abortion (Dkt. No. 73-5, ¶ 27).  Dr. Ralph relies on a large body of literature that demonstrates that young people are more likely to delay or forgo seeking health care services if confidentiality is not guaranteed (Dkt. No. 73-5, ¶ 28).

330.     Dr. Ralph cites research that shows that, if adolescents face an age-based legal requirement to involve a parent in their abortion care, the adolescents may instead delay their care – if possible—to age out of the requirement, even though that adds medical risk, continued experience of pregnancy, and cost (Dkt. No. 73-5, ¶ 29).

331.     Dr. Ralph cites research at the national level that confirms some adolescents will carry their pregnancies to term rather than comply with a parental involvement or judicial bypass requirement for abortion (Dkt. No. 73-5, ¶ 30), and others may travel to another state for care in order to avoid disclosing their pregnancy and abortion decision to a parent (Dkt. No. 73-5, ¶ 31).

332.     Dr. Ralph also cites "evidence that experiencing barriers to abortion care – in the form of state-level restrictions, cost, or long distance to a provider – are associated with more searches for information about, consideration of, and attempts at self-managed abortion (defined as abortion obtained outside the formal health care system), which in some circumstances may not be safe (Dkt. No. 73-5, ¶ 32).

333.     According to Dr. Ralph, the vast majority of adolescent patients in Arkansas do involve at least one parent in their abortion care, but those patients may decide not to involve both parents for reasons including fear of violence, loss of financial support, verbal abuse, or other punitive reactions by the second parent (Dkt. No. 73-5, ¶ 33).

334.     Dr. Ralph avers that adolescent abortion patients fear involuntary exposure of their pregnancy and abortion to others (Dkt. No. 73-5, ¶ 34).

335.     Based on research, Dr. Ralph also avers that involuntary disclosure of pregnancy and an adolescent patient's decision to have an abortion can be especially problematic if the disclosure is to someone who the young person may not know well or does not have an existing relationship with (Dkt. No. 73-5, ¶ 35).

336.     Dr. Ralph cites a study of over 4,000 U.S. abortion patients which indicated that nearly two-thirds reported that people would look down on them if they knew they had an abortion (Dkt. No. 73-5, ¶ 36).

337.     Dr. Ralph opines that the Local Disclosure Mandate "forces disclosure of sexual intercourse, pregnancy, and an abortion to a teenage patient's local police, even when no crime has been reported or is indicated to clinic staff, who are mandatory sexual abuse reporters.  The law's characterization of the patient as a 'victim,' her sexual partner as a 'suspect,' and her products of conception as criminal evidence add additional stigmatization, beyond whatever the

patient might feel regarding abortion and the disclosed sexual activity. The law adds policing to health care in a manner that will feel threatening and judgmental to many patients, engender fear in them, and magnify the stress and trauma they may have already experienced in interactions with law enforcement" (Dkt. No. 73-5, ¶ 37).

338.    Dr. Ralph also opines that "[c]onfidence and trust in police are nationally at a record low. . . .  This is particularly marked for adolescent of color. . . .  Teenagers have increasingly come to view the police as harmful to their safety.  Over the last few years, well-publicized police confrontations resulting in death or serious injury and national protests in response may have amplified this view for young people, while also highlighting within the medical community the need to treat over-policing as a public health issue." (Dkt. No. 73-5, ¶¶ 38-39).

339.    Dr. Ralph explains:  "My experience studying adolescent abortion patients and all of the research summarized above leads me to conclude that, once adolescents learn of the Mandate's requirements, some of those patients will experience significant delay in completing their abortions and other may be dissuaded from doing so altogether." (Dkt. No. 73-5, ¶ 40).  She also opines that "[s]ome older 16-year olds will delay their care, including for week or months, to age out of the requirement.  Other patients will attempt to travel out of state, which will impose delay because of the added travel, cost, and planning involved.  Some may search for and/or unsuccessfully attempt self-managed abortion, or search in vain for some other 'work around.'  Any of these results will delay the patients' time-sensitive abortion care and add medical risk for them." (Dkt. No. 73-5, ¶ 41).

340.    Dr. Ralph also offers that, "many, if not most, of the Non-CMA Teenage Patients who complete abortion care in Arkansas will suffer ongoing fear and anxiety, knowing that the local police department has been informed of their abortion care and that criminal evidence

collection has occurred. They will be left with ongoing concern about the possibility of police harassment, further breaches of their confidentiality, and further law enforcement activity. The Mandate will cause fear and stigma even if the local police take no such action. The forced exposure of those patients' private activity and confidential medical care to outsiders in their community, as a condition of their receiving abortions in Arkansas, also is likely to cause some to avoid health care or conceal information from health care providers in the future, further jeopardizing their health in that way." (Dkt. No. 73-5, ¶ 42).

341.    Plaintiffs offer affidavits from several patients who sought abortion care at LRFP (Dkt. No. 73-6, 73-7, 73-8, 73-10, 73-11). Overall, these affidavits confirm the diverse reasons patients seek abortion care; the diverse backgrounds and life experiences of the patients who seek abortion care; the diverse views among family and community members on abortion; the realities of seeking care and obstacles faced by patients in seeking and arranging for abortion care, given their personal circumstances; the stigma that patients fear will arise if other medical providers, family members, community members, and law enforcement officers learn of their pregnancy and decision to seek abortion care; the stigma and retaliation certain patients have experienced for seeking abortion care; and the fear and reasons for that fear some patients have with regard to the possibility of having to involve others in decisions regarding their abortions. These affidavits overall corroborate the information offered by plaintiffs and their expert witnesses.

342.    Defendants submit the certified docket of the Little Rock District Court filed in 1987 as case number LRCR-87-3092 *State v. Thomas Harold Tvedten* (Dkt. No. 92-18); the Emergency Order of Suspension and Notice of Hearing before the Arkansas State Medical Board In The Matter Of : *Thomas Harold Tvedten, M.D.* dated August 13, 2020 (Dkt. No. 92-19); and the Detailed License Verification for Thomas Harold Tvedten, M.D. from the Arkansas State

Medical Board dated December 29, 2020 (Dkt. No. 92-20). The documents indicate that Dr. Tvedten's medical license was suspended for three months in 1983 and for less than two months in 2020, Dr. Tvedten currently holds an active medical license in Arkansas (Dkt. No. 29-20).

343. Defendants submit an article from the March, 2020, issue of *The Atlantic* entitled, "The #MeToo Case That Divided the Abortion-Rights Movement" (Dkt. No. 92-21). The article discusses a March 25, 2019, 3,300 word essay "the activist Candice Russell posted . . . on the website Medium titled 'To All the Women Whose Names I Don't Know, About the Pain We Share, the Secrets We Keep, and the Silence That Shouldn't Have Been Asked For.'" (*Id.*, at 3). According to the article, Candice Russell alleged in her essay that she had sex with Dr. Parker in a hotel room in Dallas in October 2016, and she labeled him a "predator." (*Id.*). There is no sponsoring witness for this document to explain, among other things, its relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

344. In Arkansas, 3,771 abortions were performed in 2015 (Dkt. No. 5, Ex. B). Of those, 581 were medication abortion and 3,190 were not. Of the 3,771 total abortions in 2015 in Arkansas, 528 were obtained by married women, and 3,234 were obtained by not married women (*Id.*). Nine individuals reported "unknown" when asked marital status (*Id.*). Of the 3,771 total abortions in 2015 in Arkansas, 141 were obtained by individuals below the age of 18 (*Id.*).

345. In Arkansas, 2,963 abortions were performed in 2019 (Dkt. No. 92-16, at 3). Of the total abortions in 2019 in Arkansas, 376 were obtained by married women, 2,575 were obtained by not married women, and 12 individuals reported "unknown" when asked marital status (*Id.* at 10). Of the 2,963 total abortions in 2019 in Arkansas, 101 were obtained by individuals below the age of 18 (*Id.* at 4). Of the 2,963 total abortions in 2019 in Arkansas, 1,317 were obtained by individuals who considered themselves white, 1,373, by individuals who considered themselves

black, 221 by individuals who considered themselves "other," and 52 by individuals who reported "unknown" when asked their race (*Id*. at 5). Of the 2,963 total abortions in Arkansas in 2019, 2,500 were obtained up to ten weeks LMP and 463 after ten weeks LMP (*Id*. at 8). Of the 2,963 total abortions in 2019 in Arkansas, 1,042 were obtained by individuals who had not had a previous live birth and 1,921 were obtained by individuals who had previously had a live birth (*Id*., at 13). Of the 2,963 total abortions in Arkansas in 2019, 2,625 were obtained by Arkansas residents and 338 were obtained by out-of-state residents (*Id*. at 15).

## IV.     Threshold Matters

In response to Dr. Hopkins' initial complaint, defendants filed a motion to dismiss, which first became ripe on July 25, 2017 (Dkt. Nos. 21, 33). With the filing of Dr. Hopkins and LRFP's first amended complaint, the Court denied as moot defendants' motion to dismiss Dr. Hopkins' initial complaint (Dkt. No. 81).

Defendants in their brief in opposition to Dr. Hopkins's motion for a second preliminary injunction and/or temporary restraining order again raise certain objections, and the Court addresses threshold matters before turning to the merits of this case. The Court must satisfy itself that the parties and these disputes are properly before the Court.

### A.     Article III Standing

Defendants previously challenged Dr. Hopkins' standing, and they continue to challenge standing in this case (Dkt. No. 92, at 3). "Article III, § 2, of the Constitution restricts the federal 'judicial [p]ower' to the resolution of 'Cases' and 'Controversies.'" *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). Plaintiffs have the burden of establishing that they have standing. *Id.* To demonstrate "Article III" standing, a plaintiff must demonstrate:

> (1) [A]n injury in fact (*i.e.,* a "concrete and particularized" invasion of a "legally protected interest"); (2) causation (*i.e.,* a "'fairly . . . trace[able]'" connection

between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.,* it is "'likely'" and not "merely 'speculative'" that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

*Id.* at 273-74 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)).

In addition to the three "irreducible constitutional minimum" requirements of Article III standing, *Lujan,* 504 U.S. at 560, courts weigh other "prudential" considerations in determining whether plaintiffs have standing. *United States v. Windsor*, 133 S. Ct. 2675, 2685 (2013) (explaining the distinction between "the jurisdictional requirements of Article III and the prudential limits on its exercise").

Dr. Hopkins is identified in the complaint as "an experienced, highly credentialed and board-certified obstetrician-gynecologist, and an abortion provider at [LRFP], the only provider of outpatient, second-trimester abortion care in Arkansas." (Dkt. No. 82, at 4, ¶ 13). LRFP is identified as a "limited liability corporation that is licensed to do business in Arkansas. It has provided high quality reproductive care in Arkansas since 1973. . . . It operates a clinic in Little Rock that provides both medication and surgical abortion care. . . . LRFP brings this action on behalf of itself, its patients, its physicians, and staff." (Id., at 4-5, ¶ 14). Plaintiffs claim that the statutes they challenge "threaten [them] with criminal penalties and deny and burden [their] patients' constitutionally protected rights to decide to end a pre-viability pregnancy, to make independent decisions related to their pregnancy care, and to protect their private medical information." (Dkt. No. 82, at 3, ¶ 9). Dr. Hopkins and LRFP seek declaratory and injunctive relief "[t]o protect their patients from these constitutional violations, to enforce their own right to clear legal standards, and to avoid irreparable harm. . . ." (Dkt. No. 82, at 3, ¶ 9).

In their filings, defendants make several arguments challenging standing in this case. As an initial matter, the United States Supreme Court held in *Doe v. Bolton*, 410 U.S. 179, 188 (1973),

that abortion doctors have first-party standing to challenge laws limiting abortion when, as in *Doe* and the current case, the doctors are subject to penalties for violation of the laws. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 903-04, 909 (1992) (plurality opinion); *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 62 (1976); *Nyberg v. City of Virginia*, 495 F.2d 1342, 1344 (8th Cir. 1974) (stating that *Doe* is not limited to affording standing to a physician only when threatened with criminal prosecution); *Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 911 (7th Cir. 2015); *Planned Parenthood of Greater Tex. Surg. Health Serv. v. Abbott II*, 748 F.3d 583, 598 (5th Cir. 2014) ("*Abbott II*"); *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 794 (7th Cir. 2013). Standing can also derive from a different, lesser injury, such as a potential financial impact on a physician from an abortion restriction. *See Singleton v. Wulff*, 428 U.S. 106, 112-13 (1976) (finding that physicians "suffer[ed] concrete injury from the operation of the challenged statute" which prevented them from receiving Medicaid reimbursements if certain requirements about the nature of the procedure were not met).

Previously, defendants argued that Dr. Hopkins could not establish an "injury in fact," meaning "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Defendants concede that courts have held, in some circumstances, that a party need not expose himself to arrest or prosecution in order to challenge a criminal statute but that, even there, there must be "a credible threat of prosecution" before a plaintiff has standing to challenge the provision. *Babbitt*, 442 U.S. at 298.

This Court has rejected nearly identical arguments that the injury was "speculative and conjectural" because the challenged abortion law had not yet been enforced against the plaintiff

physician, including by licensure action. *See Edwards v. Beck*, 8 F.Supp.3d 1091 (8th Cir. 2014), *aff'd* 786 F.3d 1113 (8th Cir. 2015). The law is well-settled that a plaintiff need not "first expose himself to actual. . . prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Courts have concurred even in the abortion context. *See, e.g., Danforth*, 428 U.S. at 62; *Doe v. Bolton*, 410 U.S. at 188. Here, Dr. Hopkins's declaration demonstrates the impact and threat of these Mandates on Dr. Hopkins and the physicians of LRFP (Dkt. No. 5, ¶¶ 23-62).

Dr. Hopkins and the physicians of LRFP face criminal penalties under the D&E Mandate, the Medical Records Mandate, and the Tissue Disposal Mandate. Further, the physicians face licensing penalties under the Medical Records Mandate and the Local Disclosure Mandate, along with licensing penalties for alleged unprofessional conduct that includes criminal conviction under statutes such as the D&E Mandate, the Medical Records Mandate, and the Tissue Disposal Mandate. Thus, physicians face a potential injury or sanction if they do not comply with the challenged Mandates. *See Doe*, 410 U.S. at 188; *June Med. Servs. v. Russo*, 140 S. Ct. 2103, 2119, 2020 WL 3492640, at *10 (2020) (plurality opinion) (stating that the "threatened imposition of governmental sanctions" for noncompliance eliminates any risk that their claims are abstract or hypothetical).

The Court disagrees with any argument that *Clapper v. Amnesty International*, 133 S. Ct. 1138 (2013), overruled this precedent. In *Clapper*, the Court determined plaintiffs, who were not directly targeted by the challenged law, relied upon a "highly attenuated chain of possibilities" and harm too speculative to satisfy the Article III injury requirement. *Id.* at 1144-48. The facts presented here are distinguishable, and *Clapper* does not control. The Court concludes that, based

on controlling precedent and the claims alleged, Dr. Hopkins and the physicians of LRFP face concrete, imminent injuries from enforcement of the challenged Mandates.

Further, that plaintiffs' vagueness challenges to the Medical Records Mandate and the Tissue Disposal Mandate are pre-enforcement facial challenges does not alter the standing analysis. *See, e.g., City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 451 (1983), *overruled on other grounds by Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992); *Colautti v. Franklin*, 439 U.S. 379, 396 (1979); S*isterSong Women of Color Reprod. Justice Collective v. Kemp*, 472 F.Supp.3d 1297, 1316 (N.D. Ga. 2020); *Planned Parenthood of the Heartland v. Heineman*, 724 F.Supp.2d 1025, 1038-39 (D. Neb. 2010).

Defendants also previously challenged Dr. Hopkins's ability to assert the third-party rights of his hypothetical future patients. Defendants argued that Dr. Hopkins could not demonstrate a "close relation" with abortion patients because he is challenging laws that were enacted to protect the health and safety of those patients. Defendants claim that this presents a conflict of interest between providers and patients, and third-party standing is forbidden if the interests of the litigant and the third-party rights-holder are even "potentially in conflict." *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 15 (2004); *see also Kowalski v. Tesmer*, 543 U.S. 125, 135 (2004) (Thomas, J., concurring) (noting that third-party standing is disallowed when the litigants "may have very different interests from the individuals whose rights they are raising"); *Canfield Aviation, Inc. v. Nat'l Transp. Safety Bd.,* 854 F.2d 745, 748 (5th Cir. 1988) ("[C]ourts must be sure. . . that the litigant and the person whose rights he asserts have interests which are aligned.").

The United States Supreme Court in a plurality opinion in *Singleton v. Wulff*, 428 U.S. 106 (1976), concluded that "it generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision." *Id.* at 118.

Generally, a plaintiff may assert the constitutional rights of a third party if the plaintiff has a "close relationship" to the third party and if there exists some "hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991); *see Kowalski*, 543 U.S. at 130. Here, the third parties are the patients who are purportedly harmed by the challenged Mandates that inhibit their right to abortion.

For decades, courts have routinely recognized categorically that abortion and reproductive health care providers and physicians have third-party standing to assert the rights of their patients. In *Singleton*, a plurality of the Supreme Court found that "it is generally appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision." *Singleton*, 428 U.S. at 118. *Singleton* concluded that "[t]he closeness of the relationship" between a doctor and an abortion patient "is patent" because "[a] woman cannot safely secure an abortion without the aid of a physician," and "the constitutionally protected abortion decision is one in which the physician is intimately involved." *Id.* at 117. *Singleton* also found that "[a]s to the woman's assertion of her own rights, there are several obstacles," including the desire to protect her privacy, the imminent mootness of her claim once an abortion is no longer available, as an option. *Id.*

The Supreme Court has applied this general principle without controversy in numerous subsequent cases brought by physicians or abortion service providers. *See, e.g.*, *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) (adjudicating physicians' and clinics' 42 U.S.C. § 1983 action against abortion restrictions on behalf of themselves and their patients); *Gonzales v. Carhart*, 550 U.S. 124, 133 (2007); *Stenberg v. Carhart*, 530 U.S. 914, 922 (2000); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 845 (1992). Other courts when confronted with this argument have rejected it. *See Abbott II,* 748 F.3d at 589 n.9.

The Supreme Court has never found that, in the abortion context, physicians who challenge laws restricting abortion have interests that conflict with those of their patients, and the Supreme Court did not accept this argument when it was advanced in *June Medical*. *See June Med. Servs.*, 140 S. Ct. at 2165-66, 2020 WL 3492640, at *49-50 (Alito, J., dissenting) (endorsing this argument on behalf of only three Justices). The plurality opinion in *June Medical*, joined by four Justices, stated that the Court has "long permitted abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related regulations" in finding that physicians who provided abortion care had standing to challenge a Louisiana statute requiring such physicians to have admitting privileges at a hospital within 30 miles of the abortion clinic. *June Med. Servs.*, 140 S. Ct. at 2118, 2020 WL 3492640, at *9 (citing nine different Supreme Court cases in which healthcare providers have invoked the rights of patients or potential patients in abortion-related constitutional challenges). A fifth Justice, Chief Justice Roberts, agreed with the plurality's standing analysis. 140 S. Ct. at 2139, 2020 WL 3492640 at *26 n.4 (Roberts, C.J., concurring) ("For the reasons the plurality explains . . . I agree that the abortion providers in this case have standing to assert the constitutional rights of their patients."). Thus, it is established that abortion care physicians have third-party standing to challenge abortion restrictions infringing on their patients' constitutional rights.

### B. Considerations Under 42 U.S.C. § 1983

Defendants have argued that, even if plaintiffs could avoid these alleged limits on third-party litigation, they still could not assert third-party rights under 42 U.S.C. § 1983 because, defendants claimed, § 1983 extends only to litigants who assert their *own* rights. Based on this, defendants contended the third-party claims may proceed only under the implied right of action established by the Supremacy Clause, and the claims cannot serve as a basis for attorneys' fees.

*See Planned Parenthood of Houston & Se. Tex. v. Sanchez,* 480 F.3d 734, 739-40 (5th Cir. 2007);

*Planned Parenthood of Houston & Se. Tex. v. Sanchez,* 403 F.3d 324, 333 (5th Cir. 2005).

There is no language in the statute that supports this argument. *See* 42 U.S.C. § 1983

(providing in pertinent part, "Every person who, under color of any statute, ordinance, regulation,

custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be

subjected, any citizen of the United States or other person within the jurisdiction thereof to the

deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be

liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

. . ."). This Court agrees with the reasoning of the Seventh Circuit Court of Appeals on this point

and rejects defendants' argument regarding standing under § 1983. *See Van Hollen*, 738 F.3d at

794−95. The Supreme Court has repeatedly allowed abortion providers to raise the rights of their

patients in cases brought under § 1983, and this Court will do the same. *See e.g.*, *June Med.*

*Servs.*, 140 S. Ct. at 2118, 2020 WL 3492640, at *9 (citing nine different Supreme Court cases in

which healthcare providers have invoked the rights of patients or potential patients in abortion-

related constitutional challenges); 140 S. Ct. at 2139, 2020 WL 3492640 at *26 n.4 (Roberts, C.J.,

concurring) ("For the reasons the plurality explains . . . I agree that the abortion providers in this

case have standing to assert the constitutional rights of their patients."); *Whole Woman's Health*,

136 S. Ct. 2292; *Gonzales*, 550 U.S. 124; *Ayotte v. Planned Parenthood of N. New England*, 546

U.S. 320, 324-25 (2006) (noting that plaintiffs raised patients' claims in suit under 42 U.S.C. §

1983); *Bellotti,* 428 U.S. at 136 (same). Defendants cite no cases and make no arguments that

persuade this Court to change its determination on this issue.

### C.     The Mandates' Private Rights of Action

Defendants also claimed that plaintiffs lack standing to challenge the Mandates' private rights of action "because any injury to [Dr.] Hopkins is not 'fairly traceable' to the defendants." (Dkt. No. 22, at 13). Each of the Mandates provide for criminal prosecution and/or civil licensing enforcement by defendants. The private rights of action present in the D&E Mandate and the Local Disclosure Mandate do not deprive this Court of jurisdiction to address the constitutionality of the laws. *See, e.g., Casey*, 505 U.S. at 887-88 (noting, as to spousal notification law the Court struck down, that "[a] physician who performs an abortion" for a married woman without spousal notice "will have his or her license revoked, and is liable to the husband for damages").

### D.  Sovereign Immunity Under The Eleventh Amendment

Defendants also previously made arguments under the Eleventh Amendment (Dkt. No. 22, at 18). "The Eleventh Amendment confirms the sovereign status of the States by shielding them from suits by individuals absent their consent." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (citing *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54 (1996)). However, "[t]o ensure the enforcement of federal law . . . the Eleventh Amendment permits suits for *prospective* injunctive relief against state officials acting in violation of federal law." *Id.* (emphasis added) (citing *Ex parte Young*, 209 U.S. 123 (1908)). "A state official is amenable to suit to enjoin the enforcement of an unconstitutional state statute only if the officer has 'some connection with the enforcement of the act.'" *Digital Recognition Network*, 803 F.3d at 960 (citing *Ex Parte Young,* 209 U.S. at 157).

To determine whether an action against state officials in their official capacities avoids an Eleventh Amendment bar to suit, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535

U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 296 (1997) (O'Connor, J., concurring). Plaintiffs' operative amended complaint "clearly satisfies [the Court's] 'straightforward inquiry.'" *Verizon Maryland, Inc.*, 535 U.S. at 645.

Furthermore, defendants, who are sued in their official capacities, are amenable to suit in this action. Defendants can be sued for prospective injunctive and declaratory relief in this action, as they have "'some connection with the enforcement of the act.'" *Digital Recognition Network, Inc.*, 803 F.3d at 960 (citing *Ex Parte Young,* 209 U.S. at 157).

## V.  Facial Versus As-Applied Challenges

Dr. Hopkins and LRPF bring both facial and as-applied challenges to certain of these Mandates. In regard to facial challenges in general, the majority of courts have adopted a definition of facial challenges as those seeking to have a statute declared unconstitutional in all possible applications. *See, e.g., Sabri v. United States*, 541 U.S. 600, 609 (2004); *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Steffel*, 415 U.S. at 474. As-applied challenges are construed as an argument that the statute is unconstitutional as applied to precise plaintiffs. "Each holding carries an important difference in terms of outcome: If a statute is unconstitutional as applied, the State may continue to enforce the statute in different circumstances where it is not unconstitutional, but if a statute is unconstitutional on its face, the State may not enforce the statute under any circumstances." *See Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187, 193-94 (6th Cir. 1997), *cert. denied*, 523 U.S. 1036 (1998).

The Supreme Court has made clear that as-applied challenges are preferred. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 448-451 (2008) (discussing the preference for as-applied challenges as opposed to facial challenges). In *Salerno*, the Supreme Court stated that a "facial challenge to a legislative Act is, of course, the most difficult challenge

to mount successfully" and will only succeed if a litigant can "establish that no set of circumstances exists under which the Act would be valid." 481 U.S. at 745.

The standard that controls a facial challenge to an abortion statute is somewhat different than that applicable to facial challenges in general. The Eighth Circuit Court of Appeals has recognized that facial challenges to abortion statutes can succeed only if a plaintiff can show that "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey,* 505 U.S. at 895. *See also Planned Parenthood Minn., N.D., S.D. v. Rounds*, 653 F.3d 662, 667-68 (8th Cir. 2011), *vacated in part on reh'g en banc sub nom. Planned Parenthood Minn., N.D., S.D. v. Rounds*, 662 F.3d 1072 (8th Cir. 2011) and *in part on reh'g en banc sub nom. Planned Parenthood Minn., N.D., S.D. v. Rounds*, 686 F.3d 889 (8th Cir. 2012); *see also Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 725, 733 n.8 (8th Cir. 2008) ("*Rounds* cases"). In *Whole Woman's Health*, the Supreme Court clarified that "cases in which the provision at issue is relevant" is a narrower category than "all women," "pregnant women," or even "*women seeking abortions* identified by the State." 136 S. Ct. at 2320 (quoting *Casey*, 505 U.S. at 895-95). To sustain a facial challenge and grant a preliminary injunction, this Court must find that the challenged Mandate is an undue burden for a large fraction of women "for whom the provision is an actual rather than an irrelevant restriction." *See id.* (discussing this as the "relevant denominator").

The Eighth Circuit Court of Appeals recognizes that "the 'large fraction' standard is in some ways 'more conceptual than mathematical,'" but this Court is required by controlling precedent to conduct this fact finding "to determine whether that number constitutes a 'large fraction.'" *Planned Parenthood of Arkansas & Eastern Oklahoma v. Jegley*, 864 F.3d 953, 960

(8th Cir. July 28, 2017) (citing *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 374 (6th Cir. 2006)).

"Traditionally, a plaintiff's burden in an as-applied challenge is different from that in a facial challenge. In an as-applied challenge, 'the plaintiff contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional.'" *Voinovich*, 130 F.3d at 193-94 (quoting *Ada v. Guam Soc'y of Obstetricians and Gynecologists*, 506 U.S. 1011, 1012 (1992) (Scalia, J., dissenting), *denying cert. to* 962 F.2d 1366 (9th Cir. 1992)). "Therefore, the constitutional inquiry in an as-applied challenge is limited to the plaintiff's particular situation." *Voinovich*, 130 F.3d at 193-94.

## VI.     Request For Preliminary Injunction

The Court turns to examine the factors set forth in *Dataphase Systems, Inc. v. C L Systems, Inc.*, as applied to Dr. Hopkins and LRFP's current request for a preliminary injunction. 640 F.2d 109 (8th Cir. 1981). In deciding a preliminary injunction motion, the Court considers four factors: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the balance of the equities; and (4) the public interest. *Grasso Enterprises, LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1035 n.2 (8th Cir. 2016) (citing *Dataphase*, 640 F.2d at 114). Under *Dataphase*, no one factor is determinative. *Id.* at 113.

The Eighth Circuit modifies the *Dataphase* test when applied to challenges to laws passed through the democratic process. Those laws are entitled to a "higher degree of deference." *Rounds*, 530 F.3d at 732. In such cases, it is never sufficient for the moving party to establish that there is a "fair chance" of success. Instead, the appropriate standard, and threshold showing that must be made by the movant, is "likely to prevail on the merits." *Id.* Only if the movant has demonstrated that it is likely to prevail on the merits should the Court consider the

remaining factors. *Id.* The Court will examine plaintiffs' argument with respect to each of the four challenged laws.

## VII. Analysis Of The Challenged Mandates

The Eighth Circuit vacated this Court's preliminary injunction and "remanded for reconsideration in light of Chief Justice Roberts's separate opinion in *June Medical*, which is controlling, as well as the Supreme Court's decision in *Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780 (2019) (per curiam)." *Hopkins v. Jegley*, 968 F.3d 912, 916 (8th Cir. 2020). The Court will examine Dr. Hopkins and LRFP's argument for a preliminary injunction with respect to each of the four challenged laws.

### A. The D&E Mandate (Count 1, H.B. 1032)

The Court examines whether it should preliminarily enjoin at this stage of the proceedings enforcement of the D&E Mandate, which imposes civil liability and a criminal penalty on physicians who "purposely perform or attempt to perform a dismemberment abortion and thereby kill an unborn child unless it is necessary to prevent a serious health risk to the pregnant woman." Ark. Code Ann. § 20-16-1803(a). Dr. Hopkins and LRFP seek a preliminary injunction based on count one of their amended complaint, which alleges that the D&E Mandate violates the Due Process Clause of the United States Constitution by placing an undue burden on Dr. Hopkins and LRFP's patients' rights to liberty and privacy. This is a facial challenge.

Under the D&E Mandate, "purposely" is defined as acting "with purpose with respect to a material element of an offense" when, "[i]f the element involves the nature of the conduct of the actor or a result of the conduct of the actor, it is the conscious object of the actor to engage in conduct of that nature or cause such a result," and "[i]f the element involves the attendant

circumstances, the actor is aware of the existence of such circumstances." Ark. Code Ann. § 20-16-1802(5).

"Attempt to perform or induce an abortion" is defined as "an act or omission of a statutorily required act, that under the circumstances as the actor believes them to be, constitutes a substantial step in a course of conduct planned to culminate in the performance or induction of an abortion in this state in violation of this subchapter. . . ." Ark. Code Ann. § 20-16-1802(2).

"Dismemberment abortion" is defined as "an abortion performed with the purpose of causing the death of an unborn child that purposely dismembers the living unborn child and extracts one (1) piece at a time from the uterus through the use of clamps, grasping forceps, tongs, scissors, or similar instruments that, through the convergence of two (2) rigid levers, slice, crush, or grasp a portion of the body of the unborn child to cut or tear off a portion of the body of the unborn child." Ark. Code Ann. § 20-16-1802(3)(A)(i). It includes "an abortion in which suction is used to extract the body of the unborn child subsequent to the dismemberment of the unborn child. . . ." Ark. Code Ann. § 20-16-1802(3)(A)(ii). It does not include "an abortion that uses suction to dismember the body parts of the unborn child into a collection container." Ark. Code Ann. § 20-16-1802(3)(B).

"Unborn child" is defined by the Arkansas legislature as "an individual organism of the species Homo sapiens from fertilization until live birth. . . ." Ark. Code Ann. § 20-16-1802(7).

"Woman" is defined as "a female human being whether or not she has reached the age of majority." Ark. Code Ann. § 20-16-1802(8). "Serious health risk to the pregnant woman" is defined as "a condition that, in a reasonable medical judgment, complicates the medical condition of a pregnant woman to such an extent that the abortion of a pregnancy is necessary to avert, either the death of the pregnant woman or the serious risk of substantial and irreversible impairment of

a major bodily function of the pregnant woman." Ark. Code Ann. § 20-16-1802(6)(A). It does not include a psychological or emotional condition or "a medical diagnosis that is based on a claim of the pregnant woman or on a presumption that the pregnant woman will engage in conduct that could result in her death or that could cause substantial and irreversible physical impairment of a major bodily function of the pregnant woman." Ark. Code Ann. § 20-16-1802(7)(B)(i)-(ii).

If a physician violates the D&E Mandate, the law imposes civil liability, Ark. Code Ann. § 20-16-1804, as well as the criminal penalties of a Class D felony under Arkansas law, Ark. Code Ann. § 20-16-1805.[11] Plaintiffs maintain the D&E Mandate also imposes professional penalties for performing the procedure (Dkt. No. 74, at 23).

Dr. Hopkins asserts that, if the State enforces the D&E Mandate, he will stop performing D&E abortions altogether due to ethical and legal concerns regarding compliance with the law, thereby rendering abortions essentially unavailable in the State of Arkansas starting at 14.0 weeks LMP. LRFP asserts the same (Dkt. No. 69-2). The most common method of second trimester abortion is a method with instrumentation called D&E (Dkt. No. 73-2, ¶ 14). This involves two steps: dilating the cervix, and then evacuating the uterus with instruments such as forceps. There are several ways to dilate the cervix (Dkt. No. 4, ¶ 17; Dkt. No. 5, ¶ 13; Dkt. No. 73-2, ¶ 13). According to Dr. Parker and Ms. Williams, physicians evaluate patient history and circumstances and use their clinical judgment to determine the best dilation protocol for each individual patient (Dkt. No. 73-2, ¶ 15; Dkt. No. 73-3, ¶ 30).

---

[11] The D&E Mandate, with respect to civil proceedings or actions brought under the subchapter, includes a provision to protect the "anonymity of a woman who received or attempted to receive a dismemberment abortion. . . from public disclosure without her written consent." Ark. Code Ann. § 20-16-1806.

Typically, during the early weeks of the second trimester of pregnancy, a doctor performing D&E uses a combination of medications that open the cervix and manual dilators; then, the same day, the doctor uses forceps to remove the fetus and other contents of the uterus. Because the fetus is larger than the opening of the cervix, the fetal tissue generally comes apart as the physician removes it through the cervix. The reason that the cervical opening is smaller than the fetal parts is that, in general, the doctor dilates only enough to allow the safe passage of instruments and fetal tissue through the cervix (Dkt. No. 4, ¶ 17-18; Dkt. No. 5, ¶ 14; Dkt. No. 73-2, ¶ 13). Ms. Williams confirms that currently in 2020 for the majority of LRFP's second-trimester patients, physicians provide a D&E procedure in one day, meaning the dilation and evacuation occur on the same day. This is true for essentially all LRFP patients who – when they return to the clinic after the 72-hour mandatory delay period required by current Arkansas law, are between 14.0 and 17.6 weeks LMP, and about half of LRFP patients who are 18.0 to 20.0 weeks LMP. As of late 2020, a small number of LRFP's second -trimester patients undergo overnight dilation, meaning the dilation process takes place over two days. About half of LRFP's patients between 19.0 and 20.0 weeks LMP, and almost all patients between 20.0 and 21.5 weeks LMP, undergo overnight dilation (Dkt. No. 73-3, ¶ 29). When the D&E is a one-day procedure, due to Arkansas's state mandated counseling laws and 72-hour mandatory delay period, this means that generally a woman would be required to make two trips to LRFP for abortion care.

Later in the second trimester, larger instruments require wider cervical dilation. Although some physicians continue to provide D&E as a one-day procedure depending on the patients' needs, doctors may add overnight osmotic dilation to the D&E protocol. Osmotic dilators are thin sticks of material that swell when they absorb moisture; when placed in a woman's cervix, they absorb moisture from the woman's body, expand slowly, and slowly dilate the cervix. Once

dilation is sufficient, typically the next day, the doctor proceeds as in earlier D&Es, removing the fetus, generally in pieces because it is larger than the cervical opening (Dkt. No. 4, ¶ 17; Dkt. No. 5, ¶ 16; Dkt. No. 73-2, ¶ 15; Dkt. No. 73-3, ¶ 31).  For patients of LRFP who have overnight osmotic dilation with the D&E protocol, those patients are required to spend that overnight within 30 minutes of LRFP so that the doctor is available in the rare instance in which a patient has any problem (Dkt. No. 6, ¶ 18; Dkt. No. 73-3, ¶ 31).  Given the requirements of Arkansas's state mandated counseling laws and 72-hour mandatory delay period, for patients receiving two-day D&E procedures, a woman would be required to make at least three trips to LRFP (Dkt. No. 6, ¶ 7).  Starting at 18.0 to 22.0 weeks LMP, some physicians, including Dr. Hopkins, undertake an additional procedure to try to cause fetal demise before the evacuation phase of a D&E for most patients, meaning those for whom it is not contraindicated (Dkt. No. 5, ¶ 18).

Through the second trimester, D&E is a safe way to provide abortion in an outpatient setting, such as a family planning clinic (Dkt. No. 5, ¶ 17; *see also* Dkt. No. 73-1, ¶¶ 8-9).  The D&E procedure has a long-established safety record in this county, with major complications occurring in less than 1% of D&E procedures (Dkt. No. 4, ¶ 19; *see also* Dkt. No. 73-1, ¶¶ 8-9).

### 1.    Likelihood Of Success On The Merits:  Due Process Challenge

To determine whether Dr. Hopkins and LRFP are likely to succeed on their challenge to the D&E Mandate, this Court applies the undue burden standard.  *June Medical Services*, 140 S. Ct. 2103 (plurality opinion); *Whole Woman's Health*, 136 S. Ct. at 2309; *Casey*, 505 U.S. at 877 (plurality opinion).

The Eighth Circuit vacated this Court's preliminary injunction order and remanded "for reconsideration in light of Chief Justice Roberts's separate opinion in *June Medical*, which is controlling, as well as the Supreme Court's decision in *Box v. Planned Parenthood of Ind. & Ky.*,

*Inc.*, 139 S. Ct. 1780 (2019) (per curiam)." (Dkt. No. 49, at 7). The Court understands the *June Medical* undue burden test as set forth in Justice Roberts' controlling concurrence to require this Court to determine when analyzing a facial challenge whether the challenged Mandate has the effect of placing a substantial obstacle in the path of a large fraction of women seeking an abortion of a nonviable fetus for whom the Mandate is relevant and to determine whether the Mandate has a legitimate purpose and whether the law is reasonably related to that goal. *See June Medical*, 140 S. Ct. at 2138 (Roberts, J. concurring) ("[I]n the context of *Casey*'s governing standard, these benefits were not placed on a scale opposite the law's burdens. Rather, *Casey* discussed benefits in considering the threshold requirement that the State have a 'legitimate purpose' and that the law be 'reasonably related to that goal.' [*Casey*, 505 U.S.] at 878, 112 S. Ct. 2791 (plurality opinion); *id.* at 882, 112 S. Ct 2791 (joint opinion). So long as that showing is made, the only question for the court is whether a law has the "effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.*, at 877, 112 S. Ct. 2791 (plurality opinion)."); *see also Whole Woman's Health*, 136 S. Ct. at 2309 ("[A] statute which, while furthering [the interest in potential life or some other] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.") (citing *Casey*, 505 U.S. at 877 (plurality opinion)); *see also Gonzales*, 550 U.S. at 161 ("The Act's furtherance of legitimate government interests bears upon, but does not resolve, . . . whether the Act has the effect of imposing an unconstitutional burden on the abortion right. . . ."). To the extent defendants suggest that rational basis review is appropriate, the Court rejects that contention and applies the *June Medical* standard from Justice Roberts' controlling concurrence to the due process challenges brought by plaintiffs to each of the Mandates.

### a. Applicable Law

Federal constitutional protection of reproductive rights is based on the liberty interest derived from the due process clause of the Fourteenth Amendment. *Casey*, 505 U.S. at 846 (majority opinion). Dr. Hopkins and LRFP challenge the D&E Mandate on this basis.

At least ten other states have passed similar laws. *See, e.g.*, Ala. Code § 26-23G-1 *et seq.*; Ark. Code. Ann. § 20-16-1801 *et seq.*; Ind. Code §§ 16-34-2-7(a), 16-18-2-96.4; Kan. Stat. Ann. § 65-6741 *et seq.*; Okla. Stat. Ann. § 1-737.7 *et seq.*; La. Stat. Ann. § 1061.1.1 *et seq.*; Miss. Code Ann. § 41-41-151 *et seq.*; Ohio Rev. Code § 2919.15(B); Tex. Health & Safety Code Ann. § 171.151 *et seq.*; W. Va. Code Ann. § 16-20-1 *et seq.* In nearly every state, plaintiffs have challenged those laws as unduly burdening the right to elect abortion before viability, as plaintiffs do here. In every challenge brought to date, the court has enjoined the law, finding that it indeed unduly burdens that right. *See, e.g., EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 960 F.3d 785, 798-806 (6th Cir. 2020), *petition for cert. filed* (U.S. Nov. 5, 2020) (No. 20-601); *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1327, 1329–30 (11th Cir. 2018) (affirming permanent injunction of Ala. Code § 26-23G-1 *et seq.*), *cert denied sub nom. Harris v. W. Ala. Women's Ctr.*, —— U.S. ——, 139 S. Ct. 2606 (2019); *Bernard v. Individual Members of Ind. Med. Licensing Bd.*, 392 F. Supp. 3d 935, 962, 964 (S.D. Ind. 2019) (preliminarily enjoining Ind. Code §§ 16-34-2-7(a), 16-18-2-96.4); *Planned Parenthood of Sw. Ohio Region v. Yost*, 375 F. Supp. 3d 848, 869, 872 (S.D. Ohio 2019) (preliminarily enjoining Ohio Rev. Code § 2919.15(B)); *Hodes & Nauser, MDs, P.A. v. Schmidt*, 368 P.3d 667, 670-71, 677-78 (Kan. Ct. App. 2016), *aff'd*, 440 P.3d 461, 467–68, 504 (Kan. 2019) (affirming temporary injunction of Kan. Stat. Ann. § 65-6741 *et seq.*); *see also, e.g., Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 145–46, 152 (3d Cir. 2000) (affirming permanent injunction of a partial-birth abortion ban, finding that its fetal-demise workaround would constitute an undue burden); *Evans v. Kelley*, 977 F. Supp. 1283, 1318–

20 (E.D. Mich. 1997) (permanently enjoining a similar law). While these cases do not dictate this Court's decision, the Court finds them highly persuasive. *See Glossip v. Gross*, 576 U.S. 863, 135 S. Ct. 2726, 2740 (2015) ("Our review is even more deferential where. . . multiple trial courts have reached the same finding, and multiple appellate courts have affirmed those findings."); *cf. Cooper v. Harris*, —— U.S. ——, 137 S. Ct. 1455, 1468 (2017) ("[A]ll else equal, a finding is more likely to be plainly wrong if some judges disagree with it."). The Court acknowledges and also has reviewed the proceedings in *Whole Woman's Health v. Paxton*, 978 F.3d 896 (5th Cir. 2020), *aff'g* 280 F. Supp. 3d 938, 953–54 (W.D. Tex. 2017), *vacating and reh'g en banc granted* 978 F.3d 974 (5th Cir. 2020).

Dr. Hopkins and LRFP argue that, as a matter of Supreme Court precedent, defendants "cannot criminalize the performance of the most common method of abortion (and indeed the only method in Arkansas) in the second-trimester, pre-viability stage of pregnancy. *See Stenberg v. Carhart*, 530 U.S. 914, 945-46 (2000); *accord Gonzales*, 550 U.S. at 150; *Danforth*, 428 U.S. at 77-79." (Dkt. No. 32, at 28). Dr. Hopkins and LRFP further assert that, "[t]his is exactly what the D&E Ban does, and it is unconstitutional. . . Decades of settled law holds that it is *per se* unconstitutional for the State to criminalize 'the . . . dominant second-trimester abortion method.' *Gonzales*, 550 U.S. at 165; *see also id.* at 150-54; *Danforth*, 428 U.S. at 77-79." (Dkt. No. 32, at 28).

Nearly 50 years ago, the Supreme Court declared that the Fourteenth Amendment protects an individual's right to elect to have an abortion. *Roe v. Wade*, 410 U.S. 113, 153–54 (1973). Then, 20 years later, in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 846 (1992), the Court reaffirmed what it identified as *Roe*'s essential holdings:

> First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability,

the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. Second is a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child.

Under this framework, "[r]egardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Id.* at 879. On the other hand, "[r]egulations which do no more than create a structural mechanism by which the State. . . may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose." *Id.* at 877. The Court acknowledges that the State "may use its voice and its regulatory authority to show its profound respect" for the dignity of human life. *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007). Likewise, states "ha[ve] an interest in protecting the integrity and ethics of the medical profession." *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997)).

However, no State interest may justify "placing a substantial obstacle in the path of a woman seeking an abortion" prior to viability. *Casey*, 505 U.S. at 877. Such an obstacle would unduly burden the right to choose prior to viability, in violation of the Fourteenth Amendment. *Gonzales*, 550 U.S. at 146. Based on record evidence, the D&E Mandate applies to abortions beginning at 14.0 weeks LMP, well before the point of viability as established by controlling law.[12]

---

[12] The Supreme Court has defined viability as "the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb, so that the independent existence of the second life can in reason and all fairness be the object of state protection that now overrides the rights of the woman." *Casey*, 505 U.S. at 870. "Before viability," the Supreme Court declared, "the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure." *Id.* at 846. "The woman's right to terminate her pregnancy before viability. . . is a rule of law and a component of liberty we cannot renounce." *Id.* at 871 (citation omitted). The Eighth Circuit has applied the rule categorically, even while recognizing "that viability varies among pregnancies and that

An undue burden exists if a statute's "purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Casey*, 505 U.S. at 878. The Supreme Court has repeatedly affirmed that laws that amount to a prohibition of the most common second-trimester abortion method impose such a burden. *See, e.g.*, *Stenberg v. Carhart*, 530 U.S. 914, 930, 938-39 (2000) (finding that a Nebraska statute effectively prohibiting D&E abortions constituted an undue burden); *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 78-79 (1976) (striking down a ban on saline amniocentesis, then the method "most commonly used nationally. . . after the first trimester"); *see also Gonzales*, 550 U.S. at 150-54, 164-65 (contrasting a permissible law prohibiting only D&X dilation and extraction abortions, and not standard D&E, with the unconstitutional law at issue in *Stenberg*). If the D&E Mandate effectively prohibits the D&E procedure, then, it poses a substantial obstacle to abortion access prior to viability and is an undue burden. The question before this Court, then, is whether the D&E Mandate imposes an undue burden which inquiry, according to the Eighth Circuit, is controlled by Justice Robert's controlling opinion in *June Medical*.

---

improvements in medical technology will push later in pregnancy the point at which abortion is safer than childbirth and advance earlier in gestation the point of fetal viability." *Edwards v. Beck*, 786 F.3d 1113, 1117 (8th Cir. 2015) (citations omitted) (invaliding an Arkansas statute banning abortions after 12 weeks' gestation because the Act "prohibits women from making the ultimate decision to terminate a pregnancy at a point before viability."). The Court recognizes that Dr. Wyatt, an expert for defendants, states that "[b]y the 14th week of pregnancy a living baby has a beating heart and moving limbs, and breathing motions have begun." (Dkt. No. 25-4, ¶ 4). The Court also recognizes that, in the D&E Mandate, the Arkansas legislature defines "unborn child" as "an individual organism of the species Homo sapiens from fertilization until live birth. . . ." Ark. Code Ann. § 20-16-1802(7). At this time, and on the record before it, this Court does not equate Dr. Wyatt's use of "living baby" or the Arkansas legislature's definition of "unborn child" with viability, as the term viability has been used by courts in the abortion context. *See Edwards v. Beck*, 8 F. Supp. 3d 1091 (E.D. Ark. 2014), *aff'd* 786 F.3d 1113 (8th Cir. 2015) (examining the term viability in both medical and legal contexts; *see also MKM Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 722 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 981 (2016) ("[t]oday, viability generally occurs at 24 weeks"); *accord Casey*, 505 U.S. at 860.

When assessing the standard to apply, this Court rejects any argument that *Gonzales* articulated a separate test that applies where a state acts to express respect for human life—that is, "the State may use its regulatory power to bar certain procedures and substitute others," so long as the alternative procedures do not impose an undue burden in the form of "significant health risks." *Gonzales*, 550 U.S. at 158, 161.

As an initial matter, the Court rejects any attempt to characterize the D&E Mandate as an attempt to "substitute" another abortion procedure during the second trimester. Because fetal tissue separates as physicians remove it from the uterus during a D&E performed after 14.0 weeks LMP based on unrefuted record evidence, the D&E Mandate prohibits D&E abortions prior to fetal demise.[13] The D&E Mandate does not identify any workaround for physicians who seek to perform or patients who seek to obtain a D&E where more than only suction will be required to evacuate the uterus. The D&E Mandate does not suggest that physicians should or must induce fetal demise prior to performing a D&E. Specifically, the D&E Mandate does not discuss any procedures for compliance. The procedures for compliance through fetal demise proposed by defendants and discussed in the record evidence are not "alternative" procedures to a D&E. A patient who undergoes any one of the fetal demise procedures addressed in this record must still undergo the entirety of a D&E, based on the current record evidence before the Court. Instead, fetal demise procedures are additional procedures. Additional procedures expose patients to

---

[13] The D&E Mandate does not use or define the term "fetal demise" or explain how fetal demise should be determined. The parties appear to agree that the fetus would no longer be considered "living" under the law when asystole, or the termination of a heartbeat, occurs, and they used the term "fetal demise" to denote that occurrence. The Court will use that term to mean termination of the fetal heartbeat. *See W. Alabama Women's Ctr. v. Miller*, 217 F. Supp. 3d 1313, 1336 n.18 (M.D. Ala. 2016).

additional risks and burdens; no party argues that these procedures are necessary or provide any medical benefit to the patient. *See Danforth*, 428 U.S. at 78-79 (striking down Missouri's ban on saline amniocentesis because it "forces a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed"); *EMW Women's Surgical Center*, 960 F.3d at 798 (similar); *Williamson*, 900 F.3d at 1326 (similar); *Farmer*, 220 F.3d at 145 (similar); *Planned Parenthood of Cent. N.J. v. Verniero*, 41 F. Supp. 2d 478, 500 (D.N.J. 1998) (similar), *aff'd sub nom. Farmer*, 220 F.3d 127; *Evans*, 977 F. Supp. at 1318 (similar).

Further, like other courts presented with argument that a different standard should apply to such regulations based on the state's asserted interest, this Court finds the argument unpersuasive. *See, e.g., EMW Women's Surgical Center*, 960 F.3d at 795-96; *Planned Parenthood of Ind. & Ky. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 817 (7th Cir. 2018). In *Whole Women's Health*, the Supreme Court inferred that the state had legislated in the interest of protecting women's health. 136 S. Ct. at 2310. The Court in *Whole Women's Health* did not distinguish that case from *Gonzales* based on the state's interest; in fact, it cited *Gonzales*'s analysis. *See id.* at 2309-10 (citing *Gonzales*, 550 U.S. at 165-66). The *Whole Women's Health* Court explained that it simply applied "[t]he rule announced in *Casey*. . . ." *Id.* at 2309. In *Gonzales*, the Court also explained that "*Casey*, in short, struck a balance," and it simply "applied [*Casey*'s] standards to the cases at bar." *Gonzales*, 550 U.S. at 146. *Casey* itself did not suggest that any separate test applied to regulations based on an interest in the dignity of human life; instead, it presented the "woman's right to terminate her pregnancy before viability" and "the interest of the State in the protection of potential life" as two sides of an equation. *Casey*, 505 U.S. at 871. Other lower courts have not understood there to be two different analyses. Courts regularly apply the undue burden analysis to regulations passed in the interest of protecting the dignity of human life. *See,*

*e.g.*, *Planned Parenthood of Ind. & Ky., Inc. v. Adams*, 937 F.3d 973, 983-84 (7th Cir. 2019); *J.D. v. Azar*, 925 F.3d 1291, 1328, 1333, 1335 (D.C. Cir. 2019); *Williamson*, 900 F.3d at 1326-27; *Planned Parenthood of Ind. & Ky. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d at 824-25, 831.

To the extent defendants contend that this Court is barred from evaluating the medical evidence concerning both the feasibility and safety of defendants' proposed fetal demise methods, the Court also rejects this argument for reasons specific to this case (Dkt. No. 23, at 45-46). Defendants contend that medical disagreement or uncertainty over the impact of the D&E Mandate is for resolution by the legislature alone (*Id.*). This argument derives from *Gonzales*, a case in which the Supreme Court upheld a federal statute that imposed a nationwide ban on intact D&E, a rarely used abortion method, concluding that the ban did not prohibit the most common procedure for second-trimester abortions, standard D&E, and then analyzed whether the procedure that would remain legal would in some circumstances posed more risk to the health of the woman than the prohibited procedure of intact D&E. Because the most common procedure – standard D&E – would remain an available and viable option for all women, and because expert testimony conflicted as to whether the rarely used procedure, intact D&E, was ever safer, the Supreme Court found that the ban did not create a substantial obstacle to obtaining an abortion. In other words, because "there is uncertainty over whether the barred procedure is ever necessary to preserve a woman's health, given the availability of other abortion procedures that are considered to be safe alternatives," the Court upheld that ban on intact D&E. *Gonzales*, 550 U.S. at 166-67. The circumstances here are different. The D&E Mandate seeks to ban an abortion procedure considered to be safe, based on the great weight of unrefuted record evidence before this Court today including the 2018 National Academies consensus-study report (Dkt. No. 73-1, ¶¶ 8-9), and

to require women seeking a D&E to submit to additional abortion procedures suggested by defendants when defendants contend uncertainty, at best, over whether those other suggested abortion procedures are safe alternatives and when, at this stage of the litigation, plaintiffs appear likely to prevail on this challenge.

In addition, the Supreme Court in *Gonzales* addressed a statute that banned a rarely used abortion method, intact D&E. 550 U.S. at 155 (noting that intact D&E constitutes "a small fraction of the overall number of D & E abortions"). In finding that the *Gonzales* ban did not create a substantial obstacle, the Supreme Court relied heavily on the fact that the most common procedure—standard D&E—would remain available to all women under the statute. *Id.* at 150-54 (noting "the availability of other abortion procedures that are considered to be safe alternatives"); *cf. Stenberg*, 530 U.S. at 945-46 (holding Nebraska's ban on intact D&E unconstitutional because it was broad enough to allow prosecution of "physicians who use [standard] D&E procedures, the most commonly used method for performing pre-viability second trimester abortions"). By contrast, the D&E Mandate has the effect of rendering the most common second-trimester abortion method, standard D&E, unavailable to women in Arkansas after 14.0 weeks LMP. This is precisely the method that *Gonzales* took care to note remained available. Because *Gonzales* dealt with a ban on one rare form of abortion, it cannot be read to suggest that statutes that effectively ban common abortion methods—such as the D&E Mandate—should be upheld.

Even in *Gonzalez*, while the Supreme Court found that legislative factual findings were due some deference under circumstances of "medical uncertainty," the Supreme Court also noted that courts "retain[] an independent constitutional duty to review factual findings where constitutional rights are at stake." *Id.* at 165. As a result, even in *Gonzalez*, the Supreme Court's

deference to the legislature was not "uncritical," and legislative findings were not given "dispositive weight." *Id.* at 165-55.

Perhaps most importantly, there are no legislative findings of fact to which this Court could defer. There are no legislative findings at all related to the D&E Mandate itself. Moreover, as explained, the D&E Mandate does not identify any workaround for physicians who seek to perform or patients who seek to obtain a D&E after 14.0 weeks LMP. The D&E Mandate does not suggest that physicians should or must induce fetal demise prior to performing a D&E. Specifically, the D&E Mandate does not discuss any procedures for inducing fetal demise and does not acknowledge these procedures at all. There are no legislative findings that these procedures are safe and effective or any indication in the record before the Court that the Arkansas legislature considered these three procedures when enacting the D&E Mandate. There are no legislative findings of fact to which this Court could even defer. As a result, the Court will examine the record evidence with regard to application of the controlling undue burden standard.

Dr. Hopkins and LRFP, who challenge the laws, retain the ultimate burden of proving their unconstitutionality. *Mazurek*, 520 U.S. at 972 (reversing appellate court for enjoining abortion restriction where plaintiffs had not proven that the requirement imposed an undue burden); *Casey*, 505 U.S. at 884 (affirming provision where "there is no evidence on this record" that the restriction would amount to an undue burden).

For Dr. Hopkins and LRFP's challenges based on alleged violations of the Due Process Clause, the Court will begin its analysis of the merits by examining each provision and the asserted state justification for each provision. The Court will then examine the alleged undue burden of the provision, and the Court will make findings of fact regarding the fraction of women, if any, for whom the D&E Mandate imposes an undue burden.

### b. Analysis Of The D&E Mandate

### 1. Burdens Imposed On Women

This Court examines whether the Mandate "has the effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *June Medical*, 140 S. Ct. at 2138 (Roberts, J. concurring) (quoting *Casey*, 505 U.S. at 877).

Dr. Hopkins and LRFP argue that, although the D&E Mandate does not use recognized medical terminology, it bans D&E because it criminalizes the use of surgical instruments to cause disarticulation or, in the D&E Mandate's terms, "dismemberment" of a "living" fetus. Ark. Code Ann. § 20-16-1802(3) (2017). Dr. Hopkins and LRFP assert that the law would force Arkansas women seeking pre-viability abortions to undergo medically unnecessary procedures and subject women to increased health risks, along with imposing financial and logistical burdens (Dkt. No. 93, at 19-20). Dr. Hopkins and LRFP also assert that, if the D&E Mandate goes into effect, D&E abortions essentially will become unavailable in the State of Arkansas starting at 14.0 weeks LMP due to ethical and legal concerns, including but not limited to potential criminal liability for physicians, regarding compliance with the law (*Id.*). There is factual support in the record for these assertions. LRFP is the only entity providing abortions after 10.0 weeks LMP and the only entity providing procedural abortion in the entire state (Dkt. No. 73-2, ¶ 9; 73-3, ¶ 13).[14] D&E procedural abortions are the only outpatient abortion procedure available throughout the second trimester in Arkansas (Dkt. No. 73-2, ¶ 4a). However, Dr. Hopkins and LRFP make clear their position that, even if plaintiffs were willing to attempt demise procedures, plaintiffs' patients will

---

[14] If hospitals in Arkansas are providing any abortion care, it is in only rare circumstances (Dkt. No. 5, ¶ 6). Dr. Hopkins is aware of no physicians, other than those with whom he practices at LRFP, who provide second trimester abortion care in the state of Arkansas (Dkt. No. 32-2, ¶ 2).

face a substantial obstacle to obtaining abortion care because of the D&E Mandate (Dkt. No. 93, at 19-20).

Plaintiffs maintain that the D&E Mandate "would constitute a significant step backward. . . ." (Dkt. No. 3, at 6). D&E was a significant advance over earlier methods of second trimester abortion (Dkt. No. 4, ¶ 19). *See also City of Akron*, 462 U.S. at 435-36, *overruled in part on other grounds by Casey*, 505 U.S. 833 ("Since [*Roe v. Wade* was decided], the safety of second trimester abortions has increased dramatically. The principal reason is that the D&E procedure is now widely and successfully used. . . .") (footnotes omitted).

Starting in the early second trimester, D&E is the only procedure that can be performed on an outpatient, ambulatory basis (Dkt. No. 4, ¶ 14; Dkt. No. 5, ¶ 17). *See also City of Akron*, 462 U.S. at 436. This significantly reduces the expense of a second trimester abortion (Dkt. No. 4, ¶ 14; Dkt. No. 73-4, ¶ 71).

If the D&E Mandate were to be enforced, Dr. Hopkins asserts that he would stop performing abortions at approximately 14.0 weeks LMP because, after that point, he would not know whether he would be able to ensure fetal demise before taking actions banned under the D&E Mandate (Dkt. No. 3, at 7; Dkt. No. 5, ¶¶ 23, 26). LRFP states the same (Dkt. Nos. 69-2; 73-3). Under the D&E Mandate, plaintiffs maintain that the only D&E that would be legal is one in which a physician successfully induces fetal demise through an additional procedure prior to starting the evacuation phase of D&E (Dkt. No. 3, at 7). Plaintiffs claim that, because it is not feasible or safe to induce fetal demise through an additional procedure in every patient prior to starting the evacuation phase of D&E, Arkansas abortion providers would not start any D&E because they may not be able to complete the procedure without violating the D&E Mandate (Dkt. No. 3, at 7). According to Dr. Parker, there is no safe and reliable way to guarantee fetal demise

prior to the evacuation of the uterus with instruments (Dkt. No. 73-2, ¶ 22). As a result, according to Dr. Parker, "[b]ecause there is no way to guarantee fetal demise with every patient," the D&E Mandate "prohibits abortion beginning as early as 14 weeks LMP." (Dkt. No. 73-2, ¶ 27).

Defendants respond that the D&E Mandate does not prohibit induction abortion or dismemberment abortion where fetal demise can be achieved before D&E (Dkt. No. 92, at 10). Defendants currently focus on three procedures: digoxin injections, potassium chloride injections, and umbilical cord transection (Dkt. No. 92, at 10-11). These proposed methods of fetal demise do not appear in the D&E Mandate; no reasonable methods for fetal demise prior to D&E are discussed there. There are no legislative findings that any of the fetal demise procedures are safe and effective or any indication in the record before the Court that the Arkansas legislature considered these procedures when enacting the D&E Mandate. The Court's determination whether the D&E Mandate imposes substantial obstacles to abortion access depends on the feasibility of defendants' methods for second trimester abortion care that do not implicate the D&E Mandate. For the following reasons, at this stage of the litigation and on the record evidence before it, the Court rejects each of defendants' proposals.

### a.    Digoxin Injection

To inject digoxin, physicians begin by using an ultrasound machine to visualize the woman's uterus and the fetus. The physician then inserts a long surgical needle through the patient's skin, abdomen, and uterine muscle to inject digoxin into the fetus or the amniotic fluid. These injections are painful and invasive because they are administered through a transabdominal needle without anesthesia. Generally, physicians attempt to inject digoxin into the fetus. If the attempt to inject digoxin into the fetus fails, the physician may inject digoxin into the amniotic fluid, but the evidence suggests this is generally less effective. Because digoxin can take up to 24

hours to work to stop the fetal heart, physicians generally must administer this injection the day performing the D&E. Physicians cannot accurately predict whether, and if so how long, digoxin will take to work in a given patient.

This Court determines that digoxin is not a feasible method for inducing fetal demise for the following reasons: (1) with between a 5% and 10% failure rate, digoxin injections do not reliably induce fetal demise and so patients may require a second injection, the effects of which have not been studied based on record evidence before the Court; (2) digoxin injections are also insufficiently studied when administered before 18 weeks LMP and would, therefore, essentially be experimental for patients who would receive them before this point; (3) various factors make it difficult or impossible for many patients to receive a digoxin injection prior to D&E; (4) digoxin injections expose patients to substantial added health risks; and (5) digoxin injections subject patients to additional logistical and emotional burdens by requiring them to undergo a risky and invasive procedure and by requiring them to invest resources in making a visit to their physician to have the injection 24 hours before receiving a D&E; this burden is heavier for the many of LRFP's patients who are low income.

When examining digoxin injections, it is important to distinguish between injections before 18.0 weeks LMP and those after 18.0 weeks LMP, based on the record before the Court. Dr. Hopkins asserts that there is no reasonable or accepted procedure available for a physician providing D&E even to attempt fetal demise in a way that might avoid the ban before 18.0 weeks LMP (Dkt. No. 4, ¶ 36; Dkt. No. 5, ¶ 24). He maintains that all methods proposed by defendants for inducing fetal demise before D&E, including digoxin injection before 18.0 weeks LMP, are virtually untested, have unknown risks and uncertain efficacy, and would be outside the standard of care (Dkt. No. 4, ¶ 26; Dkt. No. 5, ¶¶ 25-26). Any attempts to cause fetal demise prior to 18.0

weeks LMP would mean experimentation and imposing risks with no medical benefit, according to Dr. Hopkins (Dkt. No. 3, at 8).

The Court concludes that, on the current record evidence, digoxin injections are experimental for women before 18.0 weeks LMP, and most second trimester abortions in Arkansas are performed before 18.0 weeks LMP. There is no record evidence of any physician attempting digoxin injections earlier than 18.0 weeks LMP (Dkt. No. 4, ¶ 25). There are virtually no reported studies, and no studies of record, on using digoxin in the first weeks of the second trimester, when most second trimester abortions are performed (Dkt. No. 4, ¶ 26; Dkt. No. 32-3, at 39-40; Dkt. No. 73-2, ¶ 23a). Most studies on digoxin focus on pregnancies at or after 18.0 weeks LMP; only a few studies have included cases at 17.0 weeks LMP, and no study has been done on the efficacy, dosage, or safety of injecting digoxin into women before 17 weeks of pregnancy. Requiring digoxin injections for every patient starting at 14.0 weeks LMP would be requiring a physician to experiment on his patient, without any way to know or counsel her on the effectiveness or safety of the experiment (Dkt. No. 32-1, ¶ 9; Dkt. No. 32-3, at 39-40; Dkt. No. 73-2, ¶ 23a; Dkt. No. 5, ¶ 24). Further, it would force women to go through an additional experimental, potentially harmful procedure to obtain a D&E.

Starting at 18.0 weeks LMP, during the latter part of the second trimester, a majority of physicians who attempt to induce fetal demise, including Dr. Hopkins and other physicians at LRFP, do so by injecting digoxin either transabdominally or transvaginally (Dkt. No. 4, ¶ 21; Dkt. No. 5, ¶ 25). There is record evidence that the transabdominal injection can be painful and emotionally difficult for the patient. The injection poses risks, including infection, which can threaten the patient's health and future fertility, and accidental absorption of the drug into the

patient's circulation, which can result in toxicity and changes to the patient's EKG (Dkt. No. 4, ¶ 25).

Usually, physicians using these injections, including Dr. Hopkins, do so to comply with the federal "partial birth abortion ban" and similar state laws (Dkt. No. 4, ¶ 23; Dkt. No. 5, ¶ 19). *See* 18 U.S.C. 1531; Ark. Code Ann. 20-16-1203 (2009). Doing so confers no medical benefit for the woman, as the American College of Obstetricians and Gynecologists ("ACOG") has stated: "'No evidence currently supports the use of induced fetal demise to increase the safety of second trimester medical or surgical abortion.'" (Dkt. No. 4, ¶ 22)(quoting Am. Coll. of Obstetricians & Gynecologists, Practice Bulletin Number 135: Second Trimester Abortion, 121(6) Obstetrics & Gynecology 1394, 1396, 1406 (2013)). Dr. Hopkins maintains that this practice does not save the D&E Mandate even for those patients post-18.0 weeks LMP.

First, he maintains digoxin injections are not possible for every patient due to anatomical characteristics which may contraindicate these injections (Dkt. No. 3, at 9). There are some women for whom an injection of digoxin may be difficult or impossible. For example, woman may be very obese; may have anatomical variations of the uterine and vaginal anatomy, such as fibroids or a long cervix; and may have fetal positioning that creates issues. These injections also can be dangerous for women with cardiac conditions such as arrhythmias (Dkt. No. 4, ¶ 27).

Second, in some cases, digoxin fails to cause fetal demise, and Dr. Hopkins or any other physician cannot know before starting a procedure the patients in whom it will fail (Dkt. No. 4, ¶ 28; Dkt. No. 5, ¶ 25c).[15] Even for women who tolerate injections, digoxin will not cause fetal

---

[15] To the extent there is any suggestion that, based on the analysis in *Gonzales*, women who are unable to obtain abortion due to their anatomy should bring an as-applied challenge, the Court rejects that suggestion here. In *Gonzales*, the Supreme Court stated that an as-applied challenge would be appropriate if "in discrete and well-defined instances a particular condition has or is likely to occur in which the procedure prohibited by the Act must be used," where "the

demise in 5% to 10% of all cases in which it is used (Dkt. No. 4, ¶ 28). These issues cannot be predicted ahead of the procedure. Dr. Hopkins maintains the proper course when digoxin fails is to complete the abortion without additional delay (Dkt. No. 4, ¶ 29; Dkt. No. 5, ¶ 25d). The language of the D&E Mandate may be read to prohibit taking that course, when digoxin fails.

Of the physicians who undertake an additional procedure after 18.0 to 22.0 weeks LMP, the vast majority of physicians inject the drug digoxin into the fetus if possible or, if not, then into the amniotic fluid. Injecting digoxin into the amniotic fluid is technically easier, but it is less effective (Dkt. No. 4, ¶ 21; Dkt. No. 5, ¶ 18). The injections may be through the woman's abdomen or vaginal wall. These injections generally use an 18- to 22-gauge spinal needle, passed under ultrasound guidance, through the patient's abdomen, vaginal wall, or vagina and cervix, and then either into the amniotic fluid or the fetus (Dkt. No. 4, ¶ 21, 25; Dkt. No. 5, ¶ 18).

The failure rate is higher for intramniotic injections. Intramniotic injections are associated with higher complication rates than intrafetal injection (Dkt. No. 4, ¶ 25). Intrafetal injections are more difficult to perform and may be impossible to perform due to fetal position, uterine anatomy and other factors, especially the size of the fetus. The smaller the fetus, the more difficult intrafetal injection will be (Dkt. No. 4, ¶ 28).

_____

nature of the medical risk can be better quantified and balanced than in a facial attack." *Gonzales*, 550 U.S. at 167. However, the record here identifies a set of widespread conditions, any one or combination of which could make it impossible to complete the types of injections contemplated by defendants' additional procedures for fetal demise. This means that the feasibility of these injections for a given patient likely cannot be determined until a physician attempts the injection. In other words, there is no "discrete and well-defined" class of women for whom digoxin injection would be impossible who could bring an as-applied challenge. *See W. Alabama Women's Ctr. v. Miller*, 217 F. Supp. 3d 1313, 1342 (M.D. Ala. 2016).

Digoxin works very slowly. Doctors allow 24 hours after the injection for it to work. Even then, it does not always cause fetal demise (Dkt. No. 5, ¶ 18; Dkt. No. 73-2, ¶ 23d).

Like all medical procedures, the digoxin injection creates risks for the patient. Doctors who use digoxin believe that practical concerns justify using it. The record evidence is that the main benefit of using digoxin is to establish compliance with the federal "partial-birth abortion ban" or similar state laws (Dkt. No. 4, ¶ 23; Dkt. No. 5, ¶ 19). The federal "partial-birth abortion ban" has an intent requirement (Dkt. No. 4, ¶ 23). That physicians can attempt demise for some patients in the later weeks of the second trimester does not change that a physician, knowing such an attempt could fail, would risk prosecution in beginning any DE& for any patient. At this stage, plaintiffs are likely to prevail on their argument that "Arkansas cannot ban D&E by proposing physicians expose themselves to criminal liability and perform experimental, unfeasible, and/or risk-enhancing additional procedures on patients. *See Danforth*, 428 U.S. at 77-79." (Dkt. No. 74, at 53). Further, at this stage on the record before the Court, plaintiffs are likely to prevail on their argument that "[t]here is no medical evidence that Defendants' proposed demise procedures are safe, feasible, or available in the early weeks of the second trimester, when most D&Es occur." (Dkt. No. 74, at 54).

If digoxin does not result in fetal demise after 24 hours, the D&E Mandate could be read to compel a physician to attempt a second injection of digoxin, which is untested and contrary to the standard of care (Dkt. No. 4, ¶ 29; Dkt. No. 5, ¶ 25b; Dkt. No. 73-2, ¶ 25d). According to Dr. Hopkins, administering a second dose of digoxin and waiting an undetermined amount of time for fetal demise, rather than completing the abortion, would put a patient who is already dilated and whose uterus may have already started to contract at risk of infection or delivery outside the clinic – referred to as an extramural delivery meaning an unexpected and spontaneous expulsion of the

fetus from the uterus while the woman is outside of a clinical setting and without the aid of a medical professional (Dkt. No. 4, ¶ 29; Dkt. No. 5, ¶ 25b).

Based on the record before the Court there are no reported studies of record on using a second injection of digoxin, or multiple, sequential injections of digoxin, after the first dose fails to bring about fetal demise (Dkt. No. 4, ¶ 29; Dkt. No. 73-2, ¶ 25d). Using a second injection of digoxin would, at a minimum, delay the abortion procedure, require the patient to make another trip to the clinic, and increase the risk of uterine infection, extramural delivery, or digoxin toxicity (Dkt. No. 4, ¶ 29; Dkt. No. 73-2, ¶ 25d).

Dr. Hopkins would not feel comfortable asserting that those risks, while real and unacceptable, rise to the very high level of the D&E Mandate's narrow exception, limited to circumstances "necessary to avert either. . . death. . . or the serious risk of substantial and irreversible physical impairment of a majority of bodily function." Ark. Code Ann. §§ 20-16-1802(6)(A) - 1803(a). He forms this opinion based on his experience (Dkt. No. 5, ¶ 25f).

Utilizing a digoxin injection to induce fetal-demise would impose additional logistical obstacles to abortion access. Women undergoing digoxin injections would be required to make an additional trip to the clinic 24 hours prior to their D&E procedure appointment. If digoxin injections were used to induce fetal demise, a woman seeking an abortion would have to meet with a physician at least three times over a minimum of four days for a 10 to 15 minute procedure. First, she would have to receive the counseling mandated by Arkansas law and wait 72 hours for the mandated delay. Second, she would have to return for the digoxin injection. Third, she would have to return after 24 hours for the physician to determine whether fetal demise was achieved. If fetal demise was achieved, the D&E could proceed. However, in 5% to 10% of cases, the first digoxin injection will fail. As a result, additional visits could be required.

The burden of having to make multiple trips for the procedure is especially pronounced for low-income women. The procedure would become time and cost-prohibitive for some women. Faced with this financial and logistical burden, some low-income women may delay obtaining an abortion or not have an abortion at all (*See generally* Dkt. No. 73-4). Many patients of LRFP are low-income. As of 2017, approximately 30 to 40% of patients obtained financial assistance to pay for their abortion care (Dkt. No. 6, ¶ 5). As of late 2020, approximately 60% of LRFP patients met the criteria of being at or below 110% of the federal poverty guidelines so as to qualify for some funding from the National Abortion Federation ("NAF") to cover part of the costs of abortion care (Dkt. No. 73-3, ¶ 18). Many patients of LRFP struggle in their lives and in their efforts to access the medical care they need (Dkt. No. 6, ¶ 5; Dkt. No. 73-3, ¶ 21). The time and effort it takes to make the necessary plans to access medical care cause anxiety and stress and cause financial pressure for women seeking care at LRFP (*See generally* Dkt. No. 73-4). Women must arrange for time off work on multiple days, which can be very difficult given that many are in low-wage jobs and feel that they cannot explain to an employer the reason they need to take time off; women routinely report that they cannot risk their employment and confidentiality by taking time off. For women who already have children, these women must arrange and often pay for childcare. These women also must arrange and pay for transportation. In some cases, these women also have to arrange and pay for a place to stay for multiple nights (Dkt. No. 6, ¶ 8). The stress involved is compounded by the fact that making these arrangements often involves family members or other individuals, which means the patient risks having to disclose the reasons for her travel and appointments – a disclosure record evidence indicates many patients are desperate not to make (Dkt. No. 6, ¶ 8; Dkt. No. 73-2, ¶¶ 19-20; Dkt. No. 73-3, ¶ 19-20).

In sum, plaintiffs maintain that Arkansas abortion providers would end D&E practice if the D&E Mandate takes effect because, although they are highly trained and experienced obstetrician-gynecologist, and can attempt digoxin injections to try to cause fetal demise in most patients beginning at 18.0 weeks LMP, they will not experiment on patients by attempting injections earlier than 18.0 weeks LMP, will not do injections when medically contraindicated, will not do a second injection if the first one fails, and will not start a procedure when he does not know whether he will be able to finish it without violating the ban (Dkt. No. 5, ¶ 24). This would end D&E practice starting at 14.0 weeks LMP, which represents 100% of abortion care during that period reported in Arkansas in 2015 (Dkt. No. 4, ¶ 38; Dkt. No. 5, ¶ 23; Dkt. No. 73-2, ¶ 27).

Due to the unreliability of the procedure in that it fails to cause fetal demise in 5% to 10% of patients and in that there is no way to predict at the outset those patients for whom it will not cause fetal demise; unknown risks for women before 18.0 weeks LMP; unknown risks associated with injection of a second dose of digoxin if the first fails; increased risks of complications even with only one dose of digoxin; an increased travel burden with each dose of digoxin, given the time it takes to take effect; and the pain and invasiveness of the procedure, the Court concludes on the record evidence before it at this preliminary stage of the litigation that a digoxin injection is not a feasible method of inducing fetal demise before D&E in Arkansas.

### b.  Potassium Chloride Injection

Another substance, potassium chloride (KCl), will cause fetal demise if injected directly into the fetal heart, which is extremely small (Dkt. No. 4, ¶ 31; Dkt. No. 5, ¶ 22; Dkt. No. 73-9, ¶ 7). Physicians using this method begin by using a sophisticated ultrasound machine to visualize the patient's uterus and fetus. The physician then inserts a long surgical needle through the woman's skin, abdomen, and uterine muscle, and then into either the fetus or, more specifically,

the fetal heart, which according to Dr. Wenstrom, "is approximately the size of a pea at 14 weeks into a pregnancy [LMP], and roughly the size of an olive at 20 weeks LMP." (Dkt. No. 73-9, ¶ 8). If injected into the fetal heart, KCl causes fetal demise almost immediately. If the attempt to inject KCl into the fetal heart fails, KCl may be injected into the fetal body compartment, but the evidence suggests this is generally less effective, may require larger volumes of KCl, and may take longer to achieve fetal demise (Dkt. No. 23-15, ¶ 7). The physician may then perform a D&E. The Court determines this method is not a feasible method for inducing fetal demise because: (1) KCl injections cannot be completed on every individual seeking D&E; (2) KCl injections subject patients to serious health risks; and (3) KCl injections are extremely challenging and require substantial technical training to perform – training that plaintiffs do not have and cannot easily acquire.

The record evidence is, and there is no credible dispute at this stage of the proceeding, that the procedure of injecting KCl is very rare, as it carries much more severe risks for the woman, including death if the doctor places the solution in the wrong place (Dkt. No. 4, ¶ 31; Dkt. No. 5, ¶ 22; Dkt. No. 32-2, ¶ 3; Dkt. No. 32-3, at 7, 36-37; Dkt. No. 73-2, ¶ 24; Dkt. No. 73-9, ¶¶ 9). There are a number of maternal health risks with KCl injections including maternal tissue damage and severe pain if the KCl is inadvertently injected into the uterine muscle, and maternal cardiac arrest if the KCl is inadvertently injected into a material blood vessel (Dkt. No. 73-9, ¶ 22a), risks of infection or chorioamnionitis, a serious condition in which the membranes surrounding the fetus are infected by bacteria, resulting from transfer of bacteria from the maternal skin surface to the uterus (Dkt. No. 73-9, ¶ 22b), and although unlikely if performed by a trained physician, an unsuccessful procedure can result in sepsis or the need for a hysterectomy (Dkt. No. 73-9, ¶ 22c).

The procedure requires extensive training generally available only to sub-specialists in high-risk obstetrics, known as maternal-fetal medicine (Dkt. No. 4, ¶ 31; Dkt. No. 5, ¶ 22; Dkt. No. 32-2, ¶ 3; Dkt. No. 32-3, at 7, 36-37; Dkt. No. 73-2, ¶ 24; Dkt. No. 73-9, ¶ 11). Dr. Hopkins, Dr. Parker and the other doctors with whom they practice with at LRFP, like the vast majority of obstetrician-gynecologists, do not have this specialized training (Dkt. No. 4, ¶ 31; Dkt. No. 5, ¶ 22; Dkt. No. 73-2, ¶ 24). Contrary to defendants' suggestion, the Court is unaware of any authority, including in *Gonzales*, that requires Dr. Hopkins and Dr. Parker to undertake years of training in the subspecialty of maternal fetal medicine to perform abortions (Dkt. No. 23, at 43 (citing *Gonzales*, 550 U.S. at 163)). The record evidence indicates that, even if plaintiffs would so choose to provide the procedure, they have no available avenue to develop the necessary skills to perform this procedure safely due to the length of time it would take to learn the procedure and the lack of training available for interested providers (Dkt. No. 73-2, ¶ 24; Dkt. No. 73-9, ¶¶ 13, 17, 18).

Further, injecting KCl is usually done in a hospital, not a clinical, setting. The procedure requires an advanced ultrasound machine that is typically available only in a hospital setting and too expensive for most clinics to afford in addition to a trained and sophisticated ultrasound technician or another physician who can accurately guide the ultrasound tranducer (Dkt. No. 4, ¶ 31; Dkt. No. 32-2, ¶ 3; Dkt. No. 32-3, 7, 36-37; Dkt. No. 73-9, ¶ 21). Defendants cite no legal or record support for their argument that Dr. Hopkins or LRFP can be required to obtain, or could obtain, such equipment or staff without unduly burdening women who seek abortion (Dkt. No. 23, at 43). Further, defendants cite no legal or record support for their suggestion that over 600 patients seeking a D&E each year in Arkansas could go to an Arkansas hospital for a KCl injection to

terminate their second-trimester pregnancies, equating roughly to 12 patients per week (Dkt. No. 23, at 43).

There also are some women for whom injecting KCl is not medically appropriate (Dkt. No. 4, ¶ 31). Obesity, fetal and uterine positioning, and presence of uterine fibroids may complicate or prevent the administration of these injections.

The Court concludes that KCl injections are not a feasible method of inducing fetal demise before D&E procedures. Injecting KCl takes specialized training, and plaintiffs who are the only providers of second-trimester abortion care in Arkansas based on record evidence, lack that specialized training. The only subspecialists who are trained to perform the injections are maternal-fetal medicine fellows who go through highly supervised training to specialize in high-risk pregnancies. Further, Dr. Hopkins and LRFP lack the costly equipment necessary to perform the procedure on an outpatient basis.

KCl injections are an unnecessary and potentially harmful medical procedure with no counterbalancing medical benefit for the patient, based on the record before the Court. It is a technically challenging procedure that carries serious health risks. For all of these reasons, on the record before it, the Court determines KCl injections are an unavailable method for fetal demise for women seeking a D&E abortion in the state of Arkansas.

### c.      Umbilical Cord Transection[16]

Umbilical cord transection involves the physician rupturing the membranes, inserting a suction tube or other instrument such as forceps into the uterus, and grasping the cord, if possible,

---

[16] Defendants' expert, Dr. Biggio, has less practical experience and significantly less expertise than plaintiffs' experts here and in the case where he actually testified in Alabama. Specifically, Dr. Biggio's testimony on cord transection "was largely theoretical and not based on experience." *W. Ala. Women's Ctr.*, 217 F.Supp.3d at 1339 n.24.

to divide it with gentle traction, which will cause demise over the course of up to 10 minutes (Dkt. No. 4, ¶ 32). The success and ease of this procedure depends on placement of the umbilical cord. If the umbilical cord is blocked by the fetus, it would be very difficult and very risky to attempt to reach it (Dkt. No. 4, ¶ 33; Dkt. No. 73-2, ¶ 25).

The Court rejects this method as a way to induce fetal demise prior to performing a D&E to comply with the D&E Mandate because: (1) the procedure is technically challenging; (2) the procedure carries serious health risks for the patient; and (3) there is no available training in Arkansas to teach the cord transection procedure to practitioners.

The record evidence is that umbilical cord transection is not widely practiced or researched (Dkt. No. 4, ¶ 32). There has been only one scientific study on the use of cord transection to cause fetal demise; the physicians relied upon by the parties agree on this (Dkt. No. 32-1, ¶ 11; Dkt. No. 32-3, at 42; Dkt. No. 73-1, ¶ 20). The one scientific study on the use of cord transection has limitations and does not support any conclusion about the safety of the procedure (Dkt. No. 32-1, ¶¶ 12-13). That study reports on the use of transection for demise in a single setting (Dkt. No. 73-1, ¶ 22)

Attempting umbilical cord transection before 16.0 weeks LMP is completely unstudied, and like injections, these procedures are more difficult to perform the earlier in pregnancy a woman seeks care. Successfully identifying and transecting the cord at early gestations would take additional time and likely multiple passes with forceps (Dkt. No. 32-1, ¶¶ 14-15).

Further, this procedure exposes the woman to an increased risk of uterine perforation, cervical injury, and bleeding, while it unnecessarily prolongs the D&E procedure (Dkt. No. 4, ¶¶ 32-34). The record evidence is that the longer a D&E takes and the more instruments passes into the woman's uterus occur, the higher the risks of uterine perforation and other complications;

physicians relied upon by both sides agree on this (Dkt. No. 4, ¶¶ 32-34; Dkt. No. 5, ¶ 25d; Dkt. No. 32-1, ¶¶ 13, 15; Dkt. No. 23-15, ¶ 8; Dkt. No. 32-3, at 40-41; Dkt. No. 25-4, ¶ 6).

There are some women for whom umbilical cord transection is not medically appropriate; physicians relied upon by both sides agree on this (Dkt. No. 4, ¶ 32; Dkt. No. 23-15, ¶ 12).  In some cases, the fetus blocks access to the cord, rendering it difficult, if not impossible, to grasp the cord before using forceps to remove fetal tissue; even if the physician is ultimately successful, the mechanics of the procedure will increase its duration and risk, such as by prolonging the patient's bleeding and increasing the risk of uterine perforation and cervical injury (Dkt. No. 4, ¶¶ 32-34).  Moreover, physicians may grasp and separate fetal tissue instead of or in addition to transecting the cord, meaning the provider would know that they may be unable to avoid transecting fetal tissue even if he or she does not intend to do so (Dkt. No. 4, ¶ 35; Dkt. No. 73-2, ¶ 25).  Doing so would violate the D&E Mandate, and umbilical cord transection provides no way to circumvent the D&E Mandate on the record currently before the Court (Dkt. No. 4, ¶ 35; Dkt. No. 5, ¶¶ 25d-25e; Dkt. No. 73-1, ¶¶ 21-22; Dkt. No. 73-2, ¶ 25).

Dr. Nichols, an expert upon whom plaintiffs rely, does not perform umbilical cord transection (Dkt. No. 4, ¶¶ 32-35; Dkt. No. 32-1, ¶¶ 11-15).  No physician to which either party cites would require cord transection in their respective practices (Dkt. No. 4, ¶ 34; Dkt. No. 5, ¶ 25d; Dkt. No. 32-3, at 40).

This essentially is an experimental procedure that provides no medical benefits to the woman, based on the record evidence at this stage.  The Court concludes that because this procedure is difficult, because this procedure has the potential for serious harm, and due to the lack of sufficient research on the procedure, umbilical cord transection is an unavailable method for

fetal demise for women seeking a D&E abortion in the state of Arkansas on the record before the Court.

For all three of these methods – digoxin, potassium chloride injections, and umbilical cord transection – no evidence currently supports the use of induced fetal demise to increase the safety of second-trimester medical or surgical abortion. This is consistent with the medical literature (Dkt. No. 4, ¶ 22; Am. Coll. of Obstetricians & Gynecologists, Practice Bulletin Number 135: Second Trimester Abortion, 121(6) Obstetrics & Gynecology 1394, 1396, 1406 (2013)).

### d. Induction

Defendants in their opposition suggest induction abortion as a method by which to comply with the D&E Mandate (Dkt. No. 92, at 52). In an induction procedure, physicians use medication to induce labor and delivery of a non-viable fetus (Dkt. No. 4, ¶ 14; Dkt. No. 73-2, ¶ 14). To the extent defendants maintain induction abortion would be an available abortion option in Arkansas if the D&E Mandate were to take effect, the only record evidence before the Court is that there were no induction abortions reported in Arkansas in 2015 (Dkt. No. 5, ¶ 12). If hospitals in Arkansas are providing any abortion care, it is in only rare circumstances (Dkt. No. 5, ¶ 6). Dr. Hopkins is aware of no physicians, other than those with whom he practices at LRFP, who provide second trimester abortion care in the state of Arkansas (Dkt. No. 32-2, ¶ 2). Defendants have presented no record evidence to refute this.

Further, induction must be performed at a facility such as a hospital, not in an outpatient setting, and the patient may be kept for an extended stay because an induction may take 5 hours to 3 days to complete, not the 10 to 15 minutes it takes to complete a D&E (Dkt. No. 4, ¶ 14; Dkt. No. 5, ¶ 12; Dkt. No. 73-2, ¶ 14). This procedure entails labor, which can involve pain requiring significant medication or anesthesia, which may be psychologically challenging for some women,

and which may be medically contraindicated for some women (Dkt. No. 4, ¶ 14; Dkt. No. 5, ¶ 12; Dkt. No. 73-2, ¶ 14). Because induction involves an in-patient stay, requiring up to three days of hospitalization, as opposed to an out-patient procedure, there is an enormous cost difference between induction and the out-patient D&E procedure (Dkt. No. 4, ¶ 14; Dkt. No. 73-2, ¶ 14). In some women, an induction abortion fails, and the woman needs intervention in the form of D&E for her safety. This is infrequent, but this does occur (Dkt. No. 4, ¶ 15; Dkt. No. 5, ¶ 12). In approximately 5% to 10% of induction abortions, the woman must undergo an additional surgical procedure to remove a retained placenta. Induction abortion also can cause uterine rupture, which is rare but can be life threatening and can be of particular concern for women who have had multiple previous cesarean deliveries (Dkt. No. 4, ¶ 15; Dkt. No. 25-4, ¶ 8). As a result, on the record currently before the Court, induction is essentially unavailable to women seeking second trimester abortions in Arkansas. Other courts examining this method in their respective states have reached the same conclusion. *See, e.g., Bernard*, 392 F.Supp. 3d at 939; *Planned Parenthood Sw. Ohio Region v. Yost*, 375 F.Supp. 3d 848, 856 (S.D. Ohio 2019).

### e. Suction Only

When the Court evaluated these issues in 2017, defendants suggested, without evidentiary support in the record, that physicians may rely on aspiration procedures, in other words suction only, to cause fetal demise so as to avoid liability in the second trimester (Dkt. No. 23, at 31). The Court rejected that assertion in 2017 based on the then-record evidence before the Court that suction alone generally is not sufficient to complete an abortion during the second trimester of pregnancy, nor is it something physicians can rely on to cause fetal demise to avoid liability under the D&E Mandate in the second trimester (Dkt. No. 32-1, ¶ 5; Dkt. No. 73-2, ¶ 26).

With their submission in 2020, defendants include a chapter titled "Dilation and evacuation" from a textbook titled *Management of Unintended and Abnormal Pregnancy: Comprehensive Abortion Care* by Hammond (Dkt. No. 92-12); an article titled, "*Manual vacuum aspiration for second-trimester pregnancy termination*," which compares manual and electric vacuum aspiration for surgical abortions between 14 and 18 weeks of pregnancy (Dkt. No. 92-13), an article titled "*Methods for Induced Abortion*" (Dkt. No. 92-14), and an article titled, "*A Randomized Study of 12-mm and 15.9-mm Cnnulas in Midtrimester Abortion by Laminaria and Vacuum Curettage*," dated 1978 (Dkt. No. 92-17). There are no sponsoring witnesses for these documents to explain, among other things, their relevance to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case.

In response to these materials submitted by defendants in 2020, plaintiffs offer an affidavit from Dr. Nichols, who is an obstetrician-gynecologist with decades of experience providing abortion care, including D&Es, who explains that these articles on which defendants rely do not support any conclusions about using suction to guarantee fetal demise before a D&E (Dkt. No. 93-1, ¶¶ 3-7). Dr. Nichols specifically avers that he has "reviewed the literature that Defendants cite, and it does not change [his] opinion." (Dkt. No. 93-1, ¶ 6). Defendants offer only statements by counsel and exhibits, with no sponsoring witness yet alone a medical expert witness, attesting to counsel's arguments or interpretation of the exhibits. Defendants' counsel's statement is that "'[v]acuum aspiration can be safely and effectively used in the second trimester abortion procedures' to accomplish fetal demise up to 18 weeks," but the citation provided by defendants' counsel to these articles even seems to contradict that statement, suggesting some authorities take the position that 16.0 weeks LMP or 17.0 weeks LMP might be the outer limit, not 18.0 weeks LMP (Dkt. No. 92, at 52). Defendants' position does not persuade this Court on this point in the

137

light of all argument and record evidence before the Court at this stage; the record evidence at this stage does not support that physicians may rely on aspiration procedures, in other words suction only, to cause fetal demise so as to avoid liability under the D&E Mandate in the second trimester.

### 2.	State's Interests

No legislative findings accompany the D&E Mandate.  The Court does not have an explanation from the legislature of the purpose of the law.  Defendants argue that the law advances the interests of promoting respect for the life of an unborn child and regulating medical ethics (Dkt. Nos. 22, at 20; 92, at 47).[17]  Although the Court disagrees with defendants' conflation of *Casey*'s inquiry of whether the State has a "legitimate purpose" and whether the law is "reasonably related to that goal" and rational basis review, the Court assumes the legitimacy of these interests.  *Whole Woman's Health*, 136 S. Ct. at 2310 (assuming that the State had legitimate state interests where the statute did not contain any legislative findings).

### 3.	"Legitimate Purpose" To Which The Law Is "Reasonably Related"

This Court examines whether the Local Disclosure Mandate has a "legitimate purpose" and whether it is "reasonably related" to that goal.  *June Medical*, 140 S. Ct. at 2138 (Roberts, J., concurring).  Generally, the state has the burden of demonstrating a link between the legislation it enacts and what it contends are the state's interests.  *See Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 430 (1983), *overruled on other grounds by Casey*, 505 U.S. 833 (describing the burden as that of the state).

---

[17]  Defendants do not argue that the D&E Mandate is designed to avoid fetal pain.  Based on record evidence submitted by defendants, according to at least one study defendants submitted, fetal pain is not a biological possibility until 29 weeks, well beyond the range of standard D&E procedures (Dkt. No. 23-6, at 3).

Defendants' argument that the D&E Mandate should not be enjoined is premised on it being feasible for plaintiff physicians providing abortions to utilize induction abortion or aspiration abortion or one of the three fetal-demise methods examined above: digoxin injection, potassium chloride injection, or umbilical cord transection. For the reasons discussed above, the Court rejects at this stage defendants' arguments regarding these three fetal-demise methods and defendants' arguments regarding induction abortion or aspiration abortion procedures as being available during the second trimester in Arkansas for abortion patients or physicians providing second trimester abortion care in Arkansas. *Danforth*, 428 U.S. at 79 (striking down an abortion method ban where the alternatives proposed by the state were largely experimental and unavailable to women in the state).

It is difficult at this stage to see how the D&E Mandate is reasonably related to what defendants maintain are its purposes, when considered in the light of controlling law. The D&E Mandate takes no steps to inform the free choice of abortion patients in the D&E Mandate; instead it bans the only option available for abortion through the second trimester in Arkansas as reflected in current record evidence. *See Casey*, 505 U.S. at 877. Defendants assert an interest in safeguarding medical ethics, but plaintiffs present the Court with unrefuted evidence that demonstrates it would be unethical to force all patients to undergo demise procedures before D&E, regardless of the risks and burdens such procedures impose (Dkt. No. 73-1, ¶¶ 23-24).

Defendants' assertion that the D&E Ban is reasonably related to protecting doctors who provide abortions from mental strain does not persuade the Court at this stage based on the record. Unrefuted evidence indicates the D&E Mandate would cause harm to providers by exposing them to criminal liability and/or preventing them from acting in the best interests of their patients (*See* Dkt. No. 5, ¶ 4; Dkt. No. 73-2, ¶¶ 3, 27, 41-43). With respect to submissions from former abortion

patients, the Court agrees with plaintiffs on this point that it is unclear whether fetal demise procedures were performed (Dkt. No. 93, at 27 n.21), and the record includes affidavits from women holding a variety of views regarding abortion procedures.

### 4.    Undue Burden

The Court concludes that plaintiffs have carried their burden of demonstrating at this stage of the litigation that they are likely to prevail on the merits and to establish that the challenged D&E Mandate has the effect of placing a substantial obstacle in the path of women seeking an abortion of a nonviable fetus for whom the D&E Mandate is an actual rather than an irrelevant restriction. The record includes sufficient evidence from which plaintiffs satisfy their burden to present evidence of causation that the Mandate's requirements will lead to this effect. As a result, at this stage, the Court concludes that the D&E Mandate creates a substantial obstacle based solely on consideration of burdens, not weighing benefits and burdens. *June Medical Services*, 140 S. Ct. 2103 (plurality opinion); *Whole Woman's Health*, 136 S. Ct. at 2309; *Casey*, 505 U.S. at 877 (plurality opinion).

Previously, this Court determined that "[t]he undue burden analysis requires this Court to 'consider the burdens a law imposes on abortion access together with the benefits those laws confer.'" *Whole Woman's Health*, 136 S. Ct. at 2309. Based on the Court's findings, the Court determined that, under the *Whole Woman's Health* analysis, the D&E Mandate as challenged has the effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus for whom the Mandate is relevant. The Eighth Circuit remanded to this Court for reconsideration in the light of Chief Justice Roberts's concurring opinion in *June Medical*. *June Medical* in the Eighth Circuit opinion is referring to *June Medical Services. v. Russo*, 140 S. Ct. 2013, 2020 WL 3492640 (2020)(plurality opinion). Based on the Court's findings and its reconsideration, the Court determines that the D&E Mandate has the effect of placing a substantial

obstacle in the path of a woman seeking an abortion of a nonviable fetus for whom the Mandate is relevant under the *June Medical* analysis. Dr. Hopkins and LRFP are likely to prevail on the merits of their claims that the D&E Mandate imposes a substantial and undue burden that is unconstitutional.

Further, the Court rejects defendants' other attempts to salvage the constitutionality of the D&E Mandate. Specifically, for the following reasons, the Court rejects defendants' arguments premised on a scienter requirement in the D&E Mandate and the health exception in the D&E Mandate.

### a.      Scienter Requirement

Defendants maintain that there is a scienter requirement in the D&E Mandate, relying on language that prohibits a person from "purposely performing" a dismemberment abortion, meaning that it is one's "conscious object. . . to engage in conduct of that nature." (Dkt. No. 23, at 9 n.4). Defendants essentially contend that this scienter requirement preserves access to D&E, thereby rendering the D&E Mandate constitutional. The Court rejects this argument.

There is record evidence that physicians use digoxin to demonstrate a lack of *mens rea* and thereby avoid liability under the federal and similar state partial-birth abortion bans. *See* 18 U.S.C. § 1531(b)(1)(A) (prohibiting a person's acting "deliberately and intentionally. . . for the purpose of performing an overt act that the person knows will kill the. . . fetus."); Ark. Code Ann. §20-16-1202 (prohibiting a person's acting "purposely. . . for the purpose of performing an overt act that the person knows will kill the. . . fetus."). From this, defendants maintain that plaintiffs could comply with the D&E Mandate by injecting women with digoxin before 18.0 weeks LMP, regardless of the effectiveness of those injections because the injection alone would be enough to negate the scienter requirement of the D&E Mandate.

The Court makes no determination on whether the D&E Mandate includes the type of scienter requirement defendants claim.[18]  The Court also makes no determination regarding the scope or contours of such a requirement.[19]  "Mid-litigation assurances are all too easy to make and all too hard to enforce, which probably explains why the Supreme Court has refused to accept them." *Williamson*, 900 F.3d at 1328 (citing *Stenberg*, 530 U.S. at 940-41 (rejecting the Attorney General's interpretation of the statute and warning against accepting as authoritative a state's litigation position when it does not bind state courts or law enforcement authorities)).

Even if the D&E Mandate does include the scienter requirement defendants advocate there is no record evidence that demonstrates the reliability or safety of the fetal demise methods defendants propose; the scienter requirement does not resolve the constitutional problems created by the D&E Mandate.  In other words, concluding that the D&E Mandate has a scienter requirement would not resolve this dispute regarding the reliability and safety of using digoxin in D&E procedures before 18.0 weeks LMP or using multiple doses after 18.0 weeks LMP, in those cases where the initial dose was ineffective.  It also would not resolve the safety and feasibility issues associated with potassium chloride injections either.

Moreover, such a scienter requirement also would not save the method of umbilical cord transection for different reasons.  Defendants maintain that the scienter requirement allows for

---

[18]  The Court observes and agrees with Dr. Hopkins that, at a minimum, defendants' arguments on this point are inconsistent.  Although defendants contend the injection of digoxin would satisfy the scienter requirement even if ineffective, defendants also argue that before proceeding with D&E the physician would have to "employ other methods for ensuring the fetal demise including cutting the umbilical cord."  (Dkt. No. 23, at 42; Dkt. No. 32, at 38-39).

[19]  The Court observes and agrees with Dr. Hopkins that defendants later argue that the scienter requirement protects only a physician who proceeds with D&E not realizing that an attempted demise has failed and not detecting a continuing heartbeat (Dkt. No. 23, at 42; Dkt. No. 32, at 40-41).

separation of fetal tissue if the physician is using forceps to try to grasp and transect the cord (Dkt. No. 23, at 44-45). Plaintiffs convincingly argue that this ignores the fact that the experts relied upon by both sides agree that a physician knows that in attempting to reach for the cord, he is likely to grasp fetal tissue instead of or in addition to the cord (Dkt. No. 4, ¶ 35; Dkt. No. 5, ¶ 25e; Dkt. No. 32-3, at 21). There is some evidence that the earlier in pregnancy a woman seeks care, the more likely this is to happen (Dkt. No. 32-1, ¶ 15). Having this knowledge, plaintiffs maintain that a physician cannot proceed to perform a D&E by umbilical transection and credibly maintain that he or she did not purposely violate the D&E Mandate, given the law's defined terms and the inability to avoid prosecution through willful blindness. This Court, at this stage of the proceedings, finds plaintiffs' arguments on this point persuasive (Dkt. No. 32, at 42-43).

### b.  Health Exception

The Court rejects defendants' argument that "women who need [a D&E] for medical reasons" would still be able to obtain one (Dkt. No. 23, at 45). There is no record evidence to support this assertion. Instead, the record evidence supports Dr. Hopkins's argument that the health exception is narrow and does not justify defendants' assertion. Dr. Hopkins maintains that a woman who is already dilated and for whom digoxin has failed needs an abortion "for medical reasons" but that care is not yet "necessary to avert" her "death" or "serious risk of substantial and irreversible" physical harm (Dkt. No. 4, ¶ 25f). The D&E Mandate, even with its health exception, would require that a woman be denied a D&E abortion until her health condition substantially and inevitably deteriorated (Dkt. No. 4, ¶ 25f). Further, as Dr. Hopkins argues, the health exception also does not provide an exception for any woman for whom the other fetal demise methods offered by defendants are difficult or impossible because of anatomy or medical contraindication (Dkt. No. 32, at 42). Nothing in the record contradicts Dr. Hopkins on these points. Even if the D&E

Mandate includes the health exception defendants advocate, there is no record evidence that demonstrates the reliability or safety of the fetal demise methods defendants propose; the health exception does not resolve the constitutional problems created by the D&E Mandate. For these reasons, the health exception does not save the D&E Mandate at this stage of the proceeding.

### 5. Women Effected

To sustain a facial challenge and grant a preliminary injunction, this Court must find that the challenged D&E Mandate is an undue burden for a large fraction of women for whom the provision is an actual, rather than an irrelevant, restriction. The Court makes that finding here; the D&E Mandate is an undue burden for a large fraction of women for whom the provision is a relevant restriction, based on record evidence currently before the Court. The Court rejects defendants' argument that the D&E Mandate is not unconstitutional because it "affects only a small fraction of abortions" (Dkt. No. 23, at 29).

The record evidence before the Court at this stage establishes that plaintiffs are likely to succeed on their claim that the D&E Mandate is unconstitutional because those procedures offered by defendants as an effort to avoid the effects of the D&E Mandate are not actually available and cannot guarantee demise in every case; thus, the only way for physicians to protect themselves from criminal liability would be to stop providing abortions altogether starting as early as 14.0 weeks LMP. The Court further concludes that because physicians can attempt fetal demise for some patients in the later weeks of the second trimester does not change that a physician, knowing that such an attempt could fail, would risk prosecution in beginning any D&E for any patient. *See Danforth*, 428 U.S. at 77-79.

Further, even if physicians providing abortions were willing to risk liability and attempt such procedures for every second-trimester abortion patient, the D&E Mandate would still impose

an undue burden. The record evidence before the Court at this stage establishes that plaintiffs are likely to succeed in demonstrating that there is no medical evidence that defendants' proposed fetal demise procedures are safe, feasible, or available in the early weeks of the second trimester, when most D&Es occur in Arkansas. There is record evidence that, at a minimum, requiring patients to undergo these additional procedures would transform one-day abortion procedures into two-day procedures, imposing significant and increased financial and logistical burdens on patients. Further, defendant's proposed methods for fetal demise are either unstudied, unfeasible, and/or unreliable and expose patients to increases risks and/or additional financial and logistical burdens, all of which could prevent some patients from being able to obtain care at all. These burdens are supported by the record evidence in this case at this stage; other courts on the evidence presented to those courts have agreed. *See e.g., Bernard*, 392 F.Supp.3d at 963; *EMW Women's Surgical Ctr.*, 373 F.Supp.3d 807, 819, 820, 822 (W.D. Ky. 2018), *aff'd sub. nom. EMW Women's Surgical Ctr. v. Friedlander*, 960 F.3d 785 (6th Cir. 2020); *Miller*, 299 F.Supp.3d at 1286, 1273, 1278-79, *aff'd sub. nom. Williamson*, 900 F.3d at 12327, *cert. denied sub. nom, Harris v. W. Ala. Women's Ctr.*, 139 S. Ct. 2606 (2019); *Planned Parenthood of Cet. N.J. v. Verniero*, 41 F.Supp.2d 478, 500 (D. N.J. 1998), *aff'd sub. nom. Farmer*, 220 F.3d 127; *Evans v. Kelley*, 977 F.Supp. 1283, 1318 (E.D. Mich. 1997); *see also Hodes & Nauser, MDs, P.A. v. Schmidt*, 440 P.3d 461, 467-68 (Kan. 2019) (sustaining trial court findings).

Dr. Hopkins maintains that the D&E Mandate impacts all D&Es in Arkansas (Dkt. No. 4, ¶¶ 14, 16). Under the D&E Mandate, the only D&E that would be legal is one in which a physician successfully induces fetal demise through an additional procedure prior to starting the evacuation phase of D&E (Dkt. No. 3, at 7). Dr. Hopkins claims that, because it is not feasible or safe to induce fetal demise through an additional procedure in every patient prior to starting the evacuation

phase of D&E, providers would not start any D&E because they may not be able to complete the procedure without violating the D&E Mandate (Dkt. No. 3, at 7).

LRFP, along with Dr. Hopkins, provides care to women from throughout Arkansas and from other states (Dkt. No. 6, ¶ 5).  Dr. Hopkins is aware of no physicians, other than those with whom he practices at LRFP, who provide second trimester abortion care (Dkt. No. 32-2, ¶ 2).   In other words, there are no other providers in Arkansas that could fill this gap in care.  There is record evidence to support that Dr. Hopkins and LRFP will no longer continue to provide this abortion care if the D&E Mandate takes effect.

The Court makes the following findings of fact with respect to the fraction of women effected by the D&E Mandate.  LRFP is the only abortion care provider for women seeking abortion after 10.0 weeks LMP in Arkansas (Dkt. No. 5, ¶ 6; Dkt. No. 6, ¶ 2; Dkt. No. 73-2, ¶ 9; 73-3, ¶ 13).  Of the 2,963 total abortions in Arkansas in 2019, 2,500 were obtained up to ten weeks LMP and 463 after ten weeks LMP (Dkt. No. 92-16, at 8).  At the time this lawsuit was filed in 2017, each year, LRFP provided approximately 3,000 abortions, of which approximately 600 or 20% occurred during the second trimester (Dkt. No. 6, ¶ 16; Dkt. No. 73-3, ¶ 28).  In 2019, LRFP provided 1,950 abortions, 15% of which occurred in the second trimester (Dkt. No. 73-3, ¶ 28).  D&E accounts for 100% of second trimester abortions reported in Arkansas in 2015 (Dkt. No. 5, ¶ 17).  D&E abortions accounted for 100% of second-trimester abortions reported in Arkansas in 2019 (Dkt. No. 73-2, ¶ 14).  At the time this lawsuit was filed in 2017, D&E accounted for 95% of all second trimester abortions nationally (Dkt. No. 4, ¶¶ 14-16; Dkt. No. 5, ¶ 17).  As of late 2020, nationally, data suggests D&E accounts for almost all second-trimester abortion procedures in the United States (Dkt. No. 73-2, ¶ 14).  The vast majority of D&Es currently occur from 14.0 to 18.0 weeks LMP (Dkt. No. 5, ¶¶ 25-26).  Of the 638 D&Es reported in Arkansas in 2015, 407

or 64% took place during these earliest weeks of the second trimester (Dkt. No. 6, ¶ 17). Ms. Williams confirms that currently for the majority of LRFP's second-trimester patients, physicians provide a D&E procedure in one day, meaning the dilation and evacuation occur on the same day. This is true for essentially all LRFP patients who – when they return to the clinic after the 72-hour mandatory delay period, are between 14.0 and 17.6 weeks LMP, and about half of LRFP patients who are 18.0 to 20.0 weeks LMP. A small number of LRFP's second -trimester patients undergo overnight dilation, meaning the dilation process takes place over two days. About half of LRFP's patients between 19.0 and 20.0 weeks LMP, and almost all patients between 20.0 and 21.5 weeks LMP, undergo overnight dilation (Dkt. No. 73-3, ¶ 29).

This Court determines that, if the Court considers the D&E Mandate relevant for Arkansas women who select D&E during the early weeks of the second trimester, it creates an undue burden for a large fraction of these women. In Arkansas in 2015, 407 women had a D&E from 14.0 to 18.0 weeks LMP. The D&E Mandate would unduly burden 100% of these women because, if the D&E Mandate goes into effect, D&E abortions will no longer be performed in Arkansas for all of the reasons this Court has described, including but not limited to ethical and legal concerns regarding compliance with the law, thereby rendering abortions essentially unavailable in the State of Arkansas starting at 14.0 weeks LMP.

This Court determines that, even if the Court considers the D&E Mandate relevant for Arkansas women who select D&E throughout the second trimester, it creates an undue burden for a large fraction of these women. In Arkansas in 2015, 638 women selected D&E. In 2017, 600 women sought second trimester abortions at LRFP. In 2019, LRFP provided 1,950 abortions, 15% of which occurred in the second trimester meaning 292 women sought second trimester abortions at LRFP. If the D&E Mandate goes into effect, D&E abortions will no longer be performed in

Arkansas due to ethical and legal concerns regarding compliance with the law, thereby rendering abortions essentially unavailable in the State of Arkansas starting at 14.0 weeks LMP. In that case, 100% of women seeking second trimester abortion care will experience a substantial obstacle to abortion.[20]

The Court determines that it is not appropriate to use as the denominator all Arkansas women who obtained second trimester abortion; the D&E Mandate is only relevant for Arkansas women who elected to have the D&E. Regardless, even if the Court considers the D&E Mandate relevant for Arkansas women who select abortion throughout the second trimester, these numbers do not change. In 2015, no Arkansas woman elected to have an induction abortion; all Arkansas women elected to have a D&E. If the D&E Mandate goes into effect, on the record currently before the Court, D&E abortions will no longer be performed in Arkansas for all of the reasons this Court has described, including but not limited to ethical and legal concerns regarding compliance with the law, thereby rendering abortions essentially unavailable in the State of

---

[20] This Court determined in 2017 that, even if this Court were to take the position that the D&E Mandate would impact only standard D&Es performed from 14.0 to 18.0 weeks LMP, 407 of the 638 women still would be impacted. 64% of these 638 women would experience a substantial obstacle to abortion. Ms. Williams confirms that currently for the majority of LRFP's second-trimester patients, physicians provide a D&E procedure in one day, meaning the dilation and evacuation occur on the same day. This is true for essentially all LRFP patients who, when they return to the clinic after the 72-hour mandatory delay period, are between 14.0 and 17.6 weeks LMP, and about half of LRFP patients who are 18.0 to 20.0 weeks LMP. A small number of LRFP's second-trimester patients undergo overnight dilation, meaning the dilation process takes place over two days. About half of LRFP's patients between 19.0 and 20.0 weeks LMP, and almost all patients between 20.0 and 21.5 weeks LMP, undergo overnight dilation (Dkt. No. 73-3, ¶ 29). If the D&E ban had been in effect, over 80% of second-trimester patients in 2019 (294 of the 357) who would not have otherwise had an additional procedure would have been required to undergo a fetal demise procedure with all the burdens that entails or be denied care altogether(Dkt. No. 74, at 44-45 n.29). The Court notes that these figures would apply if there is a scienter requirement in the D&E Mandate; defendants maintain that, after 18.0 weeks LMP in Arkansas, the digoxin that is administered would be sufficient to comply with a scienter requirement in the D&E Mandate.

Arkansas starting at 14.0 weeks LMP. In that case, 100% of women seeking second trimester abortion care will experience a substantial obstacle to abortion.

Many patients of LRFP are low-income. In 2017, approximately 30 to 40% of patients obtain financial assistance to pay for their abortion care and as of late 2020 approximately 60% of patients meet the criteria of being at or below 110% of the poverty guidelines so as to qualify for some funding to cover part of the costs of abortion care (Dkt. No. 6, ¶ 5; Dkt. No. 73-3, ¶ 18). Many patients of LRFP struggle in their lives and in their efforts to access the medical care they need (Dkt. No. 6, ¶ 5; Dkt. No. 73-3, ¶ 21). The time and effort it takes to make the necessary plans to access medical care cause anxiety and stress and cause financial pressure for women seeking care at LRFP (Dkt. No. 6, ¶ 8; Dkt. No. 73-2, ¶¶ 19-20; Dkt. No. 73-3, ¶ 19-20; Dkt. No. 73-4, ¶ 71). If LRFP no longer performed abortions in Arkansas after 14.0 weeks LMP, financial and logistical issues would burden 30% to 40 % of these women, or 191 to 255, in finding any alternate care out of state. These findings, coupled with the finding that abortions would essentially be unavailable in the State of Arkansas starting at 14.0 weeks LMP if the D&E Mandate takes effect, bolster this Court's conclusion that if the D&E Mandate takes effect a large fraction of Arkansas women who select abortion throughout the second trimester would experience a substantial obstacle to abortion.

To the extent defendants maintain induction abortion would be an available abortion option in Arkansas if the D&E Mandate were to take effect, even if the Court considers this argument, for the reasons previously set forth in this Order, the Court rejects induction abortion as a viable alternative second trimester option available in Arkansas.

## 2. Irreparable Harm

Enforcement of the D&E Mandate will inflict irreparable harm on Dr. Hopkins, LRFP, and the fraction of women for whom the Mandate is relevant as there is no adequate remedy at law. It is well-settled that the inability to exercise a constitutional right constitutes irreparable harm. *See Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977) ("Planned Parenthood's showing that the ordinance interfered with the exercise of its constitutional rights and the rights of its patients supports a finding of irreparable injury.") (citations omitted); *accord Kirkeby v. Furness*, 52 F.3d 772, 775 (8th Cir. 1995) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

In the absence of a preliminary injunction, the large fraction of women for whom the Mandate is relevant would immediately lose the right to obtain a pre-viability abortion anywhere in the State of Arkansas after 14.0 weeks LMP based on the record evidence before the Court. Therefore, the second requirement for an order preliminarily enjoining enforcement of the D&E Mandate is satisfied.

## 3. Balancing Of Harms

In the absence of an injunction, the large fraction of women for whom the Mandate is relevant would immediately lose the right to obtain a pre-viability abortion anywhere in the State of Arkansas after 14.0 weeks LMP if the D&E Mandate were allowed to take effect. Whereas, if an injunction issues, a likely unconstitutional law passed by Arkansas legislators will not be enforced. The threatened harm to Dr. Hopkins, LRFP, and the large fraction of women for whom the Mandate is relevant clearly outweighs whatever damage or harm a proposed preliminary injunction may cause the State of Arkansas.

## 4. Public Interest

It is in the public interest to preserve the *status quo* and to give the Court an opportunity to evaluate fully the lawfulness of the D&E Mandate without subjecting Dr. Hopkins, LRFP, or their patients, or the public to any of the law's potential harms.

The Court notes that the Eleventh Amendment bars relief against an allegedly unconstitutional provision if the named state officials do not have the authority to enforce it. U.S. Const. amend XI; *see also Hutchinson*, 803 F.3d at 957-58. Therefore, the preliminary injunction order does not extend to the private civil-enforcement provisions under the D&E Mandate. Ark. Ann. § 20-16-1804.

## 5. Scope Of Relief

In their amended complaint, plaintiffs specifically request that the Court "grant such other and further relief as the Court deems just and proper." (Dkt. No. 82, at 34). The Court in 2017 considered plaintiffs' challenge to the D&E Mandate as a facial challenge. Now, for purposes of plaintiffs' current motion for preliminary injunction, the Court determines that plaintiffs' challenge to the D&E Mandate may be properly construed as an as-applied challenge brought on behalf of Dr. Hopkins and LRFP at this stage. This conclusion is based on the general premises that "facial challenges are generally disfavored" and that the Court has authority to craft injunctive relief. *Gonzales*, 550 U.S. at 168; *Jegley*, 864 F.3d at 958. Additionally, persuasive authority suggests that a facial challenge may be properly converted into an as-applied challenge. *Williamson*, 900 F.3d at 1325 (holding the district court did not err in converting a facial challenge into an as applied challenge). "The question of as-applied and facial relief is admittedly complex with regard to the fetal-demise law. . . . As discussed above, the parties' arguments and evidence clearly demonstrate that the fetal-demise law places an undue burden on women seeking a pre-

viability abortion at [plaintiff] clinics.  Because there is no question that the fetal-demise law is unconstitutional as applied to the plaintiffs, and because the court can provide sufficient relief with an as-applied finding at this time, the court in its discretion grants only as-applied relief on the fetal-demise law." *W. Alabama Women's Ctr. v. Miller*, 299 F. Supp. 3d 1244, 1290–91 (M.D. Ala. 2017), *aff'd sub nom. W. Alabama Women's Ctr. v. Williamson*, 900 F.3d 1310 (11th Cir. 2018).  Further, this case is still at the preliminary injunction stage, without the parties having fully developed, and the Court having fully considered a developed, record.  Finally, the facts underlying an as-applied challenge are anticipated by and included within a facial challenge directed toward the same statute, especially at this stage of the litigation.

It is therefore ordered that Dr. Hopkins and LRFP's motion for a preliminary injunction as to the D&E Mandate is construed as an as-applied challenge at this stage of the proceedings and is granted, and defendants are preliminarily enjoined from enforcing as to Dr. Hopkins and LRFP the provisions of H.B. 1032 referred to here as the D&E Mandate.

## B.  Medical Records Mandate (Counts III and IV, H.B. 1434)

Dr. Hopkins and LRFP seek a preliminary injunction based on count three, which alleges that the Medical Records Mandate violates the Due Process Clause of the United States Constitution by placing an undue burden on Dr. Hopkins and LRFP's patients' right to liberty and privacy, and count four, which alleges that the Medical Records Mandate violates the Due Process Clause due to its vagueness.

The statute as a whole provides:

(a) A physician or other person shall not intentionally perform or attempt to perform an abortion with the knowledge that the pregnant woman is seeking the abortion solely on the basis of the sex of the unborn child.

(b) Before performing an abortion, the physician or other person who is performing the abortion shall:

(1)    (A) Ask the pregnant woman if she knows the sex of the unborn child.

(B) If the pregnant woman knows the sex of the unborn child, the physician or other person who is performing the abortion shall inform the pregnant woman of the prohibition of abortion as a method of sex selection for children; and

(2)    (A) Request the medical records of the pregnant woman relating directly to the entire pregnancy history of the woman.

(B) An abortion shall not be performed until reasonable time and effort is spent to obtain the medical records of the pregnant woman as described in subdivision (b)(2)(A) of this section.

(c) If this section is held invalid as applied to the period of pregnancy prior to viability, then the section shall remain applicable to the period of pregnancy subsequent to viability.

Ark. Code Ann. § 20-16-1904.

A physician who "knowingly performs or attempts to perform an abortion" prohibited by this law "is guilty of a Class A misdemeanor" under Arkansas law. Ark. Code Ann. § 20-16-1905. This includes punishment of up to one year in jail, a fine, or both. Ark. Code Ann. §§ 5-4-201, 5-4-401. A physician who violates the law also is subject to civil penalties and professional sanctions, including but not limited to suspension or revocation of his or her medical license for "unprofessional conduct" by the Arkansas State Medical Board. Ark. Code Ann. § 20-16-1906.[21] In addition, the law creates a cause of action for injunctive relief against a physician who knowingly violates the law, which may be brought by the Attorney General or by the patient's

_____

[21] The Medical Records Mandate, with respect to civil proceedings or actions brought under the subchapter, includes a provision to protect the "anonymity of a woman who received or attempted to receive a dismemberment abortion. . . from public disclosure without her written consent." Ark. Code Ann. § 20-16-1907.

spouse, parent, guardian, or current or former licensed health care provider.  Ark. Code Ann. § 20-16-1906(d)(1).

Dr. Hopkins and LRFP do not challenge the requirement that a physician not perform an abortion knowing that the woman is seeking the abortion solely on the basis of the sex of the embryo or fetus.  Ark. Code Ann. § 20-16-1904(a), (b)(1).  Dr. Hopkins and Dr. Parker are unaware of such a case in Arkansas (Dkt. No. 5, ¶ 30; Dkt. No. 6, ¶ 22; Dkt. No. 73-2, ¶ 46).  Instead, plaintiffs challenge the Medical Records Mandate which "provides that '[a]n abortion shall not be performed until' the physician '[r]equest[s] the medical records of the pregnant woman relating directly to [her] entire pregnancy history,' and then spends 'reasonable time and effort. . . to obtain' such records."  (Dkt. No. 74, at 30 (citing and quoting the Medical Records Mandate)).[22]

### 1.      Likelihood Of Success On The Merits:  Vagueness Challenge

Dr. Hopkins and LRFP contend that the Medical Records Mandate is unconstitutionally vague in at least three respects.  They maintain that the Medical Records Mandate is void for vagueness in that it fails to define what constitutes "reasonable time and effort," fails to define the scope of "medical records relating directly to the entire pregnancy history" of the patient, and fails

---

[22]  When confronting a constitutional flaw in a statute, a federal court must "try not to nullify more of a legislature's work than is necessary."  *Ayotte,* 546 U.S. at 329.  It is preferable "to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact."  546 U.S. at 329 (citations omitted).  Severability is a matter of state law.  *See Russell v. Burris,* 146 F.3d 563, 573 (8th Cir. 1998).  Under Arkansas law, "an act may be unconstitutional in part and yet be valid as to the remainder."  *Ex Parte Levy,* 163 S.W.2d 529 (1942).  In determining whether a constitutionally invalid portion of a legislative enactment is fatal to the entire legislation, the Supreme Court of Arkansas looks to "(1) whether a single purpose is meant to be accomplished by the act; and (2) whether the sections of the act are interrelated and dependent upon each other."  *U.S. Term Limits, Inc. v. Hill,* 872 S.W.2d 349, 357 (1994).  Applying this standard, the Court satisfies itself that this type of challenge solely to the Medical Records Mandate of the statute is acceptable.  Defendants do not appear to take a position on this issue.

to specify for what purpose the physician must collect the records and what actions, if any, the physician must take upon receiving any records (Dkt. No. 74, at 30).

Under the Due Process Clause, "an enactment is void for vagueness if its prohibitions are not clearly defined." *D.C. v. City of St. Louis,* 795 F.2d 652, 653 (8th Cir. 1986) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)). Due process requires that laws provide fair notice by giving a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so he may act accordingly." *Id.* Due process also demands explicit standards to prevent arbitrary or discriminatory actions by those charged with enforcement. *Id.*

"As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Gonzales*, 500 U.S. at 167 (quoting *Kolender v. Lawson,* 461 U.S. 352, 357 (1983); *Posters 'N' Things, Ltd. v. United States,* 511 U.S. 513, 525 (1994)). "The degree of vagueness that the Constitution tolerates. . . depends in part on the nature of the enactment," with greater tolerance for statutes imposing civil penalties and those tempered by scienter requirements. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99 (1982). The Court notes that it must abide by "the elementary rule that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Gonzales*, 550 U.S. at 153. In construing the law narrowly to avoid constitutional doubts, the Court "must also avoid a construction that would seriously impair the effectiveness of [the law] in coping with the problem it was designed to alleviate." *See United States v. Harriss*, 347 U.S. 612, 623 (1954).

Plaintiffs contend that, if a law "threatens to inhibit the exercise of constitutionally protected rights," the Constitution requires an especially high level of clarity. *Village of Hoffman*

*Estates,* 455 U.S. at 499. Plaintiffs further argue that, when violation of a law carries criminal penalties, "a strict test of specificity" applies. *D.C.,* 795 F.2d at 654. Even if a law "nominally imposes only civil penalties," if those are "prohibitory and stigmatizing," courts still undertake a close review for vagueness. *Village of Hoffman Estates,* 455 U.S. at 499. Plaintiffs argue that the challenged provisions "triggers the strictest vagueness review, because it both inhibits the exercise of constitutionally protected rights to liberty and privacy. . .and imposes criminal and other stigmatizing penalties, such as the finding of 'unprofessional conduct' and revocation of a physician's license to practice. H.B. 1434 § 1." (Dkt. No. 3, at 32; Dkt. No. 74, at 56-57).

Plaintiffs state that, first, the Medical Records Mandate gives no guidance as to what constitutes "reasonable time and effort," leaving the word "reasonable" with no content and no context. Dr. Hopkins posed, and plaintiffs continue to pose, potential questions to illustrate the alleged vagueness of the provision: "How much effort is needed to be 'reasonable'? How long is it 'reasonable' to wait for records?" (Dkt. No. 3, at 32). Further, many of Dr. Parker's patients typically have no health care "home" that coordinates care, rely on episodic visits to different providers and facilities as needed, and sporadically receive other health care, if any, in indigent-care settings largely funded by the government, including free clinics, walk-in clinics, urgent care, and emergency rooms (Dkt. No. 73-2, ¶ 38). These circumstances further complicate the inquiry. The Court recognizes the possibility that medical records requests may take days, weeks, or even months to fulfill, if the request is responded to at all (Dkt. No. 73-2, ¶¶ 39-40, 42; Dkt. No. 37-3, ¶¶ 40-42, 49). This lack of clarity impacts how facilities and physicians can plan abortion care and how patients can schedule their care (Dkt. No. 73-2, ¶ 41; Dkt. No. 73-3, ¶ 46). Plaintiffs present record evidence to support this; defendants present no record evidence to refute this.

Plaintiffs observe that the Medical Records Mandate also does not explain whether any facts—beyond the effort expended to request records and the number of days or weeks of delay spent awaiting their arrival—are relevant in assessing what is "reasonable." (Dkt. No. 73-2, ¶ 41; Dkt. No. 73-3, ¶ 46). Dr. Hopkins posited, and plaintiffs continue to posit, more questions to illustrate this alleged ambiguity: "Is the amount of money the physician or patient must pay for searching, copying, and, where necessary, securing translation of records into English relevant to what is 'reasonable'?" (Dkt. No. 3, at 32). In response, at the 2017 hearing on the instant motion, defendants argued that, "Indeed, common sense tells us that physicians and their staffs are perfectly capable of determining, based on their years of experience, whether they have made reasonable efforts." Defendants further assert that "But [Dr. Hopkins's] claim that the reasonableness standard is vague is insufficient as a matter of law to plead a vagueness claim. Numerous criminal and civil statutes use an objective 'reasonableness' standard to evaluate conduct. To hold that Act 733's medical-records provision is void for vagueness due to its incorporation of an objective reasonableness standard would entail finding that *all* such prohibitions violate the Constitution." (Dkt. No. 23, at 52-53).

Defendants cite a number of cases that they claim support their argument that " Courts have rejected allegations of vagueness where abortion laws use an objective reasonableness standard. *See Ohio v. Akron Ctr. For Reprod. Health*, 497 U.S. 502, 519 (1990) (rejecting a facial challenge to a statute that requires physicians to give notice by telephone or in person if this can be done through 'reasonable efforts'); *Twin-Lick Oil Co. v. Marbury*, 91 U.S. 587 (1875) (what counts as 'reasonable time' must be arrived at by a consideration of all elements which affect the question at hand); *United States v. Bewig*, 354 F.3d 731, 738 (8th Cir. 2003) (rejecting the argument that a statute that criminally prohibited activity that included 'having reasonable cause to believe' a

matter was unconstitutionally vague); *Karlin v. Foust*, 188 F.3d 446, 497 (7th Cir. 1999) (rejecting the arguments that a statute incorporating an objective reasonableness standard is unconstitutionally vague and imposes an undue burden on a woman's right to choose an abortion)." (Dkt. No. 23, at 53). The Court has reviewed the cases and finds them unpersuasive, as they involve facts distinctly different from the facts in this matter. Most of the cases cited involve similar words in different types of laws and do not involve vagueness claims at all. *See Johnson*, 135 S. Ct. 2551 (striking down as unconstitutionally vague a provision about "serious potential risk of physical injury to another"); *Twin-Lick Oil Co*, 91 U.S. 587 (rejecting effort to rescind a contract).

The Court has reviewed many cases in which language like this has resulted in a determination of unconstitutional vagueness. *See, e.g., Johnson v. United States*, 135 S. Ct. 2551 (2015) (determining that the Armed Career Criminal Act violates due process); *Kolender,* 461 U.S. 352 (enjoining as vague a statute that required providing "credible and reliable" identification when requested by police officer); *Smith v. Goguen*, 415 U.S. 566 (1974) (enjoining as vague a statute that failed to define "contemptuous treatment" of the flag, whether intentional or inadvertent); *Reproductive Health Services of Planned Parenthood of the St. Louis Region, Inc. v. Nixon,* 428 F.3d 1139 (8th Cir. 2005) (enjoining the enforcement of the state's informed-consent statute that required physicians to advise of "risk factors" of abortion and imposed punishments for "knowing" violations); *Planned Parenthood of Greater Iowa, Inc. v. Miller*, 195 F.3d 836 (8th Cir. 1999) (striking as unconstitutionally vague the state's "partial birth abortion" ban which included definitions of the prohibited acts).

Dr. Hopkins notes that as to § 20-16-1904(b)(2)(B)'s requirement of "reasonable time and effort" to obtain the medical records after (2)(A)'s requests, defendants try to import a notion of

"objective reasonableness" that is nowhere referenced in the law and offer no concrete description of what "reasonable time and effort" in this context might be. Instead, defendants refer to cases concerning different standards in other contexts or to professionals' medical judgments. *Id.* Their arguments wholly fail to clarify what Arkansas means by "reasonable time and effort" in the context of § 20-16-1904(b)(2)'s non-medically indicated, blanket searches for entire medical histories, or what physicians are to do with records if and when they arrive.

Plaintiffs also note that there is no exception in the provision allowing a physician to provide care absent "reasonable time and effort" where necessary to protect a patient from increased risk, yet increased risk will, according to plaintiffs, necessarily result from the indefinite delay inherent in the Mandate (Dkt. No. 73-2, ¶ 62; Dkt. No. 73-3, ¶¶ 41, 46). Dr. Hopkins poses another set of questions illustrating potential ambiguities: "Is it 'reasonable' to proceed without receiving records in order to avoid the increased risk of a one-month delay? A one-week delay? To avoid pushing a woman's care into the second trimester, past 14.0 weeks LMP, when she would need a D&E, which entails higher risks than a suction abortion? If so, does that mean it is 'reasonable' to delay for a number of weeks-and make follow up contacts to numerous providers seeking records-for a patient who initially seeks care at 10 weeks, but not for a patient who initially seeks care at 13 weeks and some number of days? For that patient, how many days is it 'reasonable' to delay? Is just making the initial records request alone ever 'reasonable'? Is it 'reasonable' to force a woman to delay three weeks if she has the financial resources and flexibility to return in 3 weeks, but not reasonable in the case of a woman struggling financially, who absolutely cannot return-and pay for a later, more expensive procedure-in three weeks?" (Dkt. No. 3, at 33).

The Court shares plaintiffs' concerns regarding these inquiries and concludes that the phrase "reasonable time and effort" is subjective in nature and has no specified boundaries. Thus, the Court finds that the Medical Records Mandate fails to provide fair notice and could potentially result in arbitrary enforcement. *See, e.g.*, *Grayned,* 408 U.S. at 113 (highlighting the due process problems with a "completely subjective standard").

Plaintiffs next argue that the Medical Records Mandate fails to define or in any way limit the scope of "medical records relating directly to the [patient's] entire pregnancy history." In response, defendants argue that, "[i]t is difficult to imagine what could be unclear about this requirement. The Act requires that a physician request (1) any medical records that (2) directly relate to (3) the woman's (4) past pregnancies, with a view toward determining whether a woman is seeking a sex-selection abortion." (Dkt. No. 23, at 54). Defendants cite *Gonzales* for the proposition that "[t]he Act provides doctors of ordinary intelligence a reasonable opportunity to know what is [required]." (Dkt. No. 92, at 61). *Gonzales*, 550 U.S. at 149 (citation omitted) (internal quotation marks omitted).

As written, the term "reasonable" search seems to apply to a potential myriad of past and present physicians who treated the woman, and both current and any prior pregnancies or medical visits related to a current or prior pregnancy (Dkt. No. 5, ¶ 23). The term "direct" in the provision is also unclear. To illustrate, Dr. Hopkins poses inquiries: "Does a 'direct' relation to a patient's entire pregnancy history include care by her general practitioner for pregnancy-related symptoms? Must [Dr. Hopkins] request records from a laboratory or ultrasound center?" (Dkt. No. 3, 33-34). According to plaintiffs, records that might "directly relate" to that "entire pregnancy history" would seem, at a minimum, to encompass labor and delivery records from hospitals; records regarding any prenatal care from obstetricians or other physicians; miscarriage records from

physicians or emergency rooms; and any records related to a prior abortion; the language also might include but not be limited to testing and monitoring records created at laboratories, clinics, or ultrasound facilities; and the language could include records of care or monitoring necessary for the patient's own medical conditions exacerbated during the patient's current or past pregnancy (Dkt. No. 73-2, ¶ 33; Dkt. No. 73-3, ¶ 47).

Dr. Hopkins contends that "defendants' own arguments highlight the Medical Records Mandate's vagueness." (Dkt. No. 32, at 49). Dr. Hopkins notes that defendants appear to understand the reference in § 20-16-1904(b)(2)(A) to a woman's "entire pregnancy history" to apply only to "past pregnancies," yet no language in the statute specifies that limitation. Instead, the language is "entire pregnancy history," and that language as used in (b)(2)(A) could be read to include only the current "pregnancy history" or, to give more meaning to "entire," to encompass both past pregnancies *and* the women's current "pregnancy history." Dr. Hopkins argues that "defendants arbitrarily assume that the reference only applies to past pregnancies, however, and pick one of three possible readings of this unclear statutory language." (Dkt. No. 53, at 75-76).

Dr. Hopkins asserts that defendants provide no clarity as to the universe of medical records that might "directly relate to" a woman's "entire pregnancy history," and instead leave "unclear and undefined the universe of prior health care providers from whom records *must* be requested to remove § 20-16-1904(b)(2)(A)'s prohibition on proceeding with an abortion." (Dkt. No. 32, at 53).

Lastly, as related to the Medical Records Mandate, plaintiffs argue that the mandate "gives no direction whatsoever on what actions, if any, the physician is to take upon receiving any records." (Dkt. No. 3, at 34; *see also* Dkt. No. 73-2, ¶ 44; Dkt. No. 73-3, ¶ 54). Dr. Hopkins questions whether "with a mandatory search for the patient's 'entire pregnancy history,' must the physician review every record, and, if so, for what purpose?" (Dkt. No. 3, at 34). Dr. Hopkins

asserts that "[c]ontrary to the Due Process Clause, the Medical Records Mandate fails to provide clear standards for physicians, inviting arbitrary enforcement by prosecutors, the Arkansas Medical Board, and others. Dr. Hopkins is therefore likely to prevail in this challenge to the Mandate." (*Id.*). In response, defendants contend that "[b]ut the Act clearly specifies what actions a physician must *not* take—namely, the doctor must not intentionally perform an abortion with knowledge that the woman is seeking it on the basis of the child's sex. Again, the medical records are likely to shed light on this matter. In the context of this Act, it is clear what the doctor is supposed to look for in the records—indications that the woman is seeking a sex-selection abortion." (Dkt. No. 23, at 49). However, the assertion that the provision specifies what actions a doctor must not take is inapposite in relation to the contention that the terms indicating what actions a doctor must take are vague.

Defendants rely heavily on *Gonzales* to argue that the Medical Records Mandate is not unconstitutionally vague. Defendants state that "[i]n *Gonzales*, the Court upheld the partial-birth abortion ban in the face of a facial vagueness challenge similar to that which Hopkins makes here." (Dkt. No. 23, at 51-52; *see also* Dkt. No. 92, at 61-65). The Court, however, is not persuaded by this comparison, as it finds *Gonzales* factually distinct from the instant case. In *Gonzales*, the Court stated that "[i]ndeed, [the statute at issue in that case] sets forth 'relatively clear guidelines as to prohibited conduct' and provides 'objective criteria' to evaluate whether a doctor has performed a prohibited procedure. *Posters 'N' Things, supra,* at 525–526." *See* Gonzales, 550 U.S. at 149. The Court finds that the Medical Records Mandate contains no objective criteria or clear guidelines. Defendants also cite *Memphis Center for Reproductive Health v. Slatery*, Case No. 3:20-cv-00501, 2020 WL 4274198 (July 24, 2020), and to the Sixth Circuit Court of Appeals stay of a portion of the preliminary injunction issued by the district court (Dkt. No. 92, at 63).

Based on this Court's review, in that case plaintiffs asserted a void for vagueness claim to Tennessee legislation plaintiffs challenged as unconstitutional pre-viability bans on abortion; the Court sees no comparable medical records requirement in the Tennessee legislation. The Court also discerns no *mens rea* requirement in the Medical Records Mandate, further distinguishing the cases.

Moreover, the Court is not persuaded by defendants' argument that only medical records relevant to whether a woman is seeking a sex-selection abortion are required (Dkt. No. 92, at 62). That limitation is not supported by the statutory language or construction, for reasons explained by this Court. Further, "[m]id-litigation assurances are all too easy to make and all too hard to enforce, which probably explains why the Supreme Court has refused to accept them." *Williamson*, 900 F.3d at 1328 (citing *Stenberg*, 530 U.S. at 940-41 (rejecting the Attorney General's interpretation of the statute and warning against accepting as authoritative a state's litigation position when it does not bind state courts or law enforcement authorities)).

Defendants argue that "the statute clearly states precisely what conduct is criminally prohibited: knowingly performing or attempting to perform an abortion with the intent to terminate a pregnancy before spending reasonable time and effort to obtain medical records directly relating to the previous pregnancies of a woman who knows the sex of the child she is carrying." (Dkt. No. 23, at 52). Defendants miss the mark with this contention. The vagueness of the Medical Records Mandate lies not in its description of what conduct is prohibited; it lies in its terminology used to outline compliance with the mandate.

For all of these reasons, based on the record before the Court at this stage of the proceeding, Dr. Hopkins and LRFP are likely to succeed on the claim that the Medical Records Mandate is

unconstitutionally vague.  These factors also contribute to the undue burden the Medical Records Mandate imposes on women seeking abortion for whom the Mandate is relevant.

>2. **Likelihood Of Success On The Merits:  Due Process Challenge**

>a. **Applicable Law**

To determine whether Dr. Hopkins and LRFP are likely to succeed on their challenge to the Medical Records Mandate, this Court applies the undue burden standard.  *June Medical Services*, 140 S. Ct. 2103 (plurality opinion); *Whole Woman's Health*, 136 S. Ct. at 2309; *Casey*, 505 U.S. at 877 (plurality opinion).

### b.    Analysis Of The Medical Records Mandate

### 1.    Burdens Imposed On Women

This Court examines whether the Mandate "has the effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" in a large fraction of cases in which the law is relevant for this facial challenge. *June Medical*, 140 S. Ct. at 2138 (Roberts, J. concurring) (quoting *Casey*, 505 U.S. at 877). The Court concludes plaintiffs are likely to succeed on the merits of this claim.

Defendants maintain that the Medical Records Mandate applies only in "situations where the woman knows the sex" of the embryo or fetus (Dkt. No. 23, at 48-49; *see also* Dkt. No. 92, at 60). When examining the meaning of a criminal statute, the Supreme Court of Arkansas applies these principles:

> We construe criminal statutes strictly, resolving any doubts in favor of the defendant. *Hagar v. State,* 341 Ark. 633 19 S.W.3d 16 (2000). We also adhere to the basic rule of statutory construction, which is to give effect to the intent of the legislature. *Id.* We construe the statute just as it reads, giving the words their ordinary and usually accepted meaning in common language, and if the language of the statute is plain and unambiguous, and conveys a clear and definite meaning, there is no occasion to resort to rules of statutory interpretation. *Id.* Additionally, in construing any statute, we place it beside other statutes relevant to the subject matter in question and ascribe meaning and effect to be derived from the whole. *Id.*

*Short v. State*, 79 S.W.3d 313, 495 (Ark. 2002).

The Supreme Court of Arkansas also explained:

> It is a well-settled principle of statutory construction that statutes (will) receive a common-sense construction, and, where one word has been erroneously used for another, or a word omitted, and the context affords the means of correction, the proper word will be deemed substituted or supplied. This is but making the strict letter of the statute yield to the obvious intent of the Legislature.

*Henderson v. Russell*, 589 S.W.2d 565, 568 (Ark. 1979) (citations omitted).

The Supreme Court of Arkansas stated:

> Statutes will not be defeated on account of mistakes, errors or omissions, provided the intent of the General Assembly can be collected from the whole statute. *Hazelrigg v. Board of Penitentiary Commissioners*, 184 Ark. 154, 40 S.W.2d 998 (1931). We have often held that the title of an act is not controlling in its construction even though it is a matter to be considered in determining the meaning of a statute which is otherwise ambiguous. *Matthews v. Byrd*, 187 Ark. 458, 60 S.W.2d 909 (1933). Likewise, the language used in the title of an act is not controlling but may play a part in explaining ambiguities in the body of the statute. *City of Conway v. Summers*, 176 Ark. 796, 4 S.W.2d 19 (1928). We examine the title of an act only for the purpose of shedding light on the intent of the General Assembly. *Lyerley v. Manila School District No. 15*, 214 Ark. 245, 215 S.W.2d 733 (1948).

*Henderson*, 589 S.W.2d at 568.

In *Henderson*, acknowledging that controlling law, the Supreme Court of Arkansas reviewed language to determine if an emergency had been defined by the Arkansas legislature such that the emergency clause was effective, accelerating the effective date of the law. The court examined the following:

> Where County Officers must have Deputies and employees necessary to carry out the essential activities of County Government, it is hereby found that it is in the best interest of County Government that no person be employed as a Deputy or County Employee who is related by affinity or consanguinity within the third degree to any elected official. Therefore, an emergency is hereby declared to exist and this Ordinance being necessary for the immediate preservation of public peace, health and safety shall be in full force and effect from and after its passage and approval.

*Henderson*, 589 S.W. 2d at 569. The Supreme Court of Arkansas reasoned "[t]here [wa]s simply nothing in the emergency clause to indicate a real emergency existed" and declared "that the emergency clause had failed and the ordinance [would] take effect as it would have had there been no emergency clause." *Id*.

Applying those principles here, the Court concludes that Ark. Code Ann. § 20-16-1904(b) should be read as enacted; there is no ambiguity in the language. The portion which is the Medical

Records Mandate in subsection (2) is a second, independent requirement from the requirement in subsection (1) of asking the pregnant woman if she knows the "sex of the unborn child." In other words, as written, the statute requires that "[b]efore performing an abortion, the physician or other person who is performing the abortion shall" comply with both subsection (1) *and* (2) of § 1904(b). In fact, "and" appears at the end of subsection (1)(b) preceding subsection (2). There is no language in the statute as written that limits subsection (2) to instances in which the pregnant woman knows the "sex of the unborn child" or makes subsection (2) dependent upon the woman's answer to subsection (1) of § 1904(b).

Defendants do not argue a mistake, error, or omission in § 1904(b). Instead, defendants argue that the Medical Records Mandate says something that it plainly does not (Dkt. No. 23, at 48; Dkt. No. 92, at 60). Defendants contend, "Hopkins contorts the language of the sex-selection-abortion ban to try and make a valid antidiscrimination provision into an undue burden." (Dkt. No. 92, at 60). If the Court is permitted under Arkansas law and these circumstances to look to the title and legislative findings, the Court finds more persuasive defendants' argument that the legislature intended something other than what the statute plainly says (Dkt. No. 23, at 49). Defendants argue that "for those few mothers" who seek an abortion knowing the sex of the fetus "it covers only records relevant to determining whether such mothers are now seeking a sex-selection abortion – not every document in a mother's medical history file." (Dkt. No. 92, at 61). However, the Court remains skeptical, given the statue's language.

Regardless, at this stage of the proceeding, the Court will consider both interpretations of the Medical Records Mandate.[23] The Court finds that Dr. Hopkins and LRFP are likely to succeed

---

[23] The obligation of a federal court to adjudicate claims which fall within its jurisdiction has been deemed by the Supreme Court to be "virtually unflagging." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,* 491 U.S. 350, 359 (1989) (citations omitted). No party has

requested abstention, but this Court considers it. Abstention is an "extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it," and one which should be invoked "only in the exceptional circumstances." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813 (1976) (citation omitted); *see also City of Houston v. Hill,* 482 U.S. 451, 467 (1987) (stating that "[a]bstention is, of course, the exception and not the rule").

As a threshold matter, the Court observes that the Supreme Court has recognized that an abstaining federal court may grant a preliminary injunction while state courts construe the challenged statute. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 312 n.18 (1979); *Harrison v. NAACP*, 360 U.S. 167, 178-79 (1959); *see also Reproductive Health Services of Planned Parenthood of the St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139 (8th Cir. 2005) (examining a preliminary injunction against enforcement of challenged abortion regulation issued by the district court after abstaining under the *Pullman* doctrine pending state courts' interpretation of certain statute provisions).

Though there are several abstention doctrines, the *Pullman* abstention doctrine covers actions to enjoin state or local officers from enforcing an allegedly unconstitutional state law. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941). "[T]he purpose of *Pullman* abstention in such cases is to avoid resolving the federal question by encouraging a state-law determination that may moot the federal controversy." *San Remo Hotel, L.P. v. City and County of San Francisco, Cal.*, 545 U.S. 323, 349 (2005) (citing *England v. La. State Bd. of Med. Examiners*, 375 U.S. 411, 416-17 (1964)). Thus, in situations "[w]here resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal[-]state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication." *Harman v. Forssenius*, 380 U.S. 528, 534 (1965). However, "[t]he mere possibility that a state's interpretation of its law may avoid the necessity for an injunction does not preclude federal review." *Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n*, 772 F.2d 404, 413 (8th Cir. 1985). "The [*Pullman*] abstention doctrine is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers." *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964). Importantly, this "abstention rule only applies where 'the issue of state law is uncertain.'" *Wisconsin v. Constantineau*, 400 U.S. 433, 439 (1971) (quoting *Harman*, 380 U.S. at 534). "Where there is no ambiguity in the state statute, the federal court should not abstain but should proceed to decide the federal constitutional claim." *Id.* (citing *Zwickler v. Koota*, 389 U.S. 241, 250-51, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967)).

The Court is aware of the line of cases standing for the proposition that, if a facially-challenged statute is "'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld." *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383, 397 (1988) (citing *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975), and *Broadrick v. Oklahoma*, 413 U.S. 601 (1973)); *see also Erznoznik*, 422 U.S. at 216 ("[T]he Court has held that a state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts." (citing *Dombrowski v. Pfister*, 380 U.S. 479, 497 (1965))); *United Food and Commercial Workers International Union, AFL-CIO, CLC v. IBP, Inc.*, 857 F.2d 422, 431 (8th Cir. 1988) (same).

on their due process claims with respect to the Medical Records Mandate. Record evidence supports that the Medical Records Mandate impermissibly creates delays, very possibly putting abortion care out of reach for women late in pregnancy, increases health risks to women as gestation age advances; contains no health exception for those patients who have serious health complications and require urgent care; breaches patients' confidentiality for the majority of patients who seek it, further deterring their care; and imposes prohibitive logistical requirements and costs on providers. Defendants dismiss these burdens as "speculation," yet cite no record evidence for the Court's consideration on this point (Dkt. No. 92, at 61).

Based on the record evidence before the Court, obtaining medical records is medically indicated for only a fraction of abortion patients (Dkt. No. 4, ¶ 9; Dkt. No. 5, ¶¶ 33-34; Dkt. No. 6, ¶ 24; Dkt. No. 73-2, ¶34; Dkt. No. 73-3, ¶ 39). The doctors at LRFP request medical records for approximately 20 to 25 patients per year out of the approximately 2,000 to 3,000 women patients each year (Dkt. No. 6, ¶¶ 24, 32; Dkt. No. 73-3, ¶¶ 39, 48). Record evidence does not support making broad medical records requests for patients prior to providing abortion care (Dkt. No. 73-2. ¶¶ 34, 35, 37). The patients for whom doctors at LRFP request medical records, or for

---

These cases also posit that state courts are more appropriately situated than federal courts to fashion these narrowing constructions. *Am. Booksellers Ass'n*, 484 U.S. at 397 (certifying construction of contested state statutes to the Virginia Supreme Court); *Erznoznik*, 422 U.S. at 216 (stating that a narrowing construction by the state courts can rescue a state statute from facial invalidation); *IBP*, 857 F.2d at 431 (stating that federal courts "may not impose [their] own narrowing construction. . . if the state courts have not already done so" (internal quotations and citation omitted)).

Here, although defendants appear to proffer a narrowed construction of the Medical Records Mandate that would apply it only to those women who, when asked, respond that they know the sex of the unborn child, for the reasons explained in this Court's Order, even that narrowing if permissible under Arkansas law would not avoid the constitutional questions plaguing the Medical Records Mandate. Further, this Court does not pass on whether that narrowing is permissible under Arkansas law and determines that it need not to resolve plaintiffs' current motion for preliminary injunction on this claim.

whom they receive medical records, include patients who have received a diagnosis of fetal anomaly, decided to end the pregnancy, and received a referral to LRFP and patients for whom the doctor believes the records could be useful because of a woman's medical condition (Dkt. No. 6, ¶ 24; Dkt. No. 73-2, ¶ 36; Dkt. No. 73-3, ¶¶ 39- 40).

Even then, a request for only certain records related to a specific medical issue is appropriate (Dkt. No. 4, ¶ 9; Dkt. No. 5, ¶¶ 33-34; Dkt. No. 6, ¶ 24; Dkt. No. 73-3, ¶ 40). For the few patients for whom LRFP requests medical records currently, LRFP generally is able to obtain more limited records without unduly delaying care, and it is within the physician's judgment whether to continue to wait for the records or proceed with abortion care (Dkt. No. 73-3, ¶ 41). When certain records related to a specific medical issue are requested, unless the records are transmitted and received very quickly, any medical benefit of waiting for the records is outweighed by the fact that delaying abortion care increases the risks associated with the procedure for the patient (Dkt. No. 4, ¶ 9; Dkt. No. 5, ¶ 39).

For LRFP to obtain a patient's medical records, the patient must first sign a form authorizing LRFP to obtain the medical records. That authorization is then sent along with a request to the health care provider. LRFP staff then follow-up with a phone call to the health care provider, if necessary (Dkt. No. 6, ¶ 25; Dkt. No. 73-3, ¶ 40). Because LRFP typically requests records related to some aspect of the care the patient will receive, and therefore involve a specific request, not a request for the patient's full medical history, there is no fee charged for the records (Dkt. No. 6, ¶ 25; Dkt. No. 73-3, ¶ 40). Even with these specific requests, it takes time to obtain a patient's medical records from another health care provider and may take a few hours or up to several weeks (Dkt. No. 6, ¶ 26; Dkt. No. 73-2, ¶¶ 38-39; Dkt. No. 73-3, ¶ 49).

Attempting to comply with the Medical Records Mandate would mean waiting until Dr. Hopkins and LRFP had spent an undefined amount of time trying to obtain records. Even for very targeted requests, it may take anywhere from a few hours to several weeks to receive records (Dkt. No. 6, ¶ 26; Dkt. No. 73-3, ¶¶ 41, 49). Many patients who seek abortion care from LRFP's providers typically have no health care "home" that coordinates care, rely on episodic visits to different providers and facilities as needed, and sporadically receive other health care, if any, in indigent-care settings largely funded by the government, including free clinics, walk-in clinics, urgent care, and emergency rooms (Dkt. No. 73-2, ¶ 38). Delay would be compounded for patients receiving pregnancy related care outside of Arkansas or outside of the United States, and for patients whose records are in another language and must be translated into English (Dkt. No. 5, ¶ 14; Dkt. No. 6, ¶ 30). The types of requests required by the Medical Records Mandate, and waiting for some period for a response to the requests, likely will mean delays in receiving records would be even greater (Dkt. No. 6, ¶ 26; Dkt. No. 73-2, ¶ 62).

The delay caused by the Medical Records Mandate is not quantified by the law, as explained in this Court's discussion regarding the vagueness of this provision. Due to the uncertainty in the Medical Records Mandate's intended scope with the phrases "directly relate" to the "entire pregnancy history" it is unclear what scope of record search would be required for patients (Dkt. No. 73-2, ¶ 33; Dkt. No. 73-3, ¶ 47). Due to the uncertainty in the Medical Records Mandate's use and intended meaning of the phrase "reasonable time and effort" to obtain records, attempting compliance will result in delays (Dkt. No. 73-2, ¶ 41; Dkt. No. 73-3, ¶ 46). Due to this delay, enforcement of the Medical Records Mandate could cause a woman's time to obtain abortion care in Arkansas to expire. Currently, Arkansas bans abortions after 21.6 weeks LMP. Ark. Code Ann. § 20-16-1405 (2013) (banning abortion after 20.0 weeks post-fertilization, which

is 22.0 weeks LMP). This seems especially likely given defendants' contention that the Medical Records Mandate "applies only to potential sex-selection abortions – which by definition are later-term abortions where the mother knows the sex of the child she is carrying." (Dkt. No. 23, at 49; 73-3, ¶ 52). If what defendants contend is true, for those women, time is of the essence in accessing abortion care in Arkansas. Even defendants concede that delay increases the risk to the woman, given the findings of fact of the legislature that "sex-selection abortions are generally performed later in pregnancy and that the risks from abortion to maternal health increase as gestation increases" (Dkt. No. 23, at 49). *See* Ark. Code Ann. § 20-16-1902(a)(2) (legislative findings).

The record evidence is that delaying care can push a patient past the point in pregnancy at which she can receive a medication abortion, requiring a patient who prefers that method to have a procedure (Dkt. No. 6, ¶ 13; Dkt. No. 73-2, ¶¶ 30-31; Dkt. No. 73-3, ¶ 23; Dkt. No. 73-10). Delay can push a patient from a first-trimester to a second-trimester procedure or from a one-day procedure in the second trimester to a two-day procedure. Delay can also push a patient beyond the point at which she can obtain an abortion at LRFP and, therefore, in Arkansas, which means she may well not be able to access abortion at all. (Dkt. No. 6, ¶ 13; Dkt. No. 73-2, ¶¶ 30-31; Dkt. No. 73-3, ¶ 23; Dkt. No. 73-10). Delay also means that a woman may pay more for the abortion procedure itself because the procedure becomes more complex as pregnancy advances (Dkt. No. 6, ¶ 14; Dkt. No. 73-2, ¶¶ 30-31; Dkt. No. 73-6, ¶ 10).

The risks associated with legal abortion utilizing current methods increase as pregnancy progresses, particularly if that delay pushes a woman from the first trimester to the second trimester. Studies demonstrate increased risks of complications, such as bleeding and uterine perforation, associated with abortions performed later in pregnancy (Dkt. No. 4, ¶ 10; *see also* Dkt. No. 25-4, ¶ 7; Dkt. No. 73-2, ¶¶ 30-31).

Because neither the physician nor the patient can know when the Medical Records Mandate's requirement will, if ever, be satisfied, scheduling appointments is made even more difficult. The Medical Records Mandate likely will impose an open-ended roadblock to abortion care. This lack of clarity in the Medical Records Mandate impacts how facilities and physicians can plan abortion care and how patients can schedule their care (Dkt. No. 73-2, ¶ 41; Dkt. No. 73-3, ¶ 46).

These types of delays, and the impacts of these delays, erect a substantial obstacle to abortion access. When examining the judicial bypass procedures, which allow minors to obtain abortion care without otherwise mandated parental involvement, the Supreme Court made clear such procedures are unconstitutional unless they assure an expeditious time frame for completion of the process. *See, e.g., Bellotti*, 443 U.S. at 644 (holding that judicial bypass process for minors "must assure that a resolution of the issue, and any appeals that may follow, will be completed with anonymity and sufficient expedition to provide an effective opportunity for an abortion to be obtained"); *Causeway*, 109 F.3d at 1110 (striking down judicial bypass statute that lacked time limits and noting that "[s]uch open-ended bypass procedure has never been approved"), *overruled on other grounds by Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001).

The Medical Records Mandate's requirements apply even where abortion is necessary to prevent a serious health risk to the woman; the Medical Records Mandate has no exception to allow physicians to act without the required medical records search in cases where a serious health risk to the woman is present (Dkt. No. 73-2, ¶ 62). Although the plain text of the Medical Records Mandate does not permit a physician to proceed based on health risks to the woman, the State of Arkansas argues such an exception is implicit in the law. The State of Arkansas points to language in the law that prohibits an abortion "solely on the basis of the sex of the unborn child" and argues

that, if an abortion is needed for health reasons, the abortion is not a sex-selection abortion prohibited by the law (Dkt. No. 22, at 35). The Court rejects this argument. As an initial matter, defendants point to section (a) for this language, not section (b) that includes the Medical Records Mandate. *See* Ark. Code Ann. § 20-16-1904. There is no language in section (b) from which the Court could infer this exception. Instead, the language requires medical records requests for women's "entire pregnancy history" and the delay of "reasonable time and effort to obtain the medical records" before any abortion can be performed. Ark. Code Ann. § 20-16-1904(b)(2)(A), (B). Further, other Arkansas statutes regarding abortion, including some challenged here, specifically include specific health exception language. That language is absent in this statute. This Court has no legal basis from which to read that language, or such an exception, into the Medical Records Mandate.

In addition, there is record evidence that compliance with the Medical Records Mandate if applied to all LRFP patients seeking abortion care would drain providers' resources: the staff, copying, and processing costs of requesting records and attempting to compile all the records for the great majority of patients would be overwhelming (Dkt. No. 6, ¶¶ 24, 32; Dkt. No. 73-3, ¶ 48-50). LRFP provides medical care to approximately 2,000 to 3,000 women each year, the majority of whom have had one or more prior pregnancies, during which the women received medical care from one or more providers or received care for a current pregnancy (Dkt. No. 6, ¶ 32; Dkt. No. 73-3, ¶ 48). Each woman would have to gather past information, including identifying her past providers and the dates she received service, to complete a signed request for each former provider (Dkt. No. 6, ¶ 33; Dkt. No. 73-3, ¶ 48). As a result, implementation of the Medical Records Mandate will result in administrative and logistical challenges.

The Arkansas Medical Board advises that Arkansas medical providers can charge per-page copying fees and separate fees for retrieval of records from storage. *See* Ark. Code Ann. § 16-46-106 (2008). The record evidence is that, when making a request for a patient's complete medical record, a fee usually is charged for obtaining the records (Dkt. No. 6, ¶ 33; Dkt. No. 73-3, ¶ 49).

Further, there is evidence in the record that compliance would violate the women's confidentiality: requesting medical records would disclose the fact of the woman's pregnancy and her abortion decision to all her previous and current pregnancy related health care providers (Dkt. No. 5, ¶ 38; Dkt. No. 6, ¶ 28; Dkt. No. 73-2, ¶ 58; Dkt. No. 73-3, ¶ 43; 73-6, ¶ 11; 73-8, ¶¶ 7-8). LRFP is a well-known abortion provider. Any request for medical records made by LRFP, in and of itself, discloses that the patient likely is seeking an abortion. As a result, LRFP does not request records without a woman's prior written consent, and some women specifically request that LRFP not seek records from another health care provider because the woman does not want that provider to know of the pregnancy and abortion decision (Dkt. No. 6, ¶ 27; Dkt. No. 73-2, ¶ 59; Dkt. No. 73-3, ¶ 43). The record evidence is that some women have informed LRFP that the women fear hostility or harassment from their other health care providers for deciding to seek an abortion (Dkt. No. 6, ¶ 28; Dkt. No. 73-3, ¶ 44; see also Dkt. No. 73-2, ¶ 61; 73-6, ¶ 11; 73-8, ¶ 7). Many women do not want that to occur for fear of harassment and stigma, which fear is supported by record evidence (Dkt. No. 5, ¶ 38; Dkt. No. 6, ¶ 28; Dkt. No. 73-3, ¶ 44; 73-6, ¶ 11; 73-8, ¶ 7). As a result, this Court concludes that at this stage there is record evidence that this violation of confidentiality would further interfere with a woman's right to decide to end a pregnancy. *Bellotti*, 443, U.S. at 655. It will cause women to forgo abortion in Arkansas rather than risk disclosure to medical providers who they know oppose abortion or who are family friends or neighbors (Dkt. No. 6, ¶ 28; Dkt. No. 73-3, ¶ 44; *see also* Dkt. No. 73-2, ¶ 61).

Even if as defendants maintain the Medical Records Mandate applies only to patients who inform physicians that they know the sex of the fetus, that reading does little to lessen many of these burdens including the most critical ones. The few patients who know the sex of the fetus are almost always invariably later in pregnancy. Although an ultrasound examination is performed as part of routine prenatal care, it cannot determine the sex of the fetus before the fourteenth week of pregnancy because male and female fetuses develop physically in the same way up to that point (Dkt. No. 73-2, ¶ 48). Only a small minority of abortion patients come to LRFP knowing the sex of the fetus, and those patients are almost always seeking abortion only after learning of a fetal diagnosis (Dkt. No. 73-2, ¶ 50; Dkt. No. 73-3, ¶ 52). Their care decision has nothing to do with sex-selection, according to Dr. Parker (Dkt. No. 73-2, ¶ 50). The small minority of abortion patients who come to LRFP knowing the sex of the fetus and seeking abortion care only after learning of a fetal diagnosis necessarily have seen at least one prior pregnancy related medical provider (Dkt. No. 73-3, ¶ 52). Ms. Williams avers that compliance with the Medical Records Mandate even for these patients would delay these patients care at a time when medical risks, costs, and logistical challenges are significantly increasing and would delay these patients timely access to care (*Id.*). Delay at that more advanced gestational age adds to patients' medical risks and diminishes patients' ability to access care. Abortion care in Arkansas is available only to 21.6 weeks LMP.

As a result, under either reading of the Medical Records Mandate, it creates a substantial obstacle to abortion care for a large fraction of women to whom it applies. Record evidence supports that the Medical Records Mandate impermissibly creates delays, very possibly putting abortion care out of reach for women late in pregnancy; increases health risks to women as gestation age advances; contains no health exception for those patients who have serious health

complications and require urgent care; breaches patients' confidentiality for the majority of patients who seek it, further deterring their care; and imposes prohibitive logistical requirements and costs on providers.

## 2.    State's Interest

The Arkansas legislature included "legislative findings and purpose" when enacting this law.  Ark. Code Ann. § 20-16-1902.  The purpose of the law is to "[b]an abortions performed solely for reasons of sex-selection" and to "[p]rotect women from the risks inherent in late-term abortions."  Ark. Code Ann. § 20-16-1902(b).  Defendants also argue that Arkansas "has an important and legitimate interest in ensuring that unborn children – and particularly unborn girls who are far more often the victims of sex-selection—are not aborted solely on the basis of their sex." (Dkt. No. 92, at 60).  Dr. Hopkins and LRFP do not seek a preliminary injunction on or challenge enforcement of the law with respect to the ban on abortions performed solely for reasons of sex-selection.  Dr. Hopkins and LRFP do seek a preliminary injunction challenging enforcement of the Medical Records Mandate.

With respect to maternal health, the Arkansas legislature made the following findings:

(A) It is undisputed that abortion risks to maternal health increase as gestation increases.

(B) The risk of death for pregnant women at eight (8) weeks' gestation is one (1) death per one million (1,000,000) and rises to:

> (i) One (1) death per twenty-nine thousand (29,000) abortions between sixteen (16) and twenty (20) weeks' gestation, and

> (ii) One (1) death per eleven thousand (11,000) abortions at twenty-one (21) weeks' gestation or later;

(C) A woman is thirty-five (35) times more likely to die from an abortion performed at twenty (20) weeks' gestation than she would have been had the abortions been performed in the first trimester;

(D) A woman is ninety-one (91) times more likely to die from an abortion performed at twenty-one (21) weeks' gestation or later than she would have been had the abortion been performed in the first trimester; and

(E) Because abortions performed solely based on the sex of a child are generally performed later in pregnancy, women undergoing these abortions are unnecessarily exposed to increased health risks, including an exponentially higher risk of death.

Ark. Code Ann. § 20-16-1902(a)(2).

### 3. "Legitimate Purpose" To Which The Law Is "Reasonably Related"

This Court examines whether the Medical Records Mandate has a "legitimate purpose" and whether it is "reasonably related" to that goal. *June Medical*, 140 S. Ct. at 2138 (Roberts, J., concurring). Generally, the state has the burden of demonstrating a link between the legislation it enacts and what it contends are the state's interests. *See Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 430 (1983), *overruled on other grounds by Casey*, 505 U.S. 833 (describing the burden as that of the state).

The ban on abortions sought based solely on sex, with its enforcement through Ark. Code Ann. § 20-16-1904(a), stands on its own. Dr. Hopkins and LRFP do not challenge this ban.[24]

The Court determines that plaintiffs are likely to succeed on their argument that the Medical Records Mandate serves no proper state purpose, at this preliminary stage of the litigation. The Medical Records Mandate requires blanket requests for entire medical histories related to pregnancy care. It places numerous obstacles in the path of women seeking abortions by: (1) compromising the women's privacy and confidentiality in having to disclose to past and potentially current medical providers her pregnancy and desire for abortion care by even making the request for records; (2) requiring Arkansas abortion care providers to speculate about what conduct is mandated under the Medical Records Mandate, based on the literal language of the Mandate and

---

[24] As an aside, there is no record evidence that abortions in Arkansas have been sought based solely on sex (Dkt. No. 5, ¶ 30; Dkt. No. 6, ¶ 22; 73-2, ¶ 46; 73-3, ¶ 37). The Court has not relied on this observation in reaching its determination regarding the burden the Medical Records Mandate imposes.

the dispute it gives rise to with respect to being limited to sex-selection abortions, and to speculate about what conduct is required in an effort to comply; (3) by placing Arkansas abortion providers in jeopardy of criminal penalties that may impact licensure; and (4) by placing the health of women seeking abortions at risk due to increased delay in receiving care, including but not limited to those later in pregnancy who know the sex of the fetus and those who urgently need care because there is no health exception.

There is record evidence that the privacy and confidentiality concerns will have a chilling effect on women seeking abortion care and that the vagueness of the Mandate and the potential for criminal penalties for failure to comply will have a chilling effect on Arkansas abortion providers' willingness to provide care.

Further, there is record evidence that such blanket requests will increase the delay in receiving records and the cost of obtaining records (Dkt. No. 6, ¶¶ 24, 32, 33; Dkt. No. 73-2, ¶¶ 41, 42, 47; Dkt. No. 73-3, ¶¶ 41, 46, 52). These delays may put abortion care out of reach for many of the women for whom this law is relevant, especially given defendants' contention that the Medical Records Mandate "applies only to potential sex-selection abortions – which by definition are later-term abortions where the mother knows the sex of the child she is carrying." (Dkt. No. 23, at 49; *see also* Dkt. No. 6, ¶ 13; 73-2, ¶ 62). Time is of the essence in accessing abortion care in Arkansas, given the limits under Arkansas law on when abortions may be performed. All parties conceded that any delay in receiving abortion care increases the risk to the woman. *See* Ark. Code Ann. § 20-16-1902(a)(2) (legislative findings).

Although defendants have asserted in this litigation that a patient is always more likely to receive better care when her physician has greater knowledge of her health history, there is no evidentiary support for this statement in the record. The record evidence before this Court is that

abortion care does not require a physician to obtain medical records for entire medical histories related to pregnancy care for women before providing abortion care (Dkt. No. 5, ¶¶ 31-42; Dkt. No. 6, ¶¶ 24-34; 73-2, ¶¶ 34, 37). According to Dr. Parker, a patient's medical records from another health care provider are almost never relevant to or required for abortion care, and it is exceedingly rare for him to seek medical records from another clinician prior to providing an abortion (Dkt. No. 73-2, ¶ 34). He does not recall any instance of broadly requesting medical records about a patient's full reproductive history, even from a single other health care provider, before performing an abortion (Dkt. No. 73-2, ¶ 37). In almost all situations, according to Dr. Parker, medical records play no role in and would not affect abortion health care (Dkt. No. 73-2, ¶¶ 34, 37).

From the record evidence before the Court, obtaining medical records is medically indicated for only a fraction of abortion patients (Dkt. No. 4, ¶ 9; Dkt. No. 5, ¶¶ 33-34; Dkt. No, 6, ¶ 24; Dkt. No. 73-2, 37). Even then, a request for only certain records related to a specific medical issue is appropriate (Dkt. No. 4, ¶ 9; Dkt. No. 5, ¶¶ 33-34; Dkt. No. 6, ¶ 24; Dkt. No. 73-2, ¶¶ 35-37). When certain records related to a specific medical issue are requested, unless the records are transmitted and received very quickly, any medical benefit of waiting for the records is outweighed by the fact that delaying abortion care increases the risks associated with the procedure for the patient (Dkt. No. 4, ¶ 9; Dkt. No. 5, ¶ 39; 73-2, ¶ 40; 73-3, ¶ 41). Because LRFP typically requests records related to some aspect of the care the patient will receive, and therefore involve a specific request, not a request for the patient's full medical history, there is no fee charged for the records (Dkt. No. 6, ¶ 25; Dkt. No. 73-3, ¶ 40). Even with these specific requests for records, it takes time to obtain a patient's medical records from another health care provider and may take a few hours or up to several weeks (Dkt. No. 6, ¶ 26; Dkt. No. 73-3, ¶ 41).

Nothing in the Medical Records Mandate explains what a doctor is to do with these records. Defendants in their filings assert that "[m]edical records pertaining to a woman's past pregnancy history is likely to shed light on whether a woman is seeking a sex-selection abortion. For example, medical records documenting that a woman who had previously been pregnant with two girls and two boys who had abortions of the two girls would be highly probative of whether or not a woman who was currently pregnant with a girl was seeking a sex-selection abortion." (Dkt. No. 22, at 34-35). This factual assertion that medical records "likely" will provide this information is not supported by any record evidence. Record evidence refutes this at this stage of the litigation.

Medical records related to a patient's pregnancy history, especially if any past pregnancy resulted in a miscarriage, an ectopic pregnancy, or an abortion, and not a live birth, would be extremely unlikely to contain any record of the sex of the developing embryo or fetus (Dkt. No. 73-2, ¶ 51). Sex-identification is not a standard part of the medical record and in many instances may not even be known at the time of care (*Id.*). Although possible that historical records regarding a wanted pregnancy terminated only after a fetal diagnosis might reflect the sex of the fetus, that notation under such circumstances would not indicate sex selection (*Id.*). Medical records are not necessary to determine the sex of past pregnancies carried to term; the abortion patient can inform the physician of the sex of any children (Dkt. No. 73-2, ¶ 52).

Given this, medical records from an abortion patient's past pregnancy history would not provide to a physician any information about whether the patient was currently seeking an abortion "solely on the basis of sex," according to Dr. Parker (Dkt. No. 73-2, ¶ 53). If the Medical Records Mandate's requirement applies only to abortion patients who have demonstrated knowledge of the sex in the current pregnancy, according to Dr. Parker, there is no need for any medical record search to attempt to determine the same, and physicians will have made explicit to the patient, as

required by the unchallenged provision of the law, that abortions solely for sex-selection are not permitted (Dkt. No. 73-2, ¶ 56).

Moreover, nothing in the Mandate directs a doctor to use these records to aid in making a determination whether a woman seeks an abortion based solely on gender. That link is not established by the language of the Medical Records Mandate, nor is it established by any evidence in the record.

Defendants further state "[t]he discovery that a woman was seeking a sex-selection abortion may indicate that the woman has a need for counseling or is herself the victim of a coercive domestic partner who demands that she abort any child of a particular sex." (Dkt. No. 23, at 50). Again, there is no support for this in the record.

There also is no evidence in the record from defendants to inform this Court on the ease with which a provider of abortion care could comply with the Medical Records Mandate, as defendants suggest is possible. Instead, the only evidence in the record is that provided by Dr. Hopkins and LRFP, which is based on experience and personal knowledge, and that evidence establishes that compliance with lead to logistical and administrative burdens in efforts to comply. The Court accepts Dr. Hopkins and LRFP's evidence on this point at this stage of the proceeding.

There also is no evidence in the record to counter the Court's conclusion that compliance would implicate the women's confidentiality.

These harms are not dependent on unusual, as-applied circumstances, despite defendants' contention to the contrary (Dkt. No. 23, at 51; Dkt. No. 92, at 61-62). There is no record evidence to support that assertion. That assertion is directly contradicted by the record.

### 4. Undue Burden

The Court concludes that plaintiffs have carried their burden of demonstrating at this stage of the litigation that they are likely to prevail on the merits and to establish that the challenged Medical Records Mandate has the effect of placing a substantial obstacle in the path of women seeking an abortion of a nonviable fetus for whom the Medical Records Mandate is an actual rather than an irrelevant restriction. The record includes sufficient evidence from which Dr. Hopkins and LRFP satisfy their burden to present evidence of causation that the Mandate's requirements will lead to this effect. Therefore, at this stage of the proceeding, the Court determines the Medical Records Mandate is likely unconstitutional.

Previously, this Court determined that "[t]he undue burden analysis requires this Court to 'consider the burdens a law imposes on abortion access together with the benefits those laws confer.'" *Whole Woman's Health*, 136 S. Ct. at 2309. Based on the Court's findings, the Court determined that, under the *Whole Woman's Health* analysis, the Medical Records Mandate has the effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus for whom the Mandate is relevant. The Eighth Circuit remanded to this Court for reconsideration in the light of Chief Justice Roberts's concurring opinion in *June Medical*. Based on the Court's findings and its reconsideration, the Court determines that the Medical Records Mandate has the effect of placing a substantial obstacle in the path of a large fraction of women seeking an abortion of a nonviable fetus for whom the Mandate is relevant. *June Medical*, at 2138. Dr. Hopkins and LRFP are likely to prevail on the merits of their claims that the Medical Records Mandate imposes a substantial and undue burden that is unconstitutional.

### 5. Women Effected

To sustain a facial challenge and grant a preliminary injunction, this Court must find that the challenged Mandate is an undue burden for a large fraction of women for whom the provision

is an actual rather than an irrelevant restriction.  Regardless of how the Medical Records Mandate is construed – whether it effects all 2,000 to 3,000 women in Arkansas seeking an abortion, as Dr. Hopkins and LRFP contend, or only those women who know gender when seeking an abortion, as defendants contend, it creates an undue burden for a large fraction of them.  Compliance with the Medical Records Mandate for these women presents substantial obstacles to abortion care by creating a chilling effect on women seeking abortion care and on Arkansas abortion providers. Record evidence supports that the Medical Records Mandate impermissibly creates delays, very possibly putting abortion care out of reach for women late in pregnancy; increases health risks to women as gestation age advances; contains no health exception for those patients who have serious health complications and require urgent care; breaches patients' confidentiality for the majority of patients who seek it, further deterring their care; and imposes prohibitive logistical requirements and costs on providers.  The vagueness of this Mandate, especially in relation to whom it applies and how long the provider is expected to wait for records, prohibits the Court from deducing fractions of women burdened by the Mandate with any specificity.

If the Medical Records Mandate is intended to apply to all women seeking an abortion in Arkansas, based on record evidence from 2019 which is the last year for which the Arkansas Department of Health published statistics, it will apply to 2,963 women – all of the women who sought an abortion in Arkansas during that year (Dkt. No. 92-16, at 3).  If the Medical Records Mandate requires providers to seek records for all women before providing abortion, the Mandate will substantially burden all women's access.  If the Medical Records Mandate requires providers to seek records only for women who have had prior pregnancies, in 2019 of the 2,963 total abortions in 2019 in Arkansas, 1,042 were obtained by individuals who had not had a previous live birth 1,921 abortions were obtained by individuals who had previously had a live birth (*Id*., at 13).

According to Dr. Hopkins, of the approximately one-third of women in 2015 who had not had a live birth prior to obtaining abortion care, "many" will have had care earlier in their current pregnancy, a previous stillbirth, miscarriage, or abortion, or a previous ectopic or molar pregnancy (Dkt. No. 5, ¶ 32). The Court construes "many" as "a large number of" which is how the term is commonly defined. *Many,* The Oxford Dictionary (10th ed. 2014). All of these figures represent large fractions of the women effected and for whom the Medical Records Mandate will create substantial obstacles to abortion case.

If the Medical Records Mandate is intended to apply only to women who know the sex of the unborn child, as defendants contend, those are the women for whom the law is relevant, and the undue burdens created by the Medical Records Mandate will apply to all of those women; given the gestational age at which patients typically learn the sex, the burdens created will be substantial. The burdens of the Mandate are substantial and create substantial obstacles to abortion for a large fraction of the women for whom the Mandate is relevant, based on the record before this Court for the reasons explained.

## 2. Irreparable Harm

Enforcement of the Medical Records Mandate will inflict irreparable harm on Dr. Hopkins, LRFP, and the large fraction of women for whom the Mandate is relevant as there is no adequate remedy at law. It is well-settled that the inability to exercise a constitutional right constitutes irreparable harm. *See Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977) ("Planned Parenthood's showing that the ordinance interfered with the exercise of its constitutional rights and the rights of its patients supports a finding of irreparable injury.") (citations omitted); *accord Kirkeby v. Furness*, 52 F.3d 772, 775 (8th Cir. 1995) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

In the absence of a preliminary injunction, a large fraction of women in Arkansas for whom the Medical Records Mandate is relevant– whether that is all 2,000 to 3,000 women in Arkansas seeking an abortion if the Medical Records Mandate is construed as Dr. Hopkins contends, or those women who know gender when seeking an abortion, if the Medical Records Mandate is construed as defendants contend—face a substantial and undue burden resulting from the Mandate's obstacles to abortion access. Dr. Hopkins faces the violation of his due process rights due to the enforcement of a vague statute. Therefore, the second requirement for a preliminary injunction enjoining enforcement of the Medical Records Mandate is satisfied.

### 3.    Balancing Of Harms

In the absence of a preliminary injunction, a large fraction of women in Arkansas for whom the Medical Records Mandate is relevant--whether that is all 2,000 to 3,000 women in Arkansas seeking an abortion if the Medical Records Mandate is construed as Dr. Hopkins contends, or those women who know gender when seeking an abortion, if the Medical Records Mandate is construed as defendants contend—face a substantial and undue burden resulting from the Mandate's obstacles to abortion access. Dr. Hopkins faces violation of his due process rights due to the enforcement of a vague statue. Whereas, if a preliminary injunction order issues, a likely unconstitutional law passed by Arkansas legislators will not be enforced. The threatened harm to Dr. Hopkins, LRFP, and the large fraction of women for whom the Mandate is relevant clearly outweighs whatever damage or harm a proposed injunction may cause the defendants.

### 4.    Public Interest

It is in the public interest to preserve the *status quo* and to give the Court an opportunity to evaluate fully the lawfulness of the Medical Records Mandate without subjecting Dr. Hopkins, LRFP, or their patients, or the public to any of the law's potential harms.

The Court notes that the Eleventh Amendment bars relief against an allegedly unconstitutional provision if the named state officials do not have the authority to enforce it. U.S. Const. amend XI; *see also Hutchinson*, 803 F.3d at 957-58. Therefore, the preliminary injunction order does not extend to the private civil-enforcement provisions under the Medical Records Mandate. *See* Ark. Code Ann. § 20-16-1906.

It is therefore ordered that Dr. Hopkins and LRFP's motion for a preliminary injunction order is granted, and defendants are temporarily enjoined from enforcing the provisions of H.B. 1434 referred to here as the Medical Records Mandate.

### C. Local Disclosure Mandate (Count VI, H.B. 2024 as applied to Non-CMA Teenage Patients)

Dr. Hopkins and LRFP seek a preliminary injunction based on an as-applied challenge to the Local Disclosure Mandate in count six, which alleges that the Local Disclosure Mandate violates the Due Process Clause of the United States Constitution by placing an undue burden on Dr. Hopkins and LRFP's patients' right to liberty and privacy.[25]

The Arkansas legislature amended an existing law that required a physician who performed an abortion on a child less than fourteen (14) years of age at the time of the abortion to preserve fetal tissue extracted during the abortion in accordance with rules adopted by the office of the Arkansas State Crime Laboratory. Ark. Code Ann. § 12-18-108(a)(1). The amendment raised the age from fourteen (14) to seventeen (17), requiring physicians who perform abortions on women less than seventeen (17) years of age at the time of the abortion to preserve fetal tissue extracted during the abortion in accordance with rules adopted by the office of the Arkansas State Crime

---

[25] In their current motion for preliminary injunction, plaintiffs do not rely on count eight asserting an informational privacy claim under the Fourteenth Amendment for their request for preliminary injunctive relief, reserving that claim for the merits stage of the case (Dkt. No. 74, at 64 n.32).

Laboratory.  Ark. Code Ann. § 12-18-108(a)(1).  A physician's failure to comply with the law "shall constitute unprofessional conduct under the Arkansas Medical Practices Act," Ark. Code Ann. § 12-18-108(c), and subject the physician to license suspension or revocation and other disciplinary penalties, Ark. Code Ann. § 17-95-409 (2009).  LRFP also faces parallel licensure penalties, should it or its physicians violate the Local Disclosure Mandate or its implementing rules.  Ark. Code Ann. § 20-9-302(b)(3).

The Arkansas State Crime Laboratory has prescribed rules to implement the law, including a requirement that "[a]ll products of conception should be preserved" and immediately frozen, in an air-tight container, with a label that includes "the patient's name and date of birth" and the name of the physician.  Ark. Admin. Code §§ 171.00.2(1)-(2) (2013).  The requirement includes that the "physician must properly establish and maintain the chain of custody for this evidence," by completing a "Fetal Tissue Submission Form," and contacting the local law enforcement where the child resides.  The form includes the name and "address of the victim, [and her] parent and/or legal guardian," her date of birth, and the name and date of birth of the "suspect."  Ark. Admin. Code § 171.00.2(3).  The Arkansas State Crime Laboratory Fetal Tissue Submission Form includes these references to "victim," "suspect," and "parent/legal guardian" (Dkt. No. 1, at 60).  This form is given to local law enforcement, along with the tissue.  Ark. Admin. Code § 171.00.2(3).

The rule for "proper disposal of fetal tissue preserved" under this law requires that "[u]pon completion of DNA analysis, any remaining samples will be disposed of by the Arkansas State Crime Laboratory after receipt of a 'letter of destruction' from the respective investigating agency."  Ark. Admin. Code § 171.00.2(4).  The law does not apply to treatment for spontaneous miscarriage, removal of an ectopic pregnancy, or any other reproductive healthcare—only abortion.  Ark. Code Ann. § 12-18-103(2)(B); Ark. Admin. Code § 171.00.2 (Definitions).

Dr. Hopkins and LRFP bring an as-applied challenge. They do not seek a preliminary injunction regarding enforcement of the preexisting law, which already required them to transmit to local law enforcement identifying information of children less than 14 years old, along with the fetal tissue extracted during the abortion (Dkt. No. 82, ¶¶ 93-94). Instead, Dr. Hopkins and LRFP maintain the as-applied challenge on behalf of patients under the age of seventeen (17) at the time of the abortion for whom there is no basis to report to the state Hotline under the Child Maltreatment Act (Dkt. No. 82, ¶ 94). In other words, plaintiffs "challenge the Mandate's requirements as applied to those 14- to 16-year old patients whose circumstances indicate no sign of sexual or other abuse and therefore are not covered by the reporting requirements of the Arkansas Child Maltreatment Act ('CMA') (the 'Non-CMA Teenage Patients')." (Dkt. No. 74, at 34-35). For consistency, the Court also refers to these individuals as the Non-CMA Teenage Patients.

### 1. Likelihood Of Success On The Merits: Due Process Challenge

#### a. Applicable Law

To determine whether Dr. Hopkins is likely to succeed on his challenge to the Local Disclosure Mandate under the Due Process Clause, this Court applies the undue burden standard. *June Medical Services*, 140 S. Ct. 2103 (plurality opinion); *Whole Woman's Health*, 136 S. Ct. at 2309; *Casey*, 505 U.S. at 877 (plurality opinion). Because this is an as-applied challenge, the Court confines its examination of the application of the Local Disclosure Mandate to that particular context. *Voinovich*, 130 F.3d at 193-94.

#### b. Analysis Of The Local Disclosure Mandate

##### 1. Burdens Imposed On Women

This Court examines whether the Local Disclosure Mandate "has the effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" for whom the Local Disclosure Mandate is a relevant restriction based on this as-applied challenge. *June Medical*, 140 S. Ct. at 2138 (Roberts, J. concurring) (quoting *Casey*, 505 U.S. at 877). For the following reasons, the Court concludes that plaintiffs are likely to succeed in proving that the Local Disclosure Mandate has the effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus for whom the Local Disclosure Mandate is a relevant restriction based on this as-applied challenge.

As originally enacted, the law applied only to women who are 13 years of age or younger at the time of the abortion.[26] The amended law regarding maintaining forensic samples now requires that, for every woman who is less than 17 years of age at the time of the abortion, her physician must: (1) disclose the fact of her abortion to her local police department and (2) preserve all embryonic or fetal tissue from her abortion as "evidence." Ark. Code Ann. § 12-18-108(a)(1). Dr. Hopkins and LRFP challenge the new requirements only as applied to Non-CMA Teenage Patients who are those women ages 14, 15, and 16 whose sexual activity indicates no potential sexual abuse and, therefore, are not covered by the reporting requirements under the Arkansas Child Maltreatment Act. *See generally* Ark. Code Ann. §§ 12-18-401 *et seq*.

According to plaintiffs, the sexual activity of 14 to 16 year old women does not constitute reportable "sexual abuse" under Arkansas law when it takes place with a similar-age partner or

---

[26] Arkansas law makes a distinction if the victim is above or below the age of 14. Under Arkansas law, if the victim is below the age of 14, in a prosecution for statutory rape, the statute does not create a presumption of intent depending on the victim's age. Proof of intent regarding the victim's age is not required because statutory rape is a strict liability crime, although there are certain affirmative defenses available depending on the age of the accused. Ark. Code Ann. §§ 5-14-102(b), 103(a)(4); *see also Gaines v. State*, 118 S.W.3d 102 (Ark. 2003).

that teenager's spouse, and not with a caretaker or involving forcible compulsion.  *See, e.g.,* Ark. Code Ann. §§ 12-18-103(20)(B) -103(20)(C).  Such similar-age consensual sexual activity does not constitute criminal activity.  Ark. Code Ann. §§ 5-14-101 (2017), 103 (2017), 110 (2019), 124 (2019), 125 (2019), 126 (2019), 127 (2019).  For 16-year-old women, because Arkansas does not regulate the age of their consensual sexual partners; abuse reporting or criminality arises for 16-year old women when the person involved uses force or is a caretaker or other person in a similar relationship of power.  Ark. Code Ann. §§ 5-14-101(2017), 103 (2017), 110 (2019), 124 (2019), 125 (2019), 126 (2019), 127 (2019).

The Local Disclosure Mandate requires the physician to disclose the Non-CMA Teenage Patient's abortion to her local law enforcement and mandates retention of tissue from her abortion indefinitely in a crime laboratory, even when facts indicate no potential abuse or criminality.  The Local Disclosure Mandate does not specify what happens to the tissue collected at the Arkansas State Crime Lab or any restrictions on its use (Dkt. No. 73-3, ¶ 71).  Regarding the proper disposal of the fetal tissue, the Local Disclosure Mandate assumes that the context is always criminal or an abuse investigation.  That is not the case for all Non-CMA Teenage Patients.

The sexual partner of the Non-CMA Teenage Patients would be a consensual partner, typically of the same age or similar age and, based on these cited provisions of Arkansas law, would not be a criminal or abuse suspect, just as the patient would not be a victim.  LRFP, as a part of its routine counseling, discusses with the woman the age of her sexual partner (Dkt. No. 6, ¶ 38; Dkt. No. 73-3, ¶ 59).

As a matter of course, physicians do not disclose the fact that a patient has sought confidential abortion care to any member of the patient's local community (Dkt. No. 73-2, ¶ 63).  Dr. Parker avers that virtually all patients are desperate to keep the fact of their abortion private

(Dkt. No. 73-2, ¶ 59). Record evidence indicates that confidentiality is a bedrock principle of medical practice because it is foundational to the physician-patient relationship; patients must be able to share relevant information with the physician, so that the physician can provide the best care, and trust that the physician will keep that information confidential (Dkt. No. 73-2, ¶ 60 (citing *AMA Code of Medical Ethics Opinion 3.2.1: Confidentiality,* Am. Med. Ass'n, https://www.ama-assn.org/delivering-care/ethics/confidentiality (last visited Nov. 12, 2020)). These foundational protections extend not only to adults but also to minors accessing reproductive health care (*Id.*). Plaintiffs recognize exceptions to this principle (*Id.*).

Under the Child Maltreatment Act, plaintiffs report suspected abuse to the Arkansas State Police's Child Abuse Hotline (Dkt. No. 6, ¶ 38; Dkt. No. 73-3, ¶ 59). *See* Ark. Code Ann. § 12-18-402 (providing that mandated reporters "shall immediately notify the Child Abuse Hotline" if they have reasonable cause to suspect child abuse and listing reproductive healthcare facility employees and volunteers as mandatory reporters). Unlike the State Child Abuse Hotline, which is associated with a unit whose staff have specialized training in child maltreatment and handling these complicated issues, local law enforcement does not have the same kind of specialized unit or training (Dkt. No. 6, ¶ 43; Dkt. No. 73-3, ¶ 67). Record evidence indicates that plaintiffs take seriously their obligation as mandatory reporters of any suspicion of child abuse, whether sexual or otherwise, and recognize that clinicians' mandatory reporting of suspicions of child abuse is one of the limited, but important, exceptions to confidential health care of any kind (Dkt. No. 73-2, ¶ 68-69). Plaintiffs have experience cooperating with law enforcement during active criminal investigations and are well-versed in assisting victims when criminal allegations have been made (Dkt. No. 73-2, ¶ 70; Dkt. No. 73-3, ¶60). Having reviewed the record evidence submitted by

defendants, defendants present nothing to refute plaintiffs' record evidence on these points with respect to mandatory reporting and cooperating with law enforcement in these contexts.

In general, when a crime has already been reported, law enforcement are involved before the minor or adult victim visits LRFP, and law enforcement call LRFP before the minor or adult patient arrives. When an investigation is involved, LRFP preserves tissue for law enforcement (Dkt. No. 6, ¶ 39; Dkt. No. 73-3, ¶ 60). Under these circumstances, LRFP are not initiating the process or making phone calls to local law enforcement who are not already involved; when there is an active investigation, according to Ms. Williams law enforcement is responsive (Dkt. No. 73-3, ¶ 60).

Ms. Williams avers that complying with current Arkansas law for patients who are 13 or younger makes her "uncomfortable" because she is "disclosing to people in the patient's community – people who may know her and her family – that she has had an abortion." (Dkt. No. 73-3, ¶ 68). Ms. Williams describes a past incident when a patient's relative worked for the local police department to whom Ms. Williams had to make that disclosure (*Id.*). Local law enforcement can be very small, with as few as two officers, and operate in small communities (Dkt. No. 6, ¶ 45; Dkt. No. 73-3, ¶ 68). On occasion, when a LRFP representative has spoken to local law enforcement about the existing law, personnel lecture the LRFP and "preach[] anti-abortion rhetoric, including telling [the representative] that the Clinic is taking a life." (Dkt. No. 6, ¶ 43; Dkt. No. 73-3, ¶ 66).

Under Arkansas law, a woman under the age of 18 must obtain the consent of one parent prior to obtaining an abortion or, alternatively, can seek a judicial bypass (Dkt. No. 6, ¶ 36; Dkt. No. 73-3, ¶ 57). *See* Ark. Code Ann. § 20-16-804. In 2016, LRFP provided abortions to five minors under the age of 14, all five of whom had parental consent, and 69 minors under the age of

17, all of whom except one had parental consent with the one exception having received a judicial bypass (Dkt. No. 6, ¶ 36). In 2019, LRFP provided abortions to five minors under the age of 14, all five of whom had parental consent, and 53 minors under the age of 17, all of whom except two had parental consent with the two exceptions having received a judicial bypass (Dkt. No. 73-3, ¶ 57). Record evidence supports that the numbers from 2016 and 2019 are typical for LRFP in that the majority of women under the age of 17 have obtained a parent's consent to seek medical care at LRFP (Dkt. No. 6, ¶ 36; Dkt. No. 73-3, ¶ 57).

The Local Disclosure Mandate provides parents, who almost always accompany 14 to 16 year old patients, that they have no choice with respect to the Local Disclosure Mandate and that their name and address will also be disclosed to local police in connection with the abortion and kept on file at the Arkansas State Crime Laboratory (Dkt. No. 73-2, ¶ 64). In Arkansas, almost all patients in this affected 14 to 16 year old age group are receiving abortion care with a parent involved. Some may have husbands involved, as well. A few minor patients of LRFP are married, and those patients' husbands may or may not be involved in the patients' decisions to have an abortion (Dkt. No. 6, ¶ 37; Dkt. No. 73-3, ¶ 58).

The required disclosure to local law enforcement of this information creates heightened concerns for those few teenagers who rely on the judicial bypass so that they need not involve a parent in their abortion decision; the young women who, along with one parent or guardian, decide not to inform another parent or household member because of concerns; and other young women living under circumstances that might expose them to physical or other serious harm should the fact of their abortion or sexual activity become known in their home or local community (Dkt. No. 3, at 20). The Local Disclosure Mandate has no exception for those few 14 to 16 year old patients

who use judicial bypass to access abortion and do not disclose their abortion to a parent (Dkt. No. 73-2, ¶ 65; Dkt. No. 73-3, ¶ 70).

For all Non-CMA Teenage Patients, physicians would have to disclose and explain during their pre-abortion counseling the Local Disclosure Mandate's requirement of local law enforcement reporting and tissue transmittal (Dkt. No. 5, ¶ 50; Dkt. No. 6, ¶ 46; Dkt. No. 73-2, ¶ 72; Dkt. No. 73-3, ¶ 70). When initially meeting with patients seeking abortion care, including 14 to 16 year old patients, plaintiffs describe each step of care that will be provided and answer any questions the patient may have. If the Local Disclosure Mandate takes effect, plaintiffs aver that they will have to describe at that time the required notification to local police departments, the preservation of tissue as evidence, the information about their private lives that will go along with that tissue, and the eventual storage of that tissue and possible DNA testing at the Arkansas State Crime Laboratory. These Non-CMA Teenage Patients' sexual activity does not implicate child abuse concerns or criminal law.

This discussion of law enforcement contact and "evidence" collection would be distressing, punitive, confusing, and likely humiliating for these women and their families, based on record evidence before the Court (Dkt. No. 73-2, ¶ 67; Dkt. No. 73-3, ¶ 70). The required notice of abortion and transmittal of "crime lab" evidence will stigmatize these women and potentially subject them to a range of negative reactions that can occur in response to the revealed decision to end a pregnancy (Dkt. No. 73-2, ¶ 73). There is record evidence of the stigmatizing treatment these women may receive (Dkt. No. 6, ¶¶ 27-28; Dkt. No. 73-7).

Absent any indication of child maltreatment, providing information to local law enforcement is itself a harm (Dkt. No. 3, at 20; Dkt. No. 73-5, ¶¶ 40-43). S*ee generally Lambert v. Wicklund*, 520 U.S. 292, 295 (1997) (if an abortion statute requires parental consent, a judicial

bypass that "ensure[s] the minor's anonymity" is required to satisfy constitutional requirements); *Casey*, 505 U.S. at 894 (recognizing an undue burden of spousal notification requirement on married women who seek an abortion without such disclosure; a "significant number of women. . . are likely to be deterred from procuring an abortion as surely as if the Commonwealth had outlawed abortion"); *Thornburgh v. Am. Coll. of Ob. & Gyn.*, 476 U.S. 747, 766-67 (1986) (emphasizing that a "woman and her physician will necessarily be more reluctant to choose an abortion if there exists a possibility that her decision and her identity will become known" to third parties), *overruled in part on other grounds, Casey*, 505 U.S. at 881. While officers will presumably treat such information as confidential, once the information is known by local community members and written on required documents, there are risks to these young women's privacy, which can engender fear on the part of these young women which contention is supported by record evidence (Dkt. No. 5, ¶ 47; Dkt. No. 6, ¶ 45; Dkt. No. 73-5, ¶ 42).

In Dr. Parker's opinion, the Local Disclosure Mandate's requirements will also create ongoing fear in his patients, given that the law "does not merely preserve 'evidence,' but labels that evidence with the patient's name and requires explicit notice to a local police officer in communities that may be very small" that these young women have chosen abortion and turns over their medical care details and the tissue from the procedure to remain in law enforcement custody indefinitely (Dkt. No. 73-2, ¶ 74-76; 73-3, ¶ 70).

To prevent notice to local law enforcement, some Non-CMA Teenage Patients may forgo abortion care or at least significantly delay their care, including by seeking a procedure out of state (Dkt. No. 5, ¶ 50; Dkt. No. 6, ¶ 46; Dkt. No. 73-2, ¶ 75; Dkt. No. 73-5, ¶¶ 40-41). According to Dr. Parker, many 14 to 16 year old patients will have had limited experience with the health care system prior to their abortion, and he expresses concern that the Local Disclosure Mandate's

requirements may have a lasting negative impact on the patients' willingness to seek out health are in the future (Dkt. No. 73-2, ¶ 77).

Plaintiffs submit an affidavit from Lauren J. Ralph, Ph.D., M.P.H., who is offered as an expert and who currently conducts "research that examines the context in which women, and in particular adolescents, experience and make decisions around pregnancy and childbirth, and the consequences of early and unintended childbearing on women's health and well-being" (Dkt. No. 73-5, ¶ 4). Dr. Ralph offers the opinion that the Local Disclosure Mandate "will significantly add to the obstacles that the Non-CMA Teenage Patients face in accessing abortion care. It will delay care, add medical risks, impose new stigma and fears, and for some, prevent them from accessing the abortion that they want." (Dkt. No. 73-5, ¶ 11). Dr. Ralph opines that the "Local Disclosure Mandate breaches patient confidentiality and injects policing into health care in ways that will harm patients in both the near and long term." (*Id.*).

According to Dr. Ralph, abortion statistics among adolescents in Arkansas track those in the United States (Dkt. No. 73-5, ¶ 17). Dr. Ralph explains that adolescent abortion patients in Arkansas, like adult patients in the state and nationally, are disproportionately people of color; for example, according to Dr. Ralph 50% of Arkansas abortion patients aged 16 years and under were African American in 2019 (Dkt. No. 73-5, ¶ 18). She explains that "[t]his reflects the effects of many layers of inequality in American health care and society. People of color, for example, experience higher rates of unintended pregnancies, in part because they face more barriers to accessing highly effective contraceptive methods, including barriers rooted in discrimination." (*Id.*). Dr. Ralph also explains that, like adult abortion patients, adolescent patients disproportionately come from poor and low-income households based on national research (Dkt. No. 73-5, ¶ 19).

In Arkansas today, adolescents already tend to have abortions later in pregnancy, based on Dr. Ralph's assessment (Dkt. No. 73-5, ¶ 21). According to Dr. Ralph, these figures are consistent with prior research on the national level, which pointed to a combination of factors pushing adolescent abortions later in pregnancy (Dkt. No. 73-5, ¶ 22). Based on research, it takes adolescents an average of one week longer than older women to suspect and confirm they are pregnant (Dkt. No. 73-5, ¶ 23). The need to involve at least one parent and obtain that parent's consent or obtain a judicial bypass also like contributes to delay, according to Dr. Ralph (Dkt. No. 73-5, ¶ 24). According to Dr. Ralph, the vast majority of adolescent patients in Arkansas do involve at least one parent in their abortion care, but those patients may decide not to involve both parents for reasons including fear of violence, loss of financial support, verbal abuse, or other punitive reactions by the second parent (Dkt. No. 73-5, ¶ 33). Based on a multi-year study over time, approximately 10% of minor patients in Arkansas obtain judicial bypass (Dkt. No. 73-5, ¶ 25). Dr. Ralph recognizes that delays in abortion care for adolescents will add medical risk, high costs for more complex procedures, and other accompanying challenges, including additional clinic visits and possible travel for greater distances from home or for lengthier periods to obtain that care (Dkt. No. 73-5, ¶ 26).

According to Dr. Ralph, adolescents value confidentiality in reproductive health care, seeking to maintain personal autonomy over whether and to whom they disclose their decision to seek an abortion (Dkt. No. 73-5, ¶ 27). Dr. Ralph avers that adolescent abortion patients fear involuntary exposure of their pregnancy and abortion to others (Dkt. No. 73-5, ¶ 34). Dr. Ralph relies on a large body of literature that demonstrates that young people are more likely to delay or forgo seeking health care services if confidentiality is not guaranteed (Dkt. No. 73-5, ¶ 28). Based on research, Dr. Ralph also avers that involuntary disclosure of pregnancy and an adolescent

patient's decision to have an abortion can be especially problematic if the disclosure is to someone who the young person may not know well or does not have an existing relationship with (Dkt. No. 73-5, ¶ 35).  Dr. Ralph cites a study of over 4,000 U.S. abortion patients which indicated that nearly two-thirds reported that people would look down on them if they knew they had an abortion (Dkt. No. 73-5, ¶ 36).

Dr. Ralph cites research that shows that, if adolescents face an age-based legal requirement to involve a parent in their abortion care, the adolescents may instead delay their care – if possible—to age out of the requirement, even though that adds medical risk, continued experience of pregnancy, and cost (Dkt. No. 73-5, ¶ 29).  Dr. Ralph cites research at the national level that confirms some adolescents will carry their pregnancies to term rather than comply with a parental involvement or judicial bypass requirement for abortion (Dkt. No. 73-5, ¶ 30), and others may travel to another state for care in order to avoid disclosing their pregnancy and abortion decision to a parent (Dkt. No. 73-5, ¶ 31).

Dr. Ralph also cites "evidence that experiencing barriers to abortion care – in the form of state-level restrictions, cost, or long distance to a provider – are associated with more searches for information about, consideration of, and attempts at self-managed abortion (defined as abortion obtained outside the formal health care system), which in some circumstances may not be safe" (Dkt. No. 73-5, ¶ 32).

Dr. Ralph opines that the Local Disclosure Mandate "forces disclosure of sexual intercourse, pregnancy, and an abortion to a teenage patient's local police, even when no crime has been reported or is indicated to clinic staff, who are mandatory sexual abuse reporters.  The law's characterization of the patient as a 'victim,' her sexual partner as a 'suspect,' and her products of conception as criminal evidence add additional stigmatization, beyond whatever the

patient might feel regarding abortion and the disclosed sexual activity. The law adds policing to health care in a manner that will feel threatening and judgmental to many patients, engender fear in them, and magnify the stress and trauma they may have already experienced in interactions with law enforcement" (Dkt. No. 73-5, ¶ 37).

Dr. Ralph also opines that "[c]onfidence and trust in police are nationally at a record low. . . . This is particularly marked for adolescent of color. . . . Teenagers have increasingly come to view the police as harmful to their safety. Over the last few years, well-publicized police confrontations resulting in death or serious injury and national protests in response may have amplified this view for young people, while also highlighting within the medical community the need to treat over-policing as a public health issue." (Dkt. No. 73-5, ¶¶ 38-39).

Dr. Ralph explains: "My experience studying adolescent abortion patients and all of the research summarized above leads me to conclude that, once adolescents learn of the Mandate's requirements, some of those patients will experience significant delay in completing their abortions and other may be dissuaded from doing so altogether." (Dkt. No. 73-5, ¶ 40). She also opines that "[s]ome older 16-year olds will delay their care, including for week or months, to age out of the requirement. Other patients will attempt to travel out of state, which will impose delay because of the added travel, cost, and planning involved. Some may search for and/or unsuccessfully attempt self-managed abortion, or search in vain for some other 'work around.' Any of these results will delay the patients' time-sensitive abortion care and add medical risk for them." (Dkt. No. 73-5, ¶ 41).

Dr. Ralph also offers that, "many, if not most, of the Non-CMA Teenage Patients who complete abortion care in Arkansas will suffer ongoing fear and anxiety, knowing that the local police department has been informed of their abortion care and that criminal evidence collection

has occurred. They will be left with ongoing concern about the possibility of police harassment, further breaches of their confidentiality, and further law enforcement activity. The Mandate will cause fear and stigma even if the local police take no such action. The forced exposure of those patients' private activity and confidential medical care to outsiders in their community, as a condition of their receiving abortions in Arkansas, also is likely to cause some to avoid health care or conceal information from health care providers in the future, further jeopardizing their health in that way." (Dkt. No. 73-5, ¶ 42).

The opinions Dr. Ralph offers and the evidence, research, and statistics upon which she relies are unrefuted by defendants at this stage of the litigation.

Dr. Katz offers the overall opinion that enforcement of the Mandates challenged by plaintiffs in this case would impose logistical and financial obstacles that harm poor and low-income women in the following ways: preventing some from being able to obtain and abortion; delaying other women's access to that care; jeopardizing women's confidentiality and/or employment; increasing the risk that victims of domestic violence will experience physical violence or other abuse; and putting women and their families at risk of deepening poverty, hunger, or eviction (Dkt. No. 73-4, ¶ 10). She supports her opinion in a detailed, 75-paragraph affidavit (Dkt. No. 73-4). Dr. Katz offers the opinion that, "the increased costs, additional time, logistical challenges, and social-psychological hurdles imposed by the [Mandates plaintiffs challenge] are precisely the kind of challenges that delay women from accessing needed services, or prevent them from accessing such services altogether. Even the poor and low-income women who are able to raise funds to pay for an unexpected medical expense like abortion have to make difficult choices about where to get that additional money and what they are willing to sacrifice in order to raise the necessary funds. These choices put poor and low-income women at greater risk in terms of their

safety, physical and emotional well-being, and the confidentiality of their decisions." (Dkt. No. 73-4, ¶ 75). Dr. Katz's opinions also are unrefuted by defendants at this stage of the litigation.

Plaintiffs argue that the Local Disclosure Mandate can be read to bar medication abortion for patients under 17 years of age through its mandate that "[a]ll products of conception" be preserved (Dkt. No. 3, at 18; *see also* Dkt. No. 74, at 41). With medication abortion, a physician cannot collect and preserve "[a]ll products of conception" and thus would risk violating this law and its implementing Rules if performing a medication abortion. *See* Ark. Admin. Code § 171.00.2(1) (2014). Consistent with applicable standards of care and when appropriate, Dr. Hopkins and LRFP offer 14 to 16 year old women medication abortion (Dkt. No. 5, ¶ 52). After counseling, and in nearly all cases with the assistance of an involved parent or guardian, many women decide that medication abortion is a better choice for them (Dkt. No. 5, ¶ 52; Dkt. No. 6, ¶ 36). In certain instances, these women prefer or will better tolerate medication abortion, for example if the woman has never had a pelvic exam, or when uterine anomalies or high body mass index are present (Dkt. No. 5, ¶ 52).

The Local Disclosure Mandate nowhere specifies that medication abortion is excluded and can proceed, despite the physicians and LRFP's inability to preserve tissue and given that the rules implementing the Local Disclosure Mandate refer to abortion by medication (Dkt. No. 73-2, ¶ 79; Dkt. No. 73-3, ¶ 72). Defendants take the position in this litigation that the Local Disclosure Mandate does not apply to medication abortion but instead only to procedural abortion. "Mid-litigation assurances are all too easy to make and all too hard to enforce, which probably explains why the Supreme Court has refused to accept them." *Williamson*, 900 F.3d at 1328 (citing *Stenberg*, 530 U.S. at 940-41 (rejecting the Attorney General's interpretation of the statute and warning against accepting as authoritative a state's litigation position when it does not bind state

courts or law enforcement authorities)). Even if the Local Disclosure Mandate applies only to medication abortion as defendants argue, this proposed narrowing does not alleviate the burdens identified that impact the Mandate's constitutionality.[27] Further, even if the Local Disclosure Mandate applies only to non-medication abortion as defendants contend, according to Dr. Parker it "condemns only those patient's choosing procedural abortion, or who are later in their pregnancy and cannot access medication abortion, to the invasion of privacy and humiliation. . . mak[ing] one particular medical method trigger significant consequences for the patient when another method accomplishing the same result does not." (Dkt. No. 73-2, ¶ 80).

The Court rejects the formulation of the undue burden test advocated by defendants in this case for this as-applied challenge, and the Court observes that unrefuted record evidence at this stage of the litigation regarding the undue burden created by the Local Disclosure Mandate offered by plaintiffs is similar to that found sufficient by the Supreme Court in *Casey* to uphold a facial challenge to an abortion regulation. *See generally* 505 U.S. at 887-898.

### 2. State's Interest

No legislative findings accompany the Local Disclosure Mandate. The Court does not have an explanation from the legislature of the purpose of the law. The State of Arkansas argues that the law advances the interests of protecting children from sexual abuse and in prosecuting those who sexually exploit them (Dkt. No. 23, at 49; Dkt. No. 92, at 66). Although the Court disagrees with defendants' conflation of *Casey*'s inquiry of whether the State has a "legitimate

---

[27] The Court refers to, and will not repeat here, its prior footnote in this Order examining the doctrine of abstention. Here, although defendants appear to proffer a narrowed construction of the Local Disclosure Mandate that would exclude its application to medication abortion, for the reasons explained in this Court's Order, even that narrowing if permissible under Arkansas law would not avoid the constitutional questions plaguing the Local Disclosure Mandate. Further, this Court does not pass on whether that narrowing is permissible under Arkansas law and determines that it need not to resolve plaintiffs' current motion for preliminary injunction on this claim.

purpose" and whether the law is "reasonably related to that goal" and rational basis review, the Court assumes the legitimacy of these interests. *Whole Woman's Health*, 136 S. Ct. at 2310 (assuming that the State had legitimate state interests where the statute did not contain any legislative findings

### 3. "Legitimate Purpose" To Which The Law Is "Reasonably Related"

This Court examines whether the Local Disclosure Mandate has a "legitimate purpose" and whether it is "reasonably related" to that goal. *June Medical*, 140 S. Ct. at 2138 (Roberts, J., concurring). Generally, the state has the burden of demonstrating a link between the legislation it enacts and what it contends are the state's interests. *See Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 430 (1983), *overruled on other grounds by Casey*, 505 U.S. 833 (describing the burden as that of the state).

The State of Arkansas maintains that the Local Disclosure Mandate applies only to surgical abortions where a physician extracts fetal tissue, not to medication abortion (Dkt. No. 22, at 49). Defendants maintain that a woman will not be obstructed from obtaining an abortion by these regulations. Defendants contend that the Local Disclosure Mandate "rationally promotes the health and safety of young women who have had an abortion and does not require disclosures that are either broad or public" and therefore "does not create an undue burden on the decision of whether or not to have an abortion." (Dkt. No. 23, at 67). The Court disagrees. In support of this argument, defendants submit newspaper articles, articles, and other documents with no sponsoring witnesses to explain, among other things, the relevance of these exhibits to abortion care in Arkansas today or the legal and factual issues contested by the parties in this case (*See* Dkt. No. 25-2; Dkt. No. 25-7; Dkt. No. 25-8; Dkt. No. 25-9; Dkt. No. 25-10; Dkt. No. 30-1; Dkt. No. 92-1; Dkt. No. 92-2; Dkt. No. 92-3; Dkt. No. 92-4; Dkt. No. 92-5; Dkt. No. 92-6; Dkt. No. 97-6; Dkt.

No. 92-7; Dkt. No. 92-8; Dkt. No. 92-9; Dkt. No. 92-18; Dkt. No. 92-20). The Court has reviewed these exhibits as defendants cite them most recently with respect to the Local Disclosure Mandate (Dkt. No. 92, at 15-17), and all documents and filing submitted by the parties, and afforded all appropriate weight.

This Court concludes that plaintiffs are likely to succeed in demonstrating that the Local Disclosure Mandate serves no valid state purpose as applied to Non-CMA Teenage Patients, those 14 to 16 year old women who become pregnant through consensual sexual intercourse with, for example, a teenager of the same age, on whose behalf plaintiffs challenge the Mandate. The Non-CMA Teenage Patients' health care is purely a private matter. There is no mandatory reporting required, and there is no role for local law enforcement or the Arkansas State Crime Laboratory under those circumstances. The State of Arkansas argues that the law advances the interests of protecting children from sexual abuse and in prosecuting those who sexually exploit them (Dkt. No. 23, at 49). There exists no state interest in addressing child abuse and criminal conduct in these situations. Under *Casey* and *Whole Woman's Health*, there is no "constitutionally acceptable" interest when the Local Disclosure Mandate is applied to Non-CMA Teenage Patients.

When the General Assembly first enacted Arkansas Code Annotated § 12-18-108, it applied exclusively to abortions involving girls age 13 and under and targeted "sexual crimes on child victims" and "sexually predatory adults." H.B. 1447 1(a), (b) (Findings and Purposes), 89th Gen. Assemb., Reg. Sess. (Ark. 2013). It was directed at "reporting medical facilit[ies]" and explicitly contemplated that its application was co-extensive with mandatory reporting. *Id.*, (1)(b)(3), (5). That focus on girls ages 13 and under also tracked the criminal threshold for statutory rape. Ark. Code Ann. § 5-14-103(a)(3)(A) (2013).

The Local Disclosure Mandate greatly expands the reach of this section, without justification, to non-criminal, non-reportable activity that is affirmatively constitutionally protected: abortions sought by Non-CMA Teenage Patients after sexual activity under circumstances indicating no form of sexual abuse. Further, plaintiffs maintain that, in terms of noticing possible abuse and revealing sexual activity, there is no difference between teenagers seeking abortion care and those seeking care for miscarriage, sexually transmitted infections, contraception, or prenatal care, but only abortion patients are targeted by the Local Disclosure Mandate, including Non-CMA Teenage Patients for whom there is no indication at all of actual abuse (Dkt. No. 74, at 36). The Local Disclosure Mandate applies only to patients seeking abortion care; it does not impose the same requirements on miscarriage or ectopic pregnancy care for young people, or for obstetrics care, even though the patients are of the same age and their reproductive health care likewise reveals prior sexual activity (Dkt. No. 73-2, ¶ 78). The Court finds this regardless of whether the Local Disclosure Mandate prohibits medication abortion for all 14, 15, and 16 year old patients as plaintiffs contend, or not.

Defendants maintain that "there is no basis outside of [Dr.] Hopkins's subjective judgment for defining a 'discrete and well-defined' class of children to whom [this portion of the law] may be unconstitutionally applied." (Dkt. No. 23, at 65). When arguing this, defendants assert that "an abortion provider is not in the best position to identify many victims of sexual abuse. Local law enforcement are in a much better position to make a judgment concerning whether children are victims of sexual abuse." (*Id.*). There is no evidentiary support in the record for these assertions. These assertions are contradicted by Dr. Hopkins's role, and all doctors' roles, as mandatory reporters under existing Arkansas law.

The Arkansas Child Maltreatment Act includes detailed definitions of sexual abuse and sexual exploitation. This Act already enlists mandatory reporters such as Dr. Hopkins, Dr. Parker, and the staff of LRFP to report to the specialized state Child Abuse Hotline whenever there is an indication that a child may be the victim of maltreatment. The class of children to whom the Local Disclosure Mandate may be unconstitutionally applied is defined by the Child Maltreatment Act itself, under current Arkansas law, not Dr. Hopkins's "subjective judgment," as defendants contend.

Defendants point out that "law enforcement officers operate under codes of confidentiality that prevent improper public disclosures of sensitive information." (Dkt. No. 23, at 66-67). In pertinent part, defendants assert that the Law Enforcement Code of Ethics requires, "Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty." (Dkt. No. 23, at 67). Defendants also assert that records kept by the Arkansas State Crime Laboratory are privileged and confidential under Ark. Code Ann. § 12-12-312 and that such records can "be released only under the direction of a court of competent jurisdiction, the prosecuting attorney having criminal jurisdiction over the case, or the public defender appointed or assigned to the case." Ark. Code Ann. § 12-12-312(a)(1)(A)(ii).

However, Arkansas state law already determined the central repository for any suspicions of child maltreatment – the state Child Abuse Hotline, which is run by a specially trained unit of the State Police, along with the Department of Human Services. In fact, local law enforcement are themselves mandatory reporters to the state Child Abuse Hotline. If local law enforcement have information sufficient to raise suspicions of illegal sexual activity, then local law enforcement officers must raise their suspicions with the state Child Abuse Hotline, which then coordinates any

investigation and response. Ark. Code Ann. §§ 12-18-402(a)(1)(A), (b)(13). There is record evidence that supports this system of reporting to the Child Abuse Hotline is a better method, given how it is staffed and that those staffers are better trained than local law enforcement to address abuse allegations (Dkt. No. 6, ¶¶ 41, 43, 45; Dkt. No. 73-3, ¶¶ 38, 59, 61-67). Ms. Williams avers that, since the law that applies to patients who are 13 or younger has been in effect in Arkansas, LRFP has never been contacted about the use in any active crime investigation of fetal tissue obtained under the law and stored at the Arkansas State Crime Laboratory (Dkt. No. 73-3, ¶ 69).

There is no record evidence to the contrary on these points.

Plaintiffs maintains that the Local Disclosure Mandate is irrelevant to ensuring that law enforcement in Arkansas will continue to have the full cooperation of Dr. Hopkins, Dr. Parker, and LRPF in collecting tissue evidence in situations like these, where there are facts indicating rape, of a patient of any age, or other sexual abuse (Dkt. No. 5, ¶ 43; Dkt. No. 6, ¶¶ 35, 38-39; Dkt. No. 73-3, ¶ 59).

For Non-CMA Teenage Patients, there are no facts indicating abuse. There is no required reporting under Arkansas's Child Abuse Hotline, and thus, for Non-CMA Teenage Patients, the Local Disclosure Mandate "separately intervenes to require disclosure to local police in the teenager's hometown, of those purely private facts of an abortion and earlier sexual activity." (Dkt. No. 32, at 55). This same type of reporting to local law enforcement is not required under the Local Disclosure Mandate for those seeking care for miscarriage, sexually transmitted infections, contraception, or prenatal care – only abortion care.

Defendants point out that the statute requires that, "[b]efore submitting the tissue under subdivision (a)(1) of this section, the physician shall redact protected health information as required under the [federal] Health Insurance Portablity and Accountability Act of 1996," but that

reference to redaction may be misleading (Dkt. No. 23, at 66). Ark. Code Ann. § 12-18-108(a)(2). The Local Disclosure Mandate, and its implementing Rules, specifically require that personal information accompany the "evidence" collected, and HIPPA allows such disclosures made to law enforcement pursuant to state law. Here, the Local Disclosure Mandate and its implementing Rules require disclosure of the woman's abortion to local law enforcement in her home jurisdiction, infinite storage of tissue labeled with her name on it, and use of a Fetal Tissue Transmission Form, which includes not only her name, but her parent's name, her home address, and the name of the "suspect," her sexual partner. HIPAA does not appear to permit redaction here.

"[R]ecordkeeping and reporting provisions that are reasonably directed to the preservation of maternal health and that properly respect a patient's confidentiality and privacy are permissible." *Casey*, 505 U.S. at 900. The local disclosure of a teenager's identity, her address, her parents, her sexual partner, and the tissue from her abortion as contemplated by the Local Disclosure Mandate does not equate to, and is much more invasive than, the anonymous reporting and record-keeping about abortion upheld in *Casey*, 505 U.S. at 900, and in various states to serve public health purposes, including Arkansas.

As defendants note, the Local Disclosure Mandate applies to minors who receive an abortion who already have either parental consent or a judicial bypass. Ark. Code Ann. §§ 20-16-804 and 20-16-809. Defendants claim that "[i]t is unlikely that a child who – having obtained parental consent or judicial bypass – will be deterred from obtaining an abortion merely because the law requires her name to be transmitted to local law enforcement and the fetal remains preserved after the fact." (Dkt. No. 23, at 66). There is no factual support in the record for this assertion.

Instead, there is factual support in the record that "many" patients of LRFP "are desperate not to disclose the reasons for travel and appointments to seek abortion care." (Dkt. No. 6, ¶ 8; Dkt. No. 73-3, ¶ 19). Further, there is record evidence that some women specifically request that LRFP not seek medical records from another healthcare provider because the women do not want that provider to know of the pregnancy and abortion decision (Dkt. No. 6, ¶ 27; Dkt. No. 73-2, ¶59). Some women fear hostility or harassment from the other healthcare providers for deciding to seek an abortion (Dkt. No. 6, ¶ 28; Dkt. No. 73-2, ¶ 59; Dkt. No. 73-3, ¶ 44). There is evidence that, even documents meant to be confidential, such as medical record requests, can be disclosed and result in efforts to dissuade women from obtaining abortions (Dkt. No. 6, ¶ 28; Dkt. No. 73-3, ¶ 44). The opinions offered by Dr. Ralph and others in this record refute defendants' unsupported assertion at this stage of the litigation (Dkt. No. 73-5). All of this record evidence supports the chilling effect the Local Disclosure Mandate will have on Non-CMA Teenage Patients who seek abortion care.

### 4. Undue Burden

The Court concludes that plaintiffs have carried their burden of demonstrating at this stage of the litigation that they are likely to prevail on the merits and to establish that the challenged Local Disclosure Mandate has the effect of placing a substantial obstacle in the path of women seeking an abortion of a nonviable fetus for whom the D&E Mandate is an actual rather than an irrelevant restriction in this as-applied challenge filed on behalf of Non-CMA Teenage Patients.

Previously, this Court determined that "[t]he undue burden analysis requires this Court to 'consider the burdens a law imposes on abortion access together with the benefits those laws confer.'" *Whole Woman's Health*, 136 S. Ct. at 2309. Based on the Court's findings, the Court determined that, under the *Whole Woman's Health* analysis, the Local Disclosure Mandate as

applied to Non-CMA Teenage Patients has the effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus for whom the Mandate is relevant. The Eighth Circuit remanded to this Court for reconsideration in the light of Chief Justice Roberts's concurring opinion in *June Medical*. Based on the Court's findings and its reconsideration, the Court determines that the Local Disclosure Mandate as applied to Non-CMA Teenage Patients has the effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus for whom the Mandate is relevant. *June Medical*, at 2138. Dr. Hopkins and LRFP are likely to prevail on the merits of their claims that Local Disclosure Mandate as applied to Non-CMA Teenage Patients imposes a substantial and undue burden that is unconstitutional. The record includes sufficient evidence from which plaintiffs satisfy their burden to present evidence of causation that the Mandate's requirements will lead to this effect.

### 5. Women Effected

The Local Disclosure Mandate places substantial obstacles in the path of Non-CMA Teenage Patients seeking abortions; the Court also finds that it places substantial obstacles in the path of a large fraction of Non-CMA Teenage Patients seeking abortions. The substantial obstacles erected are access to abortion if the mandate prohibits medication abortion; creating a chilling effect that record evidence indicates is likely to dissuade women from obtaining abortions; preventing or delaying abortion care for these Non-CMA Teenage Patients by confusing them with discussions of evidence, suspects, and investigations as those terms are used in the Local Disclosure Mandate when those terms do not apply to them; humiliating them by disclosing very private facts about their sexual activity and reproductive choices in writing to local community members; and making them fearful of the reaction by local law enforcement in their home jurisdiction if they proceed with the care they seek and their abortion is therefore disclosed. These

obstacles created by the Local Disclosure Mandate as applied to all Non-CMA Teenage Patients are substantial and undue burdens in the path of these women seeking an abortion.

More specifically, according to Dr. Ralph's unrefuted evidence at this stage, adolescents value confidentiality in reproductive health care, seeking to maintain personal autonomy over whether and to whom they disclose their decision to seek an abortion (Dkt. No. 73-5, ¶ 27). Dr. Ralph avers that adolescent abortion patients fear involuntary exposure of their pregnancy and abortion to others (Dkt. No. 73-5, ¶ 34). Dr. Ralph relies on a large body of literature that demonstrates that young people are more likely to delay or forgo seeking health care services if confidentiality is not guaranteed (Dkt. No. 73-5, ¶ 28).

Dr. Ralph cites research that shows that, if adolescents face an age-based legal requirement to involve a parent in their abortion care, the adolescents may instead delay their care – if possible—to age out of the requirement, even though that adds medical risk, continued experience of pregnancy, and cost (Dkt. No. 73-5, ¶ 29). Dr. Ralph cites research at the national level that confirms some adolescents will carry their pregnancies to term rather than comply with a parental involvement or judicial bypass requirement for abortion (Dkt. No. 73-5, ¶ 30), and others may travel to another state for care in order to avoid disclosing their pregnancy and abortion decision to a parent (Dkt. No. 73-5, ¶ 31).

Dr. Ralph also cites "evidence that experiencing barriers to abortion care – in the form of state-level restrictions, cost, or long distance to a provider – are associated with more searches for information about, consideration of, and attempts at self-managed abortion (defined as abortion obtained outside the formal health care system), which in some circumstances may not be safe" (Dkt. No. 73-5, ¶ 32).

Dr. Ralph explains: "My experience studying adolescent abortion patients and all of the research summarized above leads me to conclude that, once adolescents learn of the Mandate's requirements, some of those patients will experience significant delay in completing their abortions and other may be dissuaded from doing so altogether." (Dkt. No. 73-5, ¶ 40). She also opines that "[s]ome older 16-year olds will delay their care, including for week or months, to age out of the requirement. Other patients will attempt to travel out of state, which will impose delay because of the added travel, cost, and planning involved. Some may search for and/or unsuccessfully attempt self-managed abortion, or search in vain for some other 'work around.' Any of these results will delay the patients' time-sensitive abortion care and add medical risk for them." (Dkt. No. 73-5, ¶ 41).

Dr. Ralph also offers that, "many, if not most, of the Non-CMA Teenage Patients who complete abortion care in Arkansas will suffer ongoing fear and anxiety, knowing that the local police department has been informed of their abortion care and that criminal evidence collection has occurred. They will be left with ongoing concern about the possibility of police harassment, further breaches of their confidentiality, and further law enforcement activity. The Mandate will cause fear and stigma even if the local police take no such action. The forced exposure of those patients' private activity and confidential medical care to outsiders in their community, as a condition of their receiving abortions in Arkansas, also is likely to cause some to avoid health care or conceal information from health care providers in the future, further jeopardizing their health in that way." (Dkt. No. 73-5, ¶ 42).

According to Dr. Ralph, abortion statistics among adolescents in Arkansas track those in the United States (Dkt. No. 73-5, ¶ 17). In Arkansas in 2019, adolescents aged 19 and younger accounted for 10% of the 2,963 abortions in the state (*Id.*). Those aged 18 to 19 accounted for

nearly 7% of all abortions, while those aged 15 to 17 accounted for 3% (*Id*.).  Adolescents younger than 15 years old accounted for 0.3% of all abortions (*Id*.).  In 2019, 65 out of 2,963 abortions or 2.2% were provided to patients 16 and under (*Id*.).  Dr. Ralph explains that Arkansas's reporting, like most national and state-level presentations of abortion statistics, groups all patients under 15 together, so the state's reporting does not allow one to break out the precise number of patients who were 14 to 16 years old at the time of their abortions (*Id*.).

Dr. Ralph explains that adolescent abortion patients in Arkansas, like adult patients in the state and nationally, are disproportionately people of color; for example, according to Dr. Ralph 50% of Arkansas abortion patients aged 16 years and under were African American in 2019 (Dkt. No. 73-5, ¶ 18).  She explains that "[t]his reflects the effects of many layers of inequality in American health care and society.  People of color, for example, experience higher rates of unintended pregnancies, in part because they face more barriers to accessing highly effective contraceptive methods, including barriers rooted in discrimination." (*Id*.).  Dr. Ralph also explains that, like adult abortion patients, adolescent patients disproportionately come from poor and low-income households based on national research (Dkt. No. 73-5, ¶ 19).

Although the Court has evidence overall on teenage abortion statistics in Arkansas, the Court cannot meaningfully break down the numbers to assess Non-CMA Teenage Patients with certainty.  According to Dr. Ralph, and nothing before the Court suggests otherwise, Arkansas's reporting, like most national and state-level presentations of abortion statistics, groups all patients under 15 together, so the state's reporting does not allow one to break out the precise number of patients who were 14 to 16 years old at the time of their abortions.  Because this is an as-applied challenge, the Court confines its examination of the application of the Local Disclosure Mandate to Non-CMA Teenage Patients and determines that, in that particular context, plaintiffs are likely

to succeed in demonstrating that the Local Disclosure Mandate imposes a substantial and undue burden on abortion access. *Voinovich*, 130 F.3d at 193-94. The Court also finds that the Local Disclosure Mandates places substantial obstacles in the path of a large fraction of Non-CMA Teenage Patients seeking abortions.

## 2.    Irreparable Harm

In the absence of a preliminary injunction, Dr. Hopkins, LRFP, and the fraction of women for whom the Local Disclosure Mandate is relevant in this as-applied challenge—Non-CMA Teenage Patients—would be unduly burdened by the substantial obstacles created by the Local Disclosure Mandate, which plaintiffs are likely to succeed in demonstrating lacks any justifying state purpose as applied to Non-CMA Teenage Patients.

Enforcement of the Local Disclosure Mandate will inflict irreparable harm on Dr. Hopkins, LRFP, and Non-CMA Teenage Patients as there is no adequate remedy at law. It is well-settled that the inability to exercise a constitutional right constitutes irreparable harm. *See Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977) ("Planned Parenthood's showing that the ordinance interfered with the exercise of its constitutional rights and the rights of its patients supports a finding of irreparable injury.") (citations omitted); *accord Kirkeby v. Furness*, 52 F.3d 772, 775 (8th Cir. 1995) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

## 3.    Balancing Of Harms

In the absence of a preliminary injunction, Dr. Hopkins, LRFP, and the large fraction women for whom the Local Disclosure Mandate is relevant in this as-applied challenge would be unduly burdened by the substantial obstacles created by the Local Disclosure Mandate. Further, plaintiffs are likely to succeed in demonstrating that the Local Disclosure Mandate lacks any

justifying state purpose as applied to Non-CMA Teenage Patients. Whereas, if a preliminary injunction order issues, a likely unconstitutional law as applied to Non-CMA Teenage Patients passed by Arkansas legislators will not be enforced. The threatened harm to Dr. Hopkins, LRFP, and the Non-CMA Teenage Patients clearly outweighs whatever damage or harm a preliminary injunction order may cause the defendants.

### 4. Public Interest

It is in the public interest to preserve the *status quo* and to give the Court an opportunity to evaluate fully the lawfulness of the Local Disclosure Mandate without subjecting Dr. Hopkins, LRFP, or Non-CMA Teenage Patients, or the public to any of the law's potential harms.

It is therefore ordered that Dr. Hopkins and LRFP's motion for a preliminary injunction is granted, and defendants are preliminarily enjoined from enforcing the provisions of H.B. 2024 referred to here as the Local Disclosure Mandate as applied to the Non-CMA Teenage Patients.

### D. Tissue Disposal Mandate (Counts X and XI, H.B. 1566)

Dr. Hopkins and LRFP seek a preliminary injunction based on the Tissue Disposal Mandate in count ten, which alleges that the tissue disposal mandate violates the Due Process Clause by placing an undue burden on Dr. Hopkins and LRFP's patients' right to liberty and privacy, and count eleven, which alleges that the tissue disposal mandate violates the Due Process Clause due to its vagueness.

Prior to enactment of the Tissue Disposal Mandate, embryonic and fetal tissue generated from abortion and miscarriage was handled in a number of ways. Women who had medication abortions or complete miscarriage through medication disposed of the tissue at home, as she would during menstruation (Dkt. No. 6, ¶ 52; Dkt. No. 73-2, ¶ 86). This was consistent with Arkansas law that permitted tissue passed at home, rather than at a medical facility, to be disposed of without

being regulated.  *See generally* Ark. Code Ann. § 20-32-101(1993) (governing disposal of commercial medicate waste); Ark. Code Ann. § 20-31-101(5) (defining "medical waste," in relevant part, as limited to "waste from healthcare-related facilities"); Ark. Code Ann. § 20-32-101(5)(A) (defining "pathological waste"); Ark. Code Ann. § 20-17-802 (2017) (requiring disposal of tissue from abortion "in a fashion similar to that in which other tissue is disposed").

For patients who have abortions at LRFP, under an Arkansas law enacted in 2015, LRFP obtains each patient's consent in writing to having the embryonic or fetal tissue from her abortion disposed of within 48 hours (Dkt. No. 6, ¶ 50; Dkt. No 73-3, ¶ 75); *See* Ark. Code Ann. § 20-17-801(b).  Arkansas law required abortion providers to dispose of embryonic and fetal tissue generated from abortions in a manner consistent with how health care facilities treat tissue from other medical care.  *See* Ark. Code Ann. § 20-17-802 (2017) (requiring abortion facilities' disposal to be "in a fashion similar to that in which other tissue is disposed.").  For abortion procedures at LRFP, a contractor collects medical waste and embryonic or fetal tissue generated at the clinic and disposes of it out of state through incineration (Dkt. No. 6, ¶ 49; 73-2, ¶ 86; Dkt. No. 73-3, ¶ 74).  A few patients each year choose to have the tissue cremated, and those patients make arrangements with the cremation facility ((Dkt. No. 6, ¶ 49; Dkt. No. 73-2, ¶ 86; Dkt. No. 73-3, ¶ 74).  Also, for a few patients each year, the tissue is sent to pathology labs to test for specific medical conditions or to determine the cause of the anomalies and the likelihood of recurrence in future pregnancies (Dkt. No. 6, ¶ 53; Dkt. No. 73-3, ¶ 77).  In addition, following some abortions, tissue is preserved and made available to local law enforcement (Dkt. No. 6, ¶ 39; Dkt. No. 73-3, ¶ 60).  Before the Tissue Disposal Mandate was enacted, "fetal tissue" from abortion was defined as "human tissue" – which could be disposed of without regard to the Arkansas Final Disposition Rights Act.  Ark. Code Ann. §§ 20-17-801(a)(1)(A), 20-17-801(b)(2)(C).

The Tissue Disposal Mandate would change the law to require that a "physician or facility that performs an abortion shall ensure that the fetal remains and all parts are disposed of in accordance with § 20-17-801 and the Arkansas Final Disposition Rights Act of 2009, § 20-17-102." Ark. Code Ann. § 20-17-802(a). By its terms, the Tissue Disposal Mandate applies whether the embryonic or fetal tissue comes from abortion or miscarriage. The Tissue Disposal Mandate subjects physicians violating it to criminal penalties, specifically those associated with Class A misdemeanors under Arkansas law. Ark. Code Ann. § 20-17-802(f).

The Arkansas Final Disposition Rights Act of 2009 ("FDRA") primarily governs which family members have "[t]he right to control the disposition of the remains of a deceased person, the location, manner, and conditions of disposition." Ark. Code Ann. § 20-17-102(d)(1). Under the FDRA, if a decedent has not appointed anyone to control the final disposition of his or her remains, that right vests in individuals in the order the FDRA sets forth, including the decedent's spouse; child or children; parent or parents; and including other family members or, ultimately, a state government actor with the statutory obligation to arrange for the disposition of a decedent's remains. Ark. Code Ann. § 20-17-102(d)(1)(A) – (L). When the disposition right vests in a parent, and the other parent is "absent," that right vests solely in the remaining parent only after "reasonable efforts have been unsuccessful in locating the absent surviving parent." Ark. Code Ann. § 20-17-102(d)(1)(E)(ii). The FDRA defines neither "absent" nor "reasonable efforts." Ark. Code Ann. § 20-17-102.

The right to control the disposition of remains of a deceased person under the FDRA vests only in individuals who are 18 years old or older. Ark. Code Ann. § 20-17-102(d)(1). The right to control the disposition of remains of a deceased person under the FDRA also depends on the individual's willingness to assume liability for the costs associated with disposal and only if the

individual "exercise[s] his or her right of disposition within two (2) days of notification of death of the decedent." Ark. Code Ann. § 20-17-102(e)(1)(B), (C). Forfeiture occurs where, for instance, a person fails to exercise their disposition right "within two (2) days of notification of the death of the decedent," or "within five (5) days of the decedent's death, whichever is earlier." *See* Ark. Code Ann. § 20-17-102(e)(1)(B). If there is a dispute among individuals who share equal disposition rights under the FDRA, the circuit court for the county decides to whom to award the disposition right. Ark. Code Ann. § 20-17-102(e)(2).

The FDRA defines "final disposition" as "the burial, interment, cremation, removal from Arkansas, or other authorized disposition of a dead body or fetus." Ark. Code Ann. § 20-17-102(2)(C). The FDRA does not define "other authorized disposition." A person with disposition rights also may "dispose of the remains in any manner that is consistent with existing laws, rules, and practices for disposing of human remains, including. . . cremat[ion]." Ark. Code Ann. § 20-17-102(i).

### 1.    Likelihood Of Success On The Merits:  Vagueness Challenge

The Tissue Disposal Mandate requires physicians to ensure that embryonic and fetal tissue is disposed of in accordance with the FDRA and that physicians must ensure that outcome, but Dr. Hopkins and LRFP contend that the requirements of the FDRA as applied to abortion and miscarriage management leave many critical questions unanswered. They challenge the Tissue Disposal Mandate as void for vagueness.

Specifically, plaintiffs contend that H.B. 1566, "including its incorporation of the FDRA, is impermissibly vague in at least two respects:  first, whether tissue resulting from a medication abortion or following miscarriage care may be disposed of by the patient at home, and, second, what, if any, obligations are imposed on women seeking abortion and miscarriage care and/or

Plaintiff regarding 'reasonable efforts' to locate an 'absent' 'parent' or 'other members of the class' of 'grandparents.' Ark. Code. Ann.§§ 20-17-102(d)(l)(E), (d)(3)(B)." (Dkt. No. 3, at 53; Dkt. No. 73-2, ¶ 88). This Court agrees and determines that Dr. Hopkins and LRFP are likely to succeed on this claim.

Plaintiffs also argue that "while the FDRA appears to concern the "[f]inal disposition' of 'a dead body or fetus,' *id.* § 20-17-102(a)(2)(C), its various references to 'human remains,' *id.* §§ 20-17-102(b )(1 )(A), ( c ), (h), (i), (j), are unclear, because H.B. 1566 now uses 'fetal remains' to refer to tissue disposition after abortion, *see* H.B. 1566 § 3. Given the potential liability for violating H.B. 1566, plaintiff cannot make good faith efforts to comply and hope for the best. Rather, Dr. Hopkins is faced with uncertainty that will require him to curtail services." (Dkt. No. 3, at 58; *see also* Dkt. No. 74, at 68).

To the extent the Tissue Disposal Mandate applies to medication abortion, according to Dr. Parker it appears to eliminate medication abortion as an option for patients because tissue from a medication abortion is disposed of outside the abortion facility and there is no way for a provider to "ensure" that tissue from a medication abortion is disposed of in compliance with the Tissue Disposal Mandate (Dkt. No. 73-2, ¶ 95; Dkt. No. 73-3, ¶ 76). If, as defendants argue, the Tissue Disposal Mandate does not apply to medication abortion but instead only to procedural abortion, Dr. Parker does not "understand why tissue from a medication abortion, and the state-mandated decision-making about its disposal, would be treated differently than tissue from an abortion procedure" (Dkt. No. 73-2, ¶ 95). Ms. Williams shares these concerns (Dkt. No. 73-3, ¶ 76).

The Court notes the potential that the Arkansas Department of Health or Legislative Council amendment to the Tissue Disposal Mandate could remedy the vagueness in this section of the Tissue Disposal Mandate. However, at the time the Court entered its prior preliminary

injunction, the Court had no information in the record to determine the authority of that decision-making body or to determine whether the amendment was final.[28] Even if the amendment remedies the vagueness as to the types of tissue that must be disposed, the Court finds that the other sections of the Mandate are still unconstitutionally vague.[29]

For example, plaintiffs asserts that they have no way of knowing from the Mandate the definitions of "reasonable efforts" to locate an "absent" parent or "grandparent," as required by the Mandate (Dkt. No. 74, at 45). The language used in the Tissue Disposal Mandate, in Dr. Parker

---

[28] On July 20, 2017, defendants submitted supplemental authority in support of their opposition to Dr. Hopkins's motion for preliminary injunction (Dkt. No. 31). Defendants state that, on July 20, 2017, "the Arkansas Legislative Council approved an amended rule concerning the disposition of fetal remains. The amended rule, which is attached to this notice as Exhibit A, defines 'dead fetus or fetal remains' and provides that each facility shall ensure that each dead fetus or fetal remains are disposed of in accordance with Ark. Code. Ann. § 20-17-102." (Dkt. No. 31, at 1). Defendants contend that "[t]he amendments to Agency Rule #007.05 expressly provide that the requirements for the disposition of fetal remains under Ark. Code Ann. § 20-17-102 do not apply to medication abortions: 'The requirements of this subsection shall not apply to abortions induced by the administration of medications when the evacuation of any human remains occurs at a later time and not in the presence of the inducing physician nor at the facility in which the physician administered the inducing medications.' Exh. A at 6-3 ¶ 6.O.1." (*Id.*).

At the time the Court entered its prior preliminary injunction, the Court was unclear on the authority possessed by the Legislative Council and, therefore, unclear on the binding nature of this amendment to the Tissue Disposal Mandate. Defendants have not addressed these issues. At the time this Court entered its prior preliminary injunction, the Court reviewed thoroughly the amendment attached as Exhibit A to the supplemental authority. The Court concluded that, even if it had proof that this amended rule was the final, approved-of, form, the change likely does not make the Tissue Disposal Mandate constitutional, and plaintiffs are likely to prevail on this claim. That remains the situation currently before the Court.

[29] The Court refers to, and will not repeat here, its prior footnote in this Order examining the doctrine of abstention. Here, although defendants appear to proffer a narrowed construction of the Tissue Disposal Mandate that would exclude its application to medication abortion under an Arkansas Department of Health Regulation passed upon by the Arkansas Legislative Council, for the reasons explained in this Court's Order, even that narrowing if permissible under Arkansas law would not avoid the constitutional questions plaguing the Tissue Disposal Mandate. Further, this Court does not pass on whether that narrowing is permissible under Arkansas law and determines that it need not to resolve plaintiffs' current motion for preliminary injunction on this claim.

and Ms. Williams' opinions, is unclear with respect to scope of "reasonable efforts" required to notify a patient's sexual partner (Dkt. No. 73-2, ¶ 96; Dkt. No. 73-3, ¶¶ 82-83). According to Dr. Parker, the Tissue Disposal Mandate also is unclear about what it means for a patient's sexual partner to be "absent" (*Id*.). He avers that other aspects of the Tissue Disposal Mandate also are unclear, including the requirement that disposition rights are contingent on assuming "liability for the costs of such arrangements." (Dkt. No. 73-2, ¶ 98). Further, it is unclear how plaintiffs should confirm the identity of individuals who must be informed of their rights under the Tissue Disposal Mandate, when plaintiffs must make notification efforts, what to do if there is a dispute among those with disposition rights, or how to comply with the FDRA's requirements.

The FDRA addresses methods of disposition in three provisions. As noted, the statute defines "final disposition" to include "burial, interment, cremation, removal from Arkansas, or other authorized disposition of a dead body or fetus," Ark. Code Ann. § 20-17-102(a)(2)(C); gives a person with disposition rights the authority to control "the disposition of the remains of a deceased person, the location, manner, and conditions of disposition," *id.*, § 20-17-102(d)(l); and also authorizes a person with disposition rights, in the absence of a declaration of final disposition by the decedent, to "dispose of the remains in any manner that is consistent with existing laws, rules, and practices for disposing of human remains, including. . . cremat[ion]," *id.* § 20-17-102(i). Ms. Williams explains that, because the Tissue Disposal Mandate has no exception for tissue that is sent to a pathology laboratory or to local law enforcement, LRFP cannot "ensure" tissue is disposed of in accordance with the Tissue Disposal Mandate when others are responsible for ultimately disposing of it (Dkt. No. 73-3, ¶ 77). Each year LRFP sends the pregnancy tissue for a few patients to pathology if, for example, the physician suspects a molar pregnancy, which is an abnormal growth of fetal tissue that can become a tumor, or if the patient received a fetal diagnosis

and requests further testing (*Id.*).  Likewise, Arkansas law currently requires that LRFP provide tissue for certain patients to local law enforcement (*Id.*, ¶ 60).

Dr. Hopkins and LRFP contend that these civil provisions are not drafted with the precision necessary to provide physicians or LRFP or enforcement authorities with "fair notice of conduct that is forbidden or required."  *Fed. Commc'ns Comm'n v. Fox Television Station, Inc.,* 567 U.S. 239, 253 (2012).

Dr. Hopkins also notes that "[t]he lack of clarity as to a physician's obligations under the FDRA [is] compounded by the fact that § 20-17-802 of the Arkansas Code, which imposes criminal penalties, contains no scienter requirement and appears to be a strict liability offense." *See Stivers v. State,* 118 S.W.3d 588 (Ark. 2003) (offense outside the criminal code, which contained no *mens rea* requirement, in the absence of legislative intent to include one, was a strict liability offense).  *See also Stahl v. City of St. Louis, Missouri,* 687 F.3d 1038, 1041 (8th Cir. 2012) (lack of *mens rea* requirement 'further demonstrate[s]' vagueness)." (Dkt. No. 3, at 55, n. 16).

Dr. Hopkins and LRFP argue that this vagueness gives them no option but to stop providing care and that it will impermissibly deprive their patients of access to abortion and miscarriage care, including the safe and accepted method of medication abortion and disposition of the tissue at home (Dkt. No. 73-2, ¶ 100).  *See Planned Parenthood. Sioux Falls Clinic v. Miller,* 63 F.3d 1452, 1465, 1467 (8th Cir. 1995).

Defendants argue that, "the requirements for the disposition of 'human tissue' are clearly set forth in a portion of the statute that he does not challenge, Ark. Code Ann. § 20-17-801.  For its part, the Final Disposition Rights Act is also clear, providing detailed instructions for determining who has the right to dispose of a dead child's body.  Ark. Code Ann. § 20-17-102. For these reasons, Hopkins cannot show that he is likely to prevail on a vagueness challenge to

Act 603." (Dkt. No. 23, at 75-76). In their current response, defendants argue in part, "[g]iven that neither patients nor providers are required to notify anyone of an abortion, Hopkins's vagueness claims with respect to the first and second provisions discussed above do not warrant preliminary relief." (Dkt. No. 92, at 60). The Court addresses, and rejects, this contention and defendants' proposed reading of the Tissue Disposal Mandate in its analysis regarding undue burden.

The Court concludes that the claim that the Tissue Disposal Mandate is vague such that it unconstitutionally deprives plaintiffs of their due process rights is likely to succeed; due process in this context requires clarity so that those bound by the law know what is expected of them. Here, criminal penalties may be imposed and fundamental rights are implicated. Based on the record before it at this stage of the proceeding, the Court is unclear as to the scope of the obligations imposed upon women seeking abortion and miscarriage care and abortion providers. The Tissue Disposal Mandate fails to provide Dr. Hopkins or LRFP or enforcement authorities with "fair notice of conduct that is forbidden or required." *Fed. Commc'ns Comm'n.,* 567 U.S. at 253. These factors also contribute to the undue burden the Tissue Disposal Mandate imposes on women seeking abortion for whom the Mandate is relevant.

### 2. Likelihood Of Success On The Merits: Due Process Challenge

### a. Applicable Law

To determine whether Dr. Hopkins and LRFP are likely to succeed on their challenge to the Tissue Disposal Mandate under the Due Process Clause, this Court applies the undue burden standard. *June Medical Services*, 140 S. Ct. 2103 (plurality opinion); *Whole Woman's Health*, 136 S. Ct. at 2309; *Casey*, 505 U.S. at 877 (plurality opinion). To sustain a facial challenge and grant a preliminary injunction, this Court must make a finding that the Tissue Disposal Mandate is an undue burden for a large fraction of women for whom the law is relevant.

Defendants initially cited to *Planned Parenthood of Minnesota v. State of Minnesota* to assert that a woman's right to abortion is not implicated by the Tissue Disposal Mandate. 910 F.2d 479 (8th Cir. 1990). The Minnesota statute examined in that case did not require notice and consent for disposition of embryonic or fetal tissue; it lacked any provision comparable to the FDRA. Further, the case was decided before *Casey, Whole Woman's Health,* and *June Medical.* The Court determines it is not controlling with regard to the facts presented here.

In vacating this Court's prior preliminary injunction order, the Eighth Circuit directed this Court to reconsider its order, in part, based on the Supreme Court's decision in *Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780 (2019) (per curiam). The Court has reviewed *Box* and the parties' respective arguments with respect to this issue. The Court sees critical differences between the facts and argument presented here and the facts and argument addressed by the Supreme Court in *Box* that persuade the Court that *Box* does not apply.

First, the Indiana statute at issue in *Box* regulated the *manner* in which abortion providers may dispose of fetal remains. *Id*. at 1781. The Seventh Circuit in its discussion of the challenged law explained, "HEA 1337 also changes the manner in which abortion providers must dispose of aborted fetuses. HEA 1337 did not alter the provision of the Indiana Code that gives a woman 'the right to determine the final disposition of the aborted fetus.' § 16-34-3-2(a). . . . HEA 1337 alters the manner in which an abortion provider must dispose of an aborted fetus if the woman elects not to dispose of it herself." *Planned Parenthood of Indiana and Kentucky, Inc. v. Commissioner of the Indiana State Dep't of Health*, 888 F.3d 300, 303-04 (7th Cir. 2018). Arkansas's Tissue Disposal Mandate regulates *who* makes the decision about the method of disposal of fetal remains resulting from abortion, and it sanctions abortion providers for failing to ensure compliance.

Second, the Supreme Court made it clear in *Box* that, unlike here, the "[r]espondents have never argued that Indiana's law creates an undue burden on a woman's right to obtain an abortion." *Id*. The Supreme Court performed a rational basis review of the Indiana statute and specifically stated that the case did not "implicate our cases applying the undue burden test to abortion regulations." *Id*. at 1782. Dr. Hopkins has since the lawsuit was filed alleged, and Dr. Hopkins and LRFP continue to allege, Due Process claims challenging as an undue burden on abortion rights the Tissue Disposal Mandate.

For these reasons, the Court rejects application of rational basis review to plaintiffs' due process challenge to the Tissue Disposal Mandate on the facts and arguments presented in this case.

### b. Analysis Of The Tissue Disposal Mandate

### 1. Burdens Imposed On Women

This Court examines whether the Mandate "has the effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" for a large fraction of the women for whom the Tissue Disposal Mandate is relevant. *June Medical*, 140 S. Ct. at 2138 (Roberts, J. concurring) (quoting *Casey*, 505 U.S. at 877). The Court concludes that plaintiffs are likely to succeed in proving that it does. The Tissue Disposal Mandate challenged by Dr. Hopkins and LRFP on behalf of their patients and themselves requires notice and consent to the disposition of embryonic and fetal tissue – and of every woman's abortion to which the Mandate applies – from a woman's sexual partner or, if the woman and her sexual partner are minors, the parent or parents of both, in direct conflict with Supreme Court precedent. *See Casey*, 505 U.S. at 893-94 (examining spousal notification); *Hodgson v. Minnesota*, 497 U.S. 417 (1990) (examining parental consent and required judicial bypass); *Bellotti*, 443 U.S. at 622 (same). That fact that both

"parents" have disposition rights under the FDRA creates a requirement of notice and consent of the woman's sexual partner and requires that, when the other "parent" is "absent," then "reasonable efforts" need to be made to locate the other parent prior to disposition. Ark. Code Ann. § 20-17-102(d)(1)(E). The FDRA does not define "reasonable efforts." What defendants may not do directly they also may not do indirectly, and this Court will not apply rational basis review to the Tissue Disposal Mandate.

This notice and consent requirement of a woman's sexual partner required by the Tissue Disposal Mandate directly violates binding Supreme Court precedent. *See Danforth*, 428 U.S. at 69 ("[T]he State may not constitutionally require consent of the spouse. . . as a condition for abortion. . . ."); *Casey*, 505 U.S. at 898 (invalidating a provision requiring spousal notification prior to abortion); *see also id*. ("A husband has no enforceable right to require a wife to advise him before she exercises her personal choices," including about pregnancy). That the woman's sexual partner could be difficult to locate, could withhold consent, could seek a different means of disposition, or could otherwise delay the abortion gives him "an effective veto" over her decision. *Casey*, 505 U.S. at 897. Notice of abortion could subject some women to physical and psychological abuse. *Casey*, 505 U.S. at 893. (Dkt. No. 5, ¶¶ 56-57; Dkt. No. 6, ¶ 60; Dkt. No. 73-2. ¶ 91; Dkt. No. 73-4, ¶ 73, 75). Therefore, the Tissue Disposal Mandate burdens all women seeking abortions by virtue of this notice requirement and is "likely to prevent a significant number of women from obtaining an abortion." *Casey*, 505 U.S. at 893. Defendants present at this stage of the litigation no record evidence that convinces this Court it should revisit controlling Supreme Court precedents on this point.

Further, this is supported by record evidence currently before the Court in the form of sworn affidavits submitted by plaintiffs. According to Dr. Parker, compliance with the Tissue

Disposal Mandate if it were to take effect would require him to make reasonable efforts to notify others about his patients' abortion care, would require him to violate his professional ethical obligations including to breach confidentiality that is essential to the physician-patient relationship, and would require him to put his patients in potential danger, which he would not do (Dkt. No. 73-2, ¶ 88). Dr. Parker also maintains that, because the law is unclear in numerous ways, he would not be able to comply even if willing to violate his ethical obligations to keep his patients' care confidential (Dkt. No. 73-2, ¶ 88). The language used in the Tissue Disposal Mandate, in Dr. Parker and Ms. Williams' opinions, is unclear with respect to scope of "reasonable efforts" required to notify a patient's sexual partner (Dkt. No. 73-2, ¶ 96; Dkt. No. 73-3, ¶¶ 82-83). According to Dr. Parker, the Tissue Disposal Mandate also is unclear about what it means for a patient's sexual partner to be "absent" (*Id*.).

Requiring the breach of confidentiality about an abortion patients' abortion decision conditions a patient's ability to obtain an abortion on forfeiting the confidentiality of their abortion decision, according to Dr. Parker (Dkt. No. 73-2, ¶ 89). Requiring the breach of confidentiality about an abortion patients' abortion decision can also increase the risk to the patients' personal safety or risk that patients experience retribution for their decisions, according to Dr. Parker (Dkt. No. 73-2, ¶ 89).

Record evidence demonstrates that patients may have a variety of reasons for wanting to keep their abortion private, including from the person by whom they became pregnant (Dkt. No. 73-2, ¶ 91; *see also* Dkt. No. 73-6, 73-7, 73-8, 73-10, 73-11). Some patients go to great lengths to keep their abortions private (Dkt. No. 73-2, ¶ 91). Some want and need to keep their abortion private from partners who are unsupportive or abusive, for personal safety reasons (*Id*.). Patients may fear other forms of retribution stemming from the stigma associated with abortion, or concern

that their partner will disagree with their decisions, try to interfere with it, or punish them for considering or accessing abortion care (*Id*.). Patients experiencing intimate partner violence may also fear for the safety of their existing children, including fear that a partner could retaliate against her for her abortion decision by harming her children (*Id.*). Or patients may simply want to keep their abortion confidential because it is their private medical decision involving intimate personal matters (*Id.*).

Dr. Parker also has concerns that the Tissue Disposal Mandate would require him "to pressure patients to provide [him] with the names of the individual(s)" to be notified under the Tissue Disposal Mandate, which patients may be reluctant to do, and "appears designed to send the message to patients that tissue from an abortion should be treated like a decease person, a family member – regardless of whether the patient views the tissue that way" and "replaces the diversity of views patients have about their pregnancy with the State's" view (Dkt. No. 73-2, ¶¶ 93-94).

Based on her experience with patients, Ms. Williams shares similar concerns (Dkt. No. 73-3, ¶¶ 80-81, 84, 87). Further, Ms. Williams anticipates, based on her experience in counseling patients of LRFP, that patients would forgo obtaining an abortion in the state rather than disclosing their abortion decision in the manner required by the Tissue Disposal Mandate, if it were to take effect (Dkt. No. 73-3, ¶ 85).

In their response to the first motion for preliminary injunction, defendants asserted that "the right to decide how to dispose of the [embryonic and fetal tissue] vests in the parents of the deceased child." (Dkt. No. 22, at 58). The law provides "that if the father is absent, the mother is vested with the rights of disposition after reasonable efforts are unsuccessful in locating the father." (Dkt. No. 22, at 58). However, defendants maintain that "this section plainly does not require that

any efforts be made to notify the father or to obtain his consent." (Dkt. No. 22, at 58). Instead, defendants propose that, if no action is taken for five days, "'if any person' – including the father of the deceased child – does not exercise his disposition right within five days of the death, he forfeits that right." (Dkt. No. 22, at 58). And then "the right of disposition vests solely in the mother, and her wishes for the disposition of the fetal remains control." (Dkt. No. 22, at 58).

In response to the current motion for preliminary injunction, defendants assert that "under the Final Disposition Act, while a patient may decide to notify a partner and ascertain his wishes regarding disposition, neither she nor anyone else is required to notify the partner. Instead, while it generally vests parents with equal power to control disposition of a child's remains, the Final Disposition Act provides that one parent may exercise sole control in any of three alternative scenarios, either, (1) one parent is absent and 'reasonable efforts have been unsuccessful in locating' that parent; or, (2) both parents receive notification of death and only one acts within two days of receiving notice; or (3) only one parent exercises disposition rights within five days." (Dkt. No. 92, at 58-59 (citing Ark. Code Ann. §§ 20-17-102(d)(1)(E), 20-17-102(e)(1)(B)). Defendants claim the last option, "allows a single parent to exercise sole control regardless of whether there is an absent parent, there is an effort to notify, or a second parent receives notification of death." (Dkt. No. 92, at 59).

The woman alone is vested with the right to disposition only after reasonable efforts have been unsuccessful in locating the "father." Ark. Code Ann. § 20-17-102(d)(1)(E)(ii). Defendants appear to suggest that efforts could be undertaken to locate the other "parent," but that nothing more is necessary under the statute and that, if found, the other "parent" need not be notified of his disposition right. As Dr. Hopkins observes, this reading of the Tissue Disposal Mandate would require "a physician or his patient" to "engage in a search of an undefined time, but for no ultimate

purpose." (Dkt. No. 32, at 62). The Court rejects this reading of the Tissue Disposal Mandate. In construing the law narrowly to avoid constitutional doubts, the Court "must also avoid a construction that would seriously impair the effectiveness of [the law] in coping with the problem it was designed to alleviate." *See Harriss*, 347 U.S. at 623. Defendants also argued before the Court essentially that abortion providers are required to do nothing under the Tissue Disposal Mandate, only patients are, but that reading in the Court's view overlooks the requirement that providers ensure compliance with the Tissue Disposal Mandate and face penalties and sanctions for failing to do so.

Because the Tissue Disposal Mandate "emphasizes the importance of making 'reasonable efforts' to notify those individuals with disposition rights," Dr. Parker is skeptical of the State of Arkansas's position that compliance could be achieved by preserving tissue for five days before disposing of it (Dkt. No. 73-2, ¶ 99). "Mid-litigation assurances are all too easy to make and all too hard to enforce, which probably explains why the Supreme Court has refused to accept them." *Williamson*, 900 F.3d at 1328 (citing *Stenberg*, 530 U.S. at 940-41 (rejecting the Attorney General's interpretation of the statute and warning against accepting as authoritative a state's litigation position when it does not bind state courts or law enforcement authorities)).

Defendants also contend that other provisions of the law cause the right "to vest solely in the mother even sooner." (Dkt. No. 22, at 58). Defendants point to the provision that states, if the "father" is "unwilling to assume the liability for the costs" of disposition, then the right vests solely and immediately in the mother. Ark. Code Ann. § 20-17-102(e)(1)(C). As Dr. Hopkins points out, "to convey an unwillingness to assume the cost of disposition, one would have to be notified of his right in the first place" which implicates the notice requirements he challenges as unconstitutional (Dkt. No. 32, at 66). Further, Dr. Parker avers this aspect of the Tissue Disposal

Mandate, the requirement that disposition rights are contingent on assuming "liability for the costs of such arrangements," is unclear (Dkt. No. 73-2, ¶ 98). Dr. Hopkins argues that ascertaining and documenting the fact that a person with a disposition right forfeits input due to a lack of willingness or resources to assume financial responsibility may be difficult or impossible for Dr. Hopkins (Dkt. No. 3, at 24).

Defendants maintain that, if the father is "'estranged' – meaning a 'physical and emotional separation from the decedent at the time of death which has existed for a period of time that clearly demonstrates an absence of due affection, trust, and regard for the decedent' – then the disposition right vests solely in the mother immediately." (Dkt. No. 22, at 58) (citing Ark. Code Ann. § 20-17-102(e)(1)(D)(ii)). The Court agrees with Dr. Hopkins that there is no explanation for how a physician would know whether a woman's sexual partner was "estranged" from the "decedent," which are defined terms under the Tissue Disposal Mandate (Dkt. No. 32, at 66). There is no safe harbor for a physician to rely on a woman's representation that the other parent is "estranged" from the "decedent" or unwilling to assume the costs of disposition and avoid the Mandate's penalties. To read such a provision into the FDRA would be difficult because the FDRA specifically includes a safe harbor provision stating that a "funeral establishment, cemetery, or crematory shall have the right to rely on" a signed funeral service contract or authorization, and "shall have the authority to carry out the instructions of the person or persons whom the funeral home, cemetery, or crematory reasonably believes holds the right of disposition." Ark. Code Ann. § 20-17-102(f)(2). There is no comparable provision for Dr. Hopkins or other abortion providers. The Court finds the statutory canon of *expressio unius est exclusio alterius*—the expression of one is the exclusion of others—applicable on these facts. This canon, like all rules of construction, is applicable under certain conditions to determine the intention of the lawmaker when it is not otherwise manifest. Here, the

state explicitly provided a safe harbor provision in the FDRA for funeral establishments, cemeteries, and crematoriums, but declined to provide a safe harbor provision pertaining to abortion providers in the Tissue Disposal Mandate.

In the case of a minor woman, if her sexual partner was at least 18, then he would control disposition under the FDRA. Ark. Code Ann. §§ 20-17-102(d)(1), (d)(1)(E). This implicates the same constitutional concerns cited in regard to notification of sexual partners. If a minor woman's sexual partner was also a minor, then the woman's parents and her partner's parents would control disposition under the FDRA. Ark. Code Ann. §§ 20-17-102(d)(1), (d)(1)(G). This would necessitate notice to the woman's parents and her partner's parents of the woman's intent to have an abortion.

This requirement effectively circumvents Arkansas's constitutionally mandated judicial bypass process. Current law requires that a physician obtain the written consent of one parent before providing abortion care to a minor patient. Ark. Code Ann. § 20-16-804. The law also provides that a court may authorize the minor to consent to the abortion without the consent of her parent. Ark. Code Ann. §§ 20-16-808, 20-16-809. The availability of the judicial bypass process reflects long-standing constitutional requirements. *Bellotti*, 443 U.S. at 643 ("[I]f the State decides to require a pregnant minor to obtain one or both parents' consent to an abortion, it also must provide an alternative procedure whereby authorization for the abortion can be obtained."); *Id.* at 639-40 ("[A] State [can] not lawfully authorize an absolute parent veto over the decision of a minor to terminate her pregnancy.")(citing *Danforth*, 428 U.S. at 74)).

The Tissue Disposal Mandate gives a parent or others "an absolute, and possible arbitrary, veto" over a minor's decision to have an abortion. *Danforth*, 428 U.S. at 74; *see also Bellotti*, 443 U.S. at 639-40, 644. The Tissue Disposal Mandate requires a minor to disclose her decision to

both parents, in some instances risking her health and safety by doing so. *See Hodgson*, 497 U.S. at 450-451. The Tissue Disposal Mandate goes even further by requiring, under certain circumstances, the involvement of the woman's sexual partner's parents, and others even further removed from the woman, under certain circumstances. These requirements cannot be reconciled with binding Supreme Court precedent.

Defendants claim that this law does not require a minor's parents be involved, regardless of whether she has obtained a judicial bypass. Defendants rely on language that states, in the "absence" of any person qualified under the statute to exercise the disposition right, "any other person" who is willing to act may exercise the right, Ark. Code Ann. § 20-17-102(d)(2), to argue that a minor who has obtained a judicial bypass may act without involving parents (Dkt. No. 22, at 58). Under the FDRA no one under the age of 18 has the right to control disposition, so defendants appear to be incorrect on this point. Ark. Code Ann. § 20-17-102(d)(1). Further, the provision upon which defendants rely applies only after no one else is willing to exercise a disposition right. This provision of the FDRA requires that a person exercising a right under § 20-17-102(d)(2), which is the provision upon which defendants rely to make this argument invoking judicial bypass, "attest[ ] in writing that a good faith effort has been made to no avail to contact the individuals under this subsection." Ark. Code Ann. § 20-17-102(d)(2). These requirements thwart defendants' claim regarding judicial bypass. The Court observes that, even if minors had rights under the FDRA comparable to those over age 18, the disclosure and notice requirements imposed on those who do have rights constitute an undue burden under *Casey*.

There is record evidence supporting these determinations with respect to minors, as well. As Ms. Williams explains, the Tissue Disposal Mandate seems to provide no right to a patient who is 17 years old who has a boyfriend who is 18 years old; instead, the Tissue Disposal Mandate

seems to give only the 18 year old boyfriend the right to make a decision about disposition (Dkt. No. 73-3, ¶ 81). According to Dr. Parker, minors have many of the same fears and reasons for keeping their abortions private (Dkt. No. 73-2, ¶ 92). Although most minor abortion patients involve one parent, both the parent and the minor patient are often emphatic about maintaining their privacy from the other parent according to Dr. Parker (*Id.*). The Local Disclosure Mandate has no judicial bypass process and appears to require efforts to notify a minor's parents, and the minor's sexual partner's parents, even if the minor has obtained a judicial bypass (Dkt. No. 73-2, ¶ 92). Ms. Williams shares Dr. Parker's concerns with respect to these matters (Dkt. No. 73-3, ¶ 80). According to Dr. Parker, it is counter-intuitive and likely harmful for him to inform the minor's parents about the minor's abortion, if the minor has already obtained a judicial bypass (Dkt. No. 73-2, ¶ 92). These assertions are further supported, in part, by Dr. Ralph who addresses minors' concerns regarding privacy, stigma, fear, and decision-making with respect to abortion care (Dkt. No. 73-5, ¶¶ 27-37).

Further, because the phrase "in any manner that is consistent with existing laws, rules, and practices for disposing of human remains" is undefined, it is not clear as to what acceptable methods of disposition might be selected. Ark. Code Ann. §§ 20-17-102(d)(2), (e)(2). Dr. Hopkins maintains that he must ensure disposition under the FDRA's requirements even if such tissue is sent to a pathology lab. Dr. Hopkins cannot control how a pathology lab disposes of tissue after testing, but this law purports to subject Dr. Hopkins to criminal liability based on the actions of third parties who receive the tissue for reasons other than disposition (Dkt. No. 5, ¶ 60; Dkt. No. 6, ¶ 53). Dr. Hopkins also cannot control how law enforcement disposes of tissue. However, Dr. Hopkins maintains that he arranges the transport of tissue to law enforcement "consistent with existing laws," Ark. Code Ann. § 20-17-102(i), and accordingly understands the disposition to be

consistent with the FDRA (Dkt. No. 3, at 25 n.11). Ms. Williams explains that, because the Tissue Disposal Mandate has no exception for tissue that is sent to a pathology laboratory or to local law enforcement, LRFP cannot "ensure" tissue is disposed of in accordance with the Tissue Disposal Mandate when others are responsible for ultimately disposing of it (Dkt. No. 73-3, ¶ 77). Each year LRFP sends the pregnancy tissue for a few patients to pathology if, for example, the physician suspects a molar pregnancy, which is an abnormal growth of fetal tissue that can become a tumor, or if the patient received a fetal diagnosis and requests further testing (*Id.*). Likewise, Arkansas law currently requires that LRFP provide tissue for certain patients to local law enforcement (*Id.*, ¶ 60).

Defendants claim that "a fetal tissue sample sent to a pathology lab would fall under the definition of 'human tissue' in Ark. Code Ann. § 20-17-801(b)(2)(C), and can be disposed of 'in a respectful and proper manner' under the statute." (Dkt. No. 22, at 60). Therefore, defendants argue that Dr. Hopkins and LRFP would not face criminal liability for sending fetal tissue for pathological testing, even if they could not assure that the pathology lab would dispose of fetal tissue as required by the Tissue Disposal Mandate (Dkt. No. 22, at 60). The Tissue Disposal Mandate amended Ark. Code Ann. § 20-17-801(b)(2)(C) to remove "fetal tissue" from the definition of "human tissue," making that means of disposal impermissible for fetal tissue.

It also is unclear whether at-home disposal of tissue following medication abortion or treatment of miscarriage is permitted under the FDRA (Dkt. No. 3, at 24; Dkt. No. 74, at 45-46). Defendants claim that this law does not ban medication abortions used during the first trimester, arguing the law "expressly applies only to a 'physician or facility that performs an abortion.'" (Dkt. No. 60). Defendants argue this phrase does not apply "to a woman taking a pill in the comfort of her home pursuant to a medication-abortion procedure." (Dkt. No. 22, at 60). Under Arkansas

law, medication abortion must be performed by a physician. Ark. Code Ann. § 5-61-101 (crime for anyone other than licensed physician to perform abortion); Ark. Code Ann. § 20-16-603(b)(1) (physician-only law for medication abortion). Dr. Hopkins, Dr. Parker, and other Arkansas abortion providers face criminal penalties if they fail to dispose properly of tissue following a medication abortion or treatment of miscarriage. Absent certainty on these points, Dr. Hopkins and LRFP maintain that they will have to stop providing medication abortion (Dkt. No. 5, ¶ 55; Dkt. No. 6, ¶ 52; 73-2, ¶ 100). Regardless if the Tissue Disposal Mandate applies to medication abortion or not, that fact does not change the Court's ultimate conclusion regarding the constitutionality of the Mandate.

Dr. Hopkins and LRFP contend that they cannot provide care without first knowing that the tissue can be disposed of lawfully. Both Dr. Hopkins and LRFP include record evidence that, if the challenged Mandates are enforceable, they will no longer provide this type of abortion care due to the potential impacts imposed upon them for alleged violations. The Tissue Disposal Mandate requires that Dr. Hopkins and other abortion care providers subject to it notify at least one, and perhaps more than one, third party before every woman's abortion. The law mandates disclosure to a woman's partner or spouse, even if that person is no longer in her life or is a perpetrator of sexual assault. For minor women, it bypasses the State's constitutionally mandated judicial bypass process, through which a minor can choose not to involve her parent in her abortion decision and instead obtain judicial authorization. The FDRA potentially expands disclosure to all four parents – those of the woman and those of her sexual partner. Plaintiffs argue that these forced disclosures alone are enough to interfere severely with abortion care. *See, e.g., Casey*, 505 U.S. at 894 ("[A] significant number of women. . . are likely to be deterred [by a spousal notification requirement] from procuring an abortion as surely as if the [State] had outlawed

abortion in all cases.") (Dkt. No. 5, ¶¶ 56-57; Dkt. No. 6, ¶ 61).  There is no evidence in the record before the Court to contradict plaintiffs' assertions regarding compliance with the Tissue Disposal Mandate.

The Tissue Disposal Mandate imports the FDRA's disclosure and decision-making requirements – originally enacted to provide a framework for disposition of human remains by family members – to the disposition of embryonic and fetal tissue.  The Tissue Disposal Mandate will dissuade and delay women who seek abortions and also, as a practical matter based on the record evidence before this Court, make it impossible for Dr. Hopkins and LRFP to continue providing abortions because they cannot ensure that tissue disposition will ultimately take place in compliance with the FDRA, subjecting them to criminal sanctions.  Dr. Parker avers that, if the Tissue Disposal Mandate takes effect, he "would be unable to continue providing abortion care under the vague, unethical, and burdensome mandates it creates for [his] patients and [him].  Even if the Mandate did not apply to medication abortion and that option continued to be available, the Mandate would have devastating consequences for [Dr. Parker's] patients and [Dr. Parker]," according to Dr. Parker (Dkt. No. 73-2, ¶ 100).

According to Dr. Parker and Ms. Williams, as a practical matter, physicians and clinics need to know that each step of the medical care they provide can be accomplished, both practically and legally, before undertaking it (Dkt. No. 73-2, ¶ 85; Dkt. No. 73-3, ¶ 79).  Otherwise, providing care jeopardizes the physicians and clinics' licenses and may expose them to other penalties, including civil liability or criminal prosecutions (*Id.*). Given the requirements of the Tissue Disposal Mandate and the potential penalties involved, and given the impact it will have on women who seek abortion care, plaintiffs will be required to notify women who seek abortion care prior to performing procedures of the requirements of the Tissue Disposal Mandate.   According to Ms.

Williams, even if LRFP were to attempt to delay notifying the various third parties until after a patient's abortion, "which would leave both the clinic and patients in limbo," Ms. Williams has the same concerns about patient safety and confidentiality and believes based on her experience that would cause some patients to try to seek care out of state or potentially discourage them altogether (Dkt. No. 73-3, ¶ 86).

Compliance with the law requires that, within each class of decision-makers, present class members "used reasonable efforts to notify" others and that any dispute is resolved by a vote of the class members or a proceeding before the circuit court. Ark. Code Ann. §§ 20-17-102(d)(1)(E), (d)(1)(G), (e)(2). The notice, search, and documentation requirements for interested parties under the Tissue Disposal Mandate will cause significant delay that would result in harm to women seeking abortion care (Dkt. No. 5, ¶¶ 58, 61; Dkt. No. 73-3, ¶ 85). Delay increases the risks associated with pregnancy-related care, can deny a woman her choice of abortion procedure, and if she is pushed past the clinic's gestational limit, can make it impossible for her to obtain an abortion in Arkansas. *See, e.g., Schimel*, 806 F.3d at 920; *Jegley*, 2016 WL 6211310, at *29.

There is record evidence that it would be a burden on Dr. Hopkins and LRFP to set up systems sufficient and timely enough to ensure that all requirements of the FDRA are met before abortion care is provided (Dkt. No. 5, ¶ 58; Dkt. No. 6, ¶¶ 50-51, 55-56, 59, 62; Dkt. No. 73-2, ¶¶ 95-100; Dkt. No. 73-3, ¶¶ 76-79). Ms. Williams also has concerns about LRFP's ability to store properly tissue for days, weeks, or more as notifications under the Tissue Disposal Mandate play out and to navigate LRFP's role when various third parties could claim the tissue, forcing LRFP into the middle of these potentially protracted disputes (Dkt. No. 73-3, ¶ 86).

The Court determines these burdens support facial invalidity of the Tissue Disposal Mandate. It imposes substantial obstacles in the path of women for whom the Tissue Disposal

Mandate is relevant in seeking an abortion. The Court will premise its analysis on defendants' contention that the Mandate applies to all non-medication abortions. The notice provision impermissibly burdens women over the age of majority or under the age of majority with a partner over the age of majority who seek a non-medication abortion by requiring notice to the other "parent," meaning the woman's spouse or partner. The notice provision impermissibly burdens women who are minors with minor partners who seek non-medication abortions by requiring notice to the parent or parents, including notice to the partner's parents.

The Court cannot apply the defendants' suggested workarounds to the notice provisions in an effort to construe the Tissue Disposal Mandate as constitutional for the reasons stated. The workarounds are not supported by the text of the Tissue Disposal Mandate.

## 2. State's Interest

No legislative findings accompany the tissue disposal mandate. The Court does not have an explanation from the legislature of the purpose of the law. At the start of this litigation, defendants maintained that the tissue disposal mandate promotes the legitimate interests in "medical ethics" and "regulating the medical profession by ensuring that abortion clinics follow the same standards as other health care facilities that must dispose of fetal remains" and "demonstrating respect for the life of the unborn by requiring abortion providers to follow the same standards as other health care facilities that must dispose of fetal remains" (Dkt. No. 23, at 71). Now, defendants assert: "Recall that step one is coextensive with the rational-basis test. . . . *Box* first held that 'a State has a 'legitimate interest in proper disposal of fetal remains.'. . . And then it held that laws like Arkansas's Final Disposition Act are 'rationally related to the State's interest in proper disposal of fetal remains.'" (Dkt. No. 92, at 57-58). Although the Court disagrees with defendants' conflation of *Casey*'s inquiry of whether the State has a "legitimate purpose" and

whether the law is "reasonably related to that goal" and rational basis review, the Court assumes the legitimacy of the interests under the circumstances here. *Whole Woman's Health*, 136 S. Ct. at 2310 (assuming that the State had legitimate state interests where the statute did not contain any legislative findings).

### 3. "Legitimate Purpose" To Which The Law Is "Reasonably Related"

This Court examines whether the Tissue Disposal Mandate has a "legitimate purpose" and whether it is "reasonably related" to that goal. *June Medical*, 140 S. Ct. at 2138 (Roberts, J., concurring). Generally, the state has the burden of demonstrating a link between the legislation it enacts and what it contends are the state's interests. *See Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 430 (1983), *overruled on other grounds by Casey*, 505 U.S. 833 (describing the burden as that of the state).

Based upon defendants' response, the Court understands defendants now to assert only an interest in proper disposal of fetal remains with respect to the Tissue Disposal Mandate (Dkt. No. 92, at 57). Defendants make few, if any, statements to explain how the Tissue Disposal Mandate serves this interest.

As plaintiffs point out, Arkansas law already regulates tissue disposal by requiring that tissue from abortion or miscarriage be disposed of in a "respectful and proper manner." Ark. Code Ann. §§ 20-17-801(a)(1)(A), (b)(2)(C)-(D); 20-17-802(a) (tissue from abortion must be disposed "in a fashion similar to that in which other tissue is disposed"). Any interest defendants have in disposition of pregnancy tissue is served by the current law.

Further, in submissions to this Court, defendants have argued that the Tissue Disposal Mandate requires abortion providers to make "the same arrangements that all other healthcare providers are required to make for human remains." (Dkt. No. 23, at 72). Defendants cite no

authority for this, and there is no evidentiary support in the record for this contention. The FDRA itself imposes no obligations on healthcare providers; the Tissue Disposal Mandate is the first time the FDRA has been applied to a healthcare provider and then only to a "physician or facility that performs an abortion" in the context of abortion and miscarriage. Ark. Code Ann. § 20-17-802(a). Prior to the Tissue Disposal Mandate, the FDRA applied to the disposition of human remains for individuals and their family members and established protections for funeral homes and crematoria when those entities relied on information regarding disposition provided by family members. Ark. Code Ann. §§ 20-17-102(d)(1), (f)(2).

The Tissue Disposal Mandate does not specify any new method of disposal. Instead, it only imposes the FDRA's complex requirements for authorization of disposal that are separate and apart from the method, and it applies those only to a "physician or facility that performs an abortion" in the context of abortion and miscarriage. Ark. Code Ann. § 20-17-802(a).

Further, to the extent the Tissue Disposal Mandate applies to medication abortion, it appears to eliminate medication abortion as an option for patients because tissue from a medication abortion is disposed of outside the abortion facility and there is no way for a provider to "ensure" that tissue from a medication abortion is disposed of in compliance with the Tissue Disposal Mandate (Dkt. No. 73-2, ¶ 95; Dkt. No. 73-3, ¶ 76). If, as defendants argue, the Tissue Disposal Mandate does not apply to medication abortion but instead only to procedural abortion, plaintiffs do not "understand why tissue from a medication abortion, and the state-mandated decision-making about its disposal, would be treated differently than tissue from an abortion procedure" (Dkt. No. 73-2, ¶¶ 76, 95). Defendants do not respond to this.

To the extent defendants continue to claim an interest in demonstrating respect for the life of the unborn, it is unclear how if at all defendants reconcile this with the purportedly limited scope

of the Tissue Disposal Mandate.  To the extent defendants continue to assert interests in medical ethics and women's health, for reasons addressed in this Court's undue burden analysis, this Court is not convinced the Tissue Disposal Mandate is reasonably related to those goals.

For these reasons, the Court is not convinced that importing the FDRA's complex requirements for authorization satisfies the *Casey* requirement that the State have a legitimate purpose and that the law be reasonably related to that goal.  At this stage of the litigation, plaintiffs are likely to succeed on this point.

### 4.        Undue Burden

The Court concludes that plaintiffs have carried their burden of demonstrating at this stage of the litigation that they are likely to prevail on the merits and to establish that the challenged Tissue Disposal Mandate has the effect of placing a substantial obstacle in the path of a large fraction of women seeking an abortion of a nonviable fetus for whom the Tissue Disposal Mandate is an actual rather than an irrelevant restriction.

Previously, this Court determined that "[t]he undue burden analysis requires this Court to 'consider the burdens a law imposes on abortion access together with the benefits those laws confer.'"  *Whole Woman's Health*, 136 S. Ct. at 2309.  Based on the Court's findings, the Court determined that, under the *Whole Woman's Health* analysis, the Tissue Disposal Mandate has the effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus for whom the Mandate is relevant.  The Eighth Circuit remanded to this Court for reconsideration in the light of Chief Justice Roberts's concurring opinion in *June Medical*.  Based on the Court's findings and its reconsideration, the Court determines that the Tissue Disposal Mandate has the effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus for whom the Mandate is relevant under the *June Medical* analysis.  Dr.

Hopkins and LRFP are likely to prevail on the merits of their claims that the Tissue Disposal Mandate imposes a substantial and undue burden that is unconstitutional. The record includes sufficient evidence from which plaintiffs satisfy their requirement to present evidence of causation that the Mandate's requirements will lead to this effect.

### 5. Women Effected

To sustain a facial challenge and grant a preliminary injunction, this Court must make a finding that the Tissue Disposal Mandate is an undue burden for a large fraction of women the Mandate impacts. If the Mandate is construed as defendants assert, meaning that the Mandate does not apply to medication abortion, the numbers the Court will discuss may change slightly. The end result will not.

In Arkansas, 3,771 abortions were performed in 2015 (Dkt. No. 5, Ex. B, at 36). Of those, 581 were medication abortion and 3,190 were not. Of the 3,771 total abortions in 2015 in Arkansas, 528 were obtained by married women, and 3,234 were obtained by not married women (*Id.*). Nine individuals reported "unknown" when asked marital status (*Id.*). Of the 3,771 total abortions in 2015 in Arkansas, 141 were obtained by individuals below the age of 18 (*Id.*).

In Arkansas, 2,963 abortions were performed in 2019 (Dkt. No. 92-16, at 3). Of the total abortions in 2019 in Arkansas, 376 were obtained by married women, 2,575 were obtained by not married women, and 12 individuals reported "unknown" when asked marital status (*Id.* at 10). Of the 2,963 total abortions in 2019 in Arkansas, 101 were obtained by individuals below the age of 18 (*Id.* at 4).

As explained, the Tissue Disposal Mandate requires notice and consent to the disposition of embryonic and fetal tissue – and of every woman's abortion to which the Mandate applies – from a woman's sexual partner or, if the woman and her sexual partner are minors, the parent or

parents of both. There is no judicial bypass procedure for a minor, as this Court is unable to adopt defendants' argument advancing one. The denominator for this Court's analysis of women impacted by the Mandate is either total abortions or total non-medication abortions. Regardless, the numerator equals the denominator in this fraction. To comply with the Tissue Disposal Mandate, all women seeking abortions must notify their sexual partner or, if both the woman and her sexual partner are minors, the women must notify the parent or parents of both or must make efforts to do so to ensure compliance with the Tissue Disposal Mandate's requirements and abortion providers must ensure compliance subject to penalties and sanctions, recognizing that the Court determines those providers are likely to succeed on their vagueness challenge to the Mandate.

Lower court judges are bound by Supreme Court precedent, even if they seriously question what the Court has done. *MKB Management Corp. v. Stenehjem*, 795 F.3d 768 (8th Cir. 2015). The lower federal courts cannot second-guess the Supreme Court regarding "underlying facts." *Id.*, at 772. On the record before this Court, there is no basis upon which to revisit the holdings in *Casey*, *Hodgson*, and *Bellotti*, along with other consistent precedent, regarding the undue burden imposed by the types of notification requirements in the Tissue Disposal Mandate. This is especially true here where the interests the State advances in support of the Mandate are not as compelling as those interests advanced in *Casey*, *Hodgson*, *Bellotti*, and other consistent precedent. It is also true where, as here, there is no factual basis in the record upon which this Court could question or revisit the underlying factual determinations made by the Supreme Court in those cases.

In *Casey*, the spousal notification law at issue provided that, "except in cases of medical emergency, that no physician shall perform an abortion on a married woman without receiving a

signed statement from the woman that she has notified her spouse that she is about to undergo an abortion. The woman has the option of providing an alternative signed statement certifying that her husband is not the man who impregnated her; that he husband could not be located; that the pregnancy is the result of spousal sexual assault which she has reported; or that the woman believes that notifying her husband will cause him or someone else to inflict bodily injury upon her. A physician who performs an abortion on a married woman without receiving the appropriate signed statement will have his or her license revoked, and is liable to the husband for damages." *Casey*, 505 U.S. at 887-88. The Court laid out the factual findings "supported by studies of domestic violence." *Id.*, at 891.

The Court then concluded that "[t]he spousal notification requirement is thus likely to prevent a significant number of women from obtaining an abortion. It does not merely make abortions a little more difficult or expensive to obtain; for many women, it will impose a substantial obstacle. We must not blind ourselves to the fact that the significant number of women who fear for their safety and the safety of their children are likely to be deterred from procuring an abortion as surely as if the Commonwealth had outlawed abortion in all cases." *Id.* at 893-94.

Defendants in *Casey* attempted to avoid that conclusion by arguing the spousal notification law imposed almost no burden at all for the vast majority of women seeking abortions. "They begin by noting that only about 20 percent of the women who obtain abortions are married. They then note that of these women about 95 percent notify their husbands of their own volition. Thus, respondents argue, that the effects of [the spousal notification law] are felt by only one percent of the women who will be able to notify their husbands without adverse consequences or will qualify for one of the exceptions, the statute affects fewer than one percent of women seeking abortions."

*Id.* at 894.  Defendants relied upon this argument to claim the statute could not be "invalid on its face."  *Id.*

The Court rejected this argument, stating "[t]he analysis does not end with the one percent of women upon whom the statute operates; it begins there. . . .  The proper focus of the constitutional inquiry in the group for whom the law is a restriction, not the group for whom the law is irrelevant."  *Id.*  The Court determined that "[t]he unfortunate yet persisting conditions that we document above will mean that in a large fraction of the cases in which [the spousal notification law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.  It is an undue burden, and therefore invalid."  *Id.*, at 895.

In a five to four plurality decision in *Hodgson*, the Supreme Court concluded that, standing by itself, a provision of a Minnesota statute requiring that no abortion be performed on a woman under 18 years of age until at least 48 hours after both of her parents had been notified, except where an immediate abortion was necessary to prevent the woman's death or where the woman declared that she was a victim of parental abuse or neglect, and except where notification of only one parent is necessary because the second parent is dead or cannot be located through reasonably diligent effort, was unconstitutional as violating Fourteenth Amendment due process guaranties, since insofar as the statute required both parents to be notified, it did not reasonably further any legitimate state interest.  *Id.*, at 452-454.  In assessing the alleged state interest, the Court noted that a two–parent notification requirement would be harmful to some minors and their families, thereby doing a disservice to the state's interest in protecting and assisting minors.  *Id.*, at 451.

The Court reasoned that the state had no legitimate interest in conforming family life to a state–designed ideal by requiring family members to talk together, nor could the state's interest in

protecting a parent's interest in shaping a child's values and lifestyle overcome the liberty interests of a minor acting with the consent of a single parent, or a court. *Id.*

However, a majority of the justices were of the opinion that the challenged Minnesota statute avoided constitutional infirmity because it contained an adequate judicial procedure for bypassing the parental notification requirement—that is, a provision that a court of competent jurisdiction could, in a confidential proceeding, authorize an abortion without parental notification upon determining that the minor is mature and capable of giving informed consent, or that an abortion without notice to both parents would be in the minor's best interest, and the Court accordingly affirmed a judgment holding the statute, with the judicial bypass procedure, constitutional. *See also Bellotti*, 443 U.S. at 622 (standing for the proposition that a parental consent law is constitutional if it provides for a sufficient judicial bypass alternative).

If the Tissue Disposal Mandate is construed as plaintiffs contend, then the Tissue Disposal Mandate applies to all abortions in Arkansas. Accepting defendants' argument regarding scope, the Tissue Disposal Mandate would not bar medication abortion in Arkansas which record evidence indicates is available in Arkansas only until 10.0 weeks LMP (Dkt. Nos. 82, ¶ 61; 73-2, ¶ 9; Dkt. No. 73-2, ¶¶ 10-12), but it would still impose the impermissible notification requirements on all other abortion patients seeking non-medication abortions and all seeking care past 10.0 weeks LMP. The Court finds as a matter of law that plaintiffs are likely to succeed on their claim that the Tissue Disposal Mandate is an undue burden for a large fraction of the women impacted by the Mandate, regardless of how the Court construes the Mandate.

Even if the notification requirements are not alone sufficient to constitute an undue burden, and this Court determines it is bound to apply controlling precedent to conclude that they are, there are other undue burdens imposed by the Tissue Disposal Mandate that lead the Court to conclude

plaintiffs are likely to succeed on the merits. Plaintiffs take the position that, to avoid criminal penalties, Dr. Hopkins, Dr. Parker, and other providers at LRFP will have no choice but to cease providing abortions if the Tissue Disposal Mandate is enforceable. LRFP, along with Dr. Hopkins, provides care to women from throughout Arkansas and from other states (Dkt. No. 6, ¶ 5; Dkt No. 92-16, at 14). Dr. Hopkins is aware of no physicians, other than those with whom he practices at LRFP, who provide second trimester or procedural abortion care (Dkt. No. 32-2, ¶ 2). The only other provider in Arkansas provides medication abortion through 10 weeks LMP. In other words, there are no other providers in Arkansas that could fill this gap in care.

Many patients of LRFP are low-income. Approximately 30 to 40% of patients obtain financial assistance to pay for their abortion care (Dkt. No. 6, ¶ 5). Many patients of LRFP struggle in their lives and in their efforts to access the medical care they need (Dkt. No. 6, ¶ 5). The time and effort it takes to make the necessary plans to access medical care cause anxiety and stress and cause financial pressure for women seeking care at LRFP (Dkt. No. 6, ¶ 8). Dr. Katz offers the overall opinion that enforcement of the Mandates challenged by plaintiffs in this case, including the Tissue Disposal Mandate, would impose logistical and financial obstacles that harm poor and low-income women in the following ways: preventing some from being able to obtain and abortion; delaying other women's access to that care; jeopardizing women's confidentiality and/or employment; increasing the risk that victims of domestic violence will experience physical violence or other abuse; and putting women and their families at risk of deepening poverty, hunger, or eviction (Dkt. No. 73-4, ¶ 10). She supports her opinion in a detailed, 75-paragraph affidavit (Dkt. No. 73-4). Dr. Katz offers the opinion that, "the increased costs, additional time, logistical challenges, and social-psychological hurdles imposed by the [Mandates plaintiffs challenge] are precisely the kind of challenges that delay women from accessing needed services, or prevent them

from accessing such services altogether. Even the poor and low-income women who are able to raise funds to pay for an unexpected medical expense like abortion have to make difficult choices about where to get that additional money and what they are willing to sacrifice in order to raise the necessary funds. These choices put poor and low-income women at greater risk in terms of their safety, physical and emotional well-being, and the confidentiality of their decisions." (Dkt. No. 73-4, ¶ 75). These assertions are further supported, in part, by Dr. Ralph who addresses minors' concerns regarding privacy, stigma, fear, and decision-making with respect to abortion care (Dkt. No. 73-5, ¶¶ 27-37).

These findings, coupled with the finding that abortions other than medication abortions would essentially be unavailable in the State of Arkansas if the Tissue Disposal Mandate takes effect, bolster this Court's conclusion that if the Tissue Disposal Mandate takes effect a large fraction of Arkansas women to whom the Tissue Disposal Mandate applies would experience a substantial obstacle to abortion.

The notice, search, and documentation requirements for interested parties under the Tissue Disposal Mandate will cause significant delay that would result in harm to women seeking abortion care (Dkt. No. 5, ¶¶ 58, 61; Dkt. No. 73-3, ¶ 85). Delay increases the risks associated with pregnancy-related care, can deny a woman her choice of abortion procedure, and if she is pushed past the clinic's gestational limit, can make it impossible for her to obtain an abortion in Arkansas. *See, e.g., Schimel*, 806 F.3d at 920; *Jegley*, 2016 WL 6211310, at *29.

There likely would be additional costs associated with abortion care if the Tissue Disposal Mandate were to take effect, due to the increased burden of administrative costs to be incurred by the provider in setting up systems to attempt to comply with the notice provisions, document compliance, and document the fact that a person with a disposition right forfeits input due to a lack

of willingness or resources to assume financial responsibility (Dkt. No. 5, ¶ 58; Dkt. No. 6, ¶¶ 50-51, 55-56, 59, 62; Dkt. No. 73-2, ¶¶ 95-100; Dkt. No. 73-3, ¶¶ 76-79). Ms. Williams also has concerns about LRFP's ability to store properly tissue for days, weeks, or more as notifications under the Tissue Disposal Mandate play out and to navigate LRFP's role when various third parties could claim the tissue, forcing LRFP into the middle of these potentially protracted disputes (Dkt. No. 73-3, ¶ 86). All of these burdens inform this Court's finding that the Tissue Disposal Mandate imposes an undue burden on a large fraction of women for whom the Mandate is relevant, at this stage of the litigation.

### 2. Irreparable Harm

Enforcement of the Tissue Disposal Mandate will inflict irreparable harm on Dr. Hopkins, LRFP, and the large fraction of women unduly burdened by the Mandate for whom there is no adequate remedy at law. It is well-settled that the inability to exercise a constitutional right constitutes irreparable harm. *See Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977) ("Planned Parenthood's showing that the ordinance interfered with the exercise of its constitutional rights and the rights of its patients supports a finding of irreparable injury.") (citations omitted); *accord Kirkeby v. Furness*, 52 F.3d 772, 775 (8th Cir. 1995) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

### 3. Balancing Of Harms

In the absence of a preliminary injunction, the large fraction of the women impacted by the Mandate would be unduly burdened in their right to abortion by the substantial obstacles created by the Tissue Disposal Mandate, and Dr. Hopkins and LRFP likely would be denied due process as a result of the statute's vagueness. Whereas, if a preliminary injunction issues, a likely unconstitutional law passed by Arkansas legislators will not be enforced. The threatened harm to

Dr. Hopkins, LRFP, and the women unduly burdened by the Mandate clearly outweighs whatever damage or harm a proposed preliminary injunction may cause the defendants.

### 4. Public Interest

It is in the public interest to preserve the *status quo* and to give the Court an opportunity to evaluate fully the lawfulness of the Tissue Disposal Mandate without subjecting Dr. Hopkins, LRFP, or the fraction of women impacted by the Mandate, or the public to any of the law's potential harms.

It is therefore ordered that Dr. Hopkins and LRFP's motion for a preliminary injunction order is granted, and defendants are temporarily restrained from enforcing the provisions of H.B. 1566 referred to here as the Tissue Disposal Mandate.

### VIII. Security

Under Federal Rule of Civil Procedure 65(c), a district court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In these proceedings, defendants have neither requested security in the event this Court grants a preliminary injunction nor presented any evidence that they will be financially harmed if they were wrongfully enjoined.

The Court waives the bond requirement under Federal Rule of Civil Procedure 65(c). Dr. Hopkins and LRFP are serving a public interest in acting to protect constitutional rights related to abortion. Defendants will not be harmed by the order to preserve the *status quo*. Therefore, the Court will not require the posting of a bond. *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016). For these reasons, the Court declines to require security from Dr. Hopkins and LRFP.

## IX.    Conclusion

For the foregoing reasons, the Court denies defendants' motion to strike plaintiffs' motion for a second preliminary injunction and request for expedited consideration (Dkt. No. 75).  The Court determines that Dr. Hopkins and LRFP have met their burden for the issuance of a preliminary injunction enjoining enforcement of the challenged Mandates as specified by the terms of this Order.   Therefore, the Court grants Dr. Hopkins and LRFP's motion for a second preliminary injunction, as modified by the terms of this Order (Dkt. No. 73).   The Court preliminarily enjoins defendants, and all those acting in concert with them, from enforcing the requirements of:

(1)  H.B. 1032 referred to here as the D&E Mandate as applied to Dr. Hopkins and LRFP;

(2) H.B. 1434 referred to here as the Medical Records Mandate;

(3) H.B. 2024 referred to here as the Local Disclosure Mandate as applied to Non-CMA Teenage Patients; and

(4) H.B. 1566 referred to here as the Tissue Disposal Mandate.

Further, defendants are enjoined from failing to notify immediately all state officials responsible for enforcing these requirements, about the existence and requirements of this preliminary injunction.  Pursuant to Federal Rule of Civil Procedure 65(b)(2), this preliminary injunction remains in effect until further order from this Court.

So ordered this 5th day of January, 2021, at 5:00 p.m.

_____
Kristine G. Baker
United States District Judge